Sean P. Connell, Esq.
Nevada Bar Number 7311
**Muehlbauer Law Office, Ltd.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Tel.: 702.330.4505
Fax: 702.825.0141
sean@mlolegal.com

Nicholas Porritt, Esq. *(pro hac to be submitted)*
Adam Apton, Esq. *(pro hac to be submitted)*
**LEVI & KORSINSKY LLP**
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
nporritt@zlk.com
aapton@zlk.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| OUSSAMA ATTIGUI, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARILY SITATUATED,<br><br>Plaintiff,<br><br>vs.<br><br>TAHOE RESOURCES INC., ELIZABETH MCGREGOR, MARK SADLER, RONALD W. CLAYTON, and C. KEVIN MCARTHUR,<br><br>Defendants, | CASE NO. 2:17-cv-1868<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CIVIL ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

1.     Plaintiff Oussama Attigui ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel,

which included a review of United States Securities and Exchange Commission ("SEC") filings by Tahoe Resources Inc. ("Tahoe" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

2.　　This a federa1 securities class action on behalf of all investors who purchased or otherwise acquired Tahoe common stock between April 3, 2013 and July 5, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

3.　　Tahoe operates multiple mines to develop precious metals assets in America.

4.　　On June 8, 2010, upon successful completion of its initial public offering, Tahoe acquired the Escobal mine assets located in Guatemala through its wholly-owned subsidiary Minera San Rafael, S.A. ("MRM"), a Guatemala corporation.

5.　　Tahoe made materially false and/or misleading statements, misrepresenting its Escobal mine assets exploitation license from the Guatemala's Ministry of Energy and Mines ("MEM").

6.　　As the truth was fully revealed to investors, the stock price declined from a close of $8.27 per share of Tahoe stock on July 5, 2017, to a close of $5.56 per share on July 6, 2017, ***a drop of approximately 33%.***

7.     As a result of the fraudulent conduct alleged herein, Plaintiff and other members of the Class purchased Tahoe securities at artificially inflated prices and suffered significant losses and damages once the truth emerged.

## JURISDICTION AND VENUE

8.     The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District

## THE PARTIES

11.     Plaintiff purchased Tahoe common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

12.     Defendant Tahoe is incorporated in British Columbia, Canada, and headquartered at 5310 Kietzke Lane, Suite 200 Reno, Nevada 89511. Tahoe's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TAHO."

13.   Defendant C. Kevin McArthur ("McArthur") was the Company's Chief Executive Officer ("CEO") and Director from the beginning of the Class Period until August 9, 2016.

14.   Defendant Ronald W. Clayton ("Clayton") was the Company's CEO from August 9, 2016 until the end of the Class Period.

15.   Defendant Mark Sadler ("Sadler") was the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until August 9, 2016.

16.   Defendant Elizabeth McGregor ("McGregor") was the Company's CFO from August 9, 2016 until the end of the Class Period.

17.   Defendants in paragraphs 13-17 are collectively referred to herein as the "Individual Defendants."

18.   Each of the Individual Defendants:

(a)   directly participated in the management of the Company;

(b)   was directly involved in the day-to-day operations of the Company at the highest levels;

(c)   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)   was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)   approved or ratified these statements in violation of the federal securities

1      laws.

2          19.    Because of the Individual Defendants' positions within the Company, they had

3      access to undisclosed information about Tahoe's business, operations, operational trends,

4      financial statements, markets and present and future business prospects via access to internal

5      corporate documents (including the Company's operating plans, budgets and forecasts and

6      reports of actual operations and performance), conversations and connections with other

7      corporate officers and employees, attendance at management and Board meetings and

8      committees thereof and via reports and other information provided to them in connection

9      therewith.

10         20.    As officers of a publicly-held company whose securities were, and are, registered

11     with the SEC pursuant to the federal securities laws of the United States, the Individual

12     Defendants each had a duty to disseminate prompt, accurate and truthful information with

13     respect to the Company's financial condition and performance, growth, operations, financial

14     statements, business, markets, management, earnings and present and future business prospects,

15     and to correct any previously-issued statements that had become materially misleading or untrue,

16     so that the market price of the Company's publicly-traded securities would be based upon

17     truthful and accurate information. The Individual Defendants' misrepresentations and omissions

18     during the Class Period violated these specific requirements and obligations.

