Martin A. Muckleroy
State Bar #9634
**MUCKLEROY LUNT, LLC**
6077 S. Fort Apache Rd., Ste 140
Las Vegas, NV 89148
Telephone: 702-907-0097
Facsimile: 702-938-4065
Email: martin@muckleroylunt.com

Richard W. Gonnello (*pro hac vice*)
Email: rgonnello@faruqilaw.com
Megan M. Sullivan (*pro hac vice*)
Email: msullivan@faruqilaw.com
Sherief Morsy (*pro hac vice*)
Email: smorsy@faruqilaw.com
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

*Attorneys for Lead Plaintiff Kevin Nguyen*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re TAHOE RESOURCES, INC. SECURITIES LITIGATION | Case No. 2:17-cv-01868-RFB-NJK |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates to:  All Actions | |

**TABLE OF CONTENTS**

TABLE OF DEFINED TERMS AND ABBREVIATIONS ................................................. iv

TABLE OF PERSONS AND ENTITIES ................................................................... vii

RELEVANT FOREIGN AND INTERNATIONAL LEGAL PROVISIONS .................. ix

CHRONOLOGY ..................................................................................................... xii

NATURE AND SUMMARY OF THE ACTION ........................................................ 1

JURISDICTION AND VENUE ................................................................................. 7

THE PARTIES ......................................................................................................... 7

    A.    Lead Plaintiff ................................................................................................ 7

    B.    Defendants ..................................................................................................... 7

FACTUAL BACKGROUND ..................................................................................... 8

    A.    Tahoe and the Escobal Project ...................................................................... 8

        1.    The Escobal Project Area ...................................................................... 9

        2.    The Escobal License and the Juan Bosco License .................................. 11

    B.    The Xinka Indigenous People ...................................................................... 11

    C.    Indigenous Peoples' Consultation Rights Under Guatemalan Law ................. 14

        1.    ILO Convention 169 .............................................................................. 14

        2.    Declaration on the Rights of Indigenous Peoples .................................... 16

        3.    Article 66 of Guatemala's Constitution .................................................. 17

    D.    Tahoe Files An Environmental Impact Assessment For The Escobal License Which Represents To The Ministry Of Energy And Mines That There Are No Indigenous Peoples In The Area Of The License ................. 17

        1.    Guatemalan Mining Law ....................................................................... 17

        2.    Tahoe Submits the Escobal EIA ............................................................ 18

    E.    The Escobal Project Area Was Inhabited By Xinka ....................................... 19

        1.    The 2002 INE Census Figures Had Been Widely Rejected ..................... 19

        2.    The 2015 Catholic Census and 2017 Ethnographical Studies ................. 21

i

3.     Tahoe's Employees Saw Indigenous People Around The Escobal Mine Every Day ................................................................................................22

F.     Tahoe and MEM Ignore The Xinka's Request For Consultation Regarding The Escobal Project ....................................................................................24

G.     The Xinka Fight Against The Escobal Project ................................................26

     1.     The Xinka Join in the Opposition to the Escobal Project ....................................26

     2.     The Xinka Arrange Plebiscites To Vote Against the Escobal Project ................27

     3.     Tahoe Initiates Legal Action To Stop the Xinka from Protesting ........................28

     4.     The Xinka Rally in San Rafael Las Flores for a Plebiscite ..................................28

     5.     MEM Grants the Escobal License Despite Xinka Opposition ..............................31

     6.     Tahoe Resorts to Violence To Stop the Protests ..................................................32

     7.     A Xinka Parliament Representative Files a Lawsuit Against MEM for Dismissing His Objection to the Escobal LIcense ................................................33

H.     Human-Rights Bodies Blame The Unrest On A Lack Of Consultation Of Indigenous Peoples ...........................................................................................35

     1.     The Inter-American Commission on Human Rights ............................................35

     2.     Norwegian Pension Fund's Council on Ethics ....................................................35

     3.     U.N.'s High Commissioner For Human Rights in Guatemala .............................36

     4.     The Permanent People's Tribunal .......................................................................36

I.     Tahoe Touts Its Alignment With Corporate Social Responsibility Policies ....................37

     1.     UN Guiding Principles and Grievance Mechanisms ...........................................38

     2.     Equator Principles ...............................................................................................39

     3.     IFC Performance Standards and Grievance Mechanisms ....................................39

J.     The Guatemalan Government And MEM Are Rocked By Scandal ..........................40

K.     CALAS Files An Action Against MEM For Failing To Consult The Xinka ..................42

FALSE AND MISLEADING CLASS PERIOD STATEMENTS ...............................................43

A.     Statements About The Issuance Of The Escobal License ................................43

B.     Statements About The Indigenous Population In The Escobal Project Area ...................47

C.      Statements About The Protests To The Escobal Project Mischaracterized
        Xinka Involvement .................................................................................................48

D.      Statements About Tahoe's Community Outreach ............................................51

E.      Statements About Tahoe's Alignment With CSR Policies ...............................54

POST CLASS PERIOD STATEMENTS .................................................................................57

SCIENTER ALLEGATIONS ....................................................................................................59

A.      *Respondeat Superior* And Agency Principles Apply .........................................59

B.      The Escobal Project Is Part Of Tahoe's Core Operations ...............................59

C.      Defendants Had Possession Of And/Or Access To Adverse Information Regarding
        The Xinka In The Escobal Project Area And The ILO 169 Consultation
        Requirements .........................................................................................................60

        1.      Information From Tahoe Executives' Previous Experience in Guatemala ..........60

        2.      Information About the Xinka People .......................................................62

D.      Defendants' and Insiders' Financial Motives ...................................................65

        1.      The Financial Motives of Tahoe .............................................................65

        2.      The Financial Motives of Tahoe's Executives........................................66

E.      Tahoe's Interim CEO Resigns Amidst Suspicious Circumstances And Later
        Characterized Tahoe's Executives As Arrogant Americans ...........................66

F.      SOX Certifications.................................................................................................68

CLASS ACTION ALLEGATIONS ...........................................................................................70

LOSS CAUSATION....................................................................................................................72

CONTROL PERSON LIABILITY.............................................................................................73

THE FRAUD ON THE MARKET PRESUMPTION ...............................................................74

NO STATUTORY SAFE HARBOR...........................................................................................75

CAUSES OF ACTION ................................................................................................................76

JURY TRIAL DEMAND ............................................................................................................78

PRAYER FOR RELIEF .............................................................................................................79

**TABLE OF DEFINED TERMS AND ABBREVIATIONS**

| TERM | DEFINITION |
| --- | --- |
| **2002 INE Census** | Guatemala's Instituto Nacional de Estadística's 2002 Census |
| **2003/2004 Xinka Parliament Census** | Census conducted by the Xinka Parliament in 2003 and 2004 of the Xinka people living on tribal lands in Santa Rosa and Jutiapa |
| **2012 Annual Report** | Tahoe's annual financial report for the year ended December 31, 2012, filed with the SEC on March 11, 2013 |
| **2013 Annual Report** | Tahoe's annual financial report for the year ended December 31, 2013, filed with the SEC on March 17, 2014 |
| **2014 Annual Report** | Tahoe's annual financial report for the year ended December 31, 2014, filed with the SEC on March 12, 2015 |
| **2015 Annual Report** | Tahoe's annual financial report for the year ended December 31, 2015, filed with the SEC on March 11, 2016 |
| **2016 Annual Report** | Tahoe's annual financial report for the year ended December 31, 2016, filed with the SEC on March 10, 2017 |
| **Archila** | Erick Archila, Minister of Guatemala's Ministry of Energy and Mines |
| **CALAS** | Centro de Acción Legal Ambiental y Social (Center for Legal Environmental and Social Action) |
| **Catholic Census** | *Resultados de Encuesta Diocesana de Santa Rosa* (Results of the Diocesan Census of Santa Rosa) |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **CIGIC** | United Nations International Commission Against Impunity in Guatemala: in 2015 |
| **Clayton** | Defendant Ron Clayton: Tahoe's CEO since August 2016, President since March 2014, and COO from March 2010 until August 2016 |
| **CODIDENA** | Diocesan Commission for the Defense of Nature |
| **COO** | Chief Operating Officer |
| **COPXIG** | *Comite Provisional del Pueblo Xinka* |
| **Council on Ethics** | Council on Ethics for Norway's Government Pension Fund |
| **CSR** | Corporate Social Responsibility |
| **EIA** | Environmental Impact Assessment |
| **Escobal EIA** | The EIA for the Escobal License |
| **Escobal License** | Tahoe's license for the commercial extraction of minerals |

**TABLE OF DEFINED TERMS AND ABBREVIATIONS**

|  |  |
|---|---|
|  | from the Escobal vein |
| **Escobal Mine** | Mine owned by Tahoe to extract silver from the Escobal vein |
| **Escobal Project** | All of the 23 mining concessions, including pending and approved mining licenses, owned by Tahoe in Southeastern Guatemala |
| **Escobal Project Area** | The geographic area making up the 23 mining concessions in the Escobal Project |
| **Glamis** | Glamis Gold Limited |
| **Goldcorp** | Goldcorp, Inc. |
| **Hofmeister** | Defendant Edie Hofmeister, Tahoe's Secretary since February 2010, General Counsel since March 2011, and Vice President of Corporate Affairs since March 2014 |
| **IACHR** | Inter-American Commission on Human Rights |
| **IACHR Petition** | Petition against Guatemala filed with the IACHR by the Maya and Xinka peoples in 2013 |
| **IFC** | International Finance Corporation of the World Bank |
| **IFC Report** | The IFC's 2007 report discussing the Marlin mine |
| **ILO** | International Labour Organization of the United Nations |
| **ILO 169** | International Labour Organization's "Indigenous and Tribal Peoples Convention" of 1989 (Convention No. 169) |
| **ILO Manual** | The ILO's manual on ILO 169 |
| **IPO** | Initial Public Offering |
| **Juan Bosco License** | Tahoe's license for the exploration of minerals in the municipalities of San Rafael Las Flores, Casillas, Nueva Santa Rosa, and Mataquescuintla |
| **Marlin** | Glamis and Goldcorp's Marlin mine |
| **Marlin HRA** | The Marlin Human Rights Assessment |
| **McArthur** | Defendant Kevin McArthur: Tahoe's CEO from November 2009 until April 2015, and again from August 2015 until August 2016, and director since 2009 |
| **McGregor** | Defendant Dianne McGregor: Tahoe's CFO since August 2016 |
| **MEM** | Guatemala's Ministry of Energy and Mines |
| **Ministry of Culture** | Guatemala's Ministry of Culture and Sports |
| **Montana** | Montana Exploradoraa, S.A. |
| **MSR** | Minera San Rafael |

## TABLE OF DEFINED TERMS AND ABBREVIATIONS

| | |
|---|---|
| **NGO** | Non-governmental organization |
| **PPT** | Permanent Peoples' Tribunal |
| **Rio Alto** | Rio Alto Mining Limited |
| **Sadler** | Defendant Mark Sadler: Tahoe's CFO from March 2013 until August 2016 |
| **SRLF Committee** | The Committee in Defense of Life and Peace of San Rafael Las Flores |
| **Supreme Court Decision** | Supreme Court of Guatemala, Amparo 1076-2017, at 30 (Sept. 8, 2017) |
| **Tahoe** | Defendant Tahoe Resources, Inc. |
| **U.N.** | United Nations |
| **Under Siege** | Luis Solano, *Under Siege*: *Peaceful Resistance to Tahoe Resources and Militarization in Guatemala*, at 8 (Nov. 10, 2015) |
| **UNDRIP** | United Nations Declaration on the Rights of Indigenous Peoples |
| **Villalta** | Quelvin Otoniel Jimenez Villalta |
| **Xinka Parliament** | *Parlamento del Pueblo Xinka de Guatemala* |

**TABLE OF PERSONS AND ENTITIES**

| NAME | DESCRIPTION |
|---|---|
| **Archila, Erick** | Minister of MEM from 2012 until May 2015 |
| **Baldetti, Roxana** | Guatemala's Vice President from 2012 until August 2015 |
| **Black, Alex** | Tahoe's CEO from April 1, 2015 to August 5, 2015 |
| **Clayton, Ronald** | Tahoe's CEO since August 2016, President since March 2014, and COO from March 2010 until August 2016 |
| **The Committee in Defense of Life and Peace of San Rafael Las Flores (SRLF Committee)** | NGO organized by residents of San Rafael Las Flores to provide education about the Escobal License |
| **Comite Provisional del Pueblo Xinka (COPXIG)** | An official representative body of the Xinka |
| **Council on Ethics for Norway's Government Pension Fund Global** | Council organized to evaluate whether the Fund's investment in specified companies is consistent with its Ethical Guidelines |
| **Diocesan Commission for the Defense of Nature (CODIDENA)** | NGO organized by the Catholic church members in Southeastern Guatemala to provide education about and opposition to the Escobal License |
| **Glamis Gold, Ltd.** | Predecessor entity to Goldcorp which owned the Marlin mine.  McArthur served as CEO for the company from 1998 to 2006 |
| **Goldcorp, Inc.** | Corporation that sold the Escobal assets to Tahoe and held a 40% interest in Tahoe until June 2015.  McArthur served as CEO for Goldcorp from 2006 until 2008 when we left to found Tahoe |
| **Gonzalez Ucelo, Roberto** | President of the Xinka Parliament from 2012 to 2014 |
| **Hofmeister, Edie** | Tahoe's Secretary since February 2010, General Counsel since March 2011, and Vice President of Corporate Affairs since March 2014 |
| **International Financial Corporation (IFC)** | Institution that offers investment, advisory, and asset-management services to encourage private-sector development in developing countries |
| **Jimenez Villalta, Quelvin Otoniel** | Xinka Parliament's Legal Advisor |
| **Lake Shore Gold Corporation** | Company acquired by Tahoe in a stock for stock deal, announced on February 8, 2016 |
| **McArthur, Kevin** | Tahoe's CEO from November 2009 until April 2015, and again from August 2015 until August 2016; Tahoe director since 2009 |

**TABLE OF PERSONS AND ENTITIES**

| | |
|---|---|
| **McGregor, Diane** | Tahoe's CFO since August 2016 |
| **Minera San Rafael** | Tahoe's wholly-owned subsidiary in Guatemala that owns and operates the Escobal Mine |
| **Ministry of Energy and Mines (MEM)** | Guatemala's national agency responsible for governing the mining and energy sectors |
| **Montana Exploradora, S.A.** | The Goldcorp subsidiary that owned and operated Marlin |
| **Parrilla, Ekaterina** | Vice Minister of MEM in 2012 |
| **Perez Molina, Otto** | Guatemala's President from January 2012 until September 2015 |
| **Permanent Peoples' Tribunal** | International tribunal based in Italy, focused on human rights issues arising in Latin America |
| **Rio Alto Mining Limited** | Company acquired by Tahoe in a mostly stock for stock deal, announced on February 9, 2015 |
| **Rotondo Dall'Orso, Alberto** | Minera San Rafael's head of security until May 2013 |
| **Mark Sadler** | Tahoe's CFO from March 2013 until August 2016 |
| **Tahoe Resources, Inc.** | Defendant corporation that owns and operates silver mines in the Americas |
| **Xinka** | Mesoamerican native peoples of Southeastern Guatemala |
| **Xinka Parliament** | The representative body for Xinka in the departments of Santa Rosa, Jalapa, and Jutiapa |

**RELEVANT FOREIGN AND INTERNATIONAL LEGAL PROVISIONS**

| PROVISION | TEXT |
|---|---|
| **Equator Principles** | Principle 5: "Informed Consultation and Participation" process—and that projects comply with the host country's indigenous-rights laws:  "Projects affecting indigenous peoples will be subject to a process of Informed Consultation and Participation, and will need to comply with the rights and protections for indigenous peoples contained in relevant national law, including those laws implementing host country obligations under international law."<br><br>Definition of "Informed Consultation and Participation": "an in-depth exchange of views and information and an organised and iterative consultation that leads the client to incorporate the views of Affected Communities, on issues that affect them directly (such as proposed mitigation measures, the sharing of development benefits and opportunities, and implementation issues), into their decision-making process." |
| **IFC Performance Standards** | IFC Performance Standard 7: "Adverse impacts on Affected Communities of Indigenous Peoples should be avoided where possible. Where alternatives have been explored and adverse impacts are unavoidable, the client will minimize, restore, and/or compensate for these impacts in a culturally appropriate manner commensurate with the nature and scale of such impacts and the vulnerability of the Affected Communities of Indigenous Peoples.  The client's proposed actions will be developed with the ICP [Informed Consultation and Participation] of the Affected Communities of Indigenous Peoples and contained in a time-bound plan, such as an Indigenous Peoples Plan, or a broader community development plan with separate components for Indigenous Peoples."<br><br>Definition of "Informed Consultation and Participation": "[A] more in-depth exchange of views and information, and an organized and iterative consultation, leading to the client's incorporating into their decision-making process the views of the Affected Communities on matters that affect them directly, such as the proposed mitigation measures, the sharing of development benefits and opportunities, and implementation issues." |
| **ILO 169** | Article 6.1(a): "governments shall: (a) consult the peoples concerned, through appropriate procedures and in particular through their representative institutions, whenever consideration is being given to legislative or administrative measures which may affect them directly[.]" |

**RELEVANT FOREIGN AND INTERNATIONAL LEGAL PROVISIONS**

| | |
|---|---|
| | Article 6.2: "The consultations carried out in application of this Convention shall be undertaken, in good faith and in a form appropriate to the circumstances, with the objective of achieving agreement or consent to the proposed measures." |
| | Article 15: "In cases in which the State retains the ownership of mineral or sub-surface resources or rights to other resources pertaining to lands, governments shall establish or maintain procedures through which they shall consult these peoples, with a view to ascertaining whether and to what degree their interests would be prejudiced, before undertaking or permitting any programmes for the exploration or exploitations of such resources pertaining to their lands. The peoples concerned shall wherever possible participate in the benefits of such activities, and shall receive fair compensation for any damages which they may sustain as a result of such activities." |
| **Political Constitution of the Republic of Guatemala** | Article 66: "Guatemala is formed by diverse ethnic groups among which are found the indigenous groups of Mayan descent.  The State recognizes, respects, and promotes their forms of life, customs, traditions, forms of social organization, the use of the indigenous attire by men and women, [and their] languages and dialects." |
| **United Nations Declaration on the Rights of Indigenous Peoples** | Article 19: "States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that may affect them." |
| | Article 32, Section 2: "States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free and informed consent prior to the approval of any project affecting their lands or territories and other resources, particularly in connection with the development, utilization or exploitation of mineral, water or other resources[.]" |
| | Article 32, Section 3: "States shall provide effective mechanisms for just and fair redress for any such activities, and appropriate measures shall be taken to mitigate adverse environmental, economic, social, cultural or spiritual impact." |
| **United Nations Guiding Principles** | Commentary to Foundational Principle No. 18: "The initial step in conducting human rights due diligence . . . includes assessing the human rights context prior to a proposed business activity, where possible; identifying who may be |

affected; cataloguing the relevant human rights standards and issues; and projecting how the proposed activity and associated business relationships could have adverse human rights impacts on those identified. . . . To enable business enterprises to assess their human rights impacts accurately, they should seek to understand the concerns of potentially affected stakeholders by consulting them directly in a manner that takes into account language and other potential barriers to engagement."

Commentary to Foundational Principle No. 25: "grievance mechanisms" are a "process through which grievances concerning business-related human rights abuse can be raised and remedy can be sought."

Foundational Principle No. 31: Grievance mechanisms shall be "Based on engagement and dialogue: consulting the stakeholder groups for whose use they are intended on their design and performance, and focusing on dialogue as the means to address and resolve grievances."

