Leslie Bryan Hart, Esq. (SBN 4932)
Veronica A. Peterson, Esq. (SBN 13841)
FENNEMORE CRAIG, P.C.
300 E. Second St., Suite 1510
Reno, Nevada 89501
Tel: 775-788-2228   Fax: 775-788-2229
lhart@fclaw.com; vpeterson@fclaw.com

(Admitted *Pro Hac Vice*)
Scott J. Fisher, Esq.
Karl R. Barnickol, Esq.
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 1700
Chicago, IL 60602
Tel: 312-269-8047 Fax: 312-980-0878
kbarnickol@nge.com

*Attorneys for Defendants Tahoe Resources, Inc., Elizabeth McGregor,*
*Mark Sadler, Ronald W. Clayton, Edie Hofmeister and C. Kevin McArthur*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In re TAHOE RESOURCES, INC. SECURITIES LITIGATION | Case No. 2:17-cv-01868-RFB-NJK **DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

14364664.1

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ...................................................................................................3

       A.    The Company And The Escobal Mining License ....................................3

       B.    Legal Challenges To The Mining Ministry's Decision............................6

       C.    The Complaint ..........................................................................................7

III.   STANDARD OF REVIEW ..................................................................................8

IV.    ARGUMENT .......................................................................................................8

       A.    The Complaint Fails To Allege Facts Showing The Defendants Made
             Any False Or Misleading Public Statement. ...........................................8

             1.    The Allegations Do Not Show That The Challenged Statements
                   Were Misleading. ..........................................................................9

                   a.    Tahoe Fully Disclosed That Its License Could Be
                         Suspended And Other Relevant Risks...............................9

                   b.    There Was No Failure To Disclose Because Opposition
                         To The Escobal Mine Was Public. ..................................12

                   c.    Subsequent Events In Guatemala Cannot Make The
                         Statements Misleading......................................................12

             2.    In Addition To The Global Deficiencies, None Of The Public
                   Statement Allegations Was Misleading On Its Face. ...............13

                   a.    The "Escobal Project Area" Is A Concoction Of
                         Plaintiff's Imagination And Was Not Considered By
                         Guatemalan Courts. .........................................................13

                   b.    Statements Based On The Government Census Cannot
                         Support A U.S. Securities Claim......................................15

                   c.    Allegations About Generalized Opposition To The
                         Mining Ministry's Decision Do Not Show That The
                         Challenged Statements Were Misleading..........................18

                   d.    Statements About Community Outreach Are Not
                         Actionable.........................................................................19

                   e.    Statements About Corporate Social Responsibility
                         Policies Are Not Actionable.............................................21

                   f.    Statements About The Escobal Mine Are Not Misleading. .........22

       B.    Plaintiff Fails To Plead Facts Creating A Strong Inference That The
             Defendants Acted With Scienter. ...........................................................23

             1.    *Respondeat Superior* Allegations Alone Do Not Support A
                   Strong Inference Of Scienter...................................................25

             2.    Core-Operations Allegations Do Not Support A Strong Inference
                   Of Scienter..............................................................................25

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

14364664.1

3.    Allegations That The Defendants Knew About Opposition To Mining In Guatemala Do Not Support An Inference Of Scienter............27

4.    Allegations Regarding The Financial Motives Of The Individual Defendants Do Not Support An Inference Of Scienter...........................30

5.    Allegations Regarding The Resignation Of Tahoe's CEO Do Not Support An Inference Of Scienter. ..........................................................31

6.    Allegations Regarding Sarbanes-Oxley Certifications Do Not Support An Inference Of Scienter. ..........................................................31

C.    Plaintiff Fails To Plead Facts Showing Any Misleading Statements Allegedly Made By The Defendants Caused Any Loss. .....................................32

D.    Plaintiff Fails To State A Controlling Person Claim Under Section 20(a). .........34

V.    CONCLUSION ...............................................................................................................34

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

ii

# TABLE OF AUTHORITIES

CASES

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993) ............................................................................ 12

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................... 9, 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................... 8

*Bofi Holding, Inc. Sec. Litig.*,
  302 F. Supp. 3d 1128 (S.D. Cal. 2018) .................................................... 20, 21

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ...................................................................... 9, 19

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................. 33, 34

*Glazer Capital Management, LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ..................................................................... 31, 32

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002) ......................................................................... 24

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ....................................................................... 34

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ....................................................................... 20

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................... 30, 32

*In re DotHill Sys. Corp. Sec. Litig.*,
  2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ..................................................... 9

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) .......................................................... 24

*In re Lifelock Sec. Litig.*,
  690 F. App'x 947 (9th Cir. 2017) ................................................................... 23

*In re Pacific Gateway Exchange, Inc.*,
  169 F. Supp. 2d 1160 (N.D. Cal. 2001) .......................................................... 29

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .......................................................................... 8

*In re Silicon Graphics, Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ..................................................................... 23, 24

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ......................................................................... 24

*In re Yahoo! Inc. Sec. Litig.*,
  611 F. App'x 387 (9th Cir. 2015) ..................................................................... 9

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) .......................................................................... 31

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .............................................................. 4, 5, 6, 7

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................................... 33

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...................................................................................................... 9

*Metzler*,
540 F.3d ................................................................................... 24, 32, 33, 34

*New Mexico State Inv. Council v. Ernst & Young*,
641 F.3d 1089 (9th Cir. 2011) .................................................................................... 24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America-West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .................................................................................... 11

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .................................................................................... 32

*Retail Wholesale & Dept. Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ............................................................................ 21, 22

*Ronconi*,
253 F.3d 423 .......................................................................................................... 13

*Rubke v. Capitol Bancorp, Ltd.*,
551 F.3d 1156 (9th Cir. 2009) .............................................................................. 9, 12

*S. Ferry LP, No.2 v. Killilnger*,
542 F.3d 776 (9th Cir. 2008) .................................................................................... 26

*Szymborski v. Ormat Tech., Inc.*,
776 F. Supp. 2d 1191 (D. Nev. 2011) ...................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................... 8, 23, 24

*United States v. Dreyer*,
767 F.3d 826 (9th Cir. 2014) .................................................................................... 18

*United States v. Esquivel*,
88 F.3d 722 (9th Cir. 1996) ...................................................................................... 18

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .............................................................................. passim

STATUTES

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................. 8
15 U.S.C. § 78u-4(b)(2)(A) ........................................................................................... 23
15 U.S.C. § 78u-4(b)(3)(A) ............................................................................................. 8
15 U.S.C. §§78j(b) and 78t(a) ......................................................................................... 7

RULES

F.R.C.P. 5(b) .................................................................................................................. 36
Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure ................................... 1

REGULATIONS

17 C.F.R. §240.10b-5 ...................................................................................................... 7

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

OTHER AUTHORITIES

*Alliance Equipment Lease Program Securities Litigation v. Royal Indemnity Co.*, No. 98-CV-
2150 J (NLS),
2002 U.S. Dist. LEXIS 28582, at *40-41 (S.D. Cal. Oct. 11, 2002) .................................... 25
*Allied Nevada Gold Corp. Sec. Litig.*,
2017 U.S. Dist. LEXIS 152905, at *33 ................................................................................ 30
*Allied Nevada Gold Corp., Sec. Litig.*,
2017 U.S. Dist. LEXIS 152905, at *32 ................................................................................ 28
*Barrick Gold Corp. Sec. Litig.*,
2018 U.S. Dist. LEXIS 161081, at *23 (S.D.N.Y. Sep. 20, 2018) ........................................ 13
Company's operations. *Tai Jan Bao v. Solarcity Corp.*, No. 14-cv-01435-BLF,
2016 U.S. Dist. LEXIS 1190, at *23 (N.D. Cal. Jan. 5, 2016) ............................................. 26
JF (RS),
2006 U.S. Dist. LEXIS 16156, at *8-9 (N.D. Cal. Mar. 20, 2006) ...................................... 12
LRH-WGC,
2017 U.S. Dist. LEXIS 152905, at *18 (D. Nev. Sep. 20, 2017) ......................................... 13
*Sharing v. Quantum Corp.*, CIVIL NO. 96 20711 SW,
1997 U.S. Dist. LEXIS 23532, at *12 (N.D. Cal. Aug. 14, 1997) ...................................... 12
*West v. eHealth, Inc.*, No. 3:15-cv-00360-JD,
2016 U.S. Dist. LEXIS 33429, at *11-13 (N.D. Cal. Mar. 14, 2016) ................................. 11
*Wilson v. Bernstock*, No. 01-0272(JEI),
2001 U.S. Dist. LEXIS 22354, at *49 (D.N.J. Jan. 23, 2001) ............................................. 11

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

Defendants Tahoe Resources, Inc. ("Tahoe" or the "Company"), C. Kevin McArthur, Ronald W. Clayton, Elizabeth Dianne McGregor, Mark T. Sadler and Edie Hofmeister (collectively "Individual Defendants") respectfully move to dismiss the Consolidated Amended Class Action Complaint ("Complaint") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") because it fails to state a claim for relief. Specifically, Plaintiff does not: (1) identify any public statement made by the Defendants that was false or misleading at the time it was made; (2) allege particularized facts showing that the Defendants made any statement with knowledge of its falsity; or (3) allege facts showing that any statement made by the Defendants, as opposed to new Guatemalan law made by courts after the statement was made, caused his alleged loss. This motion is based on the accompanying memorandum of law, the exhibits hereto, the arguments of counsel, and any other evidence and argument that may be presented prior to the Court's decision on the motion.

