Martin A. Muckleroy
State Bar #9634
**MUCKLEROY LUNT, LLC**
6077 S. Fort Apache Rd., Ste 140
Las Vegas, NV 89148
Telephone: 702-907-0097
Facsimile: 702-938-4065
Email: martin@muckleroylunt.com

Richard W. Gonnello (*pro hac vice*)
Email: rgonnello@faruqilaw.com
Megan M. Sullivan (*pro hac vice*)
Email: msullivan@faruqilaw.com
Sherief Morsy (*pro hac vice*)
Email: smorsy@faruqilaw.com
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

*Attorneys for Lead Plaintiff Kevin Nguyen*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re TAHOE RESOURCES, INC. SECURITIES LITIGATION | Case No. 2:17-cv-01868-RFB-NJK |
| | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates to:  All Actions | |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    A.    The Escobal Project ...............................................................................................2

    B.    Indigenous Peoples' Consultation Rights In Guatemala ........................................3

    C.    The Xinka Indigenous People In The Escobal Project Area....................................4

    D.    The Xinka Resistance To The Escobal Project.............................................................4

    E.    MEM Grants The Exploitation License Despite Xinka Opposition ........................6

    F.    Defendants' False And Misleading Class Period Statements ..................................7

    G.    CALAS's Legal Claim Against MEM........................................................................8

LEGAL ARGUMENT .............................................................................................................9

I.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING
STATEMENTS DURING THE CLASS PERIOD ....................................................9

    A.    Defendants Made Actionable Statements About The Issuance Of The
Exploitation and Exploration Licenses ..................................................................9

    B.    Defendants Made Actionable Statements About The Indigenous Population In
The Escobal Project Area........................................................................................12

    C.    Defendants Made Actionable Statements About The Resistance To The Project.....13

    D.    Defendants Made Actionable Statements About Tahoe's Community Outreach .....14

    E.    Defendants Made Actionable Statements About Tahoe's Alignment With CSR
Regimes....................................................................................................................16

    F.    The Adverse Facts And Risks Contradicting Defendants' Statements Were Not
Public Information ...................................................................................................18

        1.    Defendants' Truth-on-the-Market Defense Fails.........................................18

        2.    Defendants' Risk Factors Defense Fails .....................................................20

II.    DEFENDANTS ACTED WITH THE REQUISITE SCIENTER .......................................22

    A.    Defendants Had Access To Or Recklessly Disregarded Information Regarding
The Xinka In The Escobal Project Area And The Consultation Requirements ........22

        1.    Tahoe Executives Had Access to or Recklessly Disregarded the
Consultation Requirements.............................................................................23

2.   Defendants Had Access to or Recklessly Disregarded Contemporaneous Facts About The Xinka ..................................................................................24

3.   Tahoe Had Access to Its Employees' Collective Scienter ............................27

4.   Defendants Had Access to the Knowledge of Tahoe's Employees ...............28

5.   Defendants Had Access to Information About Tahoe's Core Operations .....28

B.   Defendants Had A Motive And Opportunity To Conceal Information Regarding The Escobal Project ..........................................................................................30

C.   The Resignation Of Tahoe's Interim CEO Supports An Inference Of Scienter ........31

D.   Defendants SOX Certifications Support An Inference Of Scienter ..........................31

III.   DEFENDANTS' FRAUD PROXIMATELY CAUSED PLAINTIFF'S LOSSES ...............32

IV.   PLAINTIFF STATES A CLAIM UNDER SECTION 20(A) ...............................................34

CONCLUSION ..............................................................................................................................34

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re Alliance Equipment Lease Program Securities Litigation v. Royal Indemnity Co.*,
2002 U.S. Dist. LEXIS 28582 (S.D. Cal. Oct. 11, 2002) ........................................................22

*In re Allied Nevada Gold Corp., Sec. Litig.*,
2017 WL 4172611 (D. Nev. Sept. 20, 2017) .........................................................................11

*Allstate Life Ins. Co. v. Robert W. Baird & Co.*,
756 F. Supp. 2d 1113 (D. Ariz. 2010) .............................................................................23, 28

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) ............................................................................10, 25

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)................................................................. *passim*

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................................18, 19

*Anstalt v. New Generation Biofuels, Inc.*,
2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ........................................................................19

*In re Apollo Grp., Inc. Sec. Litig.*,
395 F. Supp. 2d 906 (D. Ariz. 2005) .....................................................................................16

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) ...................................................................................................20

*In re Atossa Genetics, Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) .................................................................................................21

*In re Banc of California Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) .........................................................................18

*Bao v. Solarcity Corp.*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ..............................................................................30

*In re Barrick Gold Corp. Sec. Litig.*,
2018 WL 4538896 (S.D.N.Y. Sept. 20, 2018).........................................................................11

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................................ *passim*

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................................15

iii

*Bielousov v. GoPro, Inc.*,
   2017 WL 3168522 (N.D. Cal. July 26, 2017)..................................................................24, 32, 33

*Billhofer v. Flamel Techs., SA*,
   281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................................................19

*In re Boeing Sec. Litig.*,
   40 F. Supp. 2d 1160 (W.D. Wash. 1998)......................................................................................30

*In re BofI Holding, Inc. Sec. Litig.*,
   302 F. Supp. 3d 1128 (S.D. Cal. 2018).........................................................................................16

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010) ........................................................................................28

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ........................................................................................34

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ........................................................................................................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   2013 WL 6441843 (N.D. Cal. Dec. 9, 2013).................................................................................18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ...................................................................................................11, 12

*In re Comverse Tech., Inc. Sec. Litig.*,
   543 F. Supp. 2d 134 (E.D.N.Y. 2008) ..........................................................................................19

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................................................17

*Curry v. Hansen Med., Inc.*,
   2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) ..............................................................................28

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ......................................................................................................16

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ................................................................................................18, 26

*Di Donato v. Insys Therapeutics Inc.*,
   2017 WL 3268797 (D. Ariz. Aug. 1, 2017)..................................................................................21

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005).......................................................................................................................32

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2002) ......................................................................................................34

*In re eSpeed, Inc. Sec. Litig.*,
   457 F.Supp.2d 266 (S.D.N.Y.2006)......................................................................................19

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)......................................................................25

*In re Forcefield Energy Inc. Sec. Litig.*,
   2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ......................................................................18

*FSP Stallion 1 v. Luce*,
   2009 WL 1219683 (D. Nev. May 1, 2009)............................................................................23

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)..................................................................................19

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ....................................................................................22

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) .....................................................................................11, 30, 31

*Helwig v. Vencor*,
   251 F.3d 540 (6th Cir. 2001) ...............................................................................................27

*Howard Gunty Profit Sharing v. Quantum Corp.*,
   1997 WL 514993 (N.D. Cal. Aug. 14, 1997) .......................................................................20

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005).......................................................................14, 20, 34

*In re Intuitive Surgical Sec. Litig.*,
   2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ....................................................................13

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................................................16

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)..................................................................................................30

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ............................................................................................9, 16

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y.2006).............................................................................19, 20

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...............................................................................20

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)..................................................................................................34

*In re LifeLock, Inc. Sec. Litig.*,
    690 F. App'x 947 (9th Cir. 2017) ...............................................................................10, 28

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ...........................................................................................33

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ............................................................................................32

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..............................................................................................9, 11, 25

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1059 (9th Cir. 2008) ..........................................................................................32

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..............................................................................................11

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ..............................................................................................9

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ......................................................................................32, 33

*Mulligan v. Impax Labs, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...............................................................................16

*N.M. State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ..........................................................................................23

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ..........................................................................27, 28

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...........................................................................30

*In re Nextcard, Inc. Sec. Litig.*,
    2006 WL 708663 (N.D. Cal. Mar. 20, 2006).....................................................................20

*Nguyen v. Radient Pharm. Corp.*,
    2011 WL 5041959 (C.D. Cal. Oct. 20, 2011).............................................................18, 19

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ......................................................................................27, 31

*Nordstrom, Inc. v. Chubb & Son*,
    54 F.3d 1424 (9th Cir. 1995) ............................................................................................27

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...................................................................................22, 23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ...........................................................................................34

*In re Nuvelo, Inc., Sec. Litig.*,
668 F. Supp. 2d 1217 (N.D. Cal. 2009) ..............................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
135 S. Ct. 1318 (2015).................................................................................................11, 12

*Patel v. Axesstel*,
2015 WL 631525 (S.D. Cal. Feb. 13, 2015) .................................................................27, 29

*Plumley v. Sempra Energy*,
2017 WL 2712297 (S.D. Cal. June 20, 2017)......................................................................14

*Police & Fire Ret. Sys. of the City of Detroit v. Crane*,
87 F. Supp. 3d 1075 (N.D. Cal. 2015) .................................................................................25

*Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ..............................................................................................33

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ......................................................................................21, 26

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ...................................................................................... *passim*

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ............................................................................................17

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)..................................................................................17

*Rihn v. Acadia Pharm. Inc.*,
2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)......................................................................30

*Robb v. Fitbit Inc.*,
216 F. Supp. 3d 1017 (N.D. Cal. 2016) ...............................................................................26

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) ........................................................................21, 22

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)..................................................................................................30

*Rubke v. Capitol Bancorp Ltd*,
 551 F.3d 1156 (9th Cir. 2009) ...................................................................................................20

*S. Ferry LP, No. 2 v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) ....................................................................................................22

*In re Sanofi Sec. Litig.*,
 155 F. Supp. 3d 386 (S.D.N.Y. 2016)........................................................................................12

*Scott v. ZST Digital Networks, Inc.*,
 2012 WL 538279 (C.D. Cal. Feb. 14, 2012)..............................................................................20

*In re Silver Wheaton Corp. Sec. Litig.*,
 2016 WL 3226004 (C.D. Cal. June 6, 2016) .......................................................23, 24, 28, 32

*Smilovits v. First Solar Inc.*,
 119 F. Supp. 3d 978 (D. Ariz. 2015) .................................................................................29, 32

*Snellink v. Gulf Resources, Inc.*,
 870 F. Supp. 2d 930 (C.D. Cal. 2012) .....................................................................................19

*In re STEC Inc. Sec. Litig.*,
 2011 WL 2669217 (C.D. Cal. June 17, 2011) ....................................................................14, 15

*In re Syncor Int'l Corp. Sec. Litig.*,
 239 F. App'x 318 (9th Cir. 2007) .............................................................................................24

*Szymborski v. Ormat Techs., Inc.*,
 776 F. Supp. 2d 1191 (D. Nev. 2011)........................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)................................................................................................22, 30, 32

*In re Terayon Commc'ns Sys., Inc.*,
 2002 WL 989480 (N.D. Cal. Mar. 29, 2002)............................................................................30

*Todd v. STAAR Surgical Co.*,
 2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ..........................................................................27

*United States v. Dreyer*,
 767 F.3d 826 (9th Cir. 2014) ....................................................................................................13

*United States v. Esquivel*,
 88 F.3d 722 (9th Cir. 1996) ......................................................................................................13

