——————2:17-cv-01868-RFB-NJK——————

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


IN RE: TAHOE RESOURCES,          )
INC. SECURITIES LITIGATION,      )  Case No. 2:17-cv-01868-RFB-NJK
                                 )
                                 )  Las Vegas, Nevada
                                 )  Wednesday, June 19, 2019
                                 )  2:35 p.m.
                                 )
                                 )  MOTIONS HEARING
                                 )
_____  )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE


APPEARANCES:        See next page


COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                    United States District Court
                    333 Las Vegas Boulevard South, Room 1334
                    Las Vegas, Nevada  89101

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

PATRICIA L. GANCI, RMR, CRR      (702) 385-0670

APPEARANCES:
For the Plaintiffs:

**MARTIN MUCKLEROY, ESQ.**
MARTIN MUCKLEROY
6077 South Fort Apache Road, Suite 140
Las Vegas, Nevada 89148
(702) 909-0097

**RICHARD GONNELLO, ESQ.**
**MEGAN SULLIVAN, ESQ.**
**DILLON HAGIUS, ESQ.**
FARUQI & FARUQI, LLP
685 Third Avenue, 26th Floor
New York, New York 10017
(212) 983-9330

For the Defendants:

**LESLIE BRYAN HART, ESQ.**
FENNEMORE CRAIG, P.C.
300 E. Second Street, Suite 1510
Reno, Nevada 89501
(775) 788-2228

**SCOTT JARED FISHER, ESQ.**
**KARL BARNICKOL, ESQ.**
NEAL, GERBER & EISENBERG, LLP
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60602
(312) 269-8000

2:17-cv-01868-RFB-NJK

LAS VEGAS, NEVADA; WEDNESDAY, JUNE 19, 2019; 2:35 P.M.

--oOo--

P R O C E E D I N G S

COURTROOM ADMINISTRATOR:  Now calling in the matter regarding Tahoe Resources, Incorporated versus -- actually, no versus -- Case Number 2:17-cv-01868-RFB-NJK.  This is the time for the motion hearing regarding Docket 65, motion to dismiss, and Docket 68, motion to strike Docket 65, motion to dismiss.

Starting with counsel for plaintiffs, please note your appearance for the record.

MR. GONNELLO:  Good morning, Your Honor.  Richard Gonnello with Faruqi and Faruqi on behalf of the lead plaintiff, Kevin Nguyen.

MS. SULLIVAN:  Good afternoon, Your Honor.  Megan Sullivan with Faruqi and Faruqi on behalf of the lead plaintiff.

MR. HAGIUS:  Good afternoon.  Dillon Hagius with Faruqi and Faruqi on behalf of the lead plaintiff.

MR. MUCKLEROY:  Martin Muckleroy on behalf of plaintiff.

MR. FISHER:  Good afternoon, Your Honor.  Scott Fisher on behalf of the defendants.

MR. BARNICKOL:  Good afternoon, Your Honor.  Karl Barnickol also on behalf of the defendants.

MS. BRYAN HART:  Good afternoon, Your Honor.  Leslie Bryan Hart and Fennemore Craig also on behalf of the defendants.

————————2:17-cv-01868-RFB-NJK————

THE COURT:  Good afternoon.  And I appreciate you all working with the technology on this as of course I'm not there, but the technology being what it is it does allow us to proceed with arguments in this case.

Who's going to be arguing the motions on behalf of the defendants in this case?

MR. FISHER:  Good afternoon, Your Honor.  It's Scott Fisher.  I'll be making the argument today.

THE COURT:  Mr. Fisher, why don't you come up to the podium, please.

MR. FISHER:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

So, Mr. Fisher, why don't we get started with there are a couple of issues here that I want you to focus on.  There's a fair amount of briefing.  We don't need to go through all of it. It does seem to me just to give you a little bit of a preliminary sense of the issues that I am focussed on relate to -- I'm slightly collapsing some of the allegations because I think some of them are interrelated.  So the allegations regarding the misstatements with respect to the issuance of the license and allegations regarding whether or not there are indigenous people who were in the area of the Escobal Project and allegations regarding consultations that may or may not have occurred with indigenous people seem to me to be the umbrella allegations.  Now, there are some sub, sort of, categories that

2:17-cv-01868-RFB-NJK

relate to sort of risks associated with the license that may have been allegedly misstated or omitted, but some of these categories are interrelated.

And so what I want to do is start with Tahoe itself and address whatever arguments you may have in that regard. I have to say it's a little more difficult for me to see how distilling down the allegations of those areas there wouldn't be enough here to proceed on those claims against Tahoe, but why don't you focus on what you think are the main aspects of the problems with those categories that I've identified in terms of the allegations.

MR. FISHER: Sure. Thank you, Your Honor.

I certainly do appreciate the opportunity to address the court and certainly concede a lot of ink has been spilled in the briefing to Your Honor. I think there are four basic points I'd like to make to address those allegations of the plaintiffs.

The first and I think the most significant and dispositive issue in this case, Judge, is that the very risk that the plaintiffs claim -- the plaintiff claim caused his loss was disclosed.

THE COURT: Okay. Well, let's talk about that.

MR. FISHER: Okay.

THE COURT: It's -- are you talking about this boiler plate language? Because this -- and the disclosure relates to changes in Guatemalan law and how the Guatemalan law may change.

2:17-cv-01868-RFB-NJK

And there's I think two or three phrases that relate to decisions issued by a Guatemalan court, but the allegations here focus on very specific alleged knowledge that the defendant and defendants had.

And is it your argument that that boiler plate language without referencing, for example, specific issues regarding the indigenous people or consultations is enough to cover the disclosure requirement?

MR. FISHER:  The direct answer to Your Honor's question is yes, but I'd like to elaborate if I might.

THE COURT:  Of course.

MR. FISHER:  First, it's not boiler plate language. The risk disclosures that are there -- and for the record for Your Honor and the court's staff, it's page 37 of Docket 65-1 of the ECF.  It's also on paragraph 154 of the plaintiff's complaint -- is rather specific and rather direct.

And the -- under the securities laws, Your Honor, the issue is not whether the -- in this case Tahoe delineated every potential item that could lead to the risk.  The issue is whether the total mix of information disclosed to the investing public adequately alerted the public to the risk.

The risk here is not, of course, that there was or was not adequate consultation.  The risk here, of course, is that the risk that --

THE COURT:  Well, why isn't -- why isn't that?  If

Guatemalan law requires consultation at different aspects of the licensing process, why is that not a relevant risk for disclosure?

MR. FISHER:  I think there's two reasons.  One is it wasn't relevant at the time because, again, the reasonable conclusion at the time was that based on --

THE COURT:  I'm sorry, Mr. Fisher.  I don't mean to interrupt you.  When you say "at the time," are you talking about at the time of the disclosure -- of the disclosure in 2013?

MR. FISHER:  That's correct.

