Leslie Bryan Hart, Esq. (SBN 4932)
FENNEMORE CRAIG, P.C.
7800 Rancharrah Parkway
Reno, Nevada 89511
Tel: 775-788-2228 Fax: 775-788-2229
lhart@fclaw.com

(Admitted *Pro Hac Vice*)
Scott J. Fisher, Esq.
Karl R. Barnickol, Esq.
Andrew G. May, Esq.
NEAL, GERBER & EISENBERG LLP
Two North LaSalle St., Suite 1700
Chicago, IL 60602
Tel: 312-269-8047 Fax: 312-980-0878

*Attorneys for Defendants Tahoe Resources, Inc., C. Kevin McArthur, Ronald Clayton, Edie Hofmeister and Mark Sadler*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: TAHOE RESOURCES, INC. SECURITIES LITIGATION | CASE NO. 2:17-cv-01868-RFB-NJK<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

## TABLE OF CONTENTS

**Page**

BACKGROUND AND PROCEDURAL HISTORY ..... 4
I. The Proposed Class Representatives and Alleged Class Definition ..... 4
II. Tahoe and the Escobal Mine ..... 5
III. ILO 169 and Indigenous Rights ..... 5
IV. Opposition to the Escobal Mine ..... 6
V. Plaintiff's Theories of Liability ..... 7
ARGUMENT ..... 7
I. PLAINTIFF CANNOT SATISFY THE PREDOMINANCE REQUIREMENT BECAUSE THE ALLEGED MISSTATEMENTS DO NOT MATCH THE ALLEGED CORRECTIVE DISCLOSURES ..... 9
II. THE DAMAGES MODEL PROPOSED BY DR. NYE IS OVERLY GENERIC AND NOT TIED TO PLAINTIFF'S THEORY OF LIABILITY ..... 11
A. Dr. Nye's Proposed Damages Model Is Unreasonably Vague And Not Tied to The Alleged Misstatements ..... 12
B. Plaintiff's Theory of Liability Is Inconsistent with Dr. Nye's Conclusion of Market Efficiency ..... 13
III. DR. NYE'S DAMAGES METHODOLOGY OVERSTATES DAMAGES BY INCLUDING LOSSES NOT CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY ..... 13
A. Dr. Nye Fails To Differentiate Risk and Actualization of Risk ..... 14
B. Dr. Nye Fails To Differentiate Information That Tahoe Allegedly Should Have Disclosed from Information That Was Publicly Known ..... 16
C. Dr. Nye Improperly Assumes That Investors Had No Understanding of The Risk That The Escobal License Could Be Suspended ..... 18
D. Dr. Nye Cannot Account For Differences In The Alleged Misstatements And How Purported Inflation Changed During The Class Period ..... 19
CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Seaworld Entm't, Inc.*, No. 14-cv-2129-MMA, 2017 U.S. Dist. LEXIS 196235 (S.D. Cal. Nov. 29, 2017) ........ 8

*In re: BP P.L.C. Sec. Litig.*, No. 4:10-md-2185, 2014 U.S. Dist. LEXIS 69900 (S.D. Tex., May 20, 2014) ........ 14

*Buckeye Tree Lodge v. Expedia, Inc.*, 2019 U.S. Dist. LEXIS 40860 (N.D. Cal. Mar. 13, 2019) ........ 8

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........ *passim*

*Connecticut Retirement Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170 (9th Cir. 2011) ........ 16

*Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427 (D. Ariz. 2019) ........ 8

*In re Diamond Foods, Inc.*, 295 F.R.D. 240 (N.D. Cal. 2013) ........ 8

*Doyle v. Chrysler Grp., LLC*, 663 Fed. Appx. 576 (9th Cir. 2016) ........ 8

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ........ 9

*Goldman Sachs Group, Inc. v. Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951 (2021) ........ 1, 9, 10

*In re High-Tech Emple. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........ 9

*Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 U.S. Dist. LEXIS 186249 (C.D. Cal. Sept. 23, 2020) ........ 9

*Loritz v. Exide Technologies*, No. 2:13-cv-02607-SVW-E, 2015 U.S. Dist. LEXIS 100471 (C.D. Cal. July 21, 2015) ........ 8, 12

*Victorino v. FCA US LLC*, 2018 U.S. Dist. LEXIS 92284 (S.D. Cal. June 1, 2018) ........ 8

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........ 7

**Other Authorities**

17 C.F.R. § 240.10b-5 ........ 1

Expert Report of Dr. Paul Gompers, Ph.D. ........ *passim*

Expert Report of Dr. Zachary Nye, Ph.D. ........ 3, 11, 12, 15

Federal Rule of Civil Procedure 23 ........ 1, 9

Rule 10b-5 ........ 1

Rule 23(a)'s ........ 8

Rule 23(b) ........ 9, 11

Rule 23(b)(3) ........ 2, 8, 9

Rule 23(b)(3)'s ........ 8, 10

United Nations International Labor Organization's "Indigenous and Tribal Peoples Convention" ........ 5, 6

## PRELIMINARY STATEMENT

Lead Plaintiff Kevin Nguyen ("Plaintiff" or "Nguyen") brought securities fraud claims against Tahoe Resources, Inc. ("Tahoe"), and certain of its former executives, including C. Kevin McArthur, Ronald S. Clayton, Mark Sadler and Edie Hofmeister (together the "Individual Defendants"), under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), §78t, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, enacted thereunder. Now, he moves under Federal Rule of Civil Procedure 23 to certify a class of all U.S. investors who purchased Tahoe stock during a four-and-a-half year period between April 3, 2013 and August 24, 2017 (the "Class Period"). Plaintiff and his expert, Dr. Zachary Nye, fail to proffer a class-wide damages methodology capable of measuring only those damages attributable to his liability case, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). This is particularly illustrated by the "mismatch" between Defendants' alleged misstatements and corrective disclosures. *Goldman Sachs Group, Inc. v. Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951, 1960-61 (2021).

Notwithstanding salacious and unsubstantiated rumors and allegations about violations of indigenous rights and Tahoe's implied role in Guatemalan government corruption and violence, this case is not about seeking redress for the Xinka people. Rather, this securities fraud case concerns whether Tahoe misled investors about the risk that Tahoe's license to operate the Escobal mine in Guatemala would be suspended – years after it was granted – through a lawsuit (that Tahoe was not a party to) claiming that the Guatemalan Ministry of Energy and Mines ("Mining Ministry") failed to consult with the Xinka indigenous community before granting the license. Throughout the Class Period, Tahoe warned investors that the mine's ability to operate was subject to an array of potential risks, including specifically that "adverse court rulings could materially and adversely impact our rights to exploration and exploitation licenses necessary for the Escobal mine," and that "communities of both indigenous people and others, and non-governmental organizations ("NGOs") have become more vocal and negative with respect to mining activities in

the country" and "have taken such actions as … initiating law suits for damages."[1] Nonetheless, Plaintiff claims the Defendants should have focused more specifically on the possibility that indigenous rights of the Xinka people would be the particular basis of an eventual adverse court ruling. In so doing, Plaintiff alternately cites and ignores both Tahoe's risk disclosures and volumes of publicly available information from other sources discussing the risks facing the mine. Plaintiff claims that he and other investors lost money on their Tahoe investment when the Guatemalan Supreme Court provisionally suspended the Escobal mine's exploitation license ("Escobal License") in July 2017, over four years after it was granted in April 2013, as the result of a lawsuit filed by an anti-mining organization against the Mining Ministry. Plaintiff seeks to certify a class of investors that he claims were damaged when "the foreseeable risks that had been fraudulently concealed by the Defendants materialized." (Compl., ¶ 242.)

In order to obtain class certification, Plaintiff bears the burden under Rule 23(b)(3) of proving that "questions of law or fact common to class members predominate" over individualized issues, and that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 35. As set forth below, Plaintiff cannot satisfy this burden for at least three independent reasons.

*First*, there is a fundamental disconnect between Plaintiff's five categories of alleged misstatements, none of which relates to litigation risk, and the alleged corrective disclosure in July 2017 announcing the court order provisionally suspending the Escobal License. The alleged corrective disclosures in this case involved the disclosure of *new* information about the ruling in a lawsuit that did not even exist for most of the Class Period. It was not information that was or could have been known by the Defendants before it was issued. Yet Dr. Nye relies only on the corrective disclosures to measure inflation. Given the topical differences between the alleged misstatements and the alleged corrective disclosures, the alleged corrective disclosures provide limited – if any – information about any inflation caused by the alleged misstatements.

---

[1] Tahoe Resources Inc., Annual Information Form for the year ended December 31, 2013 (filed as Exhibit 99.1 to SEC Form 40-F on March 12, 2014) ("2013 Annual Information Form"), pp. 19, 23. https://www.sec.gov/Archives/edgar/data/1510400/000106299314001360/exhibit99-1.htm

*Second*, Plaintiff and his expert, Dr. Nye, fail to proffer a class-wide damages methodology capable of measuring only those damages attributable to his liability case, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Instead, Dr. Nye's proposed damages model is an overly simplistic approach for calculating damages that suggests that declines in Tahoe's stock price in the last two months of the Class Period were solely caused by the Defendants' alleged fraud.[2] As reflected in the attached report from Defendants' expert, Dr. Paul Gompers,[3] Dr. Nye's one-size-fits all approach to calculating damages is not applied or tailored in any way to the alleged misrepresentations and corrective disclosures. (Gompers Rept. ¶¶ 7, 24, 109.) An event study methodology – of the sort proposed by Dr. Nye – can be used to measure damages in some cases, but that is not true here, where Plaintiff's allegations do not present a typical securities fraud claim. (*Id.* ¶¶ 7, 94.) Here, extensive public information disclosed by Tahoe, the press, analysts, and other independent sources demonstrate that the information alleged to have been omitted or falsified by the Defendants was known to investors and incorporated into Tahoe stock price. (*Id.* ¶¶ 9-10, 29.) Further, the purported "corrective disclosure" in this case was suspension of the license based on a new interpretation of Guatemalan law – not new information about Tahoe or the Xinka people. (Compl. ¶¶ 12-13, 144, 147.) The price of Tahoe's stock would have declined because of the suspension even absent any fraud. While Plaintiff says that an event study is "the standard measurement of damages in Section 10(b) securities cases," general acceptance of the event study methodology by other courts is insufficient to establish its viability here. (Pl.'s Mot. for Class Cert. [Dkt. 142], p. 22.)

*Third*, even if the Dr. Nye attempted to apply his proposed damages methodology, doing so would yield flawed and inaccurate results because his proposed methodology fails to:

1) Account for the decline in Tahoe's stock price that was caused by the suspension of the Escobal License, as opposed to any "new" information about the risk of suspension – *i.e.* identification of the risk vs. realization of the risk;

2) Value the information that Defendants' allegedly knew and should have disclosed in a way that distinguishes it from publicly available information on the same topics that was incorporated in the stock price in an efficient market;

---

[2] Expert Report of Dr. Zachary Nye, Ph.D. ("Nye Rept."), attached as Ex. A to Plaintiff's Motion to Certify Class [Dkt. 142].

[3] Expert Report of Dr. Paul Gompers, Ph.D. ("Gompers Rept."), attached as Ex. 1 hereto.

3) Address considerable evidence that the risk of license suspension and political instability was widely known and understood by the market; and

4) Measure any variation in inflation over the course of the Class Period.

Because Plaintiff has not proposed a viable damages methodology that aligns with his liability theory, Plaintiff's motion for class certification should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

### I. The Proposed Class Representatives and Alleged Class Definition

The proposed class representative, Kevin Nguyen, is an individual investor who allegedly purchased 200,000 shares of Tahoe stock in August 2016. (Nguyen Tr. 52:20-22) Nguyen claims he bought approximately $2.8 million of Tahoe stock based on a Google search that suggested the company paid a high dividend, but he never conducted further research that would have showed him that Tahoe never paid, or said it would pay, the 5% dividend Nguyen imagined. (Nguyen Tr. 69:18-25, 70:23-25, 71:1-14, 78:20-25, 79:1-8, 134:20-23.)[4] Nguyen alleges that he sold substantially all of his Tahoe stock in late December 2017 and early January 2018. (*Id.* 192:22-24.) Nguyen seeks to represent a class consisting of "all persons and entities who purchased Tahoe common stock in the United States or on the NYSE at artificially inflated prices between April 3, 2013 and August 24, 2017." (Compl. ¶ 232.)[5] Plaintiff claims that these investors were all damaged in the same way when "the foreseeable risks that had been fraudulently concealed by the Defendants materialized." (Compl. ¶ 242.) Plaintiff seeks to recover the entire difference between the amount he paid to purchase Tahoe stock and the amount he received when he sold the stock, attributing 100% of that decline to alleged fraud by the Defendants, and none of it to the well-known, widely published and extensively disclosed risks of doing business in Guatemala. (Nguyen Tr. 248:22-25, 249:1-6, 253:20-25, 254:1-7.) Of course, Nguyen's attribution of his entire loss to the purported fraud is belied by the fact that his investment in Tahoe declined by about $1 million, or 34%, between his initial purchase in August 2016 and December 2016, notwithstanding that the Alleged Corrective Disclosures did not come for another six months. (*Id.* 254:1-25, 255:1-21.) It is also

---

[4] Transcript of Mr. Nguyen's deposition on August 3, 2021, attached as Ex. 2 hereto.
[5] Consolidated Amended Complaint ("Compl.") [Dkt. 59].

entirely inconsistent with Dr. Nye's testimony that only losses caused specifically by the alleged fraud should be recoverable as damages (Nye Tr. 75:23-25, 76:1-6.)[6]

## II. Tahoe and the Escobal Mine

Tahoe Resources was a gold and silver mining company with mining operations in Guatemala, Peru, and Canada. (Gompers Rept. ¶ 12.) Its largest project throughout the Class Period was the Escobal mine in Guatemala, which accounted for 45.3 percent of Tahoe's 2016 revenue. (*Id.*) In Guatemala, the national government owns all mineral deposits, and its Mining Ministry has the exclusive right to grant licenses to explore and exploit natural resources. (*Id.*) Exploration licenses are granted for a three-year term, with the possibility of additional extensions, and allow the holder to explore an area for mineral resources. (*Id.*) Exploitation licenses are typically granted for 25-year terms, and give the holder the exclusive right to mine deposits within a much smaller area. (*Id.*) Tahoe submitted its application for the Escobal License in 2011 through its Guatemalan subsidiary, Minera San Rafael ("MSR"). (*Id.*) After following its statutory procedures, the Mining Ministry approved the Escobal License two years later, on April 3, 2013. (*Id.*) Tahoe began commercially operating the Escobal mine on January 14, 2014. (*Id.* ¶ 13.) While it was operating, the Escobal mine was one of the largest silver mines in the world.

Tahoe received an exploration license for the Juan Bosco concession, a separate, non-overlapping area to the east of the Escobal deposits, on May 9, 2012. (*Id.* ¶ 12.) Tahoe applied for an extension of the Juan Bosco exploration license on February 11, 2015, but this extension was never granted and Tahoe never sought an exploitation license for the Juan Bosco area or conducted any mining there. (*Id.* ¶ 13.)

## III. ILO 169 and Indigenous Rights

The Xinka are one of a number of indigenous people who live in parts of southeastern Guatemala (Compl. ¶ 38.) Like other Guatemalan indigenous groups, the Xinka were victims of persecution and exploitation for many years. (*Id.* ¶ 39.)

In 1996, Guatemala ratified the United Nations International Labor Organization's "Indigenous and Tribal Peoples Convention" no. 169 ("ILO 169"), which requires that, when mines

---

[6] Transcript of Dr. Nye's Deposition on August 4, 2021, attached as Ex. 3 hereto.

are established in regions with significant indigenous populations, governments must consult the indigenous peoples in the potentially affected region prior to granting licenses for mineral extraction. (*Id.*) Importantly, the consultation obligation rests squarely with the government – not private companies. (*Id.*) At the time Tahoe applied for its exploitation license, the most recent official Guatemalan Census from 2002 found that the town of San Rafael Las Flores, which is adjacent to the Escobal mine, was 99.6% non-indigenous. (*Id.* ¶ 44.) Based on this government census data, the Mining Ministry concluded that no consultation was required under ILO 169 because there was no significant indigenous population in the area of the mine. (*Id.*) Accordingly, the Mining Ministry subsequently approved the Escobal License on April 3, 2013. (*Id.*) The Guatemalan government has not enacted any laws, rules or regulations interpreting or providing procedures for implementing ILO 169 at any time before, during or after the Class Period.

## IV. <u>Opposition to the Escobal Mine</u>

A wide variety of groups opposed the Escobal License for a number of reasons, including purported community disruption, environmental contamination, noise, seismic effects, traffic, and religious reasons. Between April 2013 and May 2017, a series of lawsuits were filed against Tahoe challenging the issuance of the license on a variety of grounds. (Gompers Rept. ¶ 14.) None of those suits was based on ILO 169. Among the groups that filed these lawsuits was a Guatemalan anti-mining organization called Centro de Acción Legal, Ambiental y Social, *i.e.* the Center for Legal, Environmental and Social Action ("<u>CALAS</u>"). (*Id.*) The Guatemalan courts repeatedly rejected efforts, including multiple appeals, to overturn the Mining Ministry's decision to grant the Escobal License.

In the wake of prior failed lawsuits, on May 17, 2017, CALAS filed a new lawsuit in the Guatemalan Supreme Court. (*Id.*) This suit was not against Tahoe, but against the Mining Ministry, and alleged for the first time that the Mining Ministry should not have issued the Escobal License without first consulting the Xinka people pursuant to ILO 169. (*Id.*) The court rejected CALAS's original complaint on procedural grounds. When CALAS re-filed the complaint and it was accepted by the court, Tahoe disclosed it in a May 24, 2017 press release. (*Id.*) On July 5, 2017, the Guatemalan Supreme Court issued an order provisionally suspending the Escobal License and

any renewal of the Juan Bosco exploration license, pending a hearing on the merits of CALAS's request. (*Id.* ¶ 15.) Tahoe disclosed the order in a press release issued after the close of trading that day. (*Id.*) Tahoe's stock price dropped by approximately 33% the next day and a further 7% drop the following day, July 7th. (Compl. ¶ 12.) The Mining Ministry and Tahoe, having intervened in the case, appealed to the Guatemalan Constitutional Court, the court of last resort for such matters, but the Constitutional Court upheld the provisional suspension. (*Id.* ¶ 246.) Tahoe issued a press release disclosing the Constitutional Court's order on August 24, 2017, and again, Tahoe's stock price declined by a further 18% on August 25th, the next trading day. (*Id.* ¶ 13.)

## V. Plaintiff's Theories of Liability

Plaintiff alleges that as soon as the Escobal License was issued in 2013, and for a period of four-and-a-half years thereafter, Tahoe and the Individual Defendants made five categories of false and/or misleading statements (collectively, the "Alleged Misstatements") about:

1) the issuance of the Escobal License;
2) the indigenous population living in the Escobal project area;
3) the involvement of Xinka groups in the protests at the Escobal mine;
4) Tahoe's efforts to engage with the communities around the mine; and
5) Tahoe's alignment with corporate social responsibility ("CSR") regimes.

(Compl. ¶ 149.) Plaintiff claims that the Alleged Misstatements were corrected by two disclosures—the first occurring after the close of trading on July 5, 2017, when Tahoe announced that the Guatemalan Supreme Court had provisionally suspended the Escobal License and the Juan Bosco exploration license renewal; and the second after the close of trading on August 24, 2017, when Tahoe announced that the Guatemalan Constitutional Court had upheld the Supreme Court's decision (together, the "Alleged Corrective Disclosures"). (Compl. ¶¶ 245-46.) Plaintiff alleges that the Alleged Corrective Disclosures caused investor losses on July 6th, July 7th, and August 25th. (*Id.*) Plaintiff claims the Alleged Corrective Disclosures revealed the "truth" regarding Defendants' concealment of the risk that the Escobal License would be suspended once an indigenous group eventually came forward to challenge the Mining Ministry in court. (*Id.* ¶ 249.)

**ARGUMENT**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation omitted). To seek and recover damages on behalf of a class, Plaintiff must first satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality and adequacy, as well as Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Predominance" requires that common questions comprise a significant portion of the case and can be resolved for all class members in one adjudication and that "damages are capable of measurement on a classwide basis." *Id.*; *Comcast*, 569 U.S. at 34. "Specifically, this requires plaintiffs to tie their method of proving damages to their theory of liability." *Loritz v. Exide Technologies*, No. 2:13-cv-02607-SVW-E, 2015 U.S. Dist. LEXIS 100471, at *11 (C.D. Cal. July 21, 2015). Only then can Plaintiff meet its burden of showing "that individual damage calculations do not threaten to overwhelm questions common to the class." *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013); see also *Victorino v. FCA US LLC*, 2018 U.S. Dist. LEXIS 92284, at *36 (S.D. Cal. June 1, 2018) ("*Comcast* demands that Plaintiffs demonstrate, with evidence, that there is a class-wide method of determining damages[.]").

A plaintiff's class-wide damages methodology must be "sufficiently linked to their theory of liability." *Baker v. Seaworld Entm't, Inc.*, 2017 U.S. Dist. LEXIS 196235, at *44 (S.D. Cal. Nov. 29, 2017). In other words, Plaintiff must establish that his "proposed damages model measures damages that are solely attributable to the theory of liability." *Doyle v. Chrysler Grp., LLC*, 663 Fed. Appx. 576, 579 (9th Cir. 2016); *Snap*, 334 F.R.D. at 217 (emphasizing that plaintiffs' damages model "does not offend *Comcast*" so long as "it seeks to measure only 'damages attributable to [the liability] theory'" (citing *Comcast*, 569 U.S. at 35)). Under *Comcast*, a court cannot blindly accept plaintiffs' proposed damages model at face value. *See Comcast*, 569 U.S. at 36. Rather, the proposed damages model "needs to be logically sound." *Buckeye Tree Lodge v.*

*Expedia, Inc.*, 2019 U.S. Dist. LEXIS 40860, at *18 (N.D. Cal. Mar. 13, 2019); *see also Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 446 (D. Ariz. 2019) (plaintiffs must "present a workable method for calculating damages on a class-wide basis that is consistent with their theory of liability"). This requires the Court to engage in "a qualitative assessment, which includes a hard look at the soundness of statistical models." *In re High-Tech Emple. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013) (Rule 23(b)(3) requires the district court to determine whether expert evidence supporting a proposed damages methodology "is persuasive, which may require the [c]ourt to resolve methodological disputes"); *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 U.S. Dist. LEXIS 186249, at *13 (C.D. Cal. Sept. 23, 2020) (A district court "will . . . consider those [arguments] that go to the overall soundness of applying [plaintiffs'] methodology for calculating damages to the factual situation at issue."). The Supreme Court recently confirmed that "a court has an obligation before certifying a class to determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits." *Goldman*, 141 S. Ct. at 1960-61 (quoting *Comcast*, 569 U.S. at 35)); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class.").

As set forth below, Plaintiff's motion for class certification should be denied because Plaintiff fails to proffer a class-wide damages methodology capable of measuring only those damages attributable to his liability case, as required by Rule 23(b) and *Comcast*.

## I. PLAINTIFF CANNOT SATISFY THE PREDOMINANCE REQUIREMENT BECAUSE THE ALLEGED MISSTATEMENTS DO NOT MATCH THE ALLEGED CORRECTIVE DISCLOSURES.

As a threshold matter, Plaintiff has not proffered a damages model that aligns with his theory of liability because his expert relies only on the Alleged Corrective Disclosures to measure damages. The information that Tahoe allegedly failed to disclose, however, is the not the same information that was revealed in the Alleged Corrective Disclosures. Indeed, as the Supreme Court recently observed, the inference that a "back-end" price drop signals and equates to "front-end"

inflation "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."

> Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation. *See, e.g., Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F. 3d 408, 413-417 (7th Cir 2020); *In re Vivendi, S. A. Securities Litig*., 838 F. 3d 223, 233–237, 253–259 (2d Cir 2016). But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure. That may occur when the earlier misrepresentation is generic (e.g., "we have faith in our business model") and the later corrective disclosure is specific (e.g., "our fourth quarter earnings did not meet expectations"). Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation … from the back-end price drop.

*Goldman*, 141 S. Ct. at 1961.

This case presents a more severe mismatch than *Goldman*. There, the Court addressed the difference between generic and specific statements. Here, the Alleged Misstatements relate to different subjects than the Alleged Corrective Disclosures. The Alleged Corrective Disclosures relate to a singular and specific topic – the provisional suspension of the Escobal License in July 2017 in connection with a lawsuit filed by CALAS against the Mining Ministry in May 2017. That is distinct from the Alleged Misstatements, which are general and not focused on litigation risk, let alone the CALAS lawsuit. For example, when one contrasts the Alleged Misstatement – that Tahoe "implemented a new grievance mechanism to align with the Guiding Principles and the International Finance Corporation Performance Standards" – with the Alleged Corrective Disclosure – that the Escobal License would be suspended because the *Mining Ministry* failed to fulfill certain obligations, the inference that a "back-end" price drop signals and equates to "front-end" inflation breaks down. *Goldman*, 141 S. Ct. at 1961.

What investors learned in the Alleged Corrective Disclosures was that the Escobal License had been suspended. That cannot reasonably be viewed as a "revelation" of information hidden by Tahoe. Tahoe could not have *known* that the Escobal License was going to be suspended until it happened, and more than four years of repeated and unsuccessful court challenges to the Escobal

License certainly lead Tahoe to reasonably reach a contrary belief. The results of the CALAS lawsuit – just like any lawsuit – were not certain until the court ruled; and, indeed, the CALAS lawsuit did not even exist until the last four months of the approximately 53-month Class Period (*i.e.*, the final 8% of the Class Period). As such, Plaintiff cannot satisfy Rule 23(b)(3)'s predominance requirement. Given this disconnect, Plaintiff has not proffered a viable class-wide damages model that satisfies Rule 23(b) and *Comcast*.

## II. THE DAMAGES MODEL PROPOSED BY DR. NYE IS OVERLY GENERIC AND NOT TIED TO PLAINTIFF'S THEORY OF LIABILITY.

Plaintiff attempts to support his claim that class treatment is appropriate and the declines in Tahoe's stock price in July and August 2017 were solely the result of Defendants' allegedly misleading statements by relying on the report of economist Dr. Nye. Dr. Nye, however, provides only a cursory and generic description of a damages model based on an event study that is in no way tailored to the specifics of this case or consistent with Plaintiff's allegations. (Nye Rept. ¶¶ 69-73.) In any securities class action, economic damages for an investor are calculated based upon the degree of "inflation," if any, in the company's stock price. (Gompers Rept. ¶ 19.) Inflation, at any point in time, is the amount by which alleged misrepresentations inflated the stock beyond its "true" value – that is, the price at which the stock would have traded absent the alleged misrepresentations. (*Id.*) In order to measure the alleged inflation of Tahoe's stock at any given point during the Class Period, Dr. Nye must be able to show the amount by which the price of Tahoe's shares would have changed at that time had there been no misrepresentations. (*Id.*) Therefore, he must quantify the market price for Tahoe that would have existed without any misrepresentations, or the impact each misrepresentation had on the share price, at all points throughout the Class Period. (*Id.*)

Dr. Nye attempts to do this using a method known as "backcasting," which assumes that the price declines following the Alleged Corrective Disclosures are equal to the amount of inflation on each day of the Class Period. To implement this "backcasting" approach, Dr. Nye states that he would:

1) use an event study to "isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud";

2) "estimate the price inflation due to the alleged fraud for each day during the Class Period" using an unexplained and unspecified methodology; and

3) "calculate damages for each investor as the difference in the price inflation between the time of purchase and the time of sale[.]"

(Nye Rept. ¶¶ 71-73.) As explained below, Dr. Nye's approach for calculating damages on a class-wide basis is unreasonably vague and does not align with Plaintiff's theory of liability.

### A. Dr. Nye's Proposed Damages Model Is Unreasonably Vague And Not Tied to The Alleged Misstatements.

Dr. Nye's overly generic approach fails because he does not "tie" his proposed damages model "to the facts of [the] case." *Loritz*, 2015 U.S. Dist. LEXIS 100471, at *71 (plaintiffs cannot simply "discuss[] general techniques for computing damages in securities fraud cases" or "describe[] generally some techniques that . . . can be used," but must actually "explain[] how [they] would . . . calculate damages in this case") (emphasis added); *see also Snap*, 334 F.R.D. at 217 (stressing that plaintiffs' proposed damages model must do more than merely "la[y] out broad principles and techniques used to calculate securities claims," but must "include[] specific references to the facts alleged").

Out of his 80-paragraph report, Dr. Nye devotes only the last 11 paragraphs to what he describes as "the general economic framework for quantifying per-security damages on a Class-wide basis." (Nye Rept. ¶ 69.) His suggested framework is not tied to the allegations in this case, and indeed is largely a repackaged version of identical, non-case-specific reports he has submitted in other matters.[7] For example, Dr. Nye's report provides an "Overview of Tahoe's Business Operations," gleaned from public sources, but he does not cite any allegations from the Complaint about the Alleged Misstatements or the Alleged Corrective Disclosures. (*Id.* ¶¶ 8-13.) Similarly, he says an event study can "isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud," but he does not specify what the "revelations" – *i.e.* the Alleged Corrective Disclosures – were, nor how they corrected the five different categories of Alleged Misstatements. (*Id.* ¶ 71.) Dr. Nye's unhelpful generic approach continued during his

---

[7] *See, e.g.*, Dr. Nye's reports in *In re Allergan PLC Sec. Litig.*, No. 18-cv-12089-CM (S.D.N.Y. Jan. 31, 2021), and *In re: Akorn, Inc. Sec. Litig.*, No. 15-C-01944 (N.D. Ill. May 5, 2017), attached as Exs. 4 and 5 hereto.

deposition, where he expressed uncertainty about what the Alleged Misstatements and Alleged Corrective Disclosures actually were, while acknowledging that a damages model consistent with a plaintiff's theory of liability "always" depends on "what's been alleged in the complaint." (Nye Tr. 67:2-9, 70:16-20, 74:16-25, 75:9-20.) In fact, he was unclear about when or if he actually reviewed the Complaint and was certain only that he had read the Court's orders denying Defendants' motion to dismiss and motion for leave to appeal. (*Id.* 28:6-25, 29:1-15.)

### B. Plaintiff's Theory of Liability Is Inconsistent with Dr. Nye's Conclusion of Market Efficiency.

Dr. Nye's conclusion of market efficiency is inconsistent with Plaintiff's theory of liability, which includes damages on three dates despite there being only one real "revelation" to investors during the Class Period – the July 5, 2017 press release announcing that the Guatemalan Supreme Court had entered an order provisionally suspending the Escobal License. Plaintiff claims that the purported class damages include a 7% decline in Tahoe's stock price on July 7th and an 18% decline on August 25th. (Compl. ¶¶ 12-13, 245-46.) Plaintiff identifies no new information about the Alleged Misstatements disclosed by Tahoe on either date. (*Id.*) As to the latter, he suggests that somehow, "Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding the Escobal Project further materialized" after Tahoe announced that the provisional suspension was upheld, but there is simply no new information about the Alleged Misstatements in that announcement. (*Id.* ¶ 246.)

Dr. Nye's conclusion that Tahoe's stock traded in an efficient market is facially inconsistent with Plaintiff's liability claim. He says that in an efficient market, new information would have been quickly incorporated in Tahoe's stock price, but he fails to apply that here, where, again, no new information about the Alleged Misstatements was disclosed on July 7 or August 25. (Nye Rept. ¶ 15.) Of course, stock price drops not tied to new corrective information cannot be included in a viable damages calculation. (Gompers Rept. ¶¶ 8, 10.) As such, Dr. Nye actually undercuts Plaintiff's effort to establish class-wide damages consistent with his theory of liability.

## III. DR. NYE'S DAMAGES METHODOLOGY OVERSTATES DAMAGES BY INCLUDING LOSSES NOT CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY.

Not only is Dr. Nye's proposed damages model overly generic and not tied to Plaintiff's theory of the case, but also Dr. Nye fails to account for essential variables needed to isolate the impact of the Alleged Misstatements. Accordingly, any attempt to apply that damages model in this case would lead to flawed and inaccurate results.

### A. Dr. Nye Fails To Differentiate Risk and Actualization of Risk.

First, Dr. Nye's "backcasting" approach conflates two fundamentally different pieces of information – the existence of a risk and the actualization of that risk. (Gompers Rept. ¶¶ 88-94.) Dr. Nye mistakenly presumes that the market would react the same way to revelations about the risk of license suspension as it would to news of the suspension itself. (*Id.* ¶ 93.) The market will react very differently to information about the existence of a possible risk – *i.e.*, knowledge that a negative outcome could occur – and information about the realization of that risk – *i.e.*, that the risk has occurred.[8] (*Id.* ¶ 89.) When a risk is realized, a company's share price will generally decline even if that risk was fully understood by market participants. (*Id.* ¶ 88.) Therefore, any viable damages model must account for the fact that Tahoe's stock price would undoubtedly have declined on the Alleged Corrective Disclosure dates (when the market learned the Escobal License had been suspended), regardless of *any* fraud or misrepresentations about the risk of the license suspension. *See In re: BP P.L.C. Sec. Litig.*, No. 4:10-md-2185, 2014 U.S. Dist. LEXIS 69900, *10 (S.D. Tex.,

---

[8] Dr. Gompers provides the following example: A pharmaceutical company is developing a new medication that is pending review by the Food and Drug Administration ("FDA"). The company's stock price will reflect the market's assessment of how likely the drug is to be approved. If the present value of the company's future profits from the drug would be $4 per share if the drug is approved and $2 per share if it is not approved and denied, and the market expected that there was a 50% chance of approval, the market's value of the company would be $3 per share. The $1 difference between the expected future profits and pre-approval process valuation represents a discount to address the 50% existence of the risk that the medicine would not be approved. If approval is denied, the share value would be expected to fall by $1 to address the realization of the same risk. Even if the company withheld material, non-public information regarding the chances of approval, any determination of damages due to the investors would still have to account for the realization of the risk. If the company had unique access to information that the chances for approval were 20%, instead of 50%, the market would have valued the company at $2.40 instead of $3.00. In the latter scenario, though the realization of the risk would cause the stock price to fall by $1.00 (from $3.00 to $2.00), *damages* should only include losses caused by the alleged misrepresentations – or $0.60. (*Id.* ¶¶ 89-91.)

May 20, 2014) ("when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent.")

Dr. Nye attempts to brush aside this important distinction. During his deposition he testified, "I see no reason, as I sit here today, for making an effort to remove the effect of license revocation from the measure of damages." (Nye Tr. 102:19-21.) His reaction is not surprising because his "backcasting" methodology does not—and cannot—isolate and quantify what portion of Tahoe's stock price decline was attributable to news of the suspension of the Escobal License *itself,* as opposed to any allegedly undisclosed information about the *risk* of license suspension. (Gompers Rept. ¶ 93.) Instead, Dr. Nye's model works only if the ultimate loss of the Escobal License was 100% guaranteed upon its issuance at the beginning of the Class Period as a result of the Alleged Misstatements. (*Id.*) As discussed below, even the most charitable reading of the Complaint cannot support such an inference. (*See* Section H below.) Dr. Nye concedes that his proposed damages methodology will not work in situations where "the complaint might allege that a loss was caused by something, and upon careful examination, there was a lot more going on that was actually the reason for the decline as opposed to the alleged loss-inducing event." (Nye Tr. 44:19-24.) But here, there *was* a "lot more going on" on the dates when Tahoe's stock price dropped in July and August 2017 – the market learned for the first time that the Escobal License had been provisionally suspended and such provisional suspension had been upheld, respectively.

As a fall back, Dr. Nye suggests that he could use an event study "to isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors." (Nye Rept. ¶ 71.) However, as Dr. Gompers points out, an event study will not yield a measure of inflation that can be applied in a class-wide manner in this case. (Gompers Rept. ¶ 94.) While a properly-executed event study *can* provide a measure of the company's stock price movement caused by company-specific factors (as opposed to changes in other factors, like market- or industry-wide information), it *cannot* disentangle the effects of two pieces of company-specific information released simultaneously. (*Id.*) In other words, Dr. Nye's

event study cannot isolate and determine the portion of Tahoe's stock price decline that was attributable solely to the information about the risk of license suspension Tahoe allegedly knew about and failed to disclose, as opposed to the disclosure of the suspension of the license itself. (*Id.*)

### B. Dr. Nye Fails To Differentiate Information That Tahoe Allegedly Should Have Disclosed from Information That Was Publicly Known.

Second, Dr. Nye's proposed methodology fails to differentiate what Tahoe allegedly knew about the risk of license suspension from what was publicly known and factored into Tahoe's stock price. (Gompers Rept. ¶¶ 26-68.) In an efficient market, such as the one in which Plaintiff contends that Tahoe's stock traded, "the price of a stock … fully reflects all publicly available information about the company and its business." *Connecticut Retirement Plans & Trust Funds v. Amgen Inc*., 660 F.3d 1170, 1173 (9th Cir. 2011).[9] As a result, in order to accurately measure inflation due to the Alleged Misstatements in this case, one must identify the material, non-public information that Tahoe had, and which it could and should have disclosed to the market instead of, or along with, the Alleged Misstatements. (*Id.* ¶ 26.) Plaintiff does not identify that information. And, Dr. Nye has provided no information on how he would perform such an analysis, or how his methodology could account for specific information that Tahoe allegedly had and failed to disclose.

As noted above, the five types of Alleged Misstatements relate to information that was external to Tahoe and discussed in public sources, including news reports, social media postings, and securities analyst coverage. Plaintiff does not identify any non-public information uniquely known to Tahoe that was not already absorbed into its stock price – much less how to ascribe a value to that particular information. Indeed, in numerous instances the evidence that Plaintiff cites in support of the allegedly false or misleading misstatements in the Complaint are news articles or websites that were available to investors during the Class Period.[10] In contrast to the non-specific

---

[9] Because Plaintiff is proceeding on an efficient market theory, the availability of information to Plaintiff or any other individual investor is irrelevant, and any information in the public domain is presumed to be incorporated into the stock price very quickly.

[10] Plaintiff argues that the Defendants made misrepresentations by comparing the Company's public statements – *i.e.* allegations in paragraphs 14 and 149-186 – against public information available at the time those statements were made – *i.e.* allegations in paragraphs 5-13 and 28-148. (Compl. ¶¶ 5-14, 28-186.) The *only* information Plaintiff attributes to Tahoe, as

and generalized assertions by Dr. Nye, Dr. Gompers's Report provides extensive citations to contemporaneously available public information on the same topics that Plaintiff claims were at the heart of the Alleged Misstatements. (Gompers Rept. ¶¶ 29-68.) Some examples include:

1) Plaintiff claims that Tahoe made misrepresentations about the issuance of the Escobal License by failing to disclose that the Mining Ministry had failed to consult with the Xinka indigenous people in the area of the Escobal Project prior to granting the Escobal License. (*Id.* ¶ 31.) In November 2014, however, international human rights group Oxfam publicly reported that, "There has been a significant lack of communities living near mining sites being consulted and informed before mining operations have started." (*Id.* ¶ 35.) In July 2015, Oxfam further reported, "The political context in Guatemala is increasingly fraught with uncertainty [which] could call into question the legitimacy through which Tahoe's Minera San Rafael subsidiary obtained its concession to operate the Escobal mine." (*Id.* ¶ 36.)

2) Plaintiff alleges that Tahoe made misleading statements about the presence of the Xinka in the Escobal Project Area. (*Id.* ¶ 41.) The same information Plaintiff uses to undercut Tahoe, however, was available to the public and would have been incorporated into the market price of Tahoe's stock. (*Id.* ¶ 45.) The Xinka Parliament Census, for example, was cited in at least two United Nations Reports in 2009 and 2011. (*Id.*)

3) Plaintiff alleges that Tahoe failed to disclose the involvement of Xinka groups participating in opposition to the Escobal mine. (*Id.* ¶ 47.) In May 2013, however, the Associated Press explained that, "Residents of the area… mainly members of the Xinca indigenous group … claim the Canadian-owned Escobal silver mine, known locally as the San Rafael mine, threatens their local water sources." (*Id.* ¶ 51.) Similarly, in June 2014, BBC News reported, "[f]or the Xincas, who have a legal right to be consulted about mega-projects in their territory, mining is an intolerable destruction of Mother Earth." (*Id.* ¶ 50.)

4) Plaintiff says that Tahoe falsely described its community outreach by "representing that Tahoe was open to all constructive dialogue with the indigenous communities in the Escobal Project Area." (*Id.* ¶ 53.) A June 2014 BBC News report, however, explained that many residents of the region opposed the Escobal mine and discussed the opposition as well as Tahoe's efforts to involve the community. (*Id.* ¶57.)

Dr. Nye does not provide a methodology to differentiate the value of the information that Tahoe allegedly should have disclosed from that of the other public information available as to the same topics. Therefore, he cannot claim to have a methodology that measures damages consistent with Plaintiff's theory of liability. Further, assuming Dr. Nye is correct that Tahoe stock traded in an efficient market, all of the public information would necessarily have been incorporated into the price of Tahoe's stock, thereby making it impossible to show artificial inflation of the stock price.

---

opposed to public sources, are alleged employee observations that were equally observable to anyone. (Compl. ¶¶ 73-79.)

Measuring the alleged inflation of Tahoe's stock price would require identifying and establishing the value of only the incremental additional information, if any, that Tahoe knew and should have disclosed, relative to the vast amount of information already available in the market about each type of alleged misstatement. Dr. Nye's methodology cannot do that.

### C. Dr. Nye Improperly Assumes That Investors Had No Understanding of The Risk That The Escobal License Could Be Suspended.

Third, Dr. Nye's supposition that the risk of license suspension was "thrust upon investors unknowingly" is contradicted by ample evidence that the risk of license suspension was widely known and understood by the market and disclosed in Tahoe's public filings. (Nye Tr. 97:17–18.) In contrast and as reflected in Dr. Gompers's report, risks to mining companies in Guatemala, and to Tahoe and the Escobal mine in particular, were disclosed in public filings with U.S. and Canadian securities regulators and discussed by market participants throughout the Class Period, including in news commentary, industry reports, and analyst reports. (Gompers Rept. ¶¶ 73-86.) For example, Oxfam reported that "mining in Central America is risky business for companies and communities, alike," and "nowhere is this more evident than in Guatemala." (*Id.* ¶ 73.) Similarly, the Fraser Institute, an economic policy organization which publishes an annual survey of mining industry participants, ranked Guatemala among the least attractive jurisdictions for investment (*e.g.*, 8 out of 104 jurisdictions) based on its "Policy Perception Index," concerning uncertainty about factors like regulation, political stability, legal system, taxation regime, protected areas and disputed land claims, infrastructure, socioeconomic and community development conditions, trade barriers, labor regulations, quality of the geological database, security, and labor and skills availability. This was consistent with repeated poor investment risk rankings for Guatemala in the other annual reports published during the Class Period. (*Id.*.)

In fact, Tahoe itself specifically highlighted the potential for challenges to licenses as a risk, and that the risk could materialize with the license being revoked by Guatemalan regulators, as a result of legislation, or as a result of court rulings in its publicly-filed annual and quarterly reports during the entire Class Period:

> The validity of the licenses related to the Escobal mine can be uncertain and may be contested. There is no assurance that applicable governmental bodies will not revoke or significantly alter the conditions of applicable licenses that are required by the Escobal mine. Changes to Guatemalan laws, including new mining legislation or adverse court rulings could materially and adversely impact our rights to exploration and exploitation licenses necessary for the Escobal mine.

(Gompers Rept. ¶ 82, citing Tahoe's 2013 Annual Information Form at p. 23.) Tahoe's Annual Information Forms filed throughout the Class Period contained similar descriptions of the risks to the Escobal License, and thus highlighted and emphasized for investors the allegedly "concealed" risks to the Escobal License. (*Id.* ¶ 83.) Tahoe's public filings during the Class Period also noted that "[o]pposition in the form of roadblocks, public protests or other means, by members of local communities, anti-mining NGOs, unemployed people and unions can occur on local, national and provincial routes." (*Id.*) Tahoe regularly explained that actions by anti-mining organizations – such as CALAS – could have a material adverse effect on the Escobal mine and its operations. (*Id.*) Indeed, CALAS had a long-running campaign in which it made repeated claims with the specific and stated goal of getting a court to suspend the Escobal License, and that effort was widely reported and disclosed to Tahoe's investors.

The most Plaintiff can claim, therefore, is that the *extent* of the risk may not have been fully understood. Dr. Nye has provided no methodology that provides *any* basis to determine the extent to which the risk may not have been fully understood, and thus has provided no methodology to measure damages consistent with both the facts and Plaintiff's theory of liability.

### D. Dr. Nye Cannot Account For Differences In The Alleged Misstatements And How Purported Inflation Changed During The Class Period.

Fourth, Dr. Nye's damages model fails to account for fundamental differences in Plaintiff's theory of liability based on the five different types of Alleged Misstatements. (Gompers Rept. ¶¶ 103-104.) Dr. Nye's reliance on an event study provides no way to allocate damages among alleged misrepresentations regarding: i) the issuance of the Escobal License; ii) the presence of the Xinka in the mine's area of influence; iii) Xinka involvement in protests; iv) Tahoe's outreach to the community; or v) its adherence to corporate social responsibility regimes. (*Id.* ¶ 104.) Instead, his proposed approach can only measure the impact of all information in the Alleged Corrective

Disclosures as a whole, which included the realization of a risk (that the Escobal License would be suspended), as well as all purportedly new information correcting the Alleged Misstatements. Thus, should a jury find that Tahoe is liable for certain types of statements but not others – *e.g.* if Tahoe is found not liable for statements about the consultation process because it was the Mining Ministry's obligation and not Tahoe's to conduct consultations – Dr. Nye's methodology will overcompensate investors by attributing damages to all five types of statements. Because *Comcast* requires Plaintiff to present the Court with a damages model that allows him to quantify those damages — and only those damages – attributable to the Alleged Misstatements, Dr. Nye's methodology is insufficient.

The proposed damages model also fails because it is static. Even assuming Plaintiff could show that Tahoe's stock price was artificially inflated to some extent beginning at the start of the Class Period and continuing throughout, the model cannot reliably use the July and August 2017 stock price declines to determine how much Tahoe's stock price was inflated at any given point in time. In order to measure the inflation caused by the Alleged Misstatements, Dr. Nye must determine the value of the Alleged Misstatements on each day of the Class Period. (Gompers Rept. ¶¶ 105-08.) Given the length of the Class Period, which begins in April 2013, and the number of factors that affected the Escobal mine during the four year period before the CALAS lawsuit was filed in May 2017 – including but not limited to royalty changes, community opposition from non-indigenous groups, and other lawsuits – the degree of risk varied dramatically at different points within the extended Class Period. (*Id.* ¶ 107.) In order to measure inflation over time, Dr. Nye's model would need to measure the degree of the risk of license suspension allegedly misrepresented by Tahoe, which would vary with the amount of risk faced, at every point during the Class Period. (*Id.*) For example, Dr. Nye's backcasting approach assumes inflation was the same when Nguyen bought Tahoe stock in August 2016 as it was in December 2016, when Tahoe's stock price was 34% lower.

In addition, Dr. Nye must also account for changes in the value of such risk over the Class Period, but he provided no basis or methodology to do so. (*Id.*) Thus, even if one assumes that Dr.

Nye can measure the dollar value of inflation at the time of the Alleged Corrective Disclosures, he cannot backcast that value throughout the entire Class Period. (*Id.* ¶ 109.)

**CONCLUSION**

For the foregoing reasons, the Court should deny Lead Plaintiff's motion for class certification.

Dated: September 29, 2021

TAHOE RESOURCES, INC.

**FENNEMORE CRAIG, P.C.**
Leslie Bryan Hart, Esq. (SBN 4932)
7800 Rancharrah Parkway
Reno, Nevada 89511
Tel: 775-788-2228 Fax: 775-788-2229
lhart@fclaw.com

and

By: /s/ Karl R. Barnickol

**NEAL, GERBER & EISENBERG LLP**

(Admitted *Pro Hac Vice*)
Scott J. Fisher, Esq.
Karl R. Barnickol, Esq.
Andrew May, Esq.

*Attorneys for Defendant Tahoe Resources, Inc., C. Kevin McArthur, Ronald S. Clayton, Mark Sadler and Edie Hofmeister*

# CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b) and Electronic Filing Procedure IV(B), I certify that on September 29, 2021, a true and correct copy of the **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** was transmitted electronically by email to counsel for the Plaintiff.

Martin Muckleroy martin@muckleroylunt.com

James M. Wilson, Jr. jwilson@faruqilaw.com

Robert W. Killorin rkillorin@faruqilaw.com

Daniel Brian Weiss dweiss@faruqilaw.com

Katherine Lenahan klenahan@faruqilaw.com

Megan Remmel mremmel@faruqilaw.com

/s/ *Shawna Braselton*

**INDEX OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | Dr. Glompers' report |
| 2 | Deposition Transcript of Kevin Nguyen |
| 3 | Deposition Transcript of Dr. Zachary Nye |
| 4 | Report of Dr. Nye in Allergan Litigation |
| 5 | Report of Dr. Nye in Akorn Litigation |