# EXHIBIT 1

Dr. Gompers' Report

EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re TAHOE RESOURCES, INC. SECURITIES LITIGATION | Case No. 2:17-cv-01868-RFB-NJK |

**EXPERT REPORT**

**of**

**PAUL A. GOMPERS, PH.D.**

September 29, 2021

## TABLE OF CONTENTS


I. Qualifications ..... 4

II. Assignment ..... 5

III. Summary of Opinions ..... 6

IV. Background ..... 8

A. Factual Background ..... 8

B. Allegations ..... 9

C. Calculating Damages in a Securities Class Action ..... 10

D. Dr. Nye's Discussion of Calculating Damages ..... 11

V. Dr. Nye Has Provided No Methodology To Value the Information That Tahoe Had and Should Have Disclosed That the Market Did Not Already Have ..... 13

A. Efficient Markets Incorporate All Publicly Available Information. ..... 14

B. Information About the Alleged Misrepresentations Was Publicly Available. ..... 15

1. Statements About the Issuance of the Escobal License ..... 15
2. Statements About the Indigenous Population in the Area of the Escobal Mine ..... 19
3. Statements About Xinka Involvement in Protests Against the Escobal Mine ..... 22
4. Statements About Tahoe's Community Outreach ..... 24
5. Statements About Tahoe's Alignment with CSR Policies ..... 28

C. Dr. Nye Provides No Methodology to Account for This Information, As Is Necessary to Measure Inflation. ..... 30

VI. Dr. Nye's Theory of Liability Is Inconsistent with Market Evidence, and Therefore Any Attempt To Measure Damages Based Upon That Theory Is Inherently Flawed ..... 31

A. Tahoe Faced Risks from Operating in Guatemala That Could Have Impacted Future Revenues. ..... 32

B. Local Opposition and Legal Challenges Posed Risks to Mine Operators in Guatemala, and to Tahoe Specifically. ..... 35

VII. Dr. Nye's Proposal To Apply An Event Study To Alleged Disclosure Dates Cannot Measure Class-Wide Damages In A Manner Consistent with Plaintiff's Theory of Liability ..... 39

A. The Price Declines Following the Alleged Corrective Disclosures Include Price Declines That Would Have Occurred Absent *Any* Misrepresentations and Thus Are Not

Measures of Price Inflation. ........ 40

B. Dr. Nye Fails to Demonstrate That the July 7, 2017 and August 25, 2017 Price Declines Were Attributable to Corrections of the Alleged Misstatements. ........ 43

1. Plaintiff's Claim—That the Price of Tahoe's Stock Declined for Two Consecutive Days—Is Inconsistent with Dr. Nye's Opinion That the Market Was Efficient. ........ 43

2. Plaintiff Fails to Connect the Price Decline on August 25, 2017 to Any New "Corrective" Information. ........ 45

C. Dr. Nye Provides No Methodology Capable of Measuring Damages from the Individual Categories of Misrepresentations. ........ 46

VIII. Dr. Nye has Provided No Methodology To Account For Changes To Inflation Over Time47

IX. Conclusion ........ 48

# I. QUALIFICATIONS

1. I am the Eugene Holman Professor of Business Administration at the Harvard Business School. I teach courses and conduct research in corporate finance, the structure and governance of public and private companies, valuation of companies, and the behavior of institutional investors, as well as entrepreneurial finance and management, including the venture capital and private equity industry, young start-ups, and high-growth-potential firms. I teach these courses to Ph.D., M.B.A., Executive Education, and undergraduate students. Before joining the Harvard faculty in 1995, I was a member of the faculty at the University of Chicago Graduate School of Business, where I taught entrepreneurial finance from 1993 to 1995. I received an A.B. in Biology from Harvard College in 1987, an M.Sc. in Economics from Oxford University in 1989, and a Ph.D. in Business Economics from Harvard University in 1993.

2. In my career as an academic, I have written numerous case studies and technical notes, and published numerous articles in peer-reviewed finance and economics journals on valuation, venture capital and private equity industries, and entrepreneurial finance. Many of these case studies, notes, and research articles have directly examined financial and valuation issues of companies. I am the coauthor of five books: *The Venture Capital Cycle* (editions 1 and 2), published by MIT Press; *The Money of Invention*, published by Harvard Business School Press; *Entrepreneurial Finance: A Casebook*, published by John Wiley & Sons, Inc.; and *Private Equity: A Casebook*, published by Anthem Press. I am or have been an Associate Editor of the *Journal of Finance*, *Small Business Economics*, and the *Journal of Private Equity*, and a referee for a number of academic journals, including the *Journal of Financial Economics*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, the *Review of Financial Studies*, and the *Journal of Law and Economics*. I have also served on the boards of directors or advisory boards of several companies and investment firms, including ZEFER, Mercanteo, OnTheFrontier.com, Spur Capital Partners, Knightsbridge Investment Advisers, Khosla Ventures, Highland Capital Consumer Fund, and New Capital Partners. My CV is attached as **Appendix A** to this report.

3. I have served as an expert on the valuation of public and private companies, factors affecting public company security prices, whether securities markets were efficient, and the custom and practice of private equity and venture capital organizations. I have been qualified to serve as an expert witness in matters pertaining to valuation, securities, and the private equity

and venture capital industry, and in matters in which I provided testimony regarding alleged damages in a variety of industries. **Appendix B** contains a list of my testimony over the last four years.

## II. ASSIGNMENT

4. I have been retained by counsel for Defendants in this matter to evaluate issues relevant to Plaintiff's Motion for Class Certification in this matter, including the July 1, 2021 Expert Report of Dr. Zachary Nye (the "Nye Report"). Specifically, I have been asked to review Dr. Nye's opinion that damages under Section 10(b) of the Securities Exchange Act of 1934 allegedly suffered by investors in Tahoe Resources, Inc. ("Tahoe" or "Tahoe Resources") "can be calculated using a methodology that is common to the Class and in a manner that is consistent with Lead Plaintiff's theory of liability." I was asked to assume for purposes of my report that Tahoe's stock traded in an efficient market during the alleged Class Period.[1]

5. I am being compensated for my services at my regular hourly rate of $1,250. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

6. In formulating the conclusions and opinions set forth in this report, I have relied on my knowledge, my prior experience, my academic research on relevant topics, and my formal training in economics and finance. A list of documents, data, and other information that I have considered in forming the opinions set forth in this report is attached as **Appendix C** to this report. I reserve the right to revise my opinions in light of my ongoing review of the materials I have considered, as well as additional materials, including data, documents, and deposition or other testimony that may subsequently come to light, or if I am asked to perform further research or analysis.

[1] Plaintiff alleges that Tahoe's stock price was artificially inflated between April 3, 2013 and August 24, 2017, inclusive (the "Class Period"). *See* Section IV.B below.

# III. SUMMARY OF OPINIONS

7. Dr. Nye has provided no methodology, in either his report or deposition testimony, that can measure class-wide damages in a manner consistent with Plaintiff's theory of liability. He provides only a cursory and generic description of an event study that is in no way tailored to the specifics of this case, and nonetheless claims that it is (or will be) consistent with Plaintiff's allegations. However, his proposed approach to measuring inflation fails to account for the mismatch between the Alleged Misstatements and the Alleged Corrective Disclosures, which included the news of the provisional suspension of the Escobal License and the upholding of this suspension, in addition to any information that would have corrected the Alleged Misstatements.[2] In part due to this mismatch, it is inappropriate to use the price declines following the Alleged Corrective Disclosures—price declines which likely would have occurred (at least in part) absent any misstatements—as a measure of inflation, as Dr. Nye proposes to do.

8. Indeed, Dr. Nye's focus on the price decline fails to measure damages attributable only to the Alleged Misstatements. His generic methodology cannot separate the amount that Tahoe's stock price would have declined as a result of the license suspension, even in the absence of any misstatements, from the price decline attributable to the correction of the Alleged Misstatements.

9. Moreover, Dr. Nye's methodology cannot measure inflation created by information that Defendants should have disclosed at any point during the alleged Class Period given a wealth of public information about the same subjects. Much of the information that is alleged to have been misrepresented by Tahoe was also discussed publicly and would have been

---

[2] Plaintiff alleges that Defendants made five categories of false and/or misleading statements: statements about the issuance of the Escobal License; statements about the indigenous population in the area of the Escobal mine; statements about Xinka involvement in the protests against the Escobal mine; statements about Tahoe's community outreach; and statements about Tahoe's alignment with Corporate Social Responsibility (CSR) policies (the "Alleged Misstatements"). (Consolidated Amended Class Action Complaint, *In re Tahoe Resources, Inc. Securities Litigation*, August 31, 2018 ("Complaint") ¶ 149.) Plaintiff alleges that the "Alleged Corrective Disclosures" are the announcements on July 5, 2017, when Tahoe announced that Guatemala's Supreme Court provisionally suspended the Escobal License and the Juan Bosco License renewal; and after the close of trading on August 24, 2017, when Tahoe announced that Guatemala's Constitutional Court had upheld the Supreme Court's decision. (Complaint, ¶ 245–246.) Dr. Nye does not discuss the allegations in his report. Further, while the Complaint references price declines on July 7, 2017, the second trading day after the provisional suspension, and August 25, 2017, the trading day after the Supreme Court ruling, Dr. Nye provides no justification for the inclusion of these price declines in his calculation of damages, failing to demonstrate any connection between these declines and the correction of any Alleged Misstatements. *See* Section VII.B.

incorporated into Tahoe's market price. News reports and market commentary repeatedly discussed opposition to the Escobal License, including by communities around the mine; the Xinka presence in the area and their involvement in protests; and Tahoe's community outreach and corporate social responsibility efforts.[3] Risks to the Escobal License were also discussed in Tahoe's public filings with securities regulators in the U.S. and Canada.[4] As such, an appropriate damages methodology would need to account for the fact that public information about the allegedly misstated information was already incorporated into the stock price, and then value the impact of the disclosure of only the *incremental* information that Tahoe could and should have disclosed to the market. But Dr. Nye fails to provide any methodology to measure the value of Tahoe's disclosure of any incremental information that the company should have disclosed to the market that the market did not already have. Indeed, Dr. Nye proposes no methodology that could determine the value of any of the individual Alleged Misstatements—or even any of the five individual categories of Alleged Misstatements—as would be needed for a damages calculation to be able to "adapt" to a jury finding, as Dr. Nye claims his methodology can.[5]

10. Dr. Nye's theory of liability is based upon two assumptions—that the risk of the loss of the Escobal License was (i) unknown to the market and (ii) a *certainty* given the allegedly misstated "truth"—that are contradicted by market evidence. Guatemala was recognized as a very challenging jurisdiction for mining companies generally, and the Escobal License[6] specifically faced additional risk due to opposition from non-governmental organizations and local residents that was discussed in the public press. This publicly available information about risks to the Escobal License would have been incorporated into Tahoe's stock price in an efficient market. The fact that the market did not meaningfully discount the value of the license, given the available information regarding the alleged misstatements, is inconsistent with the loss of the Escobal License being a certainty. As such, it is not possible to attribute the entire decline in the stock price following the Alleged Corrective Disclosures to the alleged fraud.

---

[3] *See* Section V.B.

[4] As I explain in Sections V and VI, Tahoe's Annual Information Forms reference risks to the company's operations. These Annual Information Forms were filed with Canadian regulators and with the US SEC as Form 40-F filings. For concision, I cite only the SEC Form 40-F filings.

[5] Deposition of Dr. Zachary Nye, Ph.D., August 4, 2021 ("Nye Deposition"), 87:25–88:6.

[6] The "Escobal License" is the exploitation license for the Escobal mine. *See* Section IV.A.

11. Finally, Dr. Nye provides no methodology to measure inflation over the course of the Class Period. The facts in this case suggest that inflation would have varied over the Class Period. Even if Dr. Nye were able to properly measure the price declines caused by the Alleged Misstatements at the end of the Class Period—and he has provided no methodology to do so—that value would provide little, if any, information about price inflation earlier in the Class Period.

# IV. BACKGROUND

## A. Factual Background

12. Tahoe Resources was a gold and silver mining company with mining operations in Guatemala, Peru, and Canada.[7] Its largest project throughout the Class Period was the Escobal mine in Guatemala, which accounted for 45.3 percent of Tahoe's 2016 revenue.[8] The government of Guatemala owns all mineral deposits within Guatemala, and its Ministry of Energy and Mines ("MEM") is in charge of granting mining exploitation and exploration licenses to domestic or foreign entities.[9] Exploitation licenses, which are typically granted for 25-year terms, grant the holder the exclusive right to develop the deposits granted within a concession's boundaries.[10] Tahoe submitted an initial application for the exploitation license to develop the Escobal mine in 2011 through its Guatemalan subsidiary Minera San Rafael ("MSR"). MEM approved the Escobal License two years later on April 3, 2013.[11] Tahoe was separately granted the Juan Bosco exploration license, which allowed for the exploration of an area separate from the main Escobal deposits, on May 9, 2012.[12]

13. In 1996, Guatemala had ratified the United Nations International Labor Organization's "Indigenous and Tribal Peoples Convention" no. 169 ("ILO 169"), which

[7] Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2016 (filed as Exhibit 99.1 to SEC Form 40-F), filed on March 9, 2017 ("2016 Annual Information Form"), pp. 20–21.
[8] Tahoe Resources Inc., Form 6-K for the years ended December 31, 2016 and 2015, filed on March 9, 2017, p. 21.
[9] Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2011 (filed as Exhibit 99.1 to SEC Form 40-F), filed on March 8, 2012 ("2011 Annual Information Form"), p. 16.
[10] 2011 Annual Information Form, p. 18.
[11] Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2014 (filed as Exhibit 99.1 to SEC Form 40-F), filed on March 11, 2015 ("2014 Annual Information Form"), p. 29.
[12] Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2015 (filed as Exhibit 99.1 to SEC Form 40-F), filed on March 9, 2016 ("2015 Annual Information Form"), p. 27. *See* also, 2011 Annual Information Form, p. 17.

requires governments to consult local indigenous peoples before granting licenses for mineral extraction in a given area.[13] While several referenda were held in which local communities voiced opposition to the mine,[14] MEM approved the Escobal License on April 3, 2013.[15] Tahoe began commercially operating the mine on January 14, 2014.[16] Tahoe applied for an extension of the Juan Bosco exploration license on February 11, 2015, but this extension was never granted.[17]

14. On May 17, 2017, Centro de Acción Legal, Ambiental y Social ("CALAS"), a Non-Governmental Organization ("NGO"), filed a lawsuit against MEM—not against Tahoe—alleging that MEM had failed to consult the Xinka people[18] pursuant to ILO 169 and had therefore illegally granted the Escobal License.[19] At the time, the lawsuit was the latest in a series of legal challenges to the Escobal License that had been asserted during the Class Period.[20] Tahoe disclosed CALAS's lawsuit in a May 24, 2017 press release.

15. On July 5, 2017, the Guatemalan Supreme Court provisionally suspended the Escobal License and any renewal of the Juan Bosco license, pending a hearing on the merits of CALAS' request. Tahoe disclosed the provisional suspension of the Escobal License in a press release after the close of trading on July 5, 2017.[21] Subsequently, on August 24, 2017, Tahoe announced that Guatemala's Constitutional Court upheld the provisional suspension of the Escobal License and Juan Bosco license renewal.[22]

## B. Allegations

16. Plaintiff alleges that Tahoe's stock price was artificially inflated during the alleged Class Period as a result of the Alleged Misstatements. Plaintiff alleges that the first such

---

[13] Silvel Elias and Geisselle Sanchez, "Case Study Consulta Previa," Americas Quarterly, Spring 2014, p. 71.
[14] Sonia Perez Diaz, "Dispute over Guatemala silver mine turns violent; Residents fear a Canadian firm is polluting their town's water. Protests escalate into clashes." The Los Angeles Times, June 9, 2013.
[15] Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2013 (filed as Exhibit 99.1 to SEC Form 40-F) filed on March 12, 2014 ("2013 Annual Information Form"), p. 33.
[16] Tahoe Resources Inc., 2014 Annual Information Form, p. 27.
[17] Complaint, ¶ 37; *See* also Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2017 (filed as Exhibit 99.1 to SEC Form 40-F), filed on February 22, 2018 ("2017 Annual Information Form"), p. 41.
[18] The Xinka (alternately spelled "Xinca") are an indigenous community in Guatemala.
[19] Tahoe Resources Press Release, "Tahoe Reports on Legal Claim in Guatemala," May 24, 2017.
[20] *See* Section VI.B.
[21] Complaint, ¶¶ 143–144.
[22] Complaint, ¶ 246.

statement was made on April 3, 2013, when Tahoe allegedly failed to disclose the presence of Xinka indigenous people near the mine.[23]

17. Plaintiff alleges that "Defendants made five categories of false and/or misleading statements:"

a. "Statements about the issuance of the Escobal License;"

b. "Statements about the indigenous population living in the Escobal Project Area;"

c. "Statements about the Xinka's involvement in the protests to the Escobal Project;"

d. "Statements about the Company's efforts to engage with the community living in the Escobal Project Area;" and

e. "Statements about Tahoe's alignment with Corporate Social Responsibility (CSR) regimes."[24]

18. Plaintiff claims that Tahoe's alleged misstatements were corrected by the Alleged Corrective Disclosures—the first after the close of trading on July 5, 2017, when Tahoe announced that Guatemala's Supreme Court provisionally suspended the Escobal License and the Juan Bosco License renewal; and the second after the close of trading on August 24, 2017, when Tahoe announced that Guatemala's Constitutional Court had upheld the Supreme Court's decision. Plaintiff alleges that the Alleged Corrective Disclosures caused investor losses on July 5, 2017, July 6, 2017, and August 25, 2017.[25]

**C. Calculating Damages in a Securities Class Action**

19. I understand that economic damages for an investor in a securities class action are calculated based upon the degree of inflation in the company's stock price.[26] Inflation, at any point in time, is the amount by which alleged misrepresentations inflate the stock beyond its "true" value (*i.e.*, the price at which the stock would trade absent alleged misrepresentations). The actual stock price is known, and therefore to measure inflation, one must either directly measure the value of the alleged misrepresentations, or measure the price that would have

[23] Complaint, ¶ 150.
[24] Complaint, ¶ 149.
[25] Complaint, ¶¶ 245–246.
[26] Dr. Nye seems to agree. *See* Nye Report, ¶ 72.

prevailed absent the alleged misrepresentations, in order to calculate the difference between the market price and that value.

20. In an efficient market, a company's share price reflects the present value of its expected future cash flows.[27] In the case of Tahoe, the company's stock price would have reflected the market's valuation of expected future cash flows from the Escobal mine's operation and any risks to production from the mine. If the Alleged Misstatements here were in fact false or misleading and changed the market's valuation of the future cash flows of Tahoe or the evaluation of the risks to Tahoe, they would have inflated the price of Tahoe's shares. To measure inflation at a given point during the Class Period, Dr. Nye must estimate the degree to which the price of Tahoe's shares would have changed at that time had there been no Alleged Misstatements. Therefore, he must estimate the market price for Tahoe that would have prevailed without any Alleged Misstatements, or the value of each Alleged Misstatement, *at all points* throughout the Class Period.

**D. Dr. Nye's Discussion of Calculating Damages**

21. In his report, Dr. Nye presents a very "general economic framework for quantifying per-security damages on a Class-wide basis."[28] This generic discussion, which is virtually identical to his discussion in reports he has submitted in other matters,[29] does not once mention Tahoe or the allegations in this specific case. Indeed, he provides absolutely no information related specifically to this case. Instead, he explains *only* that:

a. He will first use an event study to "isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud."[30] (Dr. Nye does not specify the dates on which such "revelation[s]" occurred in this case.)

b. Second, "[a]fter isolating the price impact of the alleged misstatements and omissions" on the dates of "corrective disclosure[s] and/or the materialization[s] of a concealed risk," Dr. Nye claims, without further explanation, that "one can

---

[27] Stephen Ross et al., "Corporate-Financing Decisions and Efficient Capital Markets," in *Corporate Finance*, (New York: McGraw-Hill, 2002), pp. 108–109; *See* also, Nye Deposition, 51:4–9.
[28] Nye Report, ¶ 69.
[29] *See*, e.g., Expert Report of Zachary Nye, Ph.D., January 31, 2020, *In re Allergan PLC Securities Litigation*; Expert Report of Zachary Nye, Ph.D., May 5, 2015, *In re: Akorn Inc. Securities Litigation*.
[30] Nye Report, ¶ 71.

estimate the price inflation due to the alleged fraud for each day during the Class Period."[31]

c. Finally, Dr. Nye explains that he will calculate damages for each investor as the difference in this price inflation between the time of purchase and the time of sale, subject to certain limitations.[32]

22. Dr. Nye's approach implicitly assumes that, (i) Dr. Nye can measure the price decline caused *only* by corrective information (which he has provided no methodology to do, as I discuss in Section VII); (ii) the information that defendants had and should have disclosed at each earlier date is the same as the information that was ultimately provided in the alleged corrective disclosures; and (iii) the economic value of the undisclosed information would have been the same on each earlier date as it was at the time of the Alleged Corrective Disclosures.

23. As I discuss throughout this report, each of these assumptions is unsupported by Dr. Nye's report and is particularly unlikely given the information alleged to have been misstated and the available public information about these Alleged Misstatements. Critically, the information that was ultimately provided in the Alleged Corrective Disclosures does not match the Alleged Misstatements. Further, the Alleged Corrective Disclosures informed investors that the license for Tahoe's most important asset had been suspended, complicating the measurement of the value of any corrective information (which would have been released at the same time, *see* Section VII). When there is a substantial mismatch between the Alleged Corrective Disclosures and the Alleged Misstatements as there is in this case, the approach of "back-casting" inflation from the price decline on the disclosure dates suggested by Dr. Nye is particularly problematic.

24. Moreover, at his deposition, Dr. Nye's testimony demonstrated that the generic methodology he provided in his report was in no way tailored to Plaintiff's allegations in this case (and was in any case only the methodology he "would try first").[33] He provided no view of how his calculation of inflation would be consistent with Plaintiff's theory of liability, despite stating that, "when forming an opinion about damages[, it]…needs to be consistent with plaintiff's theory of liability."[34] He agreed that a damages model consistent with a plaintiff's

---

[31] Nye Report, ¶ 71.
[32] Nye Report, ¶¶ 72-73.
[33] Nye Deposition, 154:24–155:8.
[34] Nye Deposition, 64:23–25.

theory of liability "always" "depends on what's been alleged in the complaint,"[35] but upon questioning several times admitted he did not have an opinion on what constituted a corrective disclosure in this case, and could not recall many of the Alleged Misstatements.[36]

25. Dr. Nye also admits that he has not analyzed whether inflation would be constant or vary during the Class Period, despite testifying that this "depends on the plaintiffs' theory of liability,"[37] and that he would not need anything outside of the complaint to determine whether the theory of liability involved a constant or variable rate of inflation.[38] Nonetheless, despite claiming not to need further information, Dr. Nye explained that he "ha[d not] analyzed the issue or been asked to."[39]

## V. DR. NYE HAS PROVIDED NO METHODOLOGY TO VALUE THE INFORMATION THAT TAHOE HAD AND SHOULD HAVE DISCLOSED THAT THE MARKET DID NOT ALREADY HAVE

26. Dr. Nye claims that Tahoe's stock traded in an efficient market throughout the Class Period. In such a market, a company's stock price incorporates all publicly available information. As a result, in order to accurately measure inflation due to the Alleged Misstatements in this case, one would have to identify and measure the value of the information that Tahoe had, and could and should have disclosed to the market instead of, or along with, the Alleged Misstatements. One would then have to compare that information to the information already in the market, which would already be incorporated in the price of Tahoe's stock, and determine how the market price—reflecting the market's expectation of future revenues from the Escobal mine and the risks to those future revenues—would have changed if Tahoe had

---

[35] Nye Deposition, 75:9–20.

[36] For example, in his deposition, Dr. Nye stated "I don't have an opinion on what's corrective or not." See Nye Deposition, 67:6–8. Dr. Nye also appeared to believe that the license was suspended because defendants made misrepresentations in getting the license, an allegation not in the Complaint. *See* Nye Deposition, 98:5–15. Dr. Nye only recalled that the presence of the Xinka and certain claims about Tahoe's social responsibility programs were misrepresentations. *See* Nye Deposition, 56:19–58:11. Dr. Nye did not recall whether there were any misrepresentations, false statements, or omissions between July 5, 2017 and August 25, 2017. *See* Nye Deposition, 74:16–75:5. Dr. Nye also could not recall the legal requirement (ILO 169) under which consultation of the Xinka was allegedly required. *See* Nye Deposition, 73:16–24.

[37] Nye Deposition, 141:24–142:8.

[38] Nye Deposition, 162:12–23.

[39] Nye Deposition, 141:24–142:23.

disclosed that additional, incremental information.[40] Dr. Nye has provided no information on how he would perform such an analysis, or how his "methodology" could account for specific information that Tahoe had and failed to disclose. This failure is particularly problematic given the wealth of publicly available information related to the Alleged Misstatements, the disclosures of potential risks by Tahoe in its public filings with U.S. and Canadian securities regulators, and the Plaintiff's allegations, which point primarily to *public* information, rather than private information that Tahoe had, that rendered the Alleged Misstatements false and/or misleading.[41]

**A. Efficient Markets Incorporate All Publicly Available Information.**

27. In an efficient market, such as the one in which Dr. Nye contends that Tahoe trades, "investors bid up or down the market price of a security to reflect all publicly available information."[42] As established in academic literature, in an efficient market all publicly available information is reflected in a company's share price, and prices "fully reflect" available information.[43] Investors who wish to profit through the trading of a company's shares will seek out information, which could come from numerous types of sources,[44] and trade on that information until the information is reflected.

28. As Dr. Nye himself explains, these "[a]rbitrageurs ensure that market prices reflect public information"[45] and he specifically opined that Tahoe's "high trading volume… impl[ied] a likelihood that many investors executed trades on the basis of newly available or disseminated corporate information."[46] Dr. Nye also testified that there is not "any sort of public

---

[40] As I explain in Section VIII, this exercise needs to be performed for each day in the Class Period, to account for changes over time in the information that Tahoe could have disclosed, changes in how the market would have valued that information, or both.

[41] *See* Section V.B below.

[42] Nye Report, ¶ 37.

[43] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," The Journal of Finance, 25, no. 2, 1970, pp. 383–417, at p. 383.

[44] For example, research has shown that paying subscribers to the SEC's EDGAR website could generate an economically significant trading advantage, as they received access to SEC Form 4 filings before these reports were made available to the public at no charge. *See* Jonathan L. Rogers et al., "Run EDGAR run: SEC Dissemination in a high-frequency world," Chicago Booth Paper no. 14-36, 2014. As another example, hedge funds have purchased and used satellite imagery of parking lots to estimate the earnings of firms before earnings releases are made public. *See* Leslie Picker et al., "How hedge fund investors are making money off the data you're giving them for free," CNBC, April 24, 2019, https://www.cnbc.com/2019/04/23/how-hedge-funds-use-alternative-data-to-make-investments.html, accessed September 24, 2021.

[45] Nye Report, ¶ 34.

[46] Nye Report, ¶ 22.

information" that is not a part of market price formation.[47] Therefore, if information about the risks to Tahoe's license were publicly available—even, if as Dr. Nye notes, it were only known by "relatively few…active investors"[48]—that information would be reflected in the market price for Tahoe if the market for Tahoe's stock were efficient as Dr. Nye claims.

**B. Information About the Alleged Misrepresentations Was Publicly Available.**

29. Much of the information that is alleged to have been misrepresented by Tahoe was discussed publicly in analyst reports or news coverage and referenced in Tahoe's risk disclosures in public filings with U.S. and Canadian securities regulators. While I offer no opinion on the veracity of the statements discussed in this section (whether made by Tahoe or other sources), much of the evidence that Plaintiff provides to support the falsity of Tahoe's statements was publicly available to investors during the Class Period through articles or websites. The information in these sources, and any uncertainty that conflicting statements regarding the veracity of the Alleged Misstatements would have caused, would therefore have been incorporated into the price of Tahoe's stock, as described above.

30. Plaintiff alleges five types of Alleged Misstatements regarding: (i) the issuance of the license; (ii) the presence of the Xinka; (iii) the Xinka involvement in protests; (iv) outreach to the community; and (v) Tahoe's adherence to corporate social responsibility programs.[49] However, Plaintiff and Dr. Nye ignore a wealth of information related to each category of allegation that was available to any and all investors during the Class Period and before the alleged corrective disclosures.[50]

**1. Statements About the Issuance of the Escobal License**

31. Plaintiff claims that Tahoe made numerous false statements and misrepresentations about the issuance of the Escobal License by failing to disclose that MEM

[47] Nye Deposition, 124:3–6.
[48] Nye Report, n. 63, quoting Sharpe.
[49] Complaint, ¶ 149.
[50] I do not attempt to address every Alleged Misstatement or fact that was alleged to have been misrepresented, as the goal of this section is not to demonstrate that the entire truth was known. The goal is instead to highlight the wealth of publicly-available information related to Plaintiff's allegations that would need to be addressed in order to properly develop a methodology to calculate damages in a manner consistent with Plaintiff's theory of liability. Moreover, the fact that this information was available to investors undermines Dr. Nye's theory that the risk to the Escobal License was "unknowingly" "thrust upon investors" (a point I develop in detail in Section VI).

had failed to consult with the Xinka indigenous people in the area of the Escobal mine prior to granting the Escobal License.[51]

32. For example, Plaintiff emphasizes a September 6, 2013 article on Tahoe's public Corporate Social Responsibility ("CSR") blog and claims that the statement that "Tahoe Resources willingly submitted to the regulatory process and obtained every permit for the Escobal project in a lawful manner" was false and misleading.[52] Plaintiff also claims that Tahoe made similar misrepresentations in each of Tahoe's 2013–16 Form 6-K and Form 40-F filings with the Securities and Exchange Commission ("SEC").[53]

33. According to Plaintiff, these statements were false and/or misleading because the issuers failed to disclose that "the Escobal License was not lawfully obtained because there were thousands of Xinka living in the area directly affected by the Escobal Project…who were not consulted by MEM, as required by Guatemalan Law, before the Escobal License was issued."[54]

34. The presence of the Xinka in the area relates to the second category of Alleged Misstatements, which I discuss in Section 0 below.

35. The fact that many organizations or individuals believed that the consultation process was not adequate and that the Escobal License was unlawfully issued was reported during the Class Period and prior to the Alleged Corrective Disclosures. In November 2014, for example, Oxfam (a major international human rights organization) criticized the "model" that Tahoe and other mining companies "have followed" in Guatemala, claiming:

> [T]here has been a significant lack of communities living near mining sites being consulted and informed before mining operations have started. Despite the fact that communities nearby have voted against the mine and organized protests, the company has moved forward anyway.[55]

36. Oxfam similarly opined that "The political context in Guatemala is increasingly fraught with uncertainty [which] could call into question the legitimacy through which Tahoe's

---

[51] Complaint, ¶ 150.
[52] Complaint, ¶¶ 153, 157.
[53] Plaintiff alleges misrepresentations in Tahoe's 2013, 2014, 2015, and 2016 Form 6-K and Form 40-F filings. *See* Complaint, ¶¶ 154, 155.
[54] Complaint, ¶ 157(a).
[55] Alex Blair, "Corporate greed and human rights; Is history repeating itself in Guatemala?" Oxfam, November 25, 2014, https://politicsofpoverty.oxfamamerica.org/corporate-greed-and-human-rights-is-history-repeating-itself-in-guatemala/, accessed August 12, 2021.

Minera San Rafael subsidiary obtained its concession to operate the Escobal mine."[56] Amnesty International, another major international NGO, also discussed community members' complaints that, in their opinion, a proper consultation had not been conducted.[57] Similarly, the United States Agency for International Development ("USAID") noted that the issue of consultation "is a hugely contentious issue in Guatemala, primarily in the context of mining" and noted that the Guatemalan government had generally ignored local community-organized consultations.[58] In a 2016 report that requested that the SEC investigate Tahoe, the Justice and Corporate Accountability Project noted that:

> [N]either Tahoe nor the government of Guatemala have undertaken any formal consultation with the Xinca. The Environmental Impact Assessment for the Escobal mine site shows that the only meetings that occurred were within the core municipality of San Rafael Las Flores where the mine is currently located.[59]

The U.N. High Commissioner for Human Rights in Guatemala, in a January 2014 report, explained that the approval of the Escobal License caused conflict,[60] that mining in general was a major source of unrest, particularly in indigenous territories, and that:

> A common denominator in these social conflicts [referencing unrest at Escobal among others] was the failure to inform and to consult with indigenous and other local communities potentially affected by these projects.[61]

37. In June 2013, Oxfam was among 30 human rights organizations based in the United States, Canada, and Europe that signed an open letter to Guatemala's president, calling for the "revocation" of the exploitation license, because they believed that "the irregular manner in which the license was granted" was an example of the government's "disregard for Indigenous rights."[62]

---

[56] "Why did Goldcorp really pull out of Tahoe Resources' troubled Guatemalan mining project?" Oxfam, July 7, 2015, https://politicsofpoverty.oxfamamerica.org/why-did-goldcorp-really-pull-out-of-tahoe-resourcess-troubled-guatemalan-mining-project/, accessed August 6, 2021.

[57] "Guatemala: Mining in Guatemala: Rights at Risk," Amnesty International, September 2014, pp. 13–16.

[58] "Guatemala Resource Tenure and Sustainable Landscapes Assessment," USAID, September 2014, p. 61.

[59] "Request to Investigate Tahoe Resources for Failure to Disclose Material Information," Justice and Corporate Accountability Project, August 8, 2016, p. 15.

[60] "Annual report of the United Nations High Commissioner for Human Rights," UN General Assembly, January 13, 2014, p. 14.

[61] "Annual report of the United Nations High Commissioner for Human Rights," UN General Assembly, January 13, 2014, p. 6.

[62] Open Letter to Otto Perez Molina, "Revocation of concession of exploitation license for Escobal project," June

38. Moreover, a legal challenge against MEM resulted in a finding, discussed in a Tahoe press release in July 2013, that MEM "should have conducted a hearing of a written opposition to the Escobal exploitation license."[63] Commenting on the challenge, Oxfam explained that local farmers believed that "The license in San Rafael [was] not legally valid" and that the mine was operating illegally because the government did not allow consultation with the community.[64] In sum, Plaintiff claims that Tahoe's statements regarding the legality of the license were false because "the Escobal License was not lawfully obtained because [the Xinka] were not consulted by MEM, as required by Guatemalan Law, before the Escobal License was issued."[65] However, the market was aware of the disputed nature of the licensing process well before the Alleged Corrective Disclosures—with publicly available information that, as summarized by Oxfam, "a Guatemalan Tribunal ha[d] ruled that the permit to operate the mine…was a violation of the right to due process."[66]

---

13, 2013, p. 1, https://www.kairoscanada.org/partners-in-guatemala-question-proposed-moratorium-and-demand-respect-for-indigenous-rights, accessed August 16, 2021.

[63] Tahoe Resources Inc., "Tahoe Resources Clarifies PEA Disclosure," July 24, 2013, p. 2. In its 2013 Annual Information Form, Tahoe commented further on this legal challenge, stating "On July 23, a Court of Appeals in Guatemala held that MEM should have conducted a hearing of a written opposition to the Escobal exploitation license during the permitting application process. The court did not rule on the substance or validity of the opposition; it merely stated that MEM was obligated to hold an administrative hearing addressing the substance of the opposition under the 1997 Mining Law. The Court did not invalidate or comment on the Escobal exploitation license in its decision. MEM issued a press release on July 24 stating that the ruling had no impact on the status of Escobal's exploitation license. MEM and the company have appealed the lower court's decision to the Constitutional Court. If the Constitutional Court upholds the Court of Appeals' decision, MEM will have to hear the opposition which it already stated it believes to be without merit. A public hearing was held on the issue in November 2013. The Constitutional Court is expected to issue a ruling in the case sometime in the next several months. The Escobal exploitation license is required for the Company to operate the mill and to produce concentrate from the mine. All other permits required for continued exploration, construction and operations are in place. However, as the Escobal mine is the Company's sole project, if the exploitation permit for Escobal is unexpectedly suspended, the Company will be unable to generate revenue. As a result and under such circumstances, the Company expects this would adversely impact its business, results of operations, financial performance and may result in default on the debt facility or reduction of workforce at the project." 2013 Annual Information Form, p. 35.

[64] Chris Hufstader, "No silver lining in Guatemala conflict," Oxfam, November 26, 2014, ***********.oxfamamerica.org/explore/stories/no-silver-lining-in-guatemala-conflict/, accessed August 6, 2021.

[65] Complaint, ¶ 157(a).

[66] Chris Hufstader, "Violence, and bogus charges against the human rights defenders in Guatemala continue," Oxfam, November 3, 2015, https://firstperson.oxfamamerica.org/violence-and-bogus-charges-against-human-rights-defenders-in-guatemala-continues/, accessed August 6, 2021. The Oxfam article noted that an appeal was then pending to the Constitutional Court, but the Constitutional Court later "upheld the initial decision from the Court of Appeals." *See* "On the cusp of senior producer status in 2017; initiating coverage with Buy rating and C$23 target," Desjardins Capital Markets, August 30, 2016.

39. As such, investors in Tahoe would have had access to the information that, (i) there were allegations that MEM had not properly consulted local communities as required; (ii) MEM was mandated by a Guatemalan Court to conduct a hearing about the opposition to the mine in 2013; and (iii) Xinka representatives and other NGOs believed the license was invalid and sought to invalidate it. In the face of this information, an expert would need to determine the value of the information that Tahoe had and should have disclosed, but that the market did not have, in order to properly measure damages.[67] Plaintiff's complaint does not identify the information about Tahoe's license that Tahoe should have disclosed that was not publicly available, but it is precisely this information that would be necessary to create artificial inflation and therefore must be valued.

40. Moreover, Dr. Nye's proposed methodology *cannot* do so—his proposed approach can only measure the impact of all information in the Alleged Corrective Disclosures as a whole, which, in addition to any purportedly new information correcting the Alleged Misstatements, also included the realization of a risk. Without providing a methodology to determine the value of the information that Tahoe could and should have disclosed relative to value of the information available to the market, Dr. Nye cannot claim to have a methodology that measures damages consistent with Plaintiff's theory of liability.

**2. Statements About the Indigenous Population in the Area of the Escobal Mine**

41. Plaintiff alleges that Tahoe made false or misleading statements about the presence of the Xinka in the area of the Escobal mine by minimizing the existence of a local indigenous population.[68]

42. For example, Plaintiff references Tahoe's Preliminary Economic Assessment, filed with the SEC on July 25, 2013, in which Tahoe explained:

> The Company is not aware of any significant indigenous population residing in the area of the Escobal Project. According to Guatemala's National Institute of

---

[67] I understand that it is the obligation of MEM, and not the mining company, to consult with indigenous peoples. As a result, it will be particularly important for Plaintiff to identify the information that Tahoe, specifically, had and should have disclosed. Even if such information were identified, Dr. Nye has provided no methodology to value that information.

[68] Complaint, ¶ 158.

Statistics (Census 2002) San Rafael Las Flores' population is 99.6% "Ladino", i.e., of Hispanic origin and non-indigenous.[69]

43. Plaintiff also references the 2013 Annual Information Form filed by Tahoe, which restated the official government census's estimate of the lack of Xinka population above. Plaintiff claims that these statements were false and/or misleading because Tahoe failed to disclose that "[it] was aware of a significant Xinka population living in the Escobal Project Area."[70]

44. To support the claim that Tahoe minimized the presence of a significant Xinka population, Plaintiff points to the 2003-04 Xinka Parliament Census[71] and a 2008 census[72] conducted by the rights group COPXIG[73], which found that Xinka were present in the area of the mine—ignoring the results of Guatemala's official census of 2002, which characterized the local population as 99.6% non-indigenous. Plaintiff also references two ethnographical studies[74] published in 2017, and observations of Tahoe employees.[75]

45. However, much of the information that Plaintiff claims supports the presence of the Xinka, regardless of its accuracy, was *available to the public* and would have been incorporated into the market price of Tahoe's stock. The Xinka Parliament Census, for example, was cited in at least two United Nations Reports in 2009[76] and 2011.[77] The 2008 COPXIG

---

[69] Complaint, ¶ 159.
[70] Complaint, ¶ 161(a).
[71] The 2003-04 Census was cited in two UN reports from 2009 and 2011. *See* "Sociolinguistic Atlas of Indigenous Peoples in Latin America," United Nations International Children's Emergency Fund, Book 2, Section 11, 2009, p. 856 (translated). *See* also "Diagnosis of the Human Rights Situation of the Indigenous Peoples of Central America," Regional Office for Central America of the High Commissioner of the United Nations for Human Rights, Book 1, November 2011, p. 193 (translated).
[72] The 2008 COPXIG Census was published by the University of Guatemala San Carlos and cited in a 2016 report from the Guatemalan Ministry of Culture and Sport. *See* Abisai De la Cruz Morales, "Process of land recovery as a factor of social cohesion of the Xinka Community Las Lomas, Chiquimulilla, Santa Rosa," University of San Carlos of Guatemala, August 2009 (translated). *See* also "Analysis Report: Status of the Xinka Culture," Guatemala Ministry of Culture and Sports," November 2016 (translated).
[73] COPXIG is an acronym for Consejo Coordinador Del Pueblo Xinka de Guatemala.
[74] These ethnographical studies were mentioned in "The CC asked universities if there were Xinkas (because of a mine): the USAC responded as follows," Nomada, July 30, 2018, https://nomada.gt/identidades/de-donde-venimos/la-cc-pregunto-a-universidades-si-existian-xinkas-por-una-mina-la-usac-respondio-asi/, accessed September 24, 2021 (translated).
[75] Complaint, ¶¶ 73–79.
[76] "Sociolinguistic Atlas of Indigenous Peoples in Latin America," United Nations Children's Emergency Fund, Book 2, Section 11, 2009, p. 856 (translated).
[77] "Diagnosis of the Human Rights Situation of the Indigenous Peoples of Central America," Regional Office for Central America of the High Commissioner of the United Nations for Human Rights, Book 1, November 2011, p. 193 (translated).

Census was published by the University of San Carlos in Guatemala in August of 2009, [78] and was also cited in a 2016 report by the Guatemalan Ministry of Culture and Sports' report.[79] Similarly, the Ethnographical Studies were publicly available.[80] More generally, the presence of the Xinka near the Escobal mine was discussed by BBC News, which, in 2014, noted that "thousands of Xincas" lived in the area.[81] The Associated Press, in a 2013 article, reported that "Residents of the area are mainly members of the Xinca indigenous group, "[82] and a LA Times article also in 2013 noted that residents of the area "are mostly Xinca Indians."[83] The Justice and Corporate Accountability Project similarly explained that there was a Xinka indigenous community in the municipalities surrounding the Escobal mine.[84]

46. Dr. Nye does not provide a methodology to determine the value of the information that Tahoe could and should have disclosed, and therefore cannot claim to have a methodology that measures damages consistent with Plaintiff's theory of liability.[85]

---

[78] Abisai De la Cruz Morales, "Land recovery process as a factor of social cohesion of the Xinka Las Lomas Community, Chiquimulilla, Santa Rosa," University of San Carlos of Guatemala, August 2009 (translated).

[79] "Diagnostics on the Cultural Situation of the Xinka," Guatemala Ministry of Culture and Sports, November 2016 (translated).

[80] *See* "The CC asked universities if there were Xinkas (because of a mine): the USAC responded as follows," Nomada, July 30, 2018 (translated), available at https://nomada.gt/identidades/de-donde-venimos/la-cc-pregunto-a-universidades-si-existian-xinkas-por-una-mina-la-usac-respondio-asi/, accessed September, 2021.

[81] Nina Lakhani, "Clashes as Guatemalan communities fight mine." BBC News, June 6, 2014, ***********.bbc.com/news/world-latin-america-27678668, accessed August 5, 2021.

[82] Sonia Perez Diaz and Luis Soto, "Guatemala sends police, army to crack down on anti-mine protests, issues emergency decree," Associated Press, May 2, 2013, https://globalnews.ca/news/531909/guatemala-sends-police-army-to-crack-down-on-anti-mine-protests-issues-emergency-decree/, accessed August 12, 2021.

[83] Sonia Perez Diaz, "Dispute over Guatemala silver mine turns violent; Residents fear a Canadian firm is polluting their town's water. Protests escalate into clashes." The Los Angeles Times, June 9, 2013.

[84] "Request to Investigate Tahoe Resources for Failure to Disclose Material Information," Justice and Corporate Accountability Project, August 8, 2016, p. 13.

[85] In the face of the public information discussed in this subsection about the presence of the Xinka, an expert would need to determine the value of the information that Tahoe had and should have disclosed, but that the market did not have, in order to properly measure damages. Plaintiff's complaint does not identify the information about the presence of the Xinka that Tahoe should have disclosed that was not publicly available, but it is precisely this information that creates inflation and therefore must be valued. Moreover, Dr. Nye's proposed methodology *cannot* do so—his proposed approach can only measure the impact of all information in the Alleged Corrective Disclosures as a whole, which included the realization of a risk, as well as any purportedly new information correcting the Alleged Misstatements.

### 3. Statements About Xinka Involvement in Protests Against the Escobal Mine

47. Plaintiff also alleges that Tahoe made materially false or misleading statements about opposition to the Escobal mine, alleging that Tahoe "fail[ed] to disclose that this resistance included a large number of Xinka…"[86]

48. For example, Plaintiff references Tahoe's May 1, 2013 press release that addressed a violent protest near the Escobal mine,[87] as well as Tahoe's Form 6-K report for the first quarter of 2013 filed with the SEC, which explained:

> In recent months outlier communities and nongovernmental organizations ("NGOs") have become more vocal and active with respect to mining activities in Guatemala. These communities and NGOs have taken such actions as road closures, power line opposition, work stoppages, and law suits for damages. These actions relate not only to current activities but often in respect to decades old mining activities by prior owners of mining properties. Such actions by communities and NGOs may have a material adverse effect on our operations at the Escobal Project and on its financial position, cash flow and results of operations.[88]

49. Plaintiff also references a June 4, 2013 press release, in which Tahoe stated:

> The local population of San Rafael, where the project is located, is best characterized as grateful for enhanced law enforcement efforts in the region. Recent news articles seeing wide distribution over the last week have been highly inaccurate. Among a host of misstatements, they have falsely characterized the local population as indigenous and have incorrectly described violent activities by people from outside the community as peaceful protests by local farmers.[89]

50. According to the complaint, Tahoe should have disclosed that Xinka people were involved in the protests and the opposition to the mine. However, there was public discussion that referenced Xinka involvement in protests against, and opposition to, the Escobal mine. For example, an article published on April 11, 2013, only a few days after the beginning of the Class Period, explained that four Xinka leaders had been involved in a community referendum in San Rafael las Flores "in which more than 99 percent of people voted against the Escobal project."[90]

---

[86] Complaint, ¶ 162.
[87] Complaint, ¶ 163.
[88] Complaint, ¶ 164.
[89] Complaint, ¶ 166.
[90] Melanie Sevcenko, "After Kidnapping and Killing, Canadian Silver Mining Project Advances in Guatemala,"

Another report, published in March 2013, before the start of the Class Period, claimed that the Xinka communities had resisted "the development of the Escobal mine for more than two years" and explained that "Xinca communities started organizing community consultations" in which the vast majority of participants voted against the mining process.[91] BBC News explained that, "[f]or the Xincas, who have a legal right to be consulted about mega-projects in their territory, mining is an intolerable destruction of Mother Earth,"[92] while the LA Times reported that around the mine, "where residents are mainly Xinca Indians," many residents believed they had "no choice but to fight."[93]

51. The Xinka's involvement in protests at the outset of Tahoe's mining activities was also discussed in the public press. For example, after violent protests led the Guatemalan government to declare a state of emergency in the Escobal area in May 2013, the Associated Press explained that "Residents of the area… mainly members of the Xinca indigenous group … claim the Canadian-owned Escobal silver mine, known locally as the San Rafael mine, threatens their local water sources."[94] The legal action brought by Quelvin Jimenez, a member of the Xinka Parliament, was also discussed in public press.[95]

52. Dr. Nye does not provide a methodology to determine the value of the information that Tahoe could and should have disclosed, and therefore cannot claim to have a methodology that measures damages consistent with Plaintiff's theory of liability.[96]

---

Occupy.com, April 11, 2013, https://www.occupy.com/article/after-kidnappings-and-killing-canadian-silver-mining-project-advances-guatemala#sthash.ydnQvSsp.zJKTjEMd.dpbs., accessed September 24, 2021.

[91] John Achni Schertow, "Guatemala: Recurring Violence In Area of Escobal Mine Project Demands Investigation And Company Withdrawal," Intercontinentalcry.org, March 24, 2013, https://intercontinentalcry.org/guatemala-recent-attacks-against-the-xinca-demand-a-full-and-impartial-investigation/, accessed September 24, 2021.

[92] Nina Lakhani, "Clashes as Guatemalan communities fight mine." BBC News, June 6, 2014, ***********.bbc.com/news/world-latin-america-27678668, accessed August 5, 2021.

[93] Sonia Perez Diaz, "Dispute over Guatemala silver mine turns violent; Residents fear a Canadian firm is polluting their town's water. Protests escalate into clashes." The Los Angeles Times, June 9, 2013.

[94] Sonia Perez Diaz and Luis Soto, "Guatemala sends police, army to crack down on anti-mine protests, issues emergency decree," The Associated Press, May 2, 2013, https://globalnews.ca/news/531909/guatemala-sends-police-army-to-crack-down-on-anti-mine-protests-issues-emergency-decree/, accessed August 12, 2021.

[95] *See*, e.g., Bill Barreto, "Chamber orders hearing of mining objection," Prensa Libre, July 25, 2013 (translated); "Tahoe: court ruling does not affect Escobal mining permit, Guatemala," BNAmericas, July 24, 2013.

[96] In the face of the public information discussed in this subsection about the Xinka participation in opposition to the mine, an expert would need to determine the value of the information that Tahoe had and should have disclosed, but that the market did not have, in order to properly measure damages. Plaintiff's complaint does not identify the information about the Xinka opposition to the mine that Tahoe should have disclosed that was not publicly available, but it is precisely this information that creates inflation and therefore must be valued. Moreover, Dr. Nye's proposed methodology *cannot* do so—his proposed approach can only measure the impact of all information

**4. Statements About Tahoe's Community Outreach**

53. Plaintiff alleges that Tahoe made materially false or misleading statements regarding Tahoe's community outreach by "representing that Tahoe was open to all constructive dialogue with the indigenous communities in the Escobal Project Area, when in fact, the Company never reached out to Xinka Parliament representatives, and instead actively worked to thwart the consultation requests made by the Xinka Parliament and People."[97]

54. For example, Plaintiff alleges as misleading the following statement from Tahoe's CSR blog:

> There are many Guatemalans, including the majority of those in the San Rafael las Flores community, who support the Escobal project… Tahoe has exceeded legal requirements and demonstrated best international practices for engaging in dialogue with the community. The company has hosted hundreds of meetings with government officials and individual community members, providing project information and answering questions of supporters and opponents.[98]

55. Plaintiff also references Tahoe's Annual Reports, which provided commentary that "[Tahoe] is open to all constructive dialogue."[99]

56. Plaintiff alleges that these statements were false and/or misleading because the "[t]he majority of the people in San Rafael Las Flores did not support the Escobal Project, as evidenced by the local plebiscites held in the municipality in which 93.44% to 100% of people voted no to mining," and because Tahoe "actively worked to thwart the Xinka's efforts to exercise their consultation rights by…responding violently to protests, attempting to block plebiscites, filing legal claims against Xinka representatives, and opposing the Xinka's lawsuit against MEM."[100]

57. However, extensive information was available to the public regarding activism against the mine and Tahoe's actions in response. While the LA Times noted that the mine had local supporters, and that those supporters believed the mine would "bring jobs and tens of

---

in the Alleged Corrective Disclosures as a whole, which included the realization of a risk, as well as any purportedly new information correcting the Alleged Misstatements.

[97] Complaint, ¶ 169.

[98] Complaint, ¶ 170 (emphasis removed).

[99] Complaint, ¶¶ 172–175.

[100] Complaint, ¶ 176.

millions of dollars to local governments and communities,"[101] a number of websites and news sources discussed opposition to the project, including the plebiscites mentioned in the complaint.[102] For example, the Norwegian Council on Ethics noted that the Xinka and the Xinka Parliament "oppose the mining operation and demand that they be consulted before licenses[103] are granted in the areas in which they live."[104] Similarly, BBC News, in a June 6, 2014 article, explained that many residents of the region opposed the project and discussed the opposition as well as Tahoe's efforts to involve the community:

> Oscar Morales, co-founder of the pressure group Committee in Defense of Peace and Life in San Rafael, says that "Tahoe has no social license to operate its mine."[105]

58. Other sources also discussed the plebiscites that Plaintiff alleges show the opposition in the Xinka community.

a. On April 11, 2013, occupy.com commented that in a community referendum,

> "more than 99 percent of people voted against the Escobal project."[106]

b. In 2012, Under Siege reported:

> Immediately before and after the Escobal mineral extraction license was issued in April 2013, eight "good faith" plebiscites were held at the

---

[101] Sonia Perez Diaz, "Dispute over Guatemala silver mine turns violent; Residents fear a Canadian firm is polluting their town's water. Protests escalate into clashes.," The Los Angeles Times, June 9, 2013.
[102] *See*, e.g., Complaint ¶ 100, ("Despite the Xinka's efforts, the mayor of San Rafael Las Flores rejected the community's request for a plebiscite. See Luis Solano, "Under Siege: Peaceful Resistance to Tahoe Resources and Militarization in Guatemala," International Platform Against Impunity in Central America, Mining Watch Canada, NISGUA, November 10, 2015 ("Under Siege") at 9, n.31. Although, ultimately, with the help of the Xinka Parliament, the residents of San Rafael Las Flores organized 'good faith' plebiscites in the municipality's communities anyway. Under Siege at 10. Again, voters rejected mining, voting NO to mining between 93.44% and 100%. Under Siege, at 10") (References to source material removed).
[103] Certain sources use the Canadian spelling of various words (i.e. "licence" or "defence," instead of "license" or "defense" as spelled in the United States). For ease of readability, I have changed the spelling of these terms to the United States standard.
[104] *See* "Annual Report 2014: Council on Ethics for the Government Pension Fund Global," Council on Ethics for the Government Pension Fund Global, December 31, 2014, p. 172. *See* also "Request to Investigate Tahoe Resources for Failure to Disclose Material Information," Justice and Corporate Accountability Project, August 8, 2016, p. 15.
[105] Nina Lakhani, "Clashes as Guatemalan communities fight mine," BBC, June 6, 2014, ***********.bbc.com/news/world-latin-america-27678668, accessed August 5, 2021.
[106] Melanie Sevcenko, "After Kidnapping and Killing, Canadian Silver Mining Project Advances in Guatemala," Occupy.com, April 11, 2013, https://www.occupy.com/article/after-kidnappings-and-killing-canadian-silver-mining-project-advances-guatemala, accessed September 24, 2021.

> village in San Rafael Las Flores, promoted by the Committee in Defense of Life and Peace. These took place in the communities of San Juan Bosco, El Volcancito, La Cuchilla, Chan Grande, Las Delicias, Los Planes, and Barrio Oriental. In all of these communities, the majority voted "no."[107]

c. In November of 2014, *Oxfam* noted that:

> In five municipal consultations with high participation from registered voters, approximately 98% of voters rejected mining. Since 2011, 12 community referenda have been held in the area. In each vote, more than 90% of the participants voted against the mine. Throughout Guatemala, more than a million people have participated in 80 consultations and have overwhelmingly said no to mining in their territories. **These community votes send a clear message: Mining companies, including Tahoe Resources, do not have local support.**[108]

59. Moreover, the fact that Tahoe sought to operate the Escobal mine despite protests, which in some cases turned violent, was also covered in public press. In 2014, a year after protests around the time of the Escobal License's issuance, several protesters who had been wounded sued Tahoe "in British Columbia Supreme Court arguing it should be held liable for the alleged violent action against them."[109] The suit also alleged that "Tahoe had committed to operate under principles of corporate social responsibility to respect human rights, so it had a duty of care to make sure that its employees and contractors abided by those principles and was negligent for failing to do so."[110] Oxfam also explained in 2014 that:

> Local communities have overwhelmingly rejected the mine despite violence, intimidation, and a corrupt government that is cracking down on opposition. But if the company continues to force the mine onto communities, the increase in violence we've seen near the mine site is very likely to continue to escalate.[111]

---

[107] Under Siege, p. 10.
[108] Alex Blair, "Corporate greed and human rights: Is history repeating itself in Guatemala?" Oxfam, November 25, 2014, https://politicsofpoverty.oxfamamerica.org/corporate-greed-and-human-rights-is-history-repeating-itself-in-guatemala/, accessed August 12, 2021. Emphasis in original.
[109] Derrick Penner, "Vancouver-based Tahoe Resources faces lawsuit over violence at Guatemala mine," Postmedia Breaking News, June 18, 2014.
[110] Derrick Penner, "Vancouver-based Tahoe Resources faces lawsuit over violence at Guatemala mine," Postmedia Breaking News, June 18, 2014.
[111] Alex Blair, "Corporate greed and human rights: Is history repeating itself in Guatemala?" Oxfam, November 25, 2014, https://politicsofpoverty.oxfamamerica.org/corporate-greed-and-human-rights-is-history-repeating-itself-in-guatemala/, accessed August 12, 2021.

Indeed, as explained in a news article in the Toronto Star, "The violence at Escobal mine was singled out by Amnesty International as an example of how foreign companies need to do more to ensure respect for Human Rights."[112]

60. Tahoe also filed a lawsuit to stop the plebiscites, which was also covered in public press prior to the Alleged Corrective Disclosures.[113] In 2011, Tahoe filed a suit with the Guatemalan Constitutional Court that aimed to prevent a referendum on the mine.[114] This suit, which was initially filed secretly, led activists to issue a 2016 report calling on the SEC to investigate Tahoe for failing to disclose the claim. The report also "question[ed] the company's commitment to securing local indigenous support for the mine," and according to the authors, Tahoe's lawsuit to stop the plebiscites showed "the extent to which Tahoe and its allies feared the results of the votes and the extent to which they would thwart democratic rights to vote."[115]

61. Allegations that Tahoe's opposition led to legal claims against the Xinka and others who opposed the mine were also covered in public press. As explained by Oxfam, opponents of the mine were targeted for arrest, sometimes on purportedly false charges. According to Oxfam's program officer in Guatemala, the government and mining companies often used these tactics to "wear out human rights and environmental activists in order to undermine the public debate and opposition to mining," explaining that "Approximately one hundred people have been accused of crimes they didn't commit… in relation to Tahoe's mine."[116] Rafael Maldonado, the lawyer for CALAS who filed the eventual successful suit against MEM, alleged "a state- and company-sponsored strategy of framing mining opponents," and claimed in a hearing before the U.S. Congress that "the false accusations of serious crimes

---

[112] Marco Chown Oved, "Canadian company tried to stop referendum on mine in Guatemala," Toronto Star, August 11, 2016, https://www.thestar.com/news/world/2016/08/11/canadian-company-tried-to-stop-referendum-on-mine-in-guatemala.html, accessed August 12, 2021.
[113] "US Securities and Exchange Commission asked to investigate mining company's failure to disclose secret lawsuits," NISGUA, August 11, 2016, https://nisgua.org/us-securities-and-exchange-commission-asked-to-investigate-mining-companys-failure-to-disclose-secret-lawsuits/, accessed August 18, 2021.
[114] Marco Chown Oved, "Canadian company tried to stop referendum on mine in Guatemala," Toronto Star, August 11, 2016, https://www.thestar.com/news/world/2016/08/11/canadian-company-tried-to-stop-referendum-on-mine-in-guatemala.html, accessed August 12, 2021.
[115] Marco Chown Oved, "Canadian company tried to stop referendum on mine in Guatemala," Toronto Star, August 11, 2016, https://www.thestar.com/news/world/2016/08/11/canadian-company-tried-to-stop-referendum-on-mine-in-guatemala.html, accessed August 12, 2021.
[116] Alex Blair, "Corporate greed and human rights: Is history repeating itself in Guatemala?" Oxfam, November 25, 2014, https://politicsofpoverty.oxfamamerica.org/corporate-greed-and-human-rights-is-history-repeating-itself-in-guatemala/, accessed August 12, 2021.

(including kidnapping, illegal detention, arson…) were developed for the San Rafael mining company, a subsidiary of Tahoe Resources."[117]

62. Tahoe's opposition to the suit against MEM was also disclosed by Tahoe itself. Upon the initial decision in 2013 that MEM should have conducted a hearing of Quelvin Jimenez's claim, Tahoe joined MEM to "appeal[] the lower court's ruling to the Constitutional Court," a fact which Tahoe disclosed in the initial press release discussing the claim and updated in later public filings with securities regulators.[118]

63. Dr. Nye does not provide a methodology to determine the value of the information that Tahoe could and should have disclosed, and therefore cannot claim to have a methodology that measures damages consistent with Plaintiff's theory of liability.[119]

**5. Statements About Tahoe's Alignment with CSR Policies**

64. Plaintiff also argues, in addition to his broader claims about Tahoe's outreach to the community, that Tahoe made false or misleading statements throughout its CSR publications by "representing that Tahoe was conducting the Escobal Project in compliance with international best practices and human rights principles," while "failing to adequately engage with the indigenous populations regarding the Escobal Project."[120]

65. For example, Plaintiff references Tahoe's CSR blog and annual reports regarding their responses to consultation requests and plebiscites, which, as discussed in Section V.B.4, were covered by public press. Plaintiff also references Tahoe's May 1, 2013 press release

---

[117] Chris Hufstader, "Violence, and bogus charges against human rights defenders in Guatemala continue," Oxfam, November 3, 2015, available at https://firstperson.oxfamamerica.org/violence-and-bogus-charges-against-human-rights-defenders-in-guatemala-continues/, accessed August 6, 2021.

[118] *See* Tahoe Resources Inc. Press Release, "Tahoe Resources Clarifies PEA Disclosure," July 24, 2013. *See* also 2013 Annual Information Form, p. 35; 2016 Annual Information Form, p. 11.

[119] In the face of the public information discussed in this subsection about Tahoe's community outreach, an expert would need to determine the value of the information that Tahoe had and should have disclosed, but that the market did not have, in order to properly measure damages. Plaintiff's complaint does not identify the information about the local opposition to the mine and Tahoe's actions that Tahoe should have disclosed that was not publicly available, but it is precisely this information that creates inflation and therefore must be valued. Moreover, Dr. Nye's proposed methodology *cannot* do so—his proposed approach can only measure the impact of all information in the Alleged Corrective Disclosures as a whole, which included the realization of a risk, as well as any purportedly new information correcting the Alleged Misstatements.

[120] Complaint, ¶ 177.

"Tahoe Clarifies Reports Regarding Incidents Near Escobal Project,"[121] highlighting the statement that:

> We send our condolences to the family of the slain police officer and strive to engage with and to peacefully coexist with all stakeholders in this area of Guatemala. This project is being constructed to the highest environmental and social standards and it brings needed employment to the area and millions of dollars in annual royalties and taxes.[122]

66. Plaintiff also references a September 6, 2013 article on Tahoe's CSR blog, which stated:

> **The fact remains that Tahoe has exceeded legal requirements and demonstrated best international practices for engaging in dialogue with the community.** The company has hosted hundreds of meetings with government officials and individual community members, providing project information and answering questions of supporters and opponents. In addition, hundreds of community members and government officials have taken site tours to become more familiar with the mine. Tahoe continues to seek meaningful and effective dialogue with community members.[123]

67. Plaintiff also alleges as misstatements other filings with the SEC, in which Tahoe claimed that it worked to, and eventually did, "align[] its policies and practices in Guatemala with the United Nations Guiding Principles on Business and Human Rights."[124] Plaintiffs claim that these statements were false and/or misleading because Tahoe's practices were not aligned with these principles and standards because Tahoe "never attempted to consult with the Xinka Parliament or people who were affected by the Escobal Project…and instead actively worked to thwart the Xinka's efforts to exercise their consultation rights."[125]

68. The explanations of Tahoe's alleged lack of alignment with CSR policies are substantially similar to the reasons provided by Plaintiff in explaining why statements about community outreach were false and misleading. There was widespread public discussion of

---

[121] Tahoe Resources Inc. Press Release, "Tahoe Clarifies Reports Regarding Incidents Near Escobal Project," May 1, 2013.
[122] Complaint, ¶ 178. Emphasis altered.
[123] Complaint, ¶ 180.
[124] Complaint, ¶ 182–185, citing 2016 Annual Information Form, p. 15; 2015 Annual Information Form, p. 13; 2014 Annual Information Form, p. 14; 2013 Annual Information Form, p. 15.
[125] Complaint, ¶ 181.

these activities, as discussed in Section V.B.4 above.[126] Dr. Nye does not provide a methodology to determine the value of the information that Tahoe could and should have disclosed, and therefore cannot claim to have a methodology that measures damages consistent with Plaintiff's theory of liability.

**C. Dr. Nye Provides No Methodology to Account for This Information, As Is Necessary to Measure Inflation.**

69. As described above, measuring inflation in this case will require identifying and establishing the value of *only* the *incremental* information that Tahoe had and could and should have disclosed, relative to the vast amount of information already available in the market about each type of alleged misstatement—(1) the issuance of the license, (2) the Xinka population in the Escobal area, (3) the Xinka's opposition to the Escobal mine, (4) Tahoe's actions in response to that opposition, and (5) Tahoe's actions in relation to its CSR policies. In order to properly measure any damages, Dr. Nye must establish what the price of Tahoe's shares would have been, absent the Alleged Misstatements, and measure the difference between that price and the actual price of the stock.[127]

70. In other words, Dr. Nye must measure how the market would have assessed Tahoe's disclosure of any allegedly corrective information in the context of the other information already available and how the market would have assessed the resultant incremental change to

[126] In the face of that information, an expert would need to determine the value of the information that Tahoe had and should have disclosed, but that the market did not have, in order to properly measure damages. Plaintiff's complaint does not identify the information about the local opposition to the mine and Tahoe's actions that Tahoe should have disclosed that was not publicly available, but it is precisely this information that creates inflation and therefore must be valued. Moreover, Dr. Nye's proposed methodology *cannot* do so—his proposed approach can only measure the impact of all information in the Alleged Corrective Disclosures as a whole, which included the realization of a risk, as well as any purportedly new information correcting the Alleged Misstatements.

[127] Indeed, Dr. Nye agrees that only losses caused specifically by the fraud should be recoverable as damages (Nye Deposition, 75:23–77:6). It is noteworthy that the Lead Plaintiff, however, believes he is entitled to his entire investment loss from his purchase of Tahoe stock, which he calculated as $1.8 million (Nguyen Deposition, 247:25–249:6). Importantly, of that $1.8 million loss, more than 60% ($1.1 million) was lost *before* the Alleged Corrective Disclosures (NGUYEN_00022462). This is in stark contrast to Dr. Nye's deposition testimony: "[I]f you've got a class period where [the stock] goes from 100 to zero, you can say damages are 100, but along the way there was a whole bunch of things unrelated to fraud that caused it to go from 100 to 90 [sic] and then only the last ten dollars is fraud related. That [damages of 100] wouldn't be measuring damages in a manner consistent with plaintiffs' theory of liability. … [I]n that hypothetical only $10 of the $100 drop was due to the fraud… But if instead I took the $100 complete loss, 90 of which was due to nonfraud-related effects, then I wouldn't be measuring damages consistent with plaintiffs' theory of liability because I wouldn't be measuring the amount of the price inflation and actual loss incurred as a result of the disclosure of the relevant truth." (Nye Deposition, 75:23–77:6).

the value of Tahoe's stock due to the perceived risk to the Escobal License—especially given that much of the information to which Plaintiff points as evidence of the falsity of Tahoe's claims was publicly available. Dr. Nye has provided no methodology to perform such an analysis.

## VI. DR. NYE'S THEORY OF LIABILITY IS INCONSISTENT WITH MARKET EVIDENCE, AND THEREFORE ANY ATTEMPT TO MEASURE DAMAGES BASED UPON THAT THEORY IS INHERENTLY FLAWED

71. Dr. Nye has asserted that damages "can be calculated using a methodology that is common to the Class and in a manner that is consistent with Lead Plaintiff's theory of liability."[128] However, his report contains no description of Lead Plaintiff's allegations or theory of liability, and the theory of liability that Dr. Nye articulated at deposition is inconsistent with the market evidence and Plaintiff's own deposition testimony.[129] Specifically, Dr. Nye testified that the risk of losing the Escobal License was "thrust upon investors *unknowingly*."[130] As I explain in this section, however, there is no reasonable doubt that this risk was known. The only possible question is whether the true *extent* of the risk was known. As I discuss in Section VII below, a damages measure that compensates investors for the realization of a risk that was known (even if imperfectly understood due to a company's misstatements) will overcompensate investors.

72. In an efficient market such as the one that Dr. Nye asserts existed for Tahoe's stock, various types of information would be incorporated into Tahoe's stock price, including from sources such as public press, filings in the Guatemalan courts, legislative or regulatory changes, company disclosures, and analyst reports. Public information on risks to the Escobal License would have been reflected in the price of Tahoe's stock. Upon the suspension of the Escobal License, the price decline upon the Alleged Corrective Disclosures would therefore have reflected the reaction to the *realization* of the risk to the mine—namely the loss of future revenues from the Escobal mine—in addition to any reaction to any corrective disclosures or to the news of any allegedly concealed risk.

---

[128] Nye Report, ¶ 7.
[129] See footnote 127 above.
[130] Nye Deposition, 97:17–18 (emphasis added).

**A. Tahoe Faced Risks from Operating in Guatemala That Could Have Impacted Future Revenues.**

73. Risks to mining companies in Guatemala, and to Tahoe and the Escobal mine in particular, were discussed publicly throughout the Class Period by both Tahoe and third-party sources. For example, the Fraser Institute, an economic policy organization which publishes an annual survey of mining industry participants, published a quote in February 2017 which noted that "Political uncertainty in Guatemala is deterring investment." Indeed, this report ranked Guatemala 89th out of 104 jurisdictions in its "Policy Perception Index," concerning uncertainty about factors like regulation, political stability, and taxation.[131] The Fraser Institute ranked Guatemala poorly in the other annual reports published during the Class Period.[132] Similarly, Oxfam commented in 2015 that "[m]ining in Central America is risky business for companies and communities, alike," and "[n]owhere is this more evident than in Guatemala."[133]

74. Over the Class Period, mine operators in Guatemala faced changing risks to the level of taxation. In July 2013, for example, Guatemala's president pressured Congress to raise royalties, seeking a mandatory royalty of up to 5 percent, up from the previous 1 percent rate.[134] In December 2014, the Guatemalan Congress passed a bill requiring mining companies to pay 10 percent of revenues to the government, which was ruled unconstitutional but proposed again in

---

[131] Taylor Jackson and Kenneth P. Green, "Survey of Mining Companies 2016," Fraser Institute, February 2017, pp. 6–7, 14–15, 43

[132] *See* Alana Wilson et al., "Survey of Mining Companies 2012/2013," Fraser Institute, February 2013; Alana Wilson and Miguel Cervantes, "Survey of Mining Companies 2013," Fraser Institute, March 2014; Taylor Jackson, "Survey of Mining Companies 2014," Fraser Institute, February 2015; Taylor Jackson and Kenneth P. Green, "Survey of Mining Companies 2015," Fraser Institute, February 2016; Taylor Jackson and Kenneth P. Green, "Survey of Mining Companies 2016," Fraser Institute, February 2017; Ashley Stedman and Kenneth P. Green, "Survey of Mining Companies 2017," Fraser Institute, February 2018.

[133] "Why did Goldcorp really pull out of Tahoe Resources' troubled Guatemalan mining project?" Oxfam, July 7, 2015, available at https://politicsofpoverty.oxfamamerica.org/why-did-goldcorp-really-pull-out-of-tahoe-resourcess-troubled-guatemalan-mining-project/, accessed August 6, 2021. *See* Alana Wilson et al., "Survey of Mining Companies 2012/2013," Fraser Institute, February 2013; Alana Wilson and Miguel Cervantes, "Survey of Mining Companies 2013," Fraser Institute, March 2014; Taylor Jackson, "Survey of Mining Companies 2014," Fraser Institute, February 2015; Taylor Jackson and Kenneth P. Green, "Survey of Mining Companies 2015," Fraser Institute, February 2016; Taylor Jackson and Kenneth P. Green, "Survey of Mining Companies 2016," Fraser Institute, February 2017, pp. 6–7, 14–15, 43; Ashley Stedman and Kenneth P. Green, "Survey of Mining Companies 2017," Fraser Institute, February 2018.

[134] Mike McDonald, "Guatemala would scrap mining moratorium plan for royalty hike-minister," Reuters News, July 30, 2013.

2016.[135] In 2015, Oxfam commented on the effect of these risks, noting that "Tahoe's market valuation has been buffeted since mid-2014 by…the prospects of a royalty hike in Guatemala."[136]

75. Regulation of the licensing of mines was also inconsistent, with attitudes towards mining subject to change depending on the political environment. In 2012 and early 2013, MEM granted 387 exploration and exploitation licenses for metal mining (including the Escobal License),[137] but in July of 2013 the government enacted a two-year moratorium on new mining licenses with the support of the President.[138] Indeed, one analyst noted in a report about Tahoe that the mining industry in Guatemala "faced significant opposition" and "highlight[ed] that since the award of the Exploitation License, in July 2013 the Guatemalan government placed a moratorium on the issuance of new mining and Exploitation Licenses."[139]

76. Tahoe too noted these political risks in its disclosures filed with U.S. and Canadian securities regulators. For example, Tahoe's 2013 Annual Information Form filed during the Class Period disclosed:

> The Escobal mine is located in Guatemala which has a history of political unrest. Guatemala suffered an armed conflict for 36 years, which was finally resolved through a peace agreement reached with the country's internal revolutionary movement in 1996 … Renewed political unrest or a political crisis in Guatemala could adversely affect our business and results of operations.

…

[135] "Potential Guatemala tax creep, evaluating NAV, FCF impact," Bank of America Merrill Lynch, December 1, 2014, p. 1. "Q3/15 – Record Production, Financials In-Line, Royalty to Revert," Dundee Capital Markets, November 13, 2015, pp. 1, 4; *See* also "Steady as she goes," Canaccord Genuity, November 13, 2015, p. 1. "Tahoe Trending Toward Top Tier; Q2 Beat on Silver," Dundee Capital Markets, August 10, 2016, pp. 1, 3.

[136] "Why did Goldcorp really pull out of Tahoe Resources' troubled Guatemalan mining project?" Oxfam, July 7, 2015, https://politicsofpoverty.oxfamamerica.org/why-did-goldcorp-really-pull-out-of-tahoe-resourcess-troubled-guatemalan-mining-project/, accessed August 6, 2021.

[137] Alexandra Pedersen, "Landscapes of Resistance: Community Opposition to Canadian Mining Operations in Guatemala," Journal of Latin American Geography 13, no. 1, 2014, pp.187–214 at p.188.

[138] Tahoe Resources Inc. Press Release, "Guatemala Proposes Temporary Moratorium on New Mining Licenses: Tahoe Says No Impact to Escobal Project: Updates Construction Progress," July 10, 2013; *See* also "Tahoe's Escobal – The One Mine Major," Haywood Securities, November 5, 2013, p. 7. Changes in government attitudes were not unique to the Class Period. For example, a MEM employee characterized the period from 2004 to 2008 as one in which nearly "everything" relating to the approval of mining licenses "was to be approved." (Michael L. Dougherty, "By the gun or by the bribe: Firm size, environmental governance and corruption among mining companies in Guatemala," U4 Anti-Corruption Resource Centre, no. 17, September 2015, pp. 1–24 at p. 12.) But in 2009, Guatemala's presidential administration introduced an official moratorium on new mining projects. ("Courts, graft and protests threaten Guatemala mining," Oxford Analytica, August 4, 2016, p. 1.)

[139] "Tahoe's Escobal – The One Mine Major," Haywood Securities, November 5, 2013, p. 7.

> Our business may be exposed to a number of risks and uncertainties, including … changes to royalty and tax regimes, … volatile local, political and economic developments, difficulty with understanding and complying with the regulatory and legal framework respecting the ownership and maintenance of mineral properties, surface rights, mines and mining operations[.]
>
> …
>
> The duration and success of our efforts to obtain and renew licenses or permits are contingent upon many variables not within our control, including local politics, legal challenges and the interpretation of applicable requirements implemented by the licensing authority. Any unexpected refusals of required licenses or permits or delays or costs associated with the licensing or permitting process could prevent or delay the development or impede the operation of a mine, which could adversely impact our operations and profitability.[140]

77. Moreover, inconsistencies around policies for the consultation of indigenous peoples created additional uncertainty. Although Guatemala had approved and ratified ILO 169,[141] Guatemala's government did not establish "how consultations should be carried out, who should participate, and the degree to which the consultations would be binding."[142] Tahoe itself noted the risk that arrangements with indigenous peoples in Guatemala could pose a material risk to the Escobal mine, explaining in its 2013 Annual Form filed with the SEC on March 17, 2014:

> …laws and movements respecting the acquisition of lands and other rights of indigenous communities may alter decades-old arrangements made by prior owners of the lands where the Escobal mine is located. We used commercially reasonable efforts in our dealings to ensure all land-related agreements were entered into in accordance with applicable laws, but there is no guarantee that future laws and actions will not have a material adverse effect on our operations at the Escobal mine or on our financial position, cash flow and results of operations.[143]

78. Analysts who covered Tahoe discussed these and related risks in relation to how they could affect the Escobal mine and therefore Tahoe's stock price. Haywood Securities, for

[140] *See, e.g.,* 2013 Annual Information Form, p. 21. Tahoe's later Annual Information Forms made similar statements. *See* 2014 Annual Information Form, pp. 20–21, 2015 Annual Information Form, pp. 19–20, 2016 Annual Information Form, p. 23, 2017 Annual Information Form, pp. 29–31.
[141] "Handbook for ILO Tripartite Constituents: Understanding the Indigenous and Tribal Peoples Convention, 1989 (No.169)," International Labour Office Geneva, 2013, Section 2.
[142] Silvel Elias and Geisselle Sanchez, "Case Study Consulta Previa," Americas Quarterly, Spring 2014 ("Americas Quarterly, Spring 2014"), p. 71.
[143] 2013 Annual Information Form, p. 28.

example, assigned "High" overall risk to Tahoe and "High" political risk in its report initiating coverage for Tahoe in late 2013.[144] The analyst noted "significant political and forecast risks [to Tahoe that included] changes to the regulatory and/or taxation framework in Guatemala, in addition to general negative sentiment and/or opposition in-country to the mining industry."[145] CIBC's analysts similarly listed "Country Risk" including "negative impacts from political and social unrest" as among the key risks to Tahoe's price target in 2013.[146] TD Securities Inc., in a 2016 report that enumerated key risks to the target price for Tahoe, included "Political risk, including the potential for resource nationalization and changes to the legal and fiscal regimes."[147]

**B. Local Opposition and Legal Challenges Posed Risks to Mine Operators in Guatemala, and to Tahoe Specifically.**

79. Opposition to mining companies in Guatemala, discussed in press and analyst commentary, also included specific challenges to mining licenses. As an August 2016 report from Oxford Analytica explained:

> [T]he country's courts have, on multiple occasions, ruled to suspend projects indefinitely because of failings in prior consultation processes or environmental compliance.[148]

80. Not all oppositions were successful,[149] but some did result in rulings that put the validity of licenses at issue. For example, in July 2014, a legal challenge to the Los Chocoyos

[144] "Tahoe's Escobal – The One Mine Major," Haywood Securities, November 5, 2013, pp. 6–7.
[145] "Tahoe's Escobal – The One Mine Major," Haywood Securities, November 5, 2013, p. 6.
[146] "Flawless Delivery Continues," CIBC, November 13, 2013, p. 6.
[147] "2016 Guidance and Reserves Update," TD Securities Inc., January 15, 2016, p. 5.
[148] "Courts, graft and protests threaten Guatemala mining," Oxford Analytica, August 4, 2016, p. 1.
[149] For example, in 2007, the Association Madreselva brought a constitutional proceeding against MEM among others, challenging the exploitation licenses for the Marlin mine on the basis that the requirement to consult with indigenous people was not met, as well as on the basis of environmental and other concerns. This challenge was dismissed in 2008 by the Constitutional Court. *See* "2007-2008 Constitutional Challenge to Marlin exploitation licenses filed by the Association Madreselva," Institute of Latin American Studies, https://ilas.sas.ac.uk/research-projects/legal-cultures-subsoil/constitutional-challenge-marlin-exploitation-licences-filed, accessed September 24, 2021. In another example, the Fenix mine in Guatemala faced opposition due to its location on land claimed by indigenous peoples who claimed they were not consulted, but as of May 2017 the mine was still operating. *See* Randall S. Abate and Raquel Aldana, "Banning Metal Mining in Guatemala," Vermont Law Review 40, 2016, pp. 597–671 at pp. 609–610; *See* also "Fenix Project, Guatemala," McGill Research Group Investigating Canadian Mining in Latin America, http://www.micla.ca/conflicts/fenix-project/, accessed September 24, 2021; *See* also "Fenix grounded in Guatemala," Mining Journal, July 22, 2019, https://www.mining-journal.com/base-

mine, also alleging a lack of indigenous consultation under ILO 169, resulted in a court ruling that ordered MEM to re-evaluate the mining license.[150] Another mine, the El Tambor mine operated by Kappes, Cassiday & Associates ("KCA") faced opposition, in part based on allegations relating to MEM's failure to consult with the indigenous community.[151] In November 2015, the Guatemalan Supreme Court provisionally suspended the El Tambor mining license on the grounds that the government did not conduct community consultations.[152]

81. Moreover, Tahoe's specific risks relating to its community relations were also discussed throughout the Class Period:

a. For example, in an effort to improve local relations and mitigate this risk, Tahoe voluntarily paid an additional 4 percent royalty in addition to the mandatory royalty of 1 percent and established a community social responsibility program,[153] but activism against the mine continued.

b. In 2014, Haywood Securities highlighted "continued or increased non-governmental organization (NGO) action as a significant risk factor for Tahoe."[154]

c. In November 2015, however, Canaccord Genuity highlighted Tahoe's "strong efforts in CSR and social license building," suggesting that the risks from the

metals/news/1367883/fenix-grounded-in-guatemala, accessed September 24, 2021. The El Cerro Blanco mine was opposed because of environmental concerns, but operated in 2016 before being sold for exploration to another mining company in 2017. *See* Randall S. Abate and Raquel Aldana, "Banning Metal Mining in Guatemala," Vermont Law Review 40, 2016, pp. 597–671 at p. 609; *See* also Trish Saywell, "Bluestone's Cerro Blanco takes shape in Guatemala," July 6, 2018, https://www.northernminer.com/news/bluestones-cerro-blanco-project-takes-shape-in-guatemala/1003797575/, accessed September 24, 2021.

[150] The Maya community in the municipality of Sipacapa alleged that the MEM failed to consider the results of a 2005 community consultation before granting the license to Goldcorp, the mine's owner. *See* "Court rules that Guatemala must recognize results of community consultations (NISGUA)," Mining Justice Alliance, July 31, 2014, *******miningjusticealliance.wordpress.com/2014/07/31/court-rules-that-guatemala-must-recognize-results-of-community-consultations-nisgua/, accessed September 24, 2021.

[151] "Region rues growing use of investor suits," EcoAmericas, May 2019, ***********.ecoamericas.com/issues/article/2019/5/E504D133-1FC2-4AFA-84D6-6D788BF2762E, accessed September 24, 2021. *See* also "'La Puya' Environmental Movement," Guatemala Human Rights Commission, ***********.ghrc-usa.org/our-work/current-cases/lapuya/, accessed September 24, 2021.

[152] "Region rues growing use of investor suits," EcoAmericas*,* May 2019, ***********.ecoamericas.com/issues/article/2019/5/E504D133-1FC2-4AFA-84D6-6D788BF2762E, accessed September 24, 2021.

[153] "Guatemala: Escobal 5% royalty a positive for community relations, Tahoe says," BNAmericas, April 30, 2013, ***********.bnamericas.com/en/news/privatization/guatemala-escobal-5-royalty-a-positive-for-community-relations-tahoe-says, accessed September 24, 2021; "Tahoe's Escobal – The One Mine Major," Haywood Securities, November 5, 2013.

[154] "Escobal Feasibility Update Leads Translates to Lower Margins," Haywood Securities, November 7, 2014.

community had been mitigated somewhat—and that the risk in 2014 may have been different than the risk in late 2015.[155]

82. Tahoe also specifically highlighted the potential for challenges to licenses as a risk, and that the risk could materialize with the license being revoked by Guatemalan regulators as a result of legislation or court rulings. Tahoe's 2013 Annual Information Form included the following explanation of risks to the license:

> The validity of the licenses related to the Escobal mine can be uncertain and may be contested. There is no assurance that applicable governmental bodies will not revoke or significantly alter the conditions of applicable licenses that are required by the Escobal mine. Changes to Guatemalan laws, including new mining legislation or adverse court rulings could materially and adversely impact our rights to exploration and exploitation licenses necessary for the Escobal mine.[156]

83. All of Tahoe's subsequent Annual Information Forms filed during the Class Period contained similar descriptions of the risks to Escobal or Tahoe's mining assets, and thus emphasized the allegedly "concealed" risks to the license.[157] In Tahoe's filings, the company also noted that opposition "by members of local communities, anti-mining NGOs, unemployed people and unions" could occur.[158] Tahoe regularly explained that actions by NGOs and local communities could "have a material adverse effect on our operations at the Escobal mine and on the Company's financial position, cash flow and results of operations."[159]

84. These were not mere theoretical risks. The NGO CALAS made multiple claims during the Class Period with the specific goal of suspending the Escobal License:

a. The day after the Escobal License was granted, CALAS explained that it was "commit[ted] to exhausting all constitutional, administrative and criminal legal

---

[155] "Steady as she goes," Canaccord Genuity, November 13, 2015.
[156] 2013 Annual Information Form, p. 23.
[157] *See* 2014 Annual Information Form, p. 22; 2015 Annual Information Form, p. 21; 2016 Annual Information Form, p. 25.
[158] Tahoe Resources Inc., Form 6-K for the years ended December 31, 2016 and 2015, Filed on March 9, 2017, p. 36.
[159] 2013 Annual Information Form, p. 28. Tahoe made similar statements in the other annual forms published during the Class Period. *See* 2014 Annual Information Form, p. 25; 2015 Annual Information Form, p. 24; 2016 Annual Information Form, p. 28; 2017 Annual Information Form, p. 29.

actions in order to invalidate the approved license,"[160] and in May 2013, CALAS and Quelvin Jimenez, a Xinka leader, sued MEM.[161]

b. In July 2013, the court ruled that MEM "should have conducted a hearing of a written opposition to the Escobal exploitation license."[162] At that time, CALAS' lawyer, Rafael Maldonado, stated that CALAS' goal in bringing the claim against the Escobal License was to have the license suspended.[163]

c. In November 2015, Guatemala's Constitutional Court upheld the decision from 2013 and instructed MEM to hold a hearing relating to opposition to the Escobal mine.[164]

d. In March 2016, CALAS again petitioned the court to explicitly suspend the Escobal License, a request that Tahoe explained was rejected in May 2016.[165] MEM began the process of hearing CALAS' complaint in June of 2016, events which were discussed both in Tahoe's annual report and in analyst reports at the time.[166] Desjardins Capital Markets assigned Tahoe its highest risk categorization ("Speculative"), explaining:

> While we do not assume the exploitation license will be invalidated, this is possible. With Escobal accounting for more than half of our NAV, investors must be aware of this risk, which is a significant reason for our Speculative risk qualifier on Tahoe's shares.[167]

---

[160] "Exploitation License Granted for Tahoe Resources Escobal Project in Context of Escalating Violence," NISGUA, April 5, 2013, https://nisgua.org/exploitation-license-granted-for-tahoe-resources-escobal-project-in-context-of-escalating-violence/, accessed September 24, 2021.

[161] "Guatemalan complainants celebrate effective suspension of Tahoe Resources license," NISGUA, July 25, 2013. ********nisgua.org/guatemalan-complainants-celebrate-effective-suspension-of-tahoe-resources-license/, accessed on September 24, 2021.

[162] Tahoe Resources Inc., "Tahoe Resources Clarifies PEA Disclosure," July 24, 2013, p. 2.

[163] Bill Barreto, "Chamber orders hearing of mining objection," Prensa Libre, July 25, 2013 (translated).

[164] "On the cusp of senior producer status in 2017; initiating coverage with Buy rating and C$23 target," Desjardins Capital Markets, August 30, 2016, p. 16. *See* also, 2016 Annual Information Form, p. 11.

[165] 2016 Annual Information Form, p. 11; "On the cusp of senior producer status in 2017; initiating coverage with Buy rating and C$23 target," Desjardins Capital Markets, August 30, 2016, p. 16.

[166] *See* 2016 Annual Information Form, p. 11; "2Q Beat. Positioning for Organic Growth," Macquarie Research, August 11, 2016, p. 1; "On the cusp of senior producer status in 2017; initiating coverage with Buy rating and C$23 target," Desjardins Capital Markets, August 30, 2016, p. 16.

[167] "On the cusp of senior producer status in 2017; initiating coverage with Buy rating and C$23 target," Desjardins Capital Markets, August 30, 2016, p. 16.

85. Indeed, CALAS's legal campaign culminated in the lawsuit filed against MEM, and not Tahoe, on May 17, 2017, which alleged that MEM had failed to consult the Xinka people and resulted in the rulings that constitute the Alleged Corrective Disclosures.[168]

86. Given the public discussion of these developments, it is clear that Dr. Nye's theory of liability—that the suspension of the Escobal License was a "materialization of the concealed risk that the defendants' conduct thrust upon investors unknowingly"—is inconsistent with the facts. The market was well aware of risks to the Escobal License, which likely varied with developments related to taxation, license challenges, and changes in public opinion. Any measure of damages based upon that theory of liability will therefore be inherently flawed.

## VII. DR. NYE'S PROPOSAL TO APPLY AN EVENT STUDY TO ALLEGED DISCLOSURE DATES CANNOT MEASURE CLASS-WIDE DAMAGES IN A MANNER CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY

87. Plaintiff alleges that "Defendants' statements were corrected, and the risk concealed by the undisclosed facts regarding the Escobal Project materialized, when on July 5, 2017, Tahoe announced that the Supreme Court provisionally suspended the Escobal License and the Juan Bosco License renewal pending a final determination of CALAS's action."[169] Plaintiff further alleges that "Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding the Escobal Project further materialized when, after the market closed on August 24, 2017, the Company announced that Guatemala's Constitutional Court issued a decision upholding the Supreme Court's provisional suspension of the Escobal License and Juan Bosco License renewal."[170] Thus, in contrast to the Alleged Misstatements, which relate to several categories of facts, on each of the Alleged Corrective Disclosure dates, the market learned two types of information, according to Plaintiff: (i) the falsity of Tahoe's prior statements and (ii) that risks related to those statements had *materialized*. As I explain in this section, Dr. Nye cannot measure damages on a class-wide basis consistent with Plaintiff's theory of liability because his methodology cannot disentangle the price reaction to those two

[168] Tahoe Resources Press Release, "Tahoe Reports on Legal Claim in Guatemala," May 24, 2017.
[169] Complaint, ¶ 245.
[170] Complaint, ¶ 246.

types of information and therefore cannot determine the reaction to any corrective information alone.

### A. The Price Declines Following the Alleged Corrective Disclosures Include Price Declines That Would Have Occurred Absent *Any* Misrepresentations and Thus Are Not Measures of Price Inflation.

88. Any calculation of damages must account for the fact that Tahoe's price would likely have declined on the Alleged Corrective Disclosure Dates. Tahoe faced risks to its future revenues and profits from the Escobal mine, and the suspension of the licenses—which would temporarily or permanently halt future revenues from Escobal, affecting the value of Tahoe—were a *realization* of the risks to the future revenues from Escobal. Indeed, Plaintiff alleges that investors were damaged when "the foreseeable risks that had been fraudulently concealed by the Defendants materialized."[171] Dr. Nye similarly alleges that "under [Plaintiff's] theory of liability, the revocation of the license is a materialization of the concealed risk that defendants' conduct thrust upon investors unknowingly during the class period."[172]

89. Importantly, however, there is a distinction between the market's reaction to a risk—that is, the reaction to the knowledge that a negative outcome could occur—and the reaction to the *realization* of that risk. When a risk is realized, a company's share price will generally decline even if that risk was fully understood to market participants. As an example, suppose a new pharmaceutical company is developing a new treatment for a disease, which is pending review by the Food and Drug Administration ("FDA"). The company's stock price would reflect the market's assessment of how likely the drug was to be approved.

90. This understanding of the risk would be included in the market's estimate of the share price. If the present value of the company's future profits from the drug would be $4 per share should the approval be sustained (and $2 per share if approval were denied), and the market expected that there was a 50% chance that the drug would be approved based on the drug's profile and historical approval rates, the market's value of the company would be $3 per share. Even though the market already understood that authorization had not been granted, if the news were to break that the FDA denied approval for the treatment, the share price would fall by

[171] Complaint, ¶ 242.
[172] Nye Deposition, 97:15–18.

$1, from the expected value of $3 per share to $2 per share, the level reflecting the *realization* of the risk. Thus, even though the market fully understood the risk and the share price incorporated the risk, the realization of this risk would result in a decline in value.

91. Moreover, even if the company *did* withhold material, non-public information regarding the drug's likelihood of approval from the market, any determination of damages due to the investors would still have to account for the realization of the risk. Suppose, for example, that the company had access to information that would lower its chance of approval to 20%, instead of 50%. With full information, the market's valuation of the company would be $2.40.[173] If the company concealed this information, the price of the shares would remain at $3, and upon rejection of the drug, would fall to $2, for a loss of $1, just as before. However, because the company *should* have been priced at $2.40, based on the omitted information, the stock's price would still have fallen by $0.40 when the FDA announced its decision. Because damages should only include losses caused by the alleged misrepresentations, damages should be only $0.60 per share (for an investor who purchased the stock before the FDA's decision and held through that decision).[174]

92. The same logic applies to this case. Tahoe expected to receive future earnings from silver production at the Escobal mine. If the mine's license to operate were suspended, Tahoe would not receive future earnings from the mine's production, and Tahoe's value and stock price would decrease. In an efficient market, prior to the Alleged Corrective Disclosures, Tahoe's share price would have reflected the market's understanding of the risk—both the probability that the mine would not be operable and the impact to Tahoe's profitability that

---

[173] This is $4 * 20% + $2 * 80%.

[174] Indeed, awarding all investors the full stock price decline would effectively compensate those investors based on a presumption that, had investors known the true risk that the FDA would not approve the drug, they would have chosen to avoid the company's stock entirely, i.e., would have chosen to hold no shares of the company. However, there is no basis in financial economics for such a presumption. On the contrary, it is widely accepted that this type of risk is company-specific and therefore diversifiable in the context of an overall portfolio of investments, and it does not affect the volatility of a diversified portfolio (Zvi Bodie, Alex Kane, and Alan J. Marcus, *Investments*, (New York, NY, McGraw-Hill Irwin, 2011), 9th ed., p. 197). Portfolio theory shows that the optimal portfolio for most investors is a combination of a risk-free asset and a well-diversified portfolio of different investments. Investors who follow this strategy will generally not sell an individual stock due solely to higher company-specific risk because that risk will not affect the overall risk position of an investor's entire portfolio. (Zvi Bodie, Alex Kane, and Alan J. Marcus, *Investments*, (New York, NY, McGraw-Hill Irwin, 2011), 9th ed., pp. 206–209, 217–220). Though, certainly, *some* investors may choose to avoid a stock entirely due to higher risk, there is no reason to presume the *entire class* would not have invested in Tahoe (even accepting Plaintiff's allegations that the risk to the Escobal license was greater than understood by the market).

would occur if so. When the license was suspended by the Guatemalan court system, this risk was realized. Even if investors had complete understanding of this risk, its realization would be expected to result in a decline of Tahoe's share price.

93. Dr. Nye, however, provides no explanation for how to determine the price declines that would result *only* from the revelation of the Alleged Misstatements and even testified that "I see no reason, as I sit here today, for making an effort to remove the effect of license revocation from the measure of damages."[175] That approach could only be economically appropriate if the loss of the license were guaranteed as a result of the allegedly misrepresented information. However, the facts—specifically, that (i) there was substantial public information regarding the Alleged Misstatements available (*see* Section V above) and regarding the risk to the license (*see* Section VI above), and (ii) the market did not meaningfully discount the value of the license—are inconsistent with the loss of the Escobal License being a certainty. Dr. Nye has also offered no explanation for why Tahoe would continually invest in Escobal if Tahoe knew it would lose the ability to generate revenue from the mine.

94. Dr. Nye asserted that he could perform an analysis to distinguish between damages resulting from any revelation of Alleged Misstatements and from the actual penalty of the license suspension if necessary, and stated that his methodology could handle such a situation,[176] but he has provided no information about how he could or would do so. In his report, Dr. Nye indicated that he would use an event study "to isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors."[177] However, an event study *cannot* disentangle the effects of two pieces of company-specific information released simultaneously and thus cannot measure inflation on a class-wide basis in this matter.[178] Moreover, Dr. Nye has also put forward no methodology to measure the value of the information that Tahoe allegedly had and should have disclosed. Valuing such information in an environment with multiple sources of often

[175] Nye Deposition, 102:19–21.
[176] Nye Deposition, 102:5–103:14. *See* also Nye Deposition, 87:25–88:6.
[177] Nye Report, ¶ 71.
[178] At deposition, Dr. Nye seemed to backtrack from the assertion in his report that he could use an event study to separate the stock price effects of "material, non-fraud related, Company-specific information" (Nye Report, ¶ 71), but provided no information about how he would separate such information in this case. *See*, e.g., Nye Deposition, 147:21–149:20.

conflicting information, such as that in this case, can be a complicated exercise requiring detailed analysis and careful consideration. For example, with respect to the issuance of the license, Tahoe and MEM held the position that the Escobal License had been granted legally,[179] while the opposition believed that the license was not granted in a legal manner.[180] To determine inflation, Dr. Nye would then have to measure the impact on the stock price, of Tahoe disclosing any information it allegedly knew regarding the license, in the face of the public information and the official government position that the license was valid. As Dr. Nye has not put forward any methodology to determine the value of the alleged misstatements—specifically, the impact of Tahoe's alleged misstatements in the face of often conflicting information—he cannot measure inflation on a class-wide basis in this matter.

**B. Dr. Nye Fails to Demonstrate That the July 7, 2017 and August 25, 2017 Price Declines Were Attributable to Corrections of the Alleged Misstatements.**

95. Plaintiff alleges that, in addition to the price decline on July 6, 2017, investors were damaged by price declines on two subsequent dates: July 7, 2017, and August 25, 2017. But neither Dr. Nye nor the Complaint have articulated what new "corrective" information was revealed on those dates that remained unknown after the first alleged corrective disclosure on July 5, 2017.

**1. Plaintiff's Claim—That the Price of Tahoe's Stock Declined for Two Consecutive Days—Is Inconsistent with Dr. Nye's Opinion That the Market Was Efficient.**

96. Plaintiff alleges that Tahoe's July 5, 2017 announcement of the Escobal and Juan Bosco license suspensions caused investors' losses on July 6, 2017 "and an additional $0.41 per share on July 7, 2017."[181] Importantly, neither Dr. Nye nor Plaintiff provides any evidence of

---

[179] Tahoe announced the issuance of the Escobal License in a press release and later explained that the company had "obtained every permit in a lawful manner." *See*, Tahoe Resources Inc. Press Release, "Tahoe's Escobal Project Receives Final Permit," April 3, 2013. *See* also, Complaint, ¶ 153. MEM issued the Escobal License and, with Tahoe, appealed the July 2013 ruling that MEM was required to hear the opposition of Quelvin Jimenez. *See* Tahoe Resources Inc. Press Release, "Tahoe Resources Clarifies PEA Disclosure," July 24, 2013, p. 2. *See* also Bill Barreto, "Chamber orders hearing of mining objection," Prensa Libre, July 25, 2013.

[180] *See*, e.g., Chris Hufstader, "No silver lining in Guatemala conflict," Oxfam, November 26, 2014, ***********.oxfamamerica.org/explore/stories/no-silver-lining-in-guatemala-conflict/, accessed August 6, 2021.

[181] Complaint, ¶ 245.

additional disclosures on July 7, 2017 that corrected the alleged misstatements; indeed, the Complaint suggests that information from July 5 caused the price decline on July 7, 2017.

97. However, such an argument is inconsistent with Dr. Nye's claim of an efficient market,[182] because in efficient markets, news like the suspension of the license of a company's major asset would be incorporated into the stock price very quickly.

98. In an efficient market, stock prices will react rapidly to new and value-relevant information—academic studies show that this adjustment often happens within minutes, and for significant announcements would almost certainly happen within a trading day.[183] For example, a number of papers have shown that prices start to incorporate news within 5 to 15 minutes.[184] Indeed, Greene and Watts (1996) find that in general, a stock price begins to adjust to news during the first 30 minutes of trading after the announcement.[185]

99. As such, in an efficient market, the news of any allegedly corrective information, which was released after the market closed on July 5, 2017, would be expected to be fully incorporated into the stock price for Tahoe by the close of trading on July 6, 2017. Therefore, there is no basis to attribute the subsequent decline on July 7, 2017 to the allegedly corrective information disclosed on July 5.

---

[182] Nye Report, ¶ 6.

[183] Indeed, Dr. Nye himself admits that "for market efficiency purposes," the relevant time period for information to be incorporated into a stock price is "typically…a day," before suggesting that "when looking at damages" a longer window may be appropriate. (Nye Deposition, 114:20–115:10) The academic literature, however, provides no basis to distinguish analyses of market efficiency from those of damages and (as highlighted above) suggests that in efficient markets information will be incorporated within a day if not within minutes."

[184] *See*, e.g., "During the 15 minutes following an announcement, stock prices fall, on average, by 1.3%. During a three-hour period surrounding the announcement the average common stock return is -2.4%. An abnormally large number of transactions, correspondingly high volume, and a high variance of the returns are observed during the 15 minutes following the announcement. However, there is no evidence of significant abnormal trading activity (either positive or negative) or abnormal variance of the returns during any other interval on the announcement day." *See* Michael J. Barclay and Robert H. Litzenberger, "Announcement Effects of New Equity Issues and The Use of Intraday Price Data," Journal of Financial Economics 21, no. 1, 1988, pp. 71–99 at pp. 95–96; Robert Jennings and Laura Starks, "Information Content and the Speed of Stock Price Adjustment," Journal of Accounting Research 23, no. 1, 1985, pp. 336–350; Jeffrey A. Busse and T. Clifton Green, "Market Efficiency in Real Time," Journal of Financial Economics 65, no. 3, 2002, pp. 415–437; Jason T. Greene and Susan G. Watts, "Price discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," Financial Management 25, no. 1, 1996, pp. 19–42; James M. Patell and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," Journal of Financial Economics 13, no. 2, 1984, pp. 223–252.

[185] Jason T. Greene and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," Financial Management 25, no. 1, 1996, pp. 19–42 at pp. 19–20.

### 2. Plaintiff Fails to Connect the Price Decline on August 25, 2017 to Any New "Corrective" Information.

100. Plaintiff alleges that "Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding the Escobal Project further materialized when, after the market closed on August 24, 2017, the Company announced that Guatemala's Constitutional Court issued a decision upholding the Supreme Court's provisional suspension of the Escobal License and Juan Bosco License renewal," but Plaintiff does not explain what, if any, new corrective information was included in this ruling.[186] Indeed, Plaintiff concedes that "[i]t was not until several months after this decision that Tahoe finally acknowledged 'the presence and importance of the indigenous peoples located in the communities near Escobal, particularly the Xinka,'"[187] suggesting that Tahoe's Alleged Misstatements about the Xinka presence near Escobal were not directly corrected by the company until several months after the Alleged Corrective Disclosures.[188]

101. Without new information about the Alleged Misstatements, the price decline on August 25, 2017 would be due entirely to the realization of the risk that the license would remain suspended—a risk that would have been understood by the market given Plaintiff's claim that on July 5, 2017, "Defendants' statements were corrected, and the risk concealed by the undisclosed facts regarding the Escobal Project materialized."[189] Under Plaintiff's theory of liability, then, the market price of Tahoe stock following this allegedly corrective information would have reflected the alleged "truth" regarding the Alleged Misstatements. However, Plaintiff alleges that investors were still damaged on August 25, 2017, when the stock price reacted to the Constitutional Court's decision to uphold the license suspension.[190] Therefore, Plaintiff's theory of liability implies that a hypothetical investor who understood the information about the Alleged Misstatements would allegedly have been damaged again by the *already-disclosed* corrective information on August 25, when the court upheld the previous ruling.

---

[186] Complaint, ¶ 246.
[187] Complaint, ¶ 246.
[188] Complaint, ¶ 13.
[189] Complaint, ¶ 245.
[190] Complaint, ¶ 246.

102. Neither Plaintiff nor Dr. Nye provides an explanation as to why the market reaction on August 25, 2017 would be due to anything other than the *realization* of the well-understood risk—even under Dr. Nye's theory that until July 5 the risk had been "concealed" and "thrust upon investors unknowingly"—that the Constitutional Court would uphold the provisional suspension.[191] The stock price change on August 25, 2017 would have reflected *only* the result of the Constitutional Court's ruling, and the expectations about future production from the Escobal mine. Therefore, neither Plaintiff nor Dr. Nye has provided any basis to use the alleged corrective disclosure on August 25, 2017, in any calculation of damages.

**C. Dr. Nye Provides No Methodology Capable of Measuring Damages from the Individual Categories of Misrepresentations.**

103. Dr. Nye similarly provides no methodology that would allow him, or the finder of fact, to adjust damages for different findings regarding Plaintiff's five different types of Alleged Misstatements. Dr. Nye's reliance on an event study provides no way to allocate damages among Plaintiff's five different types of misrepresentations and allegedly false statements regarding (i) the issuance of the license; (ii) the presence of the Xinka; (iii) the Xinka involvement in protests; (iv) outreach to the community; and (v) adherence to corporate social responsibility programs.[192]

104. Moreover, Dr. Nye's proposed methodology *cannot* allocate damages among the types of different misstatements—despite his deposition testimony that his "methodology can adapt to ultimate verdicts that might deviate from the allegations"—because his proposed approach can only measure the impact of all information in the Alleged Corrective Disclosures as a whole, which included the realization of a risk, as well as *all* purportedly new information correcting the Alleged Misstatements.[193] Thus, should a finder of fact find that Tahoe is liable for certain types of statements but not others—for example, if Tahoe is found not liable for statements about the consultation process because it was MEM's obligation and not Tahoe's to conduct consultations—Dr. Nye's methodology will overcompensate investors by attributing

[191] Nye Deposition, 97:15–18.
[192] Complaint, ¶ 149.
[193] Nye Deposition, 87:25–88:6.

damages to *all* five types of statements—even if some were not, in fact, misrepresentations for which Tahoe is found liable.

## VIII. DR. NYE HAS PROVIDED NO METHODOLOGY TO ACCOUNT FOR CHANGES TO INFLATION OVER TIME

105. As described above, Dr. Nye has provided no methodology to exclude the portion of the price decline on alleged corrective disclosure dates that would have occurred absent any Alleged Misstatements. Moreover, even if Dr. Nye could properly measure the price decline resulting only from the Alleged Misstatements on those dates, he has provided no methodology to translate those price declines into inflation *earlier* in the Class Period.

106. In order to measure the inflation caused by the Alleged Misstatements, Dr. Nye must determine the value of the Alleged Misstatements on *each day* of the Class Period. In this case, as I explained above, the filing of CALAS' May 2017 lawsuit against MEM, changes in taxation or legal challenges to licenses, risks from Tahoe's relationship with the community, and changes in other sources of risk for mining companies or the Escobal mine in particular, likely changed the degree of risk to the Escobal mine at different points during the Class Period. In order to measure inflation over time, Dr. Nye's model would need to measure the *degree* of the risk allegedly misrepresented by Tahoe, which would vary with the amount of risk faced, at every point during the Class Period.

107. Moreover, in addition to any changes in the degree of risk, Dr. Nye must also account for changes in the *value* of such risk over the Class Period, and has provided no methodology to do so. The value of a certain amount of risk likely changed over the course of the Class Period as the value of the Escobal mine, and therefore the value of a suspension, changed. [194] [195]

---

[194] For example, consider the hypothetical pharmaceutical company discussed above. The company's stock would be worth $4 per share if the drug were approved, and $2 per share if the drug was not approved. Assume that the company had information about such severe side effects that it was certain that the FDA would not approve the drug, but withheld this information from the market. Further assume that, on the first day of the Class Period, the market assessed a 20% chance of approval based on preliminary results from a Phase 1 trials. At that time, the price would have been $2.40 (as discussed above), inflated by $0.40 relative to the "true" value of only $2.00 per share. If, later in the Class Period based on subsequent promising information, the market assessed a 75% likelihood that the drug would be approved, at that time, the price would be $3.50 per share, inflated by $1.50. This example demonstrates how inflation can vary during the Class Period, even if the risk were *certain* to materialize.

[195] In the case of Tahoe specifically, as an example, at the start of the Class Period, the Escobal mine not yet in

108. Thus, even if one assumes that Dr. Nye can measure the dollar value of inflation at the time of the alleged corrective disclosures, he cannot back-cast that value throughout the entire Class Period. To properly measure damages, Dr. Nye must measure *both* the risk to the license, and the value that the disclosure of that risk would have had, at all points throughout the Class Period, even if he is correct that it was "virtually certain"[196] that the license would be suspended based upon Tahoe's private information.

## IX. CONCLUSION

109. Dr. Nye has provided only a generic framework for an event study to measure damages that is in no way tailored to the specifics of this case, and what little he has provided is insufficient to measure class-wide damages in a manner consistent with Plaintiff's theory of liability. In particular:

a. Dr. Nye ignores information about the Alleged Misstatements that was already public, and fails to provide a method to measure the value of any incremental information that was unknown to the market and that Tahoe should have disclosed.

b. Dr. Nye improperly treats the risk that the license would be lost as both certain and completely unknown to the market, contrary to the market evidence.

c. Dr. Nye's proposed event study cannot measure inflation in a manner consistent with Plaintiff's theory of liability because it cannot exclude from damages the price declines that would have occurred absent *any* misrepresentations.

d. Dr. Nye has provided no methodology that would allow one to determine the value of any of Plaintiff's alleged misstatements or categories thereof.

---

production, and the mine would likely have faced uncertainties that would have affected its value—the price of silver and other metals, the costs for start-up, engineering, electrification, and eventual extraction, and the amount of metals estimated to be present and mineable. By the end of the Class Period, the value of Escobal was likely different as many uncertainties had been resolved. *See* 2013 Annual Information Form, p. 8; 2014 Annual Information Form, p. 7; 2012 Annual Information Form, pp. 6, 33.

[196] Dr. Nye claimed the license was "virtually certain to get suspended by virtue of the actions alleged." *See* Nye Deposition, 165:11–13.

e. Dr. Nye's approach ignores that any inflation in the price of Tahoe's stock would likely have changed over the Class Period. Dr. Nye provides no methodology that can determine the value of any inflation at different points in time.

Dated: September 29, 2021

Paul A. Gompers

# Paul A. Gompers CV

Baker Library 263
Graduate School of Business Administration
Harvard University
Boston, MA 02163

(617) 495-6297 (ph)
(617) 496-8443 (fax)
pgompers@hbs.edu
**********.people.hbs.edu/pgompers

## ACADEMIC POSITIONS

2000–present HARVARD BUSINESS SCHOOL BOSTON, MA
Eugene Holman Professor of Business Administration. Research interests include venture capital, private equity, entrepreneurial finance, institutional investors, corporate governance, optimal security design, dynamic capital structure, long-run performance of firms, and sources of financing for start-up businesses.

1998–2000 HARVARD BUSINESS SCHOOL BOSTON, MA
Associate Professor of Business Administration.

1995–1998 HARVARD BUSINESS SCHOOL BOSTON, MA
Assistant Professor of Business Administration.

1993–1995 UNIVERSITY OF CHICAGO CHICAGO, IL
Assistant Professor of Finance and Policy at the Graduate School of Business. Created new course on the financing of start-up companies.

1995–present NATIONAL BUREAU OF ECONOMIC RESEARCH CAMBRIDGE, MA
Research Associate. Appointed as an NBER affiliate in corporate finance.

## EDUCATION

1989–1993 HARVARD UNIVERSITY CAMBRIDGE, MA
Received Ph.D. in Business Economics, June 1993.

1987–1989 OXFORD UNIVERSITY OXFORD, UK
Graduated *summa cum laude* with a M.Sc. in economics, July 1989.

1982–1987 HARVARD COLLEGE CAMBRIDGE, MA
Graduated *summa cum laude* with an A.B. in biology.

## PUBLICATIONS

### Books

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) First Edition.
The Money of Invention, (Harvard Business School Press, Boston) November 2001. (Joint with Josh Lerner.)
Entrepreneurial Finance: A Casebook, (John Wiley, New York) December 2001. (Joint with William Sahlman.)
The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) Second Edition. 2004.
Private Equity Finance, (Anthem Press, London). March 2019. (Joint with Victoria Ivashina and Richard Ruback.)

### Articles in Refereed Journals

"Optimal Investment, Monitoring, and the Staging of Venture Capital," *Journal of Finance* 50, 1461-1489. December 1995. Reprinted in Michael Wright and Ken Robbie, editors, Venture Capital (International Library of Management) (Aldershot: Dartmouth Publishing, 1997.)
"Grandstanding in the Venture Capital Industry," *Journal of Financial Economics* 42, 133–156. July 1996.
"The Rise and Fall of Venture Capital," Business and Economic History 23, 1–24. Winter 1994. Awarded Newcomen Prize essay for best paper in business history.
"The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements," *Journal of Law and Economics* 39, 463–498. October 1996. (with Josh Lerner.)
"Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies." *Journal of Finance* 52, 1791–1821. December 1997. (with Alon Brav.) Awarded the Smith-Breeden Distinguished Paper Award.
"Venture Capital Growing Pains: Should the Market Diet?" *Journal of Banking and Finance* 22, 1089–1104. August 1998.
"An Analysis of Compensation in the US Venture Capital Partnership," *Journal of Financial Economics* 51, 3–44. January 1999. (with Josh Lerner.)
"Venture Capital Distributions: Short-Run and Long-Run Reactions," *Journal of Finance* 53, 2161–2184. December 1998. (with Josh Lerner.)
"Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital," *Journal of Law and Economics* 42, 1-28. April 1999. (with Josh Lerner.)
"What Drives Venture Capital Fundraising?" *Brookings Proceedings on Microeconomic Activity*, 149-192. August 1998. (with Josh Lerner.)
"Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations," *Journal of Financial Economics* 55, 281-325. February 2000. (with Josh Lerner.)
"Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56, 209–250. May 2000. (with Alon Brav and Chris Geczy.)
"Institutional Investors and Equity Prices," *Quarterly Journal of Economics* 114, 229–260. 2001. (with Andrew Metrick.)
"The Venture Capital Revolution," *Journal of Economic Perspectives* 15, 145–168. Spring 2001. (with Josh Lerner.)
"Who Underreacts to Cash Flow News?" *Journal of Financial Economics* 66, 409–462. 2002. (with Randy Cohen and Tuomo Vuolteenaho.)
"The Role of Lock-ups in Initial Public Offerings Provisions," *Review of Financial Studies* 16, 1–29. Spring 2003. (with Alon Brav.)
"Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118, 107-156. February 2003. (with Joy Ishii and Andrew Metrick.)
"The Really Long-Run Performance of Initial Public Offerings: Evidence from the Pre-Nasdaq Period, 1933–1972," *Journal of Finance* 56, 1355–1392. August 2003. (with Josh Lerner.)

"The Determinants of Board Structure and Function in Entrepreneurial Firms," *Journal of Law and Economics* 46, 569–598. October 2003. (with Malcolm Baker.)

"Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999," *Journal of Finance* 60, 577-614. April 2005. (with Josh Lerner and David Scharfstein.)

"Large Blocks of Stock: Prevalence, Size, and Measurement," *Journal of Corporate Finance* 12, 594-618. June 2006. (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick.)

"Venture Capital Investment Cycles: The Impact of Public Markets," *Journal of Financial Economics*, 1–23. 2008. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Specialization and Success: Evidence from Venture Capital," *Journal of Economic and Management Strategy* 18, 817–845. 2009. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Extreme Governance: An Analysis of Dual-Class Firms in the United States," *Review of Financial Studies* 23, 1051–1088. 2010. (with Joy Ishii and Andrew Metrick.)

"Performance Persistence in Entrepreneurship and Venture Capital," *Journal of Financial Economics* 96, 18–32. 2010. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Buy Local? The Geography of Successful Venture Capital Expansion," *Journal of Urban Economics* 67, 90–102. 2010. (with Henry Chen, Anna Kovner, and Josh Lerner.)

"The Cost of Friendship," *Journal of Financial Economics* 119, 626–644. March 2016. (with Vladimir Mukharlyamov and Yuhai Xuan.)

"What Do Private Equity Firms Say They Do?" *Journal of Financial Economics* 121, 449–476. September 2016. (with Steven N. Kaplan and Vladimir Mukharlyamov.)

"The Other Diversity Dividend," *Harvard Business Review.* July 2018. (with Silpa Kovvali.)

"More than Money: Venture Capitalists on Boards." *Journal of Law, Economics, and Organizations.* 2019, 35, 513-543. (with Natee Amornsiripanitch and Yuhai Xuan.)

"How Do Venture Capitalists Make Decisions," January 2020. *Journal of Financial Economics* 135, 169-190. (with Will Gornall, Steve Kaplan, and Ilya Strebulaev.) Winner of Jensen Prize for best paper in corporate finance in the *Journal of Financial Economics.*

"Gender Effects in Venture Capital," October 2020. Forthcoming in the *Journal of Financial and Quantitative Analysis.* (with Vladimir Muhkarlyamov, Emily Weisburst, and Yuhai Xuan.)

"And the Children Shall Lead: Gender Diversity and Performance in Venture Capital," October 2020. Forthcoming in the *Journal of Financial Economics.* (with Sophie Calder-Wang.)

"Private Equity and Covid-19," Forthcoming in *Journal of Financial Economics*. (with Steve Kaplan and Vladimir Muhkarlyamov.)

"Venture Capital and Covid-19," Forthcoming in *Journal of Financial and Quantitative Analysis*. (with Will Gornall, Steve Kaplan, and Ilya Strebulaev.)

"How Venture Capitalists Make Decisions," March-April 2021. *Harvard Business Review*. (with Will Gornall, Steve Kaplan, and Ilya Strebulaev.)

**Other Articles**

"Venture Capital and the Creation of Public Companies: Do Venture Capitalists Really Bring More than Money?" *Journal of Private Equity* 1, 15-32. Fall 1997. (with Josh Lerner.)

"Risk and Reward in Private Equity Investments: The Challenge of Performance Assessment," *Journal of Private Equity* 1, 5-12. Winter 1997. (with Josh Lerner.)

"Resource Allocation, Incentives, and Control: The Importance of Venture Capital in Financing Entrepreneurial Firms," *Entrepreneurship, SMEs, and the Macroeconomy* (Cambridge University Press, Cambridge), 206-238. February 1997.

"Venture Capital," *The Handbook of Technology Management* (Richard Dorf, Editor-in-Chief). January 1997. (with Josh Lerner.)

"The Determinants of Corporate Venture Capital Success: Organizational Structure, Incentives, and Complementarities," NBER Conference Volume on Concentrated Corporate Ownership, 17-54. September 1998.

"Capital Formation and Investment in Venture Markets: An Assessment of Market Imperfections," *The Economic Evaluation of Technological Change* (Richard Spivack, Editor). June 1998.

"Corporations and the Financing of Innovation: The Corporate Venturing Experience," *The Atlanta Federal Reserve Bank Conference Volume*, 1-17. 2002.
"Venture Capital and Private Equity," *The Handbook of Corporate Finance* (Espen Eckbo, Editor) (North-Holland Press, New York). 2002.
"Short-Term America Revisited? Boom and Bust in the Venture Capital Industry and the Impact on Innovation," *Innovation Policy and the Economy* 3, 1-28. March 2002. (with Josh Lerner.)
"Venture Capital," Chap. D5 of *The Handbook of Modern Finance* (Dennis Lougue, Editor). 2007. (with Josh Lerner.)
"Equity Financing," *Handbook of Entrepreneurship Research: An Interdisciplinary Survey and* introduction (Zoltan Acs and David B. Audretsch, Editor). 2010. (with Josh Lerner.)
"The Role of Venture Capitalists in the Acquisition of Private Companies." In *Research Handbook on International Banking and Governance*, edited by James Barth, Chen Lin, and Clas Wihlborg. Cheltenham, UK: Edward Elgar Publishing, 2012. (with Yuhai Xuan).

**Working Papers**
"Getting Schooled: The Role of Universities in Attracting Immigrant Entrepreneurs," May 2021. (with Natee Amornsiripanitch, George Hu, and Kaushik Vasudevan.)
"Venture Capital's #MeToo Moment," January 2021. (with Sophie Calder-Wang and Patrick Sweeney.)
"Diversity and Performance in Entrepreneurial Teams," January 2021. (with Sophie Calder-Wang and Kevin Huang.)
"Diversity in Innovation," January 2019. (with Sophie Calder-Wang.)
"Homophily in Entrepreneurial Team Formation," January 2019. (with Sophie Calder-Wang and Kevin Huang.)
"To Err is Human, To Forgive is a Mistake: Evidence from Venture Capital Hiring," December 2013. (with Vladimir Mukharlyamov and Yuhai Xuan.)
"Bridge Building in Venture Capital: Evidence from Acquisitions of Venture Capital-backed Companies," December 2011.
"Reputation and Contractual Flexibility: Evidence from Venture Capital Distribution Pricing Policies," August 2011. (with Timothy Dore and Andrew Metrick.)
"Why Experienced Venture Capitalists Leave Money on the Table: Evidence from Initial Public Offerings," July 2009. (with Alon Brav and Tim Dore.)
"Institutions, Capital Constraints and Entrepreneurial Firm Dynamics: Evidence from Europe," November 2006. (with Mihir Desai and Josh Lerner.)
"Skill vs. Luck in Entrepreneurship and Venture Capital: Evidence from Serial Entrepreneurs," December 2006. (with Anna Kovner, Josh Lerner, and David Scharfstein.)
"The Role of Venture Capitalists in the Acquisition of Private Companies," October 2005. (with Yuhai Xian.)
"Incentives vs. Control: An Analysis of U.S. Dual-class Companies," April 2004. (with Andrew Metrick and Joy Ishii.)
"Ownership and Control in Entrepreneurial Firms: An Examination of Convertible Securities in Venture Capital Investment," January 2000.
"An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms," May 2000. (with Malcolm Baker.)

**Opinion — Editorials**
"This Tax Cut Will Pay Dividends," *Wall Street Journal,* August 13, 2002. (with Andrew Metrick and Jeremy Siegel.)

**Projects in Process**
- "Intercollegiate Varsity Athletes and Career Outcomes." (with Vladimir Muhkarlyamov.)
- "Entrepreneurs as Venture Capitalists." (with Vladimir Muhkarlyamov.)
- "Human Capital and Private Equity." (with Steven Kaplan and Vladimir Muhkarlyamov.)
- "Private Equity and CEO Labor Markets." (with Steven Kaplan and Vladimir Muhkarlyamov.)

- "Migration and Entrepreneurship." (with Natee Amornsiripanitch and Kaushik Vasudevan.)
- "The Role of Immigrants in the Innovation Ecosystem." (with Natee Amornsiripanitch and Kaushik Vasudevan.)
- "Dual Class IPOs." (with Malcolm Baker.)
- "Shark Tank." (with Sophie Calder-Wang.)
- "Pre-public Financing in Entrepreneurial Ventures."
- "Institutional Ownership and Corporate Governance." (with Andrew Metrick and Joy Ishii.)
- "The Dynamics of Global Entrepreneurship." (with Mihir Desai and Josh Lerner.)
- "The Determinants of Entrepreneurial Success." (with Anna Kovner, Josh Lerner, and David Scharfstein.)
- "Risk and Return in Private Equity." (with Leslie Jeng, Josh Lerner, and Andrew Metrick.)
- "Corporate Governance through Time." (with Martijn Cremers, Allen Ferrell, and Andrew Metrick.)

**COURSE MATERIALS**

**Cases**

- "Abraaj Capital and Acibadem Healthcare Invesetment (A)." Harvard Business School Case 214-021.
- "Abraaj Capital and Acibadem Healthcare Invesetment (B)." Harvard Business School Case 214-022.
- "Advantage Partners: Dia Kanri (A)." Harvard Business School Case 214-016.
- "Advantage Partners: Dia Kanri (B)." Harvard Business School Case 214-017.
- "The Advent Israel Venture Capital Program." Harvard Business School Case 298–072.
- "ALWAYSi." Harvard Business School Case 201–075.
- "APV Technology Partners II, L.P." Harvard Business School Case 298–048.
- "Ardian: The Sale of Diana." Harvard Business School Case 215-033.
- "Aspect Ventures." Harvard Business School Case 217-046.
- "Bain Capital: Outback Steakhouse." Harvard Business School Case 212-087.
- "Bang Networks, Inc." Harvard Business School Case 201–074.
- "Beyond Meat." Harvard Business School Case 220-053.
- "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297–095.
- "Blackstone's Julia Kahr at the Summit." Harvard Business School Case 218-002.
- "Cachet Technologies." Harvard Business School Case 200–031.
- "Cambridge Technology Partners: 1991 Start Up." Harvard Business School Case 298–044.
- "Cambridge Technology Partners: Corporate Venturing (August 1996)." Harvard Business School Case 297–033.
- "Car Wash Partners, Inc." Harvard Business School Case 299–034.
- "CashDrop (A)." Harvard Business School Case 221-051.
- "CashDrop (B-1)." Harvard Business School Case 221-052.
- "CashDrop (B-2)." Harvard Business School Case 221-053.
- "Charles River Velocity." Harvard Business School Case 201–092.
- "Charter Communication Bankruptcy." Harvard Business School Case 211-035.
- "Clover Food Lab." Harvard Business School Case Study 818-073.
- "Dell Ventures." Harvard Business School Case 200–062.
- "Digital Everywhere, Inc." Harvard Business School Case 298–099.
- "edocs, Inc. (A)." Harvard Business School Case 200–015.
- "edocs, Inc. (B-1): Kevin Laracey." Harvard Business School Case 200–020.
- "edocs, Inc. (B-2): Jonathon Guerster." Harvard Business School Case 200–021.
- "Efficient Market Services: August 1993 (A)." Harvard Business School Case 298–009.
- "Efficient Market Services: August 1993 (B1), EMS Management." Harvard Business School Case 298–010.
- "Efficient Market Services: August 1993 (B2), Comdisco Ventures." Harvard Business School Case 298–011.
- "Elliot Lebowitz." Harvard Business School Case 297–094.
- "Endeca: New Growth Opportunities." Harvard Business School Case 206–041.

- "Entrepreneurial Finance Vignettes – 2020." Harvard Business School Case 220-049.
- "Entrepreneurial Finance Vignettes – 2021." Harvard Business School Case 221-055.
- "EyeControl: Inspiring Communication." Harvard Business School Case 820-078.
- "First Mark Capital." Harvard Business School Case 212-041.
- "Fitzpatrick Hotel Group (A)." Harvard Business School Case 298–002.
- "Fitzpatrick Hotel Group (B1): Niall Carroll." Harvard Business School Case 298–003.
- "Fitzpatrick Hotel Group (B2): Paddy Fitzpatrick." Harvard Business School Case 298–004.
- "Founders Fund." Harvard Business School Case 211-040.
- "Genset Initial Public Offering (A)." Harvard Business School Case 297–096.
- "Genset Initial Public Offering (B)." Harvard Business School Case 297–097.
- "Genset: 1989." Harvard Business School Case 298–070.
- "Ghia and Cleo Capital." Harvard Business School Case 221-067.
- "Ginkgo Bioworks: The Cell as a Factory." Harvard Business School Case 220-069.
- "Global Digital Utilities Corp." Harvard Business School Case 297–065.
- "Globant: Going Public." Harvard Business School Case 215-021.
- "Harrah's Entertainment LBO." Harvard Business School Case13-054.
- "HgCapital and the Visma Transaction: (A)." Harvard Business School Case 214-018.
- "HgCapital and the Visma Transaction: (B)." Harvard Business School Case 214-019.
- "HgCapital and the Visma Transaction: (C)." Harvard Business School Case 214-020.
- "Honest Tea." Harvard Business School Case 201–076.
- "Hudson Manufacturing." Harvard Business School Case 203–064.
- "ICSGroup." Harvard Business School Case 819-097.
- "Knightsbridge Advisers, Inc." Harvard Business School Case 296–054.
- "Knoll Furniture: Going Public." Harvard Business School Case 202–114.
- "Loma Vista Medical." Harvard Business School Case 819-050.
- "Luminar and the Rise of SPACs." Harvard Business School Case 221-099.
- "MSE, Inc. Privatization: August 1997." Harvard Business School Case 298–135.
- "MSE, Inc. Privatization: August 1997 (Abridged)." Harvard Business School Case 298–136.
- "New Oriental." Harvard Business School Case.
- "New York Bagel: Hungary, April 1994." Harvard Business School Case 297–078.
- "NSK Software Technologies Ltd." Harvard Business School Case 298–071.
- "Nykaa.com: A Passion for Beauty." Harvard Business School Case 218-049.
- "Ocular." Harvard Business School Case 202–118.
- "Panoramic Power." Harvard Business School Case 818-072.
- "Pet Doctors: 1999." Harvard Business School Case 200–016 "The Prague Post." Harvard Business School Case 299–033.
- "Private Equity Finance Vignettes: 2016." Harvard Business School Case 216-005.
- "Private Equity Vignettes: 2014." Harvard Business School Case 213-026.
- "Rapid7." Harvard Business School Case 817-077.
- "Sales Razor Technologies." Harvard Business School Case 217-040.
- "Sarvega." Harvard Business School Case 204–137.
- "Shenzhen Capital Group: A Pioneer in China's VC Industry" Harvard Business School Case 211-029.
- "Sky Air, Inc." Harvard Business School Case 297–110.
- "SRS and the Defense Innovation Unit: Rethinking Procurement." Harvard Business School Case 220-047."
- "TA Associates and SpeedCast." Harvard Business School Case 217-051.
- "TaskRabbit." Harvard Business School Case 217-047.
- "Torrent Systems." Harvard Business School Case 298–084.
- "Tutor Time (A)." Harvard Business School Case 297–064.
- "Tutor Time (B)." Harvard Business School Case 297–074.
- "United Capital Partners (A)." Harvard Business School Case 213-044.
- "United Capital Partners (B)." Harvard Business School Case 213-045.

- "Venture Capital in Ireland: Getting Their ACT Together." Harvard Business School Case 298–001.
- "Vueling Airlines." Havard Business School Case.
- "WeWork – November 2018." Harvard Business Schoo Case 220-075.
- "Xedia and Silicon Valley Bank (A)." Harvard Business School Case 298–119.
- "Xedia and Silicon Valley Bank (B1): The Bank's Perspective." Harvard Business School Case 298–120.
- "Xedia and Silicon Valley Bank (B2): The Company's Perspective." Harvard Business School Case 298–121.
- "Xedia and Silicon Valley Bank (C): The Final Agreement." Harvard Business School Case 298–122.
- "Yo-Yo Ma and Silkroad." Harvard Business School Case 818-110.
- "ZEFER: November 1998." Harvard Business School Case 299–032.

**<u>Course Notes and Teaching Notes</u>**

- "Advent Israel Venture Capital Program TN." Harvard Business School Teaching Note 299–054.
- "APV Technology Partners II, L.P. TN." Harvard Business School Teaching Note 299–053.
- "Beta Golf." Harvard Business School Teaching Note 202–062.
- "BioTransplant Inc.: Initial Public Offering, January 1996 TN." Harvard Business School Teaching Note 299–055.
- "Cachet Technologies." Harvard Business School Teaching Note 202–068.
- "Cambridge Technology Partners —1991 Start Up TN." Harvard Business School Teaching Note 299–057.
- "Cambridge Technology Partners: Corporate Venturing (August 1996) TN." Harvard Business School Teaching Note 299–056.
- "Carlton Polish Co." Harvard Business School Teaching Note 202–076.
- "Car Wash Partners, Inc. TN." Harvard Business School Teaching Note 299–058.
- "Contracting and Control in Venture Capital." Harvard Business School Note 298–067.
- "Dell Ventures." Harvard Business School Teaching Note 202–072.
- "Digital Everywhere, Inc. TN." Harvard Business School Teaching Note 299–059.
- "edocs, Inc. Series." Harvard Business School Teaching Note 202–064.
- "Efficient Market Services: August 1993 Series TN." Harvard Business School Teaching Note 299–061.
- "Elliot Lebowitz TN." Harvard Business School Teaching Note 299–060.
- "Emergence of Silicon Wadi." Harvard Business School Note 204–156.
- "Entrepreneurial Exits." Harvard Business School Note 220-077.
- "The Entrepreneurial Manager: Course Overview, Harvard Business School Case." 818-080
- "The Entrepreneurial Manager, Module I: Defining and Developing the Business Model." Harvard Business School Case 817-108.
- "The Entrepreneurial Manager, Module 2 Part 1: Resourcing the Business Model." Harvard Business School Case 817-109.
- "The Entrepreneurial Manager, Module 2 Part 2: Resourcing the Business Model." Harvard Business School Case 817-110.
- "Fenchel Lampshade Company." Harvard Business School Teaching Note 202–063.
- "Fitzpatrick Hotel Group Series TN." Harvard Business School Teaching Note 299–062.
- "Genset: 1989 TN." Harvard Business School Teaching Note 299–063.
- "Genset Initial Public Offering (A) & (B) TN." Harvard Business School Teaching Note 299–064.
- "Global Digital Utilities Corporation TN." Harvard Business School Teaching Note 299–065.
- "HIMSCORP, Inc." Harvard Business School Teaching Note 202–073.
- "Honest Tea." Harvard Business School Teaching Note 202–069.
- "Introduction to Entrepreneurial Finance." Harvard Business School Note 298–061.
- "Introduction to Entrepreneurial Finance – 2020." Harvard Business School Note 220-050.

- "Introduction to Private Equity Finance." Harvard Business School Note 213-026.
- "Knightsbridge Advisers, Inc. TN." Harvard Business School Teaching Note 299–066.
- "Knot, The." Harvard Business School Teaching Note 202–070.
- "MSE, Inc. Privatization: August 1997 & MSE, Inc. Privatization: August 1997 (Abridged) TN." Harvard Business School Teaching Note 299–067.
- "Nantucket Nectars." Harvard Business School Teaching Note 202–074.
- "New York Bagel: Hungary, April 1994 TN." Harvard Business School Teaching Note 299–068.
- "A Note on Angel Financing." Harvard Business School Note 298–083.
- "A Note on LBO Capital Structure." Harvard Business School Note 213-091.
- "A Note on Franchising." Harvard Business School Note 297–108.
- "A Note on Franchising." Harvard Business School Note 217-059.
- "A Note on Government Sources of Financing for Small Businesses." Harvard Business School Note 298–015.
- "Note on Strategic Alliances, A." Harvard Business School Note 298–047.
- "A Note on the Internet." Harvard Business School Note 297–109.
- "A Note on Private Equity Exits." Harvard Business School Note 213-112.
- "A Note on the Venture Capital Industry." Harvard Business School Note 295–065.
- "A Note on Valuation in Entrepreneurial Ventures." Harvard Business School Note 298–082.
- "A Note on Valuation in Private Equity." Harvard Business School Note 213-034.
- "NSK Software Technologies Ltd. TN." Harvard Business School Teaching Note 299–069.
- "Parenting Magazine TN." Harvard Business School Teaching Note 202–065.
- "Penelope's Personal Pocket Phones TN." Harvard Business School Teaching Note 299–070.
- "Prague Post, The TN." Harvard Business School Teaching Note 299–071.
- "Private Equity Valuation in Emerging Markets." Harvard Business School Note 213-043.
- "Record Masters." Harvard Business School Teaching Note 202–075.
- "Penelope's Personal Pocket Phones." Harvard Business School Case 299–004.
- "Sky Air, Inc. TN." Harvard Business School Teaching Note 299–072.
- "Torrent Systems TN." Harvard Business School Teaching Note 299–073.
- "Tutor Time (A) TN." Harvard Business School Teaching Note 299–074.
- "Tutor Time (B) TN." Harvard Business School Teaching Note 299–078.
- "Valuation in Entrepreneurial Settings." Harvard Business School Note 220-057.
- "Venture Capital in Ireland: Getting Their ACT Together TN." Harvard Business School Teaching Note 299–075.
- "Xedia and Silicon Valley Bank Series TN." Harvard Business School Teaching Note 299–076.
- "ZEFER: November 1998 TN." Harvard Business School Teaching Note 299–077.

**SEMINARS AND CONFERENCE PRESENTATIONS — Academic**

American Economic Association: Annual Meeting, January 1995, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

American Finance Association: Annual Meeting, January 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

American Finance Association: Annual Meeting, January 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

American Finance Association: Annual Meeting, January 1999, "What Drives Venture Capital Fundraising."

American Finance Association: Annual Meeting, January 2000, "An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms."

American Finance Association: Annual Meeting, January 2004, "Incentives vs. Control: An Analysis of U.S. Dual-class companies."

American Finance Association: Annual Meeting, January 2015, "Cost of Friendship."

American Finance Association: Annual Meeting, January 2015, "What Do Private Equity Firms (Say) They Do?"
American Law and Economics Association: Annual Meeting, May 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Association of Financial Economists: Annual Meeting, January 2001, "The Determinants of Board Structure and Function in Entrepreneurial Firms."
Association of Financial Economists: Annual Meeting, January 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
Arizona State University School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Boston University: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Brandeis University: Entrepreneurship Conference, April 2014, "The Next Big Question in Entrepreneurship Research."
Brookings Institute: Microeconomic Conference, June 1998, "What Drives Venture Fundraising?"
Business and Economic History: Annual Meeting, March 1994, "The Rise and Fall of Venture Capital."
Cambridge University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Center for Research on Security Prices: Biannual Meeting, March 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Center for Research on Security Prices: Biannual Meeting, November 1994, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Center for Economic and Policy Research: European Finance Conference on Financing Innovation, November 1998, "What Drives Venture Capital Fundraising?"
Columbia Law School: Law and Economics Seminar, November 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Columbia Law School: Law and Economics Seminar, November 1995, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Columbia Law School: Financing Innovation Conference, December 1997, "An Analysis of Covenants in Venture Capital Investments."
Columbia University School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Copenhagen Business School: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Cornell Business School: Finance Seminar, October 2001, "Corporate Governance and Equity Prices."
Federal Reserve Bank of Chicago: January 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Duke University Fuqua Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Georgetown Law School: April 2003, "Corporate Governance and Equity Prices."
Harvard Business School: Business History Seminar, December 2000, "The History of Silicon Valley."
Harvard Business School: Entrepreneurship Conference, December 2000, "The Really Long-run Performance of Initial Public Offerings."
Harvard Business School: Financial Decision and Control Workshop, July 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Harvard Business School: Financial Decision and Control Workshop, July 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure- backed Companies."
Harvard Business School: Financial Decision and Control Workshop, July 1997, "Reputation and

Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard Business School: Financial Decision and Control Workshop, July 1998, "How are Large Institutions Different From Other Investors? Why Do These Differences Matter for Equity Prices and Returns?"

Harvard Business School: Finance Seminar, February 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Harvard Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Harvard Business School: Finance Seminar, October 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Harvard Business School: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School: Finance Seminar, October 2011, "The Cost of Friendship."

Harvard Business School: Research Symposium, May 2018, "Diversity in the Innovation Sector."

Harvard Business School: Organizations and Markets Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School: Finance Seminar, November 2000, "The Venture Capital Revolution."

Harvard Business School: Finance Seminar, March 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Harvard Business School: Finance Seminar, December 2008, "Bridge Building in Venture Capital: Evidence from Acquisitions."

Harvard Business School: Finance Seminar, December 2014, "More than Money: Venture Capitalists on Boards."

Harvard Business School: Finance Seminar, February 2015, "What do Private Equity Firms (Say) They Do?"

Harvard Business School: Organizational Behavior Seminar, February 2012, "The Role of Social Ties in Venture Capital."

Harvard Kennedy School: Gender Diversity Conference, June 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."

Harvard University Department of Economics: Workshop, December 1992, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Harvard University Department of Economics: Organizations Workshop, December 1996, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard University Department of Economics: Organizations Workshop, December 2002, "Entrepreneurial Spawning."

Harvard University Department of Economics: Organizations Workshop, December 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."

Harvard University Department of Economics: Organizations Workshop, September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."

Hebrew University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Hebrew University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Hebrew University School of Business: Distinguished Lecture: December 2014, "What Do Private Equity Firms (Say) They Do?"

IESE Business School, October 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."

London School of Economics: Venture Capital Conference, October 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely Held Firms."

Manchester University, October 2020, "Venture Capital and Covid-19," "Private Equity and Covid-19."

Massachusetts Institute of Technology: Organizations Workshop, March 1996, "The Use of Covenants:

An Empirical Analysis of Venture Partnership Agreements."
Massachusetts Institute of Technology and Harvard University: Public Finance Workshop, March 1998, "What Drives Venture Fundraising?"
National Bureau of Economic Research: Corporate Finance Group, April 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital
National Bureau of Economic Research: Entrepreneurship Group, July 2017, "How do Venture Capitalists Make Decisions."
National Bureau of Economic Research: Summer Institute, July 1994, "An Analysis of Compensation in the U.S. Venture Partnership Agreement."
National Bureau of Economic Research: Summer Institute, July 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
National Bureau of Economic Research: Summer Institute, July 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
National Bureau of Economic Research: Finance Series, December 1997, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
National Bureau of Economic Research: Finance Series, November 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
National Bureau of Economic Research: Summer Institute, July 2001, "Corporate Governance and Equity Prices."
New York Federal Reserve Bank: May 2000, "The Determinants of Board Structure and Function in Entrepreneurial Firms."
New York University, Stern School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
New York University, Stern School of Business: Finance Seminar, February 1999, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
New York University, Stern School of Business: Finance Seminar, October 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
Northwestern University, Kellogg Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Northwestern University, Kellogg Business School: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Norwegian School of Management: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Ohio State University: Finance Seminar, October 1998, "How You Get There Matters: The Path Dependency of Corporate Governance in Closely Held Firms."
Oxford University: Graduate Student Seminar, May 1989.
Oxford University: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Oxford University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Peking University, Finance Seminar, May 2021, "Getting Schooled: The Role of Universities in Attracting Immigrant Entrepreneurs."
Queens University (Kingston, Ontario) School of Business: Finance Seminar, November 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Rutgers University: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Securities and Exchange Commission, October 2020, "Venture Capital and Covid-19," "Private Equity and Covid-19."
Stanford University Graduate School of Business: Strategy Workshop, January 1993, "Grandstanding in the Venture Capital Industry."

Stanford University Graduate School of Business: Center for Economic and Political Research, March 1997, "The Valuation of Private Equity Investments."
Stanford University: Finance Seminar, October 2012, "The Cost of Friendship."
Stanford University: Financing Innovation Conference, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Stockholm Business School: September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."
Tel Aviv University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Tel Aviv University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Tel Aviv University School of Business: Finance Seminar, December 2014, "What Do Private Equity Firms (Say) They Do?"
University of Arizona School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of California, Davis: Diversity Conference, December 2017, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
University of California at Berkeley, Haas School of Business: Finance Seminar, April 1993, "Grandstanding in the Venture Capital Industry."
University of California at Los Angeles: Finance Seminar, May 1997, "The Valuation of Private Equity Investments."
University of California at Los Angeles: Behavioral Finance Conference, April 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
University of Chicago Graduate School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
University of Chicago Graduate School of Business: Information and Uncertainty Seminar, April 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of Chicago Graduate School of Business: Finance Seminar, May 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
University of Chicago Economics Department: Economic and Legal Organization Workshop, February 1994, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
University of Chicago Economics Department: Economic and Legal Organization Workshop, October 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
University of Georgia School of Business: Finance Seminar, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Illinois School of Business: Finance Seminar, October 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
University of Michigan School of Business: Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of North Carolina School of Business: Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of Pennsylvania Wharton School: Finance Workshop, March 1998, "Money Chasing Deals? The Impact of Venture Inflows of Private Equity Prices."
University of Rochester Simon School of Business: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Rochester Simon School of Business: Organizations Seminar, February 1993, "Grandstanding in the Venture Capital Industry."
University of Washington: Finance Seminar, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."

Virginia Tech University School of Business: Finance Seminar, October 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Warwick University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Western Finance Association: Annual Meeting, June 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Western Finance Association: Annual Meeting, June 1995, "The Long-run Underperformance of Seasoned Equity Offerings Revisited."
Western Finance Association: Annual Meeting, June 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Western Finance Association: Annual Meeting, June 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Western Finance Association: Annual Meeting, June 1998, "How are Large Institutions Different from Other Investors? Why These Differences Matter for Equity Prices and Returns?"
World Bank: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Yale University, School of Management: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

**SPEECHES AND CONFERENCE PRESENTATIONS — Practitioner**

Advanced Technology Program, National Institute for Standards and Technology and NBER Conference on Financing Innovation, June 1998.
Amsterdam Institute of Finance, October 1994, "Venture Capital and the Finance of Emerging Companies."
American Friends of the Technion, October 1998, "The Development of High Technology and Venture Capital in Israel."
AT&T Small Business Conference, April 1994, "Venture Capital: The Road Ahead."
Center for Economic Policy Research, Venture Capital Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."
Deloitte and Touche, May 2003, "Entrepreneurial Leadership."
Ernst and Young Silicon Valley Venture Capital Conference, 2002, "The Future of Venture Capital."
Ernst and Young Buyout Roundtable, 2002, "Corporate Governance and Private Equity."
Greenwich Roundtable, 2015, "Skill in Private Equity."
Harvard Business School Venture Capital Conference, December 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies" and "Venture Capital Distributions: Short-run and Long-run Reactions."
Harvard Business School Alumni Series, May 2000 and May 2003, "The Future of Private Equity."
Harvard Business School European Conference, June 2003, "European Private Equity."
Harvard Business School Global Alumni Conference, June 1998, "Consolidation Buy-outs."
Harvard Business School Global Alumni Conference, May 2001, "Venture Capital 2001: Boom or Bust?"
Harvard Business School Centennial Celebration, February 2010, "Private Equity at the Crossroads."
Harvard Business School Global Alumni Venture Capital Conference, May 2012, "New Venture Capital Models"
Harvard Business School Global Alumni Venture Capital Conference, October 2014, "Lessons from the Trenches."
Hambrecht and Quist, Post-Venture Forum, March 1999, "Venture and Post-Venture Opportunities: Insightsfrom Research."
Iceland Pension Conference, May 2018, "The Opportunity in Venture Capital."
Institutional Limited Partner's Association, September 1997, "Risk and Return in Private Equity."
Institutional Limited Partner's Association, April 2002, "New Tools for Assessing Private Equity Valuation

and Asset Allocation."

International Business Forum, June 1999, "Venture Capitalists and the Public Markets." Investors' Press Alpha Roundtable, October 1996, "The Future of Private Equity." Israel Business Forum, March 1994.

Israeli Venture Capital and High Technology Conference, 2002, "The Future of Venture Capital and Its Implication for Israel."

Japanese Private Equity Forum, July 1997, "Corporations and Venture Capital: Old and New Challenges."

Latin American Chamber of Commerce, February 1995, "Capital for Entrepreneurial Companies: A Look Ahead."

Massachusetts Public Pension Fund Investment Forum, October 1998, "Venture Capital: Investing in Start-up and Newly Public Firms."

National Venture Capital Association, March 2003, "The Future of Venture Capital." Nova Pharmaceuticals, September 2009, "Venture Capital after the Downturn."

OPAL Institutional Investors Conference, December 2000, "The Future of Private Equity." Rocky Mountain Venture Capital Association, March 2003, "Venture Capital: Challenges and

Opportunities."

Russell Capital Private Equity Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Russell Capital Private Equity Conference, November 1998, "Advent Israel Venture Capital Program."
Salomon Smith Barney Private Equity Conference, March 2000, "The Future of Private Equity."
Salomon Smith Barney Consulting Group, March 2001, "Risk and Return in Private Equity."
Samsung Venture Capital Group, October 1997, "Corporations and Venture Capital: Old and New Challenges."
Seeking Alpha, March 2015, "What's Hot in Venture Capital Fundraising?"
Silicon Valley Bank, May 2003, "Venture Capital: Challenges and Opportunity."
SuperReturn Conference US, May 2009, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference Europe, February 20011, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference US, May 2013, "The Future of Private Equity."
University of Chicago Business Forum, May 1995, "The Next Ten Years in Venture Capital." (Organized and moderated panel.)
Venture Economics Venture Forum, November 1994, "The Venture Cycle." (Keynote Address.)
Venture Economics Venture Forum, November 1994, Panelist for IPO performance issues.
Venture Economics Venture Forum, November 1996, Plenary session speaker on venture capital returns.
VentureOne / Ernst and Young Venture Capital Conference, July 2002, "The Future of Venture Capital."
VentureOne / Ernst and Young Venture Capital Conference, July 2003, "The Future of European Venture Capital."
Young Presidents' Organization Conference, November 1998, "Entrepreneurial Opportunities in Crisis Situations."
Young Presidents' Organization Conference, January 2003, "The Future of Venture Capital."
Young Presidents' Organization Conference, January 2010, "New Models in Venture Capital."
Young Presidents' Organization Conference, January 2013, "Private Equity Trends."
In addition, made presentations of research findings for several institutional investors and investment managers who contributed data for the project on interactions between venture organizations and institutional investors.

## TEACHING

### University of Chicago

Developed and taught course "Entrepreneurial Finance and Management," a second-year MBA elective,

1993–1995.

**Harvard Business School**

Taught "First-Year Finance," in Required Curriculum, 1995–1997.

Taught "Entrepreneurial Finance," in Elective Curriculum, 1997–2003. 2019-2021.

Taught "The Entrepreneurial Manager," in Required Curriculum, 2003–2008.

Taught "Venture Capital and Private Equity," in Elective Curriculum, 2009–2012.

Co-developed and taught, "Private Equity Finance," in Elective Curriculum, 2012-2017. Developed and taught, "Private Equity Field," in Elective Curriculum, 2013.

Developed and taught, "Immersive Field Couse: Israel. Startup Nation." 2017-2018.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2005–2008.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2016–2019.

Co-developed and co-taught Ph.D. course "Empirical Topics in Corporate Finance," 1999–2015. (with Josh Lerner.)

Co-developed and partially taught three-day executive courses on venture capital and private equity: "Conflict and Evolution in Private Equity" (1996), "Corporate Venture Capital: The Third Wave" (1997), "The Internationalization of Private Equity" (1998), "Structuring Effective Private Equity Organizations" (1999, 2000), "Optimizing Corporate Investments" (2000), "Doing Private Equity Deals" (2001, 2003), "Private Equity in a Downturn" (2002), "Private Equity Deals" (2004), "Private Equity and Corporate Governance" (2005), "Venture Capital and Private Equity" (2006), "Internationalization of Private Equity" (2007), "Private Equity and Venture Capital" (2008), and "Private Equity after the Downturn" (2009), "Venture Capital and Private Equity" (2010-2011). "Private Equity and Venture Capital: After the Financial Crisis" (2012), Private Equity and Venture Capital: The Future" (2013). "Private Equity and Venture Capital: At the Crossroads" (2014). "Private Equity and Venture Capital: Changing Market Power." (2015), Private Equity and Venture Capital (2016-2021.) (all with Josh Lerner.)

Co-developed and taught "Economics of Markets," in Elective Curriculum, 1997.

Partially taught in a variety of programs including:

General Management Program / START, August 1996.
HBS / CIEBA Pension Workshop, April 1996.
YPO Conference, February 1997, February 2003, February 2006, February 2008.
Strategic Finance for Small Business, February 1998, March 1999, March 2000.
Entrepreneur's Toolkit, June 1997, June 1998, June 1999.

**PROFESSIONAL SERVICE AND EXPERIENCE**

1985–1986 BAYER CHEMICAL CO. LEVERKUSEN, GERMANY
Researcher. Performed biochemical analysis on locust flight muscle metabolism.

1997–2020 Associate Editor for *Small Business Economics*.

1997–2020 Associate Editor for *Journal of Private Equity.*

1997–2016 Associate Editor for *Journal of Finance*.

1997–2018 Western Finance Association Meetings Program Committee.

1998 Program Committee, *Journal of Financial Economics* conference on research methodologies in finance.

2006–2014 Associate Editor for Journal of Economic Literature.

2010–2020 Associate Editor for Journal of Economics and Management Strategy.

Referee for the Journal of Financial Economics, Journal of Finance, Journal of Political Economy, Quarterly Journal of Economics, Journal of Economic Theory, Rand Journal of Economics, Review of Financial Studies, American Economic Review, Journal of Public Economics, Journal of Corporate Finance, Journal of Small Business Management, Economic Letter, Small Business Economics, Journal of Business Venturing, Journal of Small Business Finance, Journal of Business, Journal of Law, Economics, and Organizations, and Journal of Law and Economics, Review of Economic and Statistics.

Reviewer for reports and proposals for the National Science Foundation. Reviewer for reports and proposals for the Securities and Exchange Commission.

## COMMUNTY SERVICE

Board Member, Boston Sympony Orchestra, (2021-present).
Board Member, Beth Israel Deaconess Hospital, (2014-present).
Board Member, USA Triathlon Foundation, (2015-present)
Beth Israel Deaconess Wellness Center Advisory Board (2013-2020)
Board member, Friends of Harvard Track, (2014-2018).
Vice President, Treasurer, and Executive Board Member, Harvard Hillel (1995–2010).
Board Member, Camp Yavneh (2007–2010).
Ivy League Eikeden Committee (1997–2010)
Young Israel of Brookline, Internet Advisory Board (2000–2001).
Technion Institute of Management: Boston Advisory Board (2000).
Board Member, Anshe Shalom B'nei Israel Congregation (1993–1995).

## CONSULTING PROJECTS

Apax Venture Partners, 2003.
Audax Private Equity, 2021.
Bain Capital, 2008-2010.
Battery Venture Partners, 2001.
Bessemer Venture Partners, 1998.
Deloitte and Touche, 2003.
Department of Energy, Idaho Falls National Laboratory, 1994–1995.
Department of Energy, Savannah River National Laboratory, 1995–1997.
Department of Energy, Butte, Montana National Laboratory, 1997–1998.
E.M. Warburg, Pincus, 1997.
Ernst and Young, 2002.
GTCR Golder Rauner, 1999.
Jerusalem Venture Partners, 2001.
Kleiner Perkins, 2014.
Montana Science and Engineering, Inc., 1997.
Patricoff & Co., 1995.
Phillip's Petroleum, 1998, 2000, 2001, 2002.
PriceWaterhouse Coopers, 2001.
RogersCasey Investment Advisors, 1994.
Salomon Smith Barney, 1999–2003.

TA Associates, 2015, 2019.
Thermo Electron Corporation, 1994–1997.
VentureOne, 1995.

## BOARDS OF DIRECTORS AND ADVISORY BOARDS

Beth Israel Deaconess Hospital, 2016-Present.
Evergreen Partners, 2005–2015.
Gemini Venture Capital, 2003–2015.
Highland Capital Consumer Fund, 2007–Present.
Khosla Ventures, 2009-Present.
Knightsbridge Investment Advisers, 1995–2012.
Mercanteo, 1999.
New Capital Partners, 2000–2001.
Onpoint Technology Ventures, 2003–2017.
OnTheFrontier.com, 2000–2001.
Spur Capital Partners, 2002–Present.
Triple Point Capital, 2003.
USA Triathlon Foundation, 2016-Present.
Xfund, 2019-present.
ZEFER, 1998.

## GRANTS AND AWARDS

National Science Foundation Grant, 1994–1997, "Financing New Business Formation."
National Science Foundation Grant, 2002–2005, "Corporate Governance and Firm Performance."
National Institute of Standards and Technology, Advanced Technology Program, 1996–1997, "Venture Capital and the Financing of Emerging Technologies."
Newcomen Business History Paper Prize, 1994.
American Association of Individual Investors Award for Best Paper on Investments, at the Western Finance Association Meeting, 1998.
Journal of Financial Economics, Fama-DFA Price, Second Prize, 2008.
Journal of Finance, Smith Breeden Distinguished Paper Prize, 1998.
Rodney White Center for Financial Research, Best Paper Prize, 2002.
MBA Class of 1961 Fellow, 1997–1998.

## PATENTS GRANTED

Private Equity Investments, Patent Number US 7,426,488 B1, Issued September 16, 2008. (co-inventors Joshua Lerner, Andrew Metrick, and Leslie Jeng.)

## ATHLETICS

Alternate on the 1988 Olympic team in the marathon. Finished fourth in the Olympic trials. Qualified for 1984, 1988, 1992 Olympic marathon trials. Cross-Country All-American. Academic All-American. Set World Junior Record in the marathon (1983). Bronze medalist in 1985 World University Games in Japan (marathon). Qualified for two US cross-country teams and competed in the World Championships. Set Harvard Records in the 5,000 and 10,000 meters. Triathlon Age Group All-American 2007, 2009, 2010, 2013, 2014, 2015, 2016, 2017, 2018. Ranked second in the world by World Triathlon Corporation in Age Group at the Ironman 70.3 distance in 2014. Competed in ITU Age Group World Championships (2007, 2015). Competed in Ironman 70.3 World Championship (2007, 2016, 2017, 2019). Competed in Ironman World Championships in Kailua Kona (2009, 2010, 2018).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Hudson Bay Master Fund Ltd. v. Patriot National, Inc. and Steven M. Mariano and CVI Investments, Inc. v. Patriot National, Inc., on behalf of Patriot National, Inc. and Steven M. Mariano, United States District Court for the Southern District of New York, Case Nos. 16-cv-2767 (GBD) (RLE) and 16-cv-2787 (GBD) (RLE) (October 4, 2017).

Testimony of Paul A. Gompers in Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C. v. Virgin Media Inc., on behalf of Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C., Superior Court of New Jersey, Law Division: Morris County, Civil Action No. MRS-L-734-13 (October 18, 2017).

Deposition of Paul A. Gompers in Winson Tang v. Lindsay Rosenwald, Michael Weiss, Opus Point Partners, LLC, Mustang Bio, Inc. (aka Mustang Therapeutics, Inc.), City of Hope, and Fortress Biotech, Inc. (f/k/a Coronado Biosciences, Inc.), on behalf of Opus Point Partners, LLC, Mustang Therapeutics, Inc., Fortress Biotech, Inc., Lindsay Rosenwald, and Michael Weiss, Superior Court of the State of California, County of Los Angeles, Case No. BC 607346 (October 23, 2017).

Deposition of Paul A. Gompers in EWC Holdings, Inc. v. Princeton Ventures II, LLC and Brazos/EWC, LLC, on behalf of EWC Holdings, Inc., Court of Chancery of the State of Delaware, C.A. No. 12519-VCL (November 7, 2017).

Deposition of Paul A. Gompers in Securities and Exchange Commission v. AVEO Pharmaceuticals, Inc., Tuan Ha-Ngoc, David Johnston, and William Slichenmeyer, on behalf of the individual defendants, United States District Court for the District of Massachusetts, Case No. 1:16-cv-10607-NMG (December 13, 2017).

Deposition of Paul A. Gompers in Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom, on behalf of Proskauer Rose, LLP and Thomas V. Sjoblom, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:13-cv-00477-N (January 22, 2018).

Arbitration Testimony of Paul A. Gompers in Credit Agricole Corporate and Investment Bank (f/k/a Calyon Bank New York Branch), et al. v. Black Diamond Capital Management LLC, et al., on behalf of Black Diamond Capital Management LLC, BDC Finance LLC, and Black Diamond CLO 2006-1, American Arbitration Association, Arbitration No. 01-17-0007-1196 (February 6, 2018).

Deposition of Paul A. Gompers in Michael J. Angley, Individually and on Behalf of All Others Similarly Situated v. UTi Worldwide Inc., et al., on behalf of UTi Worldwide Inc. and the individual defendants, United States District Court for the Central District of California, Western Division, Case No. 2:14-cv-02066-CBM-E (February 27, 2018).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Gary Koopmann, Timothy Kidd, and Victor Pirnik, Individually and on Behalf of All Others Similarly Situated v. Fiat Chrysler Automobiles N.V., et al., on behalf of Fiat Chrysler Automobiles N.V., United States District Court for the Southern District of New York, Case No. 1:15-cv-07199-JMF (March 5, 2018).

Deposition of Paul A. Gompers in Kortright Capital Partners LP, et al. v. Investcorp Investment Advisers Limited, on behalf of Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell, United States District Court for the Southern District of New York, Case No. 16-cv-7619 (March 27, 2018).

Deposition of Paul A. Gompers in In Re Medtronic, Inc. Securities Litigation, on behalf of Medtronic, Inc. and the individual defendants, United States District Court for the District of Minnesota, Master File No. 0:13-cv-01686-JRT-FLN (May 10, 2018).

Deposition of Paul A. Gompers in Hsingching Hsu, Individually and on Behalf of All Others Similarly Situated v. Puma Biotechnology, Inc., et al., on behalf of Puma Biotechnology, Inc., United States District Court for the Central District of California, Southern Division, Case No. 8:15-cv-00865-AG-JCG (June 5, 2018).

Deposition of Paul A. Gompers in Akorn, Inc. v. Fresenius Kabi AG, Quercus Acquisition, Inc., and Fresenius SE & Co. KGaA, on behalf of Akorn, Inc., Court of Chancery of the State of Delaware, C.A. No. 2018-0300-JTL (June 28, 2018).

Evidentiary Hearing Testimony of Paul A. Gompers in In Re Goldman Sachs Group, Inc. Securities Litigation, on behalf of The Goldman Sachs Group, Inc., United States District Court for the Southern District of New York, Case No. 1:10-cv-03461-PAC (July 25, 2018).

Deposition of Paul A. Gompers in Gary Koopmann, Timothy Kidd, and Victor Pirnik, Individually and on Behalf of All Others Similarly Situated v. Fiat Chrysler Automobiles N.V., et al., on behalf of Fiat Chrysler Automobiles N.V., United States District Court for the Southern District of New York, Case No. 1:15-cv-07199-JMF (October 19, 2018).

Testimony of Paul A. Gompers in Securities and Exchange Commission v. AVEO Pharmaceuticals, Inc., Tuan Ha-Ngoc, David Johnston, and William Slichenmeyer, on behalf of the individual defendants, United States District Court for the District of Massachusetts, Case No. 1:16-cv-10607-NMG (November 16, 2018).

Testimony of Paul A. Gompers in Kortright Capital Partners LP, et al. v. Investcorp Investment Advisers Limited, on behalf of Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell, United States District Court for the Southern District of New York, Case No. 16-cv-7619 (December 17, 2018).

Testimony of Paul A. Gompers in Hsingching Hsu, Individually and on Behalf of All Others Similarly Situated v. Puma Biotechnology, Inc., et al., on behalf of Puma Biotechnology, Inc., United States District Court for the Central District of California, Southern Division, Case No. 8:15-cv-00865-AG-JCG (January 24, 2019).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Oaktree Principal Fund V, LP, et al. v. Warburg Pincus LLC, et al., on behalf of Warburg Pincus LLC, Warburg Pincus Private Equity X, L.P., and Sean Carney, United States District Court for the Central District of California, Western Division, Case No. 2:15-CV-08574-PSG-MRWx (February 1, 2019).

Deposition of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (March 15, 2019).

Deposition of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (April 24, 2019).

Deposition of Paul A. Gompers in Roofers' Pension Fund, Individually and on Behalf of All Others Similarly Situated v. Perrigo Co., plc, et al., on behalf of Perrigo Co., plc, United States District Court for the District of New Jersey, Case No. 2:16-cv-02805-MCA-LDW (May 16, 2019).

Hearing Testimony of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (May 21, 2019).

Testimony of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (June 13, 2019).

Deposition of Paul A. Gompers in United States Securities and Exchange Commission v. Daniel C. Ustian, on behalf of Daniel C. Ustian, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 16-cv-03885 (July 10, 2019).

Deposition of Paul A. Gompers in In Re Twitter, Inc. Securities Litigation, on behalf of Twitter, Inc., Richard Costolo, and Anthony Noto, United States District Court for the Northern District of California, Case No. 3:16-cv-05314-JST (September 10, 2019).

Deposition of Paul A. Gompers in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated v. Esperion Therapeutics, Inc., et al., on behalf of Esperion Therapeutics, Inc. and Tim Mayleben, United States District Court for the Eastern District of Michigan, Civil Action No. 2:16-cv-10089-AJT-RSW (September 16, 2019).

Deposition of Paul A. Gompers in Eric Weiner, Individually and on Behalf of All Others Similarly Situated v. Tivity Health, Inc., et al., on behalf of Tivity Health, Inc., United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469 (November 21, 2019).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Testimony of Paul A. Gompers in In the Matter of the Companies Law (2016 Revision) and In the Matter of Nord Anglia Education, Inc., on behalf of the respondents, In the Grand Court of the Cayman Islands, Financial Services Division, Cause No. FSD 235 of 2017 (IKJ) (December 12, 13, 16, and 17, 2019).

Deposition of Paul A. Gompers in Brigade Leveraged Capital Structures Fund Ltd., Brigade Cavalry Fund Ltd., and Brigade Distressed Value Master Fund Ltd. v. Kindred Healthcare, Inc., on behalf of Brigade Leveraged Capital Structures Fund Ltd., Brigade Cavalry Fund Ltd., and Brigade Distressed Value Master Fund Ltd., Court of Chancery of the State of Delaware, C.A. No. 2018-0566-KJSM (January 23, 2020).

Deposition of Paul A. Gompers in Plymouth County Retirement System v. Patterson Companies, Inc., Scott P. Anderson, Ann B. Gugino, R. Stephen Armstrong, and James W. Wiltz, on behalf of Patterson Companies, Inc. and Scott P. Anderson, United States District Court for the District of Minnesota, Case No. 0:18-cv-00871-MJD-SER (July 6, 2020).

Deposition of Paul A. Gompers in Michael Karsch v. Blink Health Ltd. (f/k/a/ Chaiken Holdings LLC and Vital Matters LLC), Geoffrey Chaiken and Matthew Chaiken, on behalf of Blink Health Ltd., United States District Court for the Southern District of New York, Case No. 17-cv-03880 (July 15, 2020).

Deposition of Paul A. Gompers in In Re Celgene Corporation Securities Litigation, on behalf of Celgene Corporation, Bristol-Myers Squibb, Scott A. Smith, Terrie Curran, and Phillippe Martin, United States District Court for the District of New Jersey, Civil Action No. 18-4772 (July 17, 2020).

Deposition of Paul A. Gompers in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated v. Esperion Therapeutics, Inc., et al., on behalf of Esperion Therapeutics, Inc. and Tim Mayleben, United States District Court for the Eastern District of Michigan, Civil Action No. 2:16-cv-10089-AJT-RSW (August 11, 2020).

Deposition of Paul A. Gompers in Callsome Solutions, Inc. v. Google, Inc., on behalf of Google, Inc., Supreme Court of the State of New York for the County of New York, Index No. 652386/2014 (September 21, 2020).

Deposition of Paul A. Gompers in In Re The Allstate Corporation Securities Litigation, on behalf of The Allstate Corporation, Thomas J. Wilson, and Matthew E. Winter, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 16-cv-10510 (October 5, 2020).

Deposition of Paul A. Gompers in Symbiont.io, Inc. v. Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., on behalf of Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., Court of Chancery of the State of Delaware, C.A. No. 2019-0407-JTL (November 2, 2020).

Deposition of Paul A. Gompers in Eric Weiner, Individually and on Behalf of All Others Similarly Situated v. Tivity Health, Inc., et al., on behalf of Tivity Health, Inc., United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469 (November 5, 2020).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Testimony of Paul A. Gompers in Symbiont.io, Inc. v. Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., on behalf of Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., Court of Chancery of the State of Delaware, C.A. No. 2019-0407-JTL (December 10, 2020).

Cross-Examination of Paul A. Gompers in Kevin Gowanlock v. Auxly Cannabis Group Inc., on behalf of Auxly Cannabis Group Inc., Ontario Superior Court of Justice, Court File No. CV-19-00617136 (January 19, 2021).

Deposition of Paul A. Gompers in Roofers' Pension Fund, Individually and on Behalf of All Others Similarly Situated v. Perrigo Co., plc, et al., on behalf of Perrigo Co., plc, United States District Court for the District of New Jersey, Case No. 2:16-cv-02805-MCA-LDW (January 21, 2021).

Deposition of Paul A. Gompers in Plymouth County Retirement System v. Patterson Companies, Inc. and Scott P. Anderson, on behalf of Patterson Companies, Inc. and Scott P. Anderson, United States District Court for the District of Minnesota, Case No. 0:18-cv-00871-MJD-HB (April 2, 2021).

Cross-Examination of Paul A. Gompers in Abram B. Dyck v. Tahoe Resources Inc. and Ronald Wayne Clayton, on behalf of Tahoe Resources Inc. and Ronald Wayne Clayton, Ontario Superior Court of Justice, Court File No. CV-18-00606411-00CP (May 10, 2021).

Deposition of Paul A. Gompers in Richard J. Tornetta v. Elon Musk, et al., on behalf of Elon Musk, et al., Court of Chancery of the State of Delaware, C.A. No. 2018-0408-JRS (September 10, 2021).

**APPENDIX C**

# List of Documents Considered

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Pleadings and Legal Documents** | |
| Consolidated Amended Class Action complaint, *In re Tahoe Resources. Inc., Securities Litigation* | August 31, 2018 |
| "Indigenous and Tribal Peoples Convention, 1989 (No. 169)," International Labour Organization | June 7, 1989 |
| **Expert Reports** | |
| Expert Report of Dr. Zachary Nye, *In re: Akorn Inc. Securities Litigation* | May 5, 2015 |
| Expert Report of Dr. Zachary Nye, *In re Allergan PLC Securities* | January 31, 2020 |
| Expert Report of Dr. Zachary Nye, *In re Tahoe Resources, Inc. Securities Litigation* | July 1, 2021 |
| **Depositions** | |
| Deposition of Kevin Nguyen | August 3, 2021 |
| Deposition of Dr. Zachary Nye | August 4, 2021 |
| **Bates Documents** | |
| Fidelity Investments Investment Report, "Kevin Duc-Hair Nguyen – Joint WROS – TOD," NGUYEN_00022097–707 at 462 | |
| **SEC Filings** | |
| Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2011 (filed as Exhibit 99.1 to SEC Form 40-F) | March 8, 2012 |
| Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2012 (filed as Exhibit 99.1 to SEC Form 40-F) | March 7, 2013 |
| Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2013 (filed as Exhibit 99.1 to SEC Form 40-F) | March 12, 2014 |
| Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2014 (filed as Exhibit 99.1 to SEC Form 40-F) | March 11, 2015 |
| Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2015 (filed as Exhibit 99.1 to SEC Form 40-F) | March 9, 2016 |
| Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2016 (filed as Exhibit 99.1 to SEC Form 40-F) | March 9, 2017 |
| Tahoe Resources Inc., Annual Information Form: For the year ended December 31, 2017 (filed as Exhibit 99.1 to SEC Form 40-F) | February 22, 2018 |
| Tahoe Resources Inc., Management Discussion and Analysis for Year Ended December 31, 2013 (filed as Exhibit 99.2 to SEC Form 6-K) | March 13, 2014 |
| Tahoe Resources Inc., Management Discussion and Analysis For the Years Ended December 31, 2016 and 2015 (filed as Exhibit 99.3 to SEC Form 6-K) | March 9, 2017 |
| Tahoe Resources Inc., Management Discussion and Analysis For the Three Months Ended March 31, 2018 and 2017 (filed as Exhibit 99.2 to SEC Form 6-K) | May 2, 2018 |
| **SEDAR Filings** | |
| Tahoe Resources, Inc., "Annual Information Form: For the year ended December 31, 2011" | March 8, 2012 |
| Tahoe Resources, Inc., "Annual Information Form: For the year ended December 31, 2012" | March 7, 2013 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Tahoe Resources, Inc., "Annual Information Form: For the year ended December 31, 2013" | March 12, 2014 |
| Tahoe Resources, Inc., "Annual Information Form: For the year ended December 31, 2014" | March 11, 2015 |
| Tahoe Resources, Inc., "Annual Information Form: For the year ended December 31, 2015" | March 9, 2016 |
| Tahoe Resources, Inc., "Annual Information Form: For the year ended December 31, 2016" | March 9, 2017 |
| **Analyst Reports** | |
| "Potential Guatemala tax creep, evaluating NAV, FCF impact," Bank of America Merrill Lynch | December 1, 2014 |
| "Q3/15 – Record Production, Financials In-Line, Royalty to Revert," Dundee Capital Markets | November 13, 2015 |
| "Steady as she goes," Canaccord Genuity | November 13, 2015 |
| "Tahoe Trending Toward Top Tier; Q2 Beat on Silver," Dundee Capital Markets | August 10, 2016 |
| "Tahoe's Escobal – The One Mine Major," Haywood Securities | November 5, 2013 |
| **Reports** | |
| Abisai De la Cruz Morales, "Process of land recovery as a factor of social cohesion of the Xinka Community Las Lomas, Chiquimulilla, Santa Rosa," University of San Carlos of Guatemala (translated) | August 2009 |
| "Annual Report 2014: Council on Ethics for the Government Pension Fund Global," Council on Ethics for the Government Pension Fund Global | December 31, 2014 |
| "Annual report of the United Nations High Commissioner for Human Rights," UN General Assembly | January 13, 2014 |
| "Diagnosis of the Human Rights Situation of the Indigenous Peoples of Central America," Regional Office for Central America of the High Commissioner of the United Nations for Human Rights (translated) | November 2011 |
| "Analysis Report: Status of Xinka Culture," Guatemala Ministry of Culture and Sports (translated) | November 2016 |
| "Guatemala: Mining in Guatemala: Rights at Risk," Amnesty International | September 2014 |
| "Guatemala Resource Tenure and Sustainable Landscapes Assessment," USAID | September 2014 |
| "Handbook for ILO Tripartite Constituents: Understanding the Indigenous and Tribal Peoples Convention, 1989 (No.169)," International Labour Office Geneva | 2013 |
| Luis Solano, "Under Siege: Peaceful Resistance to Tahoe Resources and Militarization in Guatemala," International Platform Against Impunity in Central America, Mining Watch Canada, NISGUA | November 10, 2015 |
| Michael L. Dougherty, "By the gun or by the bribe: Firm Size, environmental governance and corruption among mining companies in Guatemala," U4 Anti-Corruption Resource Centre, no. 17, pp. 1–24 | September 2015 |
| Silvel Elias and Geisselle Sanchez, "Case Study Consulta Previa," Americas Quarterly | Spring 2014 |
| "Sociolinguistic Atlas of Indigenous Peoples in Latin America," United Nations Children's Emergency Fund (translated) | 2009 |
| Alana Wilson et al., "Survey of Mining Companies 2012/2013," Fraser Institute | February 2013 |
| Alana Wilson and Miguel Cervantes, "Survey of Mining Companies 2013," Fraser Institute | March 2014 |
| Taylor Jackson, "Survey of Mining Companies 2014," Fraser Institute | February 2015 |
| Taylor Jackson and Kenneth P. Green, "Survey of Mining Companies 2015," Fraser Institute | February 2016 |
| Taylor Jackson and Kenneth P. Green, "Survey of Mining Companies 2016," Fraser Institute | February 2017 |
| Ashley Stedman and Kenneth P. Green, "Survey of Mining Companies 2017," Fraser Institute | February 2018 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Academic Literature and Textbooks** | |
| Alexandra Pedersen, "Landscapes of Resistance: Community Opposition to Canadian Mining Operations in Guatemala," Journal of Latin American Geography 13, no. 1, pp. 187–214 | 2014 |
| Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," The Journal of Finance 25, no. 2, pp. 383–417 | 1970 |
| James M. Patell and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," Journal of Financial Economics 13, no. 2, pp. 223-252 | 1984 |
| Jason T. Greene and Susan G. Watts, "Price discovery on the NYSE and the NASDAQ: The case of Overnight and Daytime News Releases," Financial Management 25, no. 1, pp. 19-42 | 1996 |
| Jeffrey A. Busse and T. Clifton Green, "Market Efficiency in Real Time," Journal of Financial Economics 65, no. 3, pp. 415-437 | 2002 |
| Jonathan L. Rogers et al., "Run EDGAR run: SEC Dissemination in a high-frequency world," Chicago Booth Paper no. 14-36 | 2014 |
| Michael J. Barclay and Robert H. Litzenberger, "Announcement Effects of New Equity Issues and the Use of Intraday Price Data," Journal of Financial Economics 21, no.1, pp. 71-99 | 1988 |
| Randall S. Abate and Raquel Aldana, "Banning Metal Mining in Guatemala," Vermont Law Review 40, pp. 597–671 | 2016 |
| Robert Jennings and Laura Starks, "Information Content and the Speed of Stock Price Adjustment," Journal of Accounting Research 23, no.1, pp. 336-350 | 1985 |
| Stephen Ross et al., "Corporate-Financing Decisions and Efficient Capital Markets," in *Corporate Finance*, (New York: McGraw-Hill) | 2002 |
| Zvi Bodie, Alex Kane and Alan J. Marcus, *Investments*, (New York: McGraw-Hill Irvin), 9th ed. | 2011 |
| **Other Public Materials** | |
| "2007-2008 Constitutional Challenge to Marlin exploitation licences filed by the Association Madreselva," Institute of Latin American Studies, https://ilas.sas.ac.uk/research-projects/legal-cultures-subsoil/constitutional-challenge-marlin-exploitation-licences-filed, accessed September 24, 2021 | |
| Alex Blair, "Corporate greed and human rights; Is history repeating itself in Guatemala?" Oxfam, ********politicsofpoverty.oxfamamerica.org/corporate-greed-and-human-rights-is-history-repeating-itself-in-guatemala, accessed August 12, 2021 | November 25, 2014 |
| Bill Barreto, "Chamber orders hearing of mining objection," Prensa Libre (translated) | July 25, 2013 |
| Chris Hufstader, "No silver lining in Guatemala conflict," Oxfam, ***********.oxfamamerica.org/explore/stories/no-silver-lining-in-guatemala-conflict/, accessed August 6, 2021 | November 26, 2014 |
| Chris Hufstader, "Violence, and bogus charges against human rights defenders in Guatemala continue," Oxfam, https://firstperson.oxfamamerica.org/violence-and-bogus-charges-against-human-rights-defenders-in-guatemala-continues/, accessed August 6, 2021 | November 3, 2015 |
| "Court rules that Guatemala must recognize results of community consultations (NISGUA)," Mining Justice Alliance, https://miningjusticealliance.wordpress.com/2014/07/31/court-rules-that-guatemala-must-recognize-results-of-community-consultations-nisgua/, accessed September 24, 2021 | July 31, 2014 |
| "Courts, graft and protests threaten Guatemala mining," Oxford Analytica | August 4, 2016 |
| Derrick Penner, "Vancouver-based Tahoe Resources faces lawsuit over violence at Guatemala mine," Postmedia Breaking News | June 18, 2014 |

**APPENDIX C**

| Document Title, Bates Numbers | Document Date |
|---|---|
| "Exploitation License Granted for Tahoe Resources Escobal Project in Context of Escalating Violence," NISGUA, https://nisgua.org/exploitation-license-granted-for-tahoe-resources-escobal-project-in-context-of-escalating-violence/, accessed September 24, 2021 | April 5, 2013 |
| "Fenix grounded in Guatemala," Mining Journal, https://www.mining-journal.com/base-metals/news/1367883/fenix-grounded-in-guatemala, accessed September 24, 2021 | July 22, 2019 |
| "Fénix Project, Guatemala," McGill Research Group Investigating Canadian Mining in Latin America, **********.micla.ca/conflicts/fenix-project/, accessed September 24, 2021 | |
| "Guatemala: Escobal 5% royalty a positive for community relations, Tahoe says," BNAmericas, ***********.bnamericas.com/en/news/privatization/guatemala-escobal-5-royalty-a-positive-for-community-relations-tahoe-says, accessed September 24, 2021 | April 30, 2013 |
| "Guatemalan complainants celebrate effective suspension of Tahoe Resources license," NISGUA, ********nisgua.org/guatemalan-complainants-celebrate-effective-suspension-of-tahoe-resources-license/, accessed September 24, 2021 | July 25, 2013 |
| John Achni Schertow, "Guatemala: Recurring Violence In Area of Escobal Mine Project Demands Investigation And Company Withdrawal," Intercontinentalcry.org, ********intercontinentalcry.org/guatemala-recent-attacks-against-the-xinca-demand-a-full-and-impartial-investigation/, accessed September 24, 2021 | March 24, 2013 |
| "'La Puya' Environmental Movement," Guatemala Human Rights Commission, https://www.ghrc-usa.org/our-work/current-cases/lapuya/, accessed September 24, 2021 | |
| Leslie Picker et al., "How hedge fund investors are making money off the data you're giving them for free," CNBC, https://www.cnbc.com/2019/04/23/how-hedge-funds-use-alternative-data-to-make-investments.html, accessed September 24, 2021 | April 23, 2019 |
| Mike McDonald, "Guatemala would scrap mining moratorium plan for royalty hike-Minister," Reuters News | July 30, 2013 |
| Marco Chown Oved, "Canadian company tried to stop referendum on mine in Guatemala," Toronto Star, ***********.thestar.com/news/world/2016/08/11/canadian-company-tried-to-stop-referendum-on-mine-in-guatemala.html, accessed August 12, 2021 | August 11, 2016 |
| Melanie Sevcenko, "After Kidnapping and Killing, Canadian Silver Mining Project Advances in Guatemala," Occupy.com, https://www.occupy.com/article/after-kidnappings-and-killing-canadian-silver-mining-project-advances-guatemala#sthash.ydnQvSsp.zJKTjEMd.dpbs, accessed September 24, 2021 | April 11, 2013 |
| Nina Lakhani, "Clashes as Guatemalan communities fight mine," BBC News, ***********.bbc.com/news/world-latin-america-27678668, accessed August 5, 2021 | June 6, 2014 |
| Open Letter to Otto Perez Molina, "Revocation of concession of exploitation license for Escobal project," https://www.kairoscanada.org/partners-in-guatemala-question-proposed-moratorium-and-demand-respect-for-indigenous-rights, accessed August 16, 2021 | June 13, 2013 |
| "Region rues growing use of investor suits," EcoAmericas, ***********.ecoamericas.com/issues/article/2019/5/E504D133-1FC2-4AFA-84D6-6D788BF2762E, accessed September 24, 2021 | May 2019 |
| "Request to Investigate Tahoe Resources for Failure to Disclose Material Information," Justice and Corporate Accountability Project | August 8, 2016 |
| Sonia Perez Diaz and Luis Soto, "Guatemala sends police, army to crack down on anti-mine protests, issues emergency decree," Associated Press, https://globalnews.ca/news/531909/guatemala-sends-police-army-to-crack-down-on-anti-mine-protests-issues-emergency-decree/, accessed August 12, 2021 | May 2, 2013 |
| Sonia Perez Diaz, "Dispute over Guatemala silver mine turns violent; Residents fear a Canadian firm is polluting their town's water. Protests escalate into clashes." The Los Angeles Times | June 9, 2013 |

**APPENDIX C**

| Document Title, Bates Numbers | Document Date |
|---|---|
| "Tahoe: court ruling does not affect Escobal mining permit, Guatemala," BNAmericas | July 24, 2013 |
| Tahoe Resources, Inc. Press Release, "Guatemala Proposes Temporary Moratorium on New Mining Licenses: Tahoe Says No Impact to Escobal Project: Updates Construction Progress" | July 10, 2013 |
| Tahoe Resources, Inc. Press Release, "Tahoe Clarifies Reports Regarding Incidents Near Escobal Project" | May 1, 2013 |
| Tahoe Resources, Inc. Press Release, "Tahoe Resources Clarifies PEA Disclosure" | July 24, 2013 |
| Tahoe Resources, Inc. Press Release, "Tahoe's Escobal Project Receives Final Permit" | April 3, 2013 |
| "The CC asked universities if there were Xinkas (because of a mine): the USAC responded as follows," Nomada, https://nomada.gt/identidades/de-donde-venimos/la-cc-pregunto-a-universidades-si-existian-xinkas-por-una-mina-la-usac-respondio-asi/, accessed September 24, 2021 (translated) | July 30, 2018 |
| Trish Saywell, "Bluestone's Cerro Blanco takes shape in Guatemala," ***********.northernminer.com/news/bluestones-cerro-blanco-project-takes-shape-in-guatemala/1003797575/, accessed September 24, 2021 | July 6, 2018 |
| "US Securities and Exchange Commission asked to investigate Tahoe Resources' failure to disclose secret lawsuits," NISGUA, https://nisgua.org/us-securities-and-exchange-commission-asked-to-investigate-mining-companys-failure-to-disclose-secret-lawsuits/, accessed August 18, 2021 | August 11, 2016 |
| "Why did Goldcorp really pull out of Tahoe Resources' troubled Guatemalan mining project?" Oxfam, ********politicsofpoverty.oxfamamerica.org/why-did-goldcorp-really-pull-out-of-tahoe-resourcess-troubled-guatemalan-mining-project/, accessed August 6, 2021 | July 7, 2015 |

**Note: In addition to the documents on this list, I considered all documents cited in my report in forming my opinions.**