19         21.    The Individual Defendants, because of their positions with the Company,

20     possessed the power and authority to control the contents of Tahoe's reports to the SEC, press

21     releases, and presentations to securities analysts, money and portfolio managers, and institutional

22     investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the

23     Company's reports and press releases alleged herein to be misleading prior to, or shortly after,

24

their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Tahoe common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Tahoe's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Tahoe securities at artificially inflated prices

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

23.     Tahoe operates multiple mines to develop precious metals assets in America.

24.     On June 8, 2010, upon successful completion of its initial public offering, Tahoe acquired the Escobal mine assets located in Guatemala through its wholly-owned subsidiary Minera San Rafael, S.A. ("MRM"), a Guatemala corporation.

### B. Material Misstatements and Omissions during the Class Period

25.     The Class Period begins on April 3, 2013, when Tahoe issued a press release about the Escobal exploitation license from Guatemala's Ministry of Energy and Mines ("April

2013 Press Release"). The Company also attached the press release to a Form 8-K Filed with the SEC ("April 2013 Form 8-K"). The press release stated in relevant part:

### TAHOE'S ESCOBAL PROJECT RECEIVES FINAL PERMIT

VANCOUVER, B.C. (April 3, 2013) – **Tahoe Resources Inc.** (TSX: THO, NYSE: TAHO) *is pleased to announce that it has received the Escobal exploitation license from Guatemala's Ministry of Energy and Mines*. Construction activities remain on-budget and on-schedule for mill commissioning in the second half of 2013 and commercial production in early 2014.

26. The news was immediately controversial. As such, on April 8, 2013, the Center for International Environmental Law published an article entitled "Mining license approved in wake of violence, investigation into murder pending" stating in relevant part:

(Washington, D.C.) – After more than two years of delay, the Guatemalan Minister of Energy and Mines (MEM) announced on Wednesday, April 3, that it had approved the exploitation license for Tahoe Resources' Escobal mine in San Rafael Las Flores, Guatemala. *The announcement comes less than two weeks after four indigenous Xinca leaders were abducted while returning from a community referendum in El Volcancito, in which more than 99 percent of people voted against the Escobal project*. *One of those abducted was found dead the next day.*

\* \* \*

More than 4,300 individuals from 43 countries have signed a letter to Guatemalan Attorney General Claudia Paz y Paz, requesting her office involve the International Commission Against Impunity in Guatemala (CICIG) to carry out a robust investigation into the attack and murder. *The letter also urges the government to protect human rights and environmental defenders as they exercise their rights to live in a safe and healthy environment and to free, prior and informed consent*.

Emphasis added.

27. However, Tahoe assured compliance with governmental law and regulations, and respect of local indigenous people.

28.     On Mars 17, 2014, Tahoe filed an annual report on Form 40-F with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2013 ("2013 40-F"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. The Form 40-F stated in pertinent part:

**Environment**

We recognize that all development comes with some impacts. ***We are dedicated to the highest standards of responsible environmental stewardship. We honour this commitment by meeting or exceeding local governmental regulations and operating our projects to North American standards.*** See "Description of Our Business – Escobal mine – Environment" and "– Reclamation". ***We have review processes in place which are designed to prevent or minimize environmental incidents or impacts, to evaluate incidents and operating practices and to create action plans and operating procedures to prevent reoccurrence.*** The Board oversees the Company's environmental management through the Health, Safety, Environment and Community Committee.

***In 2013, we continued to work with local communities to help them upgrade water systems and infrastructure programs.*** The Company also advanced its partnership with San Carlos University in Guatemala to conduct health and environmental baseline studies. We also worked with independent consultants on community needs assessments to guide further programs in the vicinity of the Escobal mine.

* * *

<u>Governmental Laws and Regulations</u>

***Our operations, exploration and development activities are subject to the laws and regulations of Guatemala that govern various matters including environmental protection, management and use of toxic substances and explosives, management of natural resources, exploration, development, production, and post-closure reclamation of mines, imports and exports, price controls, taxation, mining royalties, labour***

*standards and occupational health and safety, including mine safety and historic and cultural preservation*.

\* \* \*

*We have competent and well-trained individuals and consultants to assist us with compliance with such laws and regulations*, however, even with the application of considerable skill we may inadvertently fail to comply with certain laws. Failure to comply with laws and regulations could lead to financial restatements, fines, penalties, loss, reduction or expropriation of entitlements, the imposition of additional local, foreign or governmental parties as joint venture partners with carried or other interests and other material negative impacts on us.

\* \* \*

On July 8, 2011, an application was submitted to MEM for the Escobal Exploitation concession, covering 20.0 km2 of area designated for mine development in the original Oasis exploration concession. Upon filing of the exploitation concession application, three new exploration concessions (Oasis I, II, III) were requested to occupy the area liberated through elimination of the original Oasis concession.

In the second quarter of 2011, the Company completed additional baseline studies and environmental analyses and submitted an Exploitation EIS ("EIS") to MARN for the Escobal mine exploitation license. On October 21, 2011, MARN notified the Company that it had approved the Exploitation EIS. Once full EIS clearance was received, construction of the process plant and support facilities required for full production began. By year end, earthwork at the main plant site and tailings areas, warehouse, access road and office facilities were well underway. In addition, construction of the electrical substation and power line on the Escobal mine site commenced.

In the third quarter of 2011, the Company submitted an exploitation concession application and supporting documentation to MEM. MEM had completed all of the review possible without EIS approval by October 8, 2011. A final legal review commenced on October 24, 2011 when the Exploitation EIS was officially received at MEM. After completing a technical and legal review, MEM issued the Escobal exploitation license on April 3, 2013 for a period of 25 years.

Emphasis added.

29.    On Mars 12, 2015, Tahoe filed an annual report on Form 40-F with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2014 ("2014 40-F"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. The Form 40-F stated in pertinent part:

**ENVIRONMENT**

We recognize that all development comes with some impacts. ***We are dedicated to the highest standards of responsible environmental stewardship. We honour this commitment by meeting or exceeding local governmental regulations and operating our projects to North American standards.*** See "Description of Our Business – Escobal mine – Environment" and "– Reclamation". We have review processes in place which are designed to prevent or minimize environmental incidents or impacts, to evaluate incidents and operating practices and to create action plans and operating procedures to prevent reoccurrence. The Board oversees the Company's environmental management through the Health, Safety, Environment and Community Committee.

***In 2014, we continued to work with local communities to help them upgrade water systems and infrastructure programs.*** The Company also advanced its partnership with San Carlos University in Guatemala to conduct health and environmental baseline studies. We also worked with independent consultants on community needs assessments to guide further programs in the vicinity of the Escobal mine.

\* \* \*

**RECENT ACTIVITIES AT THE ESCOBAL MINE**

The Company achieved commercial production at the Escobal mine on January 14, 2014. In 2014, the mine processed a total of 1.25 million tonnes of ore with average feed grades of 585 g/t Ag, 0.42 g/t Au, 0.93% Pb, and 1.43% Zn; recovering 20.3 million ounces of silver, 10,893 ounces of gold, 10,359 tonnes of lead, and

13,394 tonnes of zinc in concentrate. Metal recoveries into each of the lead and zinc concentrates met or exceeded expectations.

The Escobal mine and processing facilities are operating at design capacity, with capital development and stope development and production at levels to sustain the 3,500 tpd processing rate. Mill throughput in 2014 averaged 3,413 tpd, including the first quarter ramp-up period. Now that the Escobal mine has reached operational design parameters, the Company is focused on optimizing mining and processing procedures.

***In November 2014, the Company released the Escobal Feasibility Study which demonstrated the feasibility of the Escobal mine, updated the Mineral Resource Estimate***, and supported the Company's initial declaration of Proven and Probable Mineral Reserves.

Emphasis added.

30.     On Mars 25, 2016, Tahoe filed an annual report on Form 40-F with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2015 ("2015 40-F"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. The Form 40-F stated in pertinent part:

<u>Developments Regarding Indigenous Peoples</u>

To the best of our knowledge, although indigenous people may have inhabited the area of our Mines at one time, there are no indigenous populations currently living in the immediate area of the Escobal, La Arena or Shahuindo Mine sites. ***In 2015, MSR engaged with indigenous communities in Guatemala that expressed an interest in the Escobal Mine and during the year, more than 130 indigenous community members visited the Escobal Mine***. In addition, indigenous peoples have participated in our Guatemalan avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments through its social investment program. The Company also attended workshops with the Guatemalan government and other private sector organizations to promote the elimination of all forms of racial discrimination against indigenous groups.

\* \* \*

<u>Governmental Laws and Regulations</u>

***Our operations, exploration and development activities are subject to the laws and regulations of Guatemala and Peru that govern various matters including*** environmental protection, management and use of toxic substances and explosives, management of natural resources, exploration, development, production, and post-closure reclamation of mines, imports and exports, price controls, taxation, mining royalties, labour standards and occupational health and safety, including mine safety and ***historic and cultural preservation***.

\* \* \*

***We have competent and well-trained individuals and consultants to assist us with compliance with such laws and regulations***, however, even with the application of considerable skill we may inadvertently fail to comply with certain laws. Failure to comply with laws and regulations could lead to financial restatements, fines, penalties, loss, reduction or expropriation of entitlements, the imposition of additional local, foreign or governmental parties as joint venture partners with carried or other interests and other material negative impacts on us.

Emphasis added.

31.   On Mars 10, 2017, Tahoe filed an annual report on Form 40-F with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2016 ("2016 40-F"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. The Form 40-F stated in pertinent part:

**ENVIRONMENT AND SOCIAL ACTIVITIES**

\* \* \*

We are dedicated to the highest standards of responsible environmental stewardship. We honour this commitment by meeting or exceeding local governmental regulations and aligning our policies and practices with international guidelines. See "Description of Our Business – Escobal Mine – Environment" and

"– Reclamation," "– La Arena Mine – Environment," "–
Shahuindo Mine – Closure," "– Bell Creek Mine – Environment"
and "– Timmins West Mine – Environment." We have
environmental management processes in place which are designed
to prevent or minimize environmental impacts, to implement
mitigation measures where appropriate, and to improve
performance. ***Tahoe's Board of Directors oversees the Company's
environmental management through the Health, Safety,
Environment and Community Committee and reviews site
performance on a quarterly basis. Tahoe's Sustainability
Steering Committee, chaired by Tahoe's Executive Chair, and
comprised of executive management and site leaders, oversees
environmental and other social matters related to each operation
on a quarterly basis. Tahoe's Health, Safety, Environment and
Community Committee receives quarterly reports from the
Committee in monitoring the effectiveness of health, safety,
environmental, community relations and sustainability policies
and programs at Tahoe operations.***

\* \* \*

### Developments Regarding Indigenous Peoples

To the best of our knowledge, although indigenous people may
have inhabited the area of our Mines in Guatemala and Peru at one
time, there are no indigenous populations currently living in the
immediate area of the Escobal, La Arena or Shahuindo Mine sites.
***In 2016, MSR engaged with indigenous communities in
Guatemala that expressed an interest in the Escobal Mine and
during the year, more than 130 indigenous community members
visited the Escobal Mine.*** In addition, indigenous peoples have
participated in our Guatemalan avocado and coffee rust prevention
programs and received donations of agricultural supplies and
musical instruments through its social investment program. The
Company also attended workshops with the Guatemalan
government and other private sector organizations to promote the
elimination of all forms of racial discrimination against indigenous
groups.

### Governmental Laws and Regulations

***Our operations, exploration and development activities are
subject to the laws and regulations of Guatemala, Peru and
Canada that govern various matters including*** environmental
protection, management and use of toxic substances and
explosives, management of natural resources, exploration,

development, production, and post-closure reclamation of mines, imports and exports, price controls, taxation, mining royalties, labour standards and occupational health and safety, including mine safety and *historic and cultural preservation*.

\* \* \*

*We have competent and well-trained individuals and consultants to assist us with compliance with such laws and regulations,* however, even with the application of considerable skill we may inadvertently fail to comply with certain laws. Failure to comply with laws and regulations could lead to financial restatements, fines, penalties, loss, reduction or expropriation of entitlements, the imposition of additional local, foreign or governmental parties as joint venture partners with carried or other interests and other material negative impacts on us.

Emphasis added.

32.     The statements in paragraphs 25-31 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) Tahoe's exploitation license of the Escobal mine assets was in violation of the indigenous people's rights to be consulted; (2) Tahoe was not in compliance with governmental law and regulations; and (3) as a result of the foregoing, Defendants' statements about Tahoe's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

C.  **The Truth Emerges**

33.     On July 5, 2017, after the market close, Tahoe issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the suspension of the Escobal mining license ("July 2017 Press Release"). The press release stated in pertinent part:

**GUATEMALAN LOWER COURT ISSUES RULING ON
TAHOE'S MINING LICENSE**

VANCOUVER, British Columbia – July 5, 2017 – **Tahoe Resources Inc.** (TSX: THO, NYSE: TAHO) ("Tahoe" or the "Company") today reported that the Company has learned that *the Supreme Court of Guatemala has issued a provisional decision in respect of an action brought by the anti-mining organization*, *CALAS, against Guatemala's Ministry of Energy and Mines ("MEM"). The action alleges that MEM violated the Xinca Indigenous people's right of consultation in advance of granting the Escobal mining license to Tahoe's Guatemalan subsidiary, Minera San Rafael.* The provisional decision is in respect of a request by CALAS for an order to temporarily suspend the license to operate the Escobal mine until the action is fully heard. The Company understands that no Xinca representative or community is currently participating in the CALAS lawsuit against MEM.

*The provisional decision suspends the Escobal mining license of Minera San Rafael while the action is being reviewed by the court.* The Company was not a party to the action commenced by CALAS and did not previously have standing to make submissions to the court in respect of the provisional application. This decision confers legal standing on the Company which will now take all legal steps possible to have the ruling reversed and the license reinstated as soon as possible, including immediately appealing the decision to the Constitutional Court.

The Guatemala Supreme Court is the initial trial court in Guatemala for constitutional actions filed against MEM. Appeals from these decisions are heard by Guatemala's Constitutional Court. Based on a prior ruling by the Constitutional Court involving consultation obligations with respect to a large natural resource project, the Company believes that its operating license should remain in effect while any additional consultation is completed. Accordingly, the Company intends to both appeal the decision to the Constitutional Court and ask for the Supreme Court to reconsider its provisional ruling.

The Company believes that all consultation obligations relating to the permitting of the Escobal license were met. The last official census shows the San Rafael community to be 98.6% non-indigenous and with no Xinca community presence. Despite the fact that the Escobal mine is not located in or impacting any indigenous communities of Guatemala, the Company understands that MEM held a consultation process that complied with the requirements set forth in ILO Convention 169.

Based on its prior experience with Guatemalan court proceedings and evaluation of similar cases before the courts, the Company estimates the Constitutional Court could rule on the appeal within two to four months. We will be seeking to have the license reinstated during this period.

The Company also plans to file a motion for reconsideration with the Supreme Court, which is the lower court that issued the provisional decision. Based on prior cases, the Company cannot predict when the Supreme Court would rule on the motion for reconsideration.

In addition, the Company will also be requesting the Supreme Court to resolve CALAS's definitive constitutional claim. The definitive constitutional claim and appeal process could take between 12 and 18 months.

While the Company cannot determine at this time when or if the suspension will be rescinded and the license will be reinstated, including for purposes of conducting a consultation process, we believe ILO 169 does not apply here, and if it did apply, was already met. We understand that the effect of ruling in favour of CALAS could mean that consultation must occur before the suspension is revoked. It could also mean, as happened in similar cases in Guatemala, that the court could allow operations to resume while a consultation process is conducted. We believe that the timeframe to undertake the consultation processes, and for a reconsideration of our application for the issue of the license, could be in the range of six to 12 months.

Upon formal receipt of the order temporarily suspending the license for Escobal, the mine will be placed on stand-by and is planned to be maintained in a manner such that full production can be expeditiously resumed on a reversal of the suspension. During this time, the Company will continue to maintain its high standard of security and environmental protection.

Ron Clayton, President and CEO of Tahoe Resources Inc., commented: "We are extremely disappointed in the Court's ruling suspending the license because we believe that there are no indigenous communities affected by Escobal's operations. While the lack of indigenous communities in our area makes ILO 169 inapplicable, there is nevertheless extensive documentation evidencing that an ILO 169 consultation process was in fact conducted in the area of the mine. *We are acutely aware that an adverse ruling could have a significant adverse impact on our*

*shareholders, partners, employees, vendors and community populations, as tax and royalty payments, along with purchases of operating supplies will be suspended during any period that the mine is not operating. Escobal is our flagship mine which has been designed and operated to meet the highest environmental standards and we will make every effort to remove any suspension and bring Escobal back into operation as soon as possible.* We remain committed to protecting our employees' livelihoods, as well as those livelihoods of the Company's suppliers and the thousands of Guatemalan families that benefit from the responsible operation of the Escobal mine."

Emphasis added.

34. As the truth was fully revealed to investors, the stock price declined from a close of $8.27 per share of Tahoe stock on July 5, 2017, to a close of $5.56 per share on July 6, 2017, *a drop of approximately 33%.*

35. On July 6, 2017, Reuters reported that the Guatemala's Supreme Court on Thursday confirmed a preliminary decision to suspend two mining licenses belonging to the local unit of Canadian miner Tahoe Resources Inc, citing violation of indigenous people's rights to be consulted.

## ADDITIONAL SCIENTER ALLEGATIONS

36. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tahoe, their control over, and/or receipt and/or modification of Tahoe's allegedly materially misleading statements and/or their associations with

the Company which made them privy to confidential proprietary information concerning Tahoe, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

37.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Tahoe's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Tahoe's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

38.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Tahoe's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially

false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Tahoe's common stock to be artificially inflated. Plaintiff and other Class members purchased Tahoe's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## **PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

39.     At all relevant times, the market for Tahoe common stock was an efficient market for the following reasons, among others:

(a) Tahoe common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

(b) During the Class Period, Tahoe common stock were actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, Tahoe filed with the SEC periodic public reports during the Class Period;

(d) Tahoe regularly communicated with public investors via established market communication mechanisms;

(e) Tahoe was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Tahoe was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

40.     As a result of the foregoing, the market for Tahoe common stock promptly digested current information regarding Tahoe from all publicly available sources and reflected

such information in Tahoe's stock price. Under these circumstances, all purchasers of Tahoe common stock during the Class Period suffered similar injury through their purchase of Tahoe's common stock at artificially inflated prices, and a presumption of reliance applies.

41.      Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Tahoe.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

42.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

43.      To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

44.      Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking

statement" was authorized and/or approved by an executive officer of Tahoe who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Tahoe common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

46.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tahoe securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tahoe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2016, Tahoe had more than 311 million outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not

millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

48.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of Tahoe securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### _Violation of Section 10(b) and Rule 10b-5 Against All Defendants_

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Tahoe common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

53.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Tahoe securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

54.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Tahoe as specified herein.

55.   These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Tahoe's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Tahoe and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Tahoe common stock during the Class Period.

56.   Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's

1    dissemination of information to the investing public which they knew or recklessly disregarded
2    was materially false and misleading.

3         57.    Defendants had actual knowledge of the misrepresentations and omissions of
4    material facts set forth herein, or acted with reckless disregard for the truth in that they failed to
5    ascertain and to disclose such facts, even though such facts were available to them. Such
6    Defendants' material misrepresentations and/or omissions were done knowingly or recklessly
7    and for the purpose and effect of concealing Tahoe's operating condition and future business
8    prospects from the investing public and supporting the artificially inflated price of its securities.
9    As demonstrated by Defendants' overstatements and misstatements of the Company's financial
10   condition throughout the Class Period, Defendants, if they did not have actual knowledge of the
11   misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by
12   deliberately refraining from taking those steps necessary to discover whether those statements
13   were false or misleading.

14        58.    As a result of the dissemination of the materially false and misleading information
15   and failure to disclose material facts, as set forth above, the market price of Tahoe's securities
16   was artificially inflated during the Class Period. In ignorance of the fact that market prices of
17   Tahoe's publicly-traded securities were artificially inflated, and relying directly or indirectly on
18   the false and misleading statements made by Defendants, or upon the integrity of the market in
19   which the common stock trades, and/or on the absence of material adverse information that was
20   known to or recklessly disregarded by Defendants but not disclosed in public statements by
21   Defendants during the Class Period, Plaintiff and the other members of the Class acquired
22   Tahoe' common stock during the Class Period at artificially high prices and were or will be
23   damaged thereby.

24

59.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Tahoe's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Tahoe securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

60.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

62.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II

### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

63.     Plaintiff repeats each and every allegation contained above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of Tahoe within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

65.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.     As set forth above, Tahoe, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

67.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

68.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and

Plaintiff's counsel as class counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a jury trial.

Dated this 7th day of July 2017.

/s/ Sean P. Connell
Sean P. Connell, Esq.
Nevada Bar Number 7311
**Muehlbauer Law Office, Ltd.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Tel.: 702.330.4505
Fax: 702.825.0141
sean@mlolegal.com

***Attorneys for Plaintiff and Proposed Liaison Counsel for the Proposed Class***

-and-

Nicholas Porritt, Esq. *(pro hac to be submitted)*
Adam Apton, Esq. *(pro hac to be submitted)*
**LEVI & KORSINSKY LLP**
1101 30th Street NW, Suite 115
Washington, D.C. 20007

Telephone: (202) 524-4290
nporritt@zlk.com
aapton@zlk.com

***Attorneys for Plaintiff and Proposed Lead Counsel
for the Proposed Class***