## CHRONOLOGY

| DATE | EVENT |
|---|---|
| 17th Century | Xinka tribal lands are recognized by the Spanish Crown.  ¶43. |
| 1996 | COPXIG is formed to represent Xinka interests in Guatemala. ¶40. |
| 2007 | McArthur is the CEO of Goldcorp, and the International Finance Corporation of the World Bank issues a report based on Goldcorp's Marlin mine, warning companies to ensure that governments comply with ILO 169.  ¶199. |
| 2008 | McArthur is the CEO of Goldcorp, and socially-responsible shareholders induce Goldcorp to commission a human-rights-assessment of Marlin after a lack of consultation leads to controversy. (The human-rights-assessment is published in 2010).  ¶200. |
| June 8, 2010 | Tahoe acquires the Escobal assets from Goldcorp.  ¶29. |
| 2010 | The Xinka Parliament informs MEM that they need to be consulted about the Escobal Project. |
| 2011 | The Xinka begin denouncing the Escobal Project in protests and press conferences covered by the Guatemalan media.  ¶¶90-113. |
| March 2011 | Tahoe submits and application for the Escobal License to MEM.  ¶36. |
| June 8, 2011 | Tahoe submits an environmental impact assessment ("EIA") for the Escobal License to MEM, which ignores the indigenous presence around the Escobal License.  ¶62. |
| July 2011 through Nov. 2012 | In plebiscites organized by the Xinka and other NGOs, voters in the municipalities surrounding the Escobal and Juan Bosco Licenses overwhelmingly vote NO to mining.  ¶92. |
| 2012 | Xinka representatives attend at least two meetings with Tahoe and MEM, but MEM and Tahoe stop communications with the Xinka after the Xinka raise environmental concerns.  ¶¶82, 84-85. |
| May 9, 2012 | MEM issues the Juan Bosco License to Minera San Rafael.  ¶37. |
| June 2012 | Tahoe sues Guatemala's President and Ministry of Defense, among other officials, alleging that Guatemala has failed to protect the Escobal Mine from protestors.  ¶95. |
| Feb. 2013 through April 2013 | The Xinka organize plebiscites in the municipality that is home to the Escobal License, and voters overwhelmingly reject mining.  ¶100. |
| March 17, 2013 | Xinka leaders are abducted by masked gunman after the plebiscites in El Volcanito. The Xinka Parliament's Secretary is found dead from a blow to the head, with his hands and feet bound.  ¶101. |
| **April 3, 2013** | **Class Period Begins:** Tahoe announces that it has received the Escobal License from Guatemala's Ministry of Energy and Mines.  Tahoe begins making false and/or misleading statements about the issuance of the Escobal License.  ¶¶102, 151-57. |

## CHRONOLOGY

| | |
|---|---|
| April 2013 | Protestors against the Escobal Project begin a permanent protest camp in front of the mine's gates. ¶103. |
| April 27, 2013 | Tahoe's security opens fire on the protestors in front of the Escobal Mine, and Tahoe's head of security attempts to flee the country before being arrested. ¶104. |
| May 1, 2013 | Tahoe begins making false and/or misleading statements to the market regarding the community's response to the Escobal Project and Tahoe's alignment with Corporate Social Responsibility regimes. ¶¶163-168. |
| May 2, 2013 | The President of Guatemala declares a state of siege around the Escobal Mine in response to the violence and continued protests. ¶107. |
| June 4, 2013 | Tahoe begins making false and/or misleading statements to the market regarding the Xinka population near the Escobal Project. ¶¶159-161. |
| Aug. 14, 2013 | The Council on Ethics begins corresponding with Tahoe about its human-rights concerns. ¶¶117-19. |
| Sept. 2, 2013 | Tahoe begins making false and/or misleading statements about its community outreach efforts. ¶¶170-186. |
| Jan. 13, 2014 | Addressing the social unrest regarding the Escobal Project, the United Nation's Commissioner for Human Rights in Guatemala blames the conflict on a failure to consult the community, including the indigenous community. ¶120. |
| April 1, 2015 | Tahoe announces the completion of its merger with Rio Alto, and that Rio Alto's Alex Black has replaced Defendant McArthur as CEO; McArthur becomes Executive Board Chair. ¶219. |
| Aug. 5, 2015 | Tahoe announces that CEO Alex Black is resigning for "personal reasons" and that Defendant McArthur will replace him. ¶222. |
| Aug. 9, 2016 | Tahoe announces management changes, effective August 16, 2016: Defendant Clayton is named President and CEO, and is made a director; Defendant McGregor is named CFO; Defendant Sadler leaves his position as CFO and becomes VP, Project Development; and Defendant McArthur leaves his position as CEO and becomes Executive Chair, but retains his position as a director. ¶¶21-24. |
| Mar. 2015 | MEM is rocked by scandal and its Minister resigns. ¶¶136-141. |
| May 17, 2017 | CALAS files a lawsuit against MEM alleging that MEM failed to consult the Xinka indigenous people pursuant to ILO Convention 169, Article 19 of the UNDRIP, and Article 66 of Guatemala's Constitution, before granting the Escobal and Juan Bosco Licenses. ¶142. |
| July 5, 2017 | After the close of trading, Tahoe announces that Guatemala's Supreme Court suspends the Escobal License and the Juan Bosco License renewal. ¶144. |
| July 6, 2017 | Following Tahoe's announcement, Tahoe's shares fall $2.74 per share, |

## CHRONOLOGY

|  |  |
|---|---|
|  | or over 33% from the previous day's closing price of $8.30 per share, to close at $5.56 per share.  ¶145. |
| July 7, 2016 | Tahoe's shares fall an additional $0.41 per share, or over 7% from the previous day's closing price of $5.56 per share, to close at $5.15 per share.  ¶145. |
| **Aug. 24, 2017** | **Class Period Ends**: After MEM and Tahoe appealed the Supreme Court's order, the Constitutional Court rejects their appeal and upholds the order.  ¶147. |
| Aug. 25, 2017 | Tahoe's shares fall $1.01 per share, or over 18% from the previous day's closing price of $5.48, to close at $4.47 per share.  ¶148. |
| Sept. 8, 2017 | The Supreme Court addresses CALAS's claim on the merits and finds that the MEM was required to consult the Xinka under ILO 169, Article 19 of the UNDRIP, and Article 66 of Guatemala's Constitution, but did not do so.  The court gives MEM one-year to carry out the consultation, but also lifts the suspension of the licenses.  ¶¶189, 190. |

The allegations in this Consolidated Amended Class Action Complaint are based on the personal knowledge of Lead Plaintiff Kevin Nguyen ("**Lead Plaintiff**")[1] as to Lead Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Lead Plaintiff's information and belief is based upon the investigation by Lead Plaintiff's counsel into the facts and circumstances alleged herein, including: (i) review and analysis of those public filings Tahoe Resources, Inc. ("**Tahoe**" or the "**Company**") made with the United States Securities and Exchange Commission ("**SEC**") referenced herein; (ii) review and analysis of those press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Tahoe and the other Individual Defendants named herein (together with Tahoe, the "**Defendants**"); (iii) review and analysis of those Company conference calls, press conferences, and related statements and materials referenced herein; and (iv) review and analysis of those other documents referenced herein. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control. Lead Plaintiff believes that additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## NATURE AND SUMMARY OF THE ACTION

1. Subject to certain exclusions, this is a federal securities class action brought on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the common stock of Tahoe in the United States or on the NYSE at artificially inflated prices between April 3, 2013 and August 24, 2017, inclusive (the "**Class Period**"), and who suffered damages thereby, which action seeks to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**") and SEC Rule 10b-5 promulgated thereunder.

2. Tahoe is a mining company focused on mineral exploration and exploitation projects in the Americas. After its initial public offering ("**IPO**"), Tahoe acquired Goldcorp, Inc.'s ("**Goldcorp**") "Escobal" silver-mining assets in Guatemala. These assets became Tahoe's "**Escobal Project,**" which was made up of 23 mining concessions and pending and approved mining licenses

---

[1] All emphases are added and all internal citations and quotations are omitted unless otherwise noted.

covering approximately 2,500 km$^2$ in Southeastern Guatemala (the "**Escobal Project Area**").  When acquired, the Escobal assets included several mining licenses and mining license applications, but did not include a license for the commercial extraction of any minerals, nor any physical mining plant.  After the acquisition, Tahoe focused on securing a license for commercial extraction of silver from the Escobal vein (the "**Escobal License**") and building a mine (the "**Escobal Mine**") as well as exploring for more silver deposits in a broader area by obtaining the Juan Bosco exploration License (the "**Juan Bosco License**" and together with the Escobal License, the "**Licenses**").

3.       By way of relevant background, in 1996, Guatemala ratified the United Nations' ("**U.N.**") International Labour Organizations' ("**ILO**") "Indigenous and Tribal Peoples Convention" of 1989, No. 169, known as "**ILO 169**."  ILO 169 requires that governments consult indigenous people, through the indigenous peoples' representative institutions, before granting licenses for mineral exploration or extraction.  In Guatemala, the Ministry of Energy and Mining ("**MEM**") is responsible for granting mining licenses and is responsible for carrying out the consultation process.

4.       Defendant Kevin McArthur, and other Tahoe employees and directors who came over from Goldcorp were well aware of ILO 169 based on their experiences while working at Glamis Gold Ltd. ("**Glamis**") which owned Guatemala's Marlin mine ("**Marlin**").  Marlin was plagued by controversy because of MEM's failure to consult the indigenous population.  This controversy led the International Finance Corporation ("**IFC**"), one of Marlin's financiers, to issue a 2007 report based on lessons from the Marlin mine including warning companies that, in places like Guatemala, companies need to ensure that the government fulfills its ILO 169 consultation responsibility, or else company permits would be at risk.

5.       The Escobal Project Area includes the ancestral homelands of Guatemala's indigenous Xinka peoples.  The Escobal License Environmental Impact Assessment ("**Escobal EIA**") that Tahoe filed with MEM in support of the Escobal License application used Guatemala's Instituto Nacional de Estadística's 2002 Census ("**2002 INE Census**") to represent to MEM that there were only 2 Xinka people in several small communities within the immediate area of the Escobal Mine.  MEM relied upon this EIA to determine that ILO 169 was inapplicable to the Escobal License, thus utterly disregarding its obligation to consult with all indigenous peoples ***who***

1  *may be affected* by the Escobal Project, not just those in the immediate area of the mine.  Thereafter,

2  during the Class Period, Tahoe represented to investors that "[t]he Company [was] not aware of any

3  significant indigenous population residing in the area of the Escobal Project."

4          6.      These statements were deceptive for two reasons.  First, the Escobal Project Area

5  covered five separate Xinka tribal lands which were inhabited by thousands of Xinka.  Second, the

6  2002 INE Census that Tahoe relied upon has widely been discredited as unreliable and racist.

7  Indeed, frustrated with the lack of representation in the 2002 INE Census, the Parlamento del Pueblo

8  Xinka de Guatemala (the "**Xinka Parliament**") the governing body for the Xinka indigenous

9  peoples in Southeastern Guatemala, conducted its own census in 2003 and 2004 which showed

10  160,000 Xinka living in and around the Escobal Project Area.  In 2008, Consejo del Pueblo Xinka de

11  Guatemala ("**COPXIG**"), another Xinka governing organization, conducted a census that showed

12  190,000 Xinka living in and around the Escobal Project Area, including 8,500 Xinka living in on the

13  Xinka communal lands in San Carlos Alzate, which lie less than a quarter of a mile from the

14  eastern border of the Escobal License area.  Then, in 2015, the Catholic Church conducted a census

15  placing 6,674 Xinka in San Rafael Las Flores (the municipality where the Escobal License area sits).

16  Furthermore, Xinka were not difficult to find in the area: beginning in 2010, the Xinka Parliament

17  repeatedly reached out to MEM requesting that they be consulted regarding the Escobal Project.  For

18  example, several times in 2012, Xinka Parliament representatives attended meetings where MEM

19  and Tahoe representatives were present, during which the Xinka Parliament requested that they be

20  consulted regarding the Escobal Project.

21          7.      Rather than ensure that MEM consulted the Xinka's representatives pursuant to ILO

22  169, in the years preceding the Class Period, Tahoe repeatedly thwarted the Xinka Parliament's

23  requests to be consulted by MEM.  In response, the Xinka Parliament and people joined the

24  opposition to the Escobal Project and began protesting in front of the Escobal Mine.  Despite the

25  growing unrest, and without consulting the Xinka who were directly affected by the Escobal Project,

26  on May 9, 2012, MEM issued the Juan Bosco License to Tahoe.  This only further fueled the

27  Xinka's opposition, and they continued their resistance to the Escobal Project by issuing press

28  releases and attending meetings regarding the Escobal Project, and by helping to arrange

"plebiscites," *i.e.* referenda, to document opposition to the Escobal Project by public votes.  After one plebiscite, on March 17, 2013, four leaders of the Xinka Parliament were kidnapped by masked gunmen.  The Parliament's Secretary was found dead the next day with his hands and feet bound. The other leaders escaped.  According to press reports, the kidnappers told the Xinka Parliament's President that they were taking him to see Escobal's mine manager.

8.    After MEM granted the Escobal License on April 3, 2013—without first consulting the Xinka—community resistance intensified.  Xinka and other community protestors began a peaceful protest camp in front of the Escobal Mine's gates.  Shortly thereafter, the Company's security forces opened fire on the protestors, leading to international condemnation and the Guatemalan military instituting a "state of siege" to quell future protests and controversy.

9.    Amidst the controversy, but while still denying the Xinka's presence, Defendants began to tout the Company's "corporate social responsibility" ("**CSR**") initiatives and paint Tahoe as a champion of human rights in the community.  For example, on September 6, 2013, Tahoe's CSR blog stated that "Tahoe has exceeded legal requirements and demonstrated best international practices for engaging in dialogue with the community . . . Tahoe continues to seek meaningful and effective dialogue with community members."  Then, on June 12, 2014, Tahoe published its Human Rights Policy on its CSR blog which stated that Tahoe is committed to "observing the laws and respecting the cultural values in the countries in which it operates, including the indigenous peoples recognized by the laws of the applicable jurisdiction[.]"  As part of these efforts, Defendants represented that Tahoe had aligned its practices and policies with the U.N. Guiding Principles on Business and Human Rights and the Equator Principles, which require that "[p]rojects affecting indigenous peoples will be subject to a process of Informed Consultation and Participation, and will need to comply with the rights and protections for indigenous peoples contained in relevant national law[.]"

10.    In 2013 and 2014, human rights organizations began to take notice of the controversy surrounding the Escobal Project, and were concerned by what they found.  For example, in January 2014, the U.N. High Commissioner for Human Rights in Guatemala determined that the cause of the social conflicts in the areas around the Escobal Mine "was the failure to inform and to consult with

indigenous and other local communities potentially affected by" the project.  In April 2014, the Council on Ethics for Norway's Government Pension Fund found that "there is an unacceptable risk of Tahoe Resources contributing to serious human rights violations[,]" as demonstrated by the Company's failure to consult with the Xinka.  Tahoe dismissed these concerns, and its CEO instead blamed the unrest on the "gimme gimme gimme" attitude of the community.

11.     In May 2015, it became evident that MEM's misdeeds were not limited to the Escobal Project.  MEM, along with the highest levels of the Guatemalan government, was rocked by corruption and bribery scandals.  As a result, on May 15, 2015, Erick Archila ("**Archila**"), MEM's Minister since 2012, resigned.  On May 21, 2015, the Minister's former deputy and week-old also replacement resigned.

12.     By May 2017, Tahoe's time was up: Centro de Acción Legal Ambiental y Social (Center for Legal Environmental and Social Action) ("**CALAS**"), an environmental non-governmental organization ("**NGO**"), filed an action in Guatemala's Supreme Court asking the Court to revoke the Escobal License and deny renewal of the Juan Bosco License because MEM failed to consult the Xinka as required by ILO 169.  CALAS also asked the court to provisionally suspend the Escobal License and the Juan Bosco License renewal while awaiting decision on the underlying merits of the claim.  On July 5, 2017, Tahoe reported that the Court had granted the provisional License suspensions.  On this news, Tahoe's shares fell $2.74 per share, over 33% from the previous day's closing price, to close at $5.56 per share on July 6, 2017.  On July 7, 2017, Tahoe's shares continued to fall an additional $0.41 per share, or over 7% from the previous day's closing price, to close at $5.15 per share.

13.     Despite the court's decision, Tahoe continued to deny that there were any indigenous people in the area of the Escobal or Juan Bosco Licenses, and thus, ILO 169 did not apply to the Licenses.  Then, on August 24, 2017, Tahoe announced that the Guatemalan Constitutional Court upheld the lower court's decision to provisionally suspend the Escobal License and the Juan Bosco License's renewal.  On this news, Tahoe's shares fell $1.01 per share, or over 18% from the previous day's closing price of $5.48, to close at $4.47 per share on August 25, 2017.  It was not until several months after this decision that Tahoe finally acknowledged "the presence and importance of the

1    indigenous peoples located in the communities near Escobal, particularly the Xinka."

2        14.     During the Class Period, Defendants made materially false and/or misleading

3    statements regarding the (1) the issuance of the Escobal License; (2) the presence of indigenous

4    peoples in the area of the Escobal Project; (3) the community's response to the Escobal Project; (4)

5    the Company's outreach efforts in the communities in the Escobal Project Area; and (5) Tahoe's

6    alignment with CSR regimes.  These statements were materially false and/or misleading because

7    Defendants knew or were reckless in not knowing but failed to disclose, *inter alia*, the following:

8        (a)     Thousands of Xinka lived in the area directly affected by the Escobal Project,

9                as evidenced by the 2003/2004 Xinka Parliament Census, COPXIG's 2008

10               Census, the Catholic Census, Tahoe employees' observations, the Xinka tribal

11               lands, and the 2017 Ethnographical Studies (¶¶42, 66-79, 190), who were not

12               consulted by MEM, as required by Guatemalan Law, before the Escobal and

13               Juan Bosco Licenses were issued (¶¶46-56, 64, 80-101, 114-22, 189, 190);

14       (b)     The Xinka Parliament repeatedly requested at meetings, during press

15               conferences, at protests, and through legal actions, that MEM consult them

16               regarding the Escobal Project (¶¶80-113);

17       (c)     The Xinka had actively contested the issuance of the Escobal License and the

18               Escobal Project by engaging in protests, organizing plebiscites, and initiating

19               various legal actions (¶¶80-113);

20       (d)     Tahoe never reached out to the Xinka people who were directly affected by

21               the Escobal Project, and instead actively worked to thwart the Xinka's efforts

22               to exercise their consultation rights by, *inter alia*, responding violently to

23               protests, attempting to block plebiscites, filing legal claims against Xinka

24               representatives, and opposing the Xinka's lawsuit against MEM (¶¶63, 80, 85-

25               88, 90-113, 117-19, 121-22); and

26       (e)     Tahoe did not demonstrate best international practices for engaging in

27               dialogue with the community because the Company never attempted to

28               consult with the Xinka Parliament or people who were affected by the Escobal

                                            6

Project, as required by international human rights policies (¶¶63, 80, 85-88, 90-113, 117-19, 121-22, 126-135).

## JURISDICTION AND VENUE

15.   This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.   This Court has jurisdiction over the action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.   Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as certain of the acts and conduct complained of herein, including dissemination or omission of materially false and misleading information to the investing public, occurred in this District.

18.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## THE PARTIES

### A.   Lead Plaintiff

19.   Lead Plaintiff Kevin Nguyen, as set forth in his shareholder certification (ECF No. 10-6), purchased Tahoe common stock at artificially inflated prices during the Class Period and suffered damages thereby.

### B.   Defendants

20.   Defendant Tahoe is incorporated in British Columbia, Canada and has its principal executive offices located at 5310 Kietzke Lane, Reno, Nevada 89511.  Tahoe is a mining company that owns and operates mines in the Americas.  During the Class Period, Tahoe's stock traded on the NYSE under the ticker symbol "TAHO."

21.   Defendant Ronald W. Clayton ("**Clayton**") has served as Tahoe's Chief Executive Officer ("**CEO**") since August 2016 and as Tahoe's President since March 2014.  From March 2010

until August 2016, Clayton served as Tahoe's Chief Operating Officer ("**COO**").

22.     Defendant C. Kevin McArthur ("**McArthur**") served as Tahoe's CEO from November 2009 until April 2015 and then again from August 2015 until August 2016.  McArthur has been a director on Tahoe's Board of Directors since November 2009.

23.     Defendant Elizabeth Dianne McGregor ("**McGregor**") has served as Tahoe's Chief Financial Officer ("**CFO**") and Vice President since August 2016.

24.     Defendant Mark T. Sadler ("**Sadler**") served as Tahoe's CFO and Vice President from March 2013 until August 2016.

25.     Defendant Edie Hofmeister ("**Hofmeister**") has served as Tahoe's Corporate Secretary since February 2010, General Counsel since March 2011, and Vice President of Corporate Affairs since March 2014.  During the Class Period, Hofmeister was also responsible for implementing new CSR programs at the Company.

26.     Defendants Clayton, McArthur, McGregor, Sadler, and Hofmeister are referred to herein, collectively, as the "**Individual Defendants**."

27.     Tahoe and the Individual Defendants are referred to herein as the "**Defendants**."

## FACTUAL BACKGROUND

### A.     Tahoe And The Escobal Project

28.     On November 10, 2009, Defendant McArthur founded and incorporated Tahoe Resources, Inc.  *See* Tahoe Resources History, http://www.tahoeresources.com/English/company/about-tahoe/default.aspx (last visited Aug. 30, 2018).  Tahoe is a mining company, whose business is the acquisition, exploration, and development of resource properties in the Americas for the mining of precious metals.  Tahoe Resources Inc., Short Form Prospectus (SEDAR), at 10 (Dec. 17, 2010).  But at its founding, Tahoe did not have any mining assets.

29.     On June 8, 2010, Tahoe completed its IPO and listed its shares on the Toronto Stock Exchange.  Tahoe Resources, Inc., Annual Report (Form 40-F, Ex. 99.1) at 8 (Mar. 17, 2014) ("**2013 Annual Report**").  Tahoe listed its shares on the New York Stock Exchange in May 2012.  *Id.*  Through its IPO, Tahoe acquired Goldcorp's "Escobal" mining assets: an undeveloped silver mining project in Guatemala, consisting of mining concessions and several mining licenses and pending

8

license applications.  *Id.*  These assets became Tahoe's Escobal Project.  *Id.*  Tahoe owns and operates the Escobal Project through its wholly-owned Guatemalan subsidiary Minera San Rafael ("**MSR**").  *Id.*

30.     At the time of the purchase, the Escobal Project included licenses allowing Tahoe to explore for silver deposits.  But the Project did not have a license that allowed Tahoe to commercially mine silver deposits, and the Project did not include any physical mining operations.  Tahoe Resources Inc., Annual Report (Form 40-F, Ex. 99.1) at 32-36 (Mar. 8, 2012).  Tahoe, however, planned to develop the Escobal Project into the world's third largest silver mining operation and use Escobal to grow the Company.  *See* Press Release, Tahoe Resources, Inc., *Tahoe Reports 2013 Results* (Mar. 13, 2014).

31.     In consideration for Goldcorp's Escobal assets, Tahoe paid Goldcorp $224,570,000 in cash and 47,766,000 shares of Tahoe common stock.  2013 Annual Report at 8-10, 30.  Tahoe's payment of common stock gave Goldcorp a 40% ownership interest in Tahoe and the right to elect three members to Tahoe's eight-member Board of Directors.  2013 Annual Report, at 8.

### 1.     The Escobal Project Area

32.     The Escobal Project Area consists of all 23 mining concessions, *i.e.* land rights, and several granted and pending license applications owned by Tahoe for mining development.  The area is located in southeastern Guatemala, approximately 40 km southeast of Guatemala City, and spans approximately 2,496.8 km$^2$.  Conrad Huss, P.E., et al., *Escobal Guatemala Project NI 43-101 Preliminary Economic Assessment*, 2 (July 24, 2013) ("**PEA**").  Guatemala is broken down into 22 "departments" (similar to American states), and each department is broken down into various "municipalities" (similar to American counties).  During the Class Period, the Escobal Project Area spanned the intersection of three Guatemalan departments: Santa Rosa, Jutiapa, and Jalapa.

33.     Below is a map of Santa Rosa, Jutiapa, and Jalapa with the Escobal Project Area over-layed in pink, blue, and red (color-coded depending on the type of license or concession):



Source: Council on Ethics for the Government Pension Fund Global, Annual Report, 172 (2014).

34.     Below is a detailed map of the Escobal Project Area during the Class Period, which more clearly shows the delineation between the concessions, pending licenses, and granted licenses. The Escobal License area is the irregular, rectangular shape in the center of the map outlined in red. The Juan Bosco License area is green U-shaped area directly to the left of the Escobal License:

10

Source:  PEA at 26.

## 2.      The Escobal License and the Juan Bosco License

35.      The two licenses within the Escobal Project that are specifically at issue in this case are Tahoe's Escobal License—Tahoe's first license for the commercial extraction of minerals—and Tahoe's Juan Bosco License.[2]

36.      Tahoe applied for the Escobal License in March 2011.  PEA at 3.  The area subject to the Escobal License consists of 20 km$^2$ entirely within the Municipality of San Rafael Las Flores, in the Department of Santa Rosa, and sits two kilometers east of the town of San Rafael Las Flores. *See* PEA at 34.  The area of the Escobal License also closely borders several other municipalities, including Casillas, Mataquescuintla, San Carlos Alzate, and Nueva Santa Rosa.  *See* Suroriente, Resistencia Los Pueblos, http://resistenciadlp.webcindario.com/html/suroriente.html.

37.      The Juan Bosco License is an exploration license that was granted to Tahoe on May 9, 2012 for a period of three years, and thus subsequently expired on May 12, 2015.  Tahoe Resources, Inc., Annual Report (Form 40-F, Ex. 99.1) 31, 32 (Mar. 10, 2017) ("**2016 Annual Report**"); Supreme Court Decision Supreme Court of Guatemala, Amparo 1076-2017, at 30 (Sept. 8, 2017) ("**Supreme Court Decision**"), *certified translation prepared by* Morningside Translation, Inc.  Tahoe applied for a three-year extension on February 11, 2015, but the extension was never granted.  *Id.*  The Juan Bosco License area is larger than the Escobal License, covering an area of 59.9 km$^2$.  The license area lies within the four municipalities of San Rafael Las Flores, Casillas, Nueva Santa Rosa, and Mataquescuintla.  Supreme Court Decision at 2.

## B.      The Xinka Indigenous People

38.      The Xinka indigenous people are Mesoamerican natives of southeastern Guatemala. Their ancestral, and present day, homelands are in the departments of Santa Rosa, Jutiapa, and Jalapa—the same departments covered by the Escobal Project.  *See* Guatemala Ministerio de Cultura y Deportes, *Diagnóstico Situación de la Cultura Xinka*, 7, 11 (Nov. 2016) ("**Ministry of Culture**"). Guatemala recognizes the Xinka as an independent indigenous group, and the Xinka of Santa Rosa,

---

[2]      An exploration license allows the holder to study and analyze mineral deposits within the license area whereas an exploitation license allows the holder to extract mineral deposits for commercial use within the license area.  *See* ¶¶58-59.

Jutiapa, and Jalapa are represented by their own government, the Xinka Parliament.  Guatemala also recognizes the Xinka "communal lands," which are plots of land that have been solely farmed and owned by Xinka for generations.

39.   Like all Guatemalan indigenous peoples, the Xinka were victims of attempted genocide in the late-twentieth century.  From 1960 until 1996, Guatemala was mired in a brutal civil war, during which Guatemala's military-dictatorship murdered indigenous villages, believing that indigenous peoples were sympathetic to the rebels.  Commission for Historical Clarification, *Guatemala Memory of Silence*, 23-24, 34-35, 55 (1999).  Indeed, at the war's height, Guatemala's military-dictatorship began a genocidal "scorched earth" campaign to eliminate Guatemala's indigenous population.  Center for Justice & Accountability, *Guatemala "Silent Holocaust"*, http://cja.org/where-we-work/guatemala/ (last visited Aug. 6, 2018).  The civil war came to end with a series of U.N.-brokered peace accords, among them the Agreement on Identity and Rights of Indigenous Peoples of 1995.  General Assembly Security Council, Agreement on Identity and Rights of Indigenous People, United Nations (Apr. 10, 1995), https://peacemaker.un.org/sites/peacemaker.un.org/files/GT_950331_AgreementIdentityAndRights OfIndigenousPeoples.pdf.  With this agreement, the new Republic of Guatemala granted the Xinka formal recognition as an independent indigenous ethnic group.

40.   Immediately following the war, in 1996, the Xinka created an official body to represent their interests on the national stage: the *Consejo del Pueblo Xinka de Guatemala*, or "**COPXIG**."  Frauke Sachse, *Cultivating Marginality: The Process of Reconstructing Identity and the Development of Xinka Cultural Activism in Southeastern Guatemala*, at 6 (2014).  In 2002, the Xinka in southeastern Guatemala formed an additional organization called the *Consenso por la Unidad del Pueblo Xinka de Guatemala* to address, among other things, on-going land disputes.  *Id.* In 2004, this body reconstituted itself as the *Parlamento del Pueblo Xinka de Guatemala*, the Xinka Parliament.  *Id.*

41.   At the center of Xinka identity are their communal lands: lands inhabited and managed by Xinka communities since pre-colonial times.  Ministry of Culture, at 24.  Even today, these lands are farmed ***exclusively*** by Xinka, with Xinka families owning small plots for their

12

subsistence.  *Id.* at 28.  In addition to providing subsistence, the communal lands are integral to Xinka identity:  they are "a social, cultural, and symbolic [area] . . . with deep symbolic and religious connotations that are rooted in history."  *Id.* at 25.  While the communal lands are a center of Xinka life, they are not the only areas inhabited by Xinka, Xinka live in all parts of Guatemala, including cities, villages, and rural areas.

42.     The map below of the departments of Santa Rosa, Jalapa, and Jutiapa clearly depicts that five of the Xinka tribal lands sit within the Escobal Project Area, and one, San Carlos Alzatate, sits less than a quarter mile from the entire eastern boarder of the Escobal License area.  In the map below, the Escobal Project Area is outlined in black and shaded in dark green, the Xinka communal lands are outlined in yellow and shaded in white, and the Escobal License area is shaded in red:



Source: NISGUA, *Un Vistazo al Futuro?*, https://nisgua.org/un-vistazo-al-futuro-mapas-comunitarios-muestran-el-potencial-de-tahoe-resources-para-ampliar-operaciones-mineras/.

43.     In the seventeenth, eighteenth, and nineteenth centuries, the Spanish crown granted the Xinka title to their communal lands by royal decree, and the Xinka communities of today can trace their title to these royal grants.  Ministry of Culture, at 26-27.  Article 67 of Guatemala's Constitution—"Protection of Indigenous Agricultural Lands and Cooperatives"—confers special protection on the Xinka's communal lands and guarantees their indefinite existence.

44.     Each of the Xinka communal lands is administered by an "indigenous community" and maintains a formal hierarchy, akin to a board of directors, which promulgates rules and principles regarding things like possession, inheritance, and resource conservation.  Ministry of Culture, at 24, 28-29.  All Xinka communal lands have rules limiting the possession and use of land by people outside of the community.  *Id.* at 28.  Beginning in the early-twentieth century, these indigenous communities were obliged to formally register with Guatemala's Ministry of the Interior and Justice as private "peasant" or "indigenous" organizations.  *Id.* at 27-28.

45.     The Escobal License area is closest to the Xinka communal land of San Carlos Alzate—in fact, the entire eastern border of Escobal License area sits less than a quarter of a mile from this community.  *See* Escobal EIA at 63 (providing exact coordinates for the Escobal License); Ministry of Culture, at 37.  In June 1930, the Xinka communal lands of San Carlos Alzate were first registered with Guatemala's government as a "private, peasant, developmental, non-profit, apolitical and non-religious entity."  Ministry of Culture, at 27.  Since 1990, the formal registered name has been "Indigenous Committee of San Carlos Alzate (Comscal)."  *Id.* at 27.

### C.     Indigenous Peoples' Consultation Rights Under Guatemalan Law

46.     The Supreme Court of Guatemala's September 8, 2017 decision suspending the Escobal License and Juan Bosco License renewal cited to three relevant Guatemalan laws that require MEM to consult with indigenous peoples prior to issuing a mining license.

#### 1.     ILO Convention 169

47.     Before granting an exploration or exploitation license, MEM must first consult indigenous people who ***may*** be affected by the license, pursuant to the ILO "Indigenous and Tribal

Peoples Convention" of 1989, known as ILO 169.

48.     The ILO is a U.N. agency that promulgates international standards, including "Conventions," which are international treaties that can be ratified by member countries.  Once ratified by a country, a Convention becomes a legally-binding treaty for that country.  International Labour Organization, http://www.ilo.org/global/standards/introduction-to-international-labour-standards/conventions-and-recommendations/lang--en/index.htm.

49.     Guatemala ratified ILO 169 in 1995, thereby binding itself to ILO 169's terms. Rachel Sieder; *The judiciary and Indigenous Rights in Guatemala*, 5 Int'l J. Const. L. 211, 220-21 (2007).  Indeed, Article 46 of Guatemala's Constitution gives human-rights treaties like ILO 169 supremacy over the government's domestic law-making: "The general principle that within matters of human rights, the treaties and agreements approved and ratified by Guatemala have preeminence over the internal law is established."  *See id.* at 230.

50.     ILO 169 Article 6 requires the government, in this case MEM, to consult with indigenous peoples who may be directly affected by a mining license, through their representative institutions, before taking any administrative action that may affect them: "governments shall: (a) ***consult the peoples concerned***, through appropriate procedures and in ***particular through their representative institutions***, ***whenever consideration is being given to legislative or administrative measures which may affect them directly***[.]"  ILO 169, Art. 6.1(a).

51.     The consultation required by ILO 169 Article 6 must aim for the indigenous peoples' agreement or consent to the proposed action: "The consultations carried out in application of this Convention shall be undertaken, in good faith and in a form appropriate to the circumstances, with the objective of achieving agreement or consent to the proposed measures."  ILO 169, Art. 6.2.

52.     ILO 169 Article 15 specifically requires governments to establish mechanisms to consult indigenous peoples before issuing licenses for mineral exploration or extraction: "In cases in which the State retains the ownership of mineral or sub-surface resources or rights to other resources pertaining to lands, governments shall establish or maintain procedures through which they ***shall consult these peoples***, with a view to ascertaining whether and to what degree their interests would be prejudiced, ***before undertaking or permitting any programmes for the exploration or***

1  *exploitations of such resources pertaining to their lands*. The peoples concerned shall wherever

2  possible participate in the benefits of such activities, and shall receive fair compensation for any

3  damages which they may sustain as a result of such activities."  ILO 169, Art. 15.

4       53.    The ILO 169 "Manual," published by the ILO in 2003, says that merely providing

5  information to affected indigenous people does not satisfy ILO 169's consultation requirement.

6  International Labour Organization, *ILO Convention on Indigenous and Tribal Peoples, 1989 (No.*

7  *169): A Manual*, at 16 (2003) ("**The Manual**").  Instead, "*[t]he objective of such consultation is to*

8  *reach agreement (consensus)* or full and informed consent" and "*no measures should be taken*

9  *against the wishes of indigenous and tribal peoples*[.]"  *Id.* at 16.

10       54.    The Manual also emphasizes that "if an appropriate consultation is not developed

11  with the indigenous and tribal institutions or organizations that are truly representative of the

12  communities affected, the resulting consultations will not comply with the requirements of the

13  Convention."  *Id.*

14            **2.**     **Declaration on the Rights of Indigenous Peoples**

15       55.    On September 13, 2007, the U.N. adopted the Declaration on the Rights of

16  Indigenous Peoples ("**UNDRIP**") by a majority of votes (143-4), with Guatemala being among those

17  states voting in favor of the Declaration.  *See* Press Release, UN, General Assembly Adopts

18  Declaration on Rights of Indigenous Peoples (Sept. 13, 2007), *available at*

19  www.un.org/press/en/2007/ga10612.doc.htm.  The UNDRIP calls for the maintenance and

20  strengthening of indigenous peoples' cultural identities, and emphasizes their right to pursue

21  development in keeping with their own needs and aspirations.  *Id.*  Article 19 of UNDRIP provides:

22  "States shall consult and cooperate in good faith with the indigenous peoples concerned through

23  *their own representative institutions* in order to obtain their *free, prior and informed consent*

24  before adopting and implementing legislative or administrative measures that may affect them."

25  Declaration on the Rights of Indigenous People, G.A. 61/295, U.N. Doc. A/61/L.67 (Sept. 13, 2007).

26  In regard to exploitation specifically, Article 32, Section 2 of UNDRIP provides that "States shall

27  consult and cooperate in good faith with the indigenous peoples concerned *through their own*

28  *representative institutions* in order to obtain their *free and informed consent* prior to the approval

of any project affecting their lands or territories and other resources, particularly in connection with

the development, utilization or *exploitation of mineral, water or other resources*." *Id.*  Section 3

provides that "States shall provide effective mechanisms for just and fair redress for any such

activities, and appropriate measures shall be taken to mitigate adverse environmental, economic,

social, cultural or spiritual impact." *Id.*

### 3.        Article 66 of Guatemala's Constitution

56.        More generally, Article 66 of the Political Constitution of the Republic of Guatemala

provides that the state must promote and protect the rights of indigenous peoples.  The provision

states that "Guatemala is formed by diverse ethnic groups among which are found the indigenous

groups of Mayan descent.  The State recognizes, respects, and promotes their forms of life, customs,

traditions, forms of social organization, the use of the indigenous attire by men and women, [and

their] languages and dialects."  Constitución Política de la República de Guatemala art. 66 (amended

1993).

### D.        Tahoe Files An Environmental Impact Assessment For The Escobal License Which Represents To The Ministry Of Energy And Mines That There Are No Indigenous Peoples In The Area Of The License

### 1.        Guatemalan Mining Law

57.        The State of Guatemala owns all mineral deposits within Guatemala.  Tahoe

Resources, Inc., Annual Report (Form 40-F, Ex. 99.1) 17 (Mar. 11, 2013) ("**2012 Annual Report**").

Guatemala's MEM is responsible for granting mining licenses within the country.  *Id.* at 17.

58.        Guatemala issues three types of mining licenses: reconnaissance licenses, exploration

licenses, and exploitation licenses.  2012 Annual Report at 18-19.  Reconnaissance licenses allow

the holder to locate areas for exploration and may cover up to 3,000 km$^2$.  *Id.* at 18.  Exploration

licenses allow the holder to study and analyze mineral deposits, may cover up to 100 km$^2$, and

typically expire after three years, but the holder may apply for two-year extensions.  *Id.* at 18.

59.        Exploitation licenses are the only licenses that allow the holder to extract mineral

deposits on a commercial scale.  These licenses may cover up to 20 km$^2$, and typically expire after

25 years.  2012 Annual Report at 19.  To obtain an exploitation license, the applicant must, *inter*

*alia*, prepare an EIA for review and approval by MEM.  *Id.* at 19; Guatemala Mining Law, Decree No. 48-97, Article 20.

60.     The one-page application for exploration licenses requires basic information such as the license area's coordinates and the applicant's basic identifying information.  *See* Guatemala Mining Law, Decree No. 48-97, Article 41; *see* Ministry of Energy and Mines, *Mining License Application*, http://www.mem.gob.gt/wp-content/uploads/2015/05/Solicitud-de-Licencia_ mineria.pdf (last visited Aug. 6, 2018).  Thus, only the EIA provides MEM with substantive information about a project's effect and impact.

61.     An EIA must include a "Description of the Socioeconomic and Cultural Environment."  *See* Ministry of the Environment and Natural Resources, *Guide on the Elaboration of an Environmental Impact Study*, http://www.marn.gob.gt/Multimedios/304.pdf (last visited Aug. 6, 2018).  The description must include data about the population near the project.  *Id.*  The description must also catalogue "Local Perception of the Project" through public participation: using public opinion polls, the attitudes and concerns of residents about the implementation of the project must be documented.  *Id.*  The public participation requirement is intended to prevent conflict between the project and affected communities.  Ministry of the Environment and Natural Resources, *Términos de Referencia para Orientar el Proceso de Participacíon Pública*, Release DVGA-GA-012.

## 2.     Tahoe Submits the Escobal EIA

62.     Despite its intention to make the Escobal Mine one of the largest silver mines in the world (¶30), in the Escobal EIA, Tahoe purposefully limited the "Description of Socioeconomic and Cultural Environment" to only 10 small communities in San Rafael Las Flores (the municipality in which the Escobal License area sits).  EIA § 10-1; *infra* ¶36.  Then, based upon this small area, Tahoe used data from Guatemala's 2002 INE Census to characterize the population of these communities as almost devoid of any indigenous people.  *See* Escobal EIA, at 10-1 – 10-11, 10-1 n. 1.[3]  The 2002 INE Census showed that only two Xinka resided in these areas, both in the community

---

[3]      Guatemala has not conducted a census since 2002.  *See After Volcano Eruption, Guatemalans Lead Their Own Disaster Recovery*, Associated Press (June 21, 2018, 6:25 am),

of Aldea El Fucío.  *See* Escobal EIA, at 10-6.  Aside from the mention of these two people, the EIA makes no reference to any indigenous peoples, the Xinka, or the Xinka communal lands.  *See generally* Escobal EIA.

63.     The EIA's "Local Perception of the Project" section also fails to mention any consultation with indigenous peoples.  Instead Tahoe convened workshops of 20 to 30 participants and detailed the concerns raised at the workshops.  *See* Escobal EIA, §10.5.  The primary concerns raised were water contamination, air contamination, deforestation, and that mining activity would affect crops, or the perception of local crops, and drive down prices.  *Id.*  In response, Tahoe emphasized that it would follow all necessary protocols and address issues as they arose.  *Id.*

64.     MEM then relied upon the indigenous population numbers provided in the EIA to determine that it was not required to consult any indigenous people pursuant Guatemalan law (¶¶46-56) before granting the Escobal License (¶189).  However, the Company's self-determined area of influence is not the test by which MEM must determine who should be consulted regarding a mining license.  Under Guatemalan law (¶¶46-56), MEM was required to consult with all indigenous peoples who **may be affected** by the Escobal Project, and surely that population, at the very least, included the Xinka living on the San Carlos Alzate communal lands less than a quarter of a mile from the border of the Escobal License area (¶¶36, 42).

   E.     **The Escobal Project Area Was Inhabited By Xinka**

          1.     **The 2002 INE Census Figures Had Been Widely Rejected**

65.     The Xinka Parliament has long rejected the 2002 INE Census as racist.  According to Xinka Parliament leaders, the 2002 INE Census takers marked nearly all residents as Ladino as long as they were "wearing shoes."  Roberto Gonzalez Ucelo, President of the Xinka Parliament from 2012 to 2014, explained that the interviewers did not ask the residents if they were indigenous, they simply marked everyone as ladinos: "Even people said 'I'm indigenous' and they still marked them as ladino" "just that one person [who was wearing traditional clothing,] they marked as indigenous. Everybody else they mark as ladino."  Quelvin Otoniel Jimenez Villalta ("**Villalta**"), the Xinka

---

https://wtop.com/national/2018/06/after-volcano-eruption-guatemalans-lead-their-own-disaster-recovery/ (noting that Guatemala's census is nearly two decades old).

Parliament's Legal Advisor, also explained that: "It's a racist country with lots of discrimination." "They say to be indigenous you need to live in an adobe house with no shoes.  The census simply never asked who was indigenous."

66.     Unhappy with the 2002 INE Census, in 2003 and 2004, the Xinka Parliament conducted its own census of Xinka people living on Xinka communal lands in the departments of Santa Rosa and Jutiapa (the "**2003/2004 Xinka Parliament Census**")—two of the departments covered by the Escobal Project Area.  ¶¶32, 33.  This census counted 164,613 Xinka in those departments alone.  *See* U.N. Children's Fund's, *Atlas Sociolingüístico de Pueblos Indígenas en América Latina* (2009) ("**2009 UNICEF Guide**").  Indeed, the census showed that the Xinka communal land of Quezada, which sits entirely within the Escobal Project Area (¶42), was inhabited by 8,315 Xinka, and the Xinka tribal land of Nueva Santa Rosa, which almost entirely sits within the Escobal Project Area (*id.*), was inhabited by 15,220 Xinka.  2009 UNICEF Guide at 856.

67.     Two U.N. publications circulated in Latin America in 2009 and 2011 cited the 2003/2004 Xinka Parliament Census and highlighted the discrepancies with the 2002 INE Census. The 2009 UNICEF Guide stated: "The data from the 2002 census contrast with the data collected by the Parliament of the Xinka People of Guatemala" as the 2002 census "defines the southeastern zone of Guatemala (Santa Rosa, Jutiapa, Jalapa) as an area with little indigenous presence, where there is only between 0.8% and 7.5% of indigenous population concentration."  2009 UNICEF Guide, at 856.  The 2011 UN Guide stated that: "The 2002 Census indicates that in the southeast area of Guatemala between 0.8% and 7.5% of the population is indigenous, of which 16,214 self-identified as Xinca.  This information contrasts with the data collected by the Parliament of the Xinca people of Guatemala[,]" which lists 164,613 Xinka.  U.N.'s *Diagnóstico Sobre la Situación de los Derechos Humanos de los Pueblos Indígenas de América Central* 93 (2011) ("**2011 U.N. Guide**").

68.     In 2008, COPXIG created a census of Xinka people living on communal lands in the Departments of Santa Rosa, Jutiapa, and Jalapa—all three of the departments covered by the Escobal Project Area.  *See* ¶¶32, 33; Abisai De La Cruz Morales, *Proceso de Recuperación de la Tierra Como Factor de Cohesión Social de la Comunidad Xinka Las Lomas, Chiquimulilla, Santa Rosa* 32 (Aug. 2009) (unpublished thesis, Universidad de San Carlos de Guatemala).  This census counted

over 190,000 Xinka living on communal lands in these departments.  *Id.*  Specifically, the COPXIG census showed 20,000 Xinka living in Nueva Santa Rosa and 7,000 living in Mataquescuintla, both of which are municipalities covered by the Juan Bosco License.  *Id.*; ¶37.  Also, the COPXIG census shows 8,500 Xinka living in San Carlos Alzatate, which sits less than a quarter of a mile from the entire eastern border of the Escobal License area.  *Id.*; ¶42.  The census was cited in academic sources as early as 2009.  *See id.*  In its 2016 survey of the Xinka, Guatemala's own Ministry of Culture and Sports relied on the COPXIG census to document the Xinka population and noted the discrepancy with the 2002 census.  Ministry of Culture, at 23.

69.     In 2012, the Xinka Parliament signed a letter to Guatemala's President Otto Pérez Molina demanding that the government take them into account in official censuses.  The Xinka letter signing was covered by the Guatemalan press.  *See e.g.* Prensa Libre, *Xincas se Quejan de Marginación*, Prensa Libre (Feb. 18, 2012), http://www.prensalibre.com/santa_rosa/Xincas-quejan-marginacion_0_648535179-html.

### 2.     The 2015 Catholic Census and 2017 Ethnographical Studies

70.     In Spring 2015, the Catholic Church conducted a census in the department of Santa Rosa—one of the departments in the Escobal Project Area (the "**Catholic Census**").  Catholic Church, *Resultados de Encuesta Diocesana de Santa Rosa* (2015).  According to Bishop Bernabé de Jesús Sagastume Lemus, the census was conceived to assist the Church in understanding the communities it served.

71.     The Church's door-to-door census counted 6,674 Xinka living in San Rafael Las Flores, as well 3,944 Ladinos.  *Id.*  That is, the population of San Rafael Las Flores was 63% Xinka.  *Id.* at 2.  The Catholic Census also counted significant Xinka populations in two other municipalities covered by the Juan Bosco License: 5,822 Xinka in Casillas and 8,099 Xinka in Nueva Santa Rosa.  *Id.*  The Supreme Court of Guatemala later relied on this census to determine that there is a significant Xinka population in the municipalities of San Rafael Las Flores, Casillas, Nueva Santa Rosa, and Mataquescuintla.  Supreme Court Decision at 30, 59.

72.     In July 2017, Guatemala's Constitutional Court commissioned two anthropological teams, from the University of Valle de Guatemala and the University of San Carlos, to determine

whether there were Xinka living in San Rafael Las Flores.  *See* Nómada, *The CC asked the UVG if there are Xinkas to decide on the mine; this was the answer* (July 26, 2018),  https://nomada.gt/ identidades/guatemala-rural/la-cc-pregunto-a-la-uvg-si-hay-xinkas-para-decidir-sobre-la-mina-esta-fue-la-respuesta/.  Both Universities concluded that the Xinka had never left San Rafael Las Flores. *Id.*; Nómada, *The CC asked the universities if there were Xinkas; the USAC answered like this* (July 30, 2018), https://nomada.gt/identidades/de-donde-venimos/la-cc-pregunto-a-universidades-si-existian-xinkas-por-una-mina-la-usac-respondio-asi/.  In its report to the Court, the team from Valle de Guatemala concluded that Xinka have continually resided in the area since before European colonization, which "reflects a family and community trajectory associated with belonging to the territory."  Nómada (July 26).  In their interviews with local residents, this team observed social, economic, cultural, and political elements typical of Xinka and Pocoman indigenous peoples.  *Id.* The team from the University of San Carlos, in its report to the Court, said of San Rafael Las Flores' population: "Although it is true that here there are people who identify themselves as ladinos and / or mestizas; there are many others that recognize their indigenous ancestors and from this account they define themselves as indigenous and as xinkas."  Nómada (July 30).

### 3. Tahoe's Employees Saw Indigenous People Around the Escobal Mine Every Day

73.     Tahoe's own employees observed a significant indigenous population in San Rafael Las Flores and confirmed that the Company was well aware of the presence of indigenous peoples in the Escobal License area.

74.     Leonardo Menegazzo Grindley was a Human Resources Supervisor at MSR from November 2011 to November 2012.  During his tenure at MSR, Menegazzo lived in San Rafael Las Flores.  Menegazzo says that, during his time at MSR, an indigenous population was clearly visible in San Rafael Las Flores: "Yes, you would see them in the streets often enough."  He also said the indigenous people were easy to identify from "how they dressed, how they spoke—their language."  When asked, Menegazzo agreed that the local indigenous population would have been evident to all of the Company's workers: "Yes—it was evident to the whole company and to the people who lived in the town."

22

75.     Confidential Witness No. 1 ("**CW1**") was the Chief of Mining Security at MSR from July 2011 to December 2015.  In that role, CW1 "supervised and controlled the security team for the mine itself and the surrounding areas."  CW1 arrived at MSR before the Escobal License was granted.  According to CW1, before the License was issued: "[the Company] never did any consultation.  Minera San Rafael entered, bought the land and that was it."  When asked whether there were indigenous individuals within this group of landowners, CW1 said: "Yes surely. It's almost a fact."

76.     When asked how one could identify a person as indigenous, CW1 said: "From the form of speech, from their clothes, their expressions, the type of skin, nose, eye."  When asked if there was a significant indigenous population around the mine, CW1 said: "Yes, there were people around the mine, around the villages.  More in the countryside than in the villages.  There were some—not so many."  When asked whether he found it strange that the Company would not know about the local indigenous population, CW1 said: "Yes, it is surprising."

77.     As part of his job, CW1 had to travel offsite for environmental monitoring tasks, "so we would see the people around the mine."  He did this about once a month and would "interact with three of four [s]ites."  At these sites, CW1 estimated the population was "maybe 50% indigenous."  CW1 conducted these visits with a team of four to five people – environmentalists and security personnel.  When asked if the rest of the team identified residents at the monitoring sites as indigenous, CW1 replied: "Yes—it was clear."

78.     Tim Lehman was MSR's Mine Maintenance Manager from March 2011 to May 2014.  Lehman did not remember discussions about indigenous consultation during his tenure at MSR.  Although, he said: "I'm pretty sure there were indigenous people there."  Lehman said it was easy to identify people as indigenous: "You could tell by looking at them if they were indigenous, or had some Spanish or whatever in them.  When you went from San Rafael Las Flores through Mataquescuintla up the mountain, my understanding was those were all indigenous people.  If I were a betting man I'd say so."  Although he could not remember who at the Company had told him, he said: "They told us not to go up in that area—'They're indigenous people and you can't go to Mataquescuintla.'  Mataquescuintla—it's an indigenous name, I'm sure."

79.     Despite obviously living and working amongst indigenous peoples, Tahoe continually told investors during the Class Period that the Company "is not aware of any significant indigenous population residing in the area of the Escobal Project."  *See, e.g.,* 2013 Annual Report, at 20.

F.     **Tahoe And MEM Reject The Xinka's Request For Consultation Regarding The Escobal Project**

80.     Beginning as early as 2010, the Xinka Parliament informed Tahoe and MEM representatives that the Xinka needed to be consulted by MEM about the Escobal Project.  At meetings attended by representatives of the Company and MEM, Xinka leaders expressed their concerns about the Escobal Project, its potential environmental consequences, and its proximity to their lands.  But MEM never consulted with the Xinka and quickly broke-off all dialogue.

81.     Villalta, the Xinka Parliament's Legal Adviser, has been active with the Xinka Parliament since its beginning and focuses his work on the preservation and recuperation of Xinka communal territories.  *See* Luis Solano, *Under Siege*: *Peaceful Resistance to Tahoe Resources and Militarization in Guatemala*, at 8 (Nov. 10, 2015) 6 ("**Under Siege**").  According to Villalta, in 2010, the Xinka started asking the local municipal government for a consultation regarding the Escobal Project: "We asked the municipal government for a consultation starting in 2010, specifically in San Rafael Las Flores.  We said the Xinka need to participate—the mine is almost inside the town—just 20 kilometers away."  Villalta added that "there were concerns regarding water contamination."  Nothing came of this request because, according to Villalta: "The municipality and the company obstructed the realization of this consultation."

82.     Villalta specifically recalls several meetings that were attended by Xinka representatives, MEM, and/or Company representatives—none of which produced the Xinka's desired consultation.

83.     According to Villalta, in early 2011, he participated in a meeting as the Xinka Parliament representative that was also attended by the Vice Minister of MEM, various mayors of Nueva Santa Rosa, the mayor of Casillas, and Father Juan Manuel Arija from the Catholic Church.  Villalta said that during the meeting he and others "said they [MEM] couldn't issue licenses without the consultation – that we were not in agreement with the issuance of permits."  He explained that

the thrust of the meeting was to tell MEM "that we were against it – but that at least they needed to consult."  Villalta relayed that the Vice Minister found this assertion to be "ridiculous" because, "for a driver's license[,] there's no consultation."  Villalta elaborated that "the vice minister did not recognize issues of environmental, social and economic impacts on the region - nor ILO 169."  During this meeting, the Vice-Minister also told attendees that "consulting indigenous people is 'stupid' because they are not qualified to make decisions about mining activity."

84.  Then, Villalta attended a meeting held in early 2012 with Moises Divas, another official representative of the Xinka community.  At the meeting, Robert Robinson, a U.S. engineer hired by the Madre Selva Collective (an environmental NGO), presented his conclusion that the Escobal EIA should not have been approved because it contained serious environmental deficiencies.[4]  But after the presentation, MEM said it would not recognize Robinson's analysis because he is not accredited in Guatemala.  *See* Under Siege at 8.

85.  At a second meeting Villalta attended in 2012, Xinka representatives, municipal officials, and church officials spoke with Company representatives.  At this meeting, the Xinka representatives "gave a presentation" outlining their concerns about the Escobal Mine.   It was after this meeting, says Villalta, that the communication stopped between the Xinka, MEM, and Tahoe.

86.  Also in 2012, San Rafael Las Flores elected a new mayor, who decided to organize a consultation.  The consultation was meant to bring together community members, the Xinka, and the Company.

87.  Unfortunately, this consultation never took place.  A group of women, who Villalta believes were offered gifts and bribes by the Company, applied for restraining orders against the community leaders under Guatemala's femicide laws prohibiting violence and crimes against women, and these restraining orders prevented the leaders from attending the plebiscite.  According to Villalta: "The women in the company accused the Xinka that were asking for the consultation—so they could not go."  Villalta believes the applications were filed in the names of people associated with a group that worked with the mine—either the Asociación de Artesanía or Asociación de

---

[4]  Robert Robinson's report, *Análisis de Estudio de Impacto Ambiental del Proyecto Minero El Escobal*, is available at: https://www.ocmal.org/analisis-de-estudio-de-impacto-ambiental-del-proyecto-minero-el-escobal/.

Platería –he did not remember the exact name.  *See also* Under Siege at 9 n.31 (in regard to the requested plebiscite in San Rafael Las Flores: "Local leaders at the forefront of the referenda movement had multiple spurious legal cases filed against them during the same period by mine employees or people associated with the mining company.").  Villalta adds that two of the women later spoke out, saying they did not know the lawyer and did not authorize him to act on their behalf.

88.     In 2012, the new MEM Vice Minister, Ekaterina Parrilla, attended a development council meeting, a "consejo de desarrollo," comprised of the department of Santa Rosa's municipal mayors.  Videotape: 2012 San Rafael Las Flores Consejo de Desarrollo (Sistema de Consejos de Desarrollo).  At the meeting, Parilla explained how the mining license process works, and the difficult balance between mining and regulatory interests.  *Id.*  Enrique Arredondo, the mayor of Nueva Santa Rosa, complained that MEM was not doing enough to inform the community about mining and explained that people needed this information to decide whether they wanted mining in their communities.  *Id.*  Felipe Rojas, the mayor of Casillas, said mining was a critical issue for his residents and asked MEM to intervene in the controversy surrounding Escobal.  *Id.*  In regards to the Escobal Project, vice-minister Parilla said: "We agree that the company has not done an adequate job in communication, in socialization, and in desensitization . . . and we are working on this."  *Id.*

### G.     The Xinka Fight Against The Escobal Project

89.     Because Tahoe and MEM would not honor their request for consultation, the Xinka joined protest efforts opposed to the Escobal Project.

#### 1.     The Xinka Join in the Opposition to the Escobal Project

90.     In the early days of the Escobal Project, many NGOs were formed or joined in to educate residents and support the resistance to the project.  The Committee in Defense of the Life of San Rafael Las Flores ("**SRLF Committee**") was formed in 2010 by several concerned residents who wanted to obtain more information about the Escobal Project.  *See* Under Siege at 7.  Then, in December 2010, members of the Catholic Church began coordinated efforts to educate residents about the project which led to the formation of Diocesan Commission in Defense of Nature of the Diocese of Santa Rosa Lima ("**CODIDENA**").  *See id.* at 8.  CODIDENA then brought in the help of national organization, CALAS.  *See id.*  The Xinka Parliament also worked closely with these

NGOs to represent people in opposition to the Escobal Project.  *See id.* at 9; *see also* Letter from Network in Solidarity with the People of Guatemala et al., to Canadian Ambassador Deborah Chatsis & U.S. Ambassador Todd Robinson (Aug. 21, 2017), *available at* http://www.breakingthesilenceblog.com/general/4362/ ("The Xinca Parliament has been actively participating in the resistance to the mine project since at least 2012[.]").

**2.    The Xinka Arrange Plebiscites To Vote Against the Escobal Project**

91.    In 2011, the Xinka Parliament and CODIDENA encouraged people from the municipalities within the Escobal Project area to engage in plebiscites, *i.e.* referenda, in order to document public opinion against the Escobal Project.  Under Siege, at 8-9.  Plebiscites allow municipal residents to vote on issues affecting them and are legally recognized by Articles 60-66 of Guatemala's Municipal Code.  Under Siege, at 9.  In the plebiscites organized by the Xinka and CODIDENA, residents were asked to vote YES or NO to mining in their municipality.  *Id.* at 9.

92.    In every municipality, including the municipalities in and around the Escobal and Juan Bosco License areas, voters overwhelming rejected mining: 98.86% voted NO in Nueva Santa Rosa; 95.69% voted NO in Santa Rosa de Lima; 98.61% voted NO in Casillas; and 98.68% voted NO to mining in Mataquescuintla. Under Siege, at 9.

93.    On August 4, 2011, MSR filed a legal action against the plebiscite in Casillas in an attempt to prevent it from taking place.  Under Siege, at 9.  The Court ultimately dismissed MSR's action.  Constitutional Court, Expediente 4672-2011.  Lawsuits to stop plebiscites in the other municipalities were filed by the Guatemalan Chamber of Commerce, among other pro-business groups.  Under Siege, at 9.

94.    On June 22, 2012, representatives from the Xinka Parliament (Villalta), CODIDENA, Madre Selva Collective, CALAS, Committee in Defense of Life, and the Community Development Counsel of Juan Bosco held a press conference to denounce the Juan Bosco License that had recently been granted to Tahoe by MEM.  *See Rechazan Licencia Minera de Exploración "Juan Bosco*," C.P.R. Urbana (June 22, 2012, 7:30 AM), http://cpr-urbana.blogspot.ca/2012/06/rechazan-licencia-minera-de-exploracion.html.  The community leaders argued that the recent plebiscites held in Nueva Santa Rosa and Casillas made the license illegal.  *Id.*

27

### 3.     Tahoe Initiates Legal Action To Stop the Xinka from Protesting

95.     Beginning in 2011, people began holding large-scale protests in front of the gates of the Escobal Mine.  *See* Under Siege at 13.  By June 2012, MSR secretly filed a lawsuit in Guatemala's Constitutional Court against several Guatemalan government agencies and officials alleging that the government had failed to protect the Escobal Mine from protesters.  Constitutional Court, Expediente 2728-2012.  The Company's lawsuit claimed: "The state is not ensuring security [for the Company] by allowing residents to protest against activities that are authorized and have the corresponding licenses, committing illegal acts and carrying out blockades in front of the installations, which impede free transit."  Under Siege, at 16.  The Constitutional Court dismissed the Company's action on February 26, 2013.  *Id.* at 16.

96.     On September 18, 2012, while protesting in front of the mine's gates, protestors were violently evicted by the Company's private security and local police.  Under Siege, at 13.  At least 32 protestors were arrested on charges including terrorism.  *Id.*  MSR acted as a "joint plaintiff" in the public prosecutor's case against the protestors.  *Id.*  In addition to those arrested, the public prosecutor also issued an arrest warrant for the President of the Xinka Parliament, Roberto González Ucelo.  *Id.*  The charges against the President and other protestors were later dismissed for inadequate investigation.  *Id.*

### 4.     The Xinka Rally in San Rafael Las Flores for a Plebiscite

97.     In the Summer of 2012, the Xinka Parliament, the SRLF Committee, CODIDENA, and other NGOs organized a peaceful event in San Rafael Las Flores to support the residents' demand for a municipal consultation.  *See* Somos Xinkas, *Divulgación: Concentración Contra La Minera en Territorio Xinka* (July 19, 2012), http://yosoyxinka.blogspot.com/2012/07/divulgacion-concentracion-contra-la.html.  The Xinka Parliament and the other organizations hoped that the event in San Rafael Las Flores would allow for dialogue between local authorities, the Company, and the people who opposed the Escobal Project.  MiMundo.org, *In San Rafael Las Flores and My House, the Mine Does Not Pass* (July 22, 2012).  An invitation to the event that was circulated online is shown below:



Source:  Somos Xinkas, *Divulgación: Concentración Contra La Minera en Territorio Xinka* (July 19, 2012).  A picture of the President of the Xinka Parliament, Roberto Gonzalez Ucelo, speaking at the event, is featured below:



29

*See* http://cpr- urbana.blogspot.com/2012/07/en-san-rafael-las-flores-santa-rosa.html.  Below is a picture of other Xinka people at the rally who held a sign identifying themselves as Xinka:



98.     The sign above reads in part: "The Xinkas have their own government that is exercised by the communal board in which all the Xinkas are represented."  *See, e.g.,* James Rodríguez, *In San Rafael Las Flores and My House, the Mine Does Not Pass*, Mimundo Blog (July 22, 2012), http://blog.mimundo.org/2012/07/2012-07-in-san-rafael-las-flores-and-my-house-the-mine-does-not-pass/

99.     Oscar Morales of CODIDENA summarized the community's frustration stating: "[F]or three years we have been asking for a municipal referendum and we have been denied[.]" "The company has criminalized us. They put forth appeals seeking the annulment and revocation of the process so that we couldn't carry out the referendum."  *See* Melanie Sevcenko, After Kidnapping and Killings, Canadian Mining Project Advances in Guatemala, Occupy.com (Apr. 11, 2013), https://www.occupy.com/article/after-kidnappings-and-killing-canadian-silver-mining-project-advances-guatemala#sthash.ydnQvSsp.dpbs.

100.     Despite the Xinka's efforts, the mayor of San Rafael Las Flores rejected the community's request for a plebiscite.  *See Under Siege* at 9, n.31.  Although, ultimately, with the help of the Xinka Parliament, the residents of San Rafael Las Flores organized "good faith" plebiscites in the municipality's communities anyway.  Under Siege at 10.  Again, voters rejected mining, voting NO to mining between 93.44% and 100%.  Under Siege, at 10.

101.     Four leaders of the Xinka Parliament attended the "good faith" plebiscite in El Volcanito on March 17, 2013, including President Roberto Gonzalez Ucelo and Secretary Exaltacion Marcos Ucelo.  On their way home from the plebiscite, the Xinka leaders were kidnapped by a dozen heavily-armed men wearing ski masks.  *See* Annie Baird, *Genocide Never Again: General Rios Montt on Trial and the Abduction of Xinca Leaders in Santa Maria Xalapan*, Council on Hemispheric Affairs (April 8, 2013), http://www.coha.org/22177/.  The next day, the Secretary was found dead with his hands and feet bound and his mouth gagged.  *Id.*  Press reports alleged that the Secretary was murdered with a blow to the head.  *Id.*  The Xinka President was reportedly told by his captors that he was being taken to the Department's congressman and the Escobal mine's manager.  *Id.*  But the President was abandoned at a local hotel after his captors learned that search efforts were underway.  *Id.*

### 5.     MEM Grants the Escobal License Despite Xinka Opposition

102.     On April 3, 2013, the day MEM granted the Escobal License, the Xinka Parliament, CALAS, and CODIDENA held a press conference in Guatemala City, to denounce MEM's "illegal approval" of the License.  *Exploitation License Granted for Tahoe Resources Escobal Project in Context of Escalating Violence*, NISGUA (Apr. 5, 2013), https://nisgua.org/exploitation-license-granted-for-tahoe-resources-escobal-project-in-context-of-escalating-violence/.  In their press release for the event, the Xinka Parliament expressed their

> [C]omplete disappointment in the attitude assumed by the Minister of Energy and Mines who, in clear violation of the prevalence of the common good over the individual, ignored the community consultations carried out in the municipalities of Casillas, Nueva Santa Rosa, and Santa Rosa de Lima, as well as the community consultations held in the communities of San Rafael las Flores, during which more than 98% of the population rejected the development of this illegally approved mining project.

### 6.     Tahoe Resorts to Violence To Stop the Protests

103.     Immediately after MEM granted the Escobal License, people erected a peaceful protest camp in front of the Escobal Mine's gates.  Representatives of the Xinka Parliament were among those manning the camp.  *See* Communidades en Resistence Pacifica el Escobal, *Tercer Dia de Resistencia Pacifica*, Communidades en Resistence Pacifica el Escobal (Apr. 10, 2013), http://resistencapacificaelescobal.blogspot.com/search?updated-max=2013-04-11T21:40:00-07:00&max-results=7&start=7&by-date=false.

104.     Then, on the evening of April 27, 2013, while people were peacefully protesting outside of the Escobal Mine, the Company's security opened fire on the protestors.  Under Siege at 16.  Protestors sustained bullet wounds to their faces and their backs.  *See* Mike Caswell, *Tahoe Sued By Protestors Over Escobal Shooting*, Stockwatch Daily (June 9, 2014).  In recorded conversations from that evening, Alberto Rotondo Dall'Orso, MSR's head of security, boasted: "I ran them out with bullets . . . Well then, sons of bitches! . . . There is no way I am ever going to allow them to get confident . . ."  Rotondo told his subordinate: "They say that one has a, a bullet wound in the face and . . . if it exploded in their face, it's with bullets that they learn."  *Wiretap Transcripts Raise Troubling Questions About Tahoe Resources' Militarized Security Detail*, Amnesty International (Apr. 7, 2015), https://www.amnesty.ca/news/public-statements/joint-press-release/wiretap-transcripts-raise-troubling-questions-about-tahoe.

105.     Several days later, Rotondo was arrested at the airport, attempting to flee the country.  *See* Under Siege, at 16.  The following week, Guatemalan authorities indicted Rotondo for causing grave injuries to the protestors.  *Id.*

106.     On May 1, 2013, Tahoe addressed the incident, which it later referred to as an "unfortunate gate-blockage incident[.]"  Despite the fact that peaceful protestors had sustained grave injuries, Tahoe claimed that its personnel only used rubber bullets against the "hostile" protestors "armed with machetes."  Press Release, Tahoe Resources, Inc., *Tahoe Clarifies Reports Regarding Incidents Near Escobal Project* (May 1, 2013); *See* Edie Hofmeister, *One View: Criticism of Tahoe Resources' Escobal Mine Biased, Unfounded*, Reno Gazette Journal, Sept. 15, 2016.

107.     In response to Tahoe's attack on protestors, on May 2, 2013, Guatemala's President Perez Molina declared a military state of siege in the municipalities of San Rafael Las Flores, Mataquescuintla, Casillas, and Jalapa.  *See* Guatemalan Government Declares State of Siege in Municipalities Surrounding Tahoe Escobal Mine, NISGUA (May 3, 2013), https://nisgua.org/guatemalan-govt-declares-state-of-siege-in-municipalities-surrounding-tahoe-escobal-mine/.  The President deployed more than 8,500 military personnel to the area and appointed the Deputy Head of the Depart of Defense to command the siege.  Under Siege, at 17.

### 7.     A Xinka Parliament Representative Files a Lawsuit Against MEM for Dismissing His Objection to the Escobal License

108.     Guatemala's mining law allows those who consider themselves prejudiced by a mining license application to submit a formal opposition to MEM before the license is granted. Guatemala Mining Law, Decree No. 48-97, Art. 46.  MEM is required to hold a hearing on each opposition and resolve the opposition in 30 days.  *Id.*, Art. 47.  The license should not be granted until the opposition process is exhausted.  Id., Art. 48.

109.     Beginning in November 2011, approximately 250 individuals from communities affected by the Escobal License began submitting formal objections to the Escobal License to MEM. *See* NISGUA, *Guatemalan Complainants Celebrate Effective Suspension of Tahoe Resources License* (July 25, 2013).  Villalta was among those who filed an opposition.  In his opposition, Villalta argued that discharges from Tahoe's operations into local waterways were already affecting him and his community.

110.     MEM never granted hearings on any of the oppositions.  On April 3, 2013, less than one hour before the press conference announcing approval of the Escobal License, MEM dismissed all of the over 250 oppositions.  *Id.*  In May 2013, Villalta and CALAS filed suit against MEM in the Civil and Mercantile Division of Guatemala's First Court of Appeals, alleging that because MEM dismissed the objections without granting hearings for the claims, the Escobal License was granted illegally.  *Id.*  The suit was supported by the Xinka Parliament, and the complaint initiating the suit as well as many of the legal filings identified Villalta as Xinka.  *Id.*

33

111.     On July 23, 2013 the Civil and Mercantile Court held that MEM had violated

Villalta's rights and ordered MEM to hold a hearing on Villalta's opposition.  NISGUA, Guatemalan

Complainants Celebrate Effective Suspension of Tahoe Resources License (July 25, 2013).

112.     In response, on July 24, 2013, CALAS and the Xinka Parliament held a press

conference to announce the Civil and Mercantile Court's decision.  During the press conference,

Villalta told reporters: "The only thing the Escobal mine is currently producing in the area is

conflict."  NISGUA, Guatemalan Complainants Celebrate Effective Suspension of Tahoe Resources

License (July 25, 2013).  The Guatemalan press reported Villalta's victory and identified him as

"part of the Xinka communities that live in the mine's vicinity."  el Periódico, *Pobladores Ganan*

*Pulso Legal a Mina San Rafael* (July 25, 2013).  A picture of the press conference can be seen

below, Villalta is the man holding the microphone:



113.     On July 25, 2013, MEM and Tahoe, as an interested party, appealed the Court of

Appeals decision to the Constitutional Court.  Corte de Constitutionalidad, Expedientes Acumulados

3173-2013 and 3389-2013, at 4-5.  A Company representative attended the Constitutional Court's

hearing, and there Villalta identified himself as Xinka and even made some of his arguments in the

Xinka language.  Villalta argued that the Escobal Mine was already having an adverse effect on his

community.  The Constitutional Court ultimately ordered MEM to conduct hearings, and MEM

commenced a hearing process in June 2016, but then suspended the process indefinitely.  *See* 2016

Annual Report at 11.

### H.   Human-Rights Bodies Blame The Unrest Surrounding The Escobal Project On A Lack Of Consultation Of Indigenous Peoples

#### 1.   The Inter-American Commission on Human Rights

114.   On September 3, 2013, the Mayan and Xinka peoples of Guatemala filed a petition with the Inter-American Commission on Human Rights ("**IACHR**") against Guatemala, the President of Guatemala, the Minister of MEM, and other Guatemalan officials.  *See generally* Los Pueblos Maya y Xinka Presentamos: *Petición Contra El Estado de Guatemala* (Sep. 3, 2013) ("**IACHR Petition**").  The petition asserted that MEM violated the rights of Mayan and Xinka peoples by issuing mining licenses without consulting them.  *Id.* at 17.

115.   The IACHR is a juridical and governmental forum for the Organization of American States, which is intended to protect the human rights of individuals residing in those states.  *See* OAS, *Who We Are*, http://www.oas.org/en/about/who_we_are.asp  (last visited Aug. 8, 2018).

116.   The IACHR petition singled out two mines: Escobal and Marlin.  *See* IACHR Petition, at 8.  The Xinka complained that Guatemala failed to inform them when the approval process for the Escobal License began.  *Id.* at 9.  The Xinka also denounced the criminalization of their resistance to the Escobal License.  The Xinka explained that the protests at the Escobal Mine's gates were an act of peaceful resistance and a request to be consulted.  *Id.* at 9.  But Tahoe responded with violence, and the Guatemalan government responded by criminalizing the resistance: instituting a state of siege, and issuing arrest warrants for members of the resistance.  *Id.* at 9-11.

#### 2.   Norwegian Pension Fund's Council on Ethics

117.   In June 2013, as part of its review process to ensure that its investments are consistent with its code of ethics, the Council on Ethics for Norway's Government Pension Fund Global, began investigating Tahoe for alleged human-rights violations in connection with the Escobal License.  *See* Council on Ethics for the Government Pension Fund Global, *Annual Report for 2014* (*Unofficial English Translation*) 167-83 (Jan. 26, 2015).  Based on reports from the Xinka Parliament, among others, and correspondence with Tahoe beginning on August 14, 2013, the Council concluded on April 8, 2014 that "there is an unacceptable risk of Tahoe Resources contributing to serious human rights violations." *Id.* at 167.  The Council produced its conclusion in a formal report, which was provided to Tahoe for comment before being finalized. *Id.* at 169.  In response to the report, Tahoe

told the Council it was confident that it had met or exceeded the requirements of national and international law based on the consultations it had conducted.  *Id.* at 176.

118.    The Council's report identified Xinka opposition to the mine and the Xinka consultation demand as primary factors driving the Escobal Project controversy: "The Xinka Parliament and other Xinka organizations have engaged actively in opposing the mine and what they consider the imposition of a development model based on major interventions in nature. Accordingly, they oppose the mining operation and demand that they be consulted before licenses are granted in the areas in which they live."  Council on Ethics, at 172.

119.    For Tahoe's benefit, the Council recommended that the Company take responsibility for its role in the controversy but expressed doubt that the Company would follow through:

> The Council is of the opinion that a social due diligence process in accordance with the UN Guiding Principles could have helped to reduce future risk.  In this process, it is important for the company to take responsibility for its role in the ongoing conflict, carefully identify and analyse the stakeholders in the specific area, and accept that critical stakeholders should also be heard.  Given the deadlocked situation and the company's replies to the Council, it appears unlikely that such a due diligence process will be conducted in the near future."

*Id.* at 179.

### 3.    U.N.'s High Commissioner For Human Rights in Guatemala

120.    On January 13, 2014, the U.N.'s High Commissioner for Human Rights in Guatemala issued a 2013 annual report discussing the activities in her Guatemala office during the year.  U.N. High Commissioner for Human Rights in Guatemala, *Annual Report on the Activities of Her Office in Guatemala*, ¶16, U.N. Doc. A/HRC/25/19/Add.1 (Jan. 13, 2014).  The report discussed the conflict surrounding the Escobal Project and blamed the unrest on the failure to consult the indigenous and community.  *Id.* at 6.  The Commissioner determined that the "common denominator" in the social conflicts around the Escobal Mine "was the failure to inform and to consult with indigenous and other local communities potentially affected by" the project.  *Id.*

### 4.    The Permanent People's Tribunal

121.    On June 1, 2014, the Permanent Peoples' Tribunal ("**PPT**"), an international tribunal based in Italy that focuses on human-rights issues arising in Latin America, found Tahoe symbolically guilty of human rights violations for operating the Escobal Mine without the consent of

the Xinka and the community.  *See* Session on the Canadian Mining Industry, Hearing on Latin America, Ruling, P.P.T. (June 2014).  The PPT invited Tahoe to attend a hearing on the issues, but the Company did not respond.  *See id.* at 2.

122.    The PPT determined that neither Tahoe nor Guatemala respected the Xinka's right to be consulted under ILO 169 and the UNDRIP.  *Id.* at 29.  The PPT asked Tahoe to: "Acknowledge and respect the right of self-determination for populations in the region, especially the Xinka indigenous peoples, which includes, among others, the right to say no to any mining project; and formally renounce, should the communities refuse to give their consent for the implementation of a mine on their territory, any mining project in the area concerned[.]"  *Id.* at 63.

I.    **Tahoe Touts Its Alignment With Corporate Social Responsibility Policies**

123.    Beginning in 2014, Tahoe claimed in its annual reports filed with the SEC that it had aligned its practices and policies with several international CSR frameworks and grievance mechanisms, stating:

> The Company became a [Business for Social responsibility] member and retained it to assist in implementing policies and practices aligned with the ***United Nations Guiding Principles on Business and Human Rights***, including designing a new grievance program and human rights policy, the Voluntary Principles on Security and Human Rights, including human rights trainings for security contractors, and ***the Equator Principles***.

Mar. 17, 2014, Ex. 99.1 at 15.

124.    In its Annual Report for the year ended December 31, 2014, filed with the SEC on Form 40-F on March 12, 2015 ("**2014 Annual Report**"), Tahoe also began claiming that it "implemented a new ***grievance mechanism*** to align with the ***Guiding Principles*** and the ***International Finance Corporation Performance Standards***."

125.    Tahoe's policies, practices, and grievance mechanism were not aligned with the U.N. Guiding Principles, the Equator Principles, or the IFC Performance Standards because each framework requires that companies consult indigenous peoples who may be affected by a project. Tahoe, on the other hand, had never reached out to the Xinka Parliament or people, and was actively working to thwart the Xinka's efforts to exercise their right to consultation by, *inter alia*, responding

violently to protests, filing legal claims against Xinka representatives, attempting to block plebiscites, and opposing the Xinka's lawsuit against MEM (¶¶63, 86-88, 90-113, 117-19, 121-22).

### 1.    UN Guiding Principles and Grievance Mechanisms

126.    The U.N.'s "Guiding Principles on Business and Human Rights" ("**Guiding Principles**") are a human-rights responsibility framework endorsed by the U.N. Human Rights Council.  U.N., *Guiding Principles on Business and Human Rights*, at iv (2011).  The Guiding Principles require that companies respect U.N. human-rights instruments, such as Article 19 of UNDRIP, which as set forth in ¶55 above.  *See* Guiding Principles, at 13-14.  The Guiding Principles emphasize that companies' responsibility to respect human rights "exists independently of States' abilities and/or willingness to fulfill their own human rights obligations, and does not diminish those obligations."  Guiding Principles, at 13.

127.    Foundational Principle No. 18 imposes a "human rights due diligence" requirement: "The initial step in conducting human rights due diligence . . . includes assessing the human rights context prior to a proposed business activity, where possible; identifying who may be affected; cataloguing the relevant human rights standards and issues; and projecting how the proposed activity and associated business relationships could have adverse human rights impacts on those identified."  Guiding Principles, at 19-20.

128.    Foundational Principle No. 18's corporate-due-diligence standard then requires companies to consult with potentially-affected groups: "To enable business enterprises to assess their human rights impacts accurately, they should seek to understand the concerns of potentially affected stakeholders by consulting them directly in a manner that takes into account language and other potential barriers to engagement."  Guiding Principles, at 20.

129.    Foundational Principle No. 25 describes "grievance mechanisms" as a "process through which grievances concerning business-related human rights abuse can be raised and remedy can be sought."  Guiding Principles, at 27.  At the project level, Foundational Principle No. 31 requires that grievance mechanisms be: "Based on engagement and dialogue: consulting the stakeholder groups for whose use they are intended on their design and performance, and focusing on dialogue as the means to address and resolve grievances."  *Id.* at 34.

### 2.  Equator Principles

130.    The Equator Principles Association is an association of financial institutions who require that the projects they finance comply with a series of obligations known as the "Equator Principles."  *See* About the Equator Principles, http://equator-principles.com./about/.  Because Tahoe is not a financial institution it cannot be an Equator Principle's member.  The most Tahoe can say is that it has aligned its practices and policies with the Equator Principles.

131.    Equator Principle 5 ("Stakeholder Engagement") requires that companies consult indigenous people affected by their projects—through an "Informed Consultation and Participation" process—and that projects comply with the host country's indigenous-rights laws:  "Projects affecting indigenous peoples will be subject to a process of Informed Consultation and Participation, and will need to comply with the rights and protections for indigenous peoples contained in relevant national law, including those laws implementing host country obligations under international law."  The Equator Principles Association, *The Equator Principles*, at 7-8 (June 2013).

132.    "Informed Consultation and Participation" is defined as "an in-depth exchange of views and information and an organised and iterative consultation that leads the client to incorporate the views of Affected Communities, on issues that affect them directly (such as proposed mitigation measures, the sharing of development benefits and opportunities, and implementation issues), into their decision-making process."  *Id.* at 17.

### 3.  IFC Performance Standards and Grievance Mechanisms

133.    The IFC Performance Standards apply to projects financed by the IFC.  The Escobal Project is not financed by the IFC.  The most Tahoe can say is that they implemented a grievance mechanism to "align" with the IFC's Performance Standards.

134.    IFC Performance Standard 7, paragraph nine prescribes grievance-mechanism requirements for affected indigenous communities, in recognition of the fact that many companies have adopted ILO 169.  IFC, *Addressing Grievances from Project-Affected Communities*: *Guidance for Projects and Companies on designing Grievance Mechanisms*, at II, 2 (September 2009).  The Standard requires companies to consult affected indigenous communities, and formally document the consultations, at the project-proposal stage: "Adverse impacts on Affected Communities of

Indigenous Peoples should be avoided where possible. Where alternatives have been explored and adverse impacts are unavoidable, the client will minimize, restore, and/or compensate for these impacts in a culturally appropriate manner commensurate with the nature and scale of such impacts and the vulnerability of the Affected Communities of Indigenous Peoples.  The client's proposed actions will be developed with the ICP [Informed Consultation and Participation] of the Affected Communities of Indigenous Peoples and contained in a time-bound plan, such as an Indigenous Peoples Plan, or a broader community development plan with separate components for Indigenous Peoples."  IFC, *Performance Standard 7 Indigenous Peoples*, at 2 ¶9 (Jan. 1, 2012).

135.    Informed Consultation and Participation "involves a more in-depth exchange of views and information, and an organized and iterative consultation, leading to the client's incorporating into their decision-making process the views of the Affected Communities on matters that affect them directly, such as the proposed mitigation measures, the sharing of development benefits and opportunities, and implementation issues."  IFC, *Performance Standard 1 Assessment and Management of Environmental and Social Risks and Impacts*, at 8 ¶31 (Jan. 1, 2012).

**J.     The Guatemalan Government And MEM Are Rocked By Scandal**

136.    In April 2015, Guatemalan prosecutors and the U.N. International Commission Against Impunity in Guatemala ("**CIGIC**") began cracking down on systematic corruption at the highest levels of Guatemala's government.  *See* Sandra Cuffe, *Mining and Energy Contracts Under Investigation as Corruption Scandals Rock Guatemala*, Mongabay (May 22, 2015), https://news.mongabay.com/2015/05/mining-and-energy-contracts-under-investigation-as-corruption-scandals-rock-guatemala/ ("**Mongabay**").

137.    The crackdown began with arrests on April 16, 2015 in a tax-avoidance bribery scheme, dubbed "La Línea," which prosecutors traced back to underlings of President Otto Pérez Molina and Vice President Roxana Baldetti.  Mongabay, at 3-4.  As a result, Baldetti was arrested in August 2015, and in early September 2015 Pérez Molina resigned and was arrested after being stripped of his immunity.  *See* Michael Lohmuller, *Guatemala's Government Corruption Scandals Explained*, Insight Crime (June 21, 2016), https://www.insightcrime.org/news/analysis/guatemala-s-government-corruption-scandals-explained/.

138.     On May 15, 2015, Archila, the Minister of MEM since January 2012, resigned without explanation.  Mongabay, at 3.  On May 21, 2015, the President, under pressure to clean house, announced that several other cabinet ministers were resigning, including the new Minister of MEM, Edwin Rodas.  *Id.* at 2-3.

139.     On July 9, 2015, Edwin Rodas and Filadelfo Reyes, a former deputy manager at MEM, were arrested for bribery in connection with contracts they awarded while at MEM. Jerson Ramos, *Exministro del MEM se Declara Culpable en Caso Redes*, Prensa Libra (Nov. 20, 2015).  Rodas was Archila's deputy when the contracts were awarded.  *Id.*  Rodas pled guilty, but insisted he was following Archila's orders.  *Id.*

140.     In June 2016, Guatemalan prosecutors and the CIGIC discovered that, between 2012 and 2014, top government officials—including Archila—had been spending public money on lavish gifts for President Pérez Molina in order to maintain their lucrative government positions.  *See* Rosa María Bolaños, *Colecta Entre Ministros del PP Facilitó Fegalos Lujosos*, Pensa Libre (June 11, 2016, 1:11 p.m.), http://www.prensalibre.com/guatemala/justicia/exministros-fueron-capturados-por-el-caso-la-coperacha.  Prosecutors described the fraud, dubbed "La Cooperacha," as a mafia-style scheme in which Ministers kicked money up to the President.  *Id.*  Archila has yet to be arrested because when he discovered that he was being investigated by CIGIC for his involvement in La Cooperacha, he fled to the United States and is currently fighting for citizenship.  *See Canal A. Media Holding, LLC et al. v. United States Citizenship and Immigration Services et al.*, No. 2:17-cv-06491-FMO-JC (C.D. Cal. Sept. 1, 2017).

141.     In 2017, Guatemalan prosecutors and the CIGIC discovered a network of shell companies in Guatemala, Panama, and the United Sates that Archila had been using to purchase luxury real estate throughout the Western Hemisphere, and raided their offices.  *See* el Periódico, *The Hidden Fortune of Erick Archila* (Mar. 9, 2017), https://elperiodico.com.gt/investigacion/2017/09/03/la-fortuna-oculta-de-erick-archila/.  The prosecutors believe the properties were purchased with bribes that Archila received, while Minister of MEM, for approving contracts and mining licenses.  *Id.*

**K.    CALAS Files An Action Against MEM For Failing To Consult The Xinka**

142.    On May 17, 2017, CALAS filed an action in Guatemala's Supreme Court against MEM, alleging that MEM—in violation of ILO 169, Article 19 of UNDRIP, and Article 66 of Guatemala's Constitution—failed to consult the Xinka living in the municipalities of San Rafael Las Flores, Nueva Santa Rosa, Casillas, and Mataquescuintla before granting the Escobal and Juan Bosco Licenses.  *See* Supreme Court Decision at 3-4.  CALAS asked the court to provisionally suspend the Escobal License and the Juan Bosco License renewal until its action was fully heard on the merits.  *Id.* at 4.

143.    Tahoe addressed CALAS's action in a May 24, 2017 press release, in which Tahoe argued that CALAS's claim lacked merit because there were no indigenous people to consult—but that MEM and the Company had conducted consultations anyway.  *See* Press Release, Tahoe Resources, Inc., *Tahoe Reports on Legal Claim in Guatemala* (May 24, 2017).

144.    On July 5, 2017, Tahoe reported that the Supreme Court had granted CALAS's request to provisionally suspend the Escobal License and the Juan Bosco License renewal pending a final determination of CALAS's action.  *See* Press Release, Tahoe Resources, Inc., *Guatemala Lower Court Issues Ruling on Tahoe's Mining License* (July 5, 2017).  Despite this news, in the press release and on the subsequent conference call, Tahoe continued to maintain that there were no indigenous people to consult, but that ILO 169 consultations were conducted anyway**.**  *See id.*; FD (Fair Disclosure) Wire Tr., at 3, 5 (July 6, 2017).

145.    On the news that the Supreme Court suspended the Escobal and Juan Bosco Licenses, Tahoe's stock declined over a two-day period.  On July 6, 2017, Tahoe's shares fell $2.74 per share, or over 33% from the previous day's closing price of $8.30 per share, to close at $5.56 per share.  On July 7, 2017, Tahoe's shares continued to fall an additional $0.41 per share, or over 7% from the previous day's closing price of $5.56 per share, to close at $5.15 per share.

146.    The Supreme Court's provisional decision conferred legal standing on the Company, and the Company immediately appealed the decision to Guatemala's Constitutional Court.  *See* Press Release, Tahoe Resources, Inc., *Guatemala Lower Court Issues Ruling on Tahoe's Mining License* (July 5, 2017).

147.    After the market closed on August 24, 2017, Tahoe issued a press release announcing "it has learned through unconfirmed sources that the Guatemalan Constitutional Court issued a decision upholding the lower court's decision to provisionally suspend" the Escobal License and the Juan Bosco License renewal.  Press Release, Tahoe Resources, Inc., *Guatemalan Court Provisionally Suspends Escobal License—Hearing on the Merits of the Case set for August 28th* (Aug. 24, 2017).  The Constitutional Court's decision upheld the Supreme Court's decision to temporarily suspend the license and license renewal until the underlying claim could be heard on the merits, with a hearing scheduled for August 28, 2017.  *Id.*

148.    On this news, Tahoe's shares fell $1.01 per share, or over 18% from the previous day's closing price of $5.48, to close at $4.47 per share on August 25, 2017.

## FALSE AND MISLEADING CLASS PERIOD STATEMENTS

149.    During the Class Period, Defendants made five categories of false and/or misleading statements:

      (a)    Statements about the issuance of the Escobal License;

      (b)    Statements about the indigenous population living in the Escobal Project Area;

      (c)    Statements about the Xinka's involvement in the protests to the Escobal Project;

      (d)    Statements about the Company's efforts to engage with the community living in the Escobal Project Area; and

      (e)    Statements about Tahoe's alignment with Corporate Social Responsibility (CSR) regimes.

## A.    Statements About The Issuance Of The Escobal License

150.    From the beginning of the Class Period on April 3, 2013 until March 10, 2017, Defendants made materially false and/or misleading statements regarding the issuance of the Escobal License by failing to disclose that Xinka lived in the Escobal Project Area (¶¶42, 66-79, 190), and that MEM had failed to consult with these people prior to granting the Escobal License (¶¶64, 80-101, 114-22, 189), as required by Guatemalan law (¶¶46-56, 190).  These statements are especially

misleading when considered in the context of the Xinka Parliament's repeated requests to MEM to be consulted about the Escobal Project (¶¶80-113); Tahoe's active efforts to thwart the consultation sought by the Xinka (¶¶86, 87, 90-113, 117-19), and the Xinka's vocal participation in the resistance to the Escobal Project (¶¶80-113).

151.    The Class Period begins on April 3, 2013, when Tahoe issued a press release announcing that MEM had granted the Escobal License.  In the press release, titled "Tahoe's Escobal Project Receives Final Permit," the Company stated:[5]

> VANCOUVER, B.C. (April 3, 2013) - **Tahoe Resources Inc.** (TSX: THO, NYSE: TAHO) **is pleased to announce that it has received the Escobal exploitation license from Guatemala's Ministry of Energy and Mines**.  Construction activities remain on-budget and on-schedule for mill commissioning in the second half of 2013 and commercial production in early 2014.[6]

152.    On June 4, 2013, Tahoe issued a press release addressing the "state of emergency" in Jalapa and Santa Rosa.  In the press release, titled "Tahoe Resources Closes $50 Million Secured Credit Facility – State of Emergency Lifted in Departments of Jalapa and Santa Rosa," the Company stated in relevant part:

> The local population of San Rafael, where the project is located, is best characterized as grateful for enhanced law enforcement efforts in the region.  Recent news articles seeing wide distribution over the last week have been highly inaccurate. Among a host of misstatements, they have falsely characterized the local population as indigenous and have incorrectly described violent activities by people from outside the community as peaceful protests by local farmers.

> Tahoe has learned that a letter has been sent to the Ontario Securities Commission (OSC) alleging inadequate disclosure regarding the Escobal project.  The company has not been contacted by OSC and will respond as necessary. The allegations make broad references to a variety of press accounts in Guatemala, many of which are inflammatory and inaccurate. **The company is confident that it has fully disclosed all material events regarding the Escobal project.**

153.    On September 6, 2013, Tahoe published an article on its CSR Blog entitled "Dispelling Myths About Tahoe's Escobal Project" which stated in relevant part:

> **MYTH: Tahoe Resources' mining license was attained [sic] fraudulently**.

---

[5]    Tahoe is the speaker within the meaning of Rule 10b-5 for every statement it published.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 147 (2011).

[6]    Although many statements by the Defendants are listed in this section, the statements being challenged as false and/or misleading are those statements that are **bolded, italicized, and** in some instances **_underlined_** for emphasis.

**TRUTH:** The process to obtain a mining license in Guatemala is driven by the Guatemalan government and mining law. ***It is a lengthy, multi-stage process that provides for the thorough and integrated assessment of potential environmental, economic, social, heritage and health effects that may occur during a project's life cycle. It also provides for meaningful public participation.***

***Tahoe Resources willingly submitted to the regulatory process and obtained every permit for the Escobal project in a lawful manner.*** In the first quarter of 2012, the Guatemalan government notified Tahoe that all legal requirements for approval of the exploitation license had been met and assured the company that the license was forthcoming. Tahoe received its exploitation license for the Escobal project from the Guatemala Ministry of Energy and Mines on April 3, 2013.

154.    On March 17, 2014, Tahoe filed its 2013 Annual Report with the SEC on a Form 40-F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister. The "Risk Factors" section of the 2013 Annual Report stated in relevant part:

***The validity of the licenses related to the Escobal mine can be uncertain and may be contested. There is no assurance that applicable governmental bodies will not revoke or significantly alter the conditions of applicable licenses that are required by the Escobal mine. Changes to Guatemalan laws, including new mining legislation or adverse court rulings could materially and adversely impact our rights to exploration and exploitation licenses necessary for the Escobal mine.*** See "Description of Our Business – Doing Business in Guatemala" and " – Risk Factors – Risks Relating to Our Business – Operations in Guatemala".

There is no guarantee that title to the Escobal mine or surface rights will not be challenged or impugned. Our properties may be subject to prior unregistered liens, agreements or transfers, indigenous land claims or undetected title defects.

Mar. 17, 2014 Form 40-F, Ex. 99.1 at 23-24.

155.    The "Risk Factors" sections of the following documents contained substantially similar statements as that set forth in ¶154 above:

      (a)    Tahoe's 2014 Annual Report filed with the SEC on March 12, 2015 on a Form 40-F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister (Ex. 99.1 at 22);

      (b)    Tahoe's Annual Report for the year ended December 31, 2015 filed with the SEC on March 11, 2016 on a Form 6-K, which was signed by Hofmeister, and on March 25, 2016 on a Form 40-F, which was signed by McArthur and Sadler ("**2015 Annual Report**") (Ex. 99.1 at 21); and

      (c)    Tahoe's 2016 Annual Report filed with the SEC on March 10, 2017 on a

1    Form 40-F, which was signed by Clayton and McGregor, and on a Form 6-K,

2    which was signed by Hofmeister (Ex. 99.1 at 25).

3        156.    On June 12, 2014, McArthur posted a "Human Rights Policy Letter" on Tahoe's CSR

4    Blog.  The letter included Tahoe's "Human Rights Policy."  The letter, which was signed by

5    McArthur, stated in relevant part:

6        HUMAN RIGHTS POLICY LETTER

7                                    *    *    *

8        ***Our Human Rights Policy is more than just a policy; it is an ethical code that we
9        follow and holds us accountable.***

         *    *    *

10       HUMAN RIGHTS POLICY

11                                   *    *    *

12       ***Tahoe Resource's business shall be conducted in accordance with all applicable
13       laws of the jurisdictions in which it operates.***  We strive to always reflect a high
         ethical standard and respect for the law and expect our stakeholders to do the same.
14       Where state law conflicts with international human rights norms, we will comply with
         the law but endeavor to meet the spirit of the standard.

15                                   *    *    *

16       Communities - ***Tahoe Resources is committed to observing the laws and respecting
         the cultural values in the countries in which it operates, including the indigenous
17       peoples recognized by the laws of the applicable jurisdiction; to giving appropriate
         regard to the self-sufficiency, sustainability, health, safety and the environment of
18       such communities***; ***to conducting business as a responsible corporate citizen; and to
         promoting an atmosphere of mutual respect and cooperation***.

19

20       157.    The statements in ¶¶151-56 above were false and/or misleading when made because

21   the speakers failed to disclose the following:

22       (a)    The Escobal License was not lawfully obtained because there were thousands

23              of Xinka living in the area directly affected by the Escobal Project, as

24              evidenced by the 2003/2004 Xinka Parliament Census, COPXIG's 2008

25              Census, the Catholic Census, Tahoe employees' observations, the Xinka tribal

26              lands, and the 2017 Ethnographical Studies (¶¶42, 66-79, 190), who were not

27              consulted by MEM, as required by Guatemalan Law, before the Escobal

28              License was issued (¶¶46-56, 64, 80-101, 114-22, 189, 190); and

                                        46

(b)     The Xinka were actively contesting the issuance of the Escobal License and the Escobal Project by engaging in protests, organizing plebiscites, and initiating legal actions (¶¶80-113), which efforts Tahoe worked to thwart by, *inter alia*, responding violently to protests, filing legal claims against Xinka representatives, attempting to block plebiscites, and opposing the Xinka's lawsuit against MEM (¶¶86, 88, 90-113, 117-19).

**B.     Statements About The Indigenous Population In The Escobal Project Area**

158.    Throughout the Class Period, Defendants made materially false and/or misleading statements denying and/or misleadingly minimizing the existence of an indigenous population in the Escobal Project Area when, in fact, thousands of Xinka lived within the Escobal Project Area (¶¶42, 66-79, 190).  These statements are especially misleading when considered in the context of the consultation provisions set forth in Guatemalan law that required MEM to consult with all indigenous peoples *who may be directly affected* by Escobal mining operations, not only those residing within the licensed area (¶¶50, 55, 56); and the active resistance of the Xinka who had the right to be consulted by MEM (¶¶80-113).

159.    On July 25, 2013, Tahoe filed the PEA for the Escobal Project with the SEC on a Form 6-K.  In the PEA, the Company stated in relevant part:

> *The Company is not aware of any significant indigenous population residing in the area of the Escobal Project.  According to Guatemala's National Institute of Statistics (Census 2002) San Rafael Las Flores' population is 99.6% "Ladino", i.e., of Hispanic origin and non-indigenous.*

July 25, 2013 Form 6-K, Ex. 99.2 at 2.

160.    On March 17, 2014, Tahoe filed its 2013 Annual Report with the SEC on a Form 40-F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister.  The 2013 Annual Report stated in relevant part:

> The Company is open to all constructive dialogue and, in 2013, engaged with one indigenous group that expressed an interest in the Escobal mine.  *However, it is not aware of any significant indigenous population residing in the area of the Project.  According to Guatemala's National Institute of Statistics (Census 2002) San Rafael Las Flores' population is 99.6% "Ladino", i.e., of Hispanic origin and non-indigenous.*

\* \* \*

*To the best of our knowledge, although indigenous people may have inhabited the area at one time, there are no indigenous populations currently living in the immediate area of the Escobal mine site. According to Guatemala's most recent census--National Institute of Statistics (Census 2002)--San Rafael Las Flores' population is 99.6% "Ladino", i.e., of Hispanic origin and non-indigenous.*

Mar. 17, 2014 Form 40-F, Ex. 99.1 at 20, 28.

161.    The statements in ¶¶159 and 160 above were false and/or misleading when made because the speakers failed to disclose the following:

(a)    Tahoe was aware of a significant Xinka population living in the Escobal Project Area, for the reasons set forth below and herein.

(b)    There were thousands of Xinka living in the Escobal Project Area, as evidenced by the 2003/2004 Xinka Parliament Census, COPXIG's 2008 Census, the Catholic Census, Tahoe employees' observations, the Xinka tribal lands, and the 2017 Ethnographical Studies (¶¶42, 66-79, 190), which fact was material because the Xinka were not consulted by MEM, as required by Guatemalan Law, before the Escobal and Juan Bosco Licenses were issued (¶¶46-56, 64, 80-101, 114-22, 189, 190);

(c)    Tahoe failed to conduct a reasonable inquiry into the number of Xinka living in the Escobal Project Area, as evidenced by Tahoe's failure to contact the Xinka representative institutions or conduct any independent census of its own (¶¶62, 63, 80, 85, 189); and

(d)    Tahoe actively worked to thwart the Xinka's efforts to exercise their consultation rights by, *inter alia*, responding violently to protests, attempting to block plebiscites, filing legal claims against Xinka representatives, and opposing the Xinka's lawsuit against MEM (¶¶86, 87, 90-113, 117-19).

**C.    Statements About The Protests To The Escobal Project Mischaracterized Xinka Involvement**

162.    During the Class Period, Defendants made materially false and/or misleading statements regarding the resistance to the Escobal Project, while failing to disclose that this

48

resistance included a large number of Xinka who had a right to be consulted regarding the Escobal Project (¶¶80-113).  These statements are especially misleading when considered in the context of Defendants' numerous statements boasting that Tahoe had engaged in meaningful dialogue with the community (¶¶170, 172-75); Tahoe's efforts to thwart the consultation sought by the Xinka Parliament and people (¶¶86, 87, 90-113, 117-19); and Defendants' insistence that no indigenous peoples lived in the Escobal Project Area (¶¶159, 160).

163.    On May 1, 2013, Tahoe issued a press release addressing the violence surrounding the Escobal Mine.  In the press release, titled "Tahoe Clarifies Reports Regarding Incidents Near Escobal Project," McArthur and the Company stated in relevant part:

> *According to Tahoe CEO Kevin McArthur, the Company has seen a number of anti-mining protests around the project that is under construction near the community of San Rafael Las Flores.* "*While many of these activities have been peaceful and respectful, violence from outside influences has escalated in the past weeks since we received our operating permit*," said Mr. McArthur.

> During the evening shift change of Saturday, April 27, 2013, a protest involving approximately 20 people armed with machetes turned hostile.  The Escobal security force used tear gas and rubber bullets to repel the protestors at the mine gate.  These individuals left the area following this incident and some were treated at hospitals and released.

> \*    \*    \*

> With the exception of the Saturday incident, all other reported events occurred away from the project site.  *The Company reports an increase in outsiders being bused into the area to protest and cause public disturbances.  On Monday, four busloads brought protestors to the area, and in an ambush of local police, one officer was shot and killed*.

164.    On May 10, 2013, Tahoe issued a financial report for the first quarter of 2013 with the SEC on form 6-K ("**2013 1Q Report**").  The "Management's Discussion and Analysis" section of the 2013 1Q Report stated in relevant part:

> **Anti-Mining Resistance:** *In recent months outlier communities and non-governmental organizations ("NGOs") have become more vocal and active with respect to mining activities in Guatemala. These communities and NGOs have taken such actions as road closures, power line opposition, work stoppages, and law suits for damages. These actions relate not only to current activities but often in respect to decades old mining activities by prior owners of mining properties.* Such actions by communities and NGOs may have a material adverse effect on our operations at the Escobal Project and on its financial position, cash flow and results of operations.

165.    The "Management's Discussion and Analysis" sections of the following documents contained substantially similar statements as that set forth in ¶164 above:

    (a)    Tahoe's financial report for the second quarter of 2013, filed with the SEC on August 9, 2013 on a Form 6-K (Ex. 99.2 at 6-7); and

    (b)    Tahoe's financial report for the third quarter of 2013, filed with the SEC on November 11, 2013 on a Form 6-K, which was signed by Defendant Hofmeister (Ex. 99.2).

166.    On June 4, 2013, Tahoe issued a press release addressing the "state of emergency" in Jalapa and Santa Rosa.  In the press release, titled "Tahoe Resources Closes $50 Million Secured Credit Facility – State of Emergency Lifted in Departments of Jalapa and Santa Rosa," the Company stated in relevant part:

> ***The local population of San Rafael, where the project is located, is best characterized as grateful for enhanced law enforcement efforts in the region. Recent news articles seeing wide distribution over the last week have been highly inaccurate.  Among a host of misstatements, they have falsely characterized the local population as indigenous and have incorrectly described violent activities by people from outside the community as peaceful protests by local farmers***.

167.    On March 17, 2014, Tahoe filed its 2013 Annual Report with the SEC on a Form 40-F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister. The "Risk Factors" section of the 2013 Annual Report stated in relevant part:

> ***In recent years communities and non-governmental organizations ("NGOs") have become more vocal and active with respect to mining activities at or near their communities throughout Guatemala.  These communities and NGOs have taken such actions as road closures, destruction of property, work stoppages, and law suits for damages. These actions relate not only to current activities but often in respect to decades-old mining activities by prior owners of mining properties.***  Such actions by communities and NGOs may have a material adverse effect on our operations at the Escobal mine and on the Company's financial position, cash flow and results of operations.

Mar. 17, 2014 Form 40-F, Ex. 99.1 at 28.

168.    The statements in ¶¶163-67 above were false and/or misleading when made because the speakers failed to disclose that the protests and resistance included Xinka (¶¶80-113) who had communicated to MEM and Tahoe that MEM had violated their right to be consulted about the Escobal Project (¶¶80-113).

**D.    Statements About Tahoe's Community Outreach**

169.    Throughout the Class Period, Defendants made materially false and/or misleading statements representing that Tahoe was open to all constructive dialogue with the indigenous communities in the Escobal Project Area, when in fact, the Company never reached out to Xinka Parliament representatives, and instead actively worked to thwart the consultation requests made by the Xinka Parliament and people.  ¶¶63, 80, 85-88, 90-113, 117-19, 121-22.  These statements are especially misleading when considered in the context of the consultation provisions set forth in Guatemalan law that require far more than informational meetings and gifts of "agriculture supplies" and "musical instruments" to a handful of indigenous people (¶¶50-56); the Xinka's escalating resistance to the Escobal Project (¶¶80-113), and (3) MEM's and human rights organizations' criticism of Tahoe for failing to provide more information to the communities (¶¶88, 117-19, 121-22).

170.    On September 6, 2013, Tahoe published an article on its CSR bog entitled "Dispelling Myths About Tahoe's Escobal Project" which stated in relevant part:

> **MYTH: *The Escobal project does not have any community support/social license. Tahoe Resources does not consult with local community members and continues to operate in spite of requests by the community to cease operations***.
>
> **TRUTH: *There are many Guatemalans, including the majority of those in the San Rafael las Flores community, who support the Escobal project***.  On July 28, 2012, several municipal officials in the local area held a press conference to denounce activities of certain opponents and make clear their support for the Escobal project. ***Like many industrial projects around the world, the Escobal project is opposed by a small group of opponents who refuse to engage in meaningful discussions about the project***.  Local Guatemalan authorities have identified some members of the opposition to be from outside the local area, transported in and organized and funded by local and international NGOs.  Some these outsiders have resorted to violence and intimidation tactics against Tahoe Resource's employees, contractors and local supporters.
>
> The fact remains that Tahoe has exceeded legal requirements and demonstrated best international practices for engaging in dialogue with the community**.** The company has hosted hundreds of meetings with government officials and individual community members, providing project information and answering questions of supporters and opponents. In addition, hundreds of community members and government officials have taken site tours to become more familiar with the mine. ***Tahoe continues to seek meaningful and effective dialogue with community members***.

171.    The statements in ¶170 above were false and/or misleading when made because the Company failed to disclose the following:

1        (a)     The majority of the people in San Rafael Las Flores did not support the

2                Escobal Project, as evidenced by the local plebiscites held in the municipality

3                in which 93.44% to 100% of people voted no to mining (¶100);

4        (b)     The Xinka did not refuse to engage in meaningful discussions regarding the

5                Escobal Project.  In fact, the Xinka Parliament repeatedly requested at

6                meetings, during press conferences, at protests, and through legal actions, that

7                MEM consult them regarding the Escobal Project (¶¶80-113); and

8        (c)     Tahoe did not seek meaningful dialogue with the community because the

9                Company never reached out to the Xinka Parliament or people who were

10              directly affected by the Escobal Project, and instead actively worked to thwart

11              the Xinka's efforts to exercise their consultation rights by, *inter alia*,

12              responding violently to protests, attempting to block plebiscites, filing legal

13              claims against Xinka representatives, and opposing the Xinka's lawsuit

14              against MEM (¶¶63, 80, 85-88, 90-113, 117-19, 121-22).

15       172.    On March 17, 2014, Tahoe filed its 2013 Annual Report with the SEC on a Form 40-

16 F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister.

17 The 2013 Annual Report stated in relevant part:

18        ***The Company is open to all constructive dialogue and, in 2013, engaged with***

19        ***one indigenous group that expressed an interest in the Escobal mine***.  However,
           it is not aware of any significant indigenous population residing in the area of the

20        Project.  According to Guatemala's National Institute of Statistics (Census 2002)
           San Rafael Las Flores' population is 99.6% "Ladino", i.e., of Hispanic origin and

21        non-indigenous.

22 Mar. 17, 2014 Form 40-F, Ex. 99.1 at 20.

23       173.    On March 12, 2015, Tahoe filed its 2014 Annual Report with the SEC on a Form 40-

24 F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister.

25 The "Risk Factors" section of the 2014 Annual Report stated in relevant part:

26        To the best of our knowledge, although indigenous people may have inhabited the
           area at one time, there are no indigenous populations currently living in the

27        immediate area of the Escobal mine site.  ***In 2014, the Company engaged with***
           ***indigenous communities that expressed an interest in the Escobal mine and to***

28        ***date, more than 70 indigenous community members have visited the Escobal***

> ***mine. In addition, indigenous peoples have participated in the Company's avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments through its social investment program.*** The Company also attended workshops with the Guatemalan government and other private sector organizations to promote the elimination of all forms of racial discrimination against indigenous groups.

Mar. 12, 2015 Form 40-F, Ex. 99.1 at 25.

174.    On March 11, 2016, Tahoe filed its 2015 Annual Report with the SEC on a Form 6-K, which was signed by Hofmeister, and on March 25, 2016 on a Form 40-F, which was signed by McArthur and Sadler. The "Risk Factors" section of the 2015 Annual Report stated in relevant part:

> To the best of our knowledge, although indigenous people may have inhabited the area of our Mines at one time, there are no indigenous populations currently living in the immediate area of the Escobal, La Arena or Shahuindo Mine sites. ***In 2015, MSR engaged with indigenous communities in Guatemala that expressed an interest in the Escobal Mine and during the year, more than 130 indigenous community members visited the Escobal Mine. In addition, indigenous peoples have participated in our Guatemalan avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments through its social investment program.*** The Company also attended workshops with the Guatemalan government and other private sector organizations to promote the elimination of all forms of racial discrimination against indigenous groups.

Mar. 11, 2016 Form 6-K, Ex. 99.1 at 24.

175.    On March 10, 2017, Tahoe filed its 2016 Annual Report with the SEC on a Form 40-F, which was signed by Clayton and McGregor, and on a Form 6-K, which was signed by Hofmeister. The "Risk Factors" section of the 2016 Annual Report, stated in relevant part:

> To the best of our knowledge, although indigenous people may have inhabited the area of our Mines in Guatemala and Peru at one time, there are no indigenous populations currently living in the immediate area of the Escobal, La Arena or Shahuindo Mine sites. ***In 2016, MSR engaged with indigenous communities in Guatemala that expressed an interest in the Escobal Mine and during the year, more than 130 indigenous community members visited the Escobal Mine. In addition, indigenous peoples have participated in our Guatemalan avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments through its social investment program.*** The Company also attended workshops with the Guatemalan government and other private sector organizations to promote the elimination of all forms of racial discrimination against indigenous groups.

Mar. 10, 2017 Form 40-F, Ex. 99.1 at 28.

176.    The statements in ¶¶172-75 above were false and/or misleading when made because the speakers failed to disclose the following:

(a)     The Xinka who had a right to be consulted by MEM regarding the Escobal

Project were actively opposing the Project through protests, plebiscites, and

legal action (¶¶80-113); and

(b)     Tahoe never reached out to the Xinka people who were directly affected by

the Escobal Project, and instead actively worked to thwart the Xinka's efforts

to exercise their consultation rights by, *inter alia*, responding violently to

protests, attempting to block plebiscites, filing legal claims against Xinka

representatives, and opposing the Xinka's lawsuit against MEM (¶¶63, 80, 85-

88, 90-113, 117-19, 121-22).

### E.     Statements About Tahoe's Alignment With CSR Policies

177.     Throughout the Class Period, Defendants made materially false and/or misleading

statements representing that Tahoe was conducting the Escobal Project in compliance with

international best practices and human rights principles, when in fact, Tahoe had never reached out

to the Xinka who were affected by the Escobal Project, as required by those practices and principles.

¶¶63, 80, 85, 88, 117-19, 121-22, 126-35.  These statements are especially misleading when

considered in the context of Tahoe's efforts to actively thwart the efforts by the Xinka to exercise

their right to consultation (¶¶86, 87, 90-113, 117-19); the Xinka's vocal opposition to the Escobal

Project because they were not consulted by MEM (¶¶80-113); and the decisions of several human

rights bodies admonishing Tahoe for failing to adequately engage with the indigenous populations

regarding the Escobal Project (¶¶117-19, 121-22).

178.     On May 1, 2013, Tahoe issued a press release addressing the violence surrounding

the Escobal mine.  In the press release, Defendant McArthur stated in relevant part:

> "We send our condolences to the family of the slain police officer and ***strive to
> engage with and to peacefully coexist with all stakeholders in this area of
> Guatemala.  This project is being constructed to the highest*** environmental and
> ***social standards*** and it brings needed employment to the area and millions of
> dollars in annual royalties and taxes," said Mr. McArthur.

179.     The statements in ¶178 above were false and/or misleading when made because the

Company failed to disclose that the Escobal Project was not being conducted pursuant to the highest

social standards because the Company never attempted to consult with the Xinka Parliament or

54

people who were affected by the Escobal Project, as required by international human rights policies (¶¶63, 80, 85, 88, 117-19, 121-22, 126-35), and instead actively worked to thwart the Xinka's efforts to exercise their consultation rights by, *inter alia*, responding violently to protests, attempting to block plebiscites, filing legal claims against Xinka representatives, and opposing the Xinka's lawsuit against MEM (¶¶86, 87, 90-113, 117-19).

180.    On September 6, 2013, Tahoe published an article on its CSR blog entitled "Dispelling Myths About Tahoe's Escobal Project" which stated in relevant part:

> **MYTH: The Escobal project does not have any community support/social license. Tahoe Resources does not consult with local community members** and continues to operate in spite of requests by the community to cease operations.
>
> TRUTH: There are many Guatemalans, including the majority of those in the San Rafael las Flores community, who support the Escobal project.  On July 28, 2012, several municipal officials in the local area held a press conference to denounce activities of certain opponents and make clear their support for the Escobal project.  Like many industrial projects around the world, the Escobal project is opposed by a small group of opponents who refuse to engage in meaningful discussions about the project.  Local Guatemalan authorities have identified some members of the opposition to be from outside the local area, transported in and organized and funded by local and international NGOs.  Some these outsiders have resorted to violence and intimidation tactics against Tahoe Resource's employees, contractors and local supporters.
>
> **The fact remains that Tahoe has exceeded legal requirements and demonstrated best international practices for engaging in dialogue with the community.** The company has hosted hundreds of meetings with government officials and individual community members, providing project information and answering questions of supporters and opponents. In addition, hundreds of community members and government officials have taken site tours to become more familiar with the mine. Tahoe continues to seek meaningful and effective dialogue with community members.

181.    The statements in ¶180 above were false and/or misleading when made because the Company failed to disclose that Tahoe did not demonstrate best international practices for engaging in dialogue with the community because the Company never attempted to consult with the Xinka Parliament or people who were affected by the Escobal Project, as required by international human rights policies (¶¶63, 80, 85, 88, 117-19, 121-22, 126-35), and instead actively worked to thwart the Xinka's efforts to exercise their consultation rights by, *inter alia*, responding violently to protests, attempting to block plebiscites, filing legal claims against Xinka representatives, and opposing the Xinka's lawsuit against MEM (¶¶86, 87, 90-113).

182.    On March 17, 2014, Tahoe filed its 2013 Annual Report with the SEC on a Form 40-F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister. The 2013 Annual Report stated in relevant part:

> Business for Social Responsibility ("BSR"): ***The Company became a BSR member and retained it to assist in implementing policies and practices aligned with the United Nations Guiding Principles on Business and Human Rights,*** including designing a new grievance program and human rights policy, the Voluntary Principles on Security and Human Rights, including human rights trainings for security contractors, ***and the Equator Principles.***

Mar. 17, 2014 Form 40-F, Ex. 99.1 at 15.

183.    On March 12, 2015, Tahoe filed its 2014 Annual Report with the SEC on a Form 40-F, which was signed by McArthur and Sadler, and on a Form 6-K, which was signed by Hofmeister. The 2014 Annual Report stated in relevant part:

> ***In the latter half of 2013 and throughout 2014, the Company worked to align its policies and practices with the United Nations Guiding Principles on Business and Human Rights ("Guiding Principles"),*** the Voluntary Principles on Security and Human Rights ***and the Equator Principles.*** The adoption of these standards reflects the Company's evolution from a junior exploration company to a major silver producer following receipt of our final operating permits in 2013. The Company finalized a comprehensive Social Impact Assessment and outlined its strategies to avoid, minimize or mitigate real or perceived social impacts in its Social Management Plan. ***We also implemented a new grievance mechanism to align with the Guiding Principles and the International Finance Corporation Performance Standards.***

Mar. 12, 2015 Form 40-F, Ex. 99.1 at 14.

184.    On March 11, 2016, Tahoe filed its 2015 Annual Report with the SEC on a Form 6-K, which was signed by Hofmeister, and on a Form 40-F on March 25, 2016, which was signed by McArthur and Sadler.  The 2015 Annual Report stated in relevant part:

> ***The Company has aligned its policies and practices with the United Nations Guiding Principles on Business and Human Rights ("Guiding Principles"***), the Voluntary Principles on Security and Human Rights ("VPs") ***and its Equator Principles.*** The Company finalized a comprehensive Social Impact Assessment and outlined its strategies to avoid, minimize or mitigate real or perceived social impacts in its Social Management Plan. ***We also implemented a new grievance mechanism in Guatemala in January 2015 to align with the Guiding Principles and the International Finance Corporation ("IFC") Performance Standards.***  This mechanism utilizes the NAVEX Global's case management software which provides for multiple communication options.  The same grievance mechanism is being implemented at La Arena and Shahuindo Mines in Peru and is expected to be fully operational by the second quarter of 2016.

Mar. 11, 2016 Form 6-K, Ex. 99.1 at 13.

185.   On March 10, 2017, Tahoe filed its 2016 Annual Report with the SEC, which was

signed Clayton and McGregor.  The 2016 Annual Report stated in relevant part:

> ***The Company has aligned its policies and practices in Guatemala with the United Nations Guiding Principles on Business and Human Rights ("Guiding Principles"),*** the Voluntary Principles on Security and Human Rights ("VPSHR") ***and the Equator Principles*** and expects to complete alignment with these standards in Peru and Canada by the end of 2017. ***In Guatemala, the Company completed a Social Impact Assessment and implemented a grievance mechanism in January 2015 to align with the Guiding Principles and the International Finance Corporation ("IFC") Performance Standards.***  This mechanism utilizes the NAVEX Global's case management software which provides for multiple communication options.

Mar. 10, 2017 Form 40-F, Ex. 99.1 at 15.

186.   The statements in ¶¶182-85 above were false and/or misleading when made because

the speakers failed to disclose that Tahoe's practices and policies were not aligned with the U.N.

Guiding Principles or the Equator Principles and Tahoe did not implement a grievance mechanism

aligned with IFC Performance Standards because Tahoe never attempted to consult with the Xinka

Parliament or people who were affected by the Escobal Project, as required by those principles

(¶¶63, 80, 85, 88, 117-19, 121-22, 126-35), and instead actively worked to thwart the Xinka's efforts

to exercise their consultation rights by, *inter alia*, responding violently to protests, attempting to

block plebiscites, filing legal claims against Xinka representatives, and opposing the Xinka's lawsuit

against MEM (¶¶86, 87, 90-113).

## POST CLASS PERIOD STATEMENTS

187.   After the market closed on August 24, 2017, Tahoe issued a press release announcing

that the Guatemalan Constitutional Court upheld the lower court's decision to provisionally suspend

the Escobal License and the Juan Bosco License's renewal until the underlying claim could be heard

on the merits, with a hearing scheduled for August 28, 2017.  Press Release, Tahoe Resources, Inc.,

*Guatemalan Court Provisionally Suspends Escobal License—Hearing on the Merits of the Case set*

*for August 28th* (Aug. 24, 2017).

188.   On this news, Tahoe's shares fell $1.01 per share, or over 18% from the previous

day's closing price of $5.48, to close at $4.47 per share on August 25, 2017.

189.     The Supreme Court held a hearing on August 28, 2017, during which MEM argued that its issuance of the Licenses to MSR "complied with all the requirements of the Mining Act and there is no indigenous population, reason for which it was not appropriate to carry out a consultation."  Supreme Court Decision at 32.  MSR argued, among other things, that ILO 169 is not applicable because "there were no indigenous people in the area of influence of the 'Escobal' mining project[.]"  *Id.*  In support of its claim, CALAS argued that the areas in question are Xinka "territories" as shown in the 2016 assessment carried out by the Ministry of Culture and Sports titled "Situación de la Cultura Xinka" (cited above in ¶¶38-45) which "revealed how said indigenous people has organized and stayed in the departments of Santa Rosa, Jalapa, and Jutiapa."  *Id.* at 3.  CALAS also introduced the Catholic Census showing that more than 6,000 Xinka reside in San Rafael Las Flores.  *See id.* at 30.  The Xinka Parliament was also present and pointed out that MEM "affirmed that through an environmental impact assessment it was determined that no indigenous population existed, which shows the permanent violation of the Xinka people's right to consultation[.]"  *Id.* at 33.

190.     On September 8, 2017, the Supreme Court rendered its definitive decision on CALAS's claim.  The Court held that MEM violated the constitutional rights of the Xinka communities in San Rafael Las Flores, Casillas, Nueva Santa Rosa, and Mataquescuintla by granting the Juan Bosco and Escobal Licenses without first consulting those Xinka communities, as required by ILO 169, Article 19 UNDRIP, and Article 66 of the Constitution.  *Id.* at 65.  The Court revoked the license suspension for twelve months, and ordered MEM to consult the affected Xinka people pursuant to ILO 169 within that time.  *Id.* at 65.

191.     It was not until February 13, 2018 that Tahoe publicly acknowledged the presence of the Xinka in the communities affected by the Escobal Project.  In a press release issued that day, announcing Tahoe's commitment to develop a comprehensive Indigenous Peoples Policy, Clayton said:

> It is in this spirit that ***Tahoe wishes to clarify and specifically acknowledge the presence and importance of the indigenous peoples located in the communities near Escobal, particularly the <u>Xinka</u>.***  We are focused on finding a way to work constructively with the Xinka communities and other indigenous groups across the region.  Tahoe respects the rights, customs and cultural heritage of all indigenous

peoples, and we are committed to engagement and dialogue in all regions of our operations for the mutual benefit of everyone.

Press Release, Tahoe Resources, Inc., *Tahoe to Develop Comprehensive Indigenous Peoples Policy in 2018* (Feb. 13, 2018).

## SCIENTER ALLEGATIONS

### A. *Respondeat Superior* And Agency Principles Apply

192. Tahoe is liable for the acts of Tahoe's, and its wholly-owned subsidiary, MSR's, officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of Tahoe's and MSR's officers, directors, employees, and agents is similarly imputed to Tahoe under *respondeat superior* and agency principles.

### B. The Escobal Project Is Part Of Tahoe's Core Operations

193. Because the fraud alleged herein relates to the core business of Tahoe, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants.  *See Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014).  Indeed, until it acquired Rio Alto Mining Limited ("**Rio Alto**") on April 1, 2015 with inflated Tahoe stock, Tahoe warned investors that: "The Escobal mine is the Company's sole operation."  2013 Annual Report, at 20.

194. Throughout the Class Period, McArthur emphasized the importance of the Escobal Project to Tahoe's business and the Company's focus on developing Escobal mining operations.  For example, during a November 13, 2013 conference call, McArthur explained that the Company was focused on nothing but the Escobal Mine: "Well, *it all starts with a company-maker mine*, and that to me is the important thing is getting that delivered and getting it delivered correctly.  And we're – I'll call it 90% there.  *So I like to say 110% of our efforts is still getting that right and getting that into steady production and making sure that we get it right*."  Conference Call, FD (Fair Disclosure) Wire Tr., at 2 (November 13, 2013).  McArthur reiterated that sentiment during a November 12, 2014 conference call: "We IPO'ed in 2010.  *And entirely, 100% of our focus has been on permitting and financing and building our first mine*.  And I've got to say that ramp-up all through this year has been continues to be 100% of our focus."  Conference Call, Bloomberg Tr., at

5 (November 12, 2014).

195.    Furthermore, Tahoe has a small number of employees, and it can be presumed that the Individual Defendants, as officers and/or directors, had knowledge of the adverse facts pertaining to the Escobal and Juan Bosco Licenses.  At all relevant times, the Company's headquarters have been located in Reno, Nevada, where all of its officers resided during the Class Period.  *See* 2013 Annual Report at 43-44; 2015 Annual Report at 60-61; Tahoe Resources, Inc., Annual Report (Form 40-F, Ex. 99.1) 82-83 (Feb. 23, 2018).  As of March 11, 2013, the Company had 22 employees in its Nevada office.  2012 Annual Report at 14.  As of March 17, 2014, the Company had 27 employees in its Nevada office.  2013 Annual Report at 13.  As of March 12, 2015, the Company had fewer than 30 employees in its Nevada office.  2014 Annual Report at 14.  As of March 25, 2016, the Company had fewer than 30 employees in its Nevada office.  2015 Annual Report at 12.  As of March 10, 2017, the Company had approximately 25 employees in its Nevada office.  2016 Annual Report at 14.

C.    **Defendants Had Possession Of And/Or Access To Adverse Information Regarding The Xinka In The Escobal Project Area And The ILO 169 Consultation Requirements**

1.    **Information From Tahoe Executives' Previous Experience in Guatemala**

196.    At the time of its IPO, Tahoe touted its officers' and directors' "extensive" experience in Guatemalan mining, exploration and development, based on their experience at Glamis "when [Glamis] acquired the Marlin mine in Guatemala, expanded the reserves, permitted operations and constructed the mine."  Tahoe Resources, Inc., Amended and Restated Preliminary Prospectus (SEDAR), at 19 (May 5, 2010).  When the Marlin Project was permitted and constructed:

a)  McArthur was Glamis' President and CEO;

b)  Brian Brodsky (Tahoe's V.P. of Exploration since June 2010), was Glamis' Exploration Manager;

c)  James Voorhees (a Tahoe director since April 2010) was Glamis' COO;

d)  Dan Rovig (a Tahoe director since June 2010) was Glamis' Board Chair; and

e)  Kenneth Williamson (a Tahoe director since June 2010) was a Glamis director.

*See id.* at 8.

197.    Based on their experience with Glamis and Goldcorp's Marlin mine in Guatemala, McArthur, and other Tahoe employees and directors, had access to information indicating that they should proactively ensure that MEM fulfilled its ILO 169 consultation obligation, or else Tahoe's mining licenses would be at risk.  In fact, while at Glamis, McArthur "played a key role in the identification, acquisition, and development of the Marlin property."  Bloomberg Executive Profile: C. Kevin McArthur, https://www.bloomberg.com/research/stocks/people/person.asp?personId= 30269754&privcapId=330453.

198.    This access stemmed from the fact that, beginning in the early 2000's, indigenous peoples living around the Marlin mine began to argue that they had not been consulted before the license for the mine was issued.  These accusations led to widely publicized protests and calls from the international community that Guatemala shut Marlin down because MEM had not complied with ILO 169.  *See* Zarsky and Stanley, *Searching for Gold in the Highlands of Guatemala: Economic Benefits and Environmental Risks of the Marlin Mine*, Global Development and Environmental Institute at Tufts University, 11 (September 2011); Institutional Shareholder Services, *ISS Ethix Norm-Based Research Report for Goldcorp, Inc.*, at 7 (May 10, 2017).  Two reports summarized the lessons McArthur learned during his tenure at Glamis and Goldcorp.

199.    The first report entitled—"ILO Convention 169 and the Private Sector – Questions and Answers for IFC Clients" ("IFC Report")—was prepared in 2007 by the IFC, one of Marlin's financers.  ***Using Marlin as a case study***, it warned that:

- "If a State fails to comply with obligations on prior consultation on a project, a private company may find that the licenses that have been granted are subject to legal challenge."  IFC Report, at 3.

- "[P]rivate companies need to play a proactive role in the design and implementation of a consultation process with government participation and endorsement.  Companies should invite appropriate government agencies and other third parties to join the key consultation meetings with the local communities.  The presence of the government representatives add credibility to the process and facilitates the delivery of information on certain subjects, such as the licensing processes and the legal obligations of private companies."  IFC Report, at 10.

200.    The second report was prepared by an independent human-rights committee

61

commissioned by Goldcorp in March 2008, while McArthur was its CEO.  This assessment, entitled "Human Rights Assessment of Goldcorp's Marlin Mine" ("**Marlin HRA**")—was published in 2010. The Marlin HRA warned that "[a]lthough Montana[7] undertook various efforts to consult and engage with the communities adjacent to the mine and to disclose information about the proposed project, the company could not, and cannot, adequately respect indigenous people's rights under ILO 169 without the Guatemalan government's involvement in and oversight of its consultation efforts. This is perhaps the most important legacy issue for the Marlin mine and it remains a pertinent issue with respect to current exploration activities as well as any plans Montana has for future expansion of its operations."  Marlin HRA, at 53.

### 2.     Information About the Xinka People

201.     Executives at Tahoe had access to information showing that indigenous Xinka people lived in the Escobal Project Area, and would be directly affected by the Escobal Project.

202.     ***Xinka Tribal Lands***:  The Xinka tribal lands that sit within the Escobal Project Area have been documented in land records as far back as the Spanish Crown.  ¶43.  The Xinka tribal lands that were overlapped by the Escobal Project Area would have been documented in Tahoe's land concessions regarding these areas.  ¶¶43-45.  As well, Tahoe carved the Escobal License area from a larger exploration license within the Escobal Project Area named "Oasis."  *See* PEA 24.  The Oasis license overlapped the Xinka tribal lands of San Carlos Alzatate.  ¶¶34, 42.  When Tahoe decided which portions of the Oasis license make into the Escobal License, it presumably looked at the land titles for the areas within the Oasis license, and would have seen the name and designation of the San Carlos Alzatate Xinka tribal lands, which was officially registered as Indigenous Committee of San Carlos Alzatate (Comscal).  ¶¶34, 42, 45.

203.     ***Xinka Consultation Requests***:  Villalta, the Legal Representative of the Xinka Parliament, confirms that the Xinka Parliament reached out to MEM as early as 2010 to seek consultation about the Escobal Project.  ¶80.  Villalta also specifically referenced two meetings in 2012 that were attended by Xinka representatives and Company representatives at which the Xinka

---

[7]     "**Montana**" is short for Montana Exploradora, S.A., Glamis' and Goldcorp's wholly-owned Guatemalan subsidiary that owned in and operated the Marlin mine.

Parliament requested that MEM consult the Xinka regarding the Escobal Project.  ¶¶82, 84, 85.

204.  ***Xinka Opposition Efforts***: Because MEM did not consult the Xinka as they had requested, the Xinka mounted an opposition to the Escobal Project through various community efforts, of which Tahoe was well aware.

205.  In 2011, the Xinka Parliament and CODIDENA encouraged people from the municipalities within the Escobal Project Area to engage in plebiscites in order to document public opinion against the Escobal Project.  ¶¶86, 87, 91-93, 97-101.  Tahoe was aware of these plebiscites because, on August 4, 2011, MSR filed a legal action against the plebiscite in Casillas, in an attempt to prevent it from taking place.  ¶93.  The court eventually dismissed the action, and the plebiscite was held.  *Id.*  Since that strategy failed, in 2012, according to the Xinka Parliament, the Company offered a group of women gifts and bribes to apply for restraining orders against the community leaders to prevent the leaders from attending the plebiscite in San Rafael Las Flores.  ¶¶86, 87.

206.  After the Juan Bosco License was issued by MEM, on June 22, 2012, representatives from the Xinka Parliament and other NGOs held a press conference pointing to the votes from the plebiscites they had organized to denounce the Juan Bosco License.  ¶94.

207.  Also, in June 2012, Tahoe further indicated its awareness of the Xinka's resistance efforts by filing a lawsuit in Guatemala's Constitutional Court against several Guatemalan government agencies and officials, alleging that the government had failed to protect the Escobal Mine from protesters, many of whom were Xinka.  ¶95.  A month later, the Xinka Parliament circulated an invitation to a protest in San Rafael Las Flores on July 20, 2012, which was publicized by local news showing pictures of the Xinka Parliament President, Roberto Gonzalez Ucelo, making a speech and other Xinka people identifying themselves through signage.  ¶97.

208.  On September 18, 2012, Tahoe violently evicted Xinka protestors and others from a rally outside the gates of the Escobal Mine.  ¶96.  After this protest, Tahoe, acting as a "joint plaintiff," instituted a public prosecution against 32 protestors, which included an arrest warrant for the President of the Xinka Parliament, Roberto González Ucelo.  *Id.*  The charges against these individuals were later dismissed for inadequate investigation.  *Id.*

209.  On March 17, 2013, Xinka leaders were kidnapped by a dozen heavily-armed men.

¶101.  The Xinka President was reportedly told by his captors that he was being taken to the Department's congressman and the Escobal mine's manager.  *Id.*

210.    After MEM granted the Escobal License on April 3, 2013, the Xinka Parliament, in conjunction with local NGOs, held a press conference in Guatemala City, to denounce MEM's "illegal approval" of the License, which was publicized in the local news media.  ¶102.  Immediately thereafter, people, including representatives of the Xinka Parliament, erected a peaceful protest camp directly in front of the Escobal Mine's gates.  ¶103.

211.    On April 27, 2013, the Company's security officers opened fire on the protestors.  ¶104.  Tahoe addressed this incident directly on May 1, 2013, by explaining that only rubber bullets were used against "hostile" protestors.  ¶106.  Tahoe's statements regarding the incident reveal that the Company was up-to-date on the details of the altercation.  ¶¶105, 106.

212.    The opposition around the Escobal Mine grew so undeniable, that on May 2, 2013, Guatemala's President declared a military state of siege in the municipalities of San Rafael Las Flores, Mataquescuintla, Casillas, and Jalapa.  ¶107.

213.    Villalta had filed a lawsuit against MEM in May 2013 in which he argued that the Mine was contaminating the area in which he lived.  ¶¶109-12.  Tahoe became directly involved in this lawsuit when, on July 25, 2013, MEM and Tahoe appealed the Court of Appeals' decision in the suit.  ¶113.  In the legal documents filed pursuant to the appeal, Villalta identified himself as Xinka.  *Id.*  A hearing was granted in the lawsuit, which a Company representative attended, and where Villalta identified himself as Xinka and said some of his arguments in the Xinka language.  *Id.*

214.    Beginning in August 2013, Tahoe also discussed the Xinka's involvement in the resistance when responding to the Norwegian Pension Fund's Council on Ethics.  ¶¶117-19.  When asked about the kidnapping of the four Xinka Parliament leaders, the Company referred the Council to a report from Guatemala's Ministry of Justice, which apparently stated that one Xinka leader died from choking on his own vomit after drinking too much, and that the President of the Xinka Parliament orchestrated his own kidnapping.  Council on Ethics at 177.  The Council ultimately provided Tahoe with a report in August 2014 that identified Xinka opposition to the mine and the Xinka consultation demand as primary factors driving the Escobal Project controversy.  Council on

Ethics at 172.

215.   **Employee Observations**:  Tahoe's own employees admit that they saw indigenous people living around the Escobal Mine and that the Company would have been aware of these peoples because their indigenous identity was obvious based upon their appearance.  ¶¶73-79.

216.   **The IACHR Petition and PPT Claims**:  On September 3, 2013, the Xinka people of Guatemala filed a petition with IACHR against Guatemala and other Guatemalan officials for the state's failure to consult them prior to issuing the Escobal License.  ¶¶114-16.  Tahoe admitted on March 12, 2015 that it was in receipt of the IACHR petition.  2014 Annual Report at 25.  As well, in 2014, the PPT advised Tahoe of the allegations lodged against the Company and invited Tahoe to attend a hearing on the issues.  ¶¶121, 122.

D.   **Defendants' and Insiders' Financial Motives**
   1.   **The Financial Motives of Tahoe**

217.   During the Class Period, Defendants were motivated to keep the Company's stock price high in order to acquire additional companies and their mines.  Indeed, during the Class Period, Tahoe paid over $1.6 billion in Tahoe stock, and only about $2 million cash, to acquire two mining companies.

218.   Before and throughout the Class Period, Tahoe consistently stated in its SEC filings: "An element of our business strategy is to make selected acquisitions."  2012 Annual Report at 28; 2013 Annual Report at 27; 2014 Annual Report at 25; 2015 Annual Report at 23; 2016 Annual Report at 28.

219.   The artificially inflated stock price that Tahoe received from boasting about the Escobal Project allowed it to acquire two companies and their respective mining interests during the Class Period using artificially inflated Tahoe stock: (1) Rio Alto on April 1, 2015, whose principal asset was the La Arena gold mine in Peru, for over $1.1 billion in Tahoe stock and only about $2 million in cash (*see* Press Release, Tahoe Resources, Inc., *Tahoe Resources and Rio Alto Mining Announce Completion of Merger* (Apr. 2, 2015)); and (2) Lake Shore Gold Corp. on April 1, 2016, whose principal asset was the Timmins gold mine in Ontario, Canada, for $540 million in Tahoe stock (*see* Press Release, Tahoe Resources, Inc., *Tahoe Resources Creates New Leader in Precious*

1   *Metals Sector; Provides Combined 2016 Guidance* (Apr. 4, 2016)).

2      220.   A statement by McArthur on January 22, 2014 reveals that the Company's financial

3   motives came before any consideration of the interests of the local population, as he denounced the

4   communities' and anti-mining NGOs' "***gimme gimme gimme***" attitude:

5         [B]uilding [mines] is a real challenge.  Permitting them is even worse.  The
          cultural things.  I talked about corporate social responsibility programs.  The huge
6         push that's worldwide right now against mining, and left versus right, and the
          gimme gimme gimme kind of attitude.  It's very difficult to convince
7         communities that mining is good and that modern mining is clean and provides
          opportunities.  And the minute you say but we'll provide jobs and taxes and
8         careers and we'll help to develop a middle-class, that's just fodder for attack by
          the anti-mining NGOs.
9
          And they'll always say, well, you're cheating people; you're stealing the wealth
10        out of the ground that belongs to the country.  These are debates that it's very
          difficult to enter into. It's very difficult to win those debates.  We've found that
11        just having a good, broad, steady, consistent, and transparent kind of program
          wins eventually.  It's difficult.
12

13   CIBC Whistler Institutional Investor Conference, FD (Fair Disclosure) Wire Tr., at 7 (Jan. 22, 2014).

14             **2.   The Financial Motives of Tahoe's Executives**

15      221.   During the Class Period, Tahoe had implemented a compensation plan that tied

16   officers' bonuses to certain corporate performance goals.  *See* Tahoe Resources, Inc., Notice of 2014

17   Annual General Meeting of Shareholders (Form 6-K, Ex. 99.1) 22 (Apr. 3, 2014).  In 2013, officers

18   were eligible to receive a bonus up to 100% of their base salary if the Escobal License was granted

19   by MEM in the first quarter of 2013, and 50% of their base salary if the Escobal License was granted

20   in the second quarter of 2013.  *Id.* at 24.  The Escobal License was granted in the second quarter of

21   2013, and that year, McArthur received a $525,000 bonus that was 150% of his base salary; Clayton

22   received a $320,000 bonus that was 100% of his base salary; Sadler received a $120,000 bonus that

23   was 80% of his base salary; and Hofmeister received a $180,000 bonus that was 80% of her salary.

24   *Id.* at 25.

25       **E.   Tahoe's Interim CEO Resigns Amidst Suspicious Circumstances And Later
              Characterized Tahoe's Executives As Arrogant Americans**
26

27      222.   On April 1, 2015, Tahoe announced the closing of Rio Alto deal, and that Alex Black,

28   Rio Alto's President and CEO, was replacing McArthur as Tahoe's CEO.  *See* Press Release, Tahoe

Resources, Inc., *Tahoe Resources and Rio Alto Mining Announce Completion or Merger* (Apr. 1, 2015).

223.   On April 29, 2015, during his first and only Tahoe conference call, Black said his primary focus was stakeholder engagement and strengthening communications with local institutions, including Guatemala NGOs:

> My initial focus as the new CEO of Tahoe will be on strengthening the company's image and profile in Latin America, and working closely with our Peruvian and Guatemalan management teams *in strengthening communication channels and initiatives with various institutions such as NGOs, government, religious groups and business leaders*. Our mining operations are important contributors to the economies of the regions in which we operate, and our management team is in agreement that *we need to continue finding ways of engaging more clearly and proactively with all stakeholders in those regions*.

Bloomberg Tr., at 2 (Apr. 29, 2015). During the conference call, Black stressed communication and transparency: "Our future business is built on three principal cornerstones of communication, transparency and trust and our entire management team is focused on delivering results based on these key principles." Bloomberg Tr., at 2 (Apr. 29, 2015).

224.   Black's stakeholder outreach didn't get very far. Only four months after being appointed Tahoe's CEO, on August 5, 2015, Tahoe announced that Black was resigning. *See* Press Release, Tahoe Resources, Inc., *Tahoe Announces Kevin McArthur to Assume CEO Role* (Aug. 5, 2015). The Company only offered a vague explanation for Black's departure: "Mr. Black, who assumed the CEO role following the acquisition of Rio Alto Mining Limited in February, is resigning for personal reasons." *Id.*

225.   The fact that these "personal reasons" were actually referring to a corporate disagreement between Black and Tahoe would become evident in April 2018, when Tahoe reported a labor strike at the La Arena mine in Peru, a mine Black developed as Rio Alto's CEO. *See* Press Release, Tahoe Resources, Inc., *Tahoe Reports Labor Strike at La Arena Mine* (Apr. 22, 2018). In

response, Black took to Twitter to share how he really felt about "arrogant" Tahoe and its

community relations skills:

> **Alex Black** @BlackAlexb · Apr 23
>
> We (Rio Alto) built and operated La Arena for 6 years without a union on site.
> Tahoe has undone all that good work and destroyed the harmony we established
> with the community and workers! 👨‍💼
> Arrogant Americans!! 🙁

> **Alex Black** @BlackAlexb · Apr 24
>
> Clarification:
> Wow!!! A benign tweet in cyberspace and it seems I have Bay Street in a flap 😮
> Just to clarify my comment "Arrogant Americans" refers to the Tahoe gang in
> Reno NOT Americans in general.
> Enough said now lets move on with more important things 👍

Alex Black, Twitter.com, https://twitter.com/BlackAlexb/status/988490450687455233 (April 23 &

24, 2018).

226.     Black's quick firing and his critical comments about Tahoe indicate that his focus on

"engaging more clearly and proactively with *all stakeholders*" was contrary to the Company's

deliberate decision to ignore the existence of the Xinca population in the Escobal Project Area.

**F.      SOX Certifications**

227.     Defendants McArthur and Sadler signed certifications pursuant to the Sarbanes-Oxley

Act of 2002 ("**SOX**") that they filed with the SEC in connection with the filing of Tahoe's 2013

Annual Report.  The 2013 Annual Report SOX certification states that the annual report "fully

complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934"

and "the information contained in the Annual Report fairly presents, in all material respects, the

financial condition and results of operations of the Company."  McArthur and Sadler each further

certified that they each "reviewed" the annual filings, and:

> 2. *No misrepresentations:* Based on my knowledge, having exercised reasonable
>    diligence, the annual filings do not contain any untrue statement of a material fact or
>    omit to state a material fact required to be stated or that is necessary to make a
>    statement not misleading in light of the circumstances under which it was made, for
>    the period covered by the annual filings.

3.   ***Fair presentation:*** Based on my knowledge, having exercised reasonable diligence, the annual financial statements together with the other financial information included in the annual filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the annual filings.

228.   The 2014 Annual Report, 2015 Annual Report, 2016 Annual Report, signed by McArthur and Sadler, and the 2017 Annual Report, signed by Defendants Clayton and McGregor, contained substantially similar certifications.

229.   Defendants McArthur and Sadler signed certifications of interim filings filed on Form 52-109F2 that they filed with the SEC in connection with Tahoe's May 10, 2013 Form 6-K for the quarter ended March 31, 2013, which stated in relevant part:

2.   ***No misrepresentations:*** Based on my knowledge, having exercised reasonable diligence, the annual filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the annual filings.

3.   ***Fair presentation:*** Based on my knowledge, having exercised reasonable diligence, the annual financial statements together with the other financial information included in the annual filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the annual filings.

230.   The following interim filings contained substantially similar certifications, signed by Defendants McArthur and Sadler:

- August 9, 2013 Form 6-K for the quarter ended June 30, 2013;

- November 13, 2013 Form 6-K for the quarter ended September 30, 2013;

- May 8, 2014 Form 6-K for the quarter ended March 31, 2014;

- August 13, 2014 Form 6-K for the quarter ended June 30, 2014;

- November 12, 2014 Form 6-K for the quarter ended September 30, 2014;

- April 29, 2015 Form 6-K for the quarter ended March 31, 2015;

- August 12, 2015 Form 6-K for the quarter ended June 30, 2015;

- November 13, 2015 Form 6-K for the quarter ended September 30, 2015;

- May 4, 2016 Form 6-K for the quarter ended March 31, 2016; and

- August 10, 2016 Form 6-K for the quarter ended June 30, 2016.

231.     The following interim filings contained substantially similar certifications, signed by Defendants Clayton and McGregor:

- November 4, 2016 Form 6-K for the quarter ended September 30, 2016; and
- May 3, 2017 Form 6-K for the quarter ended March 31, 2017.

## CLASS ACTION ALLEGATIONS

232.     Lead Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities who purchased Tahoe common stock in the United States or on the NYSE at artificially inflated prices between April 3, 2013 and August 24, 2017, inclusive, and were damaged thereby, seeking to pursue remedies under the Exchange Act (the "**Class**").

233.     Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

234.     Also excluded from the Class are those who purchased or otherwise acquired Tahoe common stock on foreign exchanges or purchased or otherwise acquired Tahoe common stock outside of the United States, in accordance with the United States Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010) ("[I]t is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.").

235.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Tahoe common stock was actively traded on the NYSE, which is an efficient market.  While the exact number of Class members cannot be determined at this early stage, Lead Plaintiff believes that thousands of people held Tahoe common stock during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Tahoe or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

236.    Lead Plaintiff's claims are typical of the claims of the other members of the Class because Lead Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained of herein.

237.    Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiff has no interests that are contrary to or in conflict with those of the Class.

238.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

      a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.    Whether Defendants' publicly disseminated statements made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      c.    Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Tahoe's common stock to be artificially inflated during the Class Period;

      d.    Whether Defendants acted with the requisite level of scienter in omitting and/or misrepresenting material facts;

      e.    Whether the Individual Defendants were controlling persons of Tahoe; and

      f.    Whether the Class members have sustained damages, and if so, the proper measure of damages.

239.    Lead Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

240.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be

relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## LOSS CAUSATION

241.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial damages.

242.    During the Class Period, Lead Plaintiff and other Class members purchased Tahoe common stock at artificially inflated prices, and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Tahoe common stock declined significantly causing Lead Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by the Defendants materialized.

243.    Defendants made false and misleading statements regarding the issuance of the Escobal License (¶¶151-56); the indigenous population in the Escobal Project Area (¶¶159, 160); the community's response to the Escobal Project (¶¶163-67); Tahoe's engagement efforts with the communities in the Escobal Project Area (¶¶170, 172-75); and Tahoe's alignment with CSR regimes (¶¶178, 180, 182-85).  On the strength of these false and misleading statements, the Company's stock price was artificially inflated to a Class Period high of $25.63 per share on July 28, 2014. Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting a falsely positive perception of Tahoe's business, operations, performance, and prospects.

244.    The true facts and risks regarding the matters that were omitted and/or misrepresented by Defendants (¶¶157, 161, 168, 171, 176, 179, 181, 186) eventually caused the price of Tahoe stock to decline on two occasions, thereby causing harm to investors.

245.    First, Defendants' statements were corrected, and the risk concealed by the undisclosed facts regarding the Escobal Project materialized, when on July 5, 2017, Tahoe

announced that the Supreme Court provisionally suspended the Escobal License and the Juan Bosco License renewal pending a final determination of CALAS's action, causing investors losses as Tahoe's share price fell $2.74 per share on July 6, 2017 and an additional $0.41 per share on July 7, 2017, or over 40% from the closing price of $8.30 per share on July 5, 2017.  ¶145.

246.   Then, Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding the Escobal Project further materialized when, after the market closed on August 24, 2017, the Company announced that Guatemala's Constitutional Court issued a decision upholding the Supreme Court's provisional suspension of the Escobal License and Juan Bosco License renewal, causing investors losses as Tahoe's share price fell $1.01 per share, or over 18% from the previous day's closing price of $5.48, to close at $4.47 per share on August 25, 2017. ¶¶148, 188.

247.   As a result of their purchases of Tahoe's publicly traded common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss and damages.

## CONTROL PERSON LIABILITY

248.   The Individual Defendants, because of their positions with Tahoe, possessed the power and authority to control the contents of Tahoe's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants had a duty to (1) promptly disseminate complete, accurate, and truthful information with respect to the Company's Escobal Project; (2) correct any previously issued statements that were materially misleading or untrue when made so that the market could accurately price the Company's securities based upon truthful, accurate, and complete information; and (3) update any previously-issued forward-looking statements that became materially misleading or untrue so that the market could accurately price the Company's common stock based upon truthful, accurate, and complete information.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein

had not been disclosed to, and were being concealed from, the public, and that the positive

representations and omissions which were being made were then materially false and/or misleading.

## THE FRAUD ON THE MARKET PRESUMPTION

249.    At all relevant times, the market for Tahoe's common stock was an efficient market

for the following reasons, among others:

      a.    Tahoe's common stock was listed and actively traded on the NYSE (symbol

TAHO), a highly efficient market;

      b.    As a registered and regulated issuer of securities, Tahoe filed periodic reports

with the SEC, in addition to the frequent voluntary dissemination of information;

      c.    Tahoe regularly communicated with public investors through established

market communication mechanisms, including through regular dissemination of press

releases on the national circuits of major newswire services and through other wide-ranging

public disclosures such as communications with the financial press and other similar

reporting services;

      d.    The market reacted to public information disseminated by Tahoe;

      e.    Approximately 13 analysts followed Tahoe's business and wrote reports

which were publicly available and affected the public marketplace;

      f.    The material misrepresentation and omissions alleged herein would tend to

induce a reasonable investor to overvalue Tahoe's stock; and

      g.    Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and

other members of the Class purchased Tahoe common stock between the time that

Defendants made the material misrepresentations and omissions and the time that the truth

was revealed, during which time the price of Tahoe common stock was artificially inflated by

Defendants' misrepresentations and omissions.

250.    As a result of the above, the market for Tahoe securities promptly digested current

information with respect to the Company from all publicly available sources and reflected such

information in the securities' prices.  The historical daily trading prices and volumes of Tahoe

securities are incorporated herein by reference.  Under these circumstances, all those who purchased

Tahoe common stock during the Class Period suffered similar injuries through their purchases of common stock at prices which were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## NO STATUTORY SAFE HARBOR

251.    The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

252.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.  *See In re Quality Sys., Inc. Secs. Litig.*, 865 F.3d 1130 (9th Cir. 2017).

253.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

254.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements, such as, *inter alia*, adequate consultation of the indigenous population.  Such statements were also not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings class, or other public statement described herein were general, "boilerplate" statements of risk that would affect any metal mining company, and misleadingly contained no factual disclosure of any of the specific details concerning the or similar important factors that would give investors adequate notice of such risks.

255.    Fourth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false

and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Tahoe who actually knew that each such statement was false or misleading when made.

## CAUSES OF ACTION

### COUNT I
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

256.     Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

257.     This Count is brought under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), against all Defendants.

258.     During the Class Period, Defendants violated Section 10(b) and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Tahoe common stock during the Class Period.

259.     Defendants, individually and in concert, directly and indirectly, by use of means or instrumentalities of interstate commerce and/or of the mails made the false and misleading statements specified herein, including the statements in SEC filings, presentations, press release, conference calls, and analyst reports concerning the Escobal Project, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false or misleading.

260.     Defendants, individually and in concert, directly and indirectly, by use of means or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct to conceal the problems with the Escobal Project.

261.     Defendants acted with scienter throughout the Class Period because each acted with either the intent to deceive, manipulate, or defraud, or with recklessness.  Defendants possessed

actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

262.    Tahoe is liable for the acts of the Individual Defendants and other Company agents and personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Tahoe in taking the actions alleged herein.

263.    Lead Plaintiff and Class Members purchased Tahoe common stock, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In so doing, Lead Plaintiff and Class members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.

264.    Lead Plaintiff and other Class members have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Tahoe common stock, which inflation was removed from the prices of their shares when the true facts became known. Lead Plaintiff and the Class would not have purchased Tahoe common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' materially false and misleading statements.

265.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of Tahoe common stock during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

266.    Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

267.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

268.    During their tenures as officers and/or directors of Tahoe, each of the Individual

Defendants acted as controlling persons of Tahoe within the meaning of Section 20(a) of the Exchange Act.  By reason of their status as senior executive officers and/or directors of Tahoe, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  Each of the Individual Defendants was able to and did control, directly and indirectly, the content of the public statements made by the Company during the Class Period, including the statements Lead Plaintiff alleges are false and misleading, thereby disseminating the false and misleading statements and omissions of fact alleged herein.

269.    By virtue of their high-level positions at Tahoe, and as more fully described above, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company.  The Individual Defendants were able to and did influence and control Tahoe's decision-making, including reviewing and controlling the content and dissemination of the documents that Lead Plaintiff and the Class contend contained materially false and misleading information and on which Lead Plaintiff and the Class relied.  The Individual Defendants were also in the position to prevent the issuance of these statements or to correct them prior to dissemination.

270.    As set forth in Count I, Tahoe committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly employing devices, artifices, and schemes to defraud, disseminating materially false and misleading statements and/or omissions, and/or engaging in acts, practices, or a course of conduct that operated as a fraud or deceit upon Lead Plaintiff throughout the Class Period.  By virtue of their positions as controlling persons of Tahoe and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

271.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Tahoe common stock.

## JURY TRIAL DEMAND

272.    Lead Plaintiff hereby demands a trial by jury on all triable claims.

78

# PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and statements alleged herein;

C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.     Awarding rescissory damages in favor of Lead Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

E.     Awarding such other and further relief as this Court may deem just and proper

Dated: August 31, 2018                    Respectfully submitted,

By: */s/ Richard W. Gonnello*
          Richard W. Gonnello

Richard W. Gonnello (*pro hac vice*)
Megan M. Sullivan (*pro hac vice*)
Sherief Morsy (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: rgonnello@faruqilaw.com
          msullivan@faruqilaw.com
          smorsy@faruqilaw.com

Martin A. Muckleroy
State Bar #9634
**MUCKLEROY LUNT, LLC**
6077 S. Fort Apache Rd., Ste 140
Las Vegas, NV 89148
Telephone: 702-907-0097
Facsimile: 702-938-4065
Email: martin@muckleroylunt.com

*Attorneys for Lead Plaintiff Kevin Nguyen*