## I. INTRODUCTION

Lead Plaintiff Kevin Nguyen's Complaint attempts to recast as a securities fraud claim an internal Guatemalan dispute involving anti-mining groups, the Xinka indigenous community, and the Guatemalan government. In support of this effort, Plaintiff alleges that the Guatemalan Ministry of Energy and Mines ("Mining Ministry") did not follow Guatemalan law in granting an exploitation license to Tahoe's Escobal silver mine in April 2013 because there were Xinka people living in the area around the mine, and the Mining Ministry should have consulted with them before issuing the license. Based on that premise, the Complaint claims that 29 public statements Tahoe made in the four-year period after the license was issued were misleading because Tahoe did not disclose more information about the Xinka people and the risk that a future court challenge to the Mining Ministry's process for issuing the license could result in license suspension. Compl. ¶¶149-86. In so doing, the Complaint ignores that court challenges during that same four-year period did not affect operations or contemplate suspension of the Escobal license. The Complaint also ignores that Tahoe's disclosures specifically identified the risk of a possible suspension of the Escobal

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

14364664.1

license. Plaintiff argues that the "truth" came out on July 5, 2017, when the Guatemalan Supreme Court entered an order suspending the license, in a case filed in May 2017 by an anti-mining group against the Mining Ministry, despite the fact that neither Tahoe nor the Xinka Parliament was a party in that case until after the order was entered. Plaintiff claims that Tahoe's stock price fell by about 33% following that decision suspending mining operations at Tahoe's flagship mine.

These allegations do not – and Plaintiff cannot – state a claim for securities fraud. The Complaint fails because it presumes that the Mining Ministry had a clear obligation under Guatemalan law to consult with Xinka people residing far from the Escobal mine before issuing the Escobal exploitation license. That presumption is unsupportable because:

- Plaintiff cannot cite to any provision of Guatemalan law or decision of a Guatemalan court that required the Mining Ministry to consult with indigenous groups outside the "Area of Influence" – *i.e.,* the area surrounding the mine where people or the environment could be directly affected by the mine's operations; and

- The last government census showed that no Xinka groups (and only two Xinka individuals) lived in the Escobal mine's Area of Influence.

Determinations of what area would be directly affected by the mine and what people lived in that area were the exclusive province of the Guatemalan government. The fact that Guatemalan courts concluded four years after the license was issued that the Mining Ministry had an obligation to review its process and consult with Xinka people living in the mine's Area of Influence has no bearing on whether the Defendants were reckless in making any of the challenged statements prior to those judicial decisions. Importantly, no Guatemalan court concluded that Tahoe did anything illegal or unethical in connection with the mining application process. Compl. ¶3. Tahoe followed the protocol prescribed by the Guatemalan government to procure its mining license and nothing in the Complaint contains any contrary facts. Further, there is no allegation that the Mining Ministry would have denied the Escobal license if it had engaged in a consultation process or that the consultation process gave indigenous people in the Area of Influence a veto power over the license. As such, there was no reason for Tahoe to oppose a consultation process if it was warranted. Ultimately, the issues surrounding consultation are *still* being interpreted and developed by the Guatemalan

government and the Guatemalan courts, belying any claim that the Defendants' public statements between 2013 and 2017 were misleading or that the Defendants had the requisite knowledge to support a securities fraud claim.

The Complaint also fails because it depends on this Court concluding that Plaintiff could have somehow been misled about facts that were – by his own admission – widely reported and not uniquely known to the Defendants. This is in stark contrast to all other securities fraud claims that involve operational or financial information that was uniquely known or accessible to the defendants. Moreover, his theory requires the Court to ignore Tahoe's disclosures regarding the risks of operating in Guatemala, including the very risk that caused the Company's stock price to drop at the end of the purported class period – a court-ordered suspension of the Escobal mining license.

Finally, to the extent the Complaint alleges internal problems in Guatemala with mining generally or the plight of the Xinka people, those issues are not properly before this Court, nor would this purported class action by Tahoe investors provide any remedy for the Xinka or other Guatemalan people. Notwithstanding the lengthy Complaint, Plaintiff has not alleged an actionable claim under U.S. securities laws, and the Defendants respectfully request that the Complaint be dismissed with prejudice.

## II.    BACKGROUND

### A.    The Company And The Escobal Mining License

Tahoe is a Canadian public company involved in precious metals mine operations and mineral exploration and development. Compl. ¶¶2, 20. Tahoe's common shares are listed on the Toronto and New York Stock Exchanges. *Id.* ¶29 Tahoe was incorporated in British Columbia, Canada on November 10, 2009. *Id.* ¶20, 28. Its principal corporate office is located in Reno, Nevada.[1] *Id.* ¶20. The Company, through its subsidiary Minera San Rafael

---

[1]    Tahoe and the Individual Defendants are residents of Reno, and all of the Company's U.S. information and witnesses relevant to the Complaint are in Reno. *None* of the events alleged in the Complaint occurred in Las Vegas. Accordingly, the Defendants reserve their right to seek transfer of the case to Reno.

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

("MSR"), operates the Escobal mine in San Rafael Las Flores, Guatemala, and, through other subsidiaries, two mines in Peru, and two mines in Canada. *Id.* ¶¶29, 219.

Tahoe acquired the Escobal mine assets from Goldcorp, another mining company, on June 8, 2010. *Id.* ¶¶2, 29. At the time Goldcorp held exploration licenses relating to potential mineral deposits in Guatemala, but not an exploitation license for Escobal. *Id.* As explained in Tahoe's public filings, there are three types of licenses necessary for finding and building a mine: a reconnaissance license, an exploration license, and an exploitation license. (Ex. A, 2013 Annual Report on Form 40-F, Mar. 17, 2014, pp. 32-34;[2] *see also* Compl. ¶ 58. A reconnaissance license is generally good for six months, can cover an area from 500 to 3,000 square kilometers, and allows the holder to search for mineral deposits. *Id.* An exploration license is generally good for three years, covers an area of up to 100 square kilometers, and allows the holder to locate, study, analyze and evaluate mineral deposits that have been discovered within the area of a previously granted reconnaissance license. *Id.* An exploitation license is generally good for 25 years, covers a substantially smaller area not greater than 20 square kilometers, and grants the holder the exclusive right to develop deposits within the license boundaries. *Id*; Compl. ¶59.

Following its acquisition of the Escobal assets, Tahoe applied for an exploitation license for the mine. Compl. ¶36. The first step in the process was to submit the application with an Environmental Impact Study ("EIS") to the Guatemalan Environment Ministry ("Environment Ministry"). Compl. ¶5, 59. The EIS is related to an area (of less than 20 square kilometers) around the mine where mining operations would take place and defined the mine's Area of Influence. *Id*. ¶60-61. The Environment Ministry reviewed the EIS, and on October 21, 2011, following a statutory public comment period, approved the EIS, including the identified Area of Influence. (Ex. A, p. 49.)

Once the Environment Ministry approved the EIS, the application was submitted to the

---

[2]  The Exhibits are certain of Tahoe's public filings with the Securities and Exchange Commission that are referenced in the Complaint. The Court can take judicial notice of these documents because they are matters of public record that are not subject to reasonable dispute. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Mining Ministry. Compl. ¶¶5, 64. In 1996, Guatemala adopted the "Indigenous and Tribal Peoples Convention" contained in ILO 169 promulgated by the United Nations International Labor Organization ("ILO").[3] Compl. ¶3. Article 6(a) of ILO 169 says the Government should consult with indigenous people who are "directly" affected by Government action, but it includes no specific criteria for determining who is "directly" affected and it does not provide a right to veto or otherwise prevent government action. *Id.* Because of ILO 169, the Mining Ministry must consider whether there are indigenous people (such as the Xinka) who live in a project's Area of Influence as part of the process of reviewing an application for an exploitation license. Compl. ¶¶3, 50, 52. If a determination is made that indigenous people do live in the Area of Influence, the Mining Ministry (and notably not private parties like Tahoe or its subsidiary, MSR) must engage in consultation with those people before issuing an exploitation license. *Id.* Like ILO 169, however, Guatemalan mining law does not include rules, regulations, or other guidance on how the Government should define a project's Area of Influence or how a consultation process is to be conducted.[4] Compl. ¶50.

In determining whether indigenous people resided in the Escobal Area of Influence, the Mining Ministry conducted a diagnostic of San Rafael las Flores, the community nearest to the mine, and reviewed the most recent official census data for the Area of Influence. Compl. ¶62. That census, conducted by the Guatemalan government in 2002 ("Government Census"), showed that the population residing in the immediate area of the Escobal Mine was 99.6% "Ladino" – *i.e.*, of Hispanic origin and non-indigenous. Compl. ¶¶159-160, 172. Accordingly, without any regulations to establish how to conduct a consultation process under ILO 169, the Mining Ministry determined that it did not have any consultation obligation with indigenous people under Guatemala's mining law or ILO 169 as to the Escobal exploitation license. *Id.* ¶64. When the Guatemalan Supreme Court construed the Mining Ministry's obligations differently four years later, it represented a different interpretation of the law, not a

---

[3] https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE:C169

[4] As of August 31, 2018, when this Complaint was filed, the Constitutional Court had not yet provided its ruling on how the Mining Ministry should conduct a consultation process.

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

5

repudiation of the Mining Ministry's initial efforts.

### B. Legal Challenges To The Mining Ministry's Decision

Prior to the issuance of the license, the Mining Ministry received approximately 250 oppositions to the Escobal exploitation license from people arguing that the project would cause environmental damage and threaten public health and water resources. Compl. ¶109. There is no allegation that any of these oppositions asserted a claim that the Mining Ministry needed to engage in consulting with the Xinka people or that the Area of Influence included or should be expanded to include indigenous areas. *Id.* The Mining Ministry denied all of the oppositions finding that the claimants were not directly affected by the license and, therefore, had no standing. *Id.* ¶ 110. One of the claimants brought a lawsuit challenging the Mining Ministry's decision. *Id.* That case made its way to Guatemala's highest court, the Constitutional Court, which ruled in October 2015 that the claimant had standing, and the Mining Ministry should have held a hearing on his opposition. *Id.* ¶ 113. Importantly, the Constitutional Court did not address the presence of indigenous Xinka people in the Escobal Area of Influence, any obligation by the Mining or Environment Ministries to consult with indigenous people, or the validity of the Escobal license–let alone suspension of the license.*Id.*

After years of unsuccessfully challenging the Escobal mine on environmental grounds, the anti-mining organization CALAS adopted a new strategic approach. On May 17, 2017 CALAS sued the Mining Ministry claiming that it had violated Xinka people's right to be consulted under ILO 169 ("CALAS Suit"). Compl. ¶142. Tahoe and the Xinka Parliament, a community organization, rather than a governmental body, that includes some, but not all Xinka people, were not original parties to the CALAS Suit. *Id.* On July 5, 2017, the Company was notified that the Guatemalan Supreme Court had issued a provisional decision that suspended the Escobal exploitation license until the claim was heard on the merits. *Id.* ¶144. On September 8, 2017, the Supreme Court issued a definitive decision on the merits of the underlying claim. *Id.* ¶190. The ruling reinstated the Escobal exploitation mining license, but ordered the Mining Ministry to consult with the Xinka people within a broader geographic area than the original Area of Influence approved by the Environment Ministry. *Id.*

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

CALAS and other interested parties appealed the Supreme Court's ruling to the Constitutional Court. Compl. ¶146. The Constitutional Court ultimately ruled on September 3, 2018 (with additional clarification on October 8, 2018) that the Environment Ministry needed to finalize the relevant Area of Influence in the EIS and the Mining Ministry needed to conduct a consultation process with any Xinka people residing in the affected area. *Id.* ¶147. Contrary to Plaintiff's concocted "Escobal Project Area," the Constitutional Court ordered that Tahoe's subsidiary, MSR work with the EIS consultant or another qualified consultant, and experts at two Guatemalan universities to review, define, and recommend the appropriate Area of Influence to consider in determining what indigenous people should be part of the consultation process. (Ex. E, Press Release on Form 6-K, Oct. 10, 2018, p. 2.) Following that, the Mining Ministry was ordered to conduct a pre-consultation phase to organize the consultation process, a consultation phase, and to seek review of the consultation process by the Supreme Court. *Id.* Once these phases are complete, the Mining Ministry can reinstate the exploitation license. *Id.*

### C.    The Complaint

The Complaint alleges that the Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. A majority of the allegations in the Complaint simply parrot allegations about opposition to the Escobal mine by various anti-mining groups in Guatemala. (*E.g.*, Compl. ¶¶28-146.) The gist of Plaintiff's allegations is that the Defendants were reckless in not knowing, based upon general opposition to the issuance of the exploitation license, that the Mining Ministry had failed to discharge its obligation to consult with Xinka people who "may be affected" by the mine. Compl. ¶¶5, 47, 64. In support of this claim, Plaintiff suggests that a determination of whether Xinka people might be affected should look at a broad geographic area that included not just the small area around the mine covered by the EIS and included in the Escobal exploitation license, but in the entire area where Tahoe had applied for reconnaissance or exploration licenses. Compl. ¶¶32-34, 42. That is the area that Plaintiff defines as the "Escobal Project Area." *Id.* Plaintiff then

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

points to general opposition to the Mining Ministry's decision to issue the Escobal exploitation license, mentions that Xinka participated in certain – but not all – protests of that decision, and concludes that the Defendants were reckless in not knowing that the Mining Ministry was legally required to conduct consultation but failed to properly do so. *Id.* ¶¶6-8, 103-107, 162-168. Finally, Plaintiff identifies 29 public statements made by Tahoe during the purported class period between April 3, 2013 and August 24, 2017, juxtaposes them against the unfounded allegations described above, and concludes that the public statements were misleading because the Defendants failed to disclose more information about the presence of Xinka in areas around the Escobal mine and opposition to the exploitation license. Compl. ¶¶149-186.

## III.    STANDARD OF REVIEW

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, Plaintiff must adequately plead (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). To survive a motion to dismiss under Rule 12(b)(6), Plaintiff's factual allegations must be "plausible on [their] face" and more than "speculative." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[L]abels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.* at 555. Plaintiff must also satisfy the higher standards for pleading fraud claims set forth in Rule 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b)(3)(A). Plaintiff must specify with particularity "each statement [or omission] alleged to have been misleading" and "the reason or reasons why the statement [or omission] is misleading." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).

## IV.    ARGUMENT

### A.    The Complaint Fails To Allege Facts Showing The Defendants Made Any False Or Misleading Public Statement.

Under the PSLRA, Plaintiffs must specify "each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

8

4(b)(1)(B). Plaintiff must discharge this burden by alleging, with particularity, "contemporaneous statements or information" that are inconsistent with the challenged statement—so as to demonstrate that it was false when made. *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009). "Allegations that are 'not necessarily inconsistent' with the allegedly false statement do not establish falsity." *In re DotHill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at \*10 (S.D. Cal. Mar. 18, 2009) (internal quotation omitted). Here, there are many independently fatal flaws in Plaintiff's attempt to plead a false or misleading statement.

### 1. The Allegations Do Not Show That The Challenged Statements Were Misleading.

Importantly, all of the challenged statements are criticized on the basis of purported omissions – not affirmative misstatements. *See* Compl. ¶¶157, 161, 168, 176, 186 ("The statements … above were false and/or misleading when made because the speakers *failed to disclose* the following[.]") (emphasis added).) The Supreme Court has recognized that, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Rather, disclosure is required "only when necessary to make … statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). In order for a statement to be "misleading," it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also In re Yahoo! Inc. Sec. Litig.*, 611 F. App'x 387, 389 (9th Cir. 2015) (no falsity because the challenged public statements did not affirmatively create an impression of a state of affairs that differed in a material way from the one that actually existed). In other words, Plaintiff must allege that there was "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32.

### a. Tahoe Fully Disclosed That Its License Could Be Suspended And Other Relevant Risks.

Plaintiff cannot show that the challenged statements were misleading because Tahoe *did* disclose to its investors the risk that its license could be suspended for a variety of reasons, including "[c]hanges to Guatemalan laws" and "adverse court rulings." Compl. ¶154. Indeed, Plaintiff acknowledges these specific disclosures in Tahoe's Annual Reports:

> The validity of the licenses related to the Escobal mine can be uncertain and may be contested. There is no assurance that applicable governmental bodies will not revoke or significantly alter the conditions of applicable licenses that are required by the Escobal mine. Changes to Guatemalan laws, including new mining legislation or adverse court rulings could materially and adversely impact our rights to exploration and exploitation licenses necessary for the Escobal mine.

*Id.* That disclosure alone – that Plaintiff remarkably claims is misleading – should dispose of this matter.

Contrary to the Complaint's implication, Tahoe's public filings regularly disclosed the very risks Plaintiff now suggests were unknown prior to July 5, 2017. Among other things, Tahoe's public filings during the class period told investors:

- The duration and success of our efforts to obtain and renew licenses or permits are contingent upon many variables not within our control, including local politics, legal challenges and the interpretation of applicable requirements implemented by the licensing authority. Any unexpected refusals of required licenses or permits or delays or costs associated with the licensing or permitting process could prevent or delay the development or impede the operation of a mine, which could adversely impact our operations and profitability. (Ex. A, p. 37; Ex. B, 2014 Annual Report on Form 40-F, Mar. 12, 2015, p. 40; Ex. C, 2015 Annual Report on Form 40-F, Mar. 11, 2016, p. 41; Ex. D, 2016 Annual Report on Form 40-F, Mar. 10, 2017, p. 43.)

- [A]s the Escobal mine is the Company's sole project, if the exploitation permit for Escobal is unexpectedly suspended, the Company will be unable to generate revenue. As a result and under such circumstances, the Company expects this would adversely impact its business, results of operations, financial performance and may result in default on the debt facility or reduction of workforce at the project. (Ex. A, p. 51; Ex. B, p. 39; Ex. C, p. 40.)

- Our business may be exposed to a number of risks and uncertainties, including … volatile local, political and economic developments, difficulty with understanding and complying with the regulatory and legal framework respecting the ownership and maintenance of mineral properties, surface rights, mines and mining operations[.] (Ex. A, p. 37; Ex. B, p. 39; Ex. C, p. 41.)

- [P]ossible future laws and regulations, changes to existing laws and regulations … or more stringent enforcement of current laws and regulations by governmental authorities, could cause additional expense, capital

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

10

expenditures, restrictions on or suspension of our operations and planned operations at the Escobal mine. (Ex. A, p. 40; Ex. B, p. 41; Ex. C, p. 42; Ex. D, p. 45.)

• The Company's operations in each of its jurisdictions are subject to political, economic, social and geographic risks. Mineral exploration and mining activities may be affected in varying degrees by government regulations relating to the mining industry, judicial activity or political change or instability. (Ex. C, p. 176; Ex. D, p. 200.)

• The status of Guatemala as a developing country may make it more difficult for the Company to retain licenses and obtain required financing for projects. (Ex. B, p. 131; Ex. C, p. 176; Ex. D, p. 200.)

Through these and other similar disclosures in its public statements and SEC filings throughout the purported class period, Tahoe unambiguously disclosed the very perils that the Complaint alleges caused Tahoe's stock price to dip. Plaintiff cannot plausibly claim that he bought "artificially inflated stock" without appreciating the potential risks relating to the Escobal license. Compl. ¶¶1, 19, 219. Those risks were fully disclosed and known to the markets. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America-West Holding Corp.*, 320 F.3d 920, 947 (9th Cir. 2003)("in a modern and efficient securities market, the market price of a stock incorporates all available public information.").

Even accepting all of the allegations as true, Tahoe's specific disclosures about the risks of operating in Guatemala, including license suspension, changes to Guatemalan laws, or adverse court rulings, put investors on notice of the risks associated with an investment in Tahoe, including particularly the risks associated with Tahoe's operations in Guatemala. Tahoe's detailed disclosures not only preclude any inference that Plaintiff was defrauded by any alleged omissions, but those disclosures confirm that the statements, when made, were not misleading. *See West v. eHealth, Inc.*, No. 3:15-cv-00360-JD, 2016 U.S. Dist. LEXIS 33429, at *11-13 (N.D. Cal. Mar. 14, 2016) (allegation that public statements were misleading was insufficient because defendants' public filings and earnings calls warned of the risk that was allegedly understated); *Wilson v. Bernstock*, No. 01-0272(JEI), 2001 U.S. Dist. LEXIS 22354, at *49 (D.N.J. Jan. 23, 2001) (the "underlying facts specifically alleged in the Amended Complaint and contained in SEC disclosure documents referenced by the pleadings considerably undermine Plaintiffs' theory[.]")

**b.    There Was No Failure To Disclose Because Opposition To The Escobal Mine Was Public.**

The information Tahoe allegedly "omitted" in its statements was public and accessible to Tahoe's investors.    Indeed, each item of information that the Complaint alleges Tahoe should have disclosed is coupled with a citation to an article, journal, or blog post in which that allegedly omitted information was published.   Compl. ¶¶28-146.   Tahoe did not owe a duty to disclose the allegedly "omitted" public information.   "Companies are under no obligation to disclose information already in the public domain."   *Szymborski v. Ormat Tech., Inc.*, 776 F. Supp. 2d 1191, 1199-200 (D. Nev. 2011).   The reason for this rule is obvious: "publicly available information is reflected in the market price. . . ."   *In re NextCard, Inc. Sec. Litig.*, No. C 01-21029 JF (RS), 2006 U.S. Dist. LEXIS 16156, at *8-9 (N.D. Cal. Mar. 20, 2006).    The rule also reflects that "[i]t is pointless and costly to compel firms to reprint information already in the public domain."   *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) (internal quotation omitted).   Thus, "failing to educate the public about [the] potential impact on [the] company of publicly known facts" cannot be the basis for a securities fraud claim.   *Sharing v. Quantum Corp.*, CIVIL NO. 96 20711 SW, 1997 U.S. Dist. LEXIS 23532, at *12 (N.D. Cal. Aug. 14, 1997).   Tahoe cannot be liable for any alleged omission to disclose information that was already in the public domain, and the Court need not ignore facts alleged in the Complaint that undermine the claim.   *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993).

**c.    Subsequent Events In Guatemala Cannot Make The Statements Misleading.**

Notwithstanding the risk disclosures discussed above, Plaintiff suggests that Tahoe should have said more about the potential for the Mining Ministry's license decision to be overturned in the future based on a failure to consult with Xinka people.   The problem with this claim is that it depends on after-the-fact knowledge about how the law in Guatemala developed with regard to the ILO 169 consultation process after the Escobal license was issued as a result of the Guatemalan Supreme Court's ruling in the CALAS Suit at the end of the class period.   The allegations fail to state a claim because a statement must be misleading

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

12

at the time it is made. *Ronconi*, 253 F.3d 423 at 431. "Fraud depends on the state of events when a statement is made, not on what happens later.…" *In re Barrick Gold Corp. Sec. Litig.*, 2018 U.S. Dist. LEXIS 161081, at \*23 (S.D.N.Y. Sep. 20, 2018) (dismissing claim for securities fraud based on allegedly misleading statements concerning events at Argentinian mine). "Mere allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *In re Allied Nevada Gold Corp., Sec. Litig.*, No. 3:14-cv-00175-LRH-WGC, 2017 U.S. Dist. LEXIS 152905, at \*18 (D. Nev. Sep. 20, 2017) (dismissing claim for securities fraud based on allegedly misleading statements concerning a gold and silver mine) (internal quotation omitted). Where a claim is based on nothing more than "fraud by hindsight[,]" it fails as a matter of law. *Id.*

Here, the Complaint is legally insufficient because it depends significantly on hindsight. Plaintiff seeks to hold Tahoe liable for not challenging the Mining Ministry's decision to grant the Escobal exploitation license, and for not more specifically warning that the CALAS Suit would result in the license being suspended. Plaintiff wants the Defendants to be liable for not explicitly stating that Tahoe could lose the Escobal exploitation license as a result of the CALAS Suit – before that suit was filed – and even though four years of litigation before the CALAS Suit, including appeals to Guatemala's highest court, had not previously resulted in any discussion of suspending the exploitation license. "Fraud by hindsight" is inadequate as a matter of law.

**2.      In Addition To The Global Deficiencies, None Of The Public Statement Allegations Was Misleading On Its Face.**

**a.      The "Escobal Project Area" Is A Concoction Of Plaintiff's Imagination And Was Not Considered By Guatemalan Courts.**

Plaintiff challenges a number of statements that purportedly included information about indigenous populations in the "Escobal Project Area." But the "Escobal Project Area" is a concept of Plaintiff's creation, not an objective or prescribed area for making determinations for any consultation obligations or the subject of any statement made by Tahoe. Plaintiff

defines the "Escobal Project Area" as "[t]he geographic area making up the 23 mining concessions in the Escobal project." Compl. p. v. This definition is demonstrably false because the Escobal mine involves only one concession of 20 square kilometers covering the property on which the mine sits. (Ex. B, pp. 48-51.) The geographic area making up the other 22 concessions that Tahoe applied for (but did not necessarily receive) covers an area of more than 2,400 square kilometers – more than one hundred times larger than the area covered by the Area of Influence in the EIS and Escobal exploitation license. *Id.* The "Escobal Project Area" is, therefore, irrelevant to both the Mining Ministry's consultation obligation and Tahoe's disclosure obligations.

Further, reconnaissance and exploration licenses, by definition, covered areas that did not have active mines that produced precious metals and revenues for Tahoe – that was unique to the Escobal exploitation concession. (Ex. A, pp. 32-39; Compl. ¶¶58-59. A map included in the Complaint to show the "Escobal Project Area" illustrates the distortion inherent in Plaintiff's false premise that this area was relevant to determining whether there were Xinka people in the Escobal Area of Influence that the Mining Ministry should have consulted. Plaintiff's "Escobal Project Area" consists of all of the shaded areas on the map, but the area actually considered by the Environment and Mining Ministries and the Constitutional Court is only the small green area outlined in red. Compl. ¶34.



FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

Because the "Escobal Project Area" is Plaintiff's construct, it was not only irrelevant to the Mining Ministry's decision to grant the Escobal license, it was not an area referenced in *any* of the 29 challenged statements, which similarly referred only to the smaller green area outlined in red. *See, e.g.* Compl. ¶173 ("To the best of our knowledge, although indigenous people may have inhabited the area at one time, there are no indigenous populations currently living in the immediate area of the Escobal mine site.").) None of these statements relates to the broad "Escobal Project Area" that extended far beyond the Escobal mine to every area where Tahoe had requested exploration or reconnaissance licenses. Thus, even if Plaintiff's allegation that there were indigenous populations living in the "Escobal Project Area" were true, that does not mean that there were indigenous people living in area of the Escobal exploitation license. Therefore, the challenged statements were not misleading on their face. More significantly, the presence of indigenous people in the broader area is irrelevant to the issue of whether Tahoe violated U.S. securities laws by not rejecting the Mining Ministry's decision to grant the license (while making express disclosures about the risks of operating in Guatemala).

### b. Statements Based On The Government Census Cannot Support A U.S. Securities Claim.

The challenged statements about Xinka people living in the area of the Escobal exploitation license are not, as a matter of law, misleading simply because the Complaint alleges that the Government Census upon which those statements were based is "racist."[5] Similarly, Plaintiff cannot show that reliance on the Government Census data was improper because non-official groups subsequently published different demographic data. Plaintiff does not dispute that the Government Census estimated an indigenous population of less than 0.4%,

---

[5]   The Complaint alleges that witnesses in Guatemala observed "a significant indigenous population" in the area of the Escobal Mine. Compl. ¶¶73-79. Beyond the inherently vague nature of these comments and the absence of any allegation that the observations were shared with the Individual Defendants or anyone else at the Company, the only criteria these witnesses used to identify indigenous people was "how they dressed" and their appearance. *Id*. ¶¶74-76. Ironically, the Complaint derides the Government Census as "racist" and unreliable because it purportedly identified indigenous people based on "how they dressed" and whether they were "wearing shoes." *Id*. ¶65.

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

15

or two Xinka individuals, in the area of the Escobal mine or that Tahoe accurately reported the Government Census data. *Id*. ¶5. Instead, Plaintiff claims that Tahoe should have informed its investors about other unofficial surveys allegedly performed by the Xinka Parliament, the Catholic Church, and certain "ethnographical studies" ordered by the Constitutional Court and conducted by local universities in 2018.[6] *Id.* ¶¶65-72. The Complaint suggest that those surveys "rejected" the Government Census. Compl. ¶65. However, even if the data identified by Plaintiff were valid–and in the case of the 2015 Catholic Church survey and the 2018 university studies, relevant in time to the 2013 license grant–there are no facts alleged to show that the Mining Ministry would have made a different determination about its – not Tahoe's – consultation obligations.

For example, no facts are alleged to show as reliable or accurate the methodology used by the Xinka Parliament to conduct an unofficial census in "2003 and 2004," because it was "unhappy" with the Government Census. *Id.* ¶66. Further, the data cited by Plaintiff relates to two Guatemalan "departments" (equivalent to U.S. states) and the contrived "Escobal Project Area" – not the Area of Influence around Escobal. *Id.* Thus, as shown in the color-coded map below, the Complaint looks to Xinka population in an irrelevant and massive area outlined in yellow (much of which is outside even the concocted "Escobal Project Area"), not in the non-overlapping red zone showing the Escobal exploitation license area. Compl. ¶42.

///

///

///

///

///

///

///

///

---

[6] The Complaint alleges the university studies were done in July 2017, but the Constitutional Court did not order them done until 2018. (*Id.* ¶72; <u>Ex. F</u>, Press Release on Form 6-K, March 8, 2018, p. 2.)

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

16

Departments of Santa Rosa, Jalapa, and Jutiapa

Main Highways
Interoceanic Canal
Escobal Exploitation License
Escobal Project
Xinka Communal Lands
Bodies of Water
Settlements
Borders
Rivers

Moreover, the "U.N. Publications" cited in the Complaint only commented on differences in the data between the Government Census and the Xinka Parliament data, without saying that the former was incorrect or crediting the latter. *Id.* ¶67. The same is true of an unofficial census conducted in 2008 by another Xinka group, COPXIG, which relates to three Guatemalan departments and was sufficiently obscure that it was reported in an "unpublished thesis" from the Universidad de San Carlos de Guatemala in 2009. Compl. ¶68. Again, while Guatemala's Ministry of Culture and Sports looked at the COPXIG data in 2016, long after it was published, it "noted the discrepancy" with the Government Census, but did not find the Government Census to be incorrect. *Id.* The 2015 "Catholic Census" cited in the Complaint related to the entire department of Santa Rosa – not the Area of Influence around Escobal. *Id.* ¶70-71. Further, the Complaint does not explain how the 2015 "Catholic Census" could have made challenged statements earlier in the class period misleading at the time they were made. Finally, the citation to a 2018 Ethnographical Study ordered by the

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

17

Constitutional Court is irrelevant to the truth of the challenged statements because it was not ordered or conducted until *after* the Escobal exploitation license was suspended. *Id.* ¶72.  In any event, even if these unofficial "censuses" applied to a relevant area – and they do not – at best for Plaintiff, they show that unofficial sources disputed the location of Xinka communities and their numbers throughout the class period.

The Defendants' reliance on Government Census data is reasonable as a matter of law. In the United States, government census data is widely recognized as trustworthy, but there is no similar presumption of reliability attached to demographic data obtained from third-party sources.  *E.g.*, *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996) (taking judicial notice of census data); *United States v. Dreyer*, 767 F.3d 826, 834 n.12 (9th Cir. 2014) (same). Given the widely accepted reliability of census data generally, it was reasonable for Tahoe to rely upon the validity of the Government Census.  In contrast, there is no legal basis for the implication that Tahoe had an obligation to independently challenge the accuracy of the Government Census before publicly stating that, based upon that data, it was "not aware of any significant indigenous population residing in the area of the Escobal Project."   In any event, the surveys on which the Complaint is based do not show that the Government Census was incorrect or demonstrate that Tahoe's statements were false because the surveys covered a much broader area than addressed by the allegedly misleading statements.

     **c.**  **Allegations About Generalized Opposition To The Mining Ministry's Decision Do Not Show That The Challenged Statements Were Misleading.**

Plaintiff claims that Tahoe misrepresented the extent of the Xinka's involvement in certain anti-mining protests which Tahoe characterized as mostly "peaceful and respectful," but which "escalated" in the weeks following the license issuance and became more "violen[t]" and disruptive, including "road closures, power line opposition, work stoppages, and lawsuits for damages."  Compl. ¶¶162-168.  Plaintiff does not dispute the veracity of Tahoe's statements or description of events.  The *only* reason that Plaintiff contends these statements were misleading is that Tahoe allegedly failed to disclose that "the protests and

resistance included the Xinka." Compl. ¶168. Plaintiff's claim is legally misguided and factually unsupported.

The securities laws "prohibit *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis original). "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.* Here, the fact that Tahoe did not specifically say that protests and resistance "included the Xinka" does not render the challenged statements misleading. Even if individual Xinka people were involved in anti-mining protests described by Tahoe, the alleged nondisclosure is not relevant either to the validity of the Mining Ministry's decision to issue the exploitation license or the Guatemalan courts' ultimate suspension of the license.

Additionally, the Complaint does not include any factual allegations to support Plaintiff's conclusory assertion that a "large number of Xinka" participated in the anti-mining protests described in Tahoe's statements. Compl. ¶162. The only reference in the entire Complaint to Xinka people's involvement in *any* anti-mining protests is Plaintiff's allegation that a peaceful protest camp was erected at the Escobal Mine and "[r]epresentatives of the Xinka Parliament were among those manning the camp." Compl. ¶103. Plaintiff does not allege: (a) how many members of the Xinka Parliament were in attendance; (b) whether they lived in the Escobal Area of Influence; or (c) whether they were protesting lack of consultation by the Mining Ministry as opposed to environmental concerns or the presence of the mine generally. Tellingly, the article that Plaintiff cites as support for his allegation that "members of the Xinka Parliament were manning the camp" makes no mention of the Xinka Parliament at all. *Id.*

### d.   Statements About Community Outreach Are Not Actionable.

Straying even further away from a logical nexus to the suspension of the mining license, Plaintiff challenges statements regarding Tahoe's engagement with the Xinka people. In so doing, Plaintiff intentionally ignores the distinction between general community outreach, Xinka specific community outreach, and government consultations. Further, many

of these statements – such as "Tahoe continues to seek meaningful and effective dialogue with community members" or the "Company is open to all constructive dialogue" – are simply too vague and non-specific to be actionable under the securities laws. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (rejecting as too vague the statement that "we believe our employee relations are good"); *Bofi Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1147-48 (S.D. Cal. 2018) (holding that statements that defendants had "great regulatory relations" and enjoyed a "great dialogue" with regulators were too vague to be actionable as securities fraud). The few statements that refer to Tahoe's specific community outreach effort do not come close to being material omissions.

For example, Plaintiff challenges three statements made by Tahoe in its 2014, 2015 and 2016 Annual Reports in which it reported on the number of indigenous community members who visited the mine, their participation in the Company's avocado and coffee rust prevention programs, and the donations they received from Tahoe's social investment program. Compl. ¶¶173-175. Once again, Plaintiff does not allege that any of these statements were untrue; but merely that they should have been coupled with a disclosure that the Xinka people were "actively opposing the Project through protests, plebiscites, and legal action." Compl. ¶176. As previously noted, the alleged nondisclosure of Xinka people's purported involvement in opposition to the mine does not render those statements materially false or misleading.

Similarly, Plaintiff challenges a September 6, 2013 statement on Tahoe's corporate social responsibility (CSR) blog that said, "There are many Guatemalans, including the majority of those in the San Rafael las Flores community, who support the Escobal Project." Compl. ¶170. But Plaintiff cannot show this statement is false or misleading based on allegations that an unofficial plebiscite, supposedly conducted after the mayor rejected a municipally organized plebiscite, found that between 93.44% and 100% of participants voted "NO to mining." Compl. ¶100. Not only is the unofficial plebiscite (or any election with 100% of votes purportedly going one way) inherently unreliable, but it was about general opposition to mining – not Xinka consultation – and it was conducted on November 10,

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

20

2015—two years *after* the statement at issue was made. *Id.* Further, there is no indication about what geographic area was involved in the plebiscite, that it related to the Escobal Area of Influence, or that the process and ballots were objective and not tailored to deliver a desired outcome. *Id.* Thus, the allegation about the plebiscite is meaningless.

### e.  Statements About Corporate Social Responsibility Policies Are Not Actionable.

A majority of the 29 challenged public statements relate to Tahoe's aspirations to conduct business in accordance with responsible corporate policies and in alignment with international standards. Examples of these statements include: (i) Tahoe "strive[s] to engage with and to peacefully coexist with all stakeholders in this area of Guatemala," Compl. ¶178; (ii) the Escobal Project is "being constructed to the highest environmental and social standards," *id*; (iii) "Tahoe has exceeded legal requirements and demonstrated best international practices for engaging in dialogue with the community," *id.* ¶180; (iv) "Our Human Rights Policy is more than just a policy; it is an ethical code that we follow and holds us accountable," *id.* ¶156; (v) "Tahoe Resources is committed to observing the laws and respecting the cultural values in the countries in which it operates, including the indigenous peoples recognized by the laws of the applicable jurisdiction," *id.*; and (vi) Tahoe has "worked to align its policies and practices with the United Nations Guiding Principles on Business and Human Rights ("Guiding Principles"), the Voluntary Principles of Security and Human Rights and the Equator Principles," *id.* ¶183. Even if Tahoe failed to live up to these ambitions (which Tahoe denies), that does not equate to a violation of the securities laws.

The Ninth Circuit recently considered whether a "violation of a business's ethical code may give rise to a cause of action under § 10 and Rule 10-b of the Securities Exchange Act of 1934." *Retail Wholesale & Dept. Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1271 (9th Cir. 2017). That case involved the fall-out from the resignation of Hewlett-Packard's CEO and Chairman, Mark Hurd, following revelations that he violated the Company's code of ethical conduct. A securities fraud lawsuit challenged the company's "promotion of [its] ethical behavior" as false and misleading in juxtaposition to Mr. Hurd's

unethical conduct, including statements about the company's desire to be "known for its ethical leadership" and its commitment to "conducting business consistent with [its] high ethical standards." *Id.* at 1272, 1276. In affirming the dismissal of this securities fraud complaint, the Ninth Circuit held that the challenged statements were not "capable of objective verification" and were largely "aspirational [in] nature." *Id.* The court added that a contrary interpretation "could turn all corporate wrongdoing into securities fraud," noting that it was "unable to locate a case from any jurisdiction in which a court found alleged noncompliance with an ethical code actionable" as securities fraud. *Id.* Likewise, Tahoe's statements about its commitment to best practices and high ethical standards are too vague and non-specific to be capable of sustaining a claim for securities fraud. The general declarations about which Plaintiff complains are not concrete, objective statements that are capable of being proven as false. More importantly, no Guatemalan court has ever found that Tahoe did anything illegal or unethical, and its statements about best practices have no connection to the suspension of Tahoe's mining license.

### f. Statements About The Escobal Mine Are Not Misleading.

Lastly, Plaintiff challenges an assortment of statements about the issuance of the Escobal license. Plaintiff alleges these statements are misleading for the same reasons as the other challenged statements (*i.e.*, Tahoe allegedly omitted information about the Xinka population, their involvement in anti-mining protests, and their interactions with Tahoe). Without retreading the myriad reasons these alleged omissions are not actionable, even a cursory review of statements about the Escobal mine reveals that there is nothing misleading about them.

Plaintiff challenges a press release from the day the license was issued in which Tahoe reported that it was "pleased to announce it has received the Escobal exploitation license from Guatemala's Ministry of Energy and Mines." Compl. ¶151. This is an incontrovertibly truthful and accurate statement, and the Complaint does not allege otherwise. Whether or not certain Xinka people resided in the Area of Influence, were opposed to the mine, or otherwise participated in civic resistance to the mine does not change the simple fact that the Tahoe

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

22

received an exploitation license from the Mining Ministry in April 2013 and accurately and timely disclosed that material event as required by applicable securities laws. *In re Lifelock Sec. Litig.*, 690 F. App'x 947, 952 (9th Cir. 2017) (the law does not require that "if you are going to say something, you must say everything").

Next, Plaintiff challenges a June 4, 2013 press release in which Tahoe characterized as "inflammatory and inaccurate" a letter sent by an unidentified person to the Ontario Securities Commission suggesting Tahoe provided "inadequate disclosure regarding [the] Escobal Project." Compl. ¶152. Though Plaintiff contends that it was misleading for Tahoe to state, in reference to the letter, that it was "confident it has fully disclosed all material events regarding the Escobal Project," Plaintiff does not identify what he contends was omitted from that disclosure that caused it to be misleading. *Id.*

Third, Plaintiff disputes Tahoe's statement that it "willingly submitted to the regulatory process and obtained every permit for the Escobal project in a lawful manner." Compl. ¶153. The fact that the license was suspended *four years* later because a court found that a government body needed to conduct the license review process differently does not mean that Tahoe did not lawfully obtain its mining license or that it violated securities laws by disclosing that it had obtained that license.

For all of these reasons, Plaintiff's Complaint should be dismissed for failure to plead a false or misleading statement.

### B. Plaintiff Fails To Plead Facts Creating A Strong Inference That The Defendants Acted With Scienter.

In addition to alleging falsity, Plaintiff must allege particularized facts supporting a "strong inference that the defendant acted with the required state of mind" akin to intent to deceive, manipulate, or defraud. 15 U.S.C. § 78u-4(b)(2)(A). This pleading requirement is "exacting." *Tellabs*, 551 U.S. at 313. Intent to deceive must be alleged "in great detail, [by] facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). A plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

23

inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* at 976. The facts pleaded "must not only be particular, but also must strongly imply [the defendant's] *contemporaneous* knowledge that the statement was false when made." *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1102 (C.D. Cal. 2003). Thus, Plaintiff must establish that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1424 (9th Cir. 1994).

*Tellabs* requires the Court to consider "not only inferences urged by" Plaintiff when evaluating whether the complaint adequately pleads scienter, but also "competing inferences" and "non-culpable explanations" urged by the Defendants that are "rationally drawn from the facts alleged," 551 U.S. at 314, including "inferences unfavorable to" Plaintiff. *Metzler*, 540 F.3d at 1061 (citing *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)). Any inference drawn for Plaintiff "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In evaluating these inferences, the Court must first determine "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *New Mexico State Inv. Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir. 2011). "[I]f no individual allegation is sufficient, . . . [the court must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* Simply put, Plaintiff's allegations neither individually nor holistically meet this standard.

As a threshold matter, the fact that the Mining Ministry issued the Escobal exploitation license in an area that the Guatemalan Government deemed to be 99.6% non-indigenous, coupled with the absence of any definitive legal criteria concerning the Mining Ministry's consultation obligations, belies any plausible inference that the Defendants – years before the CALAS Suit was filed – sought to deceive investors about the number of Xinka people residing in the broad and irrelevant "Escobal Project Area." Moreover, the Complaint does not allege facts showing that the Individual Defendants (or any other members of Tahoe's

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

24

management team) received information showing that any of the challenged statements were materially false or misleading when made. Cognizant that he lacks those facts, Plaintiff attempts to meet his burden by arguing that: (1) *respondeat superior* and agency principles provide a basis for inferring scienter; (2) the core operations doctrine provides a basis for inferring scienter; (3) the Defendants had access to information suggesting that the Mining Ministry failed to conduct adequate consultation; (4) the Defendants had financial motives to mislead investors; (5) Tahoe's CEO resigned "amidst suspicious circumstances;" and (6) the Defendants signed Sarbanes-Oxley certifications attached to Tahoe's public filings. Applying the rigorous standards of the PSLRA, each of these six attempts fail.

### 1. *Respondeat Superior* Allegations Alone Do Not Support A Strong Inference Of Scienter.

Plaintiff alleges in two sentences that the scienter of Tahoe's employees is imputed to Tahoe under *respondeat superior* and agency principles. While it is true that under a theory of *respondeat superior* Tahoe may be secondarily liable for securities fraud, the theory is only applicable if Plaintiff first demonstrates primary violation of securities law and scienter on behalf of the Company's officers and directors. *In re Alliance Equipment Lease Program Securities Litigation v. Royal Indemnity Co.*, No. 98-CV-2150 J (NLS), 2002 U.S. Dist. LEXIS 28582, at *40-41 (S.D. Cal. Oct. 11, 2002) (dismissing *respondeat superior* and related claims and holding that liability cannot attach when a "primary violation" is absent). As further explained below, Plaintiff fails to establish either a primary violation or the requisite scienter by any of the Defendants.

### 2. Core-Operations Allegations Do Not Support A Strong Inference Of Scienter.

Plaintiff next contends that, because the Escobal mine was important to Tahoe and related to the "core business" of Tahoe, knowledge of the alleged fraud may be imputed to the Individual Defendants. Compl. ¶¶193-194. Plaintiff also alleges that because Tahoe "has a small number of employees . . . it can be presumed that the Individual Defendants, as officers and/or directors, had knowledge of the adverse facts" pertaining to the Escobal license. *Id.* at ¶195.

In "rare circumstances," the court may infer that "facts critical to a business's 'core operations' or important transactions are known to key company officers . . . . where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No.2 v. Killilnger,* 542 F.3d 776, 781, 786 (9th Cir. 2008). However, the core operations theory requires a plaintiff to allege "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database, a specific admission from top executive that [they knew] exactly how much [they] have sold in the last hour around the world, or other particular details about the defendants' access to information within the company." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1000 (9th Cir. 2009).

Here, the Complaint simply alleges that because the Escobal mine was important to Tahoe, and because Tahoe had a small number of employees, the core operation doctrine applies. This characterization of the scope of the core operations doctrine is overbroad. First, while the operation of the mine was an important part of the Company's business, the process of issuing the license was controlled by the Environment and Mining Ministries, not Tahoe. Once the license was issued, Tahoe had no reason to question its validity. *Zucco Partners,* 552 F.3d at 1001 (core operations doctrine inapplicable because there was no indication that each stage of the project at issue "would be operationally visible to executives not intimately connected with the development process"). Second, unlike cases applying the core operations doctrine to impute knowledge of internal operational and financial data to management, all of the information relating to the issuance of the license and later opposition to it was external to the Company's operations. *Tai Jan Bao v. Solarcity Corp.*, No. 14-cv-01435-BLF, 2016 U.S. Dist. LEXIS 1190, at *23 (N.D. Cal. Jan. 5, 2016) (plaintiff failed to provide sufficient allegations to give rise to core-operations inference because, among other things, "Plaintiff does not allege that [the company] ever received external notices, much less warnings from governmental agencies"). Thus, there is no basis for applying the doctrine based on Plaintiff's allegations here, and Plaintiff cannot rely on it to meet the heightened pleading standard for showing a strong-inference of scienter.

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

26

### 3. Allegations That The Defendants Knew About Opposition To Mining In Guatemala Do Not Support An Inference Of Scienter

Plaintiff alleges that Tahoe's "extensive" experience in Guatemalan mining somehow imputed to the Defendants knowledge that they should have "proactively ensured that [the Mining Ministry] fulfilled its ILO 169 consultation obligation." Compl. ¶¶196-197. The notion that Tahoe or any other private party can "ensure" that a government body fulfills its legal obligations is patently unreasonable. Compl. ¶¶4, 7, 197. Moreover, until the Guatemalan Supreme Court concluded that Mining Ministry had not done enough to comply with Guatemalan law, Tahoe had no reason to suspect that the Mining Ministry's application of the law was insufficient. Compl. ¶3. Contrary to Plaintiff's contentions, Tahoe fulfilled its duty under the applicable Guatemalan mining laws and the Environment and Mining Ministries to procure its exploitation license. There is no basis for arguing that Tahoe was required to reinterpret and police the actions of the Guatemalan government or challenge its interpretation of Guatemalan law. The Complaint's conclusory allegations do not support any inference, much less a strong inference, that the Defendants deliberately misled investors.

The Complaint also attempts to impute scienter by asserting that the Defendants had access to information about Xinka people allegedly living in Plaintiff's invented "Escobal Project Area" because: (1) the Xinka tribal lands "sit within the Escobal Project Area"; (2) the Xinka Parliament requested consultations; (3) "the Xinka mounted an opposition to the Escobal Project through various community efforts"; (4) a handful of employees supposedly observed "indigenous people living around the Escobal Mine" and suggest that "the Company would have been aware of these peoples because their indigenous identity was obvious based upon their appearance"; and (5) the Xinka filed a petition against Guatemala and other Guatemalan officials related to the Escobal license. Compl. ¶¶201-16. Although Plaintiff attempts to paint these alleged opposition efforts as led by Xinka people, the Complaint does not include *any* factual allegations to support its assertions that Xinka people participated in or led the protracted anti-mining opposition efforts during the purported class period until after the Supreme Court suspended the Escobal license and the Xinka Parliament joined the

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

CALAS Suit on July 7, 2017. Plaintiff also fails to allege any information regarding the extent of Xinka participation, as opposed to anti-mining or other community groups, in any of the specific activities he describes.

Further, the Complaint fails to identify particularized facts supporting the conclusory assertion that the Defendants acted with intent to deceive or were deliberately reckless. Conspicuously absent from these sweeping assertions is any specific allegation that any Defendant knew, or was otherwise told, facts showing that any of the challenged statements was made with knowledge or reckless disregard of contrary facts. Instead, Plaintiff relies extensively on unrest and protests in Guatemala. According to Plaintiff, these allegations are based on information that was widely reported in news outlets and other publicly available outlets. Plaintiff appears to allege that these events were common knowledge and therefore the Defendants must have known. But "[a]llegations of common knowledge will not suffice under the applicable standard [of scienter], which requires 'specific descriptions of the precise means through which [fraud] occurred, provided by persons said to have personal knowledge of [the specific descriptions].'" *In re Allied Nevada Gold Corp., Sec. Litig.*, 2017 U.S. Dist. LEXIS 152905, at *32 (internal citation omitted).

Here, the Complaint summarizes the general protests and ongoing litigation between anti-mining groups and the Guatemalan government. Plaintiff only identifies one individual who participated in these actions, who now self-identifies as Xinka, but who asserted objections based on environmental concerns – not on the Mining Ministry's purported failure to consult with Xinka people in the Escobal Area of Influence. Compl. ¶213. The allegations lack particularity and are devoid as to the knowledge of each of the Defendants or to the actual exposure of any of the Defendants to this information at the times that the statements were made. Likewise, the allegations fail to allege or to provide any details as to what the Individual Defendants actually knew, reviewed, or were told to establish that the challenged statements regarding the Xinka population were made knowingly or with deliberate indifference at the time that the statements were made. *Zucco Partners* 552 F.3d at 1001 (holding that allegations that management had access to information or that they analyzed

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

information closely did not support the inference to know that management was in a position to know information was being manipulated); *In re Pacific Gateway Exchange, Inc.*, 169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001) ("In other words, plaintiffs must allege facts that connect specific defendants with specific intentionally reckless acts. In this case, however, plaintiffs provide no facts upon which the court can infer the state of mind of defendants at any particular point in time").

Moreover, the allegations regarding employee observations also fail to establish a strong inference of scienter. When a complaint relies on witness statements, Plaintiff must: (1) establish the witnesses' reliability by "provid[ing] an adequate basis for determining that the witnesses in question have personal knowledge of the events they report;" and (2) the witnesses' statements "must themselves be indicative of scienter." *Zucco Partners,* 552 F.3d at 995. In this case, the Complaint fails to allege either an adequate basis for reliability of any witness statements or any witness's involvement in communications of the information they report to the Individual Defendants. For example, Plaintiff cites to statements from a "Human Resources Supervisor." Tellingly, he worked at the mine *after* Tahoe submitted its documentation to the Mining Ministry and *before* the class period. This witness generally stated that "the local indigenous population" was "evident to the whole company and to the people who lived in the town." Compl. ¶74. Similarly, a "Mine Maintenance Manager" claimed that "I'm pretty sure there were indigenous people there" and "[i]f I were a betting man I'd say so." *Id.* at 78. It is not clear what this witness means by "there" – *i.e.* is he referring to the Area of Influence around the mine or to some other area, and it is not clear whether he observed Xinka living "there" or just present. No allegations describe the reliability of these witnesses or personal knowledge of what any of the Individual Defendants knew at the time the challenged statements were made. Moreover, both purported witnesses' claims seem to be based on the same kind of general observations of peoples' appearances and clothing that Plaintiff decries as "racist" in his critique of the Government Census. These witness statements do not provide any indication of scienter (much less a strong inference of scienter).

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

29

Further, the allegations about witness statements should be disregarded because confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge[,]" and "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of [falsity]." *Zucco Partners,* 552 F.3d at 995; *In re Daou Sys., Inc.,* 411 F.3d 1006, 1015 (9th Cir. 2005) (to state a claim under the PSLRA, the complaint must contain "adequate corroborating details"). For example, Plaintiff alleges in paragraphs 73 through 79 and 215 that Confidential Witness No. 1, Chief of Mining Security, stated, among other generic and conclusory statements, that Tahoe "never did any consultation." Compl. ¶75. Besides the fact that the statements of the Confidential Witness No. 1 are inherently unreliable and lack specificity, these allegations are insufficient to establish scienter because they are bereft of any corroborating details establishing that any Defendant had the alleged knowledge described by the witnesses.[7] This is evidenced by his incorrect claim that Tahoe – as opposed to the Mining Ministry – would be responsible for consultation.

All the witness statements, individually and as a whole, are unreliable, speculative, uncorroborated and conclusory in nature and do not establish a strong inference of scienter. *In re Allied Nevada Gold Corp. Sec. Litig.*, 2017 U.S. Dist. LEXIS 152905, at *33 (holding that "the majority of the confidential witnesses' alleged statements must be disregarded for lacking specificity and for being based on hearsay and speculation").

**4.      Allegations Regarding The Financial Motives Of The Individual Defendants Do Not Support An Inference Of Scienter**

The allegations regarding the financial motives of Tahoe and Tahoe's executives are insufficient to give rise to the required strong inference of scienter. Plaintiff alleges that the "artificially inflated stock price" allowed Tahoe to acquire two companies during the class

---

[7]   The unreliability of CW1's statements is clear in the statements attributed to him. Plaintiff alleges that, "[w]hen asked whether there were indigenous individuals within this group of landowners, CW1 said: 'Yes, surely. It's almost a fact.'" Compl. ¶75. He is also quoted as saying, "Yes, there were people around the mine, around the villages. More in the countryside than in the villages. There were some—not so many." Compl. ¶76. On their face, these vague and internally inconsistent statements do not have the kind of reliability necessary to create a strong inference of scienter.

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

period and that Tahoe executives had financial motives because they were eligible to receive bonuses based on the granting of the Escobal license. Compl. ¶¶217-220. These generalized allegations fail to support scienter as courts have consistently held that financial "[m]otives that are generally possessed by most corporate directors and officers do not suffice" to establish a strong inference of scienter. *E.g., Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir. 2001); *accord Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("We join our sister circuits and hold that evidence of a personal profit motive on the part of officers and directors . . . is insufficient to raise a strong inference of scienter").

### 5. Allegations Regarding The Resignation Of Tahoe's CEO Do Not Support An Inference Of Scienter.

The Complaint's speculation regarding the resignation of Tahoe's former CEO fails to establish a strong inference of scienter. Compl. ¶¶222-26.  The Ninth Circuit has held that "[m]ere conclusory allegations that a financial manager resigns or retires during the class period … without more, cannot support a strong inference of scienter." *Zucco Partners,* 552 F.3d at 1002.  Plaintiff's conclusory allegations that Black's resignation somehow constitutes circumstantial evidence of scienter is insufficient because it lacks any support to establish that the resignation was in any way linked to any false or misleading statements allegedly made by any of the Defendants.  Further, references to Black's tweets regarding "Arrogant Americans" do not establish any specific information from which to draw any inference of scienter from an otherwise routine resignation of a company executive.  *Zucco Partners,* 552 F.3d at 1002 ("For other resignations occurring during the relevant time period, a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one.").

### 6. Allegations Regarding Sarbanes-Oxley Certifications Do Not Support An Inference Of Scienter.

The allegations regarding the signing of Sarbanes-Oxley certifications fail to meet the heightened requirement for scienter.  Compl. ¶¶227-31.  "Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy" of the statements.  *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

Cir. 2008). For example, in *Glazer*, plaintiff attempted to impute scienter based on the defendants signing of the company's Form 10-K, but the court held that Sarbanes-Oxley certifications "are not sufficient, without more, to raise a strong inference of scienter." *Id.*

Here, Plaintiff suggests that because the Individual Defendants knew about and/or signed these disclosures that they were somehow also aware that the alleged false or misleading statements were in fact false or misleading at the time they were made. Compl. ¶¶ 227-231. But the Complaint alleges no facts to make this connection, and these, bare, unsupported, and uncorroborated allegations fail to support a strong inference of scienter. Like *Glazer*, Plaintiff does not allege any facts showing that any of the Individual Defendants were "severely reckless in certifying the accuracy of the filings." *Zucco Partners,* 552 F.3d at 1003-1004 ("Boilerplate language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley section 302(a), however, add nothing substantial to the scienter calculus."). Accordingly, Plaintiff's allegations related to Sarbanes-Oxley certifications are insufficient to create a strong inference of scienter.

### C. Plaintiff Fails To Plead Facts Showing Any Misleading Statements Allegedly Made By The Defendants Caused Any Loss.

Plaintiff must plead loss causation by demonstrating a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the alleged injury suffered by plaintiff. *In re Daou Sys., Inc.,* 411 F.3d at 1025. To prove loss causation, Plaintiff "must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by Plaintiffs." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,* 774 F.3d 598, 605, 608 (9th Cir. 2014) (the heightened pleading standard of "Rule 9(b) applies to all elements of a securities fraud action, including loss causation."). In other words, "the complaint must allege that the defendant's share price fell significantly after the truth became known" or was "revealed to the market." *Metzler Inv. GMBH,* 540 F.3d at 1062-1063. This is because a security's "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which

taken separately or together account for some or all of that lower price." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 343 (2005). Thus, Plaintiff must allege specific facts establishing that the stock price drop was in direct response to a corrective disclosure that revealed the company's prior statements were false or misleading. *Metzler Inv. GMBH,* 540 F.3d at 1063 (plaintiff must show that "the practices that Plaintiff contends are fraudulent were revealed to the market" and the revelation caused the resulting loss); *Loos v. Immersion Corp.,* 762 F.3d 880, 887 (9th Cir. 2014) (plaintiff must demonstrate that "the defendant's fraud was revealed to the market and caused the resulting losses."). The allegations here fail as a matter of law because they do not show that the alleged losses were caused by previously undisclosed information as opposed to new, admittedly negative, information regarding the Guatemalan Supreme Court's interpretation of Guatemalan law in the CALAS Suit and the suspension of mining operations.

The Complaint alleges that the Defendants made false and misleading statements related to: (1) the issuance of the Escobal license; (2) the indigenous population in Plaintiff's fabricated "Escobal Project Area"; (3) general opposition to the Escobal mine; (4) Tahoe's community outreach; and (5) Tahoe's "alignment with CSR regimes." Plaintiff further alleges that these alleged misleading statements caused Tahoe stock to reach a high of $25.63 per share on July 28, 2014. Compl. ¶243. Plaintiff then broadly alleges that the "true facts and risks" eventually caused the price of Tahoe stock to decline on two occasions in July 2017 and August 2017. Compl. ¶¶244-246. The "true facts and risks" referenced by Plaintiff were the disclosure of decisions by the Guatemalan Supreme Court to suspend the license, and the Constitutional Court's decision upholding the suspension. Compl. ¶¶244-246.

These allegations do not establish loss causation. The decisions did not find that Tahoe did anything wrong in connection with applying for or receiving the Escobal mining license. Instead, after almost a year of deliberations, the Constitutional Court ultimately found that the Mining Ministry should have interpreted its obligations under Guatemalan mining law differently. This was new information – new law was being established – not a corrective disclosure relating to any of the alleged misstatements by the Defendants. Moreover, the risk

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

33

that its mining license could be suspended and the uncertainty around a possible adverse court decision had been disclosed to the market in Tahoe's public filings before the decisions. Compl. ¶154.  Accordingly, the decisions could not have revealed any "true facts and risks" that were not well-known previously.

The purpose of securities law is not to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura,* 544 U.S. at 345.  Of course "[s]o long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud.  Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 (9th Cir. 2009).  Yet, this is exactly what the Complaint attempts to do.  It does not plead any corrective disclosures revealing to the market that the challenged statements were false and misleading when made.  Accordingly, Plaintiff has not and cannot establish loss causation.

**D.      Plaintiff Fails To State A Controlling Person Claim Under Section 20(a).**

To state a claim under Section 20(a)—which provides for "controlling person" liability for securities fraud—Plaintiff must allege "(1) a primary violation of federal securities laws …; and (2) that the defendant exercised actual power or control over the primary violator …" *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Plaintiff's Section 20(a) claim fails as a matter of law because, for the reasons stated above, Plaintiff fails to adequately plead a primary violation of Section 10(b) or Rule 10b-5.  *Zucco*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

**V.      CONCLUSION**

The Complaint fails to meet the PSLRA's exacting pleading requirements.  The Defendants accordingly request that the Court dismiss the Consolidated Amended Complaint with prejudice.

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

34

DATED:  October 30, 2018.


**FENNEMORE CRAIG, P.C.**

By:   /s/  Leslie Bryan Hart
Leslie Bryan Hart, Esq. (SBN 4932)
Veronica A. Peterson, Esq. (SBN 13841)
300 E. Second St., Suite 1510
Reno, Nevada 89501
Tel: 775-788-2228   Fax: 775-788-2229
lhart@fclaw.com
vpeterson@fclaw.com

           and

**NEAL, GERBER & EISENBERG LLP**
(Admitted *Pro Hac Vice*)
Scott J. Fisher, Esq.
Karl R. Barnickol, Esq.

*Attorneys for Defendants Tahoe Resources,*
*Inc., Elizabeth McGregor, Mark Sadler,*
*Ronald W. Clayton, Edie Hofmeister and C.*
*Kevin McArthur*

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

35

## CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b) and Electronic Filing Procedure IV(B), I certify that on October 30, 2018, a true and correct copy of the **DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT,** was transmitted electronically through the Court's e-filing electronic notice system to the attorney(s) below associated with this case.

Martin Muckleroy
martin@muckleroylunt.com

Richard Gonnello
rgonnello@faruqilaw.com

Megan Sullivan
msullivan@faruqilaw.com

Sherief Morsy
smorsy@faruqilaw.com

/s/    Pamela Carmon
An Employee of Fennemore Craig, P.C.

14364664

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

36

## EXHIBIT INDEX

| DESCRIPTION | EXHIBIT |
|---|---|
| 2013 Annual Report on Form 40-F, Mar. 17, 2014 | A |
| 2014 Annual Report on Form 40-F, Mar. 12, 2015 | B |
| 2015 Annual Report on Form 40-F, Mar. 11, 2016 | C |
| 2016 Annual Report on Form 40-F, Mar. 10, 2017 | D |
| Press Release on Form 6-K, Oct. 10, 2018 | E |
| Press Release on Form 6-K, March 8, 2018 | F |

FENNEMORE CRAIG, P.C.
300 E. SECOND ST.
SUITE 1510
RENO, NEVADA 89501
(775) 788-2200

37