*In re UTStarcom, Inc. Sec. Litig.*,
 617 F. Supp. 2d 964 (N.D. Cal. 2009) ......................................................................................31

*Va. Bankshares v. Sandberg*,
 501 U.S. 1083 (1991)................................................................................................................21

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)..................................................................................19

*West v. Ehealth, Inc.*,
    2016 WL 948116 (N.D. Cal. Mar. 14, 2016)........................................................................21

*Wilson v. Bernstock*,
    195 F. Supp. 2d 619 (D.N.J. 2002) ...................................................................................21

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................... *passim*

**Other Authorities**

Fed. R. Evid. 201 ......................................................................................................................13

Plaintiff Kevin Nguyen respectfully submits this memorandum of law in opposition to the Motion to Dismiss Consolidated Amended Class Action Complaint (ECF No. 65) ("MTD") filed by Tahoe Resources, Inc.. ("Tahoe" or the "Company"), C. Kevin McArthur, Ronald W. Clayton, Elizabeth Dianne McGregor, Mark T. Sadler, and Edie Hofmeister ("Defendants").[1]

**INTRODUCTION**

In 2009, Tahoe was founded to develop the "Escobal Assets"—a series of silver mining concessions and licenses in Southeastern Guatemala—which subsequently became known as Tahoe's "Escobal Project."  ¶¶28-29.  Tahoe quickly began development by applying for the appropriate licenses to build a silver mine, including the Juan Bosco exploration License ("Exploration License") and the Escobal exploitation License ("Exploitation License") (collectively "Licenses").  ¶¶35-37.  When the Xinka, an indigenous people who had resided in the region for centuries, learned of Tahoe's plans in 2010, they immediately contacted Guatemala's Ministry of Energy and Mines ("MEM") and Tahoe to request that they be consultedregarding the Escobal Project ("Project") as required by Guatemalan Law.  ¶¶80-88.  Notwithstanding, MEM rebuffed the Xinka and forged ahead with its plans to review and approve the Licenses.  *Id.*

The Xinka were not to be ignored, however, as the environmental and social integrity of their ancestral homeland was at stake.  ¶84.  Over the course of several years, and even after MEM issued the Exploration License on May 9, 2012 (¶37) and the Exploitation License on April 3, 2013 (¶102), the Xinka, *inter alia*, attended meetings with MEM and Tahoe, held press conferences, organized plebiscites, participated in protests, and initiated legal action to assert and enforce their right to consultation and make known their opposition to the Project (¶¶80-116).  Instead of trying to find common ground, Tahoe actively worked to thwart the Xinka's attempts to exercise their legal rights including by shooting protestors, kidnapping Xinka representatives, and filing dubious restraining orders against local leaders.  ¶¶86, 88, 90-113, 117-19.

---

[1]    Unless stated otherwise, the following conventions are used:  (1) all "¶" references are to the Consolidated Amended Class Action Complaint ("AC") (ECF No. 59); (2) all capitalized terms shall have the same meaning as the terms in the AC and its Table of Defined Terms and Abbreviations (AC at iv-vi); (3) all emphases are added and citations and internal quotations are omitted; and (4) the arguments in Lead Plaintiffs' Motion To Strike Extrinsic Evidence And Related Arguments Submitted With Defendants' Motion to Dismiss ("MTS") (ECF No. 68) are incorporated herein.

1

All the while, as tensions increased (¶¶103-07), Defendants fraudulently created the misimpression that Tahoe was a champion of the community, stating that: (1) the Licenses were legally issued; (2) there were no indigenous peoples residing in the area of the Escobal Project; (3) the population around the Escobal Mine was supportive of the Project; (4) Tahoe was engaged in meaningful community outreach; and (5) Tahoe was in compliance with well-known international corporate social responsibility ("CSR") regimes. ¶¶149-86. Tahoe instead blamed the "*gimme gimme gimme*" attitude of the local communities for the unrest in the area. ¶220.

By mid-2017, Tahoe could no longer conceal the Xinka opposition to the Project. On July 5, 2017, Guatemala's Supreme Court provisionally suspended Tahoe's Exploitation License and its Exploration License renewal due to MEM's failure to consult the Xinka. ¶144. On this news, Tahoe's stock price dropped 38% over two days. ¶145. Tahoe immediately appealed the suspension to Guatemala's Constitutional Court, but on August 24, 2017, the Constitutional Court upheld the Supreme Court's decision, causing an additional 18% drop. ¶¶146-48.

Plaintiff asserts claims under §10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 relating to Defendants' false and misleading statements regarding these events. For the reasons discussed below, Plaintiff respectfully requests that Defendants' MTD be denied.

## STATEMENT OF FACTS

### A.    The Escobal Project

Tahoe was founded by defendant McArthur in 2009 to acquire the Escobal Assets from his previous corporation, Goldcorp, Inc. ("Goldcorp"). ¶¶28-29. The Escobal Assets became what Tahoe defined in its Preliminary Economic Assessment ("PEA") as the "Escobal Project[.]" ¶32. "*[T]he area of the Escobal Project*[,]" as set forth in the PEA, was made up of 23 mining concessions and pending and approved mining licenses covering 2,500 km$^2$ in Southeastern Guatemala ("*Escobal Project Area*").[2] ¶¶32-34, 159. When acquired, the Escobal Assets did not include a license for the commercial extraction of any minerals, nor any physical mining plant. ¶30.

To begin on its path to developing the world's third largest silver mine, Tahoe formed a

---

[2]    For brevity's sake, in the AC, Plaintiff defined "the area of the Escobal Project" as the "Escobal Project Area."

wholly-owned Guatemalan subsidiary named Minera San Rafael, S.A. ("MSR") and set about acquiring the Licenses. ¶29. In March 2011, Tahoe applied for the Exploitation License to build a mine and extract silver from the Escobal vein in a 20 km$^2$ area within the "municipality," *i.e.* county,[3] of San Rafael Las Flores ("SRLF"). ¶36. On May 9, 2012, MEM granted the Exploration License for three years. ¶37. The Exploration License permitted Tahoe to explore the land within its borders and covered a 59.9 km$^2$ area next to the Exploitation License within the counties of SRLF, Casillas, Nueva Santa Rosa, and Mataquescuintla. *Id.*

As part of its application for the Exploitation License, Tahoe filed an Environmental Impact Assessment ("EIA") with MEM which asserted demographic data about the population within what Tahoe called the "Area of Influence" of the Escobal Mine. ¶61. Tahoe purposefully limited the "Area of Influence" to ten small communities within SRLF; and then based upon this small area, Tahoe used data from Guatemala's controversial 2002 INE Census ("2002 Census") to characterize the population of these communities as almost totally devoid of indigenous people. ¶62. In fact, thousands of Xinka lived in the "Area of Influence." ¶¶70-78, 189-91.

**B.    Indigenous Peoples' Consultation Rights In Guatemala**

There are several laws in Guatemala which guarantee indigenous peoples the ***right*** to be consulted before the government approves mining licenses. ¶46. First, the International Labor Organization's Convention No. 169 ("ILO 169"), signed into law by Guatemala in 1995, provides that "the government shall . . . consult the peoples concerned, through appropriate procedures and ***in particular through their representative institutions***, whenever consideration is being given to legislative or administrative measures which ***may affect them directly***." ¶¶48-50. The U.N. Declaration on the Rights of Indigenous Peoples ("UNDRIP") was adopted by Guatemala in 2007 and it provides that "[s]tates shall consult and cooperate in good faith with the indigenous peoples concerned ***through their own representative institutions*** in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that ***may affect them***." ¶55. More generally, Article 66 of Guatemala's Constitution provides that Guatemala

---

[3]    Municipalities in Guatemala are akin to counties in the United States, and departments are akin to states. ¶32. For familiarity's sake, Plaintiff will use the U.S. analogs herein.

is made up of diverse indigenous groups and the "State recognizes, respects, and promotes their forms of life, customs, traditions, forms of social organization . . ." ¶56.

### C.    The Xinka Indigenous People In The Escobal Project Area

The Xinka are Mesoamerican natives of southeastern Guatemala.  Their ancestral, and present-day, homelands are in the states of Santa Rosa, Jutiapa, and Jalapa—the same states home to the Project.  ¶38.  The Xinka in Guatemala are represented by their own government—the Xinka Parliament—and stake claim to government-recognized tribal communal lands which are exclusively farmed by Xinka.  *Id.*  The Xinka's ownership of the tribal lands can be traced back to the Spanish crown, and Guatemala's Constitution confers special protection on the lands.  ¶43.  The Exploitation License area is closest to the Xinka tribal land named San Carlos Alzatate; in fact, the entire eastern border of the Exploitation License area sits *less than a quarter of a mile* from this Xinka community.  ¶45.  In addition to San Carlos Alzatate, three other Xinka tribal lands sit within the Escobal Project Area.  ¶42.  The Xinka also reside in the towns and countryside of Guatemala.  ¶41.

Because the Xinka have been the victims of genocide and discrimination in Guatemala, Xinka Parliament leaders have long rejected the 2002 Census as wildly inaccurate.  ¶¶39, 65-68.  In 2003 and 2004, the Xinka Parliament conducted its own census of the Xinka tribal lands in Santa Rosa and Jutiapa (two states located in the Escobal Project Area) and counted 164,163 Xinka.  ¶66.  As well, in 2015, the Catholic Church conducted a census in the state of Santa Rosa (the "Catholic Census"), and it counted 6,674 Xinka living in SRLF alone.  ¶71.  The Catholic Census also counted 5,822 Xinka in Casillas and 8,099 Xinka in Nueva Santa Rosa, two counties covered by the Exploration License.  *Id.*  Tahoe employees also observed indigenous peoples living around the Escobal Mine (¶¶73-78), and ultimately, in 2018, Tahoe itself apologized to the Xinka for denying their existence by finally acknowledging "the presence and importance of the indigenous peoples located *in the communities near Escobal*, particularly the *Xinka*."  ¶191.

### D.    The Xinka Resistance To The Escobal Project

Under Guatemalan Law, prior to granting the Licenses, MEM was required to consult with the indigenous peoples *who may be affected*, with the help of their representative institutions.  ¶¶50-56.  Despite its obligations, MEM accepted Tahoe's conclusions in the EIA as to the relevant

geographic area and the 2002 Census data to determine that it was not required to consult with any indigenous peoples prior to granting the Exploitation License. ¶64.[4]  MEM similarly did not consult with any indigenous peoples prior to grating the Exploration License.  ¶189.  Indeed, neither MEM nor Tahoe contacted the Xinka Parliament, or any other representative institutions, to determine whether there were Xinka who may be affected by the Licenses.  ¶¶80, 82, 189-90.

The Xinka attempted to exercise their consultation rights anyway.  *Id.*  In 2011 and 2012, Kelvin Villalta, the Xinka Parliament's Legal Advisor, attended several meetings with MEM officials and Tahoe representatives during which he and other Xinka leaders requested that MEM consult them regarding the Licenses.  ¶¶81-85.  The Xinka Parliament also helped to organize plebiscites in the counties within the Escobal Project Area in order to document public opposition to the Project.  ¶91.  In an attempt to combat these efforts, in August 2011, MSR filed a legal action against the plebiscite in Casillas.  ¶93.  And, in 2012, a group of women, who Villalta and others believe were bribed by Tahoe, filed restraining orders that prevented local leaders, including certain Xinka, from attending the plebiscite in SRLF.  ¶¶86-87.

On June 22, 2012, shortly after the Exploration License was issued, representatives from the Xinka Parliament and others, held a press conference to denounce the Exploration License, citing the results from the plebiscites which overwhelmingly rejected mining.  ¶94.  A month later, the Xinka Parliament co-hosted a rally in SRLF—the town directly adjacent to the Escobal Mine—to support the residents' demand for a consultation.  ¶97.  The Xinka Parliament's President spoke at the rally, which was attended by many Xinka who carried a sign identifying their heritage.  ¶¶97-99.  By that time, without any meaningful response from MEM regarding the consultation requests, protests began to break out in front of the gates to the Escobal Mine.  ¶95.  In September 2012, MSR then acted as a "joint plaintiff" in a case against at least 32 protestors, which case resulted in an arrest warrant for the Xinka Parliament's President.  ¶96.

In 2013, with the help of the Xinka Parliament, several villages in SRLF finally held "good faith" plebiscites in which 93.44% to 100% of the voters said no to mining.  ¶100.  On the way home

---

[4]  MEM's failure to conduct further investigation into the indigenous population that may have been affected by the Exploration and Exploitation Licenses is not surprising given that the Minister and senior staff were later arrested for bribery in issuing MEM contracts.  ¶¶137-41.

from one such plebiscite, on March 17, 2013, four Xinka Parliament leaders were kidnapped by armed men. ¶101.  The following day, the Secretary was found dead and local press reported that the President was told by his captors that he was being taken to the Escobal Mine's manager.  *Id.*

### E.      MEM Grants The Exploitation License Despite Xinka Opposition

On April 3, 2013, the day MEM granted the Exploitation License, the Xinka Parliament, among others, held a press conference to denounce MEM's "illegal approval" of the License.  ¶102.  As well, Xinka Parliament representatives and many others staged peaceful protests in front of the Escobal Mine's gates.  ¶103.  Two weeks later, while people were peacefully protesting outside of the Escobal Mine, Tahoe's security guards opened fire on them.  ¶104.  Hofmeister later downplayed the violent shootings as a mere "gate blockage" incident.  ¶106.

In May 2013, Villalta filed a suit against MEM in Guatemala's Court of Appeals for dismissing his objections to the Exploitation License without holding a hearing.  ¶110.  The Court of Appeals ruled in Villalta's favor; and on July 25, 2013, MEM and Tahoe (as an interested third party) appealed the decision to the Constitutional Court.  ¶113.  In the legal filings, Villalta identified himself as Xinka, and during the hearing, which was attended by a Tahoe representative, Villalta made some of his arguments in the Xinka language.  *Id.*

Thereafter, certain human rights bodies began investigating the controversy surrounding the Project.  ¶¶114-22.  In June 2013, the Council on Ethics for Norway's Government Pension Fund Global ("Council on Ethics") began an investigation, pursuant to which Tahoe responded to questions regarding the Xinka's opposition.  ¶¶117, 214.  On April 8, 2014, the Council on Ethics provided Tahoe with a report identifying the Xinka opposition and consultation demand as the primary factors driving the Project controversy.  ¶¶117-19.  Then, on September 3, 2013, the Mayan and Xinka peoples of Guatemala filed a petition with the Inter-American Commission on Human Rights ("IACHR") against Guatemala for its failure to consult with the Xinka prior to granting the Exploitation License.  ¶¶114-16.  Tahoe acknowledged receipt of this petition in its 2014 annual report.  ¶216.  On January 13, 2014, the U.N.'s High Commissioner for Human Rights in Guatemala issued an annual report discussing the conflicts around the Escobal Mine and explaining that the "common denominator . . . was the failure to . . . consult with indigenous and other local

communities[.]" ¶120.  Then, on June 1, 2014, the Permanent Peoples' Tribunal ("PPT") found Tahoe symbolically guilty of human rights violations for operating the Escobal Mine without the Xinka's consent.  ¶121.  PPT invited Tahoe to attend a hearing, but Tahoe did not participate.  ¶121.

### F.      Defendants' False And Misleading Class Period Statements

Starting on April 3, 2013, Defendants began making a series of false and/or misleading statements which concealed the Xinka opposition to the Licenses.  First, Defendants made misleading statements about the issuance of the Licenses, representing that Tahoe "obtained every permit for the Escobal project in a lawful manner" (¶153) and that Tahoe "is committed to observing the laws and respecting the cultural values in the countries in which it operates" (¶156).  Defendants failed to disclose that (1) the Licenses were not lawfully obtained because there were thousands of Xinka who were affected by the Licenses whom MEM had not consulted; and (2) Xinka were actively contesting the Licenses' issuance.  ¶157.

Well aware that consulting with indigenous peoples was a prerequisite for MEM to issue the Licenses, Defendants assured the market that "[t]he Company is not aware of any significant indigenous population residing *in the area of the Escobal Project*."  ¶159.  When reading this statement, investors would have assumed that when forming this opinion, Tahoe conducted a reasonable inquiry into the demographics of the area and was unaware of any other adverse facts. Tahoe conducted no such inquiry, as it did not contact the Xinka Parliament or take an independent census; rather, Tahoe was aware that the Xinka existed and were asserting their rights.  ¶161.

Third, as unrest in the Escobal Project Area increased, Defendants issued statements to assuage investors' concerns which misrepresented critical facts about the protests.  For example, Defendants stated that "[r]ecent news articles seeing wide distribution over the last week . . . have falsely characterized the local population as indigenous and have incorrectly described violent activities by people from outside the community as peaceful protests by local farmers" (¶166). Defendants failed to disclose that the resistance included Xinka who had communicated to MEM and Tahoe that the Xinka had a right to be consulted about the Licenses.  ¶168.

Fourth, Tahoe created the misimpression that community outreach was a priority by stating, *inter alia*, that it "continues to seek meaningful and effective dialogue with community members"

(¶170), and it "engaged with indigenous communities that expressed an interest in the Escobal Mine, and to date, more than 70 indigenous community members have visited the Escobal mine" (¶173). To the contrary, Tahoe did not seek meaningful dialogue with the community, as it never reached out to the Xinka Parliament or Xinka people who were affected by the Project, violently opposing the Xinka's efforts to exercise their consultation rights instead.  ¶¶171, 176.

Fifth, in order to bolster the misimpression that Tahoe was respecting the human rights of the communities in the Escobal Project Area, Defendants stated that they were implementing practices to comply with the U.N. Guiding Principles on Business and Human Rights ("Guiding Principles") and the Equator Principles, and developing a grievance mechanism to comply with the Guiding Principles and the International Finance Corporation ("IFC") Performance Standards.  ¶¶182-85. The Guiding Principles and Equator Principles both require companies to consult with indigenous peoples regarding projects that may affect them.  ¶¶128, 131-32.  The Guiding Principles and IFC grievance mechanisms require companies to minimize or compensate for a project's adverse impacts on indigenous peoples.  ¶¶129, 134-35.  Tahoe did not, however, comply with any of these regimes as it never attempted to consult with the Xinka Parliament or people who were affected by the Project; rather, Tahoe worked to thwart the exercise of their consultation rights.  ¶186.

### G.    CALAS's Legal Claim Against MEM

On May 17, 2017, CALAS, an environmental organization, filed an action in Guatemala's Supreme Court against MEM, alleging that MEM—in violation of ILO 169, Article 19 of UNDRIP, and Article 66 of Guatemala's Constitution—failed to consult the Xinka living in the counties of SRLF, Nueva Santa Rosa, Casillas, and Mataquescuintla before granting the Licenses.  ¶142. CALAS asked the court to provisionally suspend the Exploitation License and the Exploration License's renewal until CALAS's action was heard.  *Id.*  On July 5, 2017, Tahoe announced that the Supreme Court granted the provisional License suspensions.  ¶144.  On this news, Tahoe's stock price fell $2.74 per share, or 33%, to close at $5.56 per share on July 6, 2017.  ¶145.  Tahoe's shares continued to fall $0.41 per share, or 7%, to close at $5.15 per share on July 7, 2017.  *Id.*

The Supreme Court's decision conferred legal standing on Tahoe, who then appealed the decision to Guatemala's Constitutional Court.  ¶146.  On August 24, 2017, Tahoe announced that the

Constitutional Court upheld the Supreme Court's suspension of the Licenses. ¶147. Tahoe's stock then fell $1.01 per share, or over 18%, to close at $4.47 per share on August 25, 2017. ¶148.

The Supreme Court held a hearing on the merits of CALAS's claim on August 28, 2017 during which MEM and Tahoe argued that the Licenses were legal because there were no indigenous people "in the area of influence of the 'Escobal' mining project[.]" ¶189. CALAS argued that the areas in question are Xinka "territories" as shown in, *inter alia*, the Catholic Census. *Id.* The Supreme Court held on September 8, 2017 that MEM violated the constitutional rights of the Xinka in SRLF, Casillas, Nueva Santa Rosa, and Mataquescuintla by granting the Licenses without first consulting them. ¶190. The Court overturned the License suspensions, but ordered MEM to consult the affected Xinka within 12 months. ¶190.

## LEGAL ARGUMENT

"[T]he court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000). Defendants' efforts to dispute the facts must be disregarded.

**I.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

It is unlawful to (1) "make any *untrue* statement of a material fact" or (2) "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, *not misleading*." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).[5] A statement or omission is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

**A.   Defendants Made Actionable Statements About The Issuance Of The Exploitation and Exploration Licenses**

Defendants made actionable statements assuring the market that the Licenses were legally issued. First, Tahoe and McArthur stated that Tahoe "is confident that it has fully disclosed all

---

[5]   "Some statements, although literally accurate, can become, through their context and manner of presentation[,]" misleading. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

9

material events regarding the Escobal project" (¶152); that the process to obtain a mining license provides for a "thorough and integrated assessment of potential . . . social, heritage and health effects . . . Tahoe Resources willingly submitted to the regulatory process and obtained every permit for the Escobal project in a lawful manner" (¶153, *see also* ¶151); and that Tahoe was "committed to observing the laws and respecting the cultural values in the countries in which it operates including the indigenous peoples recognized by the laws of the applicable jurisdiction" (¶156).  Defendants failed to tell investors that the Licenses were *not* legally obtained because thousands of Xinka lived in the area affected by the Project, and, despite their repeated requests (¶¶80-88), MEM had not consulted them prior to granting the Licenses, as required by Guatemalan Law.  ¶157.[6]  In fact, as a result of MEM's failure to consult them, the Xinka *contested the issuance* of the Licenses through protests, plebiscites, and legal actions, all of which Tahoe was aware of and actively attempted to thwart by, *inter alia*, violently assaulting protestors, attempting to block plebiscites, filing legal actions, and opposing Xinka lawsuits.  *Id.*  Defendants' statements created the misimpression that the Licenses complied with Guatemalan Law, particularly the protections afforded indigenous peoples, when in fact MEM had violated a crucial requirement.  *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1067 (C.D. Cal. 2012) (statements that the company endeavors to comply with "immigration laws" was misleading when "in reality it had employed hundreds of undocumented workers[.]").[7]

        Second, Defendants warned in the risk factors section of Tahoe's SEC filings that "the validity of the licenses related to the Escobal mine can be uncertain and may be contested."  ¶¶154-55.  "A generic warning of a risk will not suffice when undisclosed facts . . . would substantially affect a reasonable investor's calculations of probability" such that the investor would "make an

---

[6]        Defendants' argument regarding the other censuses cited in the AC misconstrues Plaintiff's claims.  MTD at 15-18.  Plaintiff is not claiming that Defendants should have disclosed the other censuses conducted by the Xinka Parliament or COPXIG.  Instead, Plaintiff is claiming that Defendants failed to disclose that MEM failed to contact the Xinka representative institutions to determine whether any Xinka people may be affected by the Licenses, as required by Guatemalan Law.  MEM failed to fulfill its basic duty to retrieve this information.

[7]        *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 951 (9th Cir. 2017) is inapposite because there the defendants did disclose the widespread customer service problems that the plaintiffs alleged the defendants concealed.  Here, Defendants did not disclose, *inter alia*, that the Licenses were being actively contested because MEM had failed to consult the Xinka.

10

overly optimistic assessment of the risk." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). Tahoe's risk factor statements were misleading because they failed to disclose the then-existing material facts that increased the likelihood that the risk would transpire, *i.e.*, (1) that the Licenses were ***not legally*** issued because MEM failed to consult the Xinka as required by Guatemalan Law; and (2) the legality of the Licenses ***had already been*** contested by Xinka. ¶157; *see Matrixx*, 563 U.S. at 34 (risk factors warning of potential product liability lawsuits were misleading when two such lawsuits had already been filed).

These statements do not rely on fraud by hindsight. "Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made." *Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014).[8] ***At the time the statements were made***: (1) Xinka lived in the Escobal Project Area who were directly affected by the issuance of the Licenses (¶¶42, 66-79, 190); (2) MEM had not consulted those Xinka in violation of the existing provisions of ILO 169 and other Guatemalan laws (¶¶46-56, 64, 80-101, 114-22, 189-90); and (3) the Xinka were already contesting the Licenses (¶¶80-113). Moreover, similar to the this case, numerous courts have found that subsequent government action ***supports*** an inference that the Licenses were illegal prior to the making of Defendants' statements.[9] In *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 742 (9th Cir. 2008), the court found that the plaintiff "has pled facts demonstrating that InVision was *not* in compliance with Section 13(b) of the Exchange Act at the time the warranties were made" because the SEC issued a cease and desist order 11 months later, finding that InVision had violated Section 13(a). *See also Reese*, 747 F.3d at 578 ("defendants cannot say that they were in compliance . . . with applicable environmental laws and regulations" when the complaint alleges numerous violations "confirmed by the company's [subsequent] guilty plea, consent decree, and . . . fines and penalties[.]").

---

[8] *Reese* was recently overruled in part by *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017), to the extent that *Reese*'s analysis of falsity of opinions is irreconcilable with *Omnicare*.

[9] The two cases cited by Defendants are not persuasive because the undisclosed facts had not occurred at the time of the statements: in *In re Barrick Gold Corp. Sec. Litig.*, 2018 WL 4538896, at *8 (S.D.N.Y. Sept. 20, 2018), the defendants were not held liable for failing to disclose a cyanide spill that had not occurred, and the statements in *In re Allied Nevada Gold Corp., Sec. Litig.*, 2017 WL 4172611, at *8 (D. Nev. Sept. 20, 2017) were projections, not statements of existing facts.

**B.**     **Defendants Made Actionable Statements About The Indigenous Population In The Escobal Project Area**

Defendants falsely denied and misleadingly minimized the existence of Xinka in the Escobal Project Area.  On two occasions, Tahoe, McArthur, and Sadler stated that the Company is "not aware of any significant indigenous population residing in ***the area of the Escobal Project***."  ¶¶159-60.  This statement is an opinion and is actionable for three reasons.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (the falsity of a statement qualified by the phrase "[b]ased on my knowledge" was dependent on the speaker's knowledge "not on what was objectively true at the time").  Under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015), an opinion may be either a false or misleading: an opinion is false when the speaker did not honestly hold the belief stated, and an opinion is misleading when, although the speaker honestly believed its opinion, the speaker fails to disclose "facts going to the basis for the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *See Align Tech.*, 856 F.3d at 615.

First, defendants' opinion is false because they did not honestly believe it.  Defendants were aware that Xinka resided in the Escobal Project Area because the Xinka were actively opposing the Project, and in response Tahoe retaliated against them by, *inter alia*, violently responding to protests, attempting to block plebiscites, filing legal claims, and opposing lawsuits.  ¶161.

Second, defendants' opinion is misleading because they failed to disclose that it was formed without a reasonable inquiry into the number of Xinka living in the Escobal Project Area.  ¶161.  Indeed, Tahoe only relied on an outdated and controversial 2002 Census, never contacting the Xinka representative institutions—who were attempting to communicate with Tahoe—or conducting any independent census of its own.  ¶161.  *See Omnicare*, 135 S. Ct. at 1328 (an opinion that "[w]e believe our conduct is lawful[,] . . . could be misleadingly incomplete . . . [i]f the issuer makes that statement without having consulted a lawyer").

Third, defendants' opinion is misleading because they were "aware of undisclosed facts tending seriously to undermine the statement's accuracy."  *Align Tech.*, 856 F.3d at 616.  Defendants were in possession of facts indicating that the Xinka were asserting their presence in the Escobal

12

Project Area, which efforts Tahoe was actively opposing. ¶161. The reality on the ground was a far cry from the impression created by defendants' statements that the population of the Escobal Project Area was non-indigenous. *See In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at \*2 (N.D. Cal. Sept. 29, 2017) (When the defendants "misclassified numerous adverse event reports" and "suppressed thousands of medical device reports . . . the statements of opinion regarding [the device's] safety and efficacy did not fairly align[ ] with the unreported and misclassified" reports).

Defendants cannot dispute the allegations now by arguing that their statements only referred to the so-called "Area of Influence[,]" because that is not what they said. Defendants defined the Escobal Project and the area it consisted of in Tahoe's PEA. ¶34. They then used that defined term when making statements to the public (¶¶159-60); thus it was reasonable for the public to interpret the statements to be consistent with Defendants' definition. If Defendants did not mean what they said, then their statements are misleading for that reason alone. Setting aside the quibbling over the Escobal Project Area, Defendants admitted the presence of Xinka "in the ***communities near Escobal***" in 2018 (¶191); they cannot now deny that Xinka ever lived in the relevant area.[10]

**C.      Defendants Made Actionable Statements About The Resistance To The Project**

Defendants made actionable statements downplaying the nature of the resistance to the Project. For example, Tahoe, McArthur, and Sadler represented that "[w]hile many of these activities have been peaceful and respectful, violence from ***outside*** influences has escalated in the past weeks" (¶163); "In recent months ***outlier communities*** and non-governmental organizations [] have become more vocal and active with respect to mining activities in Guatemala" (¶¶164-65, 167); and "Recent news articles seeing wide distribution over the last week have been highly inaccurate . . . they have ***falsely characterized the local population as indigenous*** and have

---

[10]      *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996) and *United States v. Dreyer*, 767 F.3d 826, 834 n.12 (9th Cir. 2014) are not applicable because they concern judicial notice of U.S. census data, not censuses conducted in Guatemala. Judicial notice of the 2002 Guatemalan Census would not be appropriate because Plaintiff disputes its accuracy and it was contradicted by, *inter alia*, the Xinka censuses in 2003/2004 and 2008, the 2015 Catholic Census, Tahoe employees' observations, the 2017 anthropological studies, and the Guatemalan Supreme Court decision. ¶¶65-78, 188-91. The 2002 Census is simply not a source whose accuracy cannot be reasonably questioned given the genocides perpetrated against Guatemala's indigenous population and the contradictory data available elsewhere. *See* Fed. R. Evid. 201.

incorrectly described violent activities by people from *outside the community* as peaceful protests by local farmers" (¶166).[11]  Defendants' statements created the impression that the resistance was comprised of nonlocal people who had no valid objection to and posed no threat to the Licenses; in reality, local Xinka had helped to organize and were actively involved in the resistance efforts to assert their consultation rights, thereby threatening the Licenses. ¶¶80-113.  *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) ("Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light."); *see also In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *6-7 (C.D. Cal. June 17, 2011).  Thus, Defendants' argument that they were not required to disclose every fact regarding the protests fails because the most important fact to investors was whether the resistance posed a threat to the Licenses, yet Defendants failed to disclose the most critical fact in that regard—that Xinka were protesting MEM's failure to conduct the required consultation.[12]

**D.     Defendants Made Actionable Statements About Tahoe's Community Outreach**

Defendants made actionable statements regarding their interactions with the communities in the Escobal Project Area.  First, Tahoe stated that the Project is supported by the local community and that it engages in meaningful dialogue with that community:

> MYTH:  The Escobal project does not have any community support/social license. Tahoe Resources does not consult with local community members . . . TRUTH: . . . There are many Guatemalans, including the majority of those in the [SRLF] Community, who support the Escobal project . . . the Escobal project is opposed by a small group of opponents who refuse to engage in meaningful discussions about the project. . . . Tahoe continues to seek meaningful and effective dialogue with community members.

---

[11]     Contrary to Defendants' argument, the wording of the statements, such as "*a number of* [peaceful and respectful] anti-mining protests[,]" "*all other* reported events[,]" and activities "*in recent months*" and "*in recent years*[,]" indicates that the statements do not only pertain to the shooting on April 27, 2013, but to the ongoing resistance to the Project, which the AC pleads in detail.  ¶¶86-87, 91, 94-98, 100-03, 109-14.

[12]     Similarly, in *Plumley v. Sempra Energy*, 2017 WL 2712297, at *9 (S.D. Cal. June 20, 2017), the court found statements after a gas leak that the company had "experts taking air samples . . . to reassure the community that the air quality continues to be within safe levels" were misleading because they "minimized the scope and risks the gas leak posed" to the community.  *See also In re Nuvelo, Inc., Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009) (finding statements misleading not because defendants knew the trial would fail and concealed that knowledge, but because they "omitted to disclose a [known] material risk that [the trial] would fail").

¶170. This statement was inaccurate for several reasons. First, the majority of people in SRLF did not support the Project, as 93.44% to 100% of people voted no to mining in plebiscites held in the county. ¶171.[13] Second, the Xinka did not refuse to engage in discussions regarding the Project, because they had requested consultation at meetings, press conferences, protests, and through legal action. *Id.* Third, Tahoe did not seek meaningful dialogue with the community because Tahoe never contacted the Xinka Parliament or people and instead actively opposed their efforts to exercise their consultation rights by, *inter alia*, responding violently to protests, attempting to block plebiscites, filing legal claims against Xinka representatives, and opposing the Xinka's lawsuit against MEM. *Id.* The response of various human rights organizations to the unrest in the Escobal Project Area reinforces that Tahoe did not adequately engage with the community: the Council on Ethics, U.N.'s High Commissioner, and PPT all determined that the problems arose because neither Tahoe nor MEM informed or consulted with indigenous and local communities regarding the Project. ¶¶117-22. Defendants concealed these facts, and instead continued to tout its CSR efforts in the community. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (statements that the company was committed to "respecting our environment and the communities in which we work" were misleading when the defendants concealed that the company's dam was structurally dangerous to the community around it).

Defendants also repeatedly represented that they were open to engaging in dialogue with the indigenous communities in the Escobal Project Area, stating, for example, that "[i]n 2014, the Company engaged with indigenous communities that expressed an interest in the Escobal Mine, and to date, more than 70 indigenous community members have visited the Escobal mine" and "indigenous peoples have participated in the Company's avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments[.]" ¶¶172-75. Not only are gifts of "agricultural supplies" and "musical instruments" insufficient to satisfy the consultation requirements under ILO 169, when making these statements, Defendants failed to disclose that Tahoe never contacted the Xinka Parliament, and instead actively worked to thwart the

---

[13] Defendants improperly cite the AC. The plebiscites cited in ¶¶100 and 170 were organized by communities in SRLF, not the mayor, and occurred between February 17 and April 21, 2013.

15

Xinka's efforts to exercise their consultation rights. ¶176. Once Defendants chose to discuss their interactions with indigenous communities, "they had a duty to speak fully and truthfully and such full disclosure would have included the negative" facts that Tahoe not only refused to engage with the Xinka, it vehemently and violently opposed their attempts to seek consultation. *In re Apollo Grp., Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005).

Defendants statements are not puffery because "[p]uffing statements are generally not capable of objective verification and lack a standard against which a reasonable investor could expect them to be pegged." *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Here, whether or not Defendants spoke with indigenous people and the like are verifiable facts. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 829-30, 834-35 (N.D. Cal. 2014) (statements that company was "confident" and "believe[d]" its device was "safe and effective" were actionable because "[they] could be objectively assessed").[14] Further, the statements were framed in the context of concrete details, such as the number of people (*i.e.*, "hundreds," "70"), the types of people (*i.e.*, "government officials" and "indigenous community members"), the types of meetings held (*i.e.*, "site tours" "workshops"), and the information provided at the meetings (*i.e.*, "project information," "rust prevention" advice). ¶¶170, 172-75.

Defendants remaining arguments regarding these statements (MTD 20-21) dispute the well-pleaded facts, which is inappropriate at this stage of the litigation. *Kraft Foods*, 232 F.3d at 984.

**E.   Defendants Made Actionable Statements About Tahoe's Alignment With CSR Regimes**

Defendants made actionable statements regarding Tahoe's compliance with the human rights regimes it supposedly adopted. First, Defendants stated that Tahoe "has aligned its policies and practices with the United Nations Guiding Principles on Business and Human Rights [] . . . and the Equator Principles" and "implemented a new grievance mechanism in Guatemala in January 2015 to align with the Guiding Principles and the International Finance Corporation [] Performance

---

[14]   The cases cited by Defendants do not compel otherwise. In *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010), generally having good "employee relations" is much more vague than specific efforts to engage identified community members. As well, *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1147 (S.D. Cal. 2018) the statements pertained to what defendants believed may happen in the future, not what defendants had done in the past.

16

Standards." ¶¶182-85.  The Guiding Principles require a company to directly consult stakeholders potentially affected by its business activities (¶128); the Equator Principles require a company to engage in "Informed Consultation and Participation" with indigenous peoples affected by its projects (¶131), and the Performance Standards require a company to engage in Informed Consultation and Participation with "the Affected Communities of Indigenous Peoples" through a time-bound plan (¶134).  Critically, these regimes required Tahoe itself to consult with the Xinka—Tahoe cannot try to place the blame on MEM.

Second, Tahoe and McArthur stated that the Escobal Project "is being constructed to the highest environmental and social standards" (¶178) and "Tahoe has exceeded legal requirements and demonstrated best international practices for engaging in dialogue with the community" (¶180).

To the contrary, Defendants were not aligned with the aforementioned Principles, Performance Standards, social standards, or international practices because Tahoe failed to consult with the Xinka people and Parliament who were affected by the Project as required by those principles, and instead directly opposed the Xinka's efforts to assert their rights to consultation. ¶¶123-35, 186.  Indeed, several human rights bodies admonished Tahoe for failing to engage with the indigenous populations regarding the Project.  ¶¶117-19, 121-22.

Statements representing compliance with codes of ethics may be misleading under certain circumstances.  *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 277 (S.D.N.Y. 2012) (statements that "[w]e are dedicated to complying fully with the . . . rules and ethical principles that govern us" found misleading).  Regardless, violations of widely-practiced international principles promulgated by the U.N. and other human rights institutions are analogous to violations of Generally Accepted Accounting Principles ("GAAP"), which are the conventions and procedures "that define accepted accounting practice[.]"[15]  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1175 (C.D. Cal. 2008).  When a company represents that their financial statements are in compliance with GAAP, "[f]inancial statements . . . which are not prepared in accordance with [GAAP] will be

---

[15]     *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) is further distinguished because the defendants there simply stated that they are committed to making "ethical decisions[,]" at no point did the defendants state that they were in compliance with the company's code of ethics.

presumed to be misleading or inaccurate." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at \*2 (N.D. Cal. Dec. 9, 2013); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005). Defendants' representations that Tahoe was aligned with those human rights regimes were false because Tahoe had violated central rules of those regimes.

**F.    The Adverse Facts And Risks Contradicting Defendants' Statements Were Not Public Information**

**1.    Defendants' Truth-on-the-Market Defense Fails**

Defendants' truth-on-the-market defense asserting that the "opposition to the Escobal Mine" was public fails for several reasons. First, because the truth-on-the-market defense is intensely fact-specific, it is rarely a basis upon which to dismiss a complaint. *Nguyen v. Radient Pharm. Corp.*, 2011 WL 5041959, at \*7 (C.D. Cal. Oct. 20, 2011). When asserting this defense, "[d]efendants bear a heavy burden of proof. Any conflicting interpretation of the false or misleading statements, therefore, will likely lead to considerations of fact that are inappropriate at the 12(b)(6) stage of litigation." *Id.* Here, rather than identify how each of the facts allegedly concealed by Defendants was publicly available, Defendants broadly assert that the "opposition to the Escobal Mine" was known to the market. Defendants fall far below their burden for asserting a truth-on-the market defense because they do not provide the Court with any information from which to conduct fact-specific inquiry regarding the availability of each and every omitted fact. In the absence of this information, this defense is premature. *See In re Forcefield Energy Inc. Sec. Litig.*, 2017 WL 1319802, at \*12 (S.D.N.Y. Mar. 29, 2017).

Second, the misrepresented facts were not publicly available because they were not "so manifestly well-known that [they were], as a matter of law, already part of the total mix of information available to investors." *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at \*5 (C.D. Cal. Sept. 6, 2017). Courts in this circuit routinely find that information is not publicly available when an investor would not be able to reasonably locate or process it. *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ("The mere fact that the FDA posted its briefing book on its website, or that the briefing book was made public, is not enough to shield Defendants from liability, at least at this early stage of the litigation."); *In re Amgen Inc. Sec. Litig.*,

544 F. Supp. 2d 1009, 1026 (C.D. Cal. 2008) ("The mere fact that the agenda for the 2004 ODAC meeting was available to the public, or that the meeting itself was public, is not enough to shield Defendants from liability.").[16]  The complex facts cited in the AC, most of which were scattered around the Internet on random blogs and obscure websites, written in Spanish, or translatable by costly professional translators familiar with legal jagon, could not be reasonably located or processed by investors.  *See Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930 (C.D. Cal. 2012) (holding that filings to the SAIC (the Chinese equivalent of the SEC), "were not public, and even if they were, they are not readily accessible for U.S. investors.").[17]

Third, even if any of the misrepresented facts were publicly available—which they were not—Defendants' statements contradicting these facts counterbalanced any impression they could have left on the market.  In *Radient Pharm.*, 2011 WL 5041959, at *7 (citing *Provenz v. Miller*, 102 F.3d 1478, 1492–93 (9th Cir.1996)), the court found that even when the omitted information was disclosed in the company's SEC filing before the class period, the court was unable to determine whether the information "was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [an] insider's one-sided representations."[18]  In contrast, Defendants' misleading statements assuring the market that the

---

[16]     *See also Billhofer v. Flamel Techs., SA*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) (adverse events were not public when "they were posted in an obscure location on the internet."); *Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014) ("Defendants' argument that they had no duty to disclose information regarding the Foreign Patent Reports simply because the reports were accessible through the internet is an oversimplification of the law.").

[17]     *See also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) ("The Court finds that the publication of three newspaper articles—in Chinese—does not transform the information contained within the articles into "matters of general public knowledge" that may properly be imputed to Fuwei's stockholders.); *cf. Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 478 (S.D.N.Y. 2013) ("[T]here is no indication that these documents were 'available' simply by being dropped into the middle of the internet vortex in a way that functionally and materially distinguishes them from the Chinese-language newspaper articles at issue in *In re Fuwei Films Securities Litigation,* 634 F.Supp.2d 419 (S.D.N.Y.2009)").

[18]     *See also In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 288 (S.D.N.Y.2006) (finding that bad publicity regarding defendants' new trading option did not establish truth-on-the-market when counteracted by "authoritative statements from defendants, assuring the market that [the trading option] would catch on"); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 150 (E.D.N.Y. 2008) (finding that plaintiff adequately alleged that disclosure of problems in defendant's financials "may not have been intense or credible enough to counterbalance effectively" previous misstatements); *Lapin v. Goldman Sachs Group, Inc.,* 506 F. Supp. 2d 221, 238 (S.D.N.Y.2006) (rejecting truth-on-the-market defense because even if news articles and disclaimers "raised some concern in the market about [defendant's] alleged conflicts, such information was counteracted by

Licenses were legally obtained (¶¶150-57); the population in the Escobal Project Area was non-indigenous (¶¶158-61); the protests around the Escobal Mine were being conducted by outsiders (¶¶162-68); Tahoe was engaged in meaningful community outreach (¶¶169-76); and Tahoe was aligned with international CSR regimes (¶¶177-86), all outweigh any disclosures of the actual facts regarding the "opposition to the Escobal Mine," especially when Tahoe was actively attempting to suppress this very same opposition (¶¶95-96, 103-107).  *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) (rejecting the truth-on-the-market defense where plaintiffs suggested that defendants attempted to suppress public knowledge of the allegedly omitted information).[19]  Furthermore, if the information about these facts was publicly known, Tahoe's stock price would not have plummeted when the Supreme Court provisionally suspended the Licenses (¶245) or when the Constitutional Court upheld this suspension (¶246).  *See, e.g.*, *Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279, at *12 (C.D. Cal. Feb. 14, 2012).

Most critically, Defendants' truth-on-the-market defense eviscerates their simultaneous denials of scienter.  Having asserted that the omitted adverse facts were publicly available to every investor, Defendants lack a good faith basis to disclaim their own access to ***and knowledge of*** this information.  *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) (rejecting the defendants conflicting scienter defenses because they "cannot have it both ways").

### 2. Defendants' Risk Factors Defense Fails

Likewise, Defendants risk warnings were insufficient to put the market on notice of the actual risks facing Tahoe.  Although risk factors can sometimes provide a safe harbor for related forward-looking statements, this is not the case here because all of Defendants' statements contained

---

contemporaneous statements" regarding defendant's objectivity and independence).

[19] None of the cases cited by Defendants support their truth-on-the-market defense.  *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1199-200 (D. Nev. 2011) is distinguishable because the court found the fact that a similar energy plant had been shut down was in the public domain.  The concealed adverse facts in this case are much more complex and obscure and require much more context to determine their relevance than simply the shutting down of a similar plant.  Defendants citations to *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1162–63 (9th Cir. 2009), *In re Nextcard, Inc. Sec. Litig.*, 2006 WL 708663, at *2 (N.D. Cal. Mar. 20, 2006), *Howard Gunty Profit Sharing v. Quantum Corp.*, 1997 WL 514993, at *4 (N.D. Cal. Aug. 14, 1997), and *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993) are similarly unavailing because none of the cases involved a truth-on-the-market defense.  Indeed, in *Rubke*, 551 F.3d at 1162–63, the court simply explained that an issuer is not required to reprint information that is already in the public domain because it would make filings too voluminous.

only historical facts. Regardless, any risk disclosure must be so comprehensive that "the risk of real deception *drops to nil*." *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991). Indeed, "it is likely that *no cautionary language*—short of *an outright admission* of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to" insulate the misleading statements. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146–47 (9th Cir. 2017).

Under both circumstances, the risk warnings themselves must "*relate directly* to that to which plaintiffs claim to have been misled" and cannot be "vague" or "obsure[] the issue[s] of concern to reasonable investors[.]" *In re Atossa Genetics, Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (statement that "Atossa may be subject to additional regulatory action by the FDA" did not insulate misleading statements). Here, the risks Tahoe warned of in its 2013-2016 Annual Reports were written in broad, general terms, such as "unexpected refusals of required licenses or permits," "volatile local, political, and economic developments," and "more stringent enforcement of current laws and regulations[.]" MTD at 10. These statements did not adequately warn the market of the true risks facing the Project because they were devoid of details regarding the Xinka's presence in the Escobal Project Area, MEM's and Tahoe's failure to consult the Xinka, and the Xinka's ongoing, active efforts to contest the Licenses. *See e.g.* ¶¶82, 92, 100.[20] In fact, the word "Xinka" is not found in any of Defendants' risk warnings. MTD at 10. Similarly, in *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *17 (D. Ariz. Aug. 1, 2017), the defendants argued that they did not conceal their misconduct because risk warnings concerning "government investigations, legal action, negative publicity, and employee misconduct were repeatedly disclosed in Insys's SEC filings."[21] The court rejected this argument because "none of the disclaimers stated in those filings" warned of the specific risk of the "fraud orchestrated by the company's" executives that the plaintiff alleged was concealed. *Id.*; *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1054 (N.D. Cal. 2018) ("Defendants do not explain how Gigamon's cautionary statement about the potential failure to 'close' transactions, which presumably refers to future transactions, provides a

---

[20] Plaintiff alleges that one such risk disclosure (¶¶154-55) is misleading for this very reason.
[21] *West v. Ehealth, Inc.*, 2016 WL 948116, at *9 (N.D. Cal. Mar. 14, 2016) is not compelling because the decision only pertains to forward-looking statements that qualify for the safe harbor. *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 637 (D.N.J. 2002), is out-of-circuit and distinguishable for the same reason.

21

meaningful warning about orders existing at the time of Defendants' alleged misstatements.").

## II.   DEFENDANTS ACTED WITH THE REQUISITE SCIENTER

Defendants acted with scienter if they "acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987. The Court is to undertake a dual inquiry, first "determin[ing] whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter," and "second, if no individual allegations are sufficient, [conducting] a ***holistic*** review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009). The inference must be "cogent" and "***at least as likely as*** any plausible opposing inference[,]" thus, a tie goes to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007). No "smoking-gun" is required, *id.* at 324; and "vague or ambitious allegations" are "properly considered[,]" *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

Under *respondeat superior* principles, the scienter of Tahoe's and MSR's employees may be attributed to Tahoe itself to establish the Company's liability under §10(b) and Rule 10b-5 when those employees were acting within the scope of their authority. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1173 (D. Or. 2015).[22]

### A.   Defendants Had Access To Or Recklessly Disregarded Information Regarding The Xinka In The Escobal Project Area And The Consultation Requirements

Plaintiff may plead scienter by showing either that Defendants had actual knowledge of or ***likely had access to*** facts that contradict their statements or render them misleading. *See Amgen*, 2014 WL 12585809, at *9 ("Plaintiff is not required to plead actual knowledge . . . ; it need only plead a strong inference that" it is "likely [Defendants] had access to and were put on notice" of the adverse facts). "The most direct way to show . . . that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the

---

[22]   Defendants' citation to *In re Alliance Equipment Lease Program Securities Litigation v. Royal Indemnity Co.*, 2002 U.S. Dist. LEXIS 28582, at *40-41 (S.D. Cal. Oct. 11, 2002) is not on point because it relates to a derivative control person claim, not *respondeat superior*.

statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). In pleading access to contradictory information, the plaintiff need not allege that the defendant "actually received" the information, proof of "close topical and temporal proximity" is sufficient. *Amgen*, 2014 WL 12585809, at *10.

Plaintiff may also plead scienter by alleging that Defendants were deliberately reckless to the fact that their statements may mislead investors. *See Berson*, 527 F.3d at 987. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569; *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (recklessness "where defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud").

### 1. Tahoe Executives Had Access to or Recklessly Disregarded the Consultation Requirements

Five of Tahoe's directors and/or officers, including McArthur, previously served as directors and/or officers of Glamis Gold Ltd. ("Glamis"), which later became Goldcorp, during the time that the indigenous population around Glamis's Marlin Mine began to protest that they had not been consulted under ILO 169. ¶¶196-98. These protests led to two reports, one of which was commissioned by Goldcorp when McArthur was CEO, discussing the consultation requirements under ILO 169. ¶¶198-200. Thus, McArthur had detailed knowledge of the ILO 169 requirements, and the knowledge of the other shared officers and directors can likewise be imputed to Tahoe and the other Defendants. *See FSP Stallion 1 v. Luce*, 2009 WL 1219683, at *5 (D. Nev. May 1, 2009) (the defendants "experience and knowledge of the Las Vegas golf market through their operation of other golf clubs in the city" lent to an inference of scienter); *see also Allstate Life Ins. Co. v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1143 (D. Ariz. 2010) (defendants' knowledge of a report previously prepared by an affiliate of the defendant company lent to an inference of scienter). At the very least, given that Marlin was a mine in Guatemala that famously came under fire for violating ILO 169, this information was of the type that all of the Defendants had a duty to monitor, and had they not reviewed the reports, would have acted recklessly. *See In re Silver Wheaton Corp. Sec.*

23

*Litig.*, 2016 WL 3226004, at *10 (C.D. Cal. June 6, 2016) ("In light of the stark similarities between this case and the Cameco case, defendants were arguably on notice that they too could be subject to a significant reassessment based on their transactions with Silver Wheaton's foreign subsidiary[.]").

**2.      Defendants Had Access to or Recklessly Disregarded Contemporaneous Facts About The Xinka**

The AC contains a plethora of allegations showing that Defendants were aware of or were at least reckless to the presence of Xinka in the Escobal Project Area.  Defendants, confronted with the overwhelming evidence of their wrongdoing, simply ask the Court to turn a blind eye to these compelling facts and instead rely on their far less plausible explanations of the events at issue.

*Xinka Tribal Lands*:  The Xinka tribal lands that sit within the Escobal Project Area have been documented in land records since the Spanish crown.  ¶43.  Thus, these tribal lands would have been documented in Tahoe's land concessions making up the Project.  *See* ¶¶42-45.  Tahoe also carved the Exploitation License area from an expired license that overlapped the tribal lands of San Carlos Alzatate.  ¶¶34, 42.  When determining which area of the expired license to designate as the Exploitation License, Defendants would necessarily have seen the land designated as the Xinka's San Carlos Alzatate.  This is exactly the type of "contemporaneous reports or data" from which courts routinely infer scienter.  *See Reese*, 747 F.3d at 574 (defendant was deemed aware of potential corrosion of pipeline when provided with a report documenting potential corrosion).  For example, in *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017), while the plaintiff did not provide the dates and times that defendants reviewed the adverse inventory data, the court still inferred scienter because the defendants had access to the data in their internal system.

*Xinka Consultation Requests*:  The Legal Representative of the Xinka Parliament, Villalta, referenced two meetings in 2012 that were attended by Xinka leaders and Tahoe representatives at which the Xinka Parliament requested that MEM consult the Xinka regarding the Project.  ¶¶84, 85, 203.  These meetings suffice to put Defendants on notice that the Xinka were present and asserting their consultation rights.  *See In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 321 (9th Cir. 2007) (defendants presence at meeting was sufficient to infer their knowledge of topic discussed at meetings); *Amgen*, 2014 WL 12585809, at *10 ("[T]he allegations . . . paint a very strong picture

24

that the Run 4 data was at least mentioned" at the meeting, thus defendants were deemed to have been aware of the Run 4 data).

Defendants were aware that MEM and Tahoe did not consult with the Xinka during the Class Period because they admitted as much at the Supreme Court hearing. ¶189. *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at \*32 (N.D. Cal. Mar. 21, 2018) (the defendants' admission after-the-fact that integration was not complete supported an inference of scienter).

*Xinka Opposition*: There can be no doubt that Defendants were aware of the Xinka's opposition to the Project because Tahoe itself repeatedly took action to stymie their efforts, including, *inter alia*: (1) filing a legal action against the plebiscite in Casillas which was arranged with the assistance of the Xinka Parliament (¶¶93, 205); (2) inducing women to file restraining orders against community leaders to prevent them from attending a plebiscite in SRLF which was organized by Xinka leaders, among others (¶¶86, 87, 205); (3) acting as a joint plaintiff in an action against the Xinka Parliament's President (¶¶96, 208); (4) participating in the kidnapping of four Xinka leaders (¶¶101, 209); (5) opposing a legal claim filed by Villalta where he identified himself as Xinka (¶¶113, 2013); and (6) responding to Norway's Council on Ethic's investigation by discussing the presence of Xinka in the Escobal Project Area (¶¶117-19, 214). *See Matrixx*, 563 U.S. at 49 (defendants' knowledge of and concern over an issue could be inferred when the company hired a consultant to investigate the issue and published a press release denying the issue). The Xinka also hosted three press conferences and organized a rally in SRLF to voice their opposition to the Licenses. ¶¶94, 97, 102, 113, 206-07, 240. In *In re Am. Apparel, Inc. S'holder Litig.*, the court found that it "strains credulity to infer that the company's management remained completely ignorant of [the] immigration compliance problems during the *entire pendency* of the ICE investigation." 2013 WL 174119, at \*19 (C.D. Cal. Jan. 16, 2013). Here, it is equally incredible that Defendants did not know that the Xinka were asserting their consultation rights when they were outside the gates of the Escobal Mine, *inter alia*. *See also*, *Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1085 (N.D. Cal. 2015) (presuming "the problem was so obvious and the decision to conceal it so significant" because it elicited protests from employees which "underscore[d] the importance of the issue").

***Employee Observations***:  Statements by Tahoe's employees that they saw indigenous peoples living in the area around the Escobal Mine, and it was obvious to everyone else, support Defendants' scienter.  ¶¶74-78, 215.  When a plaintiff relies upon statements by confidential witnesses to establish scienter, the complaint must pass two hurdles: "First, the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements . . . must themselves be indicative of scienter."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144–45 (9th Cir. 2017).  The statements pass both hurdles.

First, not only are all but one of the witnesses identified by name, and thus not confidential, the AC alleges that the witnesses all worked at the Escobal Mine prior to and during the Class Period, and thus were in a position to observe the people living in the area around the Escobal Mine itself.  ¶¶74-78.  Defendants' argument that Leonardo Menegazzo Grindley left the Company before it obtained the Exploitation License is irrelevant because there are no allegations that the indigenous population dramatically decreased in two years; regardless, he was present at the Company when the Exploration License was granted.  *Reese*, 747 F.3d at 575 (although revealed after the misstatements, "given the relatively constant, long-term nature of the information[,]" the court inferred that it existed at the time of the misstatements).

Second, the witness statements indicate that the presence of indigenous people was obvious to anyone working at the Escobal Mine (¶¶74-78); thus the Court can infer that Defendants had also been made aware of the indigenous people either through their own visits or employees who reported to them.[23]  *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (confidential witness statements supported inference of scienter when their statements indicated what the executives may know).  Defendants also quibble with the exact geographic region to which the employees' statements refer, but each employee makes clear that they were aware of indigenous peoples in either SRLF (¶¶74, 78), Mataquescuintla (¶78), or the villages and countryside around the Escobal Mine (¶76), none of whom Tahoe or MEM consulted.  ¶¶189-90.

---

[23]    Defendants' authority is not compelling.  In *Zucco*, 552 F.3d at 996, the witnesses only had second-hand knowledge of the information they relayed, whereas here the witnesses themselves saw indigenous peoples.  In *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) the witnesses were described with sufficient specificity because, like the AC here, the complaint provided "his or her job description and responsibilities[.]"

***IACHR Petition and PPT Claims***:  There is no question that Defendants were aware of the IACHR petition filed by the Xinka because they "bridge[d] the [scienter] gap [themselves] by referencing the" petition in an SEC filing (although without explaining its purpose).  ¶216; *Reese*, 747 F.3d at 572.  Furthermore, the PPT advised Tahoe of its allegations that the Company had violated the Xinkas' human rights and the PPT invited the Company to attend a hearing on the issues.  ¶¶121-22, 216; *see No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 (9th Cir. 2003) (presuming that directors knew of FAA reports received by company because "[i]t is absurd to suggest that the Board of Directors would not discuss . . . the FAA investigations or negotiations").

Even assuming, *arguendo*, Defendants were unaware that Xinka lived in the Escobal Project Area, Defendants nonetheless acted recklessly because "[a] defendant who asserts a fact as of his own knowledge . . . ***when he knows that he does not in fact know whether what he says is true***, is found to have intent to deceive, not so much as to the fact itself, but rather as to the extent of his information."  *Helwig v. Vencor*, 251 F.3d 540, 558 (6th Cir. 2001); *see Patel v. Axesstel*, 2015 WL 631525, at *9 (S.D. Cal. Feb. 13, 2015) (when defendants spoke about contracts, "it was deliberately and consciously reckless for them to fail to at least confirm that such contracts existed").

Defendants argue that scienter cannot be established because they were unaware that the Supreme Court would eventually determine that MEM violated ILO 169.  Defendants miss the point: Plaintiff must only show that Defendants had access to or were reckless to contradictory facts that existed at the time the statements were made, not that those facts were guaranteed to lead to legal or regulatory action.  As one court stated, if "Plaintiff were required to allege that Defendants knew a Warning Letter was imminent, then it would be virtually impossible to establish scienter at the pleading stage."  *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *14 (C.D. Cal. Apr. 12, 2016).

### 3.    Tahoe Had Access to Its Employees' Collective Scienter

Ninth Circuit courts have explained that in certain circumstances "[a] corporation's knowledge need not be possessed by a single officer or agent; the cumulative knowledge of all its agents will be imputed to the corporation."  *Nordstrom, Inc. v. Chubb & Son*, 54 F.3d 1424, 1435 (9th Cir. 1995).  Thus, "[b]ecause an agent has a duty to inform his principal of all material facts, the

27

law presumes that the agent has in fact done so." *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 981 (N.D. Cal. 2015); *see also Curry v. Hansen Med., Inc.*, 2012 WL 3242447, at *12 (N.D. Cal. Aug. 10, 2012) (although the complaint did not allege whether the officer shared his knowledge with anyone, his knowledge could be imputed to the corporation). Therefore, Tahoe's employees' knowledge of the Xinka in the Escobal Project Area, whom MEM did not consult as required by Guatemalan Law, and Tahoe did not consult as required by CSR regimes, is imputed to Tahoe.

### 4.   Defendants Had Access to the Knowledge of Tahoe's Employees

Scienter may be inferred against not just the corporation but other individual defendants when the facts indicate that the information would have been passed on to them. In *In re Cadence Design Sys., Inc. Sec. Litig.*, when the plaintiffs alleged that one officer had knowledge of problems facing the five most important deals, scienter could be inferred as to other officers because it was likely that he "informed at least some of the other Individual Defendants of the facts that rendered the" deals speculative. 692 F. Supp. 2d 1181, 1192-93 (N.D. Cal. 2010); *Robert W. Baird*, 756 F. Supp. 2d at 1144 (when one of the four founding members was in possession of information, "it seems hard to believe that senior officials, who allegedly managed the day-to-day operations of this relatively small, family-owned company, were unaware of the alleged misrepresentations[.]"). Here, the knowledge of the Company representatives who worked at Glamis/Goldcorp (¶196); attended the 2012 meetings with the Xinka (¶¶84, 85); filed the claim against the Xinka Parliament President (¶95); arranged to meet the kidnapped Xinka Parliament members (¶101); opposed Villalta's legal claim against MEM (¶113); responded to the Council on Ethics report (¶117); and received the IACHR petition and PPT notice (¶¶216, 122) can be imputed to the Individual Defendants. It defies logic that senior management would not know what meetings and kidnappings employees were attending regarding Tahoe's largest asset and what legal claims the Company was involved in. *See Silver Wheaton*, 2016 WL 3226004, at *11 ("It seems highly unlikely that these executives would not have informed their superiors at Silver Wheaton" of the tax authority's assessment).

### 5.   Defendants Had Access to Information About Tahoe's Core Operations

Additionally, Plaintiff's "[a]llegations regarding management's role in [the] corporate structure" satisfy scienter under the following prongs of the core operations theory: (1) the

28

allegations may be viewed as part of the holistic analysis; (2) they alone suffice "where they are particular and suggest that defendants had actual access to" the information; and (3) they alone suffice where "the relevant fact[s] [are] of such prominence that it would be 'absurd' to suggest that management" was unaware of them. *Reese*, 747 F.3d at 575-76.

The second prong of the doctrine closely mirrors the "access" standard for scienter, and as set forth in §II.A, Plaintiff has more than sufficiently pleaded Defendants' access to the information Defendants concealed regarding the Project. Under the third prong of the doctrine, when the subject of management's misleading statements is so integral to the company that it is "absurd to suggest" that management was not aware of the misrepresentation, scienter may be presumed without any direct facts showing the defendants' knowledge. *Berson*, 527 F.3d at 988 n.5.[24] Here, McArthur founded Tahoe for the sole purpose of buying the Escobal assets from his prior company; and the Project remained Tahoe's sole mining project until April 2015. ¶¶28-29, 193, 196. McArthur emphasized that "***100% of our focus*** has been on permitting and financing and building" the Project and "***110% of our efforts*** is" getting the Escobal Mine "into steady production[.]" ¶194; *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 1005 (D. Ariz. 2015) (Imputing scienter to the individual defendants without any evidence they received adverse facts because they were involved in preparing the financial statements and the omitted issues were important to the company).

As well, Tahoe "is not to be confused with Apple. The [I]ndividual [D]efendants [ ] are not officers in a large company who may be removed from the details of a specific business line or remote business activity." *Axesstel*, 2015 WL 631525, at *11 (with 35 employees, "the individual defendants would be among the first (and only) to know of the details of major contracts[.]"). The Nevada office at which all of the Individual Defendants worked only had 22 to 30 employees during the Class Period. ¶195. Given that the Individual Defendants were all high ranking officers, and devoted 100% of their focus to the Project, ***it would be absurd*** to think that they did not know of the presence of Xinka around the Project and that they had not been consulted by Tahoe or MEM. *See*

---

24    While Defendants misquote *Zucco*, 552 F.3d at 1000, to fabricate an overly-restrictive core operations standard—the case states that a plaintiff "might" allege specific admissions, not that a plaintiff is *required* to do so—Defendants admitted here that they "were involved in every detail" of the Project, because ***100%*** of their focus on was on the Project.

*Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, at *8 (S.D. Cal. Sept. 19, 2016) (it is absurd to suggest that CEO and CFO of a 97-person company did not know that an integral inspection of facilities had not occurred).[25]  Defendants' argument that they were unaware of the issues surrounding the Licenses because the issues were external and not part of Tahoe's operations is belied by Defendants' repeated statements about these issues, indicating that the Company considered them to be important to its operations.  ¶¶151-55, 106, 162-67.

      **B.**        **Defendants Had A Motive And Opportunity To Conceal Information Regarding The Escobal Project**

Motive is not required to demonstrate scienter.  *See Tellabs*, 551 U.S. at 325.  That said, "personal financial gain may weigh heavily in favor of a scienter inference[.]"  *Id.*  "Courts have recognized the powerful motive to distort a company's stock price when the stock will be used to acquire another company."  *In re Terayon Commc'ns Sys., Inc.*, 2002 WL 989480, at *10 (N.D. Cal. Mar. 29, 2002).  Tahoe paid over $1.6 billion in Tahoe stock, and only about $2 million in cash, to acquire two mining companies in 2015.  ¶¶217-19.  These acquisitions would not have been possible but for Defendants' fraud, because Defendants had to keep Tahoe's stock price high in order to execute these stock-based transactions.  *See Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) ("not every company has the desire to use its stock to acquire another company").[26]

"A motive to defraud based on compensation incentives such as bonuses and dividends also may strengthen an inference of scienter."  *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008).  For example, "[a] strong correlation between financial results and stock options or cash bonuses for individual defendants may" demonstrate motive.  *Zucco*, 552 F.3d at 1004.[27]  Here, even

---

[25]    Defendants' authority is inapposite.  In *Zucco*, 552 F.3d at 1001, the misrepresentations were definitional and thus would have only been obvious to technical experts, and in *Bao v. Solarcity Corp.*, 2016 WL 54133, at *8 (N.D. Cal. Jan. 5, 2016), the error omitted was "down in the weeds" of accounting and thus not sufficiently prominent to make management aware of it.  Here, however, the Xinka were vocally asserting their presence in the area and Tahoe was retaliating against them.

[26]    *See In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1175 (W.D. Wash. 1998) ("[D]efendants concealed Boeing's production problems so that the price of Boeing stock would remain high enough to make the merger attractive[.]").

[27]    Defendants' citation to *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) is not compelling because the Second Circuit applies a different scienter standard than this Circuit.  As well, *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) did not consider profit motives from bonus compensation.

more specific than general "financial results," McArthur, Clayton, Sadler, and Hofmeister were eligible to receive a bonus up to 100% of their base salary if the Exploitation License was granted in the first quarter of 2013 and 50% if granted in the second quarter.  ¶221.  Thus, they were personally motivated to obtain the Exploitation License as quickly as possible and to stymie any roadblocks such as consulting the Xinka.  *See Am. W.*, 320 F.3d at 944.

### C.      The Resignation Of Tahoe's Interim CEO Supports An Inference Of Scienter

Resignations can support an inference of scienter when they are "uncharacteristic [] compared to the defendant's typical hiring and termination patterns or [] accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002.[28]  Alex Black only survived as CEO of Tahoe for four months after he attempted to implement a new corporate policy of building "communication, transparency and trust" with the communities around Tahoe's mines.  ¶223.  Black's rant on twitter after his resignation criticizing Tahoe for destroying "the harmony we established with the community and workers" at La Arena and calling management "Arrogant Americans!!" betrayed the real reasons for his departure: Tahoe was not interested in implementing his community outreach strategy.  ¶225.  These are exactly the type of unusual and suspicious circumstances that support a finding of scienter, and specifically indicate that Tahoe did care to engage in dialogue with the communities around its mines, including the Xinka in the Escobal Project Area.  *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (resignations after the SEC staff recommended filing an injunction against the defendant supported and inference of scienter).

### D.      Defendants SOX Certifications Support An Inference Of Scienter

In the Ninth Circuit, certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") are "probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Glazer*, 549 F.3d at 747.  McArthur, Clayton, Sadler, and McGregor certified that Tahoe's SEC filings "do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that was necessary to make a statement not misleading[.]"  ¶¶227-231.  These "certifications filed with the SEC support [these defendants]

---

[28]      *Zucco* does not support Defendants' argument that Black's resignation was not indicative of scienter because in *Zucco* the plaintiffs did not provide any facts indicating that the CEO resigned due to fraud and not simply because he was "nearing retirement age."  552 F.3d at 1002.

31

scienter, because those certifications required them to access sufficient reporting information to certify that the information provided did not omit any material facts" such as information indicating that, *inter alia*, Xinka lived in the Escobal Project Area and were not consulted by MEM or Tahoe. *Bielousov*, 2017 WL 3168522, at *7; *see also Silver Wheaton*, 2016 WL 3226004, at *12 n.9.

When considering all of the aforementioned facts and inferences in §II holistically, the only logical conclusion is that Defendants acted with scienter. *Tellabs*, 551 U.S. at 326.

## III.  DEFENDANTS' FRAUD PROXIMATELY CAUSED PLAINTIFF'S LOSSES

As the Court of Appeals recently explained, the standard for loss causation under the Exchange Act "requires no more than the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Thus, "loss causation is a context-dependent inquiry as there *are an infinite variety of ways* for a tort to cause a loss. . . . the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.*[29] Here, Plaintiff adequately pleads that his losses were proximately caused by Defendants' fraud, and also satisfies the requirements of the corrective disclosure and materialization of the risk theories that have been adopted by this Circuit. *See* ¶¶241-247.

First, to plead that Defendants' fraud proximately caused Plaintiff's loss, he just must allege "particular facts indicating that but for the circumstances that the fraud concealed . . . [plaintiffs'] investment . . . would not have lost its value." *Berson*, 527 F.3d at 989. Here, Plaintiff pleaded that Tahoe's stock declined on July 6 and 7, 2017 in response to Tahoe's announcement that the Supreme Court had granted CALAS's request to provisionally suspend the Licenses due to MEM's failure to consult with the Xinka residing in the counties of SRLF, Casillas, Nueva Santa Rosa, and Mataquescuintla. ¶¶142-45. Then, on August 25, 2017, Tahoe's stock price fell again in response to

---

[29]  *First Solar*, 881 F.3d 753-54, explained that some of the more restrictive loss causation decisions in the circuit, cited by Defendants here, were determined based upon the way the plaintiffs pleaded the element. It distinguished *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1059, 1063 (9th Cir. 2008), explaining that the plaintiff pleaded that the defendants' *fraud was disclosed* to the market when an internal investigation was announced, but an investigation does not confirm fraudulent activity. Similarly, in *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) the plaintiff pleaded that the defendants' *fraud* was disclosed through disappointing earnings, but earnings announcements do not necessarily reveal that the books were cooked. As well, the plaintiffs in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) made no effort to plead how the fraud caused their losses.

Tahoe's disclosure that the Constitutional Court affirmed the Supreme Court's decision to suspend the Licenses.  ¶¶147-48.  These revelations touch upon the same issues that were omitted from Defendants' misrepresentations regarding, *inter alia*, the illegal issuance of the Licenses (¶¶151-56); the indigenous population in the Escobal Project Area (¶¶159, 160); the community's response to the Project (¶¶163-67); Tahoe's actual efforts to engage with the communities in the Escobal Project Area (¶¶170, 172-75); and Tahoe's noncompliance with CSR regimes (¶¶178, 180, 182-85), because the disclosures revealed that Xinka lived in the Escobal Project Area who were not consulted by MEM or Tahoe, and were actively opposing the Licenses.  Thus, Defendants' failure to disclose this information proximately caused Plaintiff's losses.  *See Bielousov*, 2017 WL 3168522, at \*7 (finding loss causation when the "misrepresentation or omission kept the share price artificially inflated and that as a result of a corrective disclosure, the share price fell.").

Second, under a corrective disclosure theory, Plaintiff must merely plead that when the relevant truth began to leak out, it caused the price of Tahoe's stock to depreciate, causing Plaintiff's loss.  *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  No admission or finding of fraud is required; corrective disclosures can come from *any* source and take *any* form from which the market can absorb the information and react.  *Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014).  To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must relate back to the misrepresentation and not some other negative information.  *First Solar*, 881 F.3d at 753.  The disclosures on July 5, 2017 (¶¶142-45), partially corrected Defendants' misrepresentations during the Class Period because it revealed the facts that were omitted from those disclosures, *i.e.*, that Xinka lived in the Escobal Project Area who were not consulted by MEM or Tahoe, and thus were actively opposing the Licenses.  The disclosure on August 25, 2017 (¶¶147-48) corroborated that the July 5, 2017 disclosure was corrective because it confirmed that Xinka lived in the Escobal Project Area who were not consulted by MEM or Tahoe before MEM issued the Licenses.  ¶147; *see Lloyd*, 811 F.3d at 1210.

Third, under a materialization of the risk theory, a plaintiff can "establish loss causation by alleging that the defendant's misrepresentations concealed a risk that materialized and played some

part in diminishing the value of the security." *Amgen*, 2014 WL 12585809, at *20.[30]  If "the zone of risk [] would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within the zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  Here, Defendants concealed, *inter alia*, that Xinka lived in the Escobal Project Area who were actively opposing the Licenses because they were not consulted by MEM or Tahoe.  ¶¶155, 157, 161, 168, 171, 176, 179, 181, 186.  The omission of these facts concealed the risks inherent to the Licenses, which risks materialized through the revelation of the Supreme Court's and Constitutional Court's decisions, and "played some part in diminishing the market value" of Tahoe stock.  *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1145 (N.D. Cal. 2013) ("[The CEO] resigned because his unethical conduct was revealed to the Board after he concealed it from the public" and "the stock price dropped because [he] resigned[;]" thus, the risk from his unethical conduct materialized through his resignation, causing Plaintiff to lose money").

## IV.    PLAINTIFF STATES A CLAIM UNDER SECTION 20(A)

As explained above, Plaintiff states viable primary claims against Tahoe in Count I; Plaintiff therefore states viable control person claims against the Individual Defendants in Count II.  *See Immune Response*, 375 F. Supp. 2d at 1031.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.  Alternatively, Plaintiff requests leave to amend.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2002).

Dated: December 31, 2018                        Respectfully submitted,

By: /s/ *Richard W. Gonnello*
Richard W. Gonnello

---

[30]    "While the Ninth Circuit has only addressed the materialization of the risk approach in the abstract," *see Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1122 n.5 (9th Cir. 2013), "numerous district courts in the Ninth Circuit . . . have expressly endorsed this approach." *Amgen*, 2014 2014 WL 12585809, at *20 (collecting cases).

34

Richard W. Gonnello (*pro hac vice*)
Megan M. Sullivan (*pro hac vice*)
Sherief Morsy (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: rgonnello@faruqilaw.com
        msullivan@faruqilaw.com
        smorsy@faruqilaw.com

Martin A. Muckleroy
State Bar #9634
**MUCKLEROY LUNT, LLC**
6077 S. Fort Apache Rd., Ste 140
Las Vegas, NV 89148
Telephone: 702-907-0097
Facsimile: 702-938-4065
Email: martin@muckleroylunt.com

*Attorneys for Lead Plaintiff Kevin Nguyen*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 31, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

By:     */s/ Richard W. Gonnello*
Richard W. Gonnello