THE COURT:  I just want to make sure we're talking about the same time.

MR. FISHER:  Yes.

THE COURT:  Right, because there's --

MR. FISHER:  In a world -- sorry to interrupt, Your Honor.  In a world --

THE COURT:  No.

MR. FISHER:  In a world before the decision by the Constitutional Court in July of 2017.

THE COURT:  Okay.  So, and I'm looking at I think it was -- I'm not sure if it was the first date, but from my notes in March 17, 2014, there's a filing in the 2013 Annual Report and I believe that contains the disclosure language you're talking about which reads:  "The validity of the licenses

——————————2:17-cv-01868-RFB-NJK——————

related to the Escobal mine can be uncertain and may be contested.  There is no assurance that applicable governmental bodies will not revoke or significantly alter the conditions of applicable licenses that are required by the Escobal mine. Changes to Guatemalan laws, including new mining legislation or adverse court rulings, could materially and adversely impact our rights to exploration and exploitation licenses necessary for the Escobal mine."

I assume that's the language you're talking about?

MR. FISHER:  That is one of the specific disclosures, Your Honor, but I think the -- in fairness, the total mix of information, so all of the disclosures, should be read together such that --

THE COURT:  Okay.

MR. FISHER:  -- their investor was on notice that this was a company doing business in a country that was unstable, that had domestic issues, where there were risks of changes in laws, changes in governments that could materially affect its operations.  And that's the critical risk here.  The critical risk is that for whatever reason, Judge, there would be a determination that Tahoe could not continue with its -- with its operations.  That would have an effect on the investor and that's what -- the very risk that brings them here today and that's the risk that was disclosed.

If I could, Your Honor, if, for example, when the

Constitutional Court decided it had decided as every other court in the past had decided that consultation was required, but that the license was not suspended, we wouldn't be here.  Because the risk, the relevant risk, is not whether consultation was required.  The relevant risk is the impact on the operations.  And that's the risk that was disclosed in the paragraph that the court identifies and consistently in the successive years.

I should add, Your Honor, that it's like the Matrix case that -- it's Judge Sotomayor's decision in 2001.  The real question is what's the impact or consequence of the judicial finding.  The issue is not whether -- and, again, if I might, Your Honor, the lawsuit that ended up in the Constitutional Court that was brought by CALAS, it started --

THE COURT:  Right.

MR. FISHER:  -- as an environmental dispute.  It was -- it did not start with Tahoe as a defendant.

And so the issue is not how that -- that case was presented to the court or what the underlying nature of the dispute was.  The critical question is the consequence.  As a factual matter, though, Your Honor, going back to 2013, I think there is -- it's important to note that at the time Tahoe relied on the most recent government census.  It submitted its application to the Mining Ministry of Guatemala.  That government body then considered the application as was its obligation and it approved it.

2:17-cv-01868-RFB-NJK

Tahoe --

THE COURT:  What about the subsequent information that comes out about the lack of -- and I'm not sure how to pronounce the primary indigenous group's name, Xinka.

MR. FISHER:  Xinka I believe, Your Honor.

THE COURT:  Xinka.  Subsequent to the application, certainly there are interactions between Tahoe and these individuals allegedly potentially as alleged and there is continuing activity that would suggest that there were indigenous people present in the area of the mine, but there are continuing statements -- and I'm not going to go through all of them.  You know of the statements -- that there were no indigenous people in the area of the mine.

So how do you reconcile that?

MR. FISHER:  Yeah.  So a couple of points on that, Your Honor.

One, unlike every other -- any other security case -- securities case I've ever seen or read, there are no facts alleged in this complaint, even implying, that the alleged presence of Xinka in a relevant area was uniquely known to Tahoe.  Unlike every other case -- sorry, Your Honor.  Were you going to say --

THE COURT:  I'm sorry.  I'm sorry.  What would you -- I've had a few cases, and I don't know exactly what you're talking about.  Are you saying that they had to say that they

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:17-cv-01868-RFB-NJK

had e-mails or correspondence or -- there are a lot of inference cases at this stage of a litigation that relate to major operations of companies in foreign countries.  So it's not uncommon for this to occur.

So I'm not sure I understand when you say specifically allege what it is that you're saying that -- that they would have to allege.  Are you saying there would have to be some acknowledgment by Tahoe or one of its officers that in fact there was a dispute about an indigenous people being present?  So I'm not sure I understand what it is you're saying isn't specifically alleged.

MR. FISHER:  There's -- there's nothing alleged, Your Honor, that wasn't in the public domain.  So there's nothing alleged for which our client had any duty to disclose, point one.

In most cases --

THE COURT:  But let me ask you a question about that.  If you have the Xinka who are saying publicly we are present in the Escobal mine, then you have statements from Tahoe and its officers saying there are no indigenous people present in the area, even if it's in the public domain, isn't that either a misstatement or a mischaracterization such that even if the information is in the public domain you have these individuals asserting contradictory -- allegedly contradictory information. How is that not something the court can consider as it relates

2:17-cv-01868-RFB-NJK

to falsity or omissions?

MR. FISHER:  Yeah, I don't think the allegation is that our client said that there aren't Xinka, quote, in the area, Your Honor.  And this is an important distinction if I might make it.  The plaintiff spends most of his time in his complaint talking about an expansive area of land within Guatemala.  The relevant inquiry here under ILO 69 which the Mining Ministry considered is whether the area specifically of the mine included Xinka such that consultation was required.

The census on which our client relied, the government census on which our client relied, and on which the Mining Ministry relied answered that in the negative.

What our client said --

THE COURT:  Okay.

MR. FISHER:  Sorry, Your Honor.

THE COURT:  Then there are other reports that would be to the contrary, but you're saying that your client could reasonably rely upon the census -- I think it was -- I'm not sure -- the 2000, I think it was, 10 census and also upon the mining industry -- or the Mining Ministry's own investigation.  Is that what you're saying?

MR. FISHER:  Yes, Your Honor.  And I'm -- I guess I'm also saying that when you -- when you consider the Supreme Court's decisions following the PSLRA and the question about what are the plausible inferences, the most compelling, most

2:17-cv-01868-RFB-NJK

cogent plausible inference is that our client reasonably looked at a government census, submitted that to -- as part of its application to the Mining Ministry, and the Mining Ministry concluded that consultation was not required.

But, again, that only matters, Your Honor, it's only significant if that leads to something that causes a loss.  And here --

THE COURT:  Well, yes, but if -- if there's a misrepresentation in documents obtaining the license, I don't know how that wouldn't lead to causing a loss.  So I wouldn't focus on that argument honestly because I don't know that that's your most productive way to spend the time with me.  Because, from my perspective, if there is a legitimate -- and I'm not saying that I've make that determination yet, but if there's a plausible argument that there are misrepresentations about indigenous people in the area of the mine, it's hard for me to see how that wouldn't be sufficient in this case.

So I wouldn't focus as much on that.  But I would want to talk a little bit about what these representations mean or don't mean and go back to what you said about this idea that again, one, there's information you say in the public domain, but, two, the representation was accurate to the extent that it followed what was available -- reasonably available to Tahoe and the officials there.

MR. FISHER:  Yeah.  I think the question, Judge, is the

2:17-cv-01868-RFB-NJK

allegations by the plaintiff are that there was other information in the public domain.  The fact that the plaintiff has that and that it was in the public domain is a relevant factor for this court to consider, but the related question, Your Honor, is whether it materially moves the total mix of information available to an investor such that she or he would have made a different decision.

And there's nothing in this case alleged that suggests or that could be alleged, in fact, Your Honor, to suggest that standard is met.  And that's because the consequence of any of this information --

THE COURT:  So, Mr. Fisher, maybe I wasn't as clear as I was trying to be because I think you're rearguing to me something which I just had asked you probably not to reargue to me about what the consequence could be about a misrepresentation about indigenous people.  So I don't want to have us go back and forth on that.

MR. FISHER:  Understood, Your Honor.

THE COURT:  Because I think we're going back to an area that I don't think is productive.  I mean, what's helpful for me honestly, Mr. Fisher, is to go through this extensive record and to pull out again in case I and my staff missed things the best parts of the arguments you're raising as it relates to some of the factual allegations and the arguments to those.

I would not -- and I just want to be clear, from my

2:17-cv-01868-RFB-NJK

perspective, if the statements about indigenous people are incorrect or misleading or inaccurate, I don't find there is an issue here in this case about causation -- loss causation and so I wouldn't spend time on that.  I would spend more time on, again, the record being what it is, talking about what could be reasonably alleged to be known or not known such that the statements would be misleading or deceptive or materially omit information.

MR. FISHER:  Certainly, Your Honor.

As I started earlier and I'll pick up the point, I mean, the significant allegation as Your Honor identified relates to the alleged knowledge about the presence of Xinka in the relevant area.  If you'd like me to, I will elaborate, but I do think there's an important distinction there that's dealt with in the briefing about what is the relevant area and the plaintiff --

THE COURT:  And so talk to me about that in terms of what that means in terms of the disclosure.

MR. FISHER:  Sure.

THE COURT:  Because there is some back and forth between the parties about relevant area and certainly -- excuse me.  There doesn't seem to be any dispute about the fact there's no Xinka in the exact -- and I'll let the plaintiff's counsel address this, but in the sort of identified boundaries of the mine itself.  There don't appear to be any allegations that

2:17-cv-01868-RFB-NJK

there are Xinka in that area, but what the allegation seems to me to be is that they are so close to the mine's border to be effectively in the area that would legally impact their identification to the Mining Ministry in Guatemala and whatever related Guatemalan law would be required to be complied with as it relates to consultation.

MR. FISHER:  Yeah, and that's -- I think that is their argument today, Your Honor.  So as was dealt with, there's a gradual process on the issuance of the licenses.  And, for example, the area for an exploration license is broader than the area for an exploitation license which is the license -- the latter is the license that's relevant here.

And the area that the statements relate to from our client and the area that related to the issuance by them is the area for the exploitation license.  And so much of the plaintiff's briefing is spent on a much, much more expansive area than what could have possibly been included within statements relating to the exploitation license.

THE COURT:  So from your perspective, Mr. Fisher, focusing on the exploitation license and reviewing the allegations in this case, what is the closest to the border of the exploitation license do you think the plaintiffs allege is there a present of Xinka people?

MR. FISHER:  I don't think they plead that with any specificity whatsoever, Your Honor.  I think they use a term to

define -- to define -- and I'm just grabbing -- grabbing another book, Your Honor -- to define --

THE COURT:  Take your time.

MR. FISHER:  -- a very broad area.  I don't want to misspeak, Judge.  So I want to make sure I get it for you.

Your Honor, they -- what the plaintiff refers to is what they call the Escobal Project Area.

THE COURT:  Right.

MR. FISHER:  And that is different than what is known as the area of influence which is the area that related to the issuance of the license, and that is the referenced area in each of the public statements that are alleged to be misleading because they omitted material facts.

And so the challenge in more succinctly responding to Your Honor's question is among our client's challenges to the complaint, which is while it's long, it lacks the specificity that the PSLRA and the decisions interpreting the PSLRA require in this case.  In the terms of a common law fraud case, Your Honor, the who, what, when, where, and how.

And what the plaintiffs attempted to do, I believe, is create this Escobal Project Area because it fits more neatly with the nongovernmental and third-party studies that they rely on to suggest that Xinka was present.

But, again, if we stick to that for a minute, Your Honor, and don't turn to loss causation, but talk about scienter

2:17-cv-01868-RFB-NJK

and what could possibly be alleged, there weren't facts that were uniquely known.  There's no allegation that were uniquely alleged to show that our clients knew that the license was illegally issued or knew that the Xinka people in this expansive area had a clear right to consultation or, significantly, that a court would later suspend their license or consultation.

And so while they --

THE COURT:  But so here's the question I have for you.  The statements that are alleged don't actually focus on the area of the mining license.  They actually say -- and it's variations of the statements, which is the company or whomever is not aware of any significant indigenous population residing in the area of the project.  And so it's not as if that statement also focuses on the area of the license either.

And the other issue is isn't there a body of water that directly abuts the license area that would impact the surrounding areas where the Xinka people are present.

And so one of the things I'm also going to do is there is an attorney who is sitting behind you who's shaking his head up and down when I'm speaking.  I'm not sure who it is, with dark hair.  That's really -- at defense table.  It's really distracting, and I find that to be distracting and a little disrespectful.  So I'd ask you not to do that, particularly on the video.

So, Mr. Fisher, if you could address the nature of that

statement.  And if what I understand you to be saying is that statement should be read in conjunction with the delineation of the borders of the exploitation license to mean the area of the exploitation license.  And when you say project in that statement, it's the license area.  Is that what you're saying?

MR. FISHER:  I think it has to be, Your Honor, yes, when it's read in context.

THE COURT:  Okay.

MR. FISHER:  And I think your question about the water is a really important point for me to make, if I might.  And that is --

THE COURT:  Go ahead.

MR. FISHER:  And that is there are indigenous people in Guatemala that aren't just Xinka, and there are waterways where there are NGOs and other third parties who have environmental concerns.  There are a host of events and circumstances outside of our client's control that could have materially affected its business.  And so when a company is making its disclosure, Judge, the issue is what would be the relevant risk to the investor, and it must balance the risk that by focusing on a particular group of people, in this case the plaintiffs allege the Xinka, the law holds that there's a risk that you would to a reasonable investor be minimizing her or his concerns about other risks.

But, ultimately, as I started, the reason that the

2:17-cv-01868-RFB-NJK

securities laws don't require that sort of specificity, but rather require the risk to the business is because that's what matters.  That's what affects people's pockets, which is the ability to operate the mine, to generate revenue, and to create a return for investors.  And that's the very risk that was disclosed all along.

If I can complete my thought before Your Honor's question on scienter.

THE COURT:  Certainly, but here's what I'll tell you.  I think the scienter question goes apart from the issue of -- we have other issues about knowledge and financial motive, and I don't really want you to spend that much time on those because those are fairly straightforward.  I mean, either -- I consider them, but I think this other avenue of conversation is more helpful and that really relates to to what extent should I be considering all of the information that the plaintiffs have asserted as relates to sort of one -- there are a couple of issues, one I want you to address.

One is the issue of contacts with the company about being present in the area of the mine.  The other relates to the -- there's one apparent activity of, quote/unquote, eviction or removing people from the area and to what extent, Mr. Fisher, do those protest activities not create a potential inference as it relates to the knowledge of these individuals about indigenous people being present.  Because there's no doubt that

2:17-cv-01868-RFB-NJK

there's certainly protest activity.  There's no doubt that there was some protest activity that led to security individuals at the mine taking action.  The question is what am I to take from that in terms of legal significance for the scienter aspect to the argument.

MR. FISHER:  Yeah.

Not much.

THE COURT:  Well, and let me ask you -- let me put in one final point --

MR. FISHER:  Sure.

THE COURT:  -- which is that I can't ignore obviously the fact that this was going to be not a small sort of mining project for Tahoe.  In other words, this was, I mean, I hesitate to use the word sort of, you know, golden egg, whatever you want to use, the phrase.  But this was certainly going to be the jewel of their mining operation and that was clear and they make statements about that.

And from that perspective obviously to me that means that Tahoe and these officers are going to be at least interested in what's happening there, and I'm not saying you are denying that.  But I then am offering you that as context for there are these -- just sort of a steady flow of information coming out of the area about protests, about differences, about Xinka being present.  And how do you respond to that as it relates to the plaintiff's allegations?

————————————2:17-cv-01868-RFB-NJK————————————

MR. FISHER:  Yeah.  The two main points, Your Honor, and then I'll elaborate if you'd like.  I'm being sensitive to your time.

The first is I'd commend to the court, as I said earlier, the full risk disclosures.  So on -- it's Document 65.2 on ECF.  These -- those specific events, Your Honor, were identified.  A, there was identified risks about third parties trying to manipulate local populations.  And, two --

THE COURT:  Okay.  Let me just -- so that's helpful because what I am -- what the plaintiffs are alleging is they are misidentified.  That's part of what they're saying, too, which is that it's not that they are identified.  There are these allegations that say, oh, you heard about these protests and -- but the reality is the majority of the indigenous people or many of the indigenous people support the project.  And their allegation is that's not true.  That this was also a misstatement.

And so can you tell me a little bit more specifically about which you think are disclosures and which you think address that issue?  Because they do make that allegation as it relates to statements about indigenous support for the mining project.

MR. FISHER:  Yeah, I think what I would say to that, Your Honor, is they -- what I would characterize the allegations again to try to -- I don't mean to put words in their mouth, but

just to try to summarize is they've got a collection of allegations --

THE COURT:  Right.

MR. FISHER:  -- that relate to I think in corporate parlance which is called corporate social responsibility.  And I think the principal point I would make as it relates to that, Your Honor, is that is not about what their underlying claim is. I know Your Honor didn't want me to talk about loss causation as it related to the other statements, but I do think it's a critical component and I would ask Your Honor to consider it in this context.

THE COURT:  Well, it's not that -- it's not that I don't want you to argue loss causation, but it seems to me and I'll let the plaintiffs address this, Mr. Fisher, if the statement about the misrepresentation -- alleged misrepresentation of indigenous people being present isn't fully supported of allegations, then the rest of the plaintiff's case quite honestly has much greater difficulty getting over the line as it relates to the allegations.  I'm focussed on that because if that's not true or can't be sufficiently supported, I don't know that there's enough in the remaining allegations for the case to move forward.  So that's -- just so you know --

MR. FISHER:  I understand.

THE COURT:  -- that's why I'm focussed on that because I think if there's no presence of indigenous people, then the

2:17-cv-01868-RFB-NJK

alleged misrepresentation about consultation or not are not as significant, right.  Because they're not there, there wouldn't be a need legally to consult with people.

MR. FISHER:  Right.

THE COURT:  And then the issue of not following the guiding principles also isn't necessarily relevant unless the guiding principles are tied to legal obligations to engage in consultations with the presence of indigenous people.  So it seems to me the focus of this, at least for me, is about those allegations because the rest of the allegations are supported by that fundamental from my standpoint or one of the fundamental alleged misrepresentations in this case.

MR. FISHER:  Yeah.  At the risk of concocting a hypothetical, Your Honor, I'm going to give it a go.  And that is -- and I appreciate your comment because I think it helps me focus to my point, which is taken to its logical conclusion, notwithstanding the government census, notwithstanding the Mining Ministry's conclusions, notwithstanding the approval of the license, ultimately what the plaintiff is saying is Tahoe should have second-guessed the Mining Ministry.  Indeed, I think they're actually arguing if you take it to its logical conclusion, Judge, that Tahoe was required to challenge the Mining Ministry's determination and required to challenge the census.

So it occurs to me that if we had a company that had

2:17-cv-01868-RFB-NJK

undergone a tax audit and the IRS had concluded that the company's position was a reasonable one, are the plaintiffs sincerely suggesting that if the company thought that there was another potential argument that it would have to second-guess the IRS and disclose that?  Of course not.  That's not what the law requires.

The law requires the company to reasonably act, to submit an application that it believed in good faith was appropriate and supported.  It relied on the government census to do that.  The Mining Ministry approved it.  And some several years later for the first time the court interpreted a law that had no guidance about what consultation was required, about what the appropriate areas were, and it changed the law.  And those are the exact risks that our client disclosed to the investing public.

You asked me which specific disclosures the court should look at and they're fairly consistent, Your Honor, from year to year.  I would if --

THE COURT:  So I'm looking at the Annual Report and you had referenced that.  I want to make sure I didn't miss anything.  That was attached to Document 65.  So it's 65-2.

MR. FISHER:  Page 40 of 158?

THE COURT:  Yes.  So I just want to make sure we're looking, Mr. Fisher, at the same thing.  Again, because I don't want to -- one of the things I've said that would be helpful for

—————————2:17-cv-01868-RFB-NJK—————————

both sides is you all have been living with this and know this record.  I don't want to because -- you all know this, but I don't want to miss anything as relates to the disclosures.  So why don't you point out for me again those parts of that document you identified.

MR. FISHER:  You're on the right pages, Your Honor.  It's page 40 of that exhibit to page -- through page 45 of that exhibit.  It talks -- I can walk through it if that would be helpful.

THE COURT:  No, no, no.

MR. FISHER:  Okay.

THE COURT:  I've looked at that.  What I wanted to make sure is I looked at that section.  I wanted to make sure when you were saying that you -- you identified what you thought was the entire context of the disclosures, I was looking at the same section that you were looking at.  So I wanted to make sure I was looking at the same pages.  I mean, if you want to highlight certain aspects of that, that's fine.

MR. FISHER:  Yeah.

THE COURT:  But the -- it seems to me the disclosure part, there's a section regarding obtaining and doing licenses and permits which is on what would be marked 41 at the top of -- well, actually in your -- I think it's 40.

MR. FISHER:  No, that's 41 of -- I've got 41 of 158 there.

THE COURT: Yes. Okay. I want to make sure we had the same number. Yes.

MR. FISHER: We're --

THE COURT: 41 of 158 of the document's own number which is 21.

MR. FISHER: Correct. The preceding page is an important one, Your Honor.

THE COURT: Okay.

MR. FISHER: So 40 of 158 and page 20 where there's a discussion about doing business in and the operations in Guatemala. It talks about the history of political unrest. Talks about adverse effects from third parties attempting to manipulate indigenous and local populations. It talks about the risks and uncertainties of doing business in that sort of a climate. So that I -- and the point that I was going to make, Your Honor, is when you read those five pages in total you cannot escape the conclusion that there was a real risk here.

And the risk, again, Your Honor, is not that there might be Xinka here, there might be an environmental suit, there might be a change in the law, there might be the change in the government. The risk is this company's operations might be halted, and that risk was disclosed annually.

To complete the discussion we're having, Your Honor, on the -- on plausible inferences and scienter, the other point that I was going to make if Your Honor or the staff -- court

———————————2:17-cv-01868-RFB-NJK———————————

staff have not yet is the Zucco Partners case, 552 F.3d 981. It -- it I think quite well does a few things. One, it dispenses with these rather rote arguments about the impact of Sarbanes-Oxley. It deals with the impact of confidential witnesses in that case where there was much more detail than we have here and what the relevance of those statements are on a motion to dismiss.

It deals well with, of course, executives' interest in making money and whether their compensation can be fairly read as indicating scienter, and it of course concludes that they cannot. But, ultimately, I think the most significant part of Zucco is, like here, the court concludes that the most plausible inference, more compelling and cogent that there was any sort of shenanigans here, is that the defendants reasonably relied on a government census, that they believed that the exploitation license was properly issued, but that they knew for a host of reasons there was adequate risk of domestic instability. That for reasons out of its control, Judge, there was an inherent risk that the license could be suspended. And that's what happened.

THE COURT: Okay. Thank you, Mr. Fisher.

MR. FISHER: Thank you very much for your time, Your Honor.

THE COURT: Thank you.

So plaintiff's counsel? Oh. Okay.

MR. GONNELLO:  Good afternoon, Your Honor.

I realize that the court has read our papers.  So I'm happy to address any questions you have in particular if that would be easier for you.

THE COURT:  Why don't we start off with where Mr. Fisher left off as it relates to the issue of the disclosures themselves and why you think those disclosures are not sufficient in the face of the information.  Now, you don't have to go through the counter studies.  What I want you to focus on -- and, again, I'm sorry.  Your name is again?  I didn't write this down.

MR. GONNELLO:  Mr. Gonnello, Richard.

THE COURT:  Could you say -- could you pronounce the last name again?

MR. GONNELLO:  Gonnello.

THE COURT:  Gonnello?

MR. GONNELLO:  Yes.

THE COURT:  So, Mr. Gonnello, and you know what might be helpful is you can raise that podium up a little bit because you're a little taller.  And pull that microphone up.  No, the podium itself.  There's a little button on the right.

MR. GONNELLO:  Oh.

THE COURT:  There you go.

MR. GONNELLO:  How's that, Your Honor?

THE COURT:  That's much better.  I can hear you better

that way.

So, Mr. Gonnello, talk to me a little bit about why these disclosures are insufficient in the face of the information that Tahoe and its officers could reasonably be expected to have known and understood.

MR. GONNELLO:  Sure.  Well, we can start with the text of some of these statements itself.  For instance, in paragraph 159 of the complaint, the company said, quote, The company is not aware of any significant indigenous population residing in the area of the Escobal Project, end quote.

It talks about the Escobal Project.  It doesn't talk about the mine.  The project includes both the exploitation license, which covers the mining activity, but it also includes the exploration license, which is a significantly larger geographic area.

So they're trying to limit what they actually said by somehow making it seem as if as long as there wasn't a Xinka who lived on the mine site that their statement is somehow true.

Whereas, the actual facts are that there were many Xinka who were living in the area that may have been affected.

THE COURT:  And how did they know that?

MR. GONNELLO:  Well, if you're asking in terms of scienter, well, one, they've made an argument that all of this information was available to the public.  So they can't --

THE COURT:  And I know what -- and I know what you're

—————————2:17-cv-01868-RFB-NJK—————————

going to say because I thought it myself which is, well, you can't argue that they didn't know because if it's in the public domain and they're interested, they would have known themselves. So you don't need to repeat that argument.  I understand that one, which I think is important, but why don't you point out other aspects of the record you think are helpful.

Again, what's helpful for me is, as Mr. Fisher did, pointing to those aspects of the record since it's so voluminous that you think are particularly compelling just to make sure that I and my staff haven't missed them.

MR. GONNELLO:  Understood, Your Honor.

So every court decision in Guatemala has found that there were indigenous Xinka living in the area that may have been impacted by the mining project.  And don't forget, this is a mine, right.  So they're engaging in activity which could have harmful environmental effects downstream.  The people, the Xinka, this is their ancestral homelands.  They make their living farming off the land, and they want to make sure that their land isn't being negatively impacted by some mine.  And for instance --

THE COURT:  But, Mr. Gonnello, that's not my question. My question is how does Tahoe and its officer know that they are there.  What parts of the record demonstrate or at least create a strong inference that they were aware of their presence?

MR. GONNELLO:  Well, we've talked -- we talked about

2:17-cv-01868-RFB-NJK

how there were protests outside the mine gates, and there were people there protesting with signs that said -- you know, identifying themselves as Xinka.  So they actually were aware of it such that there was a shooting incident where Tahoe security guards shot with rubber bullets a number of these protestors.

There was a petition filed by the Xinka Parliament with the Inter-American Commission on Human Rights.  That was a complaint by the Xinka and another indigenous group complaining that they had not been consulted with respect to the project.  And the defendants admitted receiving this petition in their SEC filings, although they did not explain the contents of the submission.

We also have in paragraph 191 where the defendants after the fact say:  "It is in this spirit that Tahoe wishes to clarify and specifically acknowledge the presence and importance of the indigenous people located in the communities near Escobal, particularly the Xinka."

There's simply no reason to believe that all of these Xinka moved in after the fact.  If they made any sort of reasonable inquiry such as, for example, talking to the people in the Xinka Parliament who contacted Tahoe and MME and said, "Hey, we're here.  We have a right" --

THE COURT:  To what extent -- but to what extent, Mr. Gonnello, are they required to make an inquiry?  I mean, the standard is such that they have to be making a sort of material

omission or misstatement, and that requires scienter which means that they have to know, right.  It can't be that they could have known, right.  That's not the standard, right?

MR. GONNELLO:  Well, the standard is -- there is a standard of deliberate recklessness.  So if you make a statement about something, you have a duty to make a reasonable inquiry into whether or not your statement is correct.

And relying solely on a census that is hotly contested and disputed by the Xinka Parliament, the Catholic Church, and now presumably the Guatemalan courts reflects poorly on the inquiry that they made because they took the path of least resistance because they did not want to know the answer to the question.  And that's deliberate recklessness.

THE COURT:  And how would they have known to reasonably inquire as to what were or were not the extent -- what was or was not the extent of the presence of Xinka or other indigenous people in the area of the Escobal mine or project?

MR. GONNELLO:  They would have known because Defendant McArthur, for instance, and many of the board members had previously worked at Goldcorp at a time when Goldcorp was known by Glamis Gold.  And during that time period Glamis had a mine in Guatemala that had a problem with indigenous peoples there. And Goldcorp at McArthur's behest had a report prepared that spelled out ultimately what the problems were in not consulting with the indigenous population.  So they're well aware of what

-2:17-cv-01868-RFB-NJK-

they had to do.

THE COURT:  Okay.  And as it relates to, again, the issue of scienter, is it your position then that the statements that were signed by the officers -- and I'm moving onto the issue of the individual defendants, away from Tahoe itself -- the statements that were signed by the officers were sufficient when considered in the context of the sort of countervailing information about the presence of Xinka in the area?

MR. GONNELLO:  No, because what they could have done is they could have said, "Look, there are a group of indigenous people who claim that they have rights to be consulted by this project.  We disagree, but we're going to tell you about it anyway so that way you can make an accurate determination of the risks involved here."

But they chose not only to hide it, but to then go and misrepresent the facts.  They were the ones who went out and said that the local media is incorrect when they're reporting that the people protesting are indigenous.  They had no basis for that.

I mean, we have pictures in the complaint of people who were protesting.  The Xinka Parliament leader was there.  He was protesting.  The company initiated legal proceeding that led to the arrest of the Xinka Parliament president.  They obviously knew what was going on.

THE COURT:  So you're saying when they -- when they

—————2:17-cv-01868-RFB-NJK—————

issued not just the statements, but these -- like in this blog about dispelling myths about Tahoe's Escobal Project and those sorts of statements, that those are an attempts to allegedly misstate what was known to them or at least try to recategorize or sort of characterize or recharacterize what was being reported publically?

MR. GONNELLO:  Correct.  They're an attempt to conceal the actual truth of what was going on on the ground; because they knew if they had disclosed the full truth, the stock price would have dropped sooner.  It would not necessarily have dropped the total amount, but it still would have dropped.

THE COURT:  So I want to ask you about some of the individual defendants, but I want to start with I believe it's Ms. McGregor.  Because it seems to me that she makes the fewest statements here and she signs I think in 2016 an Annual Report and some other documents, but tell me why she should stay in this case.

MR. GONNELLO:  So I have to say, Your Honor, I --

THE COURT:  And the financial motive for her is also not the same as for the others.

MR. GONNELLO:  I don't think the defendants made any distinction as to which defendants made which statements.

THE COURT:  Oh, okay.  Well, we went through and looked at some of what was attached.  And so, if you're saying you're not prepared to respond to that, that's fine.  It's just not

2:17-cv-01868-RFB-NJK

clear to me how Ms. McGregor in particular would remain in the case necessarily given the lack of specific allegations regarding scienter for her.

MR. GONNELLO:  Well, there is a core operations argument that we make which is based on the position that the defendants hold at the company and the magnitude and importance of the fact at issue.  Courts have inferred that somebody in a position like Ms. McGregor who was CFO of the company and signed Sarbanes-Oxley statements saying that she wasn't aware of any material misrepresentation in the documents and that therefore obviously, you know, somehow conducted an inquiry into that. She would have known the same information of the core operation doctrine that the other defendants did.

THE COURT:  All right.  Okay.

MR. GONNELLO:  Thank you, Your Honor.

THE COURT:  Is there -- is there anything else then you wanted to -- I'll let you -- I had started you off with some questions about responses to Mr. Fisher.  Are there other arguments you wanted to make in response to Mr. Fisher's arguments in this case?

MR. GONNELLO:  Well, before when Mr. Fisher was talking about the total mix of information available to investors, I think it's important to consider that as part of that total mix of information the defendants were repeatedly denying that Xinka were -- were present.  And they were previously making those

2:17-cv-01868-RFB-NJK

denials notwithstanding the fact that the Xinka had contacted them prior to the class period, during the class period, had initiated legal proceedings against them, were actively protesting, were running plebiscites.  So within that context of total information, I don't believe that the risks were fully disclosed.

THE COURT:  Okay.

MR. GONNELLO:  That's all, Your Honor.

THE COURT:  Is there anything else you wanted --

MR. GONNELLO:  No, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Gonnello.

MR. FISHER:  Your Honor, may I briefly reply?

THE COURT:  Briefly.

MR. FISHER:  You know me better than that already?

THE COURT:  Well, it's -- it is a by-product of your profession and mine.

MR. FISHER:  Well, I can't help but concede I was -- as I was talking in response to Your Honor's questions, I was reading the beautiful plaque on the lectern.  So, you've got me at a disadvantage to begin with.  I will be brief, Judge.

Mr. Gonnello started in response to Your Honor's questions about the risk disclosures on page -- page 45 where he argued that the company said there are no indigenous populations currently living in the immediate area of the site.  True.  He neglected of course, Your Honor, to read the very next paragraph

-2:17-cv-01868-RFB-NJK-

which explains the basis for that statement.

And it talks about Guatemala's most recent census. It details it. It talks about the percentage of Ladino folks there, and it explains the company's position. So, again, the disclosures and the information provided by the company must be read in its context.

Second, almost every response to Your Honor's questions about protests, being contacted by the Xinka Parliament, the allegations in the complaint, all lack the specificity that are required to plead a securities case, Judge. And that's because, as you and I talked about when I was last up here, none of those facts are statements that the issuance of the license was, quote/unquote, illegal as they allege or that the most plausible inference is that our client knew that the information it had was not correct; rather, rather, the most consistent inference is that there is clearly opposition to mining in Guatemala. That's not news to anybody.

And the company disclosed that indigenous populations are subject to manipulation by NGOs and other third parties to produce those kinds of protests. So the company -- to say that there were protests, to say that there were signs, to say that there was someone from the Xinka Parliament fails to meet the threshold demonstration -- determination that there were actually Xinka present in the area of influence.

THE COURT: So -- so what's the difference, Mr. Fisher,

between that premise which is that there are going to be circumstances and essentially a constant of the nature of the political and social environment in Guatemala where you are going to have indigenous resistance to mining projects, how do you distinguish that from a specific allegation regarding misrepresentation about knowing about the presence of Xinka there?  Isn't that different?

Isn't there a distinction between saying there are going to be aspects of the Guatemalan community, even the indigenous community, who are never going to support mining versus an allegation that there's essentially a misrepresentation about the nature of or extent of the presence of an indigenous community within the area of the project?  And I'm not focusing on your arguments about the boundaries of the project.  I'm focussed on distinction.

MR. FISHER:  Understood, Your Honor.  And I think the critical point I was trying to make and, perhaps, wasn't communicating effectively is none of the points that Mr. Gonnello raised in response to Your Honor's question answer or support this bald conclusion that the company knew that there were Xinka in the area of influence.  What they establish at best is that there were people claiming to be Xinka.

I mean, remember the confidential witnesses, Your Honor, say in a line that's almost hard to believe, "It is almost a fact that everybody knew."  Almost a fact is precisely

what the PSLRA tried to get rid of.

And so the issue I think becomes, Judge, it's not enough to say that there were protests that include Xinka.  That is establishing a predicate that's different than the company knew that there were Xinka present and was making statements inconsistent with that.

THE COURT:  So address briefly then, Mr. Fisher, the issue of sort of deliberate, sort of, recklessness --

MR. FISHER:  Yeah.

THE COURT:  -- as relates to that.  Because I do think that's a fair point that the court has to take into consideration.  Going back to, Mr. Fisher, my statement I made to you before about the importance of the Escobal Project to Tahoe and its officers, it seems to me that there is an issue that the court has to consider as relates to whether or not they could simply sort of put their head in the sand about information being brought to their attention.

MR. FISHER:  Yeah, I -- it was one of my notes.  I disagree with Mr. Gonnello's characterization of the standard. I think the Zucco case that we talked about in my principal argument well addresses this alleged core operations concept and the notion of deliberate recklessness.  But there -- really, Your Honor, there can be no question post PSLRA, post the Tellabs case, that this requires intent and that simply suggesting that the company took the path of least resistance is

2:17-cv-01868-RFB-NJK

not enough.  And that's because, here, again the most cogent, compelling, and plausible inference is that the company relied on the country's most recent census, the company submitted an application to the government body required to consider that application, that government body accepted that application and approved the license.  And no other court, no statute, no rule indicated that what had gone on in that process was wrong.

Subsequently the Constitutional Court made a decision, but that was simply a different branch of the government making a different decision.  But to take that and suggest that the company was taking the path of least resistance or exercising some intentionally reckless conduct by relying on a government census and a government body issuing a license is not the standard.  And Tellabs I think fairly clearly derails that point.

Two other points.  I'll be super brief, Judge.  One is this notion about Mr. McArthur and others having worked for prior -- prior mining enterprises --

THE COURT:  You don't need to address that.

MR. FISHER:  Got it.

Then the last is Mr. Gonnello made much of paragraph 191 in their complaint, this February 2018 statement.

I'm not -- since 2013, Your Honor, the company had been talking about this risk.  To suggest that the scienter allegations are satisfied because of something that happens well

after the class period closes as among the best arguments to support their claim, I think really drives home the point that we're trying to make, which is this risk was known.  It was a risk that investors accepted.  It's a risk that exists in Guatemala, and it's a risk that was fully and consistently disclosed.

Thank you very much, Your Honor.

THE COURT:  Thank you.

MR. GONNELLO:  Your Honor, may I make two to three quick points?

THE COURT:  Okay.  Five minutes and that's -- or two minutes, I should say.

MR. GONNELLO:  Okay.  I'll be very fast.

First, I just wanted to correct the standard with respect to scienter because the Supreme Court in Tellabs did not say that we need to allege the most compelling interest.  We merely need to allege an interest that is at least as compelling as the inference in favor of the defendant such that the tie goes to the plaintiff.

Second, the Tahoe employees we have cited with I think one exception, they are not confidential witnesses.  We have actually named them because they were happy to give us the information.  So they're not subject to whatever plausibility rules that are being cited by the defendants because they're not confidential.  We put their names in the complaint.

And, lastly, with respect to the post-class-period admission by the defendants, numerous courts have looked to post-class-period admissions as evidence of scienter. So this is not something that we're making up. It's, you know, a pretty standard argument when the defendant make these statements.

So unless the court has any questions, I thank the court for its time.

THE COURT: Thank you. So just give me a moment here.

So I'm just going to go through and issue my decision here orally. The court denies the motion that's in claim one against Tahoe. I find the claim may proceed on the theories that Tahoe through its corporate officers made material misrepresentations or material omissions regarding statements, one, regarding the presence of indigenous people in the Escobal Mining or Project Area; two, that the mining licenses were obtained in accordance with the law thereby undermining the magnitude of the risk of the suspension of the license; and, three, that consultations occurred -- allegedly occurred between Tahoe and indigenous people as required both by the law and by their own supposed or alleged ethical codes.

The court finds that the lead plaintiff has adequately alleged that Tahoe misrepresented to the public that no indigenous people resided within the area of or were affected by the Escobal Project. The lead plaintiff alleges that the census relied upon by the defendants was -- was widely and publicly

criticized as unreliable.  In addition, that the presence of substantial indigenous population existing in the Escobal Project was actually evident from the public information that the defendants actually themselves referenced as being public. That the indigenous presence was also apparent based upon the active opposition and protests by indigenous people which allegedly Tahoe affirmatively attempted to quash in relations to certain activities.

The court finds that these misstatements occurred in certain documents, which I'm going to incorporate and take judicial notice of and were attached to the motion to dismiss: So on July 25th, 2013, Form 6-K; March 17, 2014, in the Annual Report as it relates to the presence of indigenous people; May 1st, 2013, press release; May -- let's see.  What else -- March 12th, 2015, Annual Report and Form 40-F and Form 6-K; 2016 Annual Report as well.

(Court reporter clarification.)

THE COURT:  I'm sorry.  I turned my head.  I apologize. I'll try to put the microphone back up here.

The court finds that the lead plaintiff adequately alleges that Tahoe misrepresented to the public that the license was obtained in accordance with the law and misrepresented the risk of the license being suspended by undertaking or omitting the true magnitude of the risk from its statements.  Examples of the alleged misrepresentations or statements include the April

2:17-cv-01868-RFB-NJK

3rd, 2013, press release; the June 24th, 2013, press release; the September 6th, 2013, article in the CSR blog; the 2013 Annual Report Form 40-F and 6-K.

The court also finds that the lead plaintiff adequately alleges that Tahoe misrepresented to the public that it consulted with indigenous people.  And the court finds that the issue with the consultation isn't so much the following of sort of ethical guidelines or whether or not -- whether or not they had to do that as a legal -- is whether or not they had to do that as a legal matter.  So, in other words, the court finds that these allegations are significant and relevant and may proceed as a basis for a theory because there would have been a need and it was known to Tahoe that they would have had to engage in consultation consistent with Guatemalan law if Xinka were present in the Escobal Project Area.

The court finds that misrepresentations or statements related to these -- this allegation can be found in the September 6, 2013, CSR blog; May 1st, 2013, press release; and again the CSR blog from 2013; and the Annual Report from 2013; and the Form 40-K and -- 40-F, excuse me, and 6-K; as well as the 2016 Annual Report.

The court also finds that plaintiff has adequately alleged scienter on behalf of Tahoe.  First, the lead plaintiff adequately alleges that it would be and the court finds appropriate that it would be illogical and unreasonable for

2:17-cv-01868-RFB-NJK

Tahoe not to be aware of the indigenous population in the Escobal area, the consultation requirements under the ethical guidelines and Guatemalan law, and the opposition to the project by indigenous people.

The court finds that first because the Escobal Project was the most important project, a project intended to result in the third largest silver mine in the world.  The importance of the project in conjunction with the small size of the company clearly suggests that the defendants would be involved with the daily operations and would have known about the activities and circumstances pertinent to the mine's operating -- operation, including the presence of indigenous people and the opposition to the mine by the indigenous people.

Further, the high-ranking officials' experience in Guatemalan mining prior to the project in conjunction with the acknowledged -- acknowledgment of NGOs criticizing the lack of consultation by Tahoe with the indigenous people also suggests that Tahoe would have known about the consultation requirements.

Additionally, the court finds that lead plaintiff adequately alleges that Tahoe had a financial motive for the misrepresentations:  financial gains to allow Tahoe to acquire, well, sort of again the proceeds from the mines, but also acquire additional mining companies.

The court also finds that the lead plaintiff adequately alleges -- hold on just a moment.

2:17-cv-01868-RFB-NJK

That the allegations regarding the timing of the resignation of the CEO, Mr. Black, and the statements made after his resignation regarding the relationship of the mining company with the local population further supports a finding of scienter in this case.

The court also finds that lead plaintiffs have adequately alleged loss causation.  Tahoe's alleged statements and misstatements and omissions regarding the Escobal Project underplayed the risk of the licenses and the risk of them being suspended and the risk of the suspension of the operations.  The statements and omissions therefore allowed the stock price to remain at an inflated level for the class period because investors were unaware of the magnitude of the risk of the licenses being suspended based upon the licenses being obtained allegedly in violation of the rights of indigenous people and Guatemalan law.

When the licenses were suspended by the Guatemalan courts, the decisions alerted investors that the area did indeed consist of significant populations of indigenous people that opposed the project and were entitled to a consultation.

Tahoe had as a result of its prior misrepresentations about significant support from the indigenous population as it relates to -- again, these are alleged misrepresentations as it relates to support from the indigenous population also undermine and understated the risk of the project.  Therefore, also

---------------2:17-cv-01868-RFB-NJK---------------

artificially maintaining the price.  These statements were also significant in the cost of -- in the context of loss causation given the extent of information in the public realm as noted by the defendants about indigenous protests and indigenous opposition to the mine and not just opposition from a political standpoint, but opposition from a legal standpoint.

The alleged actions of Tahoe involved its active efforts to both engage indigenous people to prevent them from invoking their rights as it relates to plebiscites and other legal means.

The court therefore finds also that the plaintiffs adequately allege that Tahoe's actions proximately caused the harm suffered by investors purchasing the stock when it became known of the presence of indigenous people and the subsequent and the precipitous fall in the stock price.

The court finds that the claims can proceed against all of the individual defendants based upon their statements and involvement except for Ms. McGregor.  The court will dismiss the case against Ms. McGregor without prejudice.  The court does not find that scienter has been established with respect to Ms. McGregor at this time.

The court does find based upon the other individual defendants' positions and involvement with the cooperations of the company and the significance of the Escobal Project to the company in addition to the various statements that they have

―――――――――2:17-cv-01868-RFB-NJK―――――

signed in connection with the alleged misrepresentations about the presence of indigenous people support a finding of material misstatements made by the individual defendants.

The court also finds beyond the positions that they held and the significance of the project to the operation of the company that there was a financial motive as it relates to the allegations regarding the increase in base salary that further support a finding not just of misrepresentation, but of scienter in this case. And, therefore, the court finds that the case may proceed against the individual defendants with the exception of Ms. McGregor.

The court based upon its finding that the claims may proceed against -- on claim one against the individual defendants, the court therefore also denies the motion to dismiss as to claim two against the individual defendants with the exception of Ms. McGregor where the court grants without prejudice the motion to dismiss as it applies to Ms. McGregor in this case.

The court denies the motion to strike without prejudice as moot at this time and lifts the discovery stay and orders that the parties submit a discovery order within two weeks of this hearing.

The court will not issue a separate written opinion. The transcript of this hearing will be the opinion and order of the court.

————————2:17-cv-01868-RFB-NJK————

Are there any questions about the court's order at this time?

MR. FISHER:  None from the defendants, Your Honor.

MR. GONNELLO:  No, Your Honor.  None from the plaintiffs.

THE COURT:  All right then.  I appreciate the arguments of counsel today.

One of the issues that I do think is important in a case like this one, what I want you all to think about in the context of discovery, is if there are issues that you think are so significant that they suggest either sort of either bifurcation of discovery or a significant legal issue that needs to proceed first.  And let me give you some guidance on that.

Notwithstanding the court's ruling today, I do think it would be appropriate to engage in whatever discovery that would need to be engaged in in the United States first as it relates to potential depositions of the individual defendants; because while the standard for a motion to dismiss with respect to scienter is one thing, the standard is very different when it comes to a motion for summary judgment.

And so I do think that as it relates to the issue of the discovery in this case the parties should take some consideration of all that needs to be done here versus what would -- might need to be done in Guatemala, if anything, and think about whether or not there should be some bifurcation of

—————2:17-cv-01868-RFB-NJK—————

discovery or at least some potential issues as relates to decisions by this court on legal issues. And I'm focussed in these comments first on the individual defendants and scienter as it relates to them, and so I would just commend you to think about that.

Any questions about that as relates to discovery at this time?

MR. FISHER: No, Your Honor.

MR. GONNELLO: No, Your Honor.

THE COURT: All right. I appreciate the time and arguments of counsel. We'll be adjourned on this matter. Thank you.

MR. FISHER: Thank you, Judge.

MR. GONNELLO: Thank you, Your Honor.

(Whereupon the proceedings concluded at 3:56 p.m.)

2:17-cv-01868-RFB-NJK

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  June 20, 2019.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR

CCR #937