# EXHIBIT 2

Kevin Hguyen Deposition Transcript

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

IN RE: TAHOE RESOURCES, INC., )CASE NO.
SECURITIES LITIGATION )2:17-cv-01868-RFB-NJK

**********************************
REMOTE VIDEOTAPED DEPOSITION OF
KEVIN NGUYEN
August 3, 2021
**********************************

KEVIN NGUYEN, produced as a witness at the instance of the Defendant, was duly sworn and deposed in the above-styled and numbered cause on August 3, 2021, from 11:37 a.m. CST to 6:53 p.m. CST, stenographically reported, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

Reported by: Rebecca Graziano, CSR, RPR, CRR
Texas CSR Number 9306
California CSR Number 14407

A P P E A R A N C E S

REPRESENTING THE PLAINTIFF:

Mr. Robert W. Killorin
Ms. Katherine M. Lenahan
FARUQI & FARUQI, LLP
685 Third Avenue, 26th Floor
New York City, New York 10017
(212) 983-9330
rkillorin@faruqilaw.com

REPRESENTING THE DEFENDANT:

Mr. Andrew G. May
Mr. Karl R. Barnickol
NEAL, GERBER & EISENBERG, LLP
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60602
(312) 269-8047
amay@nge.com
kbarnickol@nge.com

THE VIDEOGRAPHER:

Mr. Peter Matteson

ALSO PRESENT VIA VIDEOCONFERENCE:

Mr. Brian Fryd, Cornerstone Research

# INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. MAY | 5 |
| EXAMINATION BY MR. KILLORIN | 266 |


# EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 67 | Fidelity Statements (miscellaneous Bates range) | 58 |
| Exhibit 68 | Plaintiff's Responses and Objections to Defendant Tahoe Resources' First Set of Interrogatories to Plaintiff Kevin Nguyen | 85 |
| Exhibit 69 | United States Securities and Exchange Commission Form 40-F for Tahoe Resources, Inc.; Bates NGUYEN_00001067 through 00001233 | 114 |

PROCEEDINGS

(On the record at 11:37 a.m. CST)

THE VIDEOGRAPHER: This is the videotaped deposition of Kevin Nguyen taken by the defendant, In Re: Tahoe Resources, Inc., Securities Litigation in the United States District Court, District of Nevada, Case Number 2:17-cv-01868-RFB-NJK.

This deposition is being held at 425 Market Street, 26th Floor, San Francisco, California, on August 3rd, 2021.

My name is Peter Matteson, Everest Court Reporting, and I am the video specialist. The court reporter today is Rebecca Graziano, also from Everest Court Reporting.

We are going on the record at 9:37 a.m. Counsel will now state your appearances for the record.

MR. KILLORIN: This is Robert Killorin, along with my partner Katherine Lenahan, on behalf of lead plaintiff.

MR. MAY: Good morning. This is



Andrew May, M-a-y. I'm counsel for the defendants in this action. I'm joined here today by my partner, Karl Barnickol, and Brian Fryd of Cornerstone Consulting.

Madam Court Reporter, would you please swear in the witness?

(Witness duly sworn.)

KEVIN NGUYEN,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. MAY:

Q Good morning, sir.

A Good morning.

Q Would you please state and spell your name for the record?

A Yeah. So my first name is Kevin, K-e-v-i-n. My last name is Nguyen, N-g-u-y-e-n.

Q Thank you, Mr. Nguyen.

And is it okay if I call you "Kevin"?

A That's fine, yeah.

Q Okay. Thanks, Kevin.

What's your address?

A 1745 16th Avenue, San Francisco, California 94122.

Q How long have you lived there for?



A It's about six years. I bought it for seven years, but I lived there for six years.

Q Have you ever been deposed before?

A No, I have not.

Q Okay. So I'm just going to go over a couple of ground rules quickly to make sure that this deposition goes smoothly.

Is that okay with you?

A That's fine.

Q Okay. So first things first. You may have noticed that we have a court reporter here that is appearing by video. She's going to be typing down everything that we say today. We also have a video reporter who is going to be recording what's happening as well.

In order to make sure that we have a clean record, it's really important that only one person speaks at a time. I'm going to be asking you a series of questions. You'll be giving me a series of answers, and I'd ask that you speak clearly and loudly and verbally when responding to my answers, so saying "yes" or "no" as opposed to "uh-huh" or "huh-uh" or nods or shakes of the head.

Does that make sense to you?



A It makes sense to me, yeah.

Q Okay. It's also very natural when two people are having a conversation to want to talk over each other, or you may think you know the answer to a question I'm about to ask. I would ask that you let me finish the question first before answering just so that we can have a clean record.

Is that okay with you?

A Yes.

Q If at any point today I ask a question that you don't understand, just ask me for clarification and I'll do my best to rephrase it so you do understand.

A Okay. Sounds good.

Q Okay. And we're going to be here for a couple hours. If at any point you need a break to use the bathroom or to get a drink of water or for whatever reason, that's perfectly fine. Just let me or your counsel know that you need a break.

The only exception to that is that I would ask if the question is pending, that you answer the question before we take a break; is that fair?

A It's fair.

Q Okay. You understand that you're under oath today?
A Yes.
Q Okay. And that oath requires you to testify truthfully to the questions that I answer -- ask you; correct?
A Yes.
Q Okay. Are you taking any medication today that would prevent you from being able to give clear and accurate testimony today?
A No, I do not.
Q Okay. Are you currently employed, Kevin?
A No. I'm retired.
Q When did you retire?
A Probably about over three years ago.
Q What were you doing before your retirement?
A So -- so you want me to talk about my résumé or going back to, you know, what I do before I retired?
Q Well, let's start with what you were doing immediately before --
A Oh, okay.
Q -- your retirement, and then we can go backwards --



A So I --
Q Hold on. Just let me finish the question.
Let's start with you talking about what you did immediately prior to your retirement, and then we can go from there.
A Okay. So I -- I was treasury director for a startup that's called Katerra. And then prior to that, you know, I was working at Facebook for about seven and a half years as a senior treasury manager there. And then a whole host of series of the other corporation I used to work for before in the treasury department.
Q Is it fair to say that the majority of your career was spent performing treasury-related functions?
A I started as accountant first, and then I -- over time I transitioned to treasury functions.
Q How long had you been performing treasury-related functions?
A Probably -- I would say probably about since 2000.
Q So about 20 years?
A Right.
Q Do -- did you make any investments as part



of your professional responsibilities? Was that part of your job description?
A No, but I used to work with the bankers, the investment bankers -- because I'm a cash manager, so I manage cash for the companies. So I -- we used to hire investment banker to make some investment on our behalf.
Q And what was your role in working with the investment managers with respect to these investments?
A So just review their performance and make sure, you know, they perform to the policy.
Q Did you help or assist the investment managers in terms of making decisions about what to invest in or what not to invest in?
A No, I did not.
Q Okay. So when you say you would review performance, describe what that means to you. What were you doing?
A So basically just make sure they comply with the policy to comply with -- in terms of, you know, reserve for cash, make sure they don't invest over 5 percent in these single securities and things like that, yeah.
Q Are you married?



A Yes, I'm married.
Q Who is your wife?
A Tiffany Huynh.
Q How do you spell her last name?
A H-u-y-n-h.
Q How long have you been married for?
A Almost 25 years.
Q Does Tiffany work?
A No. She retired, too.
Q When did she retire?
A 2014.
Q What did she do prior to her retirement?
A She was a financial analyst working, you know, mostly in budgeting and accounting function.
Q Was part of her professional responsibilities, did that involve making investments?
A No.
Q Okay. Did it involve analyzing investments?
A No.
Q Okay. Have you ever used the name Hai Nguyen, H-a-i?
A Yes. That's my Vietnamese name before I became a naturalized US citizen. So now I combine

that -- you know, my first name and my middle name in Vietnamese became my middle name, and Kevin become first name.
Q I understand.
A So now it's Kevin Duc Hai Nguyen, understand that.
Q When did you come to the United States?
A I came to the United States in 18 -- 1986, December of 1986.
Q What were the circumstances under which you came to the United States?
A So I was a refugee. So I -- you recall that during the fall of Saigon in Vietnam, there's a lot of -- there's a way of refugee to escape from the Communist regime in Vietnam, so I was one of them. So I escape from my countries, and I ended up in a different refugee camps before I came to the US.
Q Did you apply for asylum when you came here?
A No. I got -- because my father used to work for the US government when they was involved in the Vietnam War in Vietnam. So he's a nurse, so he worked in -- you can call it -- you know, I don't know, it was just in the hospital, but



helping, you know, some military people in there. So he just qualified as, you know -- for me as a son. So when I submitted all that paperwork, the US accepted me as a refugee.
Q Are you a citizen of the United States?
A Yes.
Q When did you become a citizen?
A 1994.
Q Do you ever still use your Vietnamese name, or do you still just -- do you go by "Kevin" exclusively now?
A I go by "Kevin" exclusively now. But some of our friends, you know, Vietnamese friends do call me "Hai."
Q Sure.
A I got a problem in the beginning, yeah, because they call me "Hai." And I thought -- they say "hi" to each other, and I thought they call my name. I turn around, and I say, "Okay. They're not talking to me," so...
Q Do you have children, Kevin?
A Yes, I do.
Q Are any of your children professionally involved in making investments of any kind?
A No. They are teenagers.



Q Do you have any family members whose professional responsibilities involve making investments?
A No.
Q Okay. Have you ever --
MR. MAY: Sorry. What were you going to say?
MR. KILLORIN: That's all right. No.
BY MR. MAY:
Q Have you ever been a party to a court proceeding of any kind before?
A No, I have not.
Q Do you trade securities for yourself?
A Yes. So I make investments for myself as I -- yes.
Q How long have you been trading for?
A So, you know, on and off for, like, 20 years.
Q How did you get started?
A So I got started because I wanted to -- at some point, I wanted to make sure I can -- would be able to retire early based on investment income. So that's how I started it.
Q What age were you when you retired three



years ago?
A Three years ago, I was 51.
Q Do you have any formal training in trading?
A No.
Q So how did you learn about making investments?
A So I learned from, you know, seminars, and I learned from the learning center from, you know, some of the website I use, for example, Fidelity's or Schwab.
Q Tell me about the seminars or the websites that you consulted to learn about investing.
A So in Fidelity, I just go into the learning center. There's a ton of information there.
And then also the Schwab, you know, they have some learning center. So I learned from there, too.
Q What did you learn?
A About investing, you know, just, like, asset allocations, the retirement, and things like that.
Q What did you learn about asset allocation?
A So basically, asset allocation, I learned

about -- just divide into different buckets, you know, like cash and then cash equivalents, and also the investment for the long term which is growth investment.
Q Is what -- strike that.
Would you characterize what you're describing right now as portfolio diversification? Is that another way of putting that?
MR. KILLORIN: Objection; leading.
You can answer now.
THE WITNESS: Hmm?
MR. KILLORIN: You can answer it.
THE WITNESS: Oh, okay.
Yeah. So diversification, yeah, in some sense; but also the growth portfolio, I wanted to go more aggressive because that's one for a lot long term, yeah.
BY MR. MAY:
Q You wanted your portfolio to be aggressive?
MR. KILLORIN: Objection; form.
MR. MAY: I'm sorry. Did he --
BY MR. MAY:
Q I thought you just said that. Did you say you wanted your portfolio to be --


A No. I said I'll leave the part of the growth because I divide into three buckets. Right? So cash, cash equivalents, and then the growth.
(Reporter interruption.)
THE REPORTER: Mr. Nguyen, could you just make sure you speak up, please?
THE WITNESS: Okay.
THE REPORTER: Thank you.
BY MR. MAY:
Q Do you -- so other than looking at the learning center on Fidelity and Schwab, you mentioned some seminars as well?
A Yeah. Over the years, Schwab or Fidelity have some kind of the webinar online. I just attend it. They have a video, you know, like, online. So I just attend those videos.
Q Besides allocating your assets between cash, cash equivalents, and growth, what else did you learn about investing?
A So that's -- pretty much that's it.
Q Did you learn any investment strategies?
A So that's the investment strategy, you know, like, I divide into three buckets, yeah.
Q In terms of deciding what investments to


make, did you learn anything about how to choose investments?
A Yeah. I learned about, you know, fundamental in terms of, you know, look at the company when they have a public statement about the earning calls. If their business is doing well, you know, their revenue increasing, they pay dividends and things like that. I -- that's a good combination. So I just focused on those companies, yeah.
Q Did you learn anything about particular investment strategies?
A Just asset allocation, basically.
Q Do you have an investment adviser that you work with?
A I do, but I don't use him at all. I only used him for the municipal portfolio, which is managed by Breckinridge.
Q Managed by what?
A The Breckinridge. It's a third party that Fidelity hire to manage municipal bonds. So that's the only things that they manage for me, but the rest I managed myself.
Q Who's the person that manages your Breckinridge portfolio?


MR. KILLORIN: Objection. I think that's irrelevant, and I'm going to ask the witness to not answer anything other than to do his stock investments relevant to this case.
MR. MAY: So you're instructing the witness not to answer that case -- that question?
MR. KILLORIN: Not that question about mutual funds -- or municipal funds. Sure. Absolutely, yes.
MR. MAY: I just asked who the investment adviser was.
MR. KILLORIN: All right. You can answer that one question.
THE WITNESS: So investment adviser with Fidelity. So Fidelity who's the one who handled the Breckinridge. So I don't work directly with Breckinridge. So that's the third party that Fidelity chose in -- you know, to manage their municipal bond portfolio for their clients.
BY MR. MAY:
Q And who's the person that you work with at Fidelity?

A Christian Kimball.
Q Is that a man or a woman?
A Man.
Q And do you work with Mr. Kimball on any other aspects of your portfolio?
MR. KILLORIN: Objection; irrelevant; and improper question.
MR. MAY: Isn't part of his portfolio the portfolio that owns Tahoe stock?
MR. KILLORIN: Yeah. Yeah, yeah. I'm sorry. I thought -- I thought you meant other than Tahoe stock. You can -- he can answer anything about Tahoe stock.
MR. MAY: Can you read back the question, please, Becky?
(Record read as requested.)
THE WITNESS: No, I do not.
BY MR. MAY:
Q How did you come to work with Mr. Kimball? What were the circumstances relating to that?
A So when I got some money from the Facebook stock options, I wanted to diversify. I wanted to retire early. And I -- that's when I, you know, began --



(Interruption in Zoom transmission.)
THE REPORTER: I'm -- I'm -- hold on. I don't know -- I don't know if you can hear me. My screen froze and you guys dropped off, so I only got the first part of the answer.
MR. MAY: Okay. We'll wait.
MR. KILLORIN: Ms. Court Reporter, maybe could you read back his answer to the point it dropped off and then we'll get him to say it again.
THE REPORTER: Sure. Yes.
(Record read as requested.)
THE WITNESS: Okay. So that's when I did research to select the investment firm that work on the best interest of the clients. So I came to pick the Fidelity because they're a private company and their adviser are fiduciary adviser. So they don't work on a commission. So I can, you know, basically manage my portfolio. I just use their platform.
BY MR. MAY:
Q You said you got some money from Facebook options, not "somebody from Facebook"?



A Some option, yes.
Q What money did you get from Facebook?
A Stock options.
Q How much?
A It's a lot.
Q How much?
A So I got 500,000 shares of Facebook.
Q And you said that you wanted to diversify in order to retire early; is that correct?
A That's correct.
Q Why did you want to diversify? What -- why would that be helpful to retiring early?
A You don't want you put all your eggs in one basket. Simple as that.
Q Why?
A You don't want to, you know, learn from, like, Lehman Brothers or some Enron in the past. You don't want to put all your 401(k) in one company. So something go wrong, you just wipe out completely. Right?
Q So in other words, it wouldn't be a prudent investment strategy to put all of your investments into a single asset?
A Yes, exactly.
MR. KILLORIN: Objection to form.



MR. MAY: What's the issue?
MR. KILLORIN: That misstates prior testimony.
BY MR. MAY:
Q Okay. Did I misstate your prior testimony when I said what I just said?
A Can you say it again?
Q Sure.
I said, "So in other words, it wouldn't be a prudent investment strategy to put all your investments into a single asset."
Do you agree with that?
A Yeah.
Q Do you ever trade on margin?
A No, not on Tahoe.
Q I'm sorry. Not what?
A Not on the Tahoe Resources stocks.
Q Do you ever trade on margin?
A Occasionally, but I don't use it a lot.
Q What were your investment goals in the period between 2016 and 2018?
A Diversify, continue to diversify from Facebook stocks to other investments.
Q Diversify from Facebook stocks, and what else did you say?

A To other -- you know, like ETF, mutual funds in some other companies that, you know, have good earning growth and also a good balance sheet.
Q When did you receive the Facebook options?
A I receive it when -- so it's just like any typical, you know, conglomerate in -- in the Bay Area is vested over four years. So I got the package when I was hired, but is vested over four years. So I start at Facebook in 2007. So over four years is 2011 when my stock package is fully vested before they -- before they went IPO.
Q What was the portfolio value of the 500,000 stock options when it was fully vested?
A So at $38, and then after it took out the tax -- it's 200,000 shares of tax -- that's 300,000 shares; right? So it's $38 at that point, so you can do a calculation.
Q Besides diversifying your Facebook options and generating money for retirement, did you have any other investment goals in the period between 2016 and 2018?
A No.
Q You said your options fully vested in 2011. Did I hear you say that correctly?
A Yeah. So four years, yes.


Q Okay.
A So 2007, 2011, yes.
Q Okay. And I was asking about the period between 2016 and 2018. Did your -- your investment goals didn't change at all between the seven years between when your options vested and the period of time I'm talking about?
A No.
Q What is your investment strategy?
A I said --
MR. KILLORIN: Objection; asked and answered.
BY MR. MAY:
Q What is your investment strategy?
A So again, I said before, to diversify the portfolio so I can -- I can retire early.
Q How do you go about achieving that objective?
A As I said before, you divide into the three buckets: Cash, cash equivalent, and then more growth over long term.
Q How do you choose which investments go into those buckets?
A So I did research online. So the companies that, you know, have, you know, good


investment in terms of the growth and also pay a dividend because I wanted to get a dividend when I retire. So that's how I did research on the Tahoe.
Q What sources did you consider in doing your research?
A Online mostly, going to some website, put in the ticker symbol, and then they pop up with all the, you know, informations. And I also look at, you know -- in Fidelity, they look at, you know, the revenue growth of the companies, and also it depends on the public statement from the senior management from the company as well.
Q So I want to make sure I've got all that.
So you look at public statements that are made by the company?
A Yes.
Q You look at other sources online?
A Yeah. Basically it's Fidelity. I look at in terms of their revenues. You know, they have a good -- the histories of the revenue growth and also the good cash and then also pay good dividend as well.
Q Would you describe yourself as a conservative investor?


A I wouldn't say myself as conservative in terms of -- if I put cash and cash equivalent, that's conservative. But the growth is more -- a little bit more -- it's not conservative because that's for growth, yes.
Q When you talked about diversification before, do you believe investing in a small number of low-risk securities is safer than investing in a large number of diversified securities?
A No. I just diversify into a mix, you know, of some companies and then some ETF and some, like, the index equivalent that -- like ETF and mutual funds.
Q What -- what are the securities that comprise the growth bucket that you've been talking about?
A So --
MR. KILLORIN: Objection. We're not here to discuss any of the securities that were redacted from his financial statements from Fidelity that we provided to you. They were redacted for a reason.
MR. MAY: I'm not asking for --
MR. KILLORIN: Maybe I misunderstood your question.

MR. MAY: All right. Let me rephrase.
BY MR. MAY:
Q How do you pick and choose the securities that go into your growth bucket?
A Increasing revenue, good -- good dividends so have a good growth prospective.
Q Have you ever bought undervalued securities?
A What do you mean by "undervalued securities"?
Q Or have you ever tried to buy a security that you believed was undervalued in some way?
A No, I don't think so.
Q Have you ever tried to take advantage of market imperfections?
A No.
Q Do you believe those are valid strategies?
A I don't think so.
Q Why not?
A [Audio interference.]
THE REPORTER: I'm sorry. I didn't hear your answer.
THE WITNESS: I never -- I never tried to tie the market.



BY MR. MAY:
Q Do you believe that market prices reflect the fair value of a security?
A I think it's -- some is right, but some is wrong; right?
Q Which ones are right, and which ones are wrong, and why?
A Right is mean that senior management tell their investor truly about the business. So wrong is mean the senior management basically misled the investor about that true business.
THE REPORTER: I'm sorry. I'm really having a hard time hearing you. You're going to have to speak up.
THE WITNESS: So -- so I say that the two answers to that question, right and wrong. Right, when the senior management of the company tell investor truly about the business. Wrong, if the senior management misled and make a false statement about that business prospective.
Can you hear me okay?
THE REPORTER: Yes, I heard you. Thank you.



BY MR. MAY:
Q Are there any other instances where a security would not reflect its fair value?
A When the senior management make the false statement, it mean less investor, of course. It inflates the stock price. That's not a right value. This isn't -- isn't the right value.
Q And I was asking if there's any other situations besides that that you can think of.
A I -- no. I don't think so.
Q So in other words -- and I'm not trying to put words in your mouth. I'm just trying to understand your testimony.
Other than instances where a company somehow makes misrepresentations to its investors, other than in those situations, a company's security reflects its fair value; you would agree with that?
A Yeah. I mean, in trading, in market efficient, of course it's reflect to fair value.
Q Are markets always efficient?
A I would say probably not. I'm not sure.
Q Why would a market not be efficient?
A So, again, it's not efficient if the senior management misled investor about their



business.
Q Well, I'm confused because I asked you -- I said other than in instances where a company somehow makes misrepresentations to its investors -- other than in those situations, a company's security reflects its fair value; would you agree with that?
And you said, "Yeah, I mean, in trading, in market efficiency, of course it's the reflected fair value."
So I'm trying to understand, are there instances where a -- in a market would be inefficient where there aren't any misrepresentations that are being made by a company? That's what I'm trying to understand.
MR. KILLORIN: Objection; asked and answered.
BY MR. MAY:
Q You can answer.
A Okay. So I think it's -- in some instances I can think of, maybe social media distort the -- you know, about the business, so forth. Yeah. I can think of -- you know, like, you know, I can think of recently about, you know, like the COVID-19, they can -- you know, social

media or media can just blow things out of proportion, and so of course it affects some security, that sort of thing. So probably in a short period of time, you know, it would not reflects the true values of the company, yeah.
Q So you're saying that information on social media can sometimes impact the fair value of a security?
A Yeah, recently, yeah.
MR. KILLORIN: Objection; misstates prior testimony.
BY MR. MAY:
Q Is that what you're saying, sir?
A Yeah. I mean, a short period of time. But over time, I think the market will correct itself and then become efficient.
Q Do you think that investors react to things that are posted on social media?
A Yeah. I think so, yeah. Or maybe on the social media, you know, like, talk something about lockdown again, something like that, it would, you know, basically affect the investor, yeah.
Q Do you ever look at social media in terms of thinking about what you choose to invest in?
A No. Not really.



Q Have you ever?
A I look at it, but I don't follow that advice. You know, people usually -- on social media, they -- I don't follow their advice. I do my own research.
Q What social media do you follow?
A Facebook, Instagram, yeah.
Q Anything else?
A That's it.
Q How long do you typically maintain your positions in a company's stock?
A So usually, you know, for -- if a company continues growth, I will keep it. But if, you know, there's something changed about, like, the senior management making false statements or misleads investor, at some point, if I think there's just no point of turning around, I have to sell it; right?
Just like in the case of Tahoe. I hold it for -- I think for some period of time. When, finally, when there's no hope of reopening the Escobal projects and say this is -- this is not going to happen any time. So I decide to sell it at that point.
Q Okay. And we'll talk about the Tahoe --



A Right.
Q -- in a minute.
But I'm asking: How long do you typically maintain your positions in stocks?
A So probably it's vary. I would say several months to years.
Q How frequently do you trade?
A Frequently? Not very frequently.
Q How frequently?
A Sometimes, you know, I trade maybe few times a month. Sometimes I don't trade at all. I just keep portfolio and rebalance maybe once a year if every things go well. If some things not go well, I probably have rebalance my portfolio. So yeah.
Q So -- and, again, I'm not trying to put words in your mouth -- you would say in general, on average, you trade a couple times a month. Is that about correct?
A Yeah. A few times, yeah. A few times, yeah.
Q Okay. We talked about some of the research that you've -- you do in connection with your investments, and you told me that you looked at information that was available on Fidelity;



right?
And you looked at information that was available on Schwab; is that correct?
A Yeah. And also on the -- on the -- on the internet as well.
Q Okay. And can you be more specific about what information you look at on the internet?
A Just like earnings and then about the public statement from the senior management from the company.
Q Anything else?
A And also about some news that is going to affect the business.
Q And where do you look to find out news about the business?
A So usually I take a look at, like, Google, you know, Finance or Yahoo Finance or Finwest, you know, just some website that have, you know, the ticker symbol with all the information, you know, about the news about a company and also the public statement from the senior management from the company.
Q Are the news sources that you consult sources that you look at consistently on a daily basis, or do you only look at those news sources

when you're thinking about making an investment?
A Sometimes I look at, you know, frequently. Sometimes if I don't have time, I don't look at it that very often.
Q Do you look at all of the public filings and statements that are made by the company?
A Not all of them. I just look at, basically, the information in terms of when they make a public statement in terms of how the prospect, you know, in the -- in general. It's not like -- I'm not the analyst, like, looking at detail and understand every nuts and bolts in every financial statement, anything missing like that.
I just look at overall. Okay? I look at the revenue. Do they -- going to go up over time. Right? And then if they have good cash balance, they pay good dividends, I look at that, just only that number. But I don't look at all the detail because I'm not analyst to analyze the discount cash flows. I have no idea.
Q How do you pick and choose which public company statements to review and which ones not to review?
A So based on information like -- okay. I



do a futures on the Fidelity in terms of a company doing, you know, offer the good dividends; or sometimes I look on the website, you know, that -- with the ticker symbol; and some news, you know, I say, "Hey, this company is paying good dividend." Like CNBC, they're talking about, "Oh, this company is paying good dividends," and I look at all sorts of things on the internet.
Q But I was asking specifically about the public company statements. How do you pick and choose which public company statements to review and which ones not to review?
MR. KILLORIN: Objection as to form. I don't know what you mean by "statements."
MR. MAY: Well, statements from the company as opposed to news sources. He was referring to things like CNBC.
MR. KILLORIN: You mean -- you mean press releases and all that, SEC filings?
MR. MAY: Sure. I'm trying to understand which statements from the company --
MR. KILLORIN: Yeah. I'm trying to understand what you mean by "statements."



Are you saying anything, press releases, SEC filings, advertisements, website postings, new advertisements for offerings, anything from the company? Is that what you mean by "statements"?
MR. MAY: Yes. I'm trying to understand which ones --
MR. KILLORIN: That's fair enough. I -- I just want to understand the word.
Okay. With that clarification, you can answer.
THE WITNESS: Yeah. Yeah. So I just look at the public statement, like the company announce the dividends or the companies announce about the earnings, right, things like that.
BY MR. MAY:
Q Do you look at the year-end statements that the company publishes?
A Not really. I just look at the quarterly things, you know, when they issue the quarterly financial statement, and they talk about in general, you know, how the business doings and how the revenue, how projections, and things like that, or the dividend they can take to increase



the dividend in the future.
Q Do you consider statements made by other companies in the same industry?
A You know, I looked at those company and compared them, you know. I say depends on, you know, within the same sector, I pick the one that is -- I think it's just the best based on their public statement in terms of the revenue growth and then the dividends.
Q So do you look at statements made by other companies in the same industry?
MR. KILLORIN: Objection as to form.
BY MR. MAY:
Q Do you understand the question?
A So can you repeat that, please?
Q Do you look at statements that have been made by other companies that are in the same industry in choosing whether or not to invest in a particular company?
A Yes.
MR. KILLORIN: Objection as to form.
BY MR. MAY:
Q What was the -- what was the answer?

A Yes.
Q Do you consider regulatory events or changes in the law that impact companies in the same industry?
MR. KILLORIN: Objection as to form.
THE WITNESS: Yes, I look at that as well, but not in detail.
BY MR. MAY:
Q What sources do you consider when you're looking at those kind of things?
MR. KILLORIN: Objection as to form.
THE WITNESS: So, for example, I look at, you know, when, you know, recently with the stimulus package, how it's going to affect the industry. Right? So if the Congress is going to have a stimulus package that's going to focus on the infrastructure, I think maybe, you know, those -- any company involved in the infrastructure business, they're going to do well in the future because of the stimulus money, things like that. Yeah, yeah.



MR. KILLORIN: In an effort to be constructive, the last three objections had to do with the fact that I'm not clear if you were asking him about his monitoring activities for stock he's already purchased or his initial decision to purchase stock. It just wasn't clear to me.
And so I'm not trying to be -- leave problems in your trail. I want you to know, you know, that I wasn't -- it wasn't unclear to me what his testimony pertained to.
MR. MAY: Sure.
BY MR. MAY:
Q And to clarify, the questions that I've been asking are about research that you do when you're making an investment.
So do -- do your answers change anything I've asked in light of that clarification?
A What do you mean by "change"?
Q Well, I'm just trying to understand. So when you're making a decision to invest in a company --



A Uh-huh.
Q -- I'm trying to understand the things that you consider, and a couple of the things that we talked about were looking at statements made by the company's executives, statements made by companies in the same industry, and then regulatory events or changes in the law. Is that all true, those are things that you consider?
A That's -- that's true.
Q Besides Google Finance and Yahoo Finance, are there any other news sources that you regularly consult when choosing to make an investment?
A You know, I listen to CNBC and then some other websites, whoever -- I think finwest.com, and there's a whole bunch of other websites that, you know, they -- anything that have a ticker symbol, I can put in and see all the statement and news about the company.
Q What about trade publications? Is that something you ever look at?
A No.
Q How about TV or radio shows?
A TV, CNBC, but no radio show.
Q When you're searching a company in Google,



do you just search by the company's ticker or do you search by the company's name?
A I search just generally. For example, you look for some company pay dividends, and I look at, like, Google search, see which company paying a good dividends, right, something like that, Google them in that sense.
Q I understand that.
But when you're putting in the name of the company into Google, do you use the company's ticker symbol, or do you use the name of the company when you're putting in your search?
MR. KILLORIN: Objection to form. He never said he put company names into Google.
MR. MAY: That's why I'm asking for clarification on that.
MR. KILLORIN: Then start -- well, start with foundation, maybe.
BY MR. MAY:
Q Well, the question was: When you're putting the name of a company into Google, do you use the company's ticker symbol, or do you use the name of the company?
MR. KILLORIN: Same objection.

THE WITNESS: It's okay?
MR. KILLORIN: You can answer it.
THE WITNESS: All right. So I look at both.
BY MR. MAY:
Q Have you ever made an investment based off of something you've seen in social media?
A No.
Q What about recommendations of friends or colleagues?
A No.
Q Do you consider the analyst reports that are published about a company?
A Yes. Sometimes I look at the analyst report.
Q Which analyst reports do you look at?
A Whatever available on, you know, internet or Fidelity. But I don't look at analyst report very often.
Q How do you choose which analyst reports to look at?
A I just go in. You know, Fidelity, they have a whole bunch of the analysts in terms of investment companies. So I can just click on those and see which ones offer, like, the analyst


report. I just look at it.
Or sometimes I just do on search on Google, sometimes they have a, you know, analyst report for free.
Q You said that you don't do that very often. What would be the circumstances when you would consider an analyst report versus those when you wouldn't?
A I would say only if I skeptical when I hear some news about the company, like they're saying something bad about the company, but the senior management is still saying, "Oh, you know, business is doing well." It's something that, you know, creates some kind of doubt in my mind. Because I always trust the senior management to make a fair and -- representations of the business. Okay?
But if I hear management say something, and then the news I see or some -- some news analyst is saying something else, say, "Oh, this is why there's a discrepancy." So I will try to kind of, you know, look at -- look at that.
Q Has that ever happened to you, where the senior management said one thing and the news sources said something else?


A Not -- not very often. I don't think so, no. I just trust the senior management because, you know, I trust the system.
Q Well, so then -- now I'm confused. So then what would be the circumstances under which you would look at an analyst report?
A So circumstance would look at the analyst report when I have a doubt in my mind about what the senior management -- make the public statement versus some, like, rumors, you know, talking about, "Oh, there's some things going on with that business, got funny things under the hood," or something like that. Yeah.
Q And has that ever happened to you?
A No, except the Tahoe -- you know, Tahoe case.
Q Okay. So in the Tahoe case, you looked at analyst reports?
A You know, when I look at -- yes. I look at analyst report, but I think that point is too late. So its stock price already dropped.
Q Okay. And we're going to get back to Tahoe in a minute.
A Yeah.
Q I'm speaking generally --


A Okay. All right.
Q -- and I'm trying to understand the circumstances under which you look at analyst reports.
A Uh-huh.
Q And if I understand your testimony, you're telling me that the circumstances under which you look at analyst reports is when you think that maybe the company has been making false statements; is that correct?
A Only when I hear something on the internet saying something, you know, different than the senior -- that senior management is saying.
Q Okay. So then other than Tahoe -- leave Tahoe aside for a minute because we'll focus on that in a second -- has that ever happened to you where you've looked at analyst reports when making an investment?
A No, I don't think so.
Q Okay. So you've never looked at analyst reports in making an investment other than in the case of Tahoe Resources.
Do I understand that?
A No. No. What I'm saying is I look at -- Number 1, I look at the -- you know, the public

statement of the senior management, because I trust the senior management. And then if something -- I feel like there's rumors going around or, you know, something talking on the internet or something, say, on CNBC or something like that, then I will look at it closely.
Q Okay. And that has happened to you before, where you have heard something that you felt you needed to look into more, and then you looked at the analyst reports?
MR. KILLORIN: Objection. Are we talking about before he buys a stock, just to be clear?
MR. MAY: Yes.
MR. KILLORIN: Okay.
THE WITNESS: I don't -- I don't recall that I have to look at that very often. No, not really very often.
BY MR. MAY:
Q You mentioned that you speak Vietnamese; right?
A Yeah.
Q Do you ever look at the media that's in Vietnamese?
A I look at media in Vietnamese, but mainly


for, like, entertainment like musics and things like that, but never investment.
Q You never look at Vietnamese media in terms of making an investment?
A No. No.
Q Do you speak any other languages?
A No. Just Vietnamese.
MR. MAY: You guys want to take a break?
MR. KILLORIN: Sure. That's fine. It's been an hour or almost anyway.
MR. MAY: Okay.
MR. KILLORIN: That would be fine.
THE VIDEOGRAPHER: We are off the record at 10:27 a.m.
(Recess from 12:27 p.m. to 12:50 p.m. CST)
THE VIDEOGRAPHER: We are back on the record. Back on the record at 10:49 a.m.
BY MR. MAY:
Q I just want to ask a couple clarifications --
A Uh-huh.
Q -- about some of the things you told me earlier. You spoke about three buckets of your


investments.
Do you remember that?
A Yes.
Q And I think you told me that the way you characterize those buckets are cash, cash equivalents, and then a growth portfolio?
A That's correct.
Q Within the -- with the growth portfolio specifically, what does "diversification" mean to you? How do you go about diversifying that portfolio specifically?
A So on that growth portfolio, I mainly diversify into different stocks, different ETF, and mutual funds.
Q And when we're talking about these three buckets, are these all buckets that exist with Fidelity, or are they at other brokerage accounts, too?
MR. KILLORIN: Objection. We're not going to talk about any other accounts that he has.
I -- let me just think about this.
No, you can answer the question.
THE WITNESS: So, yeah, all with Fidelity.


BY MR. MAY:
Q Okay. So you don't have any brokerage accounts at any other companies other than Fidelity? Am I understanding that correctly?
A I have a -- the -- I used to have -- I have brokerage account with Schwab, but only small amount of money.
Q Okay. When you mentioned a minute ago the diversification within the growth portfolio, you said choosing different stocks and ETF and mutual funds; is that correct?
A Uh-huh. That's correct.
Q How do you go about choosing different stocks? Is it based off of industry? Is it based off of large cap, small cap funds?
MR. KILLORIN: Objection. This is covering the same -- you've asked him all these questions about how he picks stocks and what his methodology is, and we don't want to just keep replowing the same field eight times looking for different responses.
BY MR. MAY:
Q Okay. You can answer the question.
A Okay. Can I answer?

Page 52

MR. KILLORIN: Yeah.
THE WITNESS: All right. Yeah.
So -- so mainly I pick on some small, some mid cap, and occasionally maybe, you know, mega cap as well.
BY MR. MAY:
Q When you sought to diversify the Facebook options you received --
A Uh-huh.
Q -- did you choose to keep any stock in Facebook, or did you get rid of all of it?
A I still keep some.
Q Okay. What percentage of stock did you keep in Facebook?
A I don't know exactly the percentage, but I still have, like, 22,000 shares. Used to be. It's a lot more.
Q Let's talk about Tahoe.
A Yeah.
Q You purchased 200,000 shares of Tahoe common stock in August 2016?
A Uh-huh.
Q Is that correct?
A That's correct.
Q Were those your only purchases of any

Page 53

Tahoe security during the class period?
A I think I purchased something else as well, but I don't remember.
Q What do you think you purchased?
A Just some other stock, as I said, in terms of dividends and also the growth prospect of the company.
Q So I'm trying to understand: Besides the 200 --
THE REPORTER: I'm sorry. You said the growth what of the company?
THE WITNESS: The growth prospects of the company in terms of --
THE REPORTER: Thank you.
THE WITNESS: Yeah.
BY MR. MAY:
Q Besides the 200,000 shares of common stock you purchased in August 2016, you said you thought you might have purchased something else?
A That's correct.
Q What is the "something else" that you thought you purchased?
MR. KILLORIN: Object. Objection; vague, and I don't understand the question. Do you mean -- do you -- there

Page 54

might have been something else in Tahoe stock?
MR. MAY: I don't understand the answer which is why I'm asking the question.
MR. KILLORIN: Sorry. Okay. All right. All right. All right. All right. Would you mind rephrasing the question just for clarity?
MR. MAY: I don't know that I can.
BY MR. MAY:
Q Besides the 200,000 shares of Tahoe common stock that you purchased in August 2016 --
A Uh-huh.
Q -- you said you thought you might have purchased something else.
Is that what your testimony was?
A Yes, some other individual stocks.
Q Other what?
A Individual stocks.
Q Of Tahoe Resources?
A No, no, not Tahoe, but something else. Other company. Yeah.
Q Okay. So my question is -- and maybe this is why I was confused: Did you purchase any other

Page 55

Tahoe security during the class period?
A Yes. 2016.
Q Yes. Besides the 200,000 shares?
A I did not purchase anything Tahoe stock after that.
Q Okay. By the way, what is your understanding of the class period?
A The class period is the period that the company violate the security rules and, you know, didn't follow the rules.
Q But what period is that?
A It's -- it's period from April of 2013 to August 24, 2017.
Q Have you ever purchased any Tahoe shares other than common stock?
A No.
Q Did you individually acquire the shares of Tahoe common stock in August 2016, or was it a trust that acquired them?
A That is a joint account with the right of survivorship. I didn't set up the trust account.
THE REPORTER: I'm -- I'm sorry. I didn't understand your answer.
THE WITNESS: The joint account with my wife and with the right of

Page 56

survivorship.
BY MR. MAY:
Q So the shares of Tahoe that you purchased in August of 2016 were acquired by a joint account with your wife with a right of survivorship; is that right?
A That's correct.
Q And is that account held in the name of a trust?
A No, it did not.
Q Okay. What is the Nguyen and -- I'm sorry. Strike that.
How -- how do you say your last -- your wife's last name?
A Huynh. Huynh.
Q Huynh?
A Huynh.
Q What is the "Nguyen and Huynh Family Trust"?
A So that, I set up in 2018 or 2019, after that 2016. Yeah. So I set up later.
Q Okay.
A Yeah.
Q Who are the trustees of that?
A We both are trustee of that.

Page 57

Q Okay. And just so that I'm clear, at the time that you and your wife acquired Tahoe stock in a joint account, that wasn't an account that was held in the name of any trust?
A That's correct.
Q Is there a specific allocation -- strike that.
Was there a specific allocation between you and your wife with respect to the stocks held in the joint account?
A Can you repeat that question?
Q Sure.
I'm trying to understand the joint account. Did you and your wife jointly own all of the stocks within that account, or did you own some stock and your wife owned some stock within that account?
A She did not any -- own any stock in some other account. But I think in the beginning, I just set up -- you know, with Fidelity some may be joint, some may be individual. I don't remember correctly. But mostly I just want to make sure my wife is beneficiary on all those accounts.
Q Okay. I'm going to show you a document that we're going to mark as Deposition Exhibit

Page 58

Number 67.
A Okay.
Q Okay.
(Nguyen Exhibit 67 marked.)
BY MR. MAY:
Q Why don't you just take a couple minutes and quickly leaf through Deposition Exhibit 67 and let me know when you've had a chance to do so.
A So 67. You mean Page 67?
Q No. Sorry. The entire document --
A Oh.
Q -- that I handed you is Deposition Exhibit 67.
A Uh-huh.
Q Does this look familiar to you at all?
A Yeah.
(Sotto voce document review.)
BY MR. MAY:
Q And let me just give a little bit of context. These are some excerpted pages from the Fidelity brokerage account statements that were produced to us in this litigation. We have not included the entirety of that brokerage account statement because it was so voluminous. We've picked some pages out that we want to ask you

Page 59

about, but I just want to see if this generally looks familiar to you.
MR. KILLORIN: Yeah. And just for clarity, I think it was a number of different statements, if you want to call it that, different -- different time periods.
MR. MAY: Correct.
MR. KILLORIN: Yeah. Yeah.
BY MR. MAY:
Q So, Mr. Nguyen, does this look familiar to you?
A Yeah.
Q Okay. I'd like to go over these a little bit to just sort of orient myself a little bit.
So if you look at the first page that's marked in the bottom right-hand corner NGUYEN_22097. Do you see that?
A It's Page 1?
Q Well, okay. When I -- I'm going to direct you to certain pages in this document.
A Okay.
Q And what I'm going to use for the page number is the Bates-label number that's in the bottom right-hand corner, which is a number that

was put on this document by your counsel.
A Uh-huh.
Q Okay.
So when I refer to a document, I'm going to refer to it by the number that begins with your last name, "Nguyen," and then it's got a number after that.
Do you see that?
A The bottom right-hand corner.
MR. KILLORIN: Yeah. And, Andrew --
MR. MAY: Let's go off the -- can we go off the record for a second?
THE VIDEOGRAPHER: We are off the record at 11:02.
(Recess from 1:02 p.m. to 1:03 p.m. CST)
THE VIDEOGRAPHER: We are back on the record at 11:03 a.m.
BY MR. MAY:
Q Okay. So, Mr. Nguyen, I just want to orient you to the first page on Deposition Exhibit 67. On the bottom right-hand corner, it's Bates-labeled Nguyen 00022097, and it says Page 1 of 50 right above it. It's the investment report for August 1, 2016, through August 31, 2016.



Do you see that?
A Yes.
Q Okay. And this is your Fidelity investment report for August of 2016; is that correct?
A That's correct.
Q All right. And that's the month that you purchased Tahoe stock; correct?
A Correct.
Q Okay. And the first page here shows that you had a net portfolio value of $7,428,179.13; is that correct?
A That's correct.
Q Okay. And just staying on this first page for a minute, it shows additions and subtractions of -- it's a million dollars in additions and then the subtractions is slightly greater than a million dollars. What does that mean?
A Oh, so that's Fidelity managed account fee. This is the one, the Breckinridge account in this report as well. So Fidelity, they combine the Breckinridge account, and then some other account into this statement as well. It's not just only one account, but I think it's several accounts in here.



Q Yeah.
A Yeah.
Q Okay. So if you flip to the next page after that that's Bates-labeled Nguyen 00022098. It's Page 2 of 50.
Do you see that?
A Yeah.
Q Okay. This lists three accounts on here.
Do you see that?
A Yes.
Q Okay. And the first account listed is that Breckinridge account that you've mentioned a couple times.
A Uh-huh.
Q Do you see that?
A Yes.
Q Okay. And I just want to remind you to wait until I finish asking the question to answer. Okay?
A Oh, okay.
Q Okay. And then there is -- there is a second account on here that's listed as the account owned by you and your wife with the right of survivorship; correct?
A Correct.



Q And then there's a third IRA account; correct?
A Correct.
Q Okay. Which of these three accounts held the Tahoe shares that you purchased?
MR. KILLORIN: Mr. Nguyen, if you need to look through the document, you're welcome to do that.
THE WITNESS: Okay. So that must be the middle account. Because the first one is Breckinridge, and then the third one is the retirement rollover. So I think this is the middle one.
BY MR. MAY:
Q Okay. And I am not trying to get into the details of necessarily what's in each one of these accounts --
A Uh-huh.
Q -- but I'm not a financial professional so I'm just trying to understand these things.
A Right.
Q I know what an IRA account is.
A Right.
Q What's -- what's the difference between the first account and the second account? Why do

you have two different accounts?
A So the first account is the account that mentioned about cash equivalent. So this one is managed by the Fidelity. That's municipal bond funds.
Q Okay. So the Breckinridge account holds the cash equivalent funds?
A You can say that, you know, like municipal bonds, yeah.
Q Okay. Municipal bonds?
A Yeah. So...
Q Which account holds the cash bucket?
A The cash is my checking/saving.
Q Okay. And is that with Fidelity or somewhere else?
A Not with Fidelity. With Bank of America. Yeah.
Q Just so that we are being clear when we are talking about accounts, how should I refer to the account that owned the Tahoe stock? What -- how would you characterize that so we can agree on a terminology so that -- I understand there's the Breckinridge account. How would you characterize what we've said is the middle account?
A So I consider it's a cash equivalent


account, which is, you know, the fixed incomes and, you know, all the coupons that the government pays.
Q Sorry. I'm not being clear.
A Right.
Q I just want us to agree on a shorthand terminology for how to refer to the second account. Should we just call that your joint account or your growth account? How would you call that?
A Yes. The growth account.
Q The growth account?
A Yes.
Q And the growth account is different than the Breckinridge account?
A That's correct.
Q Okay. So when you were telling me earlier about the strategies that you employ for your growth account, those are strategies that pertain just to the second account listed on here, not the Breckinridge account?
A That's correct.
Q Okay. And, again, at a very high level, those two accounts hold different types of investments; is that fair?


A That's fair.
Q And the -- your -- your ownership of Tahoe Resources remained in the growth account the whole time?
A Right.
Q And just so that we have a clean record here, when I am saying "growth account," I'm referring to the "Fidelity Account, Kevin D. Nguyen and Tiffany Huynh with rights of survivorship TOD"?
A Yes.
Q And these three accounts listed here are your only brokerage accounts with Fidelity; is that correct?
A No. Some other accounts as well. Facebook account is not in here.
Q All right.
A So I have another -- the way that Fidelity -- they -- I don't know how they structure the report. Somehow they group this together, but -- and then I have some Facebook account and also some -- the IRA account, I think, is for this one, the IRA account. Also I have another IRA account, one for myself and one for my wife.


Q So let me make sure I've got that.
Besides the three accounts that are listed on this page that we've been looking at that ends in Bates Number 22098, you said you have three other accounts with Fidelity; is that correct?
A So let me count. I think this three account, and then another account that I opened over the time, and then another, like, cash account, and then two retirement. So total, I think, is eight.
Q Eight? Eight additional accounts besides this?
A Yes -- no, I'm talking the five additional accounts, yes.
Q Five additional accounts besides the three listed here?
A Yes. I think some account closed over time, yeah.
Q Okay. And I know you mentioned that there were two IRAs; is that correct?
A Uh-huh. That's correct.
Q And then there was a cash account; is that correct?
A Yeah.

Page 68

Q And am I correct in understanding that a cash account just holds cash?
A Yeah. So when they pay dividends, when -- in my growth account or Breckinridge account, when they pay the dividends or the interest payment, I just -- if I need for expenses, I move that money into the cash account and then move to my checking account/savings account, yeah. So that's why I refer to "cash," but also -- like cash in Fidelity and cash also with Bank of America as well, yes.
Q I understand.
MR. KILLORIN: Are we almost at this path of --
MR. MAY: I'm just trying to --
(Simultaneous crosstalk.)
MR. KILLORIN: I understand. I'm not -- you know, I'm giving you some latitude, but yeah.
MR. MAY: Yeah.
BY MR. MAY:
Q And then you said that there is a Facebook account?
A Yeah. So that's a Fidelity account but hold the Facebook security. I still have 22,000 shares of Facebook account. Originally I have

Page 69

500,000. They took out 200,000 for taxes, so I have 300,000 shares. Over time, I diversified to -- now I have a lot less, only 22,000 shares of Facebook, but in the trust account with Fidelity.
Q And I -- I'm not trying to get into too much specifics.
A Right.
Q But does that account hold stocks besides Facebook, or is that the only stock that it holds?
A Recently it's only Facebook. But, I mean, over the time, you know, at the beginning, I tried to figure out which one is which and --
MR. KILLORIN: I'm going to object to questions beyond Tahoe stock. I mean, I think we've been more than fair.
THE WITNESS: Okay. Yeah.
BY MR. MAY:
Q Why did you choose to purchase Tahoe stock in August of 2016?
A So, Number 1, the senior management make a public statement about the prospect of the company. They said that company is doing well, so that's why they pay the monthly dividends at 5 percent. And then with the Escobal, their revenue continued to grow in the foreseeable

Page 70

future. So they just paint a very rosy pictures about the company.
Q So I want to make sure I got that.
A Yeah.
Q So you said that the company made some public statements about the prospects of the company, its monthly dividend of 5 percent, and it's revenue growth, and in general it painted a rosy picture about the company?
A Yes.
MR. KILLORIN: Objection. His answer speaks for itself. I don't understand the point of restating it. I think it was perfectly clear.
I'm going to object to form. That's not exactly what he said, and there's no point in repeating an approximation when he said exactly what he said.
BY MR. MAY:
Q Did I summarize your answer correctly?
A Yes.
Q Okay. What -- what specific statements are you referring to? Are these statements that you read in something or you saw on TV? Can you

Page 71

be more specific about the statements you're referring to?
A So when I Google, if you Googled about Tahoe, there's a public statement. They just keep saying, you know, every time when they issue a dividend, they say, "Oh, this is, like, third month, fourth month, fifth month, sixth month, eight months, and nine and ten months they paying monthly dividend." They also have a statement at the end about the prospects of the company as well.
Q Okay. So you Googled Tahoe Resources, and that's where you came across these statements?
A Yes.
Q Do you remember what the source of the statements was from your Google search, what site you found where you --
A Yeah, from Google search.
Q Sure. I understand that. Let me -- I'm sorry if I'm not being clear.
Google is a search engine; correct?
A Yes.
Q Okay. So when you put something into Google, it leads you to another website; correct?
A Uh-huh.

Page 72

Q What was the website where you found those statements?
A Google.
Q So was -- it was listed in Google News or --
A Yeah. When I Google and say about the Tahoe, then it popped up a whole bunch of stuff, and one of them is about a public statement about the company.
Q And do you remember what the thing that popped up, what the source was, whether it was a Google source or a Yahoo news source or a Bloomberg news source?
A I don't remember, but it's from -- a statement from the senior management from Tahoe.
Q And who -- which senior management specifically?
A The CEO, CFO.
Q And who is that?
A The CEO at that point, I think, was, you know, Ronald Clayton and also is Kevin McArthur. They keep switching the roles between that -- the class period. I don't keep track of the time who is, you know, called the CEO, but that two person was the CEO at that point.

Page 73

Q Anybody else that made public statements that you relied upon in choosing to invest in Tahoe?
A No. Just, you know, CEO, usually earning call -- I think usually earning calls or earnings released, you know, the public statements from the CEO and CFO, right.
Q And who is the CFO?
A If I recall correctly, it's -- that's Mark Sadler.
Q So you Googled Tahoe Resources, and you came across some statements that were made by Ron Clayton, Kevin McArthur, and Mark Sadler; is that correct?
A That's correct.
Q Okay. And what statements specifically did Ron Clayton, Kevin McArthur, or Mark Sadler make about the prospects of the company that you relied upon?
A So I recall that on top, they say the company is doing well. With Escobal, you know, mine, they continue to do well in the foreseeable future. In the bottom they say that the prospect of the -- you know, the company is -- is very -- doing really, really well. That's why they would

Page 74

be able to pay the dividends, you know.
They state that, I think, July before I bought the stock in August. They say this is -- I remember that they say something about the dividend they pay in 11 months or eight months -- I forgot exactly what they -- but they say the dividend -- they continued to pay the dividend.
This give the confident to retail investor like me. You know, that's why when the company is doing well, they paid a dividend and they pay dividend monthly. So they keep every -- I think it's every month, they keep saying, "Oh, this is the first month we pay dividends, second month," and so on and so forth.
Q And so you relied on the fact that they said that they were going to be able to pay a monthly dividend going forward. Is that -- am I understanding that correctly?
MR. KILLORIN: Objection as to form.
THE WITNESS: That's correct.
BY MR. MAY:
Q What statements by Ron Clayton, Kevin McArthur, or Mark Sadler -- strike that.
Was there anything else that Ron

Page 75

Clayton, Kevin McArthur, or Mark Sadler said about the prospects of the company, other than what you just told me, that you relied upon in investing?
A No. Just relying on the senior management of the company.
Q Right. No, I -- I understand you relied on the senior management. I'm just trying to understand specifically with respect to the prospects of the company, was there anything else specifically that you relied upon?
A No.
Q Okay. What about -- you had mentioned statements that were made about revenue growth. Was there anything else that you relied upon specifically, relating to statements about revenue growth?
A No.
Q Okay. And I think you mentioned also that there was a rosy outlook for the company. Those were your words?
A Uh-huh, yes.
Q What specifically did Ron Clayton, Kevin McArthur, or Mark Sadler say about -- that was -- conveyed to you about a rosy outlook about the company?

A So they say that -- about the thing at the disclosure, they say the Escobal mine is doing well so that they would be able to pay the monthly dividends, and the revenue continued to -- growth in the future.
Q Okay.
A Yeah.
Q So the -- just to summarize -- and, again, I'm not trying to put words in your mouth -- but the statements that you relied upon from the senior management at Tahoe in choosing to invest in August 2016 were that the company was doing well and would be able to pay monthly dividends; is that correct?
MR. KILLORIN: Objection to form.
THE WITNESS: That's correct.
BY MR. MAY:
Q Besides those statements by the company's senior management, was there anything else that influenced your decision to invest in Tahoe?
MR. KILLORIN: Objection; asked and answered. He's already talked about things that invested -- that influenced him.
THE WITNESS: Can I answer?



MR. KILLORIN: Yeah, you can.
THE WITNESS: Oh, no. Just the senior management.
BY MR. MAY:
Q Okay. Did you perform any research into Tahoe before making your decision to invest?
A Yeah. I saw some -- the revenue growth. They project revenue growth for the foreseeable future. So the last three years, if I remember correctly, the revenue growth is, you know, substantially.
Q What sources did you consider in researching the revenue growth?
A I think it's Google, too. I think I Googled the revenue of the -- Tahoe.
Q Anything else?
A That's it.
Q So besides Googling the revenue growth of Tahoe and the statements made by the company's senior management, was there anything else besides that that you considered?
A No, I don't.
Q Were any sources that you considered that discouraged you from investing in Tahoe?
A No.



Q Did you have any communications with anyone about Tahoe before the purchase of stock in August 2016?
A No.
Q You didn't speak with your investment adviser?
A No.
Q Did you speak with your wife about it?
A No.
Q In general, do you confer with your wife about the investments that you make?
A No. I handle all the financial for the family.
Q Did you review any of Tahoe's public filings?
A Can you repeat that question?
Q Did you review any of Tahoe's public filings, either with the SEC or with SEDAR?
A No.
Q How did you first hear about Tahoe?
A So, again, I think I Googled and searched for the company that paying good dividends, and, you know, with the growing of revenues, and that's the Tahoe, I think, popped up on the search engine.



Q Okay. So you -- you Googled what companies pay good dividends, and Google told you that Tahoe was one such company?
A Right. So I think it's -- I put in certain, like, over 3 percent, something like that, and then it popped up with Tahoe and -- or I think at that point, I probably looked at the Fidelity as well. But I don't remember.
Q Were you looking for growth dividend stocks or were you looking for dividends that would -- well, strike that.
Were you looking for a stock that was going to grow, or were you specifically looking for stocks that would pay dividends in terms of making your assessment?
A Both.
Q Both.
The statements that you reviewed from the public company about the fact that the -- strike that.
The statements that you told me you relied upon in making your decision to invest in Tahoe Resources, were those statements false?
A Can you repeat the question?
MR. KILLORIN: Objection as to the

Page 80

form.
BY MR. MAY:
Q The statements that you told me that you relied upon in making your decision to invest in Tahoe Resources, were those statements false?
MR. KILLORIN: Objection as to form.
THE WITNESS: If those statements is false?
BY MR. MAY:
Q Were those statements false?
MR. KILLORIN: Excuse me. The witness is talking. Please don't cut him off. He has a right to finish his answer.
MR. MAY: I thought he was asking me for clarification.
THE WITNESS: No. I just asking.
So you mean that if -- I just want to -- you know, just want to understand the full question.
So you asked me if I believe that statement from the company is a false statement? Or no?
BY MR. MAY:
Q I asked you about your decision to

Page 81

purchase Tahoe stock in August 2016.
Do you remember that?
A Uh-huh. Right.
Q Okay. And you told me what you relied upon in terms of your decision -- making your decision to invest in Tahoe.
Do you remember that?
A Right.
Q Okay. And I thought what you told me was that you relied upon statements by the company's upper management about the prospects of the company, its monthly dividend, its revenue growth, and its rosy outlook; is that correct?
A That's correct.
Q Okay. Were those statements that you relied upon false?
MR. KILLORIN: Objection as to form.
THE WITNESS: No. I believe in the company, so why would I believe that it's a false statement from the senior management?
BY MR. MAY:
Q Do you believe that the company thought those statements were false?

Page 82

A I don't think so because they're the one who run the companies, yeah.
Q So the statements that you relied upon in terms of making your decision to invest in Tahoe Resources in August 2016, those statements were not false?
MR. KILLORIN: Objection as to form.
THE WITNESS: I'm not sure about that question. Can you -- as I said, English is not my first language. So when you say "false," I -- just a little bit tricky question I'm thinking about. Can you, you know, put it in -- explain it exactly what you're trying to ask me?
BY MR. MAY:
Q Do you feel that you were misled in any way at the time you made your investments?
A No, I don't think so.
Now it's clear. Because before, a little bit tricky with your questions. I don't understand that completely.
Q Thank you.
A But I -- yeah.
Q How long had you planned to hold your

Page 83

shares in Tahoe at the time you purchased them?
A I want to hold as far as they continue to grow the business, continue to pay dividends.
Q Did you make the decision to purchase Tahoe, in part, based on the financial health of the company?
A Yes. Based on the financial health of the company, yes.
Q And what about the financial health of the company specifically led you to invest in Tahoe?
A The revenue, growth in revenue. For three years in a row, they continued to grow the revenue, yes.
Q So you looked at historical revenue growth and concluded that the company was financially healthy?
A Yes.
MR. KILLORIN: Objection to form.
THE WITNESS: Yes.
BY MR. MAY:
Q Was there anything else that you considered about the financial health of the company besides revenue growth?
A And also dividend.
Q Had the company been paying dividends

prior to your investment?
A Yes.
Q Did you make the decision to purchase Tahoe common stock based on the integrity of the market?
MR. KILLORIN: Objection as to form.
Mr. Nguyen, you can answer if you understand it.
THE WITNESS: I don't -- based on efficiency of the market, but I just -- again, as I said, I -- just the senior management statement.
BY MR. MAY:
Q My question was: Did you make the decision to purchase Tahoe common stock based in part on the integrity of the market?
A No. I don't think so. Just basically, again, as I said, just -- I just basically listened and read the statement from the senior management and their, you know, statement about the -- the business prospect.
Q Do you understand what I mean by "the integrity of the market"?
A So you mean the market is fairly



functions? Is that right?
Q Well, what do you understand that to be?
A So it means the market is efficient. It's run -- it's normal. There's nothing unusual about the stocks. I mean, the stock, I understand it when I read the -- Dr. Iyaz's expert report, market efficient is basically, you know, look at the volumes, look at the spread. That's what I just learned about it.
Q And was that, what you just described as the integrity of the market, part of what made you decide to invest in Tahoe?
A No. At that point, no.
Q I'm going to show you what we're marking as Deposition Exhibit 68.
(Nguyen Exhibit 68 marked.)
(Discussion off the record.)
MR. KILLORIN: Andrew, would now be a good time for a break, by the way? If not, I can wait and go a few minutes.
MR. MAY: Let me just -- let me just ask a couple more questions and then we'll --
MR. KILLORIN: That's fine. That's fine. That's fine.



BY MR. MAY:
Q Kevin, I'm handing you what we have marked as Deposition Exhibit 68.
Do you recognize this document?
A Yes.
Q Okay. What is it?
A So this is -- this is the plaintiff -- is my response and objections to defendant, you know, Tahoe Resources first set of interrogations -- interrogatory to the plaintiff, Kevin -- that's my name.
Q So these are your responses and objections to our set of interrogatories to you; is that correct?
A Yes.
Q Okay. And if you flip to the second-to-last page of that document, there's a verification form on there.
Do you see that?
A The second page? Yeah.
Q Okay. And that's your signature on this page?
A That's correct.
Q Okay. And in this verification, you were attesting that the responses that you gave to the



matter stated in -- therein were true and correct; is that correct?
A That's correct.
Q All right. So I want to just direct your attention to Interrogatory Number 2, which appears on Page 12 of the document. Let me know when you're there.
A Yeah. Page 12, right.
Q Page 12, yes.
A Yes, uh-huh.
Q And in Interrogatory 2, we were asking you to explain the circumstances surrounding your purchase of 200,000 shares of Tahoe stock.
Do you see that?
A Yes.
Q Okay. And then there's some objections in the first paragraph, and then your answer begins in the second paragraph on Page 12.
Do you see that?
A Subject to and --
Q Yeah, I don't need to you read it.
A Oh, okay.
Q If you -- if you look at the second sentence there, it says: "Lead plaintiff made the decision to purchase Tahoe common stock based on

the integrity of the market and the financial health of the company," and it goes on to say a couple other things.
So help me understand what you meant here by "the integrity of the market." Because when I asked you a minute ago whether you made the decision based on the integrity of the market, you told me no.
A Yeah. So --
MR. KILLORIN: Objection; misstates prior testimony. And objection as to form.
MR. MAY: Hold on a second.
BY MR. MAY:
Q So, Mr. Nguyen, I asked you just a minute ago, my question was: Did you make the decision --
MR. KILLORIN: Andrew, with all -- with all due respect, if you're going to repeat -- I'd rather have the court reporter read back prior questions instead of you read them back and us not know if you made a mistake in your reading.
MR. MAY: Okay. Madam Court Reporter, could you please read back the



question and answer that was at 13:30:21 Line 79-2.
(Record read as requested.)
MR. MAY: And then could you read back my question prior to Bob's objection?
(Record read as requested.)
MR. MAY: Do you still have an objection?
MR. KILLORIN: Yeah, same objection.
BY MR. MAY:
Q You can answer the question.
A Okay. So "integrity of the market," I'm thinking about the markets fairly, you know, represent what the senior management, you know -- statement about the health of the business. That's what I understand about "integrity of the market."
But -- and then later on, I mentioned that -- later on I, you know, with the expert report, I understand more recently that is -- it's defined differently.
So my -- in terms of "integrity," I'm thinking about the market -- you know, it just reflects the statements of the senior management



integrity. That's what I understood.
Q So when you said in your interrogatory answers that you "made the decision to purchase Tahoe common stock based on the integrity of the market," what did you mean?
A I mean it's based on the senior management, you know, statement about the prospect of the company.
Q Okay. Did -- did the -- did the company's senior management make statements about the integrity of the market that you relied upon?
A No. But that's what I misunderstood about the integrity. I thought that integrity is being integrity of, you know, the senior management, you know, talk about the prospect of the business. So that's what I'm thinking about "integrity" in my mind, integrity of the senior management, you know. They're the one who are telling the -- about their business prospect to the investors.
Q Okay. But you didn't understand "integrity of the market" to mean that same thing when I asked you about that a minute ago?
A Yeah. Yeah. Yeah.
MR. MAY: Okay. We can take a break now, Bob.



MR. KILLORIN: Okay. Great.
THE VIDEOGRAPHER: We are off the record at 11:39 a.m.
(Recess from 1:39 p.m. to 1:56 p.m. CST)
THE VIDEOGRAPHER: We are back on the record at 11:55 a.m.
BY MR. MAY:
Q Kevin, you've mentioned a couple times that having a monthly dividend was an important factor to you in investing in Tahoe; is that correct?
A That's correct.
Q Why was a monthly dividend something that was important to you?
A Because said I wanted to retire early, so I wanted, you know, dividends and to replace my salary.
Q Okay. So in other words, you intended to use the dividends as a source of income. Is that fair to say?
A That's correct.
Q How often did Tahoe pay dividends during the time that you owned the stock?
A Monthly.
Q What was the amount of those dividends?

A 5 percent.
Q Okay. If I could have you turn back to Deposition Exhibit 67. No, the other one.
A Oh, 67.
Q Uh-huh.
And have you flip to the page that's Bates-labeled NGUYEN_22191, which is the October 1, 2016, through October 31, 2016, investment report, and it says Page 17 of 28 above the Bates number.
A 17? Page 17?
Oh, this is 16 and it jump to 18. Where's the Page 17?
Q If you want to hand me the document --
A Yeah.
Q -- I can probably orient you faster.
Okay. So looking at this page, you see here at the bottom it says: "Dividends, Interest, and Other Income"?
A Uh-huh.
Q Okay. And does this show that you received a dividend from Tahoe Resources in September in the amount of just shy of $4,000?
A Uh-huh.
Q Is that "yes"?


A Yes.
Q And what does it mean, then, the description above where it says "reinvestment"?
A I think "reinvestment" is -- means that, you know, all the security and all the dividends has got reinvested at that point.
Q So I just want to make sure I understand what you just said.
The cash dividend that was paid to you got reinvested to purchase more stock?
A No. I don't think so. I didn't purchase more stock. I think this is reinvested.
You know, I don't remember exactly what happened here.
Q Okay.
A Yeah.
Q What about -- what about on the next page? If you flip to the next page that ends in 22192, it shows a dividend received of just over $4,000, and then another reinvestment. Do you know what that means?
A Yes.
Q Okay. What does that mean?
A So probably that's an reinvestment of the Tahoe.


Q Okay. And what does "reinvestment of the Tahoe" mean?
A I think it purchased the price -- the stocks.
Q So you purchased stocks with the dividend?
A Uh-huh.
MR. KILLORIN: Objection; form.
THE WITNESS: Yes.
BY MR. MAY:
Q Is that correct?
A That's correct.
Q Okay. Why would it be helpful for you to have a dividend to use for income during retirement if you reinvested that dividend in more stock?
A So a couple things. I think, at that point, I am not retired yet, so I think it's on future when I have set up the portfolio ready, I will not going to reinvest the dividends.
And then secondly, I think it's on Fidelity when I set up, by default, you know, everything is, you know, pays online mutual funds or ETF, all the funds reinvested, including the dividends and things like that. But until when I decide to retirement, I will -- not going to


invest those dividends.
Q Okay. So if I'm understanding what you just said, you intended to not reinvest the dividends and use that income for retirement once you eventually retired; but until you reached retirement, you invested -- reinvested the dividends until you had reached retirement?
A Correct.
MR. KILLORIN: Objection to form; misstates prior testimony.
THE WITNESS: It's okay to answer?
MR. KILLORIN: Yeah.
THE WITNESS: So, yes, but it also depends on the other bucket as well. So with the buckets that I mentioned about, Breckinridge also paid the interest in dividend income as well. So if that's the one I'm going to -- some of them, you know, I intended to use for my monthly expense when I retire. And then if the extra, if I need it, probably I will not reinvest some in the growth portfolio.
So that's my -- you know, I just want to -- at some point, you know, when I retire, I want to budget it and then see

how much the monthly expense I have to need to tap into that, I will decide, okay, which bucket I'm going to go and not reinvest the dividends, reinvest the capital gain contributions, and then use that as my monthly expense.
Does that make sense?
BY MR. MAY:
Q The dividends that were being paid out here in September and October of 2016, were -- were those dividends that you considered high?
A Yeah. 5 percent I consider high.
Q Okay. So let's flip back a couple pages here to Page 22190.
A What page number is that?
Q Just the page prior to the one that you were just on.
A Oh, okay.
Q Okay. So this shows here -- just for a clean record, we're on the page ending with 22190.
Do you see that?
A Uh-huh.
Q Okay. And this shows your stock ownership of Tahoe; is that correct?
A Is that the Page 17; right?



Q No. I'm on Page 16 of 28 now.
A Oh, 16 of 28. So can you say again what should I look for?
Q So this -- this page here, there's some parts that are redacted, but this shows your stock ownership of Tahoe; is that correct?
A That's correct.
Q Okay. And that shows that that stock had a market value of $2,418,635.73 at that time; is that correct?
A Which one are you looking at here? What number? Is it on top or at the bottom?
Q Well, I think there may have been some other stocks that you owned that have been --
A Oh.
Q -- redacted. So I'm looking at the line that Tahoe is on.
A Oh, okay. So is that the one at the "Beginning Market Values" or at -- the one at --
Q Okay. So do you -- do you see --
A -- "Ending Market Value"?
Q Do you see where it says "Tahoe Resources, Inc., Company" on the left there?
A Yes.
Q Okay. And then if you slide over on that



line to the column where it says "Ending Market Value October 31, 2016," do you see that?
A Yeah.
Q Okay. And that shows a market value of $2,418,635.73?
A Yes.
Q Okay. And was it your understanding that you were going to get paid a dividend of 5 percent off of that market value?
MR. KILLORIN: Objection as to form; misleading; doesn't state a time period; impossible to answer.
BY MR. MAY:
Q Do you understand the question? You said that you -- you -- you -- that you were under the impression that you were going to get dividends of 5 percent?
A Uh-huh.
Q Okay. And do I understand a dividend of 5 percent means 5 percent of the market value?
MR. KILLORIN: Objection; ambiguous.
THE WITNESS: It's okay to answer:
MR. KILLORIN: Yeah. Yeah.
THE WITNESS: 5 percent, I think,



is not the market value. The 5 percent based on the initial investment, and also paying, you know, monthly, yes.
BY MR. MAY:
Q Okay. And was your initial investment more than $2.4 million or less than $2.4 million?
A I think it's more than 2.4.
Q Okay. Does $2.8 million sound about right?
A It sounds about right.
Q Okay.
A Yeah.
Q So your understanding was that you were going to get paid a monthly dividend of 5 percent based on $2.88 million?
MR. KILLORIN: Objection; misstates prior testimony. I don't think he ever said the monthly dividend was 5 percent of the total.
BY MR. MAY:
Q Okay. What did you understand the monthly dividend to be?
A The monthly dividends?
Q Yes.
A So that's just -- they paid -- they

just -- you know, they just said 5 percent.
Q 5 percent of what?
A 5 percent of the original investment.
Q Okay.
A And also, I think, over time, the -- the value fluctuate and then also reflects that, the current values as well.
Q Okay. And 5 percent of $2.8 million is about $140,000?
A Okay.
Q Okay. Is that what you understood the monthly dividend to be?
A No. It's, I think, 5 percent over a year.
Q Okay.
A Yeah.
Q All right. So you understood the monthly dividend to be $12,000?
A Yeah. If that's the calculation that you came up with, yes.
Q Okay. And so if we go over to the monthly dividend that you received here in September, was that -- was that a $12,000 dividend?
A No.
Q Okay. And so were you receiving the equivalent of a 5 percent dividend from Tahoe



Resources?
A Obvious not.
Q No? Okay.
A Yeah.
Q So this is more like about $0.02 per share; is that correct?
MR. KILLORIN: If you need to get a calculator to answer that question --
THE WITNESS: Yeah.
MR. KILLORIN: -- you can -- we can get one.
THE WITNESS: Yes.
BY MR. MAY:
Q Is that a high dividend, $0.02 a share?
A I don't know. Probably, you know. Compared to other companies don't pay dividends, of course it's higher.
Q Okay. So compared to a company that doesn't pay any dividends at all, $0.02 a share is higher than nothing?
A Right.
Q Okay. Is it a high dividend compared to other companies that pay dividends?
A I didn't -- I don't know. I didn't compare to other company.



Q Okay. But you said the -- one of the main reasons why you invested in Tahoe was you wanted a company that paid high dividends?
A That's correct. That's correct, yes.
Q And you told me that when you Googled Tahoe, you Googled companies that paid high dividends?
A Yes.
Q Okay. And now, as you're sitting here looking at this, did you ever look back and see whether the dividends you were receiving were high or not or give any thought to that?
A So at that point, I didn't really, you know -- I trusted, you know, the system, so I thought it was going to calculate the right amount. But now I look more closely at it, the point, you know, I think probably they did -- did not pay 5 percent, as they say. So that's just another misstatement about there, statement about 5 percent.
Q So are you saying that this is -- this is another misstatement that the company made?
A Yeah. I mean, they say they paid dividend 5 percent. So I just said, you know, because I have other -- a lot more other things, like mutual



funds and things like that, so I don't really check at the number because I just trust that in their system that calculated correctly.
Q So let me get this straight.
A Uh-huh.
Q You decided to invest in Tahoe Resources because you wanted to get dividends that would be high; is that right?
A Right.
Q Okay. And then you received dividends, but you never checked to see what the amounts were?
A No. I didn't check some other things in portfolio. I have a big portfolio, you know, with other mutual funds and, you know, things in there. So I don't double-check everything.
Q Right. But you -- I mean, you're a pretty savvy investor. That's clear, right?
MR. KILLORIN: Objection; misstates prior testimony; assumes facts not in evidence.
THE WITNESS: "Savvy"? I wouldn't say "savvy." I'm not, you know, an analyst. So I just average, you know, just understand about -- basic about the

Page 104

market, not "savvy."
BY MR. MAY:
Q Okay. Well, but you -- you looked at your portfolio at least a couple times a month; right?
A No. You know, a couple times a month, but I looked at it, and then I also see if its value -- I focus on the growth first, and then, you know, some of the -- you know, some of the things. If the appreciation continues to go up, I think I'm doing fine. I just look at the percentage of the growth.
And then the dividend I base on, I believe that the system calculated correctly, so I don't look checks of other, you know, mutual funds and things like that. So I just check that the total number of the dividends and capital contribution that I receive at the summary level. Because in Fidelity, they show you, okay, this is all the dividend you receive in the buckets. So I say, "Oh, this is -- it looks like a good number." You know, I think it's when I retire, I can count on that number besides the Breckinridge account.
Q But you owned Tahoe Resources for about 16 months; right?
A Yeah. More or less, yes.

Page 105

Q And during that time, you made trades in your accounts; true?
A Trade other stocks?
Q You trade -- yeah. You traded other stocks and securities?
A Yeah. I may bought some other stocks as well, yeah.
Q You told me, I think, earlier that typically you traded a couple times a month on average?
A Something like that, yeah. I don't remember, yeah.
Q And so -- and so you're telling me that over a 16-month period that you owned Tahoe stock, you never checked to see what the dividends were that you were receiving when that was the principal reason why you invested in Tahoe?
MR. KILLORIN: Objection; misleading; misstates prior testimony.
THE WITNESS: It's okay?
MR. KILLORIN: Yeah.
THE WITNESS: Okay. Yeah, I -- as I said, I just looked at the total number of the dividends that pay in that growth portfolio that's, you know, thousand and

Page 106

thousand stocks, you know, like with the mutual funds and things like that, you know, ETF. There's a lot in there.
BY MR. MAY:
Q What about the reinvestment of the dividend? Was that something that you had a say in in how it got reinvested?
A Yeah. So I think beginning when I set up the account, you know, I have -- you know, I mentioned I have several account with Fidelity. That is set up that, you know, they just reinvest it. So when -- at some point when I retire, I would determine which one I'm going to turn off and don't reinvest it --
Q Right.
A -- so I can get the dividends.
Q But you're -- you don't -- you told me earlier that your investment adviser doesn't choose your investments for you, you choose your investments?
A That's correct.
Q Okay. And so when you made a decision to reinvest this dividend, you didn't realize that it wasn't paying the amount that you expected to receive?

Page 107

A No. I don't -- I don't remember, yeah.
Q Were you holding up -- were you holding other stocks that generated dividends for you during this time period?
A I don't remember.
Q Did your investment in Tahoe align with your investment goal to generate income for your retirement?
A Income and the growth -- appreciation of the stock price as well, yes.
Q Okay. But you would say that it didn't align with your investment goal to generate income for your retirement?
MR. KILLORIN: Objection; misstates prior testimony.
THE WITNESS: Can you repeat -- it's okay?
MR. KILLORIN: No. What -- I don't know. Do you want to restate it or do you want to --
BY MR. MAY:
Q Well, I think you said that it aligned with your investment goal for growth in the stock. Is that what you said?
MR. KILLORIN: Objection; misstates

prior testimony.
THE WITNESS: Yes.
It's okay?
MR. KILLORIN: Let me finish my objection, then you answer.
THE WITNESS: All right. Okay. All right. I didn't understand that. All right.
BY MR. MAY:
Q Do you know if, when you were reinvesting the dividends, you reinvested them in Tahoe?
MR. KILLORIN: Objection; mischaracterizes prior testimony.
THE WITNESS: Bob, it's okay to answer?
MR. KILLORIN: Oh, yeah. Yeah.
THE WITNESS: Oh, okay.
MR. KILLORIN: Yeah. Yeah.
THE WITNESS: I don't have to --
MR. KILLORIN: Unless I instruct you not to answer, let me state my objection, then answer it --
THE WITNESS: Okay.
MR. KILLORIN: -- to the best of your ability, yeah.



THE WITNESS: Sorry. I just -- can you repeat the question?
BY MR. MAY:
Q When you were reinvesting dividends, did you reinvest them in Tahoe or something else?
MR. KILLORIN: Objection -- same objection.
Go ahead.
THE WITNESS: Everything else. Reinvest everything else in the portfolio.
BY MR. MAY:
Q So when you -- I want to make sure I understand what that means.
A Right.
Q When you reinvested the dividend, that means you purchased stock in something other than Tahoe?
MR. KILLORIN: Objection; misstates prior.
MR. MAY: I'm trying to understand --
MR. KILLORIN: No, I -- and -- and --
MR. MAY: -- the testimony, Bob. I'm not misstating anything.



MR. KILLORIN: Andrew, I understand.
First, if you would indulge me, he already said he didn't reinvest, that his Fidelity did on an automatic program that he checked at the beginning. So, I mean, could -- you know, with that foundation, maybe that would clarify these questions.
MR. MAY: He told me that he makes decisions about everything that he invests.
MR. KILLORIN: No, no, I -- no. I understand that. I'm just saying when these reinvestments were done, he did nothing. Fidelity automatically reinvested because that's the box that was checked when he opened the account.
So when you say "you reinvested," to the extent that you mean, "You didn't change your instructions to Fidelity," the answer, I guess it would be yes.
But that's a big problem I've got with this line of questions --
MR. MAY: Okay. So --
MR. KILLORIN: -- when you say "you



reinvested" as if it was a decision he made every month, because it wasn't.
MR. MAY: Okay. So let me understand that.
BY MR. MAY:
Q So did you check a box at the outset that said that every time you received a dividend in Tahoe Resources, that it would be automatically reinvested by somebody else?
A I didn't check the box. I think when I opened the account, it's automatically select to reinvest it unless I tell the system not to do so. I don't remember, but I think that's what happened when I first opened the Fidelity account.
Q Okay. And if you were trying to generate income that you were going to use for retirement, why wouldn't it have been important to you to uncheck that box?
A Because --
MR. KILLORIN: Objection; asked and answered. He wasn't retired then.
MR. MAY: I'm asking the witness, Bob.
MR. KILLORIN: Okay.
MR. MAY: Thank you.

THE WITNESS: So I said when -- until I would retire, I would uncheck some of that box, depends on, you know, my monthly expenses. But that point, you know, I had not decided to retire yet.
BY MR. MAY:
Q Okay. And so looking at this page that we're on right here that ends 22191, do you see that? It's Page 17 of 28.
A Okay. 291 -- the last number is cut off so I presume that's --
Q The one above it, the number above of it says 17 --
A Oh, okay.
Q -- 28?
A Okay. I see that, yeah.
Q So when it says "Reinvestment" and it says next to it "Security Name Tahoe Resources, Inc.," did you understand that to be a reinvestment in Tahoe Resources? In other words, you're purchasing Tahoe stock?
A At that point, yes. I -- as I said, I was busy with something else, so I didn't really understand the whole system completely; but now I look at it, I think it's yes.



Q Okay. Did you consider Tahoe to be a low-risk security?
A Yes.
Q Why?
A Because they have -- you know, it's growing revenue and thinks they -- it's kind of -- it's a big companies. They, I think, have a market cap in the -- members like over 2 billion or something like that, and then they paid monthly dividends, yes.
Q Why would that make it a low-risk security, those factors that you just listed?
A Because I looked at, you know, some of the -- you know, like old-fashioned, you know, companies that pay dividend. Usually they have a very steady revenue growth and also very steady business so that they would be able to pay the dividends regularly.
Q So in other words, you understood that because this was a company that was going to pay a dividend, that that made it a low-risk investment?
A Yes.
Q Anything else about it besides the payment of a monthly dividend that made it low risk, in your mind?



A And also business continued to growth, as senior management stated.
Q At the time of your investment, one of Tahoe's principal assets was the Escobal mine; right?
A Yes.
Q And you knew that at the time of your investment, of course?
A Yes.
Q And you knew at the time of your investment that Escobal was located in Guatemala?
A Yes.
Q Did the fact that Tahoe's revenue was significantly derived from the Escobal mine impact your assessment of the risk level of Tahoe?
A No. Because senior management, they say the mine is doing well; they generate, you know, income. So that's what they were able to pay the dividends. So I have no reason not to trust their statement.
Q I'm going to show you what we're marking as Deposition Exhibit 69.
(Nguyen Exhibit 69 marked.)
BY MR. MAY:
Q Kevin, do you recognize this document?



Do you recognize this document?
A No.
Q This is a document you produced?
A My lawyers produced?
Q Yes. Is it?
A Take a look.
Q Do you see, on the bottom right-hand corner, there's the Bates label legend "Nguyen"? It begins with 00001067 on the first page.
A Uh-huh.
Q "Yes"?
A Yes.
Q Okay. And that's indicative of documents that you produced in this litigation.
Do you understand that?
A So this one is, again, my lawyers produced documents, and then they just probably showed me a copy. But I did not produce this document.
Q Right.
A The lawyers, they have all the resources.
Q Did -- I don't want to get any communications you had with your lawyers, but did you give this document to your lawyers to produce in the litigation?
A No, I did not.

Page 116

Q Okay. Do you know where this document came from?
A This -- from the lawyers. I mean, they -- they did all the research and then, you know, they showed a draft, and then they already sign it. I think so, yeah.
Q Okay. So this is not a document that came from your files?
A This document came from my files, but I did not produce this document.
Q Did you give this document to your lawyers to produce in the litigation?
A This document --
Q Yes.
A -- particularly?
Q Yes.
A No. You know, the lawyers I said did all the research and have the resources -- oh, I mean the one that, you know -- I look at the market securities -- oh, no. No. This -- that's not my transaction.
Q I'm just trying to understand. Because you said that it came from your files, but your lawyers produced it and I'm just trying to understand.

Page 117

Is this a document that originated with you, or was this a document that your lawyers gathered independently without you? That's all I'm trying to understand.
A This is gathered by the lawyer.
Q Okay. Have you ever seen a public filing like this for Tahoe Resources?
A No.
Q Okay. You never looked at any public filings like this at all?
A Not really. I just look at the, you know, big number and then earning, you know, that's released by the company.
Q Okay. Well, if you look at the document that's Bates-labeled Nguyen 00001110, it's Page 23. I don't know if you need some help orienting there.
A I don't see the page number on here. Is it this one? Yeah.
Q Well, first of all, do you understand this to be a public filing of Tahoe Resources? Does it -- do you understand that to be so?
A Yeah.
Q Okay. And if you look on Page 2 -- or Page 23 here where it says: "Licenses And Title

Page 118

to Assets," do you see that?
A Uh-huh.
Q Okay. And it says: "The validity of the licenses related to the Escobal mine can be uncertain and may be contested. There's no assurance that the applicable governmental bodies will not revoke or significantly alter the conditions of applicable licenses that are required by the Escobal mine."
Do you see that?
A Uh-huh, yes.
Q All right. You told me earlier that you did not consider Tahoe to be a risky investment because of the Escobal mine's location in Guatemala?
MR. KILLORIN: Objection; misstates prior testimony. I mean, if you want to read back his prior testimony, that's fine. But paraphrasing it always makes me nervous.
MR. MAY: So, Becky, can you read back the question and answer that, on mine, begins at 14:22:06, Line 107-17?
(Record read as requested.)
MR. MAY: That is the question, but

Page 119

that wasn't what I actually asked.
THE REPORTER: Okay. Hold on. Let me -- let me go back one second.
MR. MAY: That's all right. Strike it.
THE REPORTER: Okay.
BY MR. MAY:
Q I asked you -- I meant to ask you earlier was: Did the fact that the company's revenue was significantly derived from its investment in Escobal impact your assessment of the risk of Tahoe?
MR. KILLORIN: Objection. That's --
BY MR. MAY:
Q That's what I'm asking you right now?
MR. KILLORIN: Okay. Well, that was a statement. I object to vague; ambiguous; and not a question.
MR. MAY: I'll ask it again.
BY MR. MAY:
Q Did the fact that Tahoe's revenue was significantly derived from its investment in the Escobal mine impact your assessment of the risk level of investing in Tahoe?

A So, again, I said I didn't read all the 100 pages of all the filings. I just read the regular statement from the senior management. If I Google it, and they say, "Hey, this is a statement that we pay monthly dividends," and this is about the rosy picture of the company, and that's what I look. I never looked at, you know, like few hundred pages of the -- all this statement and look at every little detail, yeah.
Q Okay. Had you read this statement that we just read here about the fact that the validity of the licenses related to the Escobal mine can be uncertain and may be contested, would that have changed your assessment of the risk of investing in Tahoe?
MR. KILLORIN: Objection; ambiguous.
You can answer if you understand it.
THE WITNESS: Yes. I would say yes and no. They didn't say any things about the percentage of the revenue that generated from Escobal project. So that's kind of, you know, I think it's just like general, you know, every businesses when



they file this filing, they always say, "Hey, there's a risk."
But this one is a -- it didn't say significantly derived from the Escobal, if I read it correctly. So it didn't say how much revenue is going to be affected if they don't have the Escobal mine. So, again, it depends.
BY MR. MAY:
Q Okay. But you told me earlier that you understood one of Tahoe's principal assets was the Escobal mine; is that right?
A The majority of it is not -- some of their future earnings is going to reflect in that, yes.
Q If you -- can you just turn -- you're on the page right now. Can you turn a couple pages earlier to Page 19 of the report -- or, excuse me -- Page 20 of the report.
Do you see at the bottom of there, the section that reads: "Dependence on the Escobal mine"?
MR. KILLORIN: I'm sorry. I don't see where are you --
MR. MAY: Page 20.
MR. KILLORIN: Uh-huh.



MR. MAY: "Dependence on the Escobal mine."
MR. KILLORIN: Oh, the title. Okay. Yeah. Got you. The heading to the last paragraph.
BY MR. MAY:
Q Do you see that section?
A Yeah. I'm reading it right now.
Q And do you see the first sentence of that section says: "The Escobal mine is the company's sole operation"?
A Yes.
Q So turning back to your comments about the previous disclaimer we were looking at, I was trying to understand, had you read this disclaimer here, would that have impacted your assessment about the risk level of investing in Tahoe?
MR. KILLORIN: Objection; ambiguous; calls for speculation as to how this statement may have affected his thinking five years ago.
If you can answer, go ahead.
THE WITNESS: I don't -- I don't remember.



BY MR. MAY:
Q Okay. You told me that you relied on statements from the company about the monthly dividends; is that right?
A That's right.
Q Okay. And you told me that you trusted those statements because you didn't believe that there was any reason to think that the company was at all at risk?
MR. KILLORIN: Objection.
BY MR. MAY:
Q Is that correct?
MR. KILLORIN: Misstates prior testimony. Object --
THE WITNESS: I didn't say.
MR. KILLORIN: Kevin, let me finish.
THE WITNESS: Okay.
MR. KILLORIN: Objection; misstates prior testimony.
You can -- oh, gosh. I guess I'd instruct you to not answer, because that's -- that question has no basis in fact.

BY MR. MAY:
Q You told me that you did not consider Tahoe to be a risky investment; is that correct?
A Yes.
Q Okay. And you considered that because you relied on the statements of the company's management; is that correct?
A That's correct.
Q Okay. Now, I'm asking you to look at this sentence right here --
A Uh-huh.
Q -- and I'm asking you to tell me, had you read this sentence in this document whether that would have impacted your assessment of the risk level of investing in Tahoe.
MR. KILLORIN: Which --
BY MR. MAY:
Q Can you answer that?
MR. KILLORIN: Which sentence are you talking about?
MR. MAY: The first sentence of "the licenses entitled to the assets."
MR. KILLORIN: Okay. On Page 23. Are you on 23?
THE WITNESS: 20?



MR. KILLORIN: 23.
THE WITNESS: Oh, 23 not 20?
MR. KILLORIN: Yes. No, 20. He switched over to 23.
THE WITNESS: Oh.
MR. KILLORIN: So let's -- yeah. We need to try to keep it clear --
THE WITNESS: I was just looking at Page 20.
MR. KILLORIN: Yes. I understand. I was, too.
THE WITNESS: So the last one?
BY MR. MAY:
Q Let me make it simple.
If you had been told, "The validity of the licenses related to the Escobal mine can be uncertain and may be contested and there is no assurance that the applicable governmental bodies will not revoke or significantly alter the conditions of applicable licenses that are required by the Escobal mine," if you had been told and you had read that, would that have affected your assessment of the risk level of investing at Tahoe?
MR. KILLORIN: Objection; calls for



rank speculation of how one sentence taken out of context in hundreds of pages would have affected his opinion five years ago.
Now, if you can speculate on what it -- and answer that question, go ahead. But if you're -- if you don't -- can't, then don't.
MR. MAY: Bob, just make your objection, please.
MR. KILLORIN: Okay. Calls for -- objection; calls for speculation.
BY MR. MAY:
Q You can answer the question.
A I don't know. I don't remember.
Q You knew the Escobal mine was located in Guatemala?
A Yes.
Q Okay. Did the mine's location in Guatemala at all factor into your risk calculus of the investment in Tahoe?
A No.
Q Okay. Do you believe that there are country-specific risk to companies?
A No.
Q Okay. So you don't believe that there's a



different risk to a mine operating in Canada versus a mine operating in Guatemala?
A I don't think so, because it's -- it depends on the senior management statement. So I -- yeah, no.
Q Are you familiar with Guatemala at all?
A No.
Q Okay. Do you know whether Guatemala is a stable country?
A I don't know.
Q Okay. Have you ever read anything about Guatemala?
A No.
Q Do you consider some countries to be more stable than others for investments?
A Yes.
Q Do you ever consider whether a country is stable or not in terms of determining what to invest in and what not to?
A You know, if some country have a mine like North Korea, of course not. But other country, I think it's -- you know, I don't really look into detail if the senior management, you know, provide the statement about the company -- prospect of the company. So I just basically rely on the

company -- you know, the senior management statements.
Q Right. And if the company had told you Guatemala is an unstable country, would that have been something that would -- you would have factored into your risk calculus?
MR. KILLORIN: Objection; assumes facts not in evidence; and calls for rank speculation.
THE WITNESS: I don't know.
BY MR. MAY:
Q Have you ever heard of any difficulties faced by other mining companies in Guatemala?
A No.
Q Were you aware that there were protests in opposition to the mine?
A After the fact.
Q When -- when did you become aware of that?
A I think it was in 2017.
Q When specifically in 2017?
A I don't remember the day.
Q Were you aware that there had been lawsuits filed challenging the mining license?
A I think it's after the fact. I think sometime in 2017.



Q But at the time you made your investment in August 2016, you weren't aware of any lawsuits that had been filed challenging the mining license?
A No.
Q Do you know whether you've owned any other securities in any other entity with significant business operations in Guatemala?
MR. KILLORIN: Objection; out -- out of -- irrelevant to this case.
And I'm going to ask the witness to not answer that.
MR. MAY: You're going to instruct the witness not to answer that question, Bob?
MR. KILLORIN: I guess not.
Go ahead. Answer. You can answer if you know.
THE WITNESS: Can you repeat the question?
BY MR. MAY:
Q Do you know whether you've owned any other securities in any other entity with significant business operations in Guatemala?
A As far as I know, I don't think so.



Q Have you ever owned any other securities in any other entity engaged in the business of mining?
A I don't remember.
Q Was there ever a time that you stopped considering Tahoe to be a low-risk security?
MR. KILLORIN: Objection; mischaracterizes prior testimony.
BY MR. MAY:
Q Okay. Did you consider Tahoe to be a low-risk security?
A Not at the time when I invest the company -- the money in the company, no.
Q At the time you invested money in the company, you did not consider Tahoe to be a low-risk security?
A Low --
MR. KILLORIN: I apologize. This is just ambiguous. I think you're going to get what you want, but there are too many double negatives.
MR. MAY: Bob, you keep interrupting the line of questioning and you're obfuscating his testimony.
MR. KILLORIN: No, no, no.



MR. MAY: I'm asking very clear questions.
MR. KILLORIN: Andrew, it's a double negative and there's a language barrier. I --
MR. MAY: I understand, and that's why I'm asking for clarification.
MR. KILLORIN: Yeah.
MR. MAY: It's not because I'm trying to put --
MR. KILLORIN: I'm going to leave it --
MR. MAY: -- words in the witness' mouth.
MR. KILLORIN: I'm going to leave this one to you. I just believe there is confusion in the air because of the language barrier.
MR. MAY: Which is why I'm asking for clarification.
MR. KILLORIN: Okay. Which is why --
MR. MAY: You keep telling me I'm misstating his testimony.
MR. KILLORIN: Which -- no. That's

irrelevant to this particular issue. I'm just saying right now it's ambiguous, and I think there's miscommunication going on. But I'm sure you'll clean it up.
BY MR. MAY:
Q Did you consider Tahoe to be a low-risk security at the time you invested in it?
A Yes, I believed they were low risk.
Q Okay. Was there ever a time when you stopped considering it to be a low-risk investment?
A I think after the facts came out that, you know, the shut out -- the shutdown of the minings and all the protests and, you know, news about -- you know, all the negative news about the company, you know, I think show in 2017.
Q Did you have any sort of risk-and-return analysis methodology that you employed with respect to Tahoe?
A No.
Q Are there any other investments that you made that met your investment goals of investing in low-risk securities? Can you give me some other examples?
MR. KILLORIN: Objection. No, he



cannot. That's irrelevant. His investments in other companies is not relevant to this case, and I think it's outside the scope of discovery, which is why those investments have been blacked out of the -- the financial records that we have produced to you, and you have not raised any objection to that.
MR. MAY: I have not raised an objection to that?
MR. KILLORIN: Your side. I don't think you've made a motion to compel production of his other trades and other stocks.
MR. MAY: Well, I'm asking about it right now.
MR. KILLORIN: Right. And I'm objecting.
MR. MAY: Okay. Are you instructing the witness not to answer?
MR. KILLORIN: Absolutely. About other trades other than Tahoe, absolutely for the same reason we blanked it all out in the documents we produced to you. We believe that's irrelevant to this case,



and therefore, improper discovery.
BY MR. MAY:
Q Can you turn back to Deposition Exhibit 68, please, the interrogatory answers? And just direct your attention to Page 8, and the answer to the responses and objections to Interrogatory Number 1. Just let me know when you're there.
A Page 8. Okay. So this the one?
Q Yes.
So we asked you to identify all of your purchases or sales of Tahoe securities during the relevant period. That was the interrogatory; correct?
A That's correct.
Q Okay. And you provided an answer to that interrogatory that's listed here on the page we're looking at; right?
A That's right.
Q Okay. And this here reflects your purchase of 200,000 shares of Tahoe stock for approximately, we said, $2.8 million; correct?
A That's correct.
Q Okay. Why were these purchases not all made in a single order?



A You know, what I think is, when you trade, they show that individually, you know, like whoever the bid on -- you know, whoever the buyer -- or the seller on the other side, they show individually. Even, you know, like -- you know, like you make one single purchase, they will show that, okay, this person buy, you know, like sell for you hundred share, this person sell for you thousand share. I think that's the way the system works.
You know what I mean?
Q I think so.
A Yeah, yeah.
Q So what you're selling me is that you didn't purchase 100 shares and then 1,200 shares, so on and so forth. You purchased 200,000 shares all in a single order? Is that what you're telling me?
A So I don't remember, but I think it's probably a couple orders. But I think this breakdown -- because, you know, it depends on how many people selling on the other side, you know.
If I purchased, like, 50,000 -- I purchased 50,000 shares but it's only, you know, like, 30 or 50 people they selling, I think they

break -- the system break it down by things like this, yes.
Q Okay. So in other words, in order to buy that number of shares, you needed to have enough people willing to sell in order to fulfill the order?
A Yeah.
Q Is that correct?
A I think so, yeah. That's how the system worked.
Q Okay. And do you know why that took place over -- strike that.
Do you know if you purchased 200,000 shares in a single order, or were there more than one order?
A I don't remember. But at the end of the day, it's total 200,000 shares.
Q Okay.
A It was five years ago.
Q Was there anything strategic to the manner in which you purchased stock over these two days in these various transactions?
A No.
Q Okay. Can you turn back to Deposition Exhibit 67, the first -- yeah.



MR. KILLORIN: Could we suspend for about 30 seconds and go off the record?
MR. MAY: Sure. Yeah. Go off.
(Discussion off the record.)
THE VIDEOGRAPHER: We are off the record at 12:48 p.m.
(Recess from 2:48 p.m. to 3:46 p.m. CST)
THE VIDEOGRAPHER: We are back on the record at 1:45 p.m.
BY MR. MAY:
Q Great. So we were about to look at Deposition Exhibit 67 before we took a break, but I actually want to ask you one more question before we turn away to that about the interrogatory answers, which is Deposition Exhibit 68. If you can pull those back up and turn back to Page 8 of the interrogatory responses, where it lists the purchases of Tahoe stock, and let me know when you're there.
A Uh-huh.
MR. KILLORIN: And just for the record, it begins on Page 8 and goes for a few pages.
MR. MAY: Thank you, yes.



BY MR. MAY:
Q Do you see what I'm talking about?
A Yeah.
Q Okay. The shares of Tahoe stock that are listed here as being acquired -- strike that.
I think we went over before that you listed here your purchases of Tahoe stock; correct?
A Correct.
Q Okay. And not included in this list of purchases of Tahoe stock are the reinvestment of the dividends that we talked about before; is that correct?
A That's correct.
Q Okay. So this would not be a complete list of your purchases of Tahoe stock?
A So, yes, you know, if that dividends, you know, including reinvest in the Tahoe, yes, this is probably --
MR. KILLORIN: Yeah, I object; mischaracterizes prior testimony; and is ambiguous. Fidelity -- he -- it wasn't he directing the purchases of the Tahoe stock on the automatic reinvestment.
MR. MAY: Bob, I need you to stop



testifying.
MR. KILLORIN: Okay.
MR. MAY: Okay? Make --
MR. KILLORIN: Okay. I'm sorry.
MR. MAY: Okay. I just --
BY MR. MAY:
Q This is not a complete list of all of your purchases of Tahoe stock; is that correct?
MR. KILLORIN: Objection; misstates prior testimony.
THE WITNESS: Is it okay?
MR. KILLORIN: Yeah, you can answer.
THE WITNESS: So I guess so, because this is some of the stock -- you know, some of the dividend reinvested in here, but probably a small amount.
BY MR. MAY:
Q Right.
A You saw that.
Q Right. There are -- there were purchases of Tahoe stock through the reinvestment of dividends that aren't included here?
A Right.
Q Okay. Now I'm going to have you turn to

Deposition Exhibit 67. I'm going to try and make this easier, and so I'm going to give you a new, clean copy where I've marked the pages that I'm going to ask you to look at with yellow sticky notes. I hope that that will just expedite things.
MR. KILLORIN: That sounds fine with me.
MR. MAY: Okay.
MR. KILLORIN: Just like trying --
MR. MAY: Yeah. I know everybody else needs to --
MR. KILLORIN: We all need to keep up. But yeah, yeah.
MR. MAY: Yeah.
BY MR. MAY:
Q So I'm going to have you start by turning to the page that's marked 22130.
MR. KILLORIN: And you know what? This is one where the last number's cut off on the page.
MR. MAY: Yes.
MR. KILLORIN: So if you could give us, you know, the --
MR. MAY: Sure. It says Page 34 of



50 above it.
MR. KILLORIN: Okay.
BY MR. MAY:
Q Do you see that?
A Yeah, yeah.
Q Okay. And this is reflecting your purchases of Tahoe stock on August 25th and August 26th; is that correct?
A That's correct.
Q Okay. And we talked earlier about your purchase of Tahoe stock, and I think you told me that you couldn't remember whether you purchased Tahoe stock in a single order or whether it was multiple orders; is that correct?
A That's correct.
Q Okay. And I see here there's a column that's labeled "Transaction Costs."
Do you see that?
A Uh-huh, yes.
Q And it appears that there are several lines listed on here where it's indicating a transaction cost of $4.95.
Do you see that?
A Yes.
Q Okay. Do you know whether you were



charged multiple transaction costs for a single order?
A No, I -- I don't remember. But I don't think so.
Q Does -- does the -- does the fact that we see multiple transaction costs listed on here suggest to you that your shares of Tahoe stock were made in multiple orders?
A Yes. That's what I told you.
Q Okay.
A I don't remember -- so probably that's -- it's multiple order, but within that two-days period.
Q Okay.
A Yeah.
Q I also notice, as I'm looking at this, that the quantities that were purchased of Tahoe stock increased from beginning with 100 shares to going up to as much as 10,000 shares.
Do you see that on -- a couple pages later?
A Oh, a couple pages later.
Q On NGUYEN_22133.
A Is that the Page 36 that you're talking about?



Q Page 37.
A 37. Yeah.
Yeah.
Q Do you know why the shares that you purchased increased in volume?
A I --
MR. KILLORIN: Objection; vague; and ambiguous. And there's -- there's no -- there's no chronology on here, so I don't know what you mean by "increased in volume."
MR. MAY: Well, I'm looking at the way they've been listed on here, and they go from a quantity of 100 all the way up to 10,000. I'm trying to -- Bob, I'm trying to understand --
MR. KILLORIN: Well, fine. If your question is do you know why they're listed in this order on this page, then I have no objection.
BY MR. MAY:
Q Okay. Do you know why the quantities went from 100 to 10,000 in terms of quantity?
A I don't remember --
Q Okay.

A -- five years ago.
Q Okay. If you could turn to two pages earlier, the page that's marked NGUYEN_22114.
A What page is that? Oh, okay. 22144?
Q 114.
A Oh, 114.
Q And this is showing, if I'm reading this correctly, your holdings of Tahoe stock as of August 31, 2016; is that correct?
A Yes. So this is August 31st, 2016.
Q Yes.
A Yes.
Q And this is your -- this shows your holdings in Tahoe --
A Right.
Q -- as of August 31, 2016.
A Right.
Q And just let me finish my question before you answer.
Correct?
A That's correct.
Q Okay. And this shows a cost basis of $2,880,717.50. Do you see that?
A You said $0.73 at the end?
Q No, sorry.



$2,880,713.50.
A Okay. Yes.
Q That's your cost basis?
A Right.
Q And that's how much you paid for the stock; is that right?
A Uh-huh, that's right.
Q Okay. And then I also see on the "Common Stock" column, where it describes the name of the stock, there's a little "M" to the left of it.
Do you see that?
A Uh-huh.
Q Okay. "Yes"?
A Where is that? Which one did you --
Q There's a little "M" to the left where it says "Tahoe."
A Uh-huh.
Q "Yes"? I just need you to answer audibly.
MR. KILLORIN: Do you mind if I point out what you're talking about?
MR. MAY: Sure.
MR. KILLORIN: I think he's talking about that little "M" --
THE WITNESS: Oh, yeah, yeah, yeah.
MR. KILLORIN: Okay.



BY MR. MAY:
Q Do you see that?
A Uh-huh.
Q "Yes"?
A Yes.
Q And then if you turn to the page after that, there's a legend that says that "M" means the position is held in a margin account.
Do you see that?
A Yes.
Q Does that mean that -- well, what does that mean?
A So the way it works with Fidelity, even if it have a cash, list it -- list it as a margin, even have -- you know, enough cash to pay for it. Because if I want to buy -- because, you know, with the settlement, but then when you buy some stocks or ETF, it takes three days to have the transaction go in and you get the cash. So with the margin, it means that you can -- even those -- if you receive the cash for the other transaction, but you still can use that incoming cash to purchase something -- you can purchase for other investment.
Q Okay. So does -- does that mean that you



purchased Tahoe stock with money that was borrowed on margin?
A No. This is money coming in, but it's not -- so let's say if I sell the security, usually it takes three days to settle. So on the Day 2 -- I understand that on the Day 2, even I expect the money coming in on the Day 3, on the Day 2, I still would be able to purchase it because they know that I have incoming money on -- on the Day 3. So it's still listed as a margin, but there's a money coming in to cover that.
Q Okay. And this page that we're looking at shows that your total stocks as of --
MR. KILLORIN: Sorry. Which page? Because you-all are on different pages.
MR. MAY: Oh, I think we're still on Page 22114.
BY MR. MAY:
Q Are you on that page?
A Oh, so that is the page --
Q I included some yellow sticky notes on there to help --
A 114, yeah, yeah.
Q 22114.
A So this is the Page 18 of 50; right?

Q Yeah. 18 of 50, correct.
This is showing that your total stocks as of August 2016 comprised 45 percent of your account holdings; is that correct?
A Where do you see that 5 percent?
Q 45 percent of your account holdings, on the bottom left-hand corner.
MR. KILLORIN: Could you repeat the question, please?
MR. MAY: Sure.
THE WITNESS: Oh, yeah, I saw it. Yeah.
BY MR. MAY:
Q Okay. Let me just repeat it.
A Uh-huh.
Q So I just want to make sure that I'm understanding --
A Right.
Q -- what I'm looking at.
In August of 2016, the stocks that you owned comprised 45 percent of your account holdings; correct?
A Only this accounting, but I mentioned I have some other account holding as well, including Facebook.



Q Right. And the 45 percent of account holdings refers to the growth account that we've been talking about?
A Yes.
Q Okay. And --
A But I just want to clarify on that.
Q Sure.
A Growth account including Facebook stock as well. I have 300,000 shares. Over time I diversify, but I still have significant share at that point. So Facebook is still considered this growth account because I still keep Facebook stock. So I just wanted to clarify that.
Q So your understanding is that when it lists the total stocks as being 45 percent of your account holdings here, that encompasses the account that holds Facebook as well?
A No. No.
Q No, it doesn't?
A Not at all.
Q Okay.
A Just small fraction.
Q Yeah.
A 300,000 shares, you can imagine that is not the whole thing.



Q Okay. Sure.
A Yeah.
Q So this is just talking about the account holdings in the growth account -- and I'm using "growth account" because I think we agreed that that was the term that we were going to use --
A Yeah.
Q -- for this particular account.
A Right. So I -- I want to clarify. When I say "growth accounts," I mean plural. Because I have another account I keep the Facebook security. That's considered growth as well. Do you know what I mean? It's not only this account --
Q Yeah, I'm --
MR. KILLORIN: Can we go off the record for a second?
MR. MAY: Yeah. Sure.
(Recess from 3:58 p.m. to 4:00 p.m. CST)
MR. MAY: Okay. We're back on the record.
BY MR. MAY:
Q Okay. I'm just going to try and use something to clarify so that we can --
A Yeah.
Q -- make sure that we've got this going forward.



A Uh-huh.
Q Can you flip forward -- and I haven't marked this with a yellow sticky, but if you can flip forward to Page 22246, and it would show Page 18 of 32.
A 22246. You mean the bottom?
Q Yeah.
A Here?
Q Yeah, and it will show "18 of 32" above it.
A 13 of 82?
Q No. 22246.
A So which number you refer to?
Q Here.
A Yellow sticks? Or --
Q Here.
A I confuse. We using different numbers now.
Q Okay. I'm directing your attention to the page marked NGUYEN_22246, which is open in front of you. Do you see that page?
A Okay. It's top with the "Holdings;" right?
Q Yeah. And if you -- if you look at the

top right-hand corner, there's an account number that ends in 547. Do you see that?
A Yes, I see that.
Q Okay. And that number that ends in 547 is the account that holds your Tahoe stock; is that correct?
A That's correct.
Q Okay. And we've been talking about an account throughout this deposition that we've sometimes referred to as the "growth account." Do you remember that?
A Right.
Q Okay. And when we've been talking about the "growth account," what we've been referring to is the account that ends in 547; correct?
A That's correct.
Q Okay.
A But --
Q And going forward, just to be clear --
A Right, right.
Q -- I'm going to use the term "547 account" --
A Right.
Q -- when talking about --
A Yeah.


Q -- this account.
A Because I mentioned I have other growth accounts as well. It's not --
Q Right. But when we're going to talk about the joint account that your wife and you --
A Yeah.
Q -- jointly own that holds Tahoe stock, I'm going to call that the "547 account."
A Right. So that's one of several growth accounts.
Q Okay.
A I think I just wanted to clarify. Because -- yeah. In my mind when I -- when I say "growth accounts," I probably, you know, it's my language barrier. I don't pronounce, like, the "S" at the end. So --
MR. KILLORIN: Perfectly fine. Andrew's clear on it. We're good.
THE WITNESS: Okay.
BY MR. MAY:
Q Okay. So if you can now flip back to -- strike that.
If you can now turn back to the page marked NGUYEN_22114, which should be marked by a yellow sticky note, you should be able to see that


page if you flip it over. 22114.
A Okay. Yeah.
Q Okay. And it shows here in the bottom left-hand corner that your stocks that are reflected here comprised 45 percent of your 547 account.
A That's correct.
Q Okay. And the ending market value of those stocks as of August 31, 2016, was approximately $2.9 million; correct?
A Correct.
Q And of that $2.9 million, $2.6 million of that was Tahoe stock alone?
A No. So are you talking about -- I'm confused. Can you repeat that, please?
Q Sure.
I'm just looking at this page right here --
A Right.
Q -- that is marked 22114.
A Right. Right.
Q Okay. And it lists at the bottom your total stocks being approximately $2.6 million.
A Uh-huh.
Q "Yes"?


A Yes.
Q Okay. And then if you look slightly --
MR. KILLORIN: Objection. I think you said "2.6" and maybe you meant to say "2.9."
MR. MAY: No, I didn't.
MR. KILLORIN: Okay.
BY MR. MAY:
Q If you look slightly above that, it shows your holdings of Tahoe stock. Do you see that? The one part of this page that doesn't have black over it.
A Okay. Is it this one are you talking about?
Q Yes. You see the -- where it says "Tahoe Resources, Inc.," and then it shows an "Ending Market Value" as of August 31, 2016, of $2.6 million.
A Correct.
Q Do you see that?
A Uh-huh.
Q "Yes"?
A Yes.
Q I just need to remind you to answer audibly to my questions.

A Yes.
Q Okay. Am I correct in understanding that, of the $2.9 million of stocks that you owned, $2.6 million of that was Tahoe stock?
A What are you talking about, 2.9?
Q At the bottom of the page here, it shows total stocks being 45 percent of your account, and it shows a market value of those stocks being $2.9 million.
Do you see that?
A Yeah. Let me take a look at this one here.
So you take the 5.3, and you subtract that 2.6 that you're referring to. Because this account right here, the total value is 5.3 million.
Q I understand that.
A Right, right.
Right.
Q But there are other -- but there are other holdings in this account besides stocks; correct?
A Yes.
Q There's exchange traded products; right?
A Uh-huh.
Q "Yes"?



A Yes.
Q And there's mutual funds?
A Yes.
Q Okay. But I'm talking about just stocks. Okay? Your stocks -- your total stocks were $2.9 million, and of that, $2.6 million of it was Tahoe; right?
A Yeah. You could say so, because I couldn't tell -- this one is just stocks or something else here.
Q Okay.
A Yeah. Yeah.
Q Okay. And if you could turn to the page marked 22261.
A With the yellow stick saying --
Q Hold on. Strike that. Sorry.
If you could turn to Page 22280, which should be marked with a yellow sticky.
A 222- --
Q And it should say Page 20 of 28 above it.
A Hold on a second.
You said 22- --
Q 280 is the Bates number.
A Okay. 280. Yeah.
Q Do you see that page?



A Yeah.
Q And does it say at the top "2016 Year-End Investment Report" in the top right-hand corner?
A Uh-huh.
Q "Yes"?
A Yes.
Q Okay. And so this shows that, as of the end of the year in 2016, Tahoe was the only stock that you owned in your 547 account; is that correct?
A I don't remember.
Q Is that what this document shows?
A Where does it say stock only?
Q Well, it shows -- it shows your stocks listed here at the bottom of this report; doesn't it?
A Right. But it doesn't show the heading right here on top here, which is redacted --
MR. KILLORIN: Right.
THE WITNESS: -- which could be an ETF up -- something up there too.
BY MR. MAY:
Q Well, I know, but the stocks are listed below this; correct? It says stocks, and then it has a description of the stocks coming below it;



correct?
A Yeah. So this is just showing the Tahoe stocks, yes.
Q Right. And it says that your total stocks are 34 -- 34 percent of your account holdings in the 547 account; correct?
A I think so. Unless if they consider some other mutual funds and things in here also, stocks as well. But that's a basket of stocks; right?
Q Right. I understand that.
A Yeah.
Q But the -- but in terms of the common stock that you owned at the end of the year, the only common stock you owned was Tahoe Resources in 2016; is that correct?
A I don't remember. There can be other ETF in there. As I said, ETF, the basket of the stocks, so they can list it as a stock as well. So I'm not sure --
Q I'm not -- but I'm not talking about ETFs.
A Right, right. But ETF is -- also is a basket of stocks. So I don't know if they, like, you know, classify it as a stock as well. So I don't remember.
Q I'm just looking at the --

A Yeah.
Q -- the year-end report that you got from Fidelity.
A Uh-huh. Yeah.
Q Okay. And I can't see everything that's in here because your counsel has redacted certain portions of it. But at the bottom of it, it lists the stocks that you own, and the only common stock that is listed that you owned as of 2016 was Tahoe Resources; is that correct?
A I think so, but I'm not sure.
Q Do you have a different understanding of what this shows?
A As I said, this can be, you know, ETF in there, because that's considered basket of stocks as well. So --
Q Okay. So is there any way for us to be able to figure out whether this includes ETFs, based on what you're looking at?
A So probably -- if you -- you know, if this is list of stocks, I would say, you know, this is stocks, yes.
Q Okay. So I'm just trying to get a clear answer here.
A Right.



Q Having looked at your year-end financial report for 2016 for the 547 account --
A Yeah.
Q -- based on what you're seeing here, the only common stock that you owned at that time was Tahoe Resources?
A Probably, yeah. I would think so, yeah.
Again, this is, like, five years ago, so I don't remember all the details.
Q And do you see --
MR. KILLORIN: Excuse me. I need to object too. The page before this page seems to be missing. On my copy, it goes from 2278, 2279 is missing --
MR. MAY: Yeah, that's because it was completely redacted.
MR. KILLORIN: Okay. Well, I can't see that. I just know it's missing from this. And so --
MR. MAY: Yeah. And I think I said at the outset that these were some selected pages from the production --
MR. KILLORIN: Yeah. Okay. Yeah, I didn't realize you -- by "selected," you mean sometimes you'd just have two pages



in a sequence and then a gap and two more pages. But okay. I just --
THE WITNESS: So you mean that the Page, like, 19 of 50 missing here?
MR. KILLORIN: Let's not --
MR. MAY: Okay. Well, let's -- let me try and make this simple. Okay? Let's look at this again.
MR. KILLORIN: Yeah.
BY MR. MAY:
Q All right. Under "Common Stock," it shows your holding in Tahoe Resources as having a total market value of approximately $1.8 million.
Do you see that?
A Uh-huh.
Q "Yes"?
A Yes.
Q Okay. And then below it, it says total common stock comprising 34 percent of your account holdings in the 547 account as having a market value of $1.8 million, approximately.
Do you see that?
A Uh-huh.
Q "Yes"?
A I see. Yes.



Q Okay. So your total common stock holdings were equivalent to your holdings in Tahoe Resources; correct?
A Could you repeat that question?
Q Yeah.
These are the same number. Your total market value of Tahoe common stock and your total common stock are the same number.
Do you see that?
A Yes.
Q Okay. So that means that the only common stock that you owned in the end of 2016 was Tahoe; correct? According to this report.
A I think so, yeah.
Q Do you have any reason to doubt that this report is correct?
A Doubt this report is correct?
Q Do you have any reason to doubt the accuracy of what's reflected here?
A No.
Q Okay. By the end of 2016, your holdings in Tahoe Resources had fallen by a million dollars; is that correct?
A Yes.
Q Okay. Did that -- strike that.

Was your assessment of Tahoe being a low-risk stock influenced or impacted at the end of 2016?
A Can you repeat that question, please?
Q Yeah. Let me do it again.
Did the fact that your holdings in Tahoe Resources -- strike that.
Did the fact that your holdings in Tahoe Resources fell by a million dollars between August 2016 and December 2016 impact your risk assessment of Tahoe Resources?
A Yes.
Q How?
A So I think because it was drop in value, so I -- you know, concern about that. But, again, I looked at probably, you know, senior management is still showing that, you know -- they didn't say any things about -- I think at that point, they're still paying dividends. So I -- you know, I just believed that maybe some, you know, rumors that they tried to -- I don't know -- like a short seller or somebody tried to buy the stock cheap.
So that's why I did that. You know, I just wait until later when -- in 2017 when the facts is coming out when the senior management



confirmed, yes, that Escobal, you know, license has been suspended.
Q Well, I think you told me earlier that you didn't conclude that Tahoe was -- or strike that.
I think you told me earlier you didn't change your assessment about Tahoe being a low-risk stock in your view --
MR. KILLORIN: Objection; misstates prior testimony --
MR. MAY: I'm trying to understand what he said.
BY MR. MAY:
Q I think you told me earlier that you didn't change your perception of Tahoe being a low-risk stock until after the events came out in July of 2017 about the suspension of the license; is that correct?
A What I said was I consider is -- Tahoe is a low risk in 2016 when I purchased it.
Q Yes.
A Right.
Q And I think I asked you -- did there come a point that you stopped considering Tahoe to be a low-risk stock? Did you consider it to stop being a low-risk stock in December 2016, when its value



had fallen by a million dollars?
A I was skeptical, but I didn't believe it until when, you know -- as I said, I just believed whatever the senior management, you know, told the investor. So they didn't tell any things about that at the end. So I think, you know, maybe some misunderstanding here. So I wait until 2017 when actually the senior management confirmed that -- I think it was -- I remember the Escobal mine was -- license was -- was suspended.
Q Okay. But you weren't paying attention to the dividends along this time. We went over that --
A Yeah. Uh-huh.
Q -- the fact that you weren't paying attention to the dividends.
MR. KILLORIN: Well, objection -- objection; mischaracterizes prior testimony.
BY MR. MAY:
Q Is that correct, that you weren't paying attention to the dividends?
A I didn't pay attention to detail calculation, but I just look at the big picture because my portfolio is -- you know, in terms of



value, is a big -- with Facebook and some other things as well. So I just looked at the big picture. I don't look at detail every single, you know, ETF, mutual funds and, you know, all the stocks in there. I just -- yeah. I don't look at the detail.
Q Did you notice the fact that your holdings in Tahoe had fallen by a million dollars in a couple of months?
A Yeah. I noticed that. But in the grand scheme of things when I talk about a growth portfolio, it's just small. Because I have Facebook's, and I also consider as -- my 401(k) is a growth as well because I'm not going to touch that until when I'm 70 years old. So I just want to clarify that; right?
Q Okay.
A So I look at several accounts besides this one account here as my growth portfolio that -- the big picture, yes.
Q So am I correct in understanding in looking at this that approximately one-third of your entire holdings in your 547 account were invested in a single stock at the end of 2016? Is that correct?

A Yes.
Q Okay. How did that align with your investment strategy of having a diversified portfolio?
A In terms -- I look at the big picture, as I said. You look at Facebook's and also the mutual funds as well. I have several accounts besides this one in buckets considered growth, right.
Q Why Tahoe? Why just own Tahoe as your only stock?
MR. KILLORIN: Objection; totally misstates prior testimony.
MR. MAY: Well, I think we've established that the only common stock that he owned at the end of 2016 was Tahoe. So I wanted --
MR. KILLORIN: No, that's not -- he's been talking about Facebook all day long.
MR. MAY: In this account.
MR. KILLORIN: You didn't say that.
MR. MAY: Well, you've told me that the other accounts are off-limits, Bob. Do I have to clarify that every time?



MR. KILLORIN: You have to -- you have to make your questions clear and not misleading. You can't say "is this the only stock you owned" without saying "in this account."
THE WITNESS: Yeah.
MR. KILLORIN: I mean, I'm not trying to be unfair. I'm just -- I think it's misleading to not make a little more well-crafted question. That's all.
MR. MAY: Okay. All right.
BY MR. MAY:
Q Why did you pick Tahoe to be the only common stock that you owned in your 547 account?
A Again, as I said, based on the growth prospective of the company and also the dividends.
Q Okay. But surely there were other companies out there that were paying dividends; right?
A Yeah.
Q Surely there were other companies out there that had attractive growth prospects.
A Yes.
Q Okay. So why invest in Tahoe alone? Why have that be your only common stock that you



owned?
A Another thing is they pay dividends monthly. Okay? So I don't remember that any other companies, they pay dividends monthly. They pay, you know, semiannually, and usually some companies, they pay a dividend but, you know, they don't have a growth prospective. So they miss one thing or the other or miss two. They don't pay a dividend monthly.
Q But we talked earlier that -- about the importance of not having all your eggs in one basket; correct?
A Uh-huh. Yeah.
Q Okay. And if -- so why not have a variety of common stocks that you own that pay dividends? Why choose just one single common stock?
MR. KILLORIN: Objection. I mean, if we want to stipulate that this line of questions is referring to just this one account of his many accounts, some of which had common stock and mutual funds with lots of common stocks, but you're just asking about this one account on this diversity issue, we can stipulate to that. But otherwise, you need to say it in your



questions.
BY MR. MAY:
Q You can answer the question.
A So can you say it again? I just got distracted.
Q Sure.
Why -- why did -- why not have more than one common stock that you would own in this 547 account?
A Because when I look at that, I also have Facebook stock at that point as well. It's still significant. So I think I considered that and also -- so I just wanted to balance in the growth portfolio. I wanted to have, you know, mutual funds and ETF, and maybe pick some of a couple stocks that grow. So probably is outperform the S&P, you know, 500 or is paying more than -- you know, it's grown more than 6 percent like S&P 500.
Q Okay. But if it's not a good idea to have all your eggs in one basket, why not choose more than one common stock for this 547 account?
MR. KILLORIN: Objection; form.
Go ahead.
THE WITNESS: Because as I said, I own other mutual funds and ETF, and those

basket is considered thousand and thousands in stocks, other companies.
BY MR. MAY:
Q Did you consider owning such a sizeable portion of a single stock to be a safe investment strategy?
A Not if you look at only one account, but if you look at my total picture of the growth account, I mean, that's -- you know, it's a small percentage, yes.
Q Do you think that purchasing and holding a single stock is a typical trading strategy?
MR. KILLORIN: Objection; misstates prior testimony.
MR. MAY: I'm not asking about his prior testimony.
BY MR. MAY:
Q You can answer the question.
MR. KILLORIN: Oh, okay. Lack of foundation.
BY MR. MAY:
Q Okay. You can answer the question.
MR. KILLORIN: This is an abstract question about -- he doesn't own a single stock. So if you want to ask him about --


as long as it's clear this is an investment principle question, sure.
THE WITNESS: Can you repeat the question, please?
BY MR. MAY:
Q Sure.
Do you consider owning a single common stock to be a typical trading strategy?
A As I said, in my growth portfolio, I wanted to test a few single -- you know, like some of the stocks that probably have a growth prospect, pay dividend monthly, and also have the -- so, you know, that -- things so I can -- in terms of balance in your growth portfolio, I still have, you know, S&P 500 and some index funds in there. So I can mix that. You know, probably you consider single stock is more aggressive than a basket of ETF or mutual funds. So -- but if you look at the whole picture, it's just a small percentage of the whole picture, yes.
Q Right. And I'm -- I'm not trying to belabor the point.
A Right.
Q I'm just trying to understand.
A Right.


Q We looked at the monthly dividends that you were receiving, as they were about $4,000; correct?
A Uh-huh, that's correct.
Q Okay. And so on an investment of $2.88 million, you were receiving monthly dividends of $4,000; correct?
A That's correct.
Q And that was the primary reason why you chose to invest in this account, was -- this stock was because of the monthly dividends?
MR. KILLORIN: Objection; misstates prior testimony.
BY MR. MAY:
Q Is that true? Were the monthly dividends --
A Yeah.
Q -- the primary reason why you chose to invest in Tahoe?
A No, also the growth prospect as well.
Q Okay.
A As I said, growth, and then dividend and monthly as well. That's the combination of the three.
Q Okay. But by the end of 2016, the company


hadn't grown, and it had -- in fact, you had lost a million dollars of value in Tahoe; correct?
A So the company -- based on projection, is still showing the growth as the end of -- up to December; right? The stock price dropped in December, but they did not issue, you know, the financial statement or issue the guidance or anything until after December; right? Companies don't do that until 45 days later. Uh-huh, yes.
Q Did you consider selling Tahoe in the end of 2016?
A No, because I just wait until the facts. You know, I just wanted to wait to hear from the senior management. Because beside that, I don't believe anything else, what they, you know, speculate in the internet or people -- like, rumors, or anything like that. I just trust the company from the senior management. I just -- I just want to hear it from them.
Q Okay. And as of the end of 2016, you weren't paying attention to the dividends you were receiving, and you weren't concerned about the fact that the stock had fallen a million dollars; is that correct?
MR. KILLORIN: Objection; misstates

Page 176

prior testimony; no good-faith foundation to that question.
BY MR. MAY:
Q You can answer.
A So basically, you know, as I said, again, based on the grand scheme of all the accounts, it's just a small percentage. Yeah.
Q So in order to understand your position in Tahoe, it's necessary to consider the bigger picture of all your other holdings; is that correct?
A For me, yes.
Q Well, for anybody; is that true?
MR. KILLORIN: Objection; calls for speculation.
BY MR. MAY:
Q Well, I'm trying to understand, and you keep saying that "you have to consider my positions that I held in other companies and other accounts," and so I haven't seen that. So I'm trying to understand.
In order to understand your investment in Tahoe and why you did what you did, it's necessarily to consider that in the broader context of your other investments; is that what

Page 177

you're telling me?
THE WITNESS: It's okay?
MR. KILLORIN: Are you -- yeah, objection; vague; ambiguous.
But you can answer.
THE WITNESS: Okay. So yeah.
BY MR. MAY:
Q Is the answer "yes"?
A Yes.
Q Okay. Your Facebook options that you received, you told me, were 300,000 at $38 a share; is that correct?
A 500,000, but after tax -- they took out 200,000 shares. So that's -- 300,000 is the net I received, yes.
Q Okay. So I did the math, and so that would be about $11.4 million. Does that sound about right?
A That's correct. That's right -- about right.
Q Okay. So $2.8 million is 25 percent of your Facebook options; is that true?
A I think you missed the whole thing. I didn't sell at $38.
Q I'm sorry?

Page 178

A I didn't sell the Facebook stock at $38.
Q Okay.
A So that's irrelevant; right?
Q Okay.
A Because you don't -- at that point, I didn't sell at $38.
Q Okay. So what was the -- what was the value of the Facebook options, then?
MR. KILLORIN: I'm going to object.
THE WITNESS: Oh, the value of the --
MR. KILLORIN: I'm going to object to this line of questioning about your other investments and your other stocks.
MR. MAY: Well, I think I need to make the record clear that I think it's significant that the fact that he invested $2.88 million in Tahoe and how much of that -- percentage that was relative to his overall holdings is a significant and relevant line of inquiry.
MR. KILLORIN: No, I think -- I think we've been more than fair, and you now know --
MR. MAY: No, you --

Page 179

MR. KILLORIN: -- that that's less than 30 percent, maybe 20 percent of his net assets. And that's as far as we're going to go on his -- his other ownership of other stock.
BY MR. MAY:
Q What were your net assets at the end of 2016?
MR. KILLORIN: Objection.
THE WITNESS: I don't remember.
MR. KILLORIN: Yeah, you can look at the record and figure it out.
BY MR. MAY:
Q Was it more than $11 million?
A I don't remember, but -- yeah. I think so, yeah.
Q Okay.
A I don't remember.
Q Has -- have you ever owned another company's stock that has comprised 34 percent of your account holdings?
MR. KILLORIN: Objection. Let's see.
MR. MAY: Bob, do you have an objection?

MR. KILLORIN: I'm trying to figure that out.
MR. MAY: Okay. Well, why don't we let him ask -- answer the question while you think about it.
MR. KILLORIN: No. I think I'd rather wait until I make my objection, if you don't mind. Thank you. Let's see.
Yeah, I'm going to -- I guess I'll let you answer that if you know.
THE WITNESS: I don't remember, but -- yeah. It was five years ago. It's a long time.
BY MR. MAY:
Q No. I'm asking about, have you ever had another company's stock that you owned that comprised 34 percent of your account holdings?
A If I remember correctly --
MR. KILLORIN: Objection; ambiguous. Do you mean a single account or all of his accounts combined?
MR. MAY: In the 547 account.
THE WITNESS: No, I don't think so. Yeah.



BY MR. MAY:
Q Okay. Can you turn to the page that's marked 22123? Let me know when you're there.
A Is that the Page 37 of 50?
Q Yes.
A Okay.
Q And if you -- if you just leaf through the three pages that precede this, these are the records of your purchase of Tahoe stock that we looked at previously. Does that look correct to you?
A Yeah. I believe so.
Q Okay. So I'm turning back to Page 22133.
A Uh-huh.
Q You -- when you purchased Tahoe in August of 2016, the total securities that you bought at that time was $25 million, approximately; is that correct?
I'm on Page 22133 in the bottom right-hand corner.
A Uh-huh.
Q Do you see that?
A Yeah.
Q Do you -- the total securities that you bought as part of the transaction with Tahoe were



$25 million; is that correct?
A I don't remember. But if there's something here -- what does it say?
Yeah, I think it's -- it came from this, I guess so.
Q And --
A But I don't remember. Yeah.
Q And it also reflects that you sold securities at that time totaling approximately $24.8 million. Do you see that?
A This is the same page?
Q Yes.
A Where do you see that, $28 million?
Q No, $24.8 million.
A Oh, 24. Okay. Yes.
Q Why did you have such high trading volume in August 2016?
A So, again, I usually -- I look at rebalanced account at the year-ends, or if there's some of mutual funds or ETF, it's not doing well, that's before the year-end, I want to make -- you know, to rebalance the account before the year-end. Right.
Q But this is in August of 2016.
A Oh, so I had do -- you know, during the



year as well. So, for example, last August, I sold security in a Chinese --
MR. KILLORIN: I'm going to instruct you not to talk about other --
THE WITNESS: Oh, okay.
MR. MAY: Why are you instructing him not to talk about that?
MR. KILLORIN: Because it's irrelevant to this case; it's improper discovery. And for the same reason, we redacted other trades and other stocks from what we produced to you. It's irrelevant and improper discovery.
MR. MAY: Well, I'm asking about the transaction in which he purchased Tahoe.
MR. KILLORIN: Oh, if you're asking about that, then he can proceed. I misunderstood.
THE WITNESS: Yeah, so this one, you know, during the year, I just rebalanced the portfolio throughout the years.
BY MR. MAY:
Q Okay. And why -- but why did you have

such high trading volume in August of 2016? Why were you engaging in approximately 24 or $25 million worth of purchase and sales at that time?
A I don't remember, but maybe there's some event back then, you know, make me -- you know, make a decision I have to, you know, sell some position. But I don't -- I don't remember.
Q Okay. Was it typical for you to trade $25 million worth of stock in a single month?
A Yeah, my portfolio is quite big. So sometime, you know, when I rebalance the account during the year, yeah.
Q Did you purchase any other securities or commodities as part of a complementary investment or hedging strategy related to your purchase of Tahoe securities?
A No. No hedging strategy.
Q Okay. Did you or your advisers hedge any positions in Tahoe through options, swaps, futures, or short sales?
A Again, I said, my financial adviser has not -- nothing to do with my investment. That's my all decision. So I don't have any hedging strategy or anything like that, right.



Q Did you use your position in Tahoe as a hedge against other positions?
A No. Again, I don't hedge anything. So no.
Q All right. Can I turn your attention to the interrogatories that are marked Deposition Exhibit 68?
A 68?
Q Yeah.
And if you could turn to Page -- one second. I'm just orienting myself.
If you could turn to Page 15.
A Uh-huh. Yeah. Okay.
Q Sorry. I'm on the wrong page.
Lead -- Page 13, top of the page where it's -- begins at Line 2. Do you see where it says: "Lead plaintiff did not employ any hedging strategies with regard to purchases and intended to maintain his investment in Tahoe common stock for as long as the investment remained valuable."
Do you see that?
A Page 13?
Q On Page 13 at the top.
A Oh, okay.
MR. KILLORIN: Right there.



THE WITNESS: Yes, I saw that.
BY MR. MAY:
Q Okay. And that was part of your interrogatory response to our Interrogatory Number 2 asking you about explaining the circumstances surrounding your purchase of 200,000 shares; correct?
A Correct.
Q Okay. What did you mean by "as long as the investment remained valuable"? What does that mean?
A So "remained valuable" is mean that as long as the senior management of the companies do -- you know, didn't state that -- you know, they maintained their position about the healthy of the business, the growth prospect of the business. As long as they did not change the course, as to consider -- it's remaining valuable.
Q Okay. So as long -- in other words, as long as the senior management continued to insist that the company was healthy, you intended to keep your investment in Tahoe; is that correct?
A That's correct.
Q Okay. Did you monitor the performance of Tahoe during the period of time that you owned it?



MR. KILLORIN: Objection; answer -- asked and answered --
THE WITNESS: Can I answer?
MR. KILLORIN: -- three or four times.
Yeah, you can answer one more time.
THE WITNESS: I don't, you know, monitor very closely because, you know, based on the projection of the company, they said that foreseeable future, the growth prospect of the company is good and paid dividends. So, you know, I don't look at, you know -- very often. I just -- you know, I basically look at probably the statement from the senior management, if they have any change in their business and things like that.
BY MR. MAY:
Q Right. And we talked about the statements that you considered in choosing to make your investment in Tahoe.
During the period of time that you owned Tahoe, did you stay up to date or follow statements that were made by the management during your period of ownership?

A Yeah. I think so, yeah. Usually I follow the statement -- main statement from the senior management about the -- the business.
Q What did you do to stay up to date and follow up what was going on with Tahoe Resources?
A I just used Google search and public -- I remember maybe public statement from the company, things like that.
Q What -- and what would you search for in Google while you owned the company?
A You know, mainly the public statement from the senior management or from Tahoe -- directly from Tahoe.
Q But what would you search for? Would you -- what would be your Google search?
MR. KILLORIN: Objection --
THE WITNESS: I --
MR. KILLORIN: -- asked and answered.
You just answered the question.
He can answer -- you can -- I will let you ask it one more time, but then --
MR. MAY: I'm trying to understand --
THE WITNESS: Yeah.



MR. MAY: -- what he searched for.
MR. KILLORIN: Well, I'm sorry if you can't understand it, but he's answered it, and that's it.
THE WITNESS: It's Google basically.
BY MR. MAY:
Q No, I -- Google is the search engine.
A Yeah.
Q I'm just trying to understand what you put into Google. Did you just put in "Tahoe," or what --
A No, I don't --
Q Was there a specific search inquiry?
A I don't remember. I just play around with that, you know, like, you know how to search things. Sometimes you put in one word, it doesn't pop up, and you play around with that. I just don't remember exactly what I put in, but something relate to Tahoe, senior management of Tahoe. But exactly word, I don't remember.
Q Do you remember anything that you saw from your Google searches that influenced your decision to continue to hold the company's stock?
A No. I just only -- again, it's that -- I



just looked at the senior management statement. That's what I focus on, yes.
Q Was your investment in Tahoe part of a broader trading strategy?
A Broader trade -- yes, in the growth portfolio, yes.
Q What was the broader trading strategy?
A Was just on the portfolio growth funds, as I mentioned that looking for some companies that -- with a growth prospect for foreseeable futures, paid dividends, and then increase in the -- you know, the revenue.
Q You decided to sell your shares in Tahoe in December 2017; is that correct?
A That's correct.
Q Okay. What prompted you to sell your shares at that time?
A The things I recall that, you know, after -- I think is -- I remember the Supreme Court in Guatemala is -- suspend their license to operate in that mine. I think it's -- I remember something about the protests and then they shut down the mine. They only kept, you know, some employees in there, but they didn't say that -- only they were going to appeal in the future. So



that's what I decided that -- you know, when the senior management came out and say, yes, it's our -- the license to operate in the mine has been suspended by Supreme Court.
Q And do you remember when you first heard that the license had been suspended by the Supreme Court?
A I don't remember, but sometime in 2017.
Q Okay. Did anything else besides that inform your decision to sell the stock?
A No.
Q Did you speak to anyone about Tahoe at or near the time of the sale?
A No.
Q Did you ever know anyone at Tahoe, by the way --
A Huh-uh.
Q -- that worked at Tahoe?
A No, I did not know anyone.
Q Do you know anyone that works in the mining industry?
A No, I didn't know.
Q Have you ever traveled to Guatemala?
A No. Never been there.
Q Do you recall what you read that informed

you about the license's -- the suspension?
A Can you repeat the question?
Q Sure.
Do you know what you read that informed you about the license's suspension?
A Yeah. I think I read something about, you know, the Supreme Court in Guatemala suspend their -- the license, and I think during that period of 2017, also senior management came out and confirmed that it's correct, yeah.
Q Was that a news article, or was it a press release?
A I think probably, yes, a press release or article. I'm not sure. I don't remember, but -- from the company directly.
Q Were you aware that the license was suspended in July of 2017?
A July?
Q Yes.
A I don't remember exactly the time, but I know it happened in 2017, yes.
Q But you sold your stock in December of 2017; right?
A Right.
Q Okay. And what I'm trying to understand



is: Was there a period of time between when you learned that the license had been suspended and your decision to sell the stock?
A I think at that point, I hoped that the company, you know, they -- I think they -- I Googled, and they mentioned something about they're going to appeal that decision. So for me, it was some kind of hope, but I think, as later on I saw more news about the violence and things -- protests and about the -- you know, some of the bad news is showing up on the Google search, and at that point is I made the decision to start selling some of the -- these Tahoe stocks.
Q Okay. So do you remember if there was a period of time between when you learned about the suspension of the license and your decision to sell?
A I don't remember.
Q Okay. I think you had mentioned that there was something that the company said about the suspension of the license that you considered; is that correct?
A That's correct.
Q What did you -- what did the company say that influenced your decision to sell?



A They confirmed that the -- the license in Guatemala has been suspended by the Supreme Court, and I was thinking about, oh, the Supreme Court is not good, you know. Yeah.
Q Was that a corrective disclosure that the company made?
A Yeah. I think it's -- the company made that.
Q Well, and what exactly was the corrective disclosure?
A I don't remember exactly, but they -- basically the main point is they confirmed that the license in Guatemala has been suspended.
Q Okay.
A Yeah.
Q When you sold Tahoe, were you able to take capital losses to offset your gains?
A I don't remember.
Q Do you know whether the tax savings -- strike that.
MR. MAY: Let's take a break. We can --
MR. KILLORIN: All right. That's good. Mr. --
THE VIDEOGRAPHER: We are off the



record at 2:49 p.m.
(Recess from 4:49 p.m. to 5:05 p.m. CST)
THE VIDEOGRAPHER: We are back on the record at 3:05 p.m.
BY MR. MAY:
Q Okay. Kevin, could I have you turn your attention to the responses to the interrogatories, Deposition Exhibit 68, and turn to Page 10 of that document?
A Page 10?
Q Yes, please.
A Okay.
Q And beginning sort of towards the bottom of Page 10, and then continuing on to Page 11, is listed here your interrogatory response identifying your sales --
A Oh.
Q -- in Tahoe stock; is that correct?
A I'm sorry. I'm looking at different pages. Hear you say --
MR. KILLORIN: Page 10 is like right in the middle of his transactions.
THE WITNESS: Yeah.
MR. MAY: Yes.
MR. KILLORIN: Okay.

THE WITNESS: Is that what you referred to?
MR. MAY: Yes.
THE WITNESS: Okay.
BY MR. MAY:
Q Why don't we orient a little bit.
If you turn to Page 7 of the document, just to refresh everyone's recollection, this is Interrogatory Number 1 that asked you to "identify all purchases or sales of Tahoe securities by you during the relevant time period."
Do you see that?
A Yes.
Q Okay. And then if you turn to Page 10 of the document, at the bottom it identifies -- and continuing on to Page 11, identifies the sales of Tahoe stock that took place. Do you see that?
A Yes.
Q Okay. Am I correct in understanding that your sale of Tahoe took place over a period of a couple of days?
A Yeah. It looks like that.
Q Okay. Why were the sales not all done in a single order?
A Because, again, the senior management,



they mentioned about they're going to appeal the decisions to the Supreme Court. So I still have a hope that, you know, they -- it would -- they successfully appeal that, they would -- could open the mine. So I just, you know, selling some of it in 2017, 2018, and then 2019 when there's -- basically there's just no hope that that mine is reopening.
Q Okay. So are you telling me that your decision -- your decision to sell some stock on December 28th and some stock on December 29th, and then some stock on January 2nd --
A Uh-huh.
Q -- was because you were waiting for news relating to the appeal of the mine?
A For -- if there's -- you know, there's some turnaround situation, you know, not only in that period but over -- over the time.
Q Okay. Was there something you learned between December 28th of 2017 and January 2nd of 2018 that informed your decision to sell more stock?
A No. I think this one, I think, is -- when I make sales in 2017, some of that is settled three days later; right? So I think this one



reflects that some of the sale in 2000- -- the end of 2018 [sic], but it's not reflected until, you know, three days later -- three business days later. So I think that's what happened here.
Q I understand.
A Yeah.
Q Okay. So the sales that took place in late December of 2017 and -- that were settled in early January of 2018, was that all part of a single sale order, to your understanding?
A I don't remember. Probably, you know, single or maybe multiple. I don't remember. Yeah.
Q If you turn to a couple pages over, on Page 13.
A Uh-huh, yes.
Q The second-to-last sentence at the top of the page, your answer to that interrogatory said, in part: "Lead plaintiff chose to sell his shares of Tahoe common stock when he saw that Tahoe had laid off many of the individuals employed at the Escobal mine, which caused him to become skeptical that the Escobal mine would resume operations."
Do you see that?
A Uh-huh, yup.



Q What -- where did you see that "Tahoe had laid off many of the individuals employed at the Escobal mine"?
A I think it's -- again, using a Google search, and I saw that news about they lay off some employees at the mine.
Q Do you recall the particular source that that came from?
A No, I don't remember.
Q You didn't mention anything about the license suspension in your response to Interrogatory 2; is that correct?
A Yeah.
Q Was that because that wasn't part of the reason that you chose to sell your stock?
A So --
MR. KILLORIN: Objection; misstates prior testimony; no foundation.
BY MR. MAY:
Q You can answer.
A So that's -- so one, and also I mentioned about, you know, the Supreme Court in Guatemala suspended. That, you know, confirmation from the Google search, I look at it, and later on the senior management confirmed that that is true,

that the license has been suspended. And I think during that span of time, also senior management that they keep -- I think they keep saying that they follow all the rules and nothing's wrong, so they're going to appeal the position of the Supreme Court. Yes.
Q But you didn't -- you didn't mention any of that in your response to Interrogatory 2; right?
MR. KILLORIN: Objection; simply mischaracterizes what's here.
I would ask the witness to read the response before answering.
BY MR. MAY:
Q Do you see anything here about the license suspension in Interrogatory Number 2?
A No. So -- but I think it's probably because at that point, I was thinking when -- my trains of thought at that point was because when the company is laying off people -- because, you know, something that happened; right? In this case would be the suspension of the license.
Q Right, no, I understand.
A Yes.
Q But you didn't mention anything in your



response to Interrogatory 2 about the suspension of the license informing your decision to sell; correct?
MR. KILLORIN: Objection; lack of foundation; mischaracterization. It says he "lost confidence in the financial health of Tahoe."
BY MR. MAY:
Q You can answer the question.
A So, again, I said that based on when they confirmed they laid off people. I mean, I think at that point, I say probably this is -- it's not a good news. So that's related to because, you know, their driver -- their license suspended in Guatemala, and then also -- the thing is also I -- at that point I was skeptical when the senior management, they say they try to appeal to the Supreme Court. But if they going to try to appeal Supreme Court, why they laying off people? So, you know, that's -- I think back then, that's my train of thought. So at this point, I decided to sell some.
Q Do you remember when Tahoe made the announcement that it was laying off individuals employed at the Escobal mine?



A No, I don't remember.
Q You sold approximately 147,000 of your 200,000 shares over these couple of days that we've been looking at in late 2017; correct?
A Yes.
Q And you continued to hold some shares of Tahoe after that; correct?
A That's correct.
Q And why was that?
A So, again, as I said, I hope that, you know, senior management said they appealed the decision of the Supreme Court in Guatemala, so they -- hopefully they can reopen the mine in the future. So, you know, I hope that they -- that's the true case, so I still hold on to some of their shares, yes.
Q Did you ever buy more Tahoe stock?
A No.
Q Did you ever buy more stock -- did you ever buy stock in Pan American after it acquired Tahoe?
A I don't remember, but I don't think so, yeah.
Q Did you -- do you currently own any Tahoe or Pan American stock?



A No.
Q Why did you sell the remaining shares of your holdings in Tahoe and/or Pan American?
A So I think I remember after 2017 and things -- the -- more story unfolded about the company and, you know, that -- you know, the CEO resigns and the CFO resigns, something like that, so it was just more bad news just continued to come. And then at some point, I think 2000- -- I'm not sure. Between 2018 and 2019, they said their appeal to the Supreme Court has failed. Yes.
Q And how did you receive this information that was informing your subsequent sales of Tahoe stock after December of 2017?
A I used a Google search again, yeah.
Q Okay. Who are your lawyers in this case?
A It's Faruqi & Faruqi.
Q How did you meet them?
A So after -- I think there's a lot of lawsuit, you know, with so many firms showing up. You know, when I do a search, I put in the ticker symbol. When a stock drop, you see that a lot of firms come on and then, you know, file the class action lawsuit.

So that's how, again, in using Google, I saw that -- you know, on the Google search, it's like their name pop up with other names, so I just -- I did a research, and I think they have excellent experience in the class action litigation, so that's how I picked them.
Q So you -- you saw that the Faruqi firm had filed a lawsuit against Tahoe from a Google search; is that what you said?
MR. KILLORIN: Objection; misstates prior testimony.
MR. MAY: I'm just trying to understand.
MR. KILLORIN: Well, then ask him. But don't -- don't mis- -- twist his words with something he didn't say.
BY MR. MAY:
Q My question was: How did you meet the Faruqi firm?
A Based on a Google search.
Q And what did the Google search show you?
A They show -- I think it's any investor losing money on the company based on the misstatements and false statements on the senior management, contact the firm. So that's how I got



their number.
Q Okay. And do you -- and so was that a press release, or was that a lawsuit? What was it that you saw?
A So that is -- again, when it's Google -- on a Google search, I'm looking for, you know, any litigations against the company, and I see a whole bunch of the law firms saying that if any investor losing the money in the company, contact the law firm -- the law firms.
Q And what -- what prompted you to be Googling that sort of thing in the first place?
A Because I remember using some website, like I said, like Google Finance. I put in the ticker symbol. When you put in the ticker symbol, like, the list of things, like, you know, a lawsuit, you know, pendings and, you know, all the law firm that they say that it -- if the investor losing the money, contact their law firm.
Q Okay.
A Yeah.
Q And I'm just trying to understand --
A Right.
Q -- what you're saying.
You put in the ticker symbol for Tahoe



Resources --
A Right.
Q -- and that led you to an announcement that you could -- should contact the Faruqi firm if you had a claim to be made against the company; is that correct?
A That's correct.
Q Okay. When did you meet the Faruqi firm?
A You mean meet in person or over the phone?
Q For the first time. When was your first interaction with the Faruqi firm?
A I don't remember exactly the time, but sometime, you know, I saw that -- you know, the law firm, that they list if you lose the moneys, and I contacted them after that.
Q Do you know whether a lawsuit had been filed against Tahoe Resources at that time?
A Yeah. A whole bunch of them. All the law firm, you know, they just -- you put in a ticker symbol in Google search or in Google Finance, and you see, you know, all the law firm that advertise on -- you know, under Dow.
Q Did you talk to any other lawyers about filing a claim against the company?
A No.



Q Why, if there were several lawsuits listed, did you choose to reach out to the Faruqi firm specifically?
A So, number one, when I do a Google search, I saw their firm pop up on the top; right? So that's, you know -- that's the number one. I said, okay. And then, number two, I did a bit of Google search on them, and it looks like they have experience in the class action litigation.
So I just gave them a call, and it looks like they're very responsive and, you know, they -- I've never been in this kind of depositions or in any lawsuit against a company before. So to me, it seemed like, oh, they really care about the investor who lost the money because the company's, you know, misled or make a false statement about the investor -- like every investor like me. So I said, okay. This is -- it looks like they really care, yeah.
Q Have you reviewed a copy of the complaint that's been filed in this action?
A Yeah. Yes.
MR. KILLORIN: Objection. Could you be more specific?
MR. MAY: Sure.

MR. KILLORIN: Since there's several.
MR. MAY: Sure.
BY MR. MAY:
Q Have you reviewed the consolidated amended complaint that was filed in this case?
A Yeah. So you mean from our -- the Faruqi firm?
Q Yes.
A Yes.
Q Did you review a copy of the original complaint that was filed in this action?
A So every time when they do something, we -- I talk to them very often, and they, you know, keep me update in terms of the progress of the litigations, and they always draft something and have me take a look at it. And if I okay it, they just go and, you know, file the documents, and then after that, they will show me the final copy after they file it. Yeah.
Q Okay. But when the original lawsuit was filed, did you review a copy of that?
A I don't remember. So many documents. Yeah.
Q Do you -- when was the first time that you



reviewed a copy of any lawsuit that had been filed against the company by the Faruqi firm?
A I think during that period when I talked to them until -- I don't know -- is until when I -- a couple years during that time span, during -- you know, between 2017 and 2019 or '20, yeah. During that period when they -- you know, there's thousands and thousands of documents, and they just basically -- the main thing is they -- you know, they walked me through the whole process, how it worked, because I had never been in this kind of lawsuit before. So I don't know exactly how things worked.
So they got me through the whole process, and they shown me the draft they're going to do, and then they go in to fight -- you know, whatever the Court, and they show me the final copy afterward, yes.
Q Okay. Did you have any role in deciding which claims to assert or not to assert?
A I'm sorry. Can you repeat that?
Q Did you have any role in deciding which claims to assert or not to assert?
A You mean -- "assert," that means to participate? I'm not sure because assert is



what --
Q Sure.
A -- you mean by assert.
Q Yeah.
A I'm not sure about that word. Yeah.
Q Did you have a role in deciding which claims to file against the company and which claims not to file against the company?
MR. KILLORIN: I object; vague and ambiguous. I don't know what you mean by "which claims to not file against the company."
BY MR. MAY:
Q Do you understand the question?
A Can you repeat the question?
Q Okay.
There are claims that are asserted against the company in the -- in this lawsuit for securities fraud; do you understand that?
A Yes.
Q Okay. Did you have a role in deciding which claims would be asserted against the company and which claims wouldn't be?
MR. KILLORIN: Same objection.
THE WITNESS: You know, at that



point, it depends on the lawyer to tell me. So -- again, as I said, I'm not familiar with the whole process. But as far as I'm concerned is, you know, I misled -- and then by their senior management of Tahoe. So that's what I -- I just want to make sure I want to file a lawsuit against them, yeah.
BY MR. MAY:
Q Can you tell us what your understanding is of your role as the class representative?
A Yes.
MR. KILLORIN: Objection; misstates facts. He's not -- he's a lead plaintiff. He's not a class representative.
MR. MAY: Okay.
BY MR. MAY:
Q Can you tell us what your understanding is of your role as the lead plaintiff in this action?
A Yes.
Q Okay. Please do so.
A Right. So I'm to lead the litigations, and I will try to work with our -- the counsel to basically recoup all the losses for me and also other -- thousand of other investors who lost the

money because of misstatements and misleading information from the senior management of Tahoe.
Q Have you reviewed any of the documents that have been produced in this case?
A Yeah, I have.
Q Which ones?
A So, you know, most of them. I think all of them. As I said, they provide me with the draft copy, and after that -- after they file, they show me, you know, the final copy. So I -- basically over these years, from 2016 to -- you know, up to now, I just review, you know, all the documents within that five-years period.
Q Did you say 2016 through now?
A No, no. Sorry. 2017. Sorry.
Q Well, the amended complaint was filed on August 31, 2018. Does that refresh your recollection about the relevant time period in which you might have been involved?
A I don't remember, yeah.
Q Okay. The company produced documents as part of this litigation. Have you reviewed any of the documents that the company has produced?
A You mean "the company," the Tahoe?
Q Tahoe, yes.


A No.
Q Did you have any role in the requests for discovery that were issued to Tahoe?
A This mean I request -- I request defendant to --
Q Yeah. Did --
A Can you rephrase that?
Q Did you participate in the decisions about which requests for documents to make and which ones not to make?
A So, again, I rely on my -- the law firm to guide me through all that, because I'm not familiar with all the -- these procedures, yeah.
Q Did you have any role in deciding which defendants to sue in the case?
A No. It depends on -- again, it's guidance from the -- you know, the Faruqi law firm, because I -- you know, that's how I trust them, to guide me through the whole process, yes.
Q Have you done anything to monitor your counsel during the case?
A Anything to monitor the counsel? What do you mean by "monitor the counsel"?
Q Well, sort of to keep track of what they're doing as counsel in the case.


A No. I trust them. You know, that's how I decide to go with them. So there's no reason for me to have to do research on them. But yeah. Yeah.
Q How much time have you spent on the case so far?
A Oh, I think it's -- it's a lot of time. It's been, you know, talking to Faruqi lawyers very often throughout that period.
Q Could you give a rough estimate of about how much time you'd say you've spent on the case?
A I would -- I don't remember exactly, but it's a lot.
Q Okay. Ballpark range?
A Ballpark range. So every time I talk to them, maybe an hour or so. So I think over the years, I would say maybe over 100 hours. Ballpark.
Q How much time do you expect to spend on the case overall?
A I don't know.
Q How frequently do you speak with your counsel?
A Very often. They keep me updated on the progress of the case, and any documents that --


they just give me a heads-up, and they explain to me all the procedures. Yes.
Q Would you say that it's monthly or --
A I would say probably -- you know, I think it depends sometimes -- it's, you know, like weekly, sometimes it's semimonthly, sometimes monthly. It depends on how -- the progress of the case, that's how they update me. So -- yeah.
Q What do you understand this lawsuit is about?
A It's just basically that senior management of, like -- of Tahoe Resources didn't follow the rule, didn't follow security -- whatever you call it, security act?
Q Okay. And what -- what didn't they --
MR. KILLORIN: Excuse me. Excuse me.
Were you finished answering?
THE WITNESS: Yeah.
MR. KILLORIN: Okay.
BY MR. MAY:
Q What didn't they do?
A They make the false statements and misleading the typical investor like me. Yeah.
Q Okay. What false statements did they

make?
A So they -- they probably -- they would have known in advance that, you know, the Escobal, at some point, is probably in trouble, but they didn't say -- they kept saying, "Oh, this -- everything's going fine, our business is really good, you know, we continue -- as you can see, we continue to pay monthly dividends," and they showed that their revenue projection still continued to grow in the future, yeah.
Q When did the defendants know that Escobal was in trouble?
A I think -- just probably based on what I look now and look back, I think they probably knew about that all the way -- way, way before that. Because now, you know, I understand that -- you know, it's -- do more research, this thing is -- it somehow is -- Ronald Clayton and Kevin McArthur, they all connected in 2000- -- if I remember correctly, 2008/2009. Then -- Kevin McArthur used to be a CEO of Goldcorp -- Goldcorp; right? And then later on, he went to found the Tahoe, and then the -- Ronald Clayton became a CEO, and later on Kevin McArthur purchased, like, 40 percent of the Goldcorp, including Escobal



mine.
And so I think it's -- probably they already, you know, know each other way before that, so they probably were well-aware of what's going on in Guatemala, but they didn't tell -- they didn't tell investor like me.
Q And do you believe that Tahoe knew the Escobal license was going to be suspended?
A You know, yeah. I think so, yeah.
Q When did they know that?
A I don't know, but -- I don't want to speculate, but I think probably they knew way before that. Because all their connection with each other, and then they later on purchased the assets from the Goldcorp, which is -- you know, Kevin McArthur used to be a CEO, and then Ronald Clayton become the CEO of Goldcorp, and later also I think he became a CEO of the Tahoe as well.
So there's -- you know, there's a -- history between the two guys go all the way back. So they consider -- you know, later on I searched, understand that they know about all the operations, they know about mining. So in my mind, I think, probably, they probably knew way, way before that.



Q Okay. Do you think they knew with certainty that the license was going to be suspended or that they knew that there was a risk that the license was going to be suspended?
A I don't want to speculate on that, but I think they knew.
Q All right. I'm just trying to understand what you think they knew as part of these claims.
MR. KILLORIN: Objection; he just -- well, if it's the same question, he's answered it.
THE WITNESS: I think he -- I think, in my mind, at that point, based on what I -- look back, I think they knew 100 percent what's going on but they didn't tell the investor.
BY MR. MAY:
Q But -- I mean, I'm just trying to understand that, what's going on. Did they know that the license was going to be suspended in your view, or they knew that there was a risk that the license was going to get suspended?
MR. KILLORIN: Objection; he just answered that question.



BY MR. MAY:
Q You can answer.
MR. KILLORIN: No, you can't. I'm going to instruct you not to because you've already answered it once. He doesn't get to keep asking the same question.
MR. MAY: I haven't gotten a clear answer to this, Bob.
You can answer the question.
MR. KILLORIN: I think you have, so I'm going to instruct him not to.
MR. MAY: On what grounds?
MR. KILLORIN: That he's -- it's an improper question because it's been asked and answered.
MR. MAY: Okay. Well, you can make your objection.
MR. KILLORIN: Yeah, and I can instruct him not to answer.
MR. MAY: No, you can't.
MR. KILLORIN: Yes, I --
MR. MAY: I'm not asking for any privileged information.
MR. KILLORIN: Well, I guess we

disagree on that. But I'll tell you what, we can have the court reporter read back his last answer, and if you haven't asked it, then I'll let him answer it.
MR. MAY: I didn't understand his answer.
MR. KILLORIN: Okay. Then let's let the court reporter read it back and we'll see.
MR. MAY: I'm going to ask it again.
BY MR. MAY:
Q Did you think -- do you believe that the company thought that the -- strike that.
Was it certain -- did you believe that the company thought that it was certain that the license was going to be suspended or that there was a risk that the license was going to be suspended?
MR. KILLORIN: Objection as to form.
THE WITNESS: Should I answer?
MR. KILLORIN: You can answer.
THE WITNESS: I think they certainly knew that license going to be


suspended.
BY MR. MAY:
Q Okay. And what is the basis for your view that they knew that the license was going to be suspended?
A So they -- I think they -- going back and doing a Google search, I think they know that the Xinca people in that particular -- in that mine area, they have a voice, and they want to make clear that, you know, anything -- you know, operation of Escobal, they need to be consulted. And they knew that, you know, there's a thousand and thousand of indigenous Xinca people live in the area, but they just ignore them.
Q And why does that lead you to conclude that they knew the license was going to be suspended?
A Because those people had been objecting since, I think -- if I can remember correctly, since 2010. Way, way before that, yeah.
Q Did you understand that the mining ministry in Guatemala had granted a license to Tahoe to operate?
A Yes.
Q Okay. And what was your -- what is your


basis for believing that Tahoe knew that that license would, with certainty, get revoked?
A So based on today -- at that point when I invested, I didn't know. So I just want to make clear.
So based on -- now is when things in 2017 until things, you know, unfold the following years, and then do more research on that. The -- what you call -- the ministers of the mining, is that -- you call that? -- minister of mining to give the license to Tahoe, they knew that there's a thousand of people, of Xinca people live in the area, and they're supposed to consult with the Xinca representative in the congress before they give out license. I think I recall that, but they just ignored that, and they said only two people live in that area, which is not true.
And also I read some Google search that later on, employees of the Tahoe say, obviously, you know, you can see by the appearance of those people, definitely they're indigenous Xinca people, so...
Q Do you know whether the company was obligated to consult with the Xinca people or the Guatemalan government?


A The company. Also -- the company and also the minister of the minings in Guatemala, both them have to be consulted with the -- you know, with the Xinca representative in the congress.
Q Okay. And the mining license was ultimately suspended as a result of a court -- a court order; correct?
A Uh-huh, yes.
Q Okay. Did -- and that was the result of a lawsuit that was filed by an entity called CALAS. Did you understand that to be so?
A CALAS?
Q Yes.
A I don't remember. I just don't remember that name.
Q You've never heard of the name CALAS, C-A-L-A-S?
MR. KILLORIN: Objection; misstates prior testimony.
BY MR. MAY:
Q You can answer.
A I don't remember.
Q Okay. Do you know when the lawsuit was filed that led to the suspension of the mining license?

A You mean the time or --
Q Yeah.
A I don't remember exactly the timing, but I know that they -- they finally suspend the license based on the Supreme Court in Guatemala to step in to do that.
Q Do you think that Tahoe knew that -- with certainty that a lawsuit was going to get filed against them, challenging the license suspension?
A Yeah. So today, when I look back, I knew that they knew exactly. But at a given point in time, when I invest in Tahoe, I didn't -- I didn't know that information. But now things start to unfold and, you know -- yeah.
Q I'm just trying to unpack --
A Right.
Q -- your claims here.
A Right.
Q And I'm trying to understand, do you believe that Tahoe knew for certain that a lawsuit was going to be filed against the mining ministry challenging issue of the license, or that there was a risk that that might happen?
MR. KILLORIN: Objection; form.


BY MR. MAY:
Q You can answer.
A I think they knew exactly their license going to be -- eventually going to be suspended. Because as I said, when -- not at the point I invested, but the following years, you know, after 2017/2018 when more things -- you know, I start, you know, digging more, I saw that, you know, they knew that there's a protest -- is going back in 2010 -- been going on from the, you know, Xinca people. And also the Xinca representative in the congress made clear to both Tahoe and the minister of mining in Guatemala they have to consult with them before they issue the license.
Q Do you think it's possible to predict that a lawsuit is going to be filed against you?
A To predict?
Q Yes.
A Can you -- can you --
Q Sure.
Do you think it's possible to predict that a lawsuit is going to get filed against you?
A Against me?
Q Against anyone in general.
A You know, I think you can -- you can guess


that; right? If you hit someone and kill someone, a lawsuit is going to file against you, yes.
Q Do you think it's possible to predict the outcome of a lawsuit with certainty?
A No. I -- I don't think so, yeah.
Q So when Tahoe was sued, or when the mining ministry was sued, challenging the license, it wasn't possible to predict how that -- with certainty, how that lawsuit would unfold?
A That's a different -- different case.
Q How is that different?
A Because they knew exactly that they did not consult with the Xinca people and also Xinca representative going back all the way to 2009/2010, and they knew that those people are not happy when they doing minings in that area because it pollutes their environments and, you know, all that human rights that they violated.
And then they claim they did not -- again, going back in today time, when I look back, things started to unfold, and things, you know, just, like, came out to the light. You know, they violated the human right; they didn't consult with Xinca people, Xinca representative, and they just ignore the Xinca representative,


including some kind of violence, like shooting protestor and kidnap those, you know, Xinca representative from the congress to try to silence them. So I think that's -- they knew exactly what they was doing.
Q And what are -- what is the facts that support your claim that they knew exactly that the license was going to be suspended?
A As I mentioned, the same thing; right? The protest going back to 2010, they knew that they have to consult with the Xinca people and Xinca representative living in that area, because there are thousands of them. And also, they know that, you know, the Xinca people are not happy because the mine is pollute their living environment. And then when they're using the violence to -- against the protestor in order to silence them, and they use -- I think they kidnapped, like, five representatives from the congress -- you know, representatives of Xinca people, they knew exactly what --
Q What did Tahoe know about Xinca people in the area of the mine that the mining ministry didn't know?
A What did the Tahoe knew?

Q Yes.
A About the Xinca people?
Q Yes.
A That the Xinca people didn't know?
Q No.
What did Tahoe know about the Xinca people in the area of the mine that the mining ministry didn't know?
A I think both of them knew very well, there's a thousand Xinca people living in that area. They -- and they probably make a false statement. They said only two people. But obviously, you know, even employees -- later on I read the report, you know, from Google search -- even the employee of Tahoe say that that's not true. We knew all along there's a thousand and thousand of people living around that mining operation. You know, but -- just by looking at their face, right, you can tell they're local people, you know, Xinca people. So they -- employee from the Tahoe said that. They said that, you know, employees in Guatemala.
Q What area do you need to look at in order to determine whether there's indigenous people to be -- that need to be consulted?



A You know, I don't remember exactly, but I think it's -- based on the minings, it has to be two or three provinces. I think it's 2,500 kilometers, something like that, what I read on the report. And that covers, you know, a lot of Xinca people living around in that area, even close proximity to the mining.
Q And what is the source of that? What are you basing that on?
A Some of the report I read later.
Q What report?
A The Google I searched. Yeah.
Q Okay. Did you understand that at the time the license was issued in 2013 that the mining ministry determined that the Xinca people did not need to be consulted?
A Can you repeat the question?
Q Did you understand that at the time the license was issued in 2013, that the mining ministry determined that the Xinca people did not need to be consulted?
A I think the mining -- the ministries of mining knew exactly they have to consult with Xinca people. Because Xinca representative make clear to the mining -- the ministry of mining that



they need to be consulted before license had been issued to Tahoe. So mining the -- you call it the minister of minings, they knew exactly that they need to consult with the Xinca people and Xinca representative in the congress.
Q Is it your position that there were laws that existed at that time that made it clear that the Xinca people needed to be consulted by the mining ministry?
A I remember, yeah, I think so. There's some law that they say that they have to be consulted.
Q What law was that?
A I don't remember exactly the name of the law, but there's some law.
Q What misrepresentations specifically did the company make?
A So they -- I think later on when I searched Google, they said they don't believe there are any Xinca people living around -- in the Escobal mine, which is not true.
Q Anything else?
A And also they knew exactly about the risk when they projecting the rosy pictures of the company as increasing in revenue. They do -- they



knew exactly they want to inflate the stock prices because they say, "Hey, you know, we -- every month" -- I think I remember every month, they just issue a statement -- "oh, this is the eleventh month that we pay dividends monthly," and they -- at the bottom of the statement, they say, "Everything is good. You know, business, it's growing, we pay dividends every month, so everything's good."
Q What did you mean by "they knew exactly about the risk"? I don't understand what you mean by that.
A Yeah. So, again, as I said, going back to 2010, all the -- Kevin McCarthy [sic] and Ronald Clayton, they start back in 2009/2008. So they knew exactly that, number one, they have to consult with the Xinca people before the license can be, you know, issued for the company doing mining in that area; right? So they knew, and then that's why they -- you know, later on when they -- the Supreme Court, I think, has overthrown the case or reject the -- the issue renew of the license. I think they turned to violence, you know, kidnap people, kill people, kidnap the Xinca representative. So I -- they knew exactly what

Page 232

they was doing.
Can I add some point to that too? Or no? No.
MR. KILLORIN: Let him ask the questions. You can answer.
THE WITNESS: No, no. Sorry. I'm sorry. I just -- again, I just -- I'm not familiar with this --
MR. MAY: Yeah. Let's take a break. That's fine.
THE VIDEOGRAPHER: We are off the record -- we are off the record at 3:48 p.m.
(Recess from 5:48 p.m. to 6:05 p.m. CST)
THE VIDEOGRAPHER: We are back on the record at 4:05 p.m.
BY MR. MAY:
Q I wanted to ask a clarification about something you had said earlier.
I had asked you what misrepresentations specifically the company made. And in addition to talking about representations that were made concerning the mining license, you mentioned something about misstatements about the company's revenue growth. Is that -- did I

Page 233

understand that correctly?
A No. The license and revenue growth, I think, license they -- what I meant was senior management at Tahoe knew exactly that the license was going to be suspended because they didn't -- wasn't -- they did not consult with the Xinca people. But in 2016, I think is when I Googled -- in 2016 or -- you know, July, they continued to say, "Oh, you know, this is, like, 11 months that we paid monthly dividends," and under, there's a disclosure saying: "The business still doing great, you know, the Escobal mining is on schedule, and we continue to believe that it's going to be, you know, great revenue source in the future."
Q Okay.
A Yes.
Q So the alleged misstatements that you were just describing related to the company's revenue growth in the future; is that correct?
A Yes. So they say, you know, "The company is doing well, we continue to pay monthly dividends." So I believed that, you know, when the company is doing well, that's when they start -- they will continue to pay dividends.

Page 234

Q Did the company ever say the license is not going to get suspended?
A No, they did not. I don't recall that they ever mentioned about the license going to be suspended.
Q Okay. So what was the misrepresentation that they made about the license itself?
A So this one, again, going back to -- you know, going all the way back to what I knew now, that Kathy -- Kevin McCarthy [sic] and then Ronald Clayton, they knew each other in 2008/2007 and was the CEO of the Goldcorp and then later on, you know, Mr. Kevin McCarthy [sic] founded the Tahoe, and he became the CEO of Tahoe, and then later on he bought the -- 40 percent assets of the Goldcorp, which is including the -- the Escobal mines in Guatemala.
So at that point in 2010, that's -- I think it's 2010, there's a protest had been going on, and a lot of Xinca people, they upset that, you know, they was not consulted, you know, with the operations of the mine in their area.
Q Yeah, I understand that there were some protests.
I'm trying to understand, is it your

Page 235

contention that the company made a statement that was not true or that there was information that they should have disclosed to you and didn't disclose?
A I think both.
Q Okay. What was the statements that they made that were not true?
A So they say that the business is doing well, we continue to pay monthly dividends, and then the revenue, you know, in the future look great, that the business look great. Okay? So we will continue to pay that monthly dividends.
Q Okay. So the statements that "the company is doing well" and "we're going to continue to pay monthly dividends" and we "expect the revenue to increase," those were false statements, in your mind?
A At that point, when I look back -- so I just want to clarify between when I look at that point and when I look now. I just want to make clear on that.
So at that point, there's no reason for me to doubt what the management issues, you know, knows about the business. You know, I had complete trust in the senior management, so that's

what I said. That's what I believe.
Q Okay. No, I understand.
As you sit here today and you look back --
A Uh-huh, yes.
Q -- when the company made statements like the company is doing well, and it's going to continue to pay monthly dividends, those are false statements, in your mind?
A Yeah. If I look at now, that's a false statement; right? But at that point, you know, I believed that they just -- they -- you know, they make a true statement about their business, about the license -- they didn't mention about the license is going to be suspended in the future. Things like that.
Q Okay. Anything else that the company affirmatively stated that was untrue, in your mind?
A I don't know beside that. Possibly -- I don't know. But mainly it's -- that's the things that I look at it when I invest in August, and they told investors like me, who didn't have any more inside information about the company -- that's what I believe at that point, you know.



They doing great, you know, they have continue increase in revenue, they pay monthly dividends, and the future look great and the -- you know, going forward.
Q Okay. What about the information that you contend that they should have told you that they didn't? What was that specifically?
A So they should have disclosed that they need to -- I think looking back now --
Q Yes.
A -- about the Xinca people. There's a thousand and thousand of them living around there. So obviously -- even the employee of the Tahoe in that country say, you know, they knew exactly. I think they said something about senior management, and they knew exactly there's a lot of Xinca people living in that area.
But the Tahoe, now I look back, some research in more -- you know, things -- documents from the lawyers they've been providing, now I look at -- now I say that's not true because they said only two, and they're not -- supposed to be consulted in terms of the license to be -- to operate in Escobal mine.
Q How did the company know that there were



Xinca people in the area of the mine, in your view?
A Because employee -- local employees say so obviously you can tell by their appearance.
Q So you believe that you can tell somebody is a Xinca or not by their appearance?
A Yeah. I believe so. You know, if I'm -- you know, for example, I'm -- giving my example. If I live in, you know -- when I lived in Vietnam, when I see the guy, when I go down to the village, they tell -- they can tell me -- they can tell right away, this guy is not from this village because that village people, like, look dark because they, you know, spent all the day in -- you know, doing fishing and stuff like that. So they can tell different, you know, this guy is not a local guy; right?
Q Okay.
A Versus the local people, they can tell. So the employee in that Escobal, they can tell obviously, you know, Xinca people. And I believe there's some report also said that they -- about the Xinca people. And way before that, Xinca representatives already make sure that, you know, all the decision about the licensings in the



Escobal mine is to be consulted with Xinca people and Xinca representatives.
Q Would you be able to tell the difference between somebody who was a Xinca or not by looking at them?
A You know, I don't know, but I think, probably, looking at some picture, they show -- I think when I Googled that, you know, like, Xinca people, really dark skins and, you know, the not-Xinca people are completely different. You know, they know the difference.
So the employees of Tahoe in that local area, they knew, and they knew that the senior management spend time down here, and then they look at -- and also this report saying that there's a thousand and thousand of people -- Xinca people that live in the area as well.
Q And what was that report?
A So because the Xinca representative in congress, they already told the ministers of minings and also Tahoe at that point they need to be consulted when -- because there's Xinca people living in that community. So looking back with all the things going on in that -- there's an article -- a local article in the local language,

they had been talking about all along.
Q Okay. So aside from somebody's physical appearance and people who claim that they were Xinca, saying that they wanted to be consulted, is there anything else that you would be able to do to figure out if there were Xinca people living in the area?
A And also, Xinca representatives, I think, from the congress as well. So they're the one who represent the Xinca people in that area. They -- they clearly said they -- you know, they and the Xinca people in that region near the Escobal mine need to be consulted before any license be issued.
Q Okay. And did -- did the people that claimed to be Xinca make demands to be consulted before the license was issued?
A I think there's -- they was in the meeting. If I recall, that they was in a meeting with Tahoe senior management, and the ministers of mining in Guatemala, they was in that meeting with the Xinca representative from congress. So they knew that they had to consult with these people. But I think as later on, based on the research found the law firm, that they just completely ignored. Later on, they didn't involve those


people at all, the Xinca representative from congress at all. So they just ignored their request.
MR. KILLORIN: Your microphone. You're good.
BY MR. MAY:
Q So you're saying that there was a meeting that took place between the mining ministry and Tahoe Resources and members of the Xinca before the license was issued?
A So I don't know exactly the timing, because there's timing they issue a license and timing they renew. But, yeah, they -- in that period, they knew that, you know, and during when they have -- they're giving the license to Tahoe, Tahoe knew that, you know, Xinca people was not consulted and Xinca representatives not consulted. And they was in that meeting with -- you know, with the minister of the mining as well.
Q Why would Tahoe have been able to know that there were Xinca people in the area of the mine when it first came to Guatemala and was applying for a mining license?
MR. KILLORIN: Objection; asked and answered.


THE WITNESS: I can answer?
BY MR. MAY:
Q Yeah, you can answer.
A Okay. So I read some report from the law firm later on. Given what I knew today, I think there was -- you know, going back to Ronald Clayton and Kevin McCarthy [sic], they knew about the law in that region, that in order to have a commercial license in that area, they need to be consulted with -- they need to consult with the Xinca representatives and Xinca people.
Q And do you think that they knew what area you needed to consider in terms of figuring out whether there was an obligation to consult indigenous people or not?
A Yeah. I think so, yeah, because based on report from the law firm, they say exactly -- I think, if I recall the number correctly, 2,500 kilometers in the area that spread, I think -- spanned in two or three different provinces.
Q Okay. So in other words, 2,500 kilometers, you'd need to consult somebody in Los Angeles if you were going to do a project in San Francisco?


A No, it's not --
MR. KILLORIN: Objection -- excuse me.
THE WITNESS: Sorry.
MR. KILLORIN: Objection -- Mr. Nguyen, let me make my objection.
THE WITNESS: Okay.
MR. KILLORIN: Objection; vague; ambiguous.
THE WITNESS: I can answer?
MR. KILLORIN: Yes.
THE WITNESS: I'm not talking about the mine here and then the people in Los Angeles had a concern. I'm talking about the mining operation that affected, you know, that area and any things related to, you know, the Xinca population living in the area that polluted, you know, the water they drink and things like that. They believed that, yeah.
BY MR. MAY:
Q Right. I was drawing an analogy in terms of how much space that encompassed.
And so what you're saying is that -- 2,500 kilometers is about the equivalent of

Los Angeles to San Francisco -- if you were doing a project in one area, you'd have to consult with people living in another area. That's what you understand the law was in Guatemala?
MR. KILLORIN: Objection; vague and ambiguous. I don't know if we're talking about linear distance or surface area.
BY MR. MAY:
Q You can answer.
A Yeah, so I'm not good at math, so I don't know exactly is that -- the 2,500 is between here and, you know, Los Angeles. But I knew that they have to consult with the Xinca representative in related to the license issued for Escobal mine. Okay.
Q Why -- what would have prevented you from looking at public census information and determining the number of Xinca people that lived in the area?
MR. KILLORIN: Objection; vague and ambiguous. When you say "you," do you mean him?
MR. MAY: Yeah, I'm talking about him.
MR. KILLORIN: Him? Okay.



MR. MAY: Yeah.
THE WITNESS: So I think I read about that report from the law firm put together, you know, in the thousand and thousand of documents I've been going over this year. So I believe that I got that -- either that or some Google search, either that or a Google search.
BY MR. MAY:
Q No, no, no.
So my question was: What would prevent you, as an investor in Tahoe, from conducting your own research and looking at census data in determining the number of Xinca people that lived in the area of the mine? Is there anything that would prevent you from doing that?
A No. I think I Googled, and then they're saying something. That's why -- you know, they saying thing about the employee of Tahoe, they knew that the company had to consult with the Xinca people living in that area.
Q I know.
But is there anything that would have prevented an investor -- an ordinary investor -- from looking at what the census data was regarding



the number of Xinca people that lived in the area of the mine? Could an investor have done that?
MR. KILLORIN: Objection; calls for speculation.
THE WITNESS: I don't know. For me, I -- you know, I -- I don't know all the details, so I don't know what -- you know, this is translated from probably local newspaper to English and things like that. But I don't -- I don't know. Yeah.
BY MR. MAY:
Q Did you know about any of the demands that the Xinca had made to be consulted in 2016 when you invested in Tahoe?
A I don't know exactly --
MR. KILLORIN: Hold on. Did you hear his whole question?
Could we --
THE WITNESS: Yeah --
MR. KILLORIN: You started talking before he finished his question.
THE WITNESS: Oh.
MR. KILLORIN: So could you repeat your question or read it back?



BY MR. MAY:
Q Did you know about any of the demands that the Xinca had made to be consulted in 2016 when you invested in Tahoe?
A No, I did not.
Q Do you know whether there were news reports or news articles that were published about that?
A I don't think so at that point when I invested this. Yeah. I don't remember reading any news about that, no.
Q You didn't remember reading it, but do you know whether it existed?
A I don't remember, but -- yeah.
Q What are the damages that are being sought in this case?
A The damages in this case, for my case, is 1 million -- $1.8 million and then, you know, I don't know about the other thousand of investors. I don't know how much is -- I have no idea. But as far as for me, it's $1.8 million.
Q And what is your basis for that $1.8 million calculation in your -- in your situation?
A So I just calculate the -- you know, the

amount I put in to purchase Tahoe, and then the -- at the time when it completely sells everything, you know, that's come to about $1.8 million.
Q Okay. So you attribute the entire decline in the company's stock between the time you bought it in August 2016 and the time you sold it in December of 2017 to the company's misstatements; is that correct?
MR. KILLORIN: Objection; misstates prior testimony.
BY MR. MAY:
Q You can answer.
A I sold, as you mentioned, 140,000 in 2017, and then the rest, I sold it the following years.
Q That's correct.
A Yes.
Q And then the prices at which you eventually sold the stock, you attribute the entire decline in the company's value to the misstatements that the company made?
A The -- can you repeat that question?
Q I'm trying to understand how much of the stock's decline in price you attribute to the misstatements that the company made.
A Entire my loss amount.



Q I'm sorry?
A Entire my loss amount because the company misrepresent, you know, the true pictures of the business. So that's why I was misled, and then that's why, you know, eventually when I sold it, I end up with a loss of $1.8 million.
Q But we looked at the year-end statement for Tahoe for 2016. Do you remember that?
A Yeah.
Q And I pointed out to you that the -- your holdings in Tahoe had fallen by a million dollars in the couple of months since you had owned the stock; correct?
A Uh-huh, yes.
Q Okay. So if you had sold the stock at that point, would that have been attributable to any misstatements the company had made?
A The 2000- -- so let me think.
I didn't sell it in 2016. I sold it in 2017.
Q I understand.
A Yeah.
Q But if you had sold the stock in December 2016, would your losses have been caused by any misstatements the company made?



MR. KILLORIN: Objection; calls for speculation.
THE WITNESS: So I just want to clarify your -- your question. So if I look back now, of course, you know, at that point, I would -- I would have known that they make misrepresentations and false statement about the business; right? But at that point in -- at the end of 2016 -- I didn't know anything until 2017 when the company, you know, confirmed that the license had been suspended. So that's why.
I just want to make sure I'm clear on my answer. So 2016, I didn't know anything about the company make the false statements or, you know, misleading investors. I trust senior management, what they said, and they continued to pay the dividends. So I didn't have any reason to doubt that -- you know, other news than the company direct announcement.
So at that point, I haven't -- you know, that's why I didn't sell in the end of 2016. But the following year, 2017,



when things -- bad news considers -- unfolds and then the company confirmed that, you know, their license had been suspended in Guatemala, and that's when I decided to sell, yeah.
BY MR. MAY:
Q Yeah. I think what I'm asking is a little bit different.
I think what you've told me is that the stock was artificially inflated; right? Isn't that what you told me during your period of ownership?
A Now. Not -- not at that given point in time when I invest in Tahoe. So I want to make sure it's clear.
See, when the stock inflated, when I look at now and look at what's going on and go back into the histories. But at that point, when I invest in 2000- -- August of 2016, I didn't know that, you know, the stock inflated. I see the stock is appreciate because the business is doing so well, they paid the monthly dividends and, you know, they're -- the mines in Escobal continued to operate, and it's going to be great in the future.
Q Right.

A So I just want to make sure the things I look at today and the things I looked at August of 2016. I want to be clear on that.
Q Right.
A Yes.
Q And what I'm saying is that when you look back now --
A Uh-huh.
Q -- your position today is that the stock was artificially inflated in August of 2016; right? When you bought it.
A Yes. If I -- you know, I knew what I knew now, of course. That's the stock price inflated. That's why when the bad news, you know, start to unfold, the stock --
Q And it was inflated, if I understood your testimony correct, because the company knew that the license was going to get suspended eventually; is that right?
MR. KILLORIN: Objection; misstates prior testimony.
BY MR. MAY:
Q Is that correct? Is that why it was inflated?
A So, yes, that's one of the things. And



then they continued to misled investors. They say that they're going to appeal to the Supreme Court, and they say, you know, probably -- I think I recall that probably they're going to, you know, resume the operation of Escobal sometime in 2000- -- something like that.
So I continued to believe them. Okay. There probably -- there's a lot of things that -- a lot of smoke at that point, but I just keep focused on the announcement from the company.
Q And so that -- but that harm that you realized as an investor, as you claim, didn't happen until the license was suspended later on; right?
MR. KILLORIN: Objection; misstates prior testimony; and ambiguous. I'm not exactly sure what you mean by "harm."
THE WITNESS: So can you --
BY MR. MAY:
Q You're basing -- you told me that your losses are $1.8 million --
A Uh-huh.
Q -- correct?
A Yeah, over the period of time when I start selling, 2017, 2018, and 2019.



Q Right. And I'm trying to understand what part of that loss is attributable to the statements that you claim were false by the company.
Do you understand that?
A I mean, that's entire 1.8 is due to that misstatements and false statement.
Q No, that's what I'm trying to parse out here.
A Right.
Q If you bought the stock in August of 2016 --
A Yes.
Q Okay -- and then let's assume that you sold the stock at the end of December 2016. Your stock would have gone down by a million dollars; right?
A Yes.
Q Okay. And would that fall of the million dollars have been attributable to anything that the company misstated?
MR. KILLORIN: Objection; vague and ambiguous.
BY MR. MAY:
Q Because at that point, the license hadn't



been suspended.
A Right.
Q Nobody knew the license had been suspended.
A Right.
Q But the -- but the stock price fell a million dollars anyway --
A Right.
Q -- right?
So in that situation, would that million-dollar loss have been attributable to any misstatements the company made?
MR. KILLORIN: Same objection.
THE WITNESS: Is it okay to answer?
MR. KILLORIN: Yeah, you can answer if you --
THE WITNESS: Yeah, at that point, as I said, I don't believe any other news sources, because there's a lot of rumors and -- you know. So I just wanted to make sure is I get something from the company.
BY MR. MAY:
Q Okay. Can I have you look at -- strike that.
Do you know if a motion for class

Page 256

certification was filed in this case?
A Yes.
Q Did you review it?
A Yes.
Q Are you aware that there is a shareholder action in Canada against Tahoe that's making similar allegations to those in this case?
MR. KILLORIN: Objection; assumes facts not in evidence; lack of foundation.
BY MR. MAY:
Q Are you aware of that?
A I'm not aware at that point, but, you know, lawyers, you know, just mentioned it, so I just -- I knew.
Q I'm sorry. I didn't catch that.
A So I didn't know at the point -- at the time of the investment, of my August '16, when I purchased the Tahoe stocks, but much later on when I -- you know, lawyer firms, when they do a research and they mentioned that to me somewhere --
MR. KILLORIN: Mr. Nguyen, let me just caution you. You can tell him what you knew, but if it came for us, don't tell him.

Page 257

THE WITNESS: Oh, yeah.
MR. KILLORIN: Our conversations are confidential.
THE WITNESS: Right, right, right.
MR. KILLORIN: But if you were aware of the case in Canada, you can answer that question.
THE WITNESS: I'm only aware of the case in Canada much later on. Not at the time when I purchased the Tahoe stocks.
BY MR. MAY:
Q Right.
Do you have an approximate date as to when you became aware of the Canadian class action?
A I don't remember.
Q Was it after you became the lead plaintiff in this case or before?
A I don't remember.
Q Are you aware that the plaintiff in that case seeks to represent a class of all investors in Tahoe stock, even those outside of Canada, such as yourself?
A You mean in this particular case?
Q Yeah.

Page 258

Are you aware that the plaintiff in the Canadian class action is seeking to represent a class that consists of all investors in Tahoe worldwide, which would include yourself? Are you aware of that?
A No, I'm not aware of that.
Q Okay. Do you believe your interests are fairly represented in the Canadian case?
A What do you mean? I -- I just want to make sure I understand.
I don't invest anything in Canada, so I don't have any interest in that. But I just -- just want to understand correctly, just only for this case, I lost the money. So that's all I care about; right? Other investors, you know, lost the money in this case. But I'm not thinking about Canada -- Canada, yeah.
Q Okay. Well, but -- but you told me that you reviewed the motion for class certification in this case.
A Yes.
Q And that's a motion that seeks to certify a class of all US investors in Tahoe for the class period; correct?
MR. KILLORIN: Objection; that's

Page 259

not exactly the right definition.
But with that objection on the record, go ahead and answer the question.
THE WITNESS: I understand that's just on the US, yes.
BY MR. MAY:
Q Okay. And now what I'm saying is that there is a separate class action in Canada that you've told me you know about; correct?
A Uh-huh.
Q And in that class action, the plaintiff there is seeking to certify a class of all investors worldwide. Do you believe that your interests would be fairly represented in the Canadian class action?
A I don't think so, you know. In the US, you know, I should be a plaintiff to represent the US -- class action in the US.
Q Why?
A So I don't know -- is anything from Canada related to the US? I'm not sure about that. So I just think, in my mind, separately, Canada is Canada, US is US.
Q Okay. So if a class is certified in Canada and a class is certified in the US, do you

believe that you'd be entitled to recovery in both cases?
MR. KILLORIN: Objection; calls for speculation and a legal opinion.
THE WITNESS: So, again, I'm not really understanding what you're trying to say. But as far as I know, I bought the stock in the US. I don't know why I would serve, you know, in Canada. So that's why I'm not sure.
But for sure, in this case, it's related to my loss, so I would be, you know, fairly a representative for this case in the US.
BY MR. MAY:
Q Would you -- and separate from being a lead plaintiff, would you submit a claim as an investor in the Canadian class action?
A Why would I? I don't invest anything in Canada.
Q Okay. Well, the Canadian lawsuit that you told me you're familiar with --
A Right.
MR. KILLORIN: Objection; misstates prior testimony.



BY MR. MAY:
Q -- seeks to certify a class of all investors that invested in Tahoe worldwide, essentially alleging the same things that you're alleging here in this lawsuit.
MR. KILLORIN: Objection --
BY MR. MAY:
Q So as an investor --
MR. MAY: Let me finish the question, Bob.
MR. KILLORIN: Okay. Finish it.
BY MR. MAY:
Q As an investor, would you intend to submit a claim as part of the class in that Canadian lawsuit if such a class was certified?
MR. KILLORIN: Okay. Now my objection. Assumes facts not in evidence; has a false factual predicate; calls for speculation and a legal opinion.
If you think you can answer that, you may try. But if -- I don't want you to speculate, and if you don't understand it, I don't want you to try.
THE WITNESS: I don't know.



BY MR. MAY:
Q Okay. Do you understand that there's going to be other investors in this case that will be submitting claims besides yourself?
A Yes.
Q Okay.
A Class action, yeah. Some of the investor who lost money.
Q So you understand the concept of a class action?
A Yeah.
Q Okay. And so all I'm asking is if there's another class action in Canada, do you have any intention to submit a claim in that case?
MR. KILLORIN: Objection; vague and ambiguous; calls for speculation.
THE WITNESS: Do I --
MR. KILLORIN: You can try. I mean, if you think -- if you understand it. If you don't understand it, say you don't.
THE WITNESS: So in my mind, when thinking about, you know, investor in Canada, you know, if they invest in Canada, why would I -- I purchased the



stocks in the US and the US stock exchange. So I don't think there's anything related, you know, between the US and Canada.
So I just -- again, I said, you know, I just focused on this case here in front of me that I think I'm -- you know, is fairly representative as the lead plaintiff, as the Court ordered me to be in this case. But other than that, I don't know about other countries.
BY MR. MAY:
Q Okay. Do you expect to get anything out of this case besides the difference between what you bought the stock at and what you sold the stock at?
A No. Just -- just the fact that I -- just recoup my $1.8 million loss. That's all. And it also recoup the losses from other class -- I want to make sure that I understand all the terms that the legal people are using -- is that the class action that represent all the investors, like myself, typical investor, who lost the money because of the company false statements and misleading information. Yes.

Q And I don't remember if I asked this question to you before. I apologize if I did.
Do you recall when you first consulted with the Faruqi firm?
A I think I answered that at the beginning.
Q Okay. And can you remind me what your answer was?
A So, again, I said -- you know, I look at the internet, and then I searched for -- because if you put in the ticker symbol of Tahoe, and you can see all the law firm that -- okay, contact our law firm if you -- you know, you lost money in Tahoe case. And I think happened that Faruqi's popped up on top, and then I did some research, and it looks like they have, you know, a reputable firm that represent the class action.
Q Yeah. I'm actually asking about when. Do you remember when that happened?
A I don't remember when.
Q Was that before you sold the last of your holdings in Tahoe?
A Before? I don't remember. But I think it's right after the stock price dropped, and then I saw that, you know, the law firm of Faruqi pop up on the internet search, Google search, and



that's when I call them. But I don't remember exactly the timing, when you asked is that before or after.
MR. MAY: Why don't we take five minutes and see if there's any cleanup, and then --
MR. KILLORIN: Okay. That's fine.
MR. MAY: Off the record.
THE VIDEOGRAPHER: We are off the record at 4:41 p.m.
(Recess from 6:41 p.m. to 6:51 p.m. CST)
THE VIDEOGRAPHER: We are back on the record at 4:51 p.m.
BY MR. MAY:
Q Kevin, we went back and checked the docket sheet during the break and saw that you filed a petition to be appointed lead plaintiff in this case on September 5, 2017.
Does that refresh your recollection as to when you became involved in this case?
A Yeah. If you say so. But, again, as I said, I don't remember exactly the timing.
Q Okay.
A Yeah.
Q And so am I correct in understanding that



you sought to become a lead plaintiff in this case a few months before you sold any stock in Tahoe?
A Yeah. So if that's -- you said that based on September of 2017, then later on I sold it in December, yes.
Q Okay.
MR. MAY: I have no further questions.
MR. KILLORIN: Okay. I have just a couple.
EXAMINATION
BY MR. KILLORIN:
Q Mr. Nguyen, at the time you first invested in Tahoe stock, did you feel, at that time, that you were being misled by senior management in Tahoe?
A No. I did not feel I was misled at that point when I purchased stocks.
Q As you sit here today, looking back, do you feel, at that time, you were being misled --
A Yes.
Q Let me finish my question.
A Sorry.
Q -- do you feel you were being misled by senior management in Tahoe?



A Yes, as of today, when I look back at all the things I found out, yes, I feel I was misled by the senior management at that time.
Q All right. And if you said anything to the contrary, would it be because you didn't understand the context?
A Yes.
MR. MAY: Objection to the form of the question.
THE WITNESS: Yeah, yeah, yeah.
MR. KILLORIN: All right. That's all I got.
THE VIDEOGRAPHER: Okay. This is the end of this deposition of Kevin Nguyen on August the 3rd, 2021. We are off the record at 4:53 p.m.
(Off the record at 6:53 p.m. CST)

# CHANGES AND SIGNATURE

| PAGE/LINE | CHANGE | REASON |
|---|---|---|

I, KEVIN NGUYEN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

__________________________
KEVIN NGUYEN

THE STATE OF __________ )
COUNTY OF _____________ )

BEFORE ME, _________________________, on this day personally appeared KEVIN NGUYEN, known to me (or proved to me under oath of _________________________ or through _________________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ___ day of __________, 2021.

__________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF _____________
MY COMMISSION EXPIRES:
__________________________

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

IN RE: TAHOE RESOURCES, INC., )CASE NO.
SECURITIES LITIGATION )2:17-cv-01868-RFB-NJK

REPORTER'S CERTIFICATION
REMOTE VIDEOTAPED DEPOSITION OF
KEVIN NGUYEN
August 3, 2021

I, Rebecca A. Graziano, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, KEVIN NGUYEN, was duly sworn and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

____ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was

taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this 5th day of August, 2021.



Rebecca A. Graziano, CSR, RPR, CRR
Texas CSR No. 9306
Expiration Date: 07/31/22
California CSR No. 14407
Expiration Date: 09/30/21

**WORD INDEX**


< $ >
**$0.02** 101:5, 14, 19
**$0.73** 144:24
**$1.8** 162:13, 21 247:18, 21, 23 248:3 249:6 253:21 263:18
**$11** 179:14
**$11.4** 177:17
**$12,000** 100:17, 22
**$140,000** 100:9
**$2,418,635.73** 97:9 98:5
**$2,880,713.50** 145:1
**$2,880,717.50** 144:23
**$2.4** 99:6
**$2.6** 154:12, 23 155:18 156:4 157:6
**$2.8** 99:8 100:8 134:22 177:21
**$2.88** 99:15 174:6 178:18
**$2.9** 154:10, 12 156:3, 9 157:6
**$24.8** 182:10, 14
**$25** 181:17 182:1 184:3, 10
**$28** 182:13
**$38** 24:14, 16 177:11, 24 178:1, 6
**$4,000** 92:23 93:19 174:2, 7
**$4.95** 141:22
**$7,428,179.13** 61:11

< 0 >
**00001067** 115:9
**00001110** 117:15
**00001233** 3:19
**00022097** 60:23
**00022098** 62:4
**07/31/22** 271:12
**09/30/21** 271:13

< 1 >
**1** 47:25 59:19 60:23, 25 69:20 92:8 134:7 196:9 247:18
**1,200** 135:15
**1.8** 254:6
**1:02** 60:16
**1:03** 60:16
**1:39** 91:4
**1:45** 137:9
**1:56** 91:4
**10** 195:8, 10, 14, 21 196:14
**10,000** 142:19 143:15, 23
**10:27** 49:15
**10:49** 49:19
**100** 120:2 135:15 142:18 143:14, 23 214:17 218:15
**10017** 2:5
**107-17** 118:23
**11** 74:5 195:14 196:16 233:9
**11:02** 60:15
**11:03** 60:18
**11:37** 1:18 4:2
**11:39** 91:3
**11:55** 91:6
**114** 3:19 144:5, 6 147:23
**12** 87:6, 8, 9, 18
**12:27** 49:16
**12:48** 137:6
**12:50** 49:16
**13** 151:12 185:15, 22, 23 198:15
**13:30:21** 89:1
**14:22:06** 118:23
**140,000** 248:13
**14407** 1:25 271:13
**147,000** 202:2
**15** 185:12
**16** 92:12 97:1, 2 104:24 256:17
**16-month** 105:14
**16th** 5:23
**17** 92:9, 11, 13 96:25 112:9, 13
**1700** 2:10
**1745** 5:23
**18** 12:8 92:12 147:25 148:1 151:6, 10
**19** 121:17 162:4
**1986** 12:8, 9
**1994** 13:8

< 2 >
**2** 62:5 87:5, 11 113:8 117:24 147:6, 8 185:16 186:5 199:12 200:8, 16 201:1
**2,500** 229:4 242:19, 23 243:25 244:11
**2.4** 99:7
**2.6** 155:4 156:14
**2.9** 155:5 156:5
**2:17-cv-01868-RFB-NJK** 1:3 4:9 270:3
**2:48** 137:7
**2:49** 195:1
**20** 9:23 14:19 121:18, 24 124:25 125:2, 3, 9 157:20 179:2 209:6
**200** 53:9
**200,000** 24:15 52:20 53:17 54:12 55:3 69:1 87:13 134:21 135:16 136:13, 17 177:14 186:6 202:3
**2000** 9:22 198:1 203:9 216:19 249:18 251:19 253:6
**2007** 24:9 25:2
**2008/2007** 234:11
**2008/2009** 216:20
**2009/2008** 231:15
**2009/2010** 226:15
**2010** 221:20 225:10 227:10 231:14 234:18, 19
**2011** 24:10, 24 25:2
**2013** 55:12 229:14, 19
**2014** 11:11
**2016** 23:21 24:21 25:4 52:21 53:18 54:13 55:2, 18 56:4, 21 60:25 61:4 69:19 76:12 78:3 81:1 82:5 92:8 96:10 98:2 129:2 144:9, 10, 16 148:3, 20 154:9 155:17 158:2, 8 159:15 160:9 161:2 163:12, 21 164:3, 10 165:19, 25 167:24 168:16 174:25 175:11, 20 179:8 181:16 182:17, 24 184:1 212:11, 14 233:7, 8 246:13 247:3 248:6 249:8, 19, 24 250:10, 15, 25 251:19 252:3, 10 254:12, 15
**2017** 55:13 128:19, 20, 25 132:16 164:24 165:16 166:7 190:14 191:8 192:9, 17, 21, 23 197:6, 20, 24 198:8 202:4 203:4, 15 209:6 212:15 222:7 248:7, 13 249:20 250:10, 25 253:25 265:18 266:4
**2017/2018** 225:7
**2018** 23:21 24:21 25:4 56:20 197:6, 21 198:2, 9 203:10 212:17 253:25
**2019** 56:20 197:6 203:10 209:6 253:25
**2021** 1:9, 18 4:13 267:15 269:18 270:6 271:6
**212** 2:6
**22** 157:22
**22,000** 52:16 68:24 69:3
**22098** 67:4
**22114** 147:17, 24 154:1, 20
**22123** 181:3
**22130** 140:18
**22133** 181:13, 19
**22144** 144:4
**22190** 96:14, 20
**22191** 112:8

**22192** 93:*18*
**222** 157:*19*
**22246** 151:*5, 7, 13*
**22261** 157:*14*
**22280** 157:*17*
**2278** 161:*14*
**2279** 161:*14*
**23** 117:*16, 25* 124:*23, 24* 125:*1, 2, 4*
**24** 55:*13* 182:*15* 184:*3*
**25** 11:*7* 177:*21*
**25th** 141:*7*
**266** 3:*3*
**269-8047** 2:*11*
**26th** 2:*5* 4:*11* 141:*8*
**28** 92:*9* 97:*1, 2* 112:*9, 15* 157:*20*
**280** 157:*23, 24*
**28th** 197:*11, 20*
**291** 112:*10*
**29th** 197:*11*
**2nd** 197:*12, 20*

**< 3 >**
**3** 1:*9, 18* 79:*5* 147:*7, 10* 270:*6*
**3:05** 195:*4*
**3:46** 137:*7*
**3:48** 232:*13*
**3:58** 150:*18*
**30** 135:*25* 137:*2* 179:*2* 270:*18*
**30(f)(1** 270:*15*
**300,000** 24:*16* 69:*2* 149:*9, 24* 177:*11, 14*
**31** 60:*25* 92:*8* 98:*2* 144:*9, 16* 154:*9* 155:*17* 212:*17*
**312** 2:*11*
**31st** 144:*10*
**32** 151:*6, 10*
**34** 140:*25* 159:*5* 162:*19* 179:*20* 180:*17*
**36** 142:*24*
**37** 143:*1, 2* 181:*4*
**3rd** 4:*12* 267:*15*

**< 4 >**
**4:00** 150:*18*
**4:05** 232:*16*
**4:41** 265:*10*
**4:49** 195:*2*
**4:51** 265:*13*
**4:53** 267:*16*
**40** 216:*25* 234:*15*
**401(k** 22:*18* 167:*13*
**40-F** 3:*16*
**425** 4:*11*
**45** 148:*3, 6, 21* 149:*1, 15* 154:*5* 156:*7* 175:*9*

**< 5 >**
**5** 3:*3* 10:*23* 69:*24* 70:*7* 92:*1* 96:*12* 98:*8, 17, 20, 25* 99:*1, 14, 18* 100:*1, 2, 3, 8, 13, 25* 102:*18, 20, 24* 148:*5* 265:*18*
**5.3** 156:*13, 16*
**5:05** 195:*2*
**5:48** 232:*14*
**50** 60:*24* 62:*5* 135:*25* 141:*1* 147:*25* 148:*1* 162:*4* 181:*4*
**50,000** 135:*23, 24*
**500** 171:*17, 18* 173:*15*
**500,000** 22:*7* 24:*13* 69:*1* 177:*13*
**51** 15:*2*
**547** 152:*2, 4, 15, 22* 153:*8* 154:*6* 158:*9* 159:*6* 161:*2* 162:*20* 167:*23* 169:*14* 171:*9, 21* 180:*22*
**58** 3:*9*

**< 6 >**
**6** 171:*18*
**6:05** 232:*14*
**6:41** 265:*11*
**6:51** 265:*11*
**6:53** 1:*18* 267:*17*
**60602** 2:*11*
**67** 3:*8* 58:*1, 4, 7, 9, 13* 60:*22* 92:*3, 4* 136:*25* 137:*12* 140:*1*
**68** 3:*10* 85:*15, 16* 86:*3* 134:*4* 137:*16* 185:*7, 8* 195:*8*
**685** 2:*5*
**69** 3:*15* 114:*22, 23*

**< 7 >**
**7** 196:*7*
**70** 167:*15*
**79-2** 89:*2*

**< 8 >**
**8** 134:*5, 9* 137:*17, 22*
**82** 151:*12*
**85** 3:*14*

**< 9 >**
**9:37** 4:*20*
**9306** 1:*24* 271:*12*
**94122** 5:*24*
**983-9330** 2:*6*

**< A >**
**a.m** 1:*18* 4:*2, 20* 49:*15, 19* 60:*18* 91:*3, 6*
**ability** 108:*25*
**able** 8:*9* 14:*23* 74:*1, 16* 76:*3, 13* 113:*17* 114:*18* 147:*8* 153:*25* 160:*18* 194:*16* 239:*3* 240:*5* 241:*20*
**above-styled** 1:*17*
**Absolutely** 19:*11* 133:*21, 22*
**abstract** 172:*23*
**accepted** 13:*4*
**account** 51:*6* 55:*20, 21, 24* 56:*4, 8* 57:*3, 10, 14, 15, 17, 19* 58:*21, 23* 61:*19, 20, 22, 23, 24* 62:*11, 12, 22, 23* 63:*1, 10, 22, 25* 64:*2, 6, 12, 20, 23, 24* 65:*1, 8, 9, 11, 12, 14, 15, 19, 20, 21* 66:*3, 7, 8, 16, 22, 23, 24* 67:*8, 10, 18, 23* 68:*2, 4, 7, 8, 22, 23, 25* 69:*4, 8* 104:*22* 106:*9, 10* 110:*17* 111:*11, 14* 146:*8* 148:*4, 6, 21, 24* 149:*1, 2, 8, 12, 16, 17* 150:*3, 4, 5, 8, 11, 13* 152:*1, 5, 9, 10, 14, 15, 22* 153:*1, 5, 8* 154:*6* 156:*7, 15, 21* 158:*9* 159:*5, 6* 161:*2* 162:*19, 20* 167:*19, 23* 168:*21* 169:*5, 14* 170:*20, 23* 171:*9, 21* 172:*7, 9* 174:*10* 179:*21* 180:*17, 20, 22* 182:*19, 22* 184:*12*
**account/savings** 68:*8*
**accountant** 9:*16*
**accounting** 11:*14* 148:*23*
**accounts** 50:*17, 20* 51:*3* 57:*23* 61:*25* 62:*8* 63:*4, 17* 64:*1, 19* 65:*24* 66:*12, 13, 15* 67:*2, 5, 12, 15, 16* 105:*2* 150:*10* 153:*3, 10, 14* 167:*18* 168:*7, 24* 170:*20* 176:*6, 20* 180:*21*
**accuracy** 163:*19*
**accurate** 8:*10*
**achieving** 25:*17*
**acknowledged** 269:*15*
**acquire** 55:*17*
**acquired** 55:*19* 56:*4* 57:*2* 138:*5* 202:*20*
**act** 215:*14*
**action** 5:*2* 203:*25* 204:*5* 207:*9, 21* 208:*12* 211:*19* 256:*6* 257:*15* 258:*2* 259:*8, 11, 15, 18* 260:*18* 262:*7, 10, 13* 263:*22* 264:*16* 270:*25* 271:*4*
**activities** 41:*5*
**add** 232:*2*
**addition** 232:*22*
**additional** 67:*12, 14,*

16
**additions** 61:15, 16
**address** 5:22
**advance** 216:3
**advantage** 28:15
**advertise** 206:21
**advertisements** 38:2, 3
**advice** 33:3, 4
**adviser** 18:14 19:13, 16 21:19 78:6 106:18 184:22
**advisers** 184:19
**affect** 32:22 35:13 40:17
**affirmatively** 236:18
**affix** 269:2
**afterward** 209:18
**age** 14:25
**aggressive** 16:16, 20 173:17
**ago** 8:15 15:1, 2 51:8 88:6, 16 90:22 122:21 126:3 136:19 144:1 161:8 180:12
**agree** 23:12 30:17 31:7 64:21 65:6
**agreed** 150:5
**ahead** 109:8 122:22 126:5 129:17 171:23 259:3
**air** 131:17
**align** 107:6, 12 168:2
**aligned** 107:22
**allegations** 256:7
**alleged** 233:18
**alleging** 261:4, 5
**allocating** 17:18
**allocation** 15:24, 25 18:13 57:6, 8
**allocations** 15:22
**alter** 118:7 125:19
**amay@nge.com** 2:12
**ambiguous** 98:22 119:19 120:17 122:19 130:19 132:2 138:22 143:8 177:4 180:20 210:10 243:9 244:6, 21 253:16 254:23 262:16
**amended** 208:5 212:16
**America** 64:16 68:10
**American** 202:20, 25 203:3
**amount** 51:7 91:25 92:23 102:16 106:24 139:17 248:1, 25 249:2
**amounts** 103:11
**analogy** 243:22
**analysis** 132:18
**analyst** 11:13 36:11, 20 44:12, 14, 16, 18, 20, 25 45:3, 7, 20 46:6, 7, 18, 20 47:3, 8, 17, 20 48:10 103:24
**analysts** 44:23
**analyze** 36:20
**analyzing** 11:19
**and/or** 203:3
**Andrew** 2:9 5:1 60:11 85:18 88:18 110:1 131:3
**Andrew's** 153:18
**Angeles** 242:24 243:14 244:1, 12
**announce** 38:14, 15
**announcement** 201:24 206:3 250:22 253:10
**answer** 7:5, 23 8:6 16:10, 12 19:3, 7, 15 20:14 21:6, 9 28:23 31:19 38:11 39:25 44:2 50:23 51:24, 25 54:4 55:23 62:18 70:12, 21 76:25 80:14 84:8 87:17 89:1, 12 95:11 98:12, 23 101:8 108:5, 15, 21, 22 110:21 118:22 120:18 122:22 123:22 124:18 126:5, 13 129:12, 14, 17 133:20 134:6, 16 139:13 144:19 145:18 155:24 160:24 171:3 172:18, 22 176:4 177:5, 8 180:4, 10 187:1, 3, 6 188:21 198:18 199:20 201:9 219:2, 9, 10, 20 220:3, 4, 6, 22, 23 223:21 225:2 232:5 242:1, 3 243:10 244:9 248:12 250:15 255:14, 15 257:7 259:3 261:20 264:7
**answered** 25:12 31:17 76:22 111:21 187:2 188:19, 20 189:3 218:11, 24 219:5, 16 241:25 264:5
**answering** 7:7 200:13 215:18
**answers** 6:20, 22 29:16 41:19 90:3 134:4 137:15
**Anybody** 73:1 176:13
**anyway** 49:11 255:7
**apologize** 130:18 264:2
**appeal** 190:25 193:7 197:1, 4, 15 200:5 201:17, 18 203:11 253:2
**appealed** 202:11
**appearance** 222:20 238:4, 6 240:3
**appearances** 4:21
**appeared** 269:10
**appearing** 6:12
**appears** 87:5 141:20
**applicable** 118:6, 8 125:18, 20
**apply** 12:19
**applying** 241:23
**appointed** 265:17
**appreciate** 251:21
**appreciation** 104:9 107:9
**approximate** 257:13
**approximately** 134:22 154:10, 23 162:13, 21 167:22 181:18 182:9 184:2 202:2
**approximation** 70:18
**April** 55:12
**Area** 24:7 221:9, 14 222:13, 17 226:16 227:12, 23 228:7, 11, 23 229:6 231:19 234:22 237:17 238:1 239:13, 17 240:7, 10 241:21 242:9, 12, 19 243:16, 18 244:2, 3, 7, 19 245:15, 21 246:1
**article** 192:11, 14 239:25
**articles** 247:7
**artificially** 251:10 252:10
**aside** 47:15 240:2
**asked** 19:12 25:11 31:2, 16 41:20 51:17 76:21 80:21, 25 88:6, 15 90:22 111:20 119:1, 8 134:11 165:22 187:2 188:18 196:9 219:15 220:3 232:20 241:24 264:1 265:2
**asking** 6:18 25:3 27:23 30:8 34:3 37:9 41:4, 17 43:16 54:4 62:18 80:15, 17 87:11 111:22 119:16 124:9, 12 131:1, 7, 19 133:15 170:23 172:15 180:15 183:14, 17 186:5 219:6, 23 251:7 262:12 264:17
**aspects** 20:5
**assert** 209:20, 23, 24, 25 210:3
**asserted** 210:17, 22
**assessment** 79:15 114:15 119:11, 24 120:14 122:16 124:14 125:23 164:1, 11 165:6
**asset** 15:22, 24, 25 18:13 22:23 23:11

**assets** 17:18 114:4 118:1 121:11 124:22 179:3, 7 217:15 234:15
**assist** 10:13
**assume** 254:14
**assumes** 103:20 128:7 256:8 261:17
**assurance** 118:6 125:18
**asylum** 12:19
**attached** 270:19
**attend** 17:16, 17
**attention** 87:5 134:5 151:20 166:11, 16, 22, 23 175:21 185:5 195:7
**attesting** 86:25
**attorney** 270:23 271:3
**attractive** 169:22
**attributable** 249:16 254:2, 20 255:11
**attribute** 248:4, 18, 23
**audibly** 145:18 155:25
**Audio** 28:21
**August** 1:9, 18 4:12 52:21 53:18 54:13 55:13, 18 56:4 60:25 61:4 69:19 74:3 76:12 78:3 81:1 82:5 129:2 141:7, 8 144:9, 10, 16 148:3, 20 154:9 155:17 164:10 181:16 182:17, 24 183:1 184:1 212:17 236:22 248:6 251:19 252:2, 10 254:11 256:17 267:15 270:6
**automatic** 110:5 138:24
**automatically** 110:15 111:8, 11
**available** 34:25 35:3 44:17
**Avenue** 2:5 5:23
**average** 34:18 103:24 105:10
**aware** 128:15, 18, 22 129:2 192:16 256:5, 11, 12 257:6, 8, 14, 20 258:1, 5, 6

**< B >**
**back** 8:19 20:15 21:9 46:22 49:17, 18 60:17 88:21, 22, 25 89:5 91:5 92:2 96:13 102:10 118:18, 22 119:3 122:13 134:3 136:24 137:8, 16, 17 150:19 153:21, 23 181:13 184:6 195:3 201:20 216:14 217:20 218:14 220:2, 8 221:6 224:10 225:9 226:14, 20, 21 227:10 231:13, 15 232:15 234:8, 9 235:18 236:4 237:9, 18 239:23 242:6 246:24 250:5 251:18 252:7 265:12, 15 266:19 267:1
**backwards** 8:25
**bad** 45:11 193:11 203:8 251:1 252:14
**balance** 24:3 36:18 171:13 173:14
**Ballpark** 214:14, 15, 18
**Bank** 64:16 68:10
**banker** 10:6
**bankers** 10:3, 4
**Barnickol** 2:9 5:3
**barrier** 131:5, 18 153:15
**base** 104:12
**based** 14:23 36:25 39:7 44:6 51:14 83:5, 7 84:4, 10, 16 87:25 88:7 90:4, 6 99:2, 15 160:19 161:4 169:15 175:3 176:6 187:9 201:10 204:20, 23 216:13 218:13 222:3, 6 224:5 229:2 240:23 242:16 266:3
**basic** 103:25
**basically** 10:20 15:25 18:13 21:21 26:19 29:10 32:22 36:8 84:18, 19 85:7 127:25 176:5 187:14 189:6 194:12 197:7 209:9 211:24 212:11 215:11
**basing** 229:9 253:20
**basis** 35:25 123:23 144:22 145:3 221:3 222:1 247:22
**basket** 22:14 159:9, 17, 22 160:15 170:12 171:20 172:1 173:18
**Bates** 3:9, 18 67:4 92:10 115:8 157:23
**Bates-label** 59:24
**Bates-labeled** 60:23 62:4 92:7 117:15
**bathroom** 7:18
**Bay** 24:7
**Becky** 20:16 118:21
**began** 20:25
**beginning** 13:16 57:19 69:11 97:19 106:8 110:6 142:18 195:13 264:5
**begins** 60:5 87:17 115:9 118:23 137:22 185:16
**behalf** 4:24 10:7
**belabor** 173:22
**believe** 27:7 28:18 29:2 80:21 81:19, 20, 24 104:13 123:7 126:22, 25 131:16 133:25 166:2 175:15 181:12 217:7 220:13, 15 224:20 230:19 233:13 236:1, 25 238:5, 7, 21 245:6 253:7 255:18 258:7 259:13 260:1
**believed** 28:13 132:8 164:20 166:3 233:23 236:12 243:20
**believing** 222:1
**beneficiary** 57:23
**best** 7:13 21:16 39:7 108:24
**beyond** 69:14
**bid** 135:3
**big** 103:14 110:22 113:7 117:12 166:24 167:1, 2, 20 168:5 184:11
**bigger** 176:9
**billion** 113:8
**bit** 27:4 58:19 59:15 82:12, 21 196:6 207:7 251:8
**black** 155:11
**blacked** 133:5
**blanked** 133:23
**Bloomberg** 72:13
**blow** 32:1
**Bob** 90:25 108:14 109:24 111:23 126:8 129:15 130:22 138:25 143:15 168:24 179:24 219:9 261:10
**Bob's** 89:5
**bodies** 118:6 125:18
**bolts** 36:12
**bond** 19:22 64:4
**bonds** 18:21 64:9, 10
**borrowed** 147:1
**bottom** 59:17, 25 60:9, 22 73:23 92:18 97:12 115:7 121:19 148:7 151:7 154:3, 22 156:6 158:15 160:7 181:19 195:13 196:15 231:6
**bought** 6:1 28:8 74:3 105:6 181:17, 25 234:15 248:5 252:11 254:11 260:7 263:15
**box** 110:16 111:6, 10, 18 112:3
**break** 7:17, 20, 23 49:9 85:19 90:25

136:1 137:12 194:21 232:10 265:16
**breakdown** 135:21
**Breckinridge** 18:18, 20, 25 19:18, 19 61:20, 22 62:12 63:11 64:6, 23 65:15, 21 68:4 95:16 104:22
**Brian** 2:18 5:4
**broader** 176:24 190:4, 5, 7
**brokerage** 50:17 51:2, 6 58:21, 23 66:13
**Brothers** 22:17
**bucket** 27:15 28:5 64:12 95:14 96:3
**buckets** 16:1 17:2, 24 25:20, 23 49:25 50:5, 16 95:15 104:19 168:8
**budget** 95:25
**budgeting** 11:14
**bunch** 42:16 44:23 72:7 205:8 206:18
**business** 18:6 29:9, 11, 19, 21 31:1, 22 35:13, 15 38:23 40:22 45:13, 17 46:12 83:3 84:22 89:16 90:15, 19 113:17 114:1 129:8, 24 130:2 186:16, 17 187:17 188:3 198:3 216:6 231:7 233:11 235:8, 11, 24 236:13 249:4 250:8 251:21
**businesses** 120:25
**busy** 112:23
**buy** 28:12 135:7 136:3 146:16, 17 164:22 202:17, 19, 20
**buyer** 135:4
**buys** 48:12

**< C >**
**CALAS** 223:10, 12, 16
**C-A-L-A-S** 223:17
**calculate** 102:15 247:25
**calculated** 103:3 104:13
**calculation** 24:17 100:18 166:24 247:23
**calculator** 101:8
**calculus** 126:19 128:6
**California** 1:25 4:12 5:24 271:13
**call** 5:19 12:24 13:14, 17, 18 59:5 65:8, 10 73:5 153:8 207:10 215:13 222:9, 10 230:2 265:1
**called** 9:7 72:24 223:10
**calls** 18:6 73:5 122:19 125:25 126:10, 11 128:8 176:14 246:3 250:1 260:3 261:18 262:16
**camps** 12:17
**Canada** 127:1 256:6 257:6, 9, 22 258:11, 17 259:8, 20, 22, 23, 25 260:9, 20 262:13, 24, 25 263:4
**Canadian** 257:14 258:2, 8 259:15 260:18, 21 261:14
**cap** 51:15 52:4, 5 113:8
**capital** 96:5 104:16 194:17
**card** 269:13
**care** 207:15, 19 258:14
**career** 9:14
**CASE** 1:3 4:8 19:5, 7 33:19 46:16, 17 47:22 129:10 133:3, 25 183:9 200:22 202:15 203:17 208:6 212:4 213:15, 21, 25 214:5, 11, 20, 25 215:8 226:10 231:22 247:16, 17 256:1, 7 257:6, 9, 18, 21, 24 258:8, 14, 16, 20 260:11, 14 262:3, 14 263:6, 10, 14 264:13 265:18, 20 266:1 270:3
**cases** 260:2
**cash** 10:4, 5, 22 16:2 17:3, 19 25:20 26:22 27:2 36:17, 21 50:5 64:3, 7, 12, 13, 25 67:9, 23 68:2, 7, 9, 10 93:9 146:14, 15, 19, 21, 22
**catch** 256:15
**cause** 1:17 271:3
**caused** 198:22 249:24
**caution** 256:23
**census** 244:17 245:13, 25
**center** 15:9, 15, 18 17:12
**CEO** 72:18, 20, 24, 25 73:4, 7 203:6 216:21, 24 217:16, 17, 18 234:12, 14
**certain** 59:21 79:5 160:6 220:15, 16 224:20
**certainly** 220:25
**certainty** 218:2 222:2 224:8 226:4, 9
**certification** 256:1 258:19 270:5
**certified** 259:24, 25 261:15 270:8
**certify** 258:22 259:12 261:2 270:9, 14, 23
**CFO** 72:18 73:7, 8 203:7
**challenging** 128:23 129:3 224:9, 22 226:7
**chance** 58:8
**change** 25:5 41:19, 22 110:20 165:6, 14 186:17 187:16 268:2
**changed** 33:14 120:14
**changes** 40:3 42:7 268:1 270:19, 20
**characterize** 16:6 50:5 64:21, 23
**charged** 142:1
**cheap** 164:22
**check** 103:2, 13 104:15 111:6, 10
**checked** 103:11 105:15 110:6, 17 265:15
**checking** 68:7
**checking/saving** 64:13
**checks** 104:14
**Chicago** 2:11
**children** 13:21, 23
**Chinese** 183:2
**choose** 18:1 25:22 28:4 32:24 36:22 37:11 44:20 52:10 69:18 106:19 170:16 171:20 207:2
**choosing** 39:19 42:12 51:10, 13 73:2 76:11 187:20
**chose** 19:20 174:10, 18 198:19 199:15
**Christian** 20:1
**chronology** 143:9
**circumstance** 46:7
**circumstances** 12:10 20:21 45:6 46:5 47:3, 7 87:12 186:6
**citizen** 11:25 13:5, 7
**City** 2:5
**Civil** 1:20
**claim** 206:5, 24 226:19 227:7 240:3 253:12 254:3 260:17 261:14 262:14
**claimed** 240:15
**claims** 209:20, 23 210:7, 8, 11, 17, 22, 23 218:8 224:17 262:4
**clarification** 7:13 38:10 41:21 43:17 80:16 131:7, 20

232:18
**clarifications** 49:22
**clarify** 41:16 110:8 149:6, 13 150:9, 23 153:12 167:16 168:25 235:19 250:4
**clarity** 54:9 59:4
**class** 53:1 55:1, 7, 8 72:23 203:24 204:5 207:9 211:11, 15 255:25 257:14, 21 258:2, 3, 19, 23 259:8, 11, 12, 15, 18, 24, 25 260:18 261:2, 14, 15 262:7, 9, 13 263:19, 21 264:16
**classify** 159:23
**Clayton** 72:21 73:13, 17 74:23 75:1, 22 216:18, 23 217:17 231:15 234:11 242:7
**clean** 6:17 7:7 66:6 96:20 132:4 140:3
**cleanup** 265:5
**clear** 8:10 41:3, 7 48:13 57:1 64:18 65:4 70:14 71:20 82:20 103:18 125:7 131:1 152:19 153:18 160:23 169:2 173:1 178:16 219:8 221:10 222:5 225:12 229:25 230:7 235:21 250:14 251:15 252:3
**clearly** 6:21 240:11
**click** 44:24
**clients** 19:22 21:17
**close** 229:7
**closed** 67:18
**closely** 48:6 102:16 187:8
**CNBC** 37:6, 18 42:14, 24 48:5
**colleagues** 44:10
**column** 98:1 141:16 145:9
**combination** 18:9 174:23
**combine** 11:25 61:21
**combined** 180:21
**come** 12:7 20:20 165:22 203:9, 24 248:3
**coming** 147:3, 7, 11 158:25 164:25
**comments** 122:13
**commercial** 242:9
**Commission** 3:16 21:20 269:22
**commodities** 184:15
**common** 52:21 53:17 54:12 55:15, 18 84:4, 16 87:25 90:4 145:8 159:12, 14 160:8 161:5 162:11, 19 163:1, 7, 8, 11 168:15 169:14, 25 170:15, 16, 21, 22 171:8, 21 173:7 185:19 198:20
**communications** 78:1 115:22
**Communist** 12:15
**community** 239:23
**companies** 10:5 18:10 24:2 25:25 26:11 27:11 38:15 39:3, 11, 18 40:3 42:6 44:24 51:3 79:2 82:2 101:16, 23 102:6 113:7, 15 126:23 128:13 133:2 169:18, 21 170:4, 6 172:2 175:8 176:19 186:13 190:9
**company** 18:5 21:18 22:19 26:13, 16 29:18 30:14 31:3, 15 32:5 33:12 35:10, 20, 22 36:6, 23 37:1, 5, 7, 10, 11, 17, 23 38:4, 14, 19 39:4, 20 40:21 41:25 42:19, 25 43:4, 5, 10, 12, 14, 22, 24 44:13 45:10, 11 47:9 53:7, 11, 13 54:23 55:9 69:22 70:2, 5, 7, 9 71:10 72:9 73:18, 21, 24 74:10 75:2, 5, 9, 19, 25 76:12 78:22 79:3, 19 80:22 81:12, 20, 24 83:6, 8, 10, 15, 23, 25 88:2 90:8 97:23 101:18, 25 102:3, 22 113:20 117:13 120:6 123:3, 8 127:24, 25 128:1, 3 130:13, 15 132:15 169:16 174:25 175:3, 18 186:21 187:9, 11 188:7, 10 192:15 193:5, 20, 24 194:6, 7 200:20 203:6 204:23 205:7, 9 206:5, 24 207:13 209:2 210:7, 8, 12, 18, 22 212:21, 23, 24 220:14, 16 222:23 223:1 230:17, 25 231:18 232:21 233:21, 24 234:1 235:1, 13 236:6, 7, 17, 24 237:25 245:20 248:20, 24 249:2, 17, 25 250:11, 16, 22 251:2 252:17 253:10 254:4, 21 255:12, 21 263:24
**company's** 30:16 31:6 33:11 42:5 43:1, 2, 10, 23 76:18 77:19 81:10 90:9 119:9 122:10 124:6 179:20 180:16 189:24 207:16 232:25 233:19 248:5, 7, 19
**compare** 101:25
**compared** 39:5 101:16, 18, 22
**compel** 133:12
**complaint** 207:20 208:6, 12 212:16
**complementary** 184:15
**complete** 138:15 139:7 235:25
**completely** 22:20 82:22 112:24 161:16 239:10 240:24 248:2
**completion** 270:17, 22
**comply** 10:20, 21
**comprise** 27:15
**comprised** 148:3, 21 154:5 179:20 180:17
**comprising** 162:19
**concept** 262:9
**concern** 164:15 243:14
**concerned** 175:22 211:4
**concerning** 232:23
**conclude** 165:4 221:15
**concluded** 83:15
**conditions** 118:8 125:20
**conducting** 245:13
**confer** 78:10
**confidence** 201:6
**confident** 74:8
**confidential** 257:3
**confirmation** 199:23
**confirmed** 165:1 166:8 192:10 194:1, 12 199:25 201:11 250:11 251:2
**confuse** 151:18
**confused** 31:2 46:4 54:25 154:15
**confusion** 131:17
**conglomerate** 24:6
**Congress** 40:18 222:14 223:4 225:12 227:3, 20 230:5 239:20 240:9, 21 241:2
**connected** 216:19
**connection** 34:23 217:13
**conservative** 26:25 27:1, 3, 4
**consider** 26:5 39:2 40:2, 10 42:3, 8 44:12 45:7 64:25 77:12 96:12 113:1 118:13 124:2 127:14, 17 130:10, 15 132:6 159:7 165:18, 24 167:13 172:4 173:7,

17 175:10 176:9, 18, 24 186:18 217:21 242:13
**consideration** 269:16
**considered** 77:21, 23 83:22 96:11 124:5 149:11 150:12 160:15 168:8 171:12 172:1 187:20 193:21
**considering** 130:6 132:10 165:23
**considers** 251:1
**consistently** 35:24
**consists** 258:3
**consolidated** 208:5
**constructive** 41:2
**consult** 35:23 42:12 222:13, 24 225:13 226:13, 24 227:11 229:23 230:4 231:17 233:6 240:22 242:10, 14, 23 244:2, 13 245:20
**consulted** 15:13 221:11 223:3 228:25 229:16, 21 230:1, 8, 12 234:21 237:23 239:1, 22 240:4, 13, 15 241:17 242:10 246:13 247:3 264:3
**Consulting** 5:4
**contact** 204:25 205:9, 19 206:4 264:11
**contacted** 206:15
**contains** 270:20
**contend** 237:6
**contention** 235:1
**contested** 118:5 120:13 125:17
**context** 58:20 126:2 176:25 267:6
**continue** 23:22 73:22 83:2, 3 189:24 216:7, 8 233:13, 22, 25 235:9, 12, 14 236:8 237:1
**continued** 69:25 74:7 76:4 83:12 114:1 186:20 202:6 203:8 216:10 233:8 250:19 251:23 253:1, 7
**continues** 33:13 104:9
**continuing** 195:14 196:16
**contrary** 267:5
**contribution** 104:17
**contributions** 96:5
**conversation** 7:3
**conversations** 257:2
**conveyed** 75:24
**copy** 115:18 140:3 161:13 207:20 208:11, 20, 22 209:1, 18 212:9, 10
**corner** 59:17, 25 60:9, 22 115:8 148:7 152:1 154:4 158:3 181:20
**Cornerstone** 2:18 5:4
**corporation** 9:11
**correct** 8:6 22:9, 10 32:15 34:19 35:3 47:10 50:7 51:11, 12 52:23, 24 53:20 56:7 57:5 59:8 61:5, 6, 8, 9, 12, 13 62:24, 25 63:2, 3 65:16, 22 66:14 67:6, 21, 22, 24 68:1 71:21, 24 73:14, 15 74:21 76:14, 16 81:13, 14 86:14, 23 87:1, 2, 3 91:11, 12, 21 94:10, 11 95:8 96:24 97:6, 7, 10 101:6 102:4 106:21 123:12 124:3, 7, 8 134:14, 15, 22, 23 136:8 138:8, 9, 13, 14 139:8 141:8, 9, 14, 15 144:9, 20, 21 148:1, 4, 22 152:6, 7, 15, 16 154:7, 10, 11 155:19 156:2, 21 158:10, 24 159:1, 6, 15 160:10 163:3, 13, 16, 17, 23 165:17 166:21 167:21, 25 170:12 174:3, 4, 7, 8 175:2, 24 176:11 177:12, 19 181:10, 18 182:1 186:7, 8, 22, 23 190:14, 15 192:10 193:22, 23 195:18 196:19 199:12 201:3 202:4, 7, 8 206:6, 7 223:7 233:20 248:8, 15 249:13 252:17, 23 253:23 258:24 259:9 265:25 269:3
**corrective** 194:5, 9
**correctly** 24:24 51:4 57:22 70:21 73:9 74:18 77:10 103:3 104:13 121:5 144:8 180:18 216:20 221:19 233:1 242:18 258:13
**cost** 141:22 144:22 145:3
**Costs** 141:17 142:1, 6
**Counsel** 4:20 5:1 7:20 60:1 160:6 211:23 213:21, 22, 23, 25 214:23 270:24
**count** 67:7 104:21
**countries** 12:16 127:14 263:11
**country** 127:9, 17, 20, 21 128:4 237:14
**country-specific** 126:23
**COUNTY** 269:8
**couple** 6:6 7:17 34:18 42:3 49:21 58:6 62:13 85:22 88:3 91:8 94:16 96:13 104:4, 5 105:9 121:16 135:20 142:20, 22 167:9 171:15 196:21 198:14 202:3 209:5 249:12 266:10
**coupons** 65:2
**course** 30:5, 20 31:9 32:2 101:17 114:8 127:21 186:18 250:5 252:13
**COURT** 1:1 4:7, 15, 16, 17 5:5 6:11 14:11 21:8 88:20, 24 190:20 191:4, 7 192:7 194:2, 3 197:2 199:22 200:6 201:18, 19 202:12 203:11 209:17 220:2, 8 223:6, 7 224:5 231:21 253:2 263:9 270:1
**cover** 147:11
**covering** 51:17
**covers** 229:5
**COVID-19** 31:25
**creates** 45:14
**crosstalk** 68:15
**CRR** 1:24 271:11
**CSR** 1:24, 25 271:11, 12, 13
**CST** 1:18 4:2 49:16 60:16 91:4 137:7 150:18 195:2 232:14 265:11 267:17
**current** 100:7
**currently** 8:12 202:24
**cut** 80:13 112:10 140:20

**< D >**
**daily** 35:24
**damages** 247:15, 17
**dark** 238:14 239:9
**data** 245:14, 25
**date** 187:23 188:4 257:13 270:18 271:12, 13
**day** 128:21 136:17 147:6, 7, 8, 10 168:19 238:14 269:10, 18 271:5
**days** 136:21 146:18 147:5 175:9 196:21 197:25 198:3 202:3 270:18
**December** 12:9 164:10 165:25 175:5, 6, 8 190:14 192:22 197:11, 20 198:8

203:15 248:7 249:24 254:15 266:5
**decide** 33:23 85:12 94:25 96:2 214:2
**decided** 103:6 112:5 190:13 191:1 201:21 251:5
**deciding** 17:25 209:19, 22 210:6, 21 213:14
**decision** 41:6, 24 76:20 77:6 79:22 80:4, 25 81:5, 6 82:4 83:4 84:3, 16 87:25 88:7, 17 90:3 106:22 111:1 184:7, 24 189:23 191:10 193:3, 7, 12, 16, 25 197:10, 21 201:2 202:12 238:25
**decisions** 10:14 110:10 197:2 213:8
**decline** 248:4, 19, 23
**default** 94:21
**Defendant** 1:16 2:8 3:11 4:5 86:8 213:4
**defendants** 5:2 213:15 216:11
**defined** 89:22
**definitely** 222:21
**definition** 259:1
**demands** 240:15 246:12 247:2
**department** 9:12
**Dependence** 121:20 122:1
**depends** 26:12 39:5 95:14 112:3 121:8 127:4 135:21 211:1 213:16 215:5, 7
**deponent** 270:15, 16, 21
**deposed** 1:16 6:3
**DEPOSITION** 1:8 4:4, 10 6:7 57:25 58:7, 12 60:21 85:15 86:3 92:3 114:22 134:3 136:24 137:12, 15 140:1 152:9 185:6 195:8 267:14
269:1 270:5, 12, 17, 22
**depositions** 207:13
**derived** 114:14 119:10, 23 121:4
**describe** 10:18 26:24
**described** 85:10
**describes** 145:9
**describing** 16:7 233:19
**DESCRIPTION** 3:7 10:2 93:3 158:25 269:12
**detail** 36:12, 20 40:8 120:9 127:23 166:23 167:3, 6
**details** 63:16 161:9 246:7
**determine** 106:13 228:24
**determined** 229:15, 20
**determining** 127:18 244:18 245:14
**difference** 63:24 239:3, 11 263:14
**different** 12:17 16:1 47:12 50:13 51:10, 13, 21 59:5, 6 64:1 65:14, 24 127:1 147:15 151:18 160:12 195:19 226:10, 11 238:16 239:10 242:20 251:8
**differently** 89:22
**difficulties** 128:12
**digging** 225:8
**direct** 59:20 87:4 134:5 250:22
**directing** 138:23 151:20
**directly** 19:19 188:12 192:15
**director** 9:6
**disagree** 220:1
**disclaimer** 122:14, 15
**disclose** 235:4
**disclosed** 235:3 237:8
**disclosure** 76:2 194:5, 10 233:11
**discount** 36:21
**discouraged** 77:24
**discovery** 133:4 134:1 183:10, 13 213:3
**discrepancy** 45:21
**discuss** 27:19
**Discussion** 85:17 137:4
**distance** 244:7
**distort** 31:22
**distracted** 171:5
**DISTRICT** 1:1 4:7 270:1
**diversification** 16:7, 14 27:6 50:9 51:9
**diversified** 27:9 69:2 168:3
**diversify** 20:23 22:8, 11 23:22, 24 25:15 27:10 50:13 52:7 149:10
**diversifying** 24:18 50:10
**diversity** 170:24
**divide** 16:1 17:2, 24 25:19
**dividend** 26:2, 22 37:5 38:25 39:1 70:7 71:6, 9 74:5, 7, 10, 11, 17 79:9 81:12 83:24 91:9, 13 92:22 93:9, 19 94:5, 13, 14 95:17 98:8, 19 99:14, 18, 22 100:12, 17, 21, 22, 25 101:14, 22 102:23 104:12, 19 106:6, 23 109:15 111:7 113:15, 21, 24 139:16 170:6, 9 173:12 174:22
**dividends** 18:8 28:6 36:18 37:2, 7 38:14 39:9 43:4, 6 53:6 68:3, 5 69:23 74:1, 13 76:4, 13 78:22 79:2, 10, 14 83:3, 25 91:16, 19, 22, 25 92:18 93:5 94:19, 24 95:1, 4, 7 96:4, 9, 11
98:16 99:23 101:16, 19, 23 102:3, 7, 11 103:7, 10 104:16 105:15, 24 106:16 107:3 108:11 109:4 113:10, 18 114:19 120:5 123:4 138:12, 17 139:23 164:19 166:12, 16, 22 169:16, 18 170:2, 4, 15 174:1, 7, 11, 16 175:21 187:12 190:11 216:8 231:5, 8 233:10, 23, 25 235:9, 12, 15 236:8 237:2 250:20 251:22
**docket** 265:15
**document** 57:24 58:10, 17 59:21 60:1, 4 63:7 86:4, 17 87:6 92:14 114:25 115:1, 3, 18, 23 116:1, 7, 9, 10, 11, 13 117:1, 2, 14 124:13 158:12 195:9 196:7, 15 269:13
**documents** 115:13, 17 133:24 208:18, 23 209:8 212:3, 13, 21, 23 213:9 214:25 237:19 245:5
**doing** 8:16, 21 10:19 18:6 26:5 37:2 45:13 69:22 73:21, 25 74:10 76:2, 12 104:10 114:17 182:20 213:25 221:7 226:16 227:5 231:18 232:1 233:11, 22, 24 235:8, 14 236:7 237:1 238:15 244:1 245:16 251:21
**doings** 38:23
**dollars** 61:16, 18 163:23 164:9 166:1 167:8 175:2, 23 249:11 254:16, 20 255:7
**double** 130:21 131:4
**double-check** 103:16

**doubt** 45:14 46:8 163:15, 17, 18 235:23 250:21
**Dow** 206:22
**Dr** 85:6
**draft** 116:5 208:16 209:15 212:9
**drawing** 243:22
**drink** 7:18 243:19
**driver** 201:14
**drop** 164:14 203:23
**dropped** 21:5, 10 46:21 175:5 264:23
**Duc** 12:5
**due** 88:19 254:6
**duly** 1:16 5:7, 9 270:11

**< E >**
**earlier** 49:25 65:17 105:8 106:18 118:12 119:8 121:10, 17 141:10 144:3 165:3, 5, 13 170:10 232:19
**early** 14:23 20:24 22:9, 12 25:16 91:15 198:9
**earning** 18:6 24:3 73:4, 5 117:12
**earnings** 35:8 38:15 73:5 121:14
**easier** 140:2
**efficiency** 31:9 84:11
**efficient** 30:20, 21, 23, 24 32:16 85:3, 7
**effort** 41:1
**eggs** 22:13 170:11 171:20
**eight** 51:21 67:11, 12 71:8 74:5
**EISENBERG** 2:10
**either** 78:18 245:7, 8
**eleventh** 231:5
**employ** 65:18 185:17
**employed** 8:12 132:18 198:21 199:2 201:25 270:24
**employee** 228:15, 21 237:13 238:3, 20 245:19 271:2
**employees** 190:24 199:6 222:19 228:13, 22 238:3 239:12
**encompassed** 243:23
**encompasses** 149:16
**ended** 12:17
**ends** 67:4 93:18 112:8 152:2, 4, 15
**engaged** 130:2
**engaging** 184:2
**engine** 71:21 78:25 189:8
**English** 82:11 246:9
**Enron** 22:17
**entertainment** 49:1
**entire** 58:10 167:23 248:4, 19, 25 249:2 254:6
**entirety** 58:23
**entitled** 124:22 260:1
**entity** 129:7, 23 130:2 223:10
**environment** 227:16
**environments** 226:17
**equivalent** 25:20 27:2, 12 64:3, 7, 25 100:25 163:2 243:25
**equivalents** 16:2 17:3, 19 50:6
**escape** 12:14, 16
**Escobal** 33:22 69:24 73:21 76:2 114:4, 11, 14 118:4, 9, 14 119:11, 24 120:12, 23 121:4, 7, 12, 20 122:2, 10 125:16, 21 126:15 165:1 166:9 198:22, 23 199:3 201:25 216:3, 11, 25 217:8 221:11 230:21 233:12 234:16 237:24 238:20 239:1 240:12 244:14 251:23 253:5
**essentially** 261:4
**established** 168:15
**estimate** 214:10
**ETF** 24:1 27:11, 12 50:13 51:10 94:23 106:3 146:18 158:21 159:16, 17, 21 160:14 167:4 171:15, 25 173:18 182:20
**ETFs** 159:20 160:18
**event** 184:6
**events** 40:2 42:7 165:15
**eventually** 95:5 225:4 248:18 249:5 252:18
**Everest** 4:14, 17
**everybody** 140:11
**everyone's** 196:8
**everything's** 216:6 231:9
**evidence** 103:21 128:8 256:9 261:17
**exactly** 22:24 52:15 70:16, 18 74:6 82:15 93:13 189:19, 21 192:20 194:9, 11 206:12 209:13 214:12 224:3, 11 225:3 226:12 227:4, 7, 21 229:1, 23 230:3, 14, 23 231:1, 10, 16, 25 233:4 237:14, 16 241:11 242:17 244:11 246:15 253:17 259:1 265:2, 22
**EXAMINATION** 3:3 5:10 266:11
**example** 15:10 40:14 43:3 183:1 238:8, 9
**examples** 132:24
**excellent** 204:5
**exception** 7:21
**excerpted** 58:20
**Exchange** 3:16 156:23 263:2
**exclusively** 13:11, 12
**Excuse** 80:12 121:17 161:11 215:16 243:2
**executed** 269:15
**executives** 42:5
**Exhibit** 3:8, 10, 15 57:25 58:4, 7, 13 60:22 85:15, 16 86:3 92:3 114:22, 23 134:4 136:25 137:12, 16 140:1 185:7 195:8
**EXHIBITS** 3:6
**exist** 50:16
**existed** 230:7 247:13
**expect** 147:7 214:19 235:15 263:13
**expected** 106:24
**expedite** 140:5
**expense** 95:20 96:1, 6
**expenses** 68:6 112:4
**experience** 204:5 207:9
**expert** 85:6 89:20
**Expiration** 271:12, 13
**EXPIRES** 269:22
**explain** 82:14 87:12 215:1
**explaining** 186:5
**expressed** 269:16
**extent** 110:19
**extra** 95:21

**< F >**
**face** 228:19
**Facebook** 9:8 20:22 21:24, 25 22:2, 7 23:23, 24 24:4, 9, 18 33:7 52:7, 11, 14 66:16, 21 68:21, 24, 25 69:4, 9, 10 148:25 149:8, 11, 12, 17 150:11 167:1 168:19 171:11 177:10, 22 178:1, 8
**Facebook's** 167:13 168:6
**faced** 128:13
**fact** 41:3 74:15 79:19 114:13 119:9, 22 120:11 123:24 128:17, 24 142:5 164:6, 8 166:15 167:7 175:1, 23 178:17 263:17
**factor** 91:10 126:19
**factored** 128:6
**factors** 113:12

**facts** 103:20 128:8 132:12 164:25 175:12 211:14 227:6 256:9 261:17
**factual** 261:18
**failed** 203:11
**fair** 7:24, 25 9:13 29:3 30:3, 17, 20 31:6, 10 32:7 38:8 45:16 65:25 66:1 69:15 91:20 178:23
**fairly** 84:25 89:14 258:8 259:14 260:13 263:8
**fall** 12:13 254:19
**fallen** 163:22 166:1 167:8 175:23 249:11
**false** 29:20 30:4 33:15 47:9 79:23 80:5, 9, 11, 22 81:16, 21, 25 82:6, 12 204:24 207:16 215:23, 25 228:11 235:16 236:8, 10 250:8, 16 254:3, 7 261:18 263:24
**familiar** 58:15 59:2, 11 127:6 211:3 213:13 232:8 260:22
**family** 14:1 56:18 78:13
**far** 83:2 129:25 179:3 211:4 214:6 247:21 260:7
**FARUQI** 2:4 203:18 204:7, 19 206:4, 8, 11 207:2 208:7 209:2 213:17 214:8 264:4, 24
**Faruqi's** 264:13
**faster** 92:16
**father** 12:21
**Federal** 1:19
**fee** 61:20
**feel** 48:3 82:17 266:14, 17, 20, 24 267:2
**fell** 164:9 255:6
**felt** 48:9
**Fidelity** 3:8 15:14 17:12, 14 18:21 19:17, 20, 25 21:17 26:10, 19 27:21 34:25 37:1 44:18, 22 50:17, 25 51:4 57:20 58:21 61:3, 19, 21 64:4, 14, 16 66:8, 13, 19 67:5 68:9, 23 69:4 79:8 94:21 104:18 106:10 110:5, 15, 20 111:14 138:22 146:13 160:3
**Fidelity's** 15:10
**fiduciary** 21:19
**field** 51:20
**fifth** 71:7
**fight** 209:16
**figure** 69:12 160:18 179:12 180:1 240:6
**figuring** 242:13
**file** 121:1 203:24 208:18, 20 210:7, 8, 11 211:7 212:9 226:2
**filed** 128:23 129:3 204:8 206:17 207:21 208:6, 12, 22 209:1 212:16 223:10, 24 224:8, 21 225:16, 22 256:1 265:16
**files** 116:8, 9, 23
**filing** 117:6, 21 121:1 206:24
**filings** 36:5 37:20 38:2 78:15, 18 117:10 120:2
**final** 208:19 209:17 212:10
**finally** 33:21 224:4
**Finance** 35:17 42:10 205:14 206:20
**financial** 11:13 27:20 36:13 38:22 63:19 78:12 83:5, 7, 9, 22 88:1 133:6 161:1 175:7 184:22 201:6 271:4
**financially** 83:15
**find** 35:14
**fine** 5:20 6:9 7:19 49:10, 13 85:24, 25 104:10 118:19 140:7 143:17 153:17 216:6 232:10 265:7
**finish** 7:6 9:2 62:18 80:14 108:4 123:17 144:18 261:9, 11 266:22
**finished** 215:18 246:21
**Finwest** 35:17
**finwest.com** 42:15
**firm** 21:16 204:7, 19, 25 205:10, 18, 19 206:4, 8, 11, 14, 19, 21 207:3, 5 208:8 209:2 213:11, 17 240:24 242:5, 17 245:3 264:4, 11, 12, 16, 24
**firms** 203:21, 24 205:8, 10 256:19
**First** 3:12 5:9, 16 6:10 7:6 9:16 12:1, 3 21:5 59:16 60:21 61:10, 14 62:11 63:10, 25 64:2 74:13 78:20 82:11 86:9 87:17 104:7 110:3 111:14 115:9 117:20 122:9 124:21 136:25 191:5 205:12 206:10 208:25 241:22 264:3 266:13
**fishing** 238:15
**five** 67:14, 16 122:21 126:3 136:19 144:1 161:8 180:12 227:19 265:4
**five-years** 212:13
**fixed** 65:1
**flip** 62:3 86:16 92:6 93:18 96:13 151:3, 5 153:21 154:1
**Floor** 2:5 4:11
**flows** 36:21
**fluctuate** 100:6
**focus** 40:19 47:15 104:7 190:2
**focused** 18:9 253:10 263:6
**follow** 33:2, 4, 6 55:10 187:23 188:1, 5 200:4 215:12, 13
**following** 222:7 225:6 248:14 250:25 270:10
**follows** 5:9
**foregoing** 269:1, 14
**foreseeable** 69:25 73:22 77:8 187:10 190:10
**forgot** 74:6
**Form** 3:16 16:21 22:25 37:14 39:13, 23 40:6, 13 43:13 70:15 74:20 76:15 80:1, 7 81:18 82:8 83:18 84:7 86:18 88:12 94:7 95:9 98:11 171:22 220:21 224:24 267:8
**formal** 15:3
**forth** 31:23 74:14 135:16
**forward** 74:17 151:1, 3, 5 152:19 237:4
**found** 71:17 72:1 216:22 240:24 267:2
**foundation** 43:19 110:7 172:20 176:1 199:18 201:5 256:9
**founded** 234:13
**four** 24:7, 8, 10, 25 187:4
**fourth** 71:7
**fraction** 149:22
**Francisco** 4:12 5:23 242:25 244:1
**fraud** 210:19
**FRCP** 270:14
**free** 45:4
**frequently** 34:7, 8, 9 36:2 214:22
**friends** 13:13 44:9
**front** 151:21 263:7
**froze** 21:4
**Fryd** 2:18 5:4

**fulfill** 136:5
**full** 80:20
**fully** 24:10, 13, 23
**function** 11:14
**functions** 9:15, 18, 20 85:1
**fundamental** 18:4
**funds** 19:10 24:2 27:13 50:14 51:11, 15 64:5, 7 94:22, 23 103:1, 15 104:14 106:2 157:2 159:8 167:4 168:7 170:21 171:15, 25 173:15, 18 182:20 190:8
**funny** 46:12
**further** 266:7 270:14, 23 271:2
**future** 39:1 40:23 70:1 73:23 76:5 77:9 94:18 121:14 187:10 190:25 202:14 216:10 233:15, 20 235:10 236:15 237:3 251:24
**futures** 37:1 184:21 190:11

**< G >**
**gain** 96:5
**gains** 194:17
**gap** 162:1
**gathered** 117:3, 5
**general** 34:17 36:10 38:23 70:8 78:10 120:25 225:24
**generally** 43:3 46:25 59:1
**generate** 107:7, 12 111:15 114:17
**generated** 107:3 120:23
**generating** 24:19
**GERBER** 2:10
**give** 8:9 58:19 74:8 102:12 115:23 116:11 132:23 140:2, 23 214:10 215:1 222:11, 15
**given** 224:11 242:5 251:13 269:17 270:13
**giving** 6:19 68:17 238:8 241:15
**go** 6:5 8:24 9:5 13:10, 12 15:14 16:16 22:19 25:17, 22 28:5 34:13, 14 36:16 44:22 50:10 51:13 59:14 60:12, 13 85:20 96:3 100:20 104:9 109:8 119:3 122:22 126:5 129:17 137:2, 3 143:14 146:19 150:15 171:23 179:4 208:18 209:16 214:2 217:20 238:10 251:17 259:3
**goal** 107:7, 12, 23
**goals** 23:20 24:20 25:5 132:22
**goes** 6:7 88:2 137:22 161:13
**going** 4:19 6:5, 12, 14, 18 7:16 8:19 14:7 19:2 26:7 29:14 33:23 35:12 36:16 40:17, 18, 19, 22 46:11, 22 48:3 50:20 57:24, 25 59:20, 23 60:5 69:13 70:15 74:16, 17 79:13 85:14 88:19 94:19, 25 95:18 96:3 98:8, 16 99:14 102:15 106:13 111:16 113:20 114:21 121:6, 14 129:11, 13 130:19 131:11, 15 132:3 139:25 140:1, 2, 4, 17 142:19 150:6, 22, 25 152:19, 21 153:4, 8 167:14 178:9, 12 179:4 180:9 183:3 188:5 190:25 193:7 197:1 200:5 201:18 209:15 216:6 217:5, 8 218:2, 4, 15, 19, 20, 22 219:4, 12 220:10, 17, 18, 25 221:4, 6, 16 224:8, 21 225:4, 9, 10, 16, 22 226:2, 14, 20 227:8, 10 231:13 233:5, 14 234:2, 4, 8, 9, 19 235:14 236:7, 15 237:4 239:24 242:6, 24 245:5 251:17, 24 252:18 253:2, 4 262:3
**Goldcorp** 216:21, 25 217:15, 17 234:12, 16
**Good** 4:25 5:12, 13 7:15 18:9 24:3 25:25 26:21, 22 28:6, 7 36:17, 18 37:2, 5, 7 43:6 78:22 79:2 85:19 104:20 153:18 171:19 187:11 194:4, 24 201:13 216:7 231:7, 9 241:5 244:10
**good-faith** 176:1
**Google** 35:16 42:10, 25 43:5, 7, 10, 15, 22 45:3 71:3, 16, 18, 21, 24 72:3, 4, 6, 12 77:14 79:2 120:4 188:6, 10, 15 189:5, 8, 11, 23 193:11 199:4, 24 203:16 204:1, 2, 8, 20, 21 205:5, 6, 14 206:20 207:4, 8 221:7 222:18 228:14 229:12 230:19 245:7, 8 264:25
**Googled** 71:3, 12 73:11 77:15 78:21 79:1 102:5, 6 193:6 233:7 239:8 245:17
**Googling** 77:18 205:12
**gosh** 123:21
**gotten** 219:8
**government** 12:22 65:2 222:25
**governmental** 118:6 125:18
**grand** 167:10 176:6
**granted** 221:22
**Graziano** 1:24 4:17 270:8 271:11
**Great** 91:1 137:11 233:12, 14 235:11 237:1, 3 251:24
**greater** 61:17
**ground** 6:6
**grounds** 219:13
**group** 66:20
**grow** 69:25 79:13 83:3, 12 171:16 216:10
**growing** 78:23 113:6 231:8
**grown** 171:18 175:1
**growth** 16:4, 15 17:2, 4, 19 24:3 25:21 26:1, 11, 21 27:3, 5, 15 28:5, 7 33:13 39:8 50:6, 8, 12 51:9 53:6, 11, 12 65:9, 11, 12, 14, 19 66:3, 7 68:4 70:8 75:13, 16 76:4 77:7, 8, 10, 13, 18 79:9 81:12 83:11, 14, 23 95:22 104:7, 11 105:24 107:9, 23 113:16 114:1 149:2, 8, 12 150:4, 5, 10, 12 152:10, 14 153:2, 9, 14 167:11, 14, 19 168:8 169:15, 22 170:7 171:13 172:8 173:9, 11, 14 174:20, 22 175:4 186:16 187:11 190:5, 8, 10 232:25 233:2, 20
**Guatemala** 114:11 118:15 126:16, 19 127:2, 6, 8, 12 128:4, 13 129:8, 24 190:20 191:23 192:7 194:2, 13 199:22 201:15 202:12 217:5 221:22 223:2 224:5 225:13 228:22 234:17

240:20 241:22 244:4 251:4
**Guatemalan** 222:25
**guess** 110:21 123:21 129:16 139:14 180:9 182:5 219:25 225:25
**guidance** 175:7 213:16
**guide** 213:12, 18
**guy** 238:10, 12, 16, 17
**guys** 21:4 49:8 217:20

**< H >**
**Hai** 11:22 12:5 13:14, 17
**H-a-i** 11:23
**half** 9:9
**hand** 92:14 269:17
**handed** 58:12
**handing** 86:2
**handle** 78:12
**handled** 19:18
**happen** 33:23 224:23 253:13
**happened** 45:23 46:14 47:16 48:7 93:14 111:13 192:21 198:4 200:21 264:13, 18
**happening** 6:15
**happy** 226:16 227:14
**hard** 29:13
**harm** 253:11, 17
**head** 6:24
**heading** 122:4 158:17
**heads-up** 215:1
**health** 83:5, 7, 9, 22 88:2 89:16 201:7
**healthy** 83:16 186:15, 21
**hear** 21:4 24:24 28:23 29:22 45:10, 18 47:11 78:20 175:13, 19 195:20 246:17
**heard** 29:23 48:8 128:12 191:5 223:16
**hearing** 29:13
**hedge** 184:19 185:2, 3
**hedging** 184:16, 18, 24 185:17
**held** 4:10 56:8 57:4, 10 63:4 146:8 176:19
**help** 10:13 88:4 117:16 147:22
**helpful** 22:12 94:12
**helping** 13:1
**Hey** 37:5 120:4 121:2 231:2
**hi** 13:18
**high** 65:23 96:11, 12 101:14, 22 102:3, 6, 11 103:8 182:16 184:1
**higher** 101:17, 20
**hire** 10:6 18:21
**hired** 24:8
**historical** 83:14
**histories** 26:21 251:18
**history** 217:20
**hit** 226:1
**Hmm** 16:11
**Hold** 9:2 21:2 33:20 65:24 68:24 69:8 82:25 83:2 88:13 119:2 157:16, 21 189:24 202:6, 15 246:16
**holding** 107:2 148:24 162:12 172:11
**holdings** 144:8, 14 148:4, 6, 22 149:2, 16 150:4 151:23 155:10 156:21 159:5 162:20 163:1, 2, 21 164:6, 8 167:7, 23 176:10 178:20 179:21 180:17 203:3 249:11 264:21
**holds** 64:6, 12 68:2 69:9 149:17 152:5 153:7
**hood** 46:12
**hope** 33:21 140:5 193:8 197:3, 7 202:10, 14
**hoped** 193:4
**hopefully** 202:13
**hospital** 12:25
**host** 9:10
**hour** 49:11 214:16
**hours** 7:17 214:17
**huh-uh** 6:23 191:17
**human** 226:18, 23
**hundred** 120:8 135:8
**hundreds** 126:2
**Huynh** 11:3 56:15, 16, 17, 18 66:9
**H-u-y-n-h** 11:5

**< I >**
**idea** 36:21 171:19 247:20
**identifies** 196:15, 16
**identify** 134:11 196:9
**identifying** 195:16
**identity** 269:13
**ignore** 221:14 226:25
**ignored** 222:16 240:25 241:2
**Illinois** 2:11
**imagine** 149:24
**immediately** 8:22 9:4
**impact** 32:7 40:3 114:14 119:11, 24 164:10
**impacted** 122:16 124:14 164:2
**imperfections** 28:16
**importance** 170:11
**important** 6:17 91:9, 14 111:17
**impossible** 98:12
**impression** 98:16
**improper** 20:7 134:1 183:9, 13 219:15
**include** 258:4
**included** 58:23 138:10 139:23 147:21
**includes** 160:18
**including** 94:23 138:18 148:24 149:8 216:25 227:1 234:16
**income** 14:24 91:19 92:19 94:13 95:4, 17 107:7, 9, 12 111:16 114:18
**incomes** 65:1
**incoming** 146:22 147:9
**increase** 38:25 190:11 235:16 237:2
**increased** 142:18 143:5, 10
**increasing** 18:7 28:6 230:25
**independently** 117:3
**INDEX** 3:1 27:12 173:15
**indicating** 141:21
**indicative** 115:13
**indigenous** 221:13 222:21 228:24 242:15
**individual** 54:18, 20 57:21
**individually** 55:17 135:2, 5
**individuals** 198:21 199:2 201:24
**indulge** 110:3
**industry** 39:3, 11, 19 40:4, 17 42:6 51:14 191:21
**inefficient** 31:13
**inflate** 231:1
**inflated** 251:10, 16, 20 252:10, 13, 16, 24
**inflates** 30:6
**influenced** 76:20, 23 164:2 189:23 193:25
**inform** 191:10
**information** 15:15 32:6 34:25 35:2, 7, 19 36:8, 25 203:13 212:2 219:24 224:13 235:2 236:24 237:5 244:17 263:25
**informations** 26:9

**informed** 191:25 192:5 197:21
**informing** 201:2 203:14
**infrastructure** 40:20, 22
**initial** 41:6 99:2, 5
**inquiry** 178:21 189:14
**inside** 236:24
**insist** 186:20
**Instagram** 33:7
**instance** 1:16
**instances** 30:2, 14 31:3, 12, 21
**instruct** 108:20 123:22 129:13 183:4 219:4, 12, 20
**instructing** 19:6 133:20 183:6
**instructions** 110:20
**instrument** 269:14
**integrity** 84:4, 17, 24 85:11 88:1, 5, 7 89:13, 17, 23 90:1, 4, 11, 13, 14, 16, 17, 21
**intend** 261:13
**intended** 91:18 95:3, 19 185:18 186:21
**intention** 262:14
**interaction** 206:11
**interest** 21:16 68:5 92:19 95:16 258:12 271:4
**interests** 258:7 259:14
**interference** 28:21
**internet** 35:5, 7 37:8 44:17 47:11 48:5 175:16 264:9, 25
**interrogations** 86:9
**Interrogatories** 3:13 86:13 185:6 195:7
**interrogatory** 86:10 87:5, 11 90:2 134:4, 7, 13, 17 137:15, 17 186:4 195:15 196:9 198:18 199:12 200:8, 16 201:1
**interrupting** 130:23
**interruption** 17:5 21:1
**invest** 10:15, 23 32:24 39:19 41:24 73:2 76:11, 20 77:6 79:22 80:4 81:6 82:4 83:10 85:12 95:1 103:6 127:19 130:12 169:24 174:10, 19 224:12 236:22 251:14, 19 258:11 260:19 262:24
**invested** 76:23 95:6 102:2 105:17 130:14 132:7 167:24 178:17 222:4 225:6 246:14 247:4, 10 261:3 266:13
**investing** 15:13, 21 17:20 27:7, 8 75:3 77:24 91:10 119:25 120:14 122:17 124:15 125:24 132:22
**investment** 10:4, 6, 7, 9, 13 14:23 16:3, 4 17:22, 23 18:12, 14 19:13, 16 21:15 22:22 23:10, 20 24:20 25:5, 9, 14 26:1 36:1 41:18 42:13 44:6, 24 47:18, 21 49:2, 4 60:24 61:4 78:5 84:1 92:9 99:2, 5 100:3 106:18 107:6, 7, 12, 23 113:21 114:3, 8, 11 118:13 119:10, 23 124:3 126:20 129:1 132:11, 22 146:24 158:3 168:3 172:5 173:2 174:5 176:22 184:15, 23 185:19, 20 186:10, 22 187:21 190:3 256:17
**investments** 9:25 10:10 11:17, 20 13:24 14:3, 15 15:7 17:25 18:2 19:4 22:23 23:11, 23 25:22 34:24 50:1 65:25 78:11 82:18 106:19, 20 127:15 132:21 133:2, 5 176:25 178:14
**investor** 26:25 29:9, 11, 18 30:5, 25 32:22 33:16 74:9 103:18 166:5 204:22 205:8, 18 207:15, 17, 18 215:24 217:6 218:16 245:12, 24 246:2 253:12 260:18 261:8, 13 262:7, 23 263:23
**investors** 30:15 31:5 32:17 90:19 211:25 236:23 247:19 250:18 253:1 257:21 258:3, 15, 23 259:13 261:3 262:3 263:22
**invests** 110:11
**involve** 11:16, 19 14:2 240:25
**involved** 12:22 13:24 40:21 212:19 265:20
**IPO** 24:11
**IRA** 63:1, 22 66:22, 23, 24
**IRAs** 67:21
**irrelevant** 19:2 20:7 129:10 132:1 133:1, 25 178:3 183:9, 13
**issue** 23:1 38:21 71:5 132:1 170:24 175:6, 7 224:22 225:14 231:4, 22 241:12
**issued** 213:3 229:14, 19 230:2 231:18 240:13, 16 241:10 244:14
**issues** 235:23
**its** 30:3, 15, 17 31:4, 6 46:21 70:7 81:12, 13 104:6 119:10, 23 165:25
**Iyaz's** 85:6

< J >
**January** 197:12, 20 198:9
**job** 10:2
**joined** 5:2
**joint** 55:20, 24 56:4 57:3, 10, 13, 21 65:8 153:5
**jointly** 57:14 153:7
**July** 74:2 165:16 192:17, 18 233:8
**jump** 92:12

< K >
**Karl** 2:9 5:3
**Katerra** 9:7
**Katherine** 2:4 4:23
**Kathy** 234:10
**kbarnickol@nge.com** 2:12
**keep** 33:13 34:12 51:20 52:10, 12, 14 71:4 72:22, 23 74:11, 12 125:7 130:22 131:23 140:13 149:12 150:11 176:18 186:21 200:3 208:15 213:24 214:24 219:6 253:9
**kept** 190:23 216:5
**KEVIN** 1:9, 15 3:13 4:4 5:8, 16, 19, 21 8:12 12:2, 5 13:10, 12, 21 66:8 72:21 73:13, 17 74:23 75:1, 22 86:2, 10 91:8 114:25 123:16 195:6 216:18, 20, 24 217:16 231:14 234:10, 13 242:7 265:15 267:14 269:1, 4, 10 270:6, 11
**K-e-v-i-n** 5:17
**kidnap** 227:2 231:24
**kidnapped** 227:19
**kill** 226:1 231:24
**Killorin** 2:1 3:3 4:22, 23 14:8 16:9, 12, 21 19:1, 9, 14 20:6, 11 21:8 22:25

23:2 25:11 27:18, 24 31:16 32:10 37:13, 19, 24 38:8 39:12, 22 40:5, 12 41:1 43:13, 18, 25 44:2 48:11, 15 49:10, 13 50:19 51:16 52:1 53:23 54:6 59:3, 9 60:10 63:6 68:12, 16 69:13 70:11 74:19 76:15, 21 77:1 79:25 80:6, 12 81:17 82:7 83:18 84:6 85:18, 24 88:10, 18 89:9 91:1 94:7 95:9, 12 98:10, 21, 24 99:16 101:7, 10 103:19 105:18, 21 107:14, 18, 25 108:4, 12, 16, 18, 20, 24 109:6, 18, 22 110:1, 12, 25 111:20, 24 118:16 119:13, 17 120:16 121:22, 25 122:3, 18 123:10, 13, 16, 19 124:16, 19, 23 125:1, 3, 6, 10, 25 126:10 128:7 129:9, 16 130:7, 18, 25 131:3, 8, 11, 15, 21, 25 132:25 133:11, 17, 21 137:1, 21 138:20 139:2, 4, 9, 12 140:7, 10, 13, 19, 23 141:2 143:7, 17 145:19, 22, 25 147:14 148:8 150:15 153:17 155:3, 7 158:19 161:11, 17, 23 162:5, 9 165:8 166:17 168:12, 18, 22 169:1, 7 170:17 171:22 172:13, 19, 23 174:12 175:25 176:14 177:3 178:9, 12, 22 179:1, 9, 11, 22 180:1, 6, 19 183:3, 8, 17 185:25 187:1, 4 188:16, 18 189:2 194:23 195:21, 25 199:17 200:10 201:4 204:10, 14 207:23 208:1 210:9, 24 211:13 215:16, 20 218:9, 23 219:3, 11, 14, 19, 22, 25 220:7, 20, 23 223:18 224:24 232:4 241:4, 24 243:2, 5, 8, 11 244:5, 20, 25 246:3, 16, 20, 23 248:9 250:1 252:20 253:15 254:22 255:13, 15 256:8, 22 257:2, 5 258:25 260:3, 24 261:6, 11, 16 262:15, 18 265:7 266:9, 12 267:11

**kilometers** 229:4 242:19, 23 243:25

**Kimball** 20:1, 4, 20

**kind** 13:24 14:12 17:15 40:11 45:14, 22 113:6 120:24 193:8 207:12 209:12 227:1

**knew** 114:7, 10 126:15 216:14 217:7, 12, 24 218:1, 3, 6, 8, 14, 21 220:25 221:4, 12, 16 222:1, 11 224:7, 10, 11, 20 225:3, 9 226:12, 15 227:4, 7, 10, 21, 25 228:9, 16 229:23 230:3, 23 231:1, 10, 16, 19, 25 233:4 234:9, 11 237:14, 16 239:13 240:22 241:14, 16 242:5, 7, 12 244:12 245:20 252:12, 17 255:3 256:14, 24

**know** 7:4, 20 8:19 9:8 10:12, 22 11:14 12:1, 24, 25 13:1, 2, 13 14:18 15:8, 9, 17, 21 16:2 17:16, 24 18:3, 4, 7 19:21 20:24 21:3, 21 22:16 24:1, 2, 6 25:25 26:9, 10, 11, 20 27:11 31:22, 23, 24, 25 32:4, 20, 22 33:3, 12, 14 34:10 35:17, 18, 19 36:2, 10 37:2, 3, 4, 14 38:21, 23 39:4, 5, 6 40:15, 21 41:11 42:14, 17 44:17, 22 45:3, 12, 14, 22 46:3, 10, 15, 19 47:12, 25 48:4 52:4, 15 54:10 55:9 57:20 58:8 63:22 64:8 65:1, 2 66:19 67:20 68:17 69:11 71:5 72:21, 24 73:4, 6, 21, 24 74:1, 9 77:10 78:23 80:19 82:14 84:21 85:7 86:8 87:6 88:22 89:14, 15, 20, 24 90:7, 14, 15, 18 91:16 93:5, 13, 20 94:21, 22 95:19, 23, 24 99:3 100:1 101:15, 24 102:14, 17, 24 103:14, 15, 23, 24 104:5, 8, 14, 21 105:25 106:1, 3, 9, 11 107:19 108:10 110:7 112:3, 5 113:5, 13, 14 114:17 116:1, 4, 17, 19 117:11, 12, 16 120:7, 24, 25 126:14 127:8, 10, 20, 22, 23 128:1, 10 129:6, 18, 22, 25 132:13, 14, 15, 16 134:7 135:1, 2, 3, 5, 6, 7, 11, 21, 22, 24 136:11, 13 137:19 138:17, 18 139:16 140:11, 19, 24 141:25 143:4, 10, 18, 22 146:15, 16 147:9 150:12 153:14 158:23 159:22, 23 160:14, 20, 21 161:18 164:15, 16, 17, 19, 20, 21, 23 165:1 166:3, 4, 6, 25 167:4 170:5, 6 171:14, 17, 18 172:9 173:10, 13, 15, 16 175:6, 13, 15 176:5 178:24 180:10 181:3 182:22, 25 183:21 184:6, 7, 12 186:14 187:7, 8, 12, 13, 14 188:11 189:16 190:12, 18, 23 191:1, 15, 19, 20, 22 192:4, 7, 21 193:5, 10 194:4, 19 197:3, 5, 16, 17 198:3, 11 199:22, 23 200:21 201:14, 20 202:11, 14 203:6, 21, 22, 24 204:2 205:6, 16, 17 206:13, 16, 19, 21, 22 207:6, 11, 16 208:15, 18 209:4, 6, 7, 10, 12, 16 210:10, 25 211:4 212:7, 10, 12 213:17, 18 214:1, 8, 21 215:4, 5 216:3, 7, 11, 16, 17 217:3, 9, 10, 11, 15, 19, 21, 22, 23 218:19 221:7, 10, 12 222:4, 7, 20, 23 223:3, 23 224:4, 13, 14 225:6, 7, 8, 10, 25 226:17, 22, 23 227:2, 13, 14, 20, 22, 24 228:4, 6, 8, 13, 14, 18, 20, 22 229:1, 5 231:2, 7, 18, 20, 24 233:8, 9, 12, 14, 21, 23 234:9, 13, 21 235:10, 24 236:11, 12, 20, 21, 25 237:1, 3, 14, 19, 25 238:7, 8, 9, 14, 15, 16, 21, 24 239:6, 8, 9, 11 240:11 241:11, 14, 16, 18, 20 242:6 243:16, 17, 18 244:6, 11, 12 245:4, 18, 22 246:5, 6, 7, 8, 10, 12, 15 247:2, 6, 13, 18, 19, 20, 25 248:3 249:3, 5 250:5, 10, 11, 15, 17, 21, 24 251:3, 19, 20, 23 252:12, 14 253:3, 4 255:20, 25 256:13, 16, 19 258:15 259:9, 16,

17, 20 260:7, 8, 9, 13 261:24 262:23, 24 263:3, 6, 7, 11 264:8, 12, 15, 24
**known** 216:3 250:6 269:10
**knows** 235:24
**Korea** 127:21

**< L >**
**label** 115:8
**labeled** 141:17
**Lack** 172:19 201:4 256:9
**laid** 198:21 199:2 201:11
**language** 82:11 131:4, 18 153:15 239:25
**languages** 49:6
**large** 27:9 51:15
**LaSalle** 2:10
**late** 46:21 198:8 202:4
**latitude** 68:18
**law** 40:3 42:7 205:8, 9, 10, 18, 19 206:14, 18, 21 213:11, 17 230:11, 13, 15 240:24 242:4, 8, 17 244:4 245:3 264:11, 12, 24
**laws** 230:6
**lawsuit** 203:21, 25 204:8 205:3, 17 206:16 207:13 208:21 209:1, 12 210:18 211:8 215:9 223:10, 23 224:8, 20 225:16, 22 226:2, 4, 9 260:21 261:5, 15
**lawsuits** 128:23 129:2 207:1
**lawyer** 117:5 211:1 256:19
**lawyers** 115:4, 16, 20, 22, 23 116:3, 11, 17, 24 117:2 203:17 206:23 214:8 237:20 256:13
**lay** 199:5
**laying** 200:20 201:19, 24
**lead** 4:24 87:24 185:15, 17 198:19 211:14, 19, 22 221:15 257:17 260:17 263:8 265:17 266:1
**leading** 16:9
**leads** 71:24
**leaf** 58:7 181:7
**learn** 15:6, 13, 20, 24 17:20, 22 18:1, 11 22:16
**learned** 15:8, 9, 18, 25 18:3 85:9 193:2, 15 197:19
**learning** 15:9, 15, 18 17:12
**leave** 17:1 41:10 47:14 131:11, 15
**led** 83:10 206:3 223:24
**left** 97:23 145:10, 15
**left-hand** 148:7 154:4
**legal** 260:4 261:19 263:21
**legend** 115:8 146:7
**Lehman** 22:17
**Lenahan** 2:4 4:24
**level** 65:23 104:17 114:15 119:25 122:17 124:15 125:23
**license** 128:23 129:4 165:1, 16 166:10 190:20 191:3, 6 192:8, 16 193:2, 16, 21 194:1, 13 199:11 200:1, 15, 22 201:2, 14 217:8 218:2, 4, 20, 22 220:17, 18, 25 221:4, 16, 22 222:2, 11, 15 223:5, 25 224:4, 9, 22 225:3, 14 226:7 227:8 229:14, 19 230:1 231:17, 23 232:23 233:2, 3, 4 234:1, 4, 7 236:14, 15 237:23 240:13, 16 241:10, 12, 15, 23 242:9 244:14 250:12 251:3 252:18 253:13 254:25 255:3
**Licenses** 117:25 118:4, 8 120:12 124:22 125:16, 20
**license's** 192:1, 5
**licensings** 238:25
**light** 41:20 226:22
**Line** 89:2 97:16 98:1 110:23 118:23 130:23 170:18 178:13, 21 185:16
**linear** 244:7
**lines** 141:21
**list** 138:10, 16 139:7 146:14 159:18 160:21 205:16 206:14
**listed** 62:11, 22 65:20 66:12 67:3, 17 72:4 113:12 134:17 138:5, 7 141:21 142:6 143:13, 18 147:10 158:15, 23 160:9 195:15 207:2
**listen** 42:14
**listened** 84:20
**lists** 62:8 137:18 149:15 154:22 160:7
**LITIGATION** 1:3 4:6 58:22 115:14, 24 116:12 204:6 207:9 212:22 270:3
**litigations** 205:7 208:16 211:22
**little** 27:4 58:19 59:14, 15 82:12, 21 120:9 145:10, 15, 23 169:9 196:6 251:7
**live** 221:13 222:12, 17 238:9 239:17
**lived** 5:25 6:2 238:9 244:18 245:15 246:1
**living** 227:12, 15 228:10, 17 229:6 230:20 237:12, 17 239:23 240:6 243:17 244:3 245:21
**LLP** 2:4, 10
**local** 228:19 238:3, 17, 19 239:13, 25 246:9
**located** 114:11 126:15
**location** 118:14 126:18
**lockdown** 32:21
**long** 5:25 9:19 11:6 14:17 16:3, 17 25:21 33:10 34:3 82:25 168:20 173:1 180:13 185:20 186:9, 13, 17, 19, 20
**look** 18:4 26:9, 10, 15, 18, 19 32:23 33:2 35:7, 14, 16, 24, 25 36:2, 3, 5, 7, 15, 18, 19 37:3, 7 38:13, 18, 20 39:10, 17 40:7, 15 42:21 43:4 44:3, 14, 16, 18, 21 45:1, 22 46:6, 7, 19 47:3, 8, 24, 25 48:6, 9, 17, 23, 25 49:3 58:15 59:11, 16 63:7 85:7, 8 87:23 97:3 102:10, 16 104:10, 14 112:25 115:6 116:19 117:11, 14, 24 120:7, 9 124:9 127:22 137:11 140:4 151:25 155:2, 9 156:11 162:8 166:24 167:3, 5, 18 168:5, 6 171:10 172:7, 8 173:19 179:11 181:10 182:18 187:13, 14 199:24 208:17 216:14 218:14 224:10 226:21 228:23 235:10, 11, 18, 19, 20 236:3, 10, 22 237:3, 18, 21 238:13 239:15 250:5 251:17 252:2, 6 255:23 264:8 267:1

**looked** 34:24 35:2 39:4 46:17 47:17, 20 48:10 79:7 83:14 104:3, 6 105:23 113:13 117:9 120:7 161:1 164:16 167:2 174:1 181:10 190:1 249:7 252:2
**looking** 17:11 36:11 40:11 42:4 51:21 67:3 79:9, 10, 12, 13 92:17 97:11, 16 102:10 112:7 122:14 125:8 134:18 142:16 143:12 147:12 148:19 154:17 159:25 160:19 167:22 190:9 195:19 202:4 205:6 228:18 237:9 239:4, 7, 23 244:17 245:13, 25 266:19
**looks** 59:2 104:20 196:22 207:8, 11, 19 264:15
**Los** 242:24 243:14 244:1, 12
**lose** 206:14
**losing** 204:23 205:9, 19
**loss** 248:25 249:2, 6 254:2 255:11 260:12 263:18
**losses** 194:17 211:24 249:24 253:21 263:19
**lost** 175:1 201:6 207:15 211:25 258:14, 15 262:8 263:23 264:12
**lot** 12:14 16:17 22:5 23:19 52:17 69:3 102:25 106:3 203:20, 23 214:7, 13 229:5 234:20 237:16 253:8, 9 255:19
**lots** 170:22
**loudly** 6:21
**low** 113:24 130:17 132:8 165:19
**low-risk** 27:8 113:2, 11, 21 130:6, 11, 16 132:6, 10, 23 164:2 165:7, 15, 24, 25

**< M >**
**Madam** 5:5 88:24
**main** 102:1 188:2 194:12 209:9
**maintain** 33:10 34:4 185:19
**maintained** 186:15
**majority** 9:13 121:13
**making** 10:14 11:16 13:24 14:2 15:6 33:15 36:1 41:18, 24 47:9, 17, 21 49:4 77:6 79:15, 22 80:4 81:5 82:4 256:6
**man** 20:2, 3
**manage** 10:5 18:21, 22 19:21 21:21
**managed** 18:18, 19, 23 61:19 64:4
**management** 26:13 29:8, 10, 18, 20 30:4, 25 33:15 35:9, 21 45:12, 15, 18, 24 46:2, 9 47:13 48:1, 2 69:20 72:15, 16 75:4, 7 76:11, 19 77:3, 20 81:11, 22 84:13, 21 89:15, 25 90:7, 10, 14, 17 114:2, 16 120:3 124:7 127:4, 23 128:1 164:16, 25 166:4, 8 175:14, 18 186:13, 20 187:16, 24 188:3, 12 189:20 190:1 191:2 192:9 196:25 199:25 200:2 201:17 202:11 204:25 211:6 212:2 215:11 233:4 235:23, 25 237:15 239:14 240:19 250:18 266:15, 25 267:3
**manager** 9:10 10:5
**managers** 10:9, 14
**manages** 18:24
**manner** 136:20
**margin** 23:14, 18 146:8, 14, 20 147:2, 10
**mark** 57:25 73:9, 13, 17 74:24 75:1, 23
**marked** 58:4 59:17 85:16 86:2 114:23 140:3, 18 144:3 151:4, 21 153:24 154:20 157:14, 18 181:3 185:6
**Market** 4:11 28:16, 25 29:2 30:19, 23 31:9, 12 32:15 84:5, 11, 17, 24, 25 85:3, 7, 11 88:1, 5, 7 89:13, 18, 24 90:5, 11, 21 97:9, 19, 21 98:1, 4, 9, 20 99:1 104:1 113:8 116:19 154:8 155:17 156:8 162:13, 20 163:7
**markets** 30:21 89:14
**marking** 85:14 114:21
**married** 10:25 11:1, 6
**math** 177:16 244:10
**matter** 87:1
**Matteson** 2:12 4:14
**M-a-y** 5:1
**McArthur** 72:21 73:13, 17 74:24 75:1, 23 216:19, 21, 24 217:16
**McCarthy** 231:14 234:10, 13 242:7
**mean** 28:10 29:8, 10 30:5, 19 31:8 32:14 37:14, 19, 25 38:5 41:22 50:9 53:25 58:9 61:18 69:10, 14 80:18 84:23, 25 85:5 90:5, 6, 21 93:2, 23 94:2 102:23 103:17 110:6, 19 116:3, 18 118:17 135:11 143:10 146:11, 12, 25 150:10, 13 151:7 161:25 162:3 169:7 170:17 172:9 180:20 186:9, 11, 12 201:11 206:9 208:7 209:24 210:3, 10 212:24 213:4, 23 218:18 224:1 231:10, 11 244:22 253:17 254:6 257:24 258:9 262:19
**means** 10:18 85:3 93:4, 21 98:20 109:13, 16 146:7, 20 163:11 209:24
**meant** 20:13 88:4 119:8 155:4 233:3
**media** 31:21 32:1, 7, 18, 20, 23 33:4, 6 44:7 48:23, 25 49:3
**medication** 8:8
**meet** 203:19 204:18 206:8, 9
**meeting** 240:18, 20 241:7, 18
**mega** 52:5
**members** 14:1 113:8 241:9
**mention** 199:10 200:7, 25 236:14
**mentioned** 17:13 48:20 51:8 62:12 64:3 67:20 75:12, 18 89:19 91:8 95:15 106:10 148:23 153:2 190:9 193:6, 19 197:1 199:21 227:9 232:24 234:4 248:13 256:13, 20
**met** 132:22
**methodology** 51:19 132:18
**microphone** 241:4
**mid** 52:4
**middle** 12:1, 2 63:10, 13 64:24 195:22
**military** 13:1
**million** 61:16, 18 99:6, 8, 15 100:8 134:22 154:10, 12, 23 155:18 156:3, 4, 9, 16

157:6 162:13, 21 163:22 164:9 166:1 167:8 174:6 175:2, 23 177:17, 21 178:18 179:14 181:17 182:1, 10, 13, 14 184:3, 10 247:18, 21, 23 248:3 249:6, 11 253:21 254:16, 19 255:7 263:18
**million-dollar** 255:11
**mind** 45:14 46:8 54:8 90:17 113:25 145:19 153:13 180:8 217:24 218:13 235:17 236:9, 19 259:22 262:22
**mine** 73:22 76:2 114:4, 14, 17 118:4, 9, 23 119:24 120:12 121:7, 12, 21 122:2, 10 125:16, 21 126:15 127:1, 2, 20 128:16 166:9 190:21, 23 191:3 197:5, 7, 15 198:22, 23 199:3, 6 201:25 202:13 217:1 221:8 227:15, 23 228:7 230:21 234:22 237:24 238:1 239:1 240:12 241:22 243:13 244:14 245:15 246:2
**mines** 234:17 251:23
**mine's** 118:14 126:18
**mining** 128:13, 23 129:3 130:3 191:21 217:23 221:21 222:9, 10 223:5, 24 224:21 225:13 226:6 227:23 228:7, 17 229:7, 14, 19, 22, 23, 25 230:2, 9 231:19 232:23 233:12 240:20 241:8, 19, 23 243:15
**minings** 132:13 223:2 226:16 229:2 230:3 239:21
**minister** 222:10 223:2 225:12 230:3 241:19
**ministers** 222:9 239:20 240:19
**ministries** 229:22
**ministry** 221:22 224:21 226:7 227:23 228:8 229:15, 20, 25 230:9 241:8
**minute** 34:2 46:23 47:15 51:8 61:15 88:6, 15 90:22
**minutes** 58:6 85:20 265:5
**mis** 204:15
**miscellaneous** 3:9
**mischaracterization** 201:5
**mischaracterizes** 108:13 130:8 138:21 166:18 200:11
**miscommunication** 132:3
**misleading** 98:11 105:19 169:3, 9 212:1 215:24 250:17 263:25
**misleads** 33:16
**misled** 29:10, 20 30:25 82:17 207:16 211:5 249:4 253:1 266:15, 17, 20, 24 267:2
**misrepresent** 249:3
**misrepresentation** 234:6
**misrepresentations** 30:15 31:4, 14 230:16 232:21 250:7
**missed** 177:23
**missing** 36:13 161:13, 14, 18 162:4
**misstate** 23:5
**misstated** 254:21
**misstatement** 102:19, 22
**misstatements** 204:24 212:1 232:24 233:18 248:7, 20, 24 249:17, 25 254:7 255:12
**misstates** 23:2 32:10 88:10 95:10 99:16 103:19 105:19 107:14, 25 109:18 118:16 123:13, 19 139:9 165:8 168:13 172:13 174:12 175:25 199:17 204:10 211:13 223:18 248:9 252:20 253:15 260:24
**misstating** 109:25 131:24
**mistake** 88:23
**misunderstanding** 166:7
**misunderstood** 27:25 90:12 183:19
**mix** 27:10 173:16
**money** 20:22 21:24 22:2 24:19 40:24 51:7 68:6 130:13, 14 147:1, 3, 7, 9, 11 204:23 205:9, 19 207:15 212:1 258:14, 16 262:8 263:23 264:12
**moneys** 206:14
**monitor** 186:24 187:8 213:20, 22, 23
**monitoring** 41:5
**month** 34:11, 18 61:7 71:7 74:12, 13, 14 104:4, 5 105:9 111:2 184:10 231:3, 5, 8
**monthly** 69:23 70:7 71:9 74:11, 17 76:3, 13 81:12 91:9, 13, 24 95:19 96:1, 6 99:3, 14, 18, 21, 23 100:12, 16, 20 112:4 113:9, 24 120:5 123:3 170:3, 4, 9 173:12 174:1, 6, 11, 15, 23 215:3, 7 216:8 231:5 233:10, 22 235:9, 12, 15 236:8 237:2 251:22
**months** 34:6 71:8 74:5 104:24 167:9 233:9 249:12 266:2
**morning** 4:25 5:12, 13
**motion** 133:12 255:25 258:19, 22
**mouth** 30:12 34:17 76:9 131:14
**move** 68:6, 7
**multiple** 141:14 142:1, 6, 8, 12 198:12
**municipal** 18:17, 21 19:10, 21 64:4, 8, 10
**musics** 49:1
**mutual** 19:10 24:1 27:13 50:14 51:10 94:22 102:25 103:15 104:14 106:2 157:2 159:8 167:4 168:7 170:21 171:14, 25 173:18 182:20

< N >
**name** 4:14 5:14, 16, 17 11:4, 22, 24 12:1, 2, 3 13:10, 19 43:2, 9, 11, 22, 24 56:8, 14 57:4 60:6 86:11 112:18 145:9 204:3 223:15, 16 230:14 269:14
**names** 43:14 204:3
**natural** 7:2
**naturalized** 11:25
**NEAL** 2:10
**near** 191:13 240:12
**necessarily** 63:16 176:24
**necessary** 176:9
**need** 7:17, 20 63:7 68:6 87:21 95:21 96:2 101:7 117:16 125:7 138:25 140:13 145:18 155:24 161:11 170:25 178:15 221:11 228:23, 25 229:16, 21

230:1, 4 237:9 239:21 240:13 242:9, 10, 23
**needed** 48:9 136:4 230:8 242:13
**needs** 140:12
**negative** 131:4 132:15
**negatives** 130:21
**neither** 270:23
**nervous** 118:20
**net** 61:11 177:14 179:3, 7
**NEVADA** 1:1 4:8 270:1
**never** 28:24 43:14 47:20 49:2, 3 103:11 105:15 117:9 120:7 191:24 207:12 209:11 223:16
**New** 2:5 38:3 140:2
**news** 35:12, 14, 20, 23, 25 37:4, 17 42:11, 19 45:10, 19, 20, 24 72:4, 12, 13 132:14, 15 192:11 193:9, 11 197:14 199:5 201:13 203:8 247:6, 7, 11 250:22 251:1 252:14 255:18
**newspaper** 246:9
**NGUYEN** 1:9, 15 3:14 4:4 5:8, 17, 18 11:23 12:5 17:6 56:11, 18 58:4 59:11 60:6, 20, 23 62:4 63:6 66:9 84:8 85:16 88:15 114:23 115:8 117:15 243:6 256:22 266:13 267:14 269:1, 4, 10 270:6, 11
**N-g-u-y-e-n** 5:17
**NGUYEN_00001067** 3:18
**NGUYEN_22097** 59:18
**NGUYEN_22114** 144:3 153:24
**NGUYEN_22133** 142:23
**NGUYEN_22191** 92:7
**NGUYEN_22246** 151:21
**nine** 71:8
**nods** 6:23
**normal** 85:4
**North** 2:10 127:21
**NOTARY** 269:21
**note** 153:25
**noted** 269:3
**notes** 140:5 147:21
**nothing's** 200:4
**notice** 142:16 167:7
**noticed** 6:11 167:10
**not-Xinca** 239:10
**Number** 1:24, 25 3:7 4:9 27:7, 9 36:19 47:25 58:1 59:4, 24, 25 60:5, 7 67:4 69:20 87:5 92:10 96:15 97:12 103:2 104:16, 20, 22 105:23 112:10, 12 117:12, 18 134:7 136:4 151:14 152:1, 4 157:23 163:6, 8 186:5 196:9 200:16 205:1 207:4, 6, 7 231:16 242:18 244:18 245:14 246:1
**numbered** 1:17
**numbers** 151:18
**number's** 140:20
**nurse** 12:23
**nuts** 36:12

**< O >**
**oath** 8:2, 4 269:11
**obfuscating** 130:24
**Object** 53:23 69:13 70:15 119:18 123:14 138:20 161:12 178:9, 12 210:9
**objecting** 133:18 221:18
**Objection** 16:9, 21 19:1 20:6 22:25 25:11 27:18 31:16 32:10 37:13 39:12, 22 40:5, 12 43:13, 25 48:11 50:19 51:16 53:23 70:11 74:19 76:15, 21 79:25 80:6 81:17 82:7 83:18 84:6 88:10, 11 89:5, 8, 10 94:7 95:9 98:10, 21 99:16 103:19 105:18 107:14, 25 108:5, 12, 22 109:6, 7, 18 111:20 118:16 119:13 120:16 122:18 123:10, 19 125:25 126:9, 11 128:7 129:9 130:7 132:25 133:8, 10 139:9 143:7, 20 155:3 165:8 166:17, 18 168:12 170:17 171:22 172:13 174:12 175:25 176:14 177:4 179:9, 22, 25 180:7, 19 187:1 188:16 199:17 200:10 201:4 204:10 207:23 210:24 211:13 218:9, 23 219:18 220:20 223:18 224:24 241:24 243:2, 5, 6, 8 244:5, 20 246:3 248:9 250:1 252:20 253:15 254:22 255:13 256:8 258:25 259:2 260:3, 24 261:6, 17 262:15 267:8
**Objections** 3:11 41:2 86:8, 12 87:16 134:6
**objective** 25:18
**obligated** 222:24
**obligation** 242:14
**Obvious** 101:2
**obviously** 222:20 228:13 237:13 238:4, 21
**Occasionally** 23:19 52:4
**October** 92:8 96:10 98:2
**offer** 37:2 44:25
**offerings** 38:4
**office** 269:17
**off-limits** 168:24
**offset** 194:17
**Oh** 8:23 16:13 37:6 45:12, 20 46:11 58:11 61:19 62:20 71:6 74:12 77:2 87:22 92:4, 12 96:18 97:2, 15, 18 104:20 108:16, 17 112:14 116:18, 20 122:3 123:21 125:2, 5 142:22 144:4, 6 145:24 147:16, 20 148:11 172:19 178:10 182:15, 25 183:5, 17 185:24 194:3 195:17 207:14 214:7 216:5 231:4 233:9 246:22 257:1
**okay** 5:19, 21 6:5, 8, 10 7:2, 9, 15, 16 8:1, 4, 8, 12, 23 9:6 10:17 11:19, 22 13:19 14:5 16:13 17:8 21:7, 14 23:5 25:1, 3 29:22 31:20 33:25 34:22 35:6 36:15, 25 38:10 44:1 45:17 46:17, 22 47:1, 14, 20 48:7, 15 49:12 51:2, 8, 24, 25 52:13 54:6, 24 55:6 56:11, 22 57:1, 24 58:2, 3 59:14, 20, 22 60:3, 20 61:3, 10, 14 62:3, 8, 11, 17, 19, 20, 21 63:4, 9, 15 64:6, 10, 14 65:17, 23 67:20 69:16 70:23 71:12, 23 73:16 75:12, 18 76:6 77:5 79:1 81:4, 9, 15 86:6, 16, 21, 24 87:16, 22 88:24 89:13 90:9, 20, 24 91:1, 18 92:2, 17, 21 93:15, 23 94:1, 12

95:2, 11 96:3, 13, 18, 19, 23 97:8, 18, 20, 25 98:4, 7, 19, 23 99:5, 8, 11, 21 100:4, 8, 10, 11, 14, 20, 24 101:3, 18, 22 102:1, 9 103:10 104:3, 18 105:20, 22 106:22 107:11, 17 108:3, 6, 14, 17, 23 110:24 111:3, 15, 24 112:7, 10, 14, 16 113:1 115:13 116:1, 7 117:6, 9, 14, 24 118:3 119:2, 6, 17 120:10 121:10 122:4 123:2, 6, 18 124:5, 9, 23 126:10, 18, 22, 25 127:8, 11 130:10 131:21 132:9 133:19 134:9, 16, 20, 24 135:7 136:3, 11, 18, 24 138:4, 10, 15 139:2, 3, 4, 5, 11, 25 140:9 141:2, 6, 10, 16, 25 142:10, 14 143:22, 25 144:2, 4, 22 145:2, 8, 13, 25 146:25 147:12 148:14 149:5, 21 150:1, 19, 22 151:20, 23 152:4, 8, 13, 17 153:11, 19, 21 154:2, 3, 8, 22 155:2, 7, 13 156:2 157:4, 5, 11, 13, 24 158:7 160:5, 17, 23 161:17, 23 162:2, 6, 7, 18 163:1, 11, 21, 25 166:11 167:17 168:2 169:11, 17, 24 170:3, 14 171:19 172:19, 22 174:5, 21, 25 175:20 177:2, 6, 10, 16, 21 178:2, 4, 7 179:17 180:3 181:2, 6, 13 182:15 183:5, 25 184:9, 19 185:13, 24 186:3, 9, 19, 24 190:16 191:9 192:25 193:14, 19 194:14 195:6, 12, 25 196:4, 14, 19, 23 197:9, 19 198:7 203:17 205:2, 20 206:8 207:7, 18 208:17, 21 209:19 210:16, 21 211:16, 21 212:21 214:14 215:15, 20, 25 218:1 219:17 220:7 221:3, 25 223:5, 9, 23 229:13 233:16 234:6 235:6, 11, 13 236:2, 17 237:5 238:18 240:2, 14 242:4, 22 243:7 244:15, 25 248:4 249:15 253:7 254:14, 19 255:14, 23 258:7, 18 259:7, 24 260:21 261:11, 16 262:2, 6, 12 263:13 264:6, 11 265:7, 23 266:6, 9 267:13

**old** 167:15
**old-fashioned** 113:14
**once** 34:12 95:4 219:5
**ones** 29:6 36:23 37:12 38:7 44:25 212:6 213:10
**one-third** 167:22
**online** 17:15, 17 25:24 26:7, 18 94:22
**open** 151:21 197:4
**opened** 67:8 110:17 111:11, 14
**operate** 190:21 191:3 221:23 237:24 251:24
**operating** 127:1, 2
**operation** 122:11 221:11 228:18 243:15 253:5
**operations** 129:8, 24 198:23 217:23 234:22
**opinion** 126:3 260:4 261:19
**opposed** 6:22 37:17
**opposition** 128:16
**option** 22:1
**options** 20:23 21:25 22:3 24:4, 13, 18, 23 25:6 52:8 177:10, 22 178:8 184:20
**oral** 270:12
**order** 6:16 22:9 134:25 135:17 136:3, 5, 6, 14, 15 141:13 142:2, 12 143:19 176:8, 22 196:24 198:10 223:7 227:17 228:23 242:8
**ordered** 263:9
**orders** 135:20 141:14 142:8
**ordinary** 245:24
**orient** 59:15 60:21 92:16 196:6
**orienting** 117:17 185:11
**original** 100:3 208:11, 21
**Originally** 68:25
**originated** 117:1
**outcome** 226:4
**outlook** 75:19, 24 81:13
**outperform** 171:16
**outset** 111:6 161:21
**outside** 133:4 257:22
**overall** 36:15 178:20 214:20
**overthrown** 231:21
**owned** 57:16 62:23 64:20 91:23 97:14 104:23 105:14 129:6, 22 130:1 148:21 156:3 158:9 159:13, 14 160:9 161:5 163:12 168:16 169:4, 14 170:1 179:19 180:16 186:25 187:23 188:10 249:12
**ownership** 66:2 96:23 97:6 179:4 187:25 251:12
**owning** 172:4 173:7
**owns** 20:9

< P >
**p.m** 1:18 49:16 60:16 91:4 137:6, 7, 9 150:18 195:1, 2, 4 232:13, 14, 16 265:10, 11, 13 267:16, 17
**package** 24:8, 10 40:16, 19
**PAGE** 3:1, 7 58:9 59:16, 19, 23 60:21, 23 61:10, 14 62:3, 5 67:3 86:17, 20, 22 87:6, 8, 9, 18 92:6, 9, 11, 13, 17 93:17, 18 96:14, 15, 16, 20, 25 97:1, 4 112:7, 9 115:9 117:16, 18, 24, 25 121:16, 17, 18, 24 124:23 125:9 134:5, 9, 17 137:17, 22 140:18, 21, 25 142:24 143:1, 19 144:3, 4 146:6 147:12, 14, 17, 19, 20, 25 151:5, 6, 21, 22 153:23 154:1, 17 155:11 156:6 157:13, 17, 20, 25 161:12 162:4 181:2, 4, 13, 19 182:11 185:10, 12, 14, 15, 22, 23 195:8, 10, 14, 21 196:7, 14, 16 198:15, 18 270:19
**PAGE/LINE** 268:2
**pages** 58:20, 25 59:21 96:13 120:2, 8 121:16 126:2 137:23 140:3 142:20, 22 144:2 147:15 161:22, 25 162:2 181:8 195:20 198:14
**paid** 74:10 93:9 95:16 96:9 98:8 99:14, 25 102:3, 6, 23 113:9 145:5 187:12 190:11 233:10 251:22
**paint** 70:1
**painted** 70:8

**Pan** 202:20, 25 203:3
**paperwork** 13:3
**paragraph** 87:17, 18 122:5
**paraphrasing** 118:19
**parse** 254:8
**part** 9:25 10:2 11:15 17:1 20:8 21:5 83:5 84:17 85:11 155:11 181:25 184:15 186:3 190:3 198:9, 19 199:14 212:22 218:8 254:2 261:14
**participate** 209:25 213:8
**particular** 18:11 39:20 132:1 150:8 199:7 221:8 257:24
**particularly** 116:15
**parties** 270:25
**partner** 4:23 5:3
**parts** 97:5
**party** 14:11 18:20 19:20 270:16, 22
**path** 68:13
**pay** 18:7 26:1, 22 36:18 43:4 68:3, 5 69:23 74:1, 5, 7, 11, 13, 16 76:3, 13 79:2, 14 83:3 91:22 101:16, 19, 23 102:18 105:24 113:15, 17, 20 114:18 120:5 146:15 166:23 170:2, 4, 5, 6, 8, 15 173:12 216:8 231:5, 8 233:22, 25 235:9, 12, 14 236:8 237:2 250:19
**paying** 37:5, 7 43:5 71:8 78:22 83:25 99:3 106:24 164:19 166:11, 15, 21 169:18 171:17 175:21
**payment** 68:5 113:23
**pays** 65:3 94:22
**pending** 7:22
**pendings** 205:17
**people** 7:3 13:1 33:3 135:22, 25 136:5 175:16 200:20 201:11, 19 221:8, 13, 18 222:12, 16, 21, 22, 24 225:11 226:13, 15, 24 227:11, 14, 21, 22 228:2, 4, 7, 10, 12, 17, 20, 24 229:6, 15, 20, 24 230:4, 8, 20 231:17, 24 233:7 234:20 237:11, 17 238:1, 13, 19, 21, 23 239:1, 9, 10, 16, 17, 22 240:3, 6, 10, 12, 14, 22 241:1, 16, 21 242:11, 15 243:13 244:3, 18 245:14, 21 246:1 263:21
**percent** 10:23 69:24 70:7 79:5 92:1 96:12 98:8, 17, 20, 25 99:1, 14, 18 100:1, 2, 3, 8, 13, 25 102:18, 20, 24 148:3, 5, 6, 21 149:1, 15 154:5 156:7 159:5 162:19 171:18 177:21 179:2, 20 180:17 216:25 218:15 234:15
**percentage** 52:13, 15 104:11 120:22 172:10 173:20 176:7 178:19
**perception** 165:14
**perfectly** 7:19 70:14 153:17
**perform** 10:12 77:5
**performance** 10:11, 18 186:24
**performing** 9:14, 19
**period** 23:21 24:20 25:3, 7 32:4, 14 33:20 53:1 55:1, 7, 8, 11, 12 72:23 98:12 105:14 107:4 134:13 142:13 186:25 187:22, 25 192:9 193:1, 15 196:11, 20 197:18 209:3, 7 212:13, 18 214:9 241:14 251:11 253:24 258:24
**periods** 59:7
**person** 6:18 18:24 19:24 72:24 135:7, 8 206:9 269:13
**personally** 269:10
**pertain** 65:19
**pertained** 41:13
**Peter** 2:12 4:14
**petition** 265:17
**phone** 206:9
**physical** 240:2
**pick** 21:17 28:4 36:22 37:10 39:6 52:3 169:13 171:15
**picked** 58:25 204:6
**picks** 51:18
**picture** 70:9 120:6 166:24 167:3, 20 168:5 172:8 173:19, 20 176:10 239:7
**pictures** 70:1 230:24 249:3
**place** 136:11 196:17, 20 198:7 205:12 241:8
**PLAINTIFF** 2:1 3:13 4:24 86:7, 10 87:24 185:17 198:19 211:14, 19 257:17, 20 258:1 259:11, 17 260:17 263:9 265:17 266:1
**Plaintiff's** 3:10
**planned** 82:25
**platform** 21:22
**play** 189:15, 18
**please** 5:6, 14 17:7 20:16 39:16 80:13 88:25 126:9 134:4 148:9 154:15 164:4 173:4 195:11 211:21
**plural** 150:10
**point** 7:11, 17 14:22 21:10 24:16 33:16, 17, 24 46:20 70:13, 17 72:20, 25 79:7 85:13 93:6 94:17 95:24 102:13, 17 106:12 112:4, 22 145:20 149:11 164:18 165:23 171:11 173:22 178:5 193:4, 12 194:12 200:18, 19 201:12, 16, 21 203:9 211:1 216:4 218:13 222:3 224:11 225:5 232:2 234:18 235:18, 20, 22 236:11, 25 239:21 247:9 249:16 250:6, 9, 23 251:13, 18 253:9 254:25 255:17 256:12, 16 266:18
**pointed** 249:10
**policy** 10:12, 21
**pollute** 227:15
**polluted** 243:18
**pollutes** 226:17
**pop** 26:8 189:18 204:3 207:5 264:24
**popped** 72:7, 11 78:24 79:6 264:14
**population** 243:17
**portfolio** 16:7, 15, 19, 25 18:17, 25 19:22 20:5, 9 21:22 24:12 25:16 34:12, 14 50:6, 8, 11, 12 51:9 61:11 94:18 95:22 103:14 104:4 105:25 109:10 166:25 167:12, 19 168:4 171:14 173:9, 14 183:22 184:11 190:6, 8
**portion** 172:5
**portions** 160:7
**position** 146:8 176:8 184:8 185:1 186:15 200:5 230:6 252:9
**positions** 33:11 34:4 176:19 184:20 185:2
**possible** 225:15, 21 226:3, 8
**Possibly** 236:20
**posted** 32:18
**postings** 38:3
**precede** 181:8
**predicate** 261:18

**predict** 225:15, 17, 21 226:3, 8
**PRESENT** 2:17
**press** 37:20 38:1 192:11, 13 205:3
**presume** 112:11
**pretty** 17:21 103:17
**prevent** 8:9 245:12, 16
**prevented** 244:16 245:24
**previous** 122:14
**previously** 181:10
**price** 30:6 46:21 94:3 107:10 175:5 248:23 252:13 255:6 264:23
**prices** 29:2 231:1 248:17
**primary** 174:9, 18
**principal** 105:17 114:4 121:11
**principle** 173:2
**prior** 9:4, 7 11:12 23:2, 5 32:11 84:1 88:11, 21 89:5 95:10 96:16 99:17 103:20 105:19 107:15 108:1, 13 109:19 118:17, 18 123:13, 20 130:8 138:21 139:10 165:9 166:18 168:13 172:14, 16 174:13 176:1 199:18 204:11 223:19 248:10 252:21 253:16 260:25
**private** 21:18
**privileged** 219:24
**Probably** 8:15 9:21 30:22 32:3 34:5, 14 79:7 92:16 93:24 95:21 101:15 102:17 115:17 135:20 138:19 139:17 142:11 153:14 160:20 161:7 164:16 171:16 173:11, 16 187:15 192:13 198:11 200:17 201:12 215:4 216:2, 4, 13, 14 217:2, 4, 12, 24 228:11 239:7 246:8 253:3, 4, 8
**problem** 13:16 110:22
**problems** 41:10
**Procedure** 1:20
**procedures** 213:13 215:2
**proceed** 183:18
**proceeding** 14:12
**PROCEEDINGS** 4:1
**process** 209:11, 15 211:3 213:19
**produce** 115:18, 23 116:10, 12
**produced** 1:15 58:22 115:3, 4, 14, 16 116:24 133:7, 24 183:12 212:4, 21, 23
**production** 133:13 161:22
**products** 156:23
**professional** 10:1 11:15 14:2 63:19
**professionally** 13:23
**program** 110:5
**progress** 208:15 214:25 215:7
**project** 77:8 120:23 242:24 244:2
**projecting** 230:24
**projection** 175:3 187:9 216:9
**projections** 38:24
**projects** 33:22
**prompted** 190:16 205:11
**pronounce** 153:15
**proportion** 32:2
**prospect** 36:10 53:6 69:21 73:23 84:22 90:7, 15, 19 127:24 173:12 174:20 186:16 187:11 190:10
**prospective** 28:7 29:21 169:16 170:7
**prospects** 53:12 70:6 71:10 73:18 75:2, 9 81:11 169:22
**protest** 225:9 227:10 234:19
**protestor** 227:2, 17
**protests** 128:15 132:14 190:22 193:10 234:24
**proved** 269:11
**provide** 127:23 212:8
**provided** 27:21 134:16
**providing** 237:20
**provinces** 229:3 242:21
**provisions** 1:20
**proximity** 229:7
**prudent** 22:22 23:10
**public** 18:5 26:12, 15 35:9, 20 36:5, 9, 22 37:10, 11 38:13 39:8 46:9 47:25 69:21 70:6 71:4 72:8 73:1, 6 78:14, 17 79:19 117:6, 9, 21 188:6, 7, 11 244:17 269:21
**publications** 42:20
**published** 44:13 247:7
**publishes** 38:19
**pull** 137:16
**purchase** 41:7 54:25 55:4 69:18 78:2 81:1 83:4 84:3, 16 87:13, 25 90:3 93:10, 11 134:21 135:6, 15 141:11 146:23 147:8 181:9 184:3, 14, 16 186:6 248:1
**purchased** 41:6 52:20 53:2, 4, 18, 19, 22 54:13, 16 55:14 56:3 61:8 63:5 83:1 94:3, 5 109:16 135:16, 23, 24 136:13, 21 141:12 142:17 143:5 147:1 165:19 181:15 183:15 216:24 217:14 256:18 257:10 262:25 266:18
**purchases** 52:25 134:12, 24 137:18 138:7, 11, 16, 23 139:8, 21 141:7 185:18 196:10
**purchasing** 112:21 172:11
**purposes** 269:16
**pursuant** 1:19 270:14
**put** 22:13, 18, 22 23:10 26:7 27:2 30:12 34:16 42:18 43:14 60:1 71:23 76:9 79:4 82:14 131:10 189:10, 11, 17, 19 203:22 205:14, 15, 25 206:19 245:3 248:1 264:10
**putting** 16:8 43:9, 12, 22

**< Q >**
**qualified** 13:2
**quantities** 142:17 143:22
**quantity** 143:14, 23
**quarterly** 38:20, 21
**question** 7:5, 6, 11, 22, 23 9:2 19:8, 9, 15 20:7, 16 27:25 29:16 39:15 43:21 50:23 51:24 53:25 54:5, 8, 24 57:11 62:18 78:16 79:24 80:20 82:10, 13 84:15 88:16 89:1, 5, 12 98:14 101:8 109:2 118:22, 25 119:19 123:23 126:5, 13 129:14, 20 137:13 143:18 144:18 148:9 163:4 164:4 169:10 171:3 172:18, 22, 24 173:2, 4 176:2 180:4 188:20 192:2 201:9 204:18 210:14, 15

218:10, 24 219:7, 10, 15 229:17 245:11 246:17, 21, 24 248:21 250:4 257:7 259:3 261:10 264:2 266:22 267:9
**questioning** 130:23 178:13
**questions** 6:19 8:5 41:16 51:18 69:14 82:21 85:22 88:21 110:8, 23 131:2 155:25 169:2 170:19 171:1 232:5 266:8
**quickly** 6:6 58:7
**quite** 184:11

< R >
**radio** 42:23, 24
**raised** 133:8, 9
**range** 3:9 214:14, 15
**rank** 126:1 128:8
**reach** 207:2
**reached** 95:5, 7
**react** 32:17
**read** 20:15, 17 21:9, 13 70:25 84:20 85:6 87:21 88:21, 22, 25 89:3, 4, 6 118:18, 21, 24 120:1, 2, 10, 11 121:5 122:15 124:13 125:22 127:11 191:25 192:4, 6 200:12 220:2, 8 222:18 228:14 229:4, 10 242:4 245:2 246:24 269:1
**reading** 88:23 122:8 144:7 247:10, 12
**reads** 121:20
**ready** 94:18
**realize** 106:23 161:24
**realized** 253:12
**really** 6:17 29:13 32:25 38:20 48:18 73:25 102:13 103:1 112:23 117:11 127:22 207:14, 19 216:6 239:9 260:6
**reason** 7:19 27:22 105:17 114:19 123:8 133:23 163:15, 18 174:9, 18 183:10 199:15 214:2 235:22 250:21 268:2
**reasons** 102:2 270:20
**rebalance** 34:12, 14 182:22 184:12
**rebalanced** 182:19 183:22
**Rebecca** 1:24 4:17 270:8 271:11
**recall** 12:12 48:17 73:9, 20 190:18 191:25 199:7 222:15 234:3 240:18 242:18 253:4 264:3
**receipt** 270:18
**receive** 24:4, 5 104:17, 19 106:25 146:21 203:13
**received** 52:8 92:22 93:19 100:21 103:10 111:7 177:11, 15
**receiving** 100:24 102:11 105:16 174:2, 6 175:22
**Recess** 49:16 60:16 91:4 137:7 150:18 195:2 232:14 265:11
**recognize** 86:4 114:25 115:1
**recollection** 196:8 212:18 265:19
**recommendations** 44:9
**record** 1:21 4:2, 19, 21 5:15 6:17 7:8 20:17 21:13 49:15, 18 60:13, 15, 18 66:6 85:17 89:3, 6 91:3, 6 96:20 118:24 137:2, 4, 6, 9, 22 150:16, 20 178:16 179:12 195:1, 4 232:12, 16 259:3 265:8, 10, 13 267:16, 17 270:13 271:3
**recording** 6:14
**records** 133:6 181:9
**recoup** 211:24 263:18, 19
**recovery** 260:1
**redacted** 27:20, 22 97:5, 16 158:18 160:6 161:16 183:11
**refer** 60:4, 5 64:19 65:7 68:9 151:14
**referred** 152:10 196:2
**referring** 37:18 66:8 70:24 71:2 152:14 156:14 170:19
**refers** 149:2
**reflect** 29:2 30:3, 20 121:14
**reflected** 31:10 154:5 163:19 198:2
**reflecting** 141:6
**reflects** 30:17 31:6 32:5 89:25 100:6 134:20 182:8 198:1
**refresh** 196:8 212:17 265:19
**refugee** 12:12, 14, 17 13:4
**regard** 185:18
**regarding** 245:25
**regime** 12:15
**region** 240:12 242:8
**regular** 120:3
**regularly** 42:12 113:18
**regulatory** 40:2 42:7
**reinvest** 94:19 95:3, 22 96:4 106:11, 14, 23 109:5, 10 110:4 111:12 138:18
**reinvested** 93:6, 10, 12 94:14, 23 95:6 106:7 108:11 109:15 110:16, 18 111:1, 9 139:16
**reinvesting** 108:10 109:4
**reinvestment** 93:3, 4, 20, 24 94:1 106:5 112:17, 19 138:11, 24 139:22
**reinvestments** 110:14
**reject** 231:22
**relate** 189:20
**related** 118:4 120:12 125:16 184:16 201:13 233:19 243:16 244:14 259:21 260:12 263:3 270:24
**relating** 20:21 75:15 197:15
**relative** 178:19 271:2
**release** 192:12, 13 205:3
**released** 73:6 117:13
**releases** 37:20 38:1
**relevant** 19:4 133:3 134:13 178:21 196:11 212:18
**relied** 73:2, 19 74:15 75:3, 6, 10, 14 76:10 79:22 80:4 81:4, 10, 16 82:3 90:11 123:2 124:6
**rely** 127:25 213:11
**relying** 75:4
**remained** 66:3 185:20 186:10, 12
**remaining** 186:18 203:2
**remember** 50:2 53:3 57:21 71:15 72:10, 14 74:4 77:9 79:8 81:2, 7 93:13 105:12 107:1, 5 111:13 122:24 126:14 128:21 130:4 135:19 136:16 141:12 142:3, 11 143:24 152:11 158:11 159:16, 24 161:9 166:9 170:3 179:10, 15, 18 180:11, 18 182:2, 7 184:5, 8 188:7 189:15, 19, 21, 22 190:19, 21 191:5, 8 192:14, 20 193:14, 18 194:11, 18 198:11, 12 199:9 201:23 202:1, 22 203:4 205:13 206:12

208:23 212:20 214:12 216:20 221:19 223:14, 22 224:3 229:1 230:10, 14 231:3 247:10, 12, 14 249:8 257:16, 19 264:1, 18, 19, 22 265:1, 22
**remind** 62:17 155:24 264:6
**REMOTE** 1:8 270:5
**renew** 231:22 241:13
**reopen** 202:13
**reopening** 33:21 197:8
**repeat** 39:16 57:11 78:16 79:24 88:20 107:16 109:2 129:19 148:8, 14 154:15 163:4 164:4 173:3 192:2 209:21 210:15 229:17 246:23 248:21
**repeating** 70:17
**rephrase** 7:13 28:2 213:7
**rephrasing** 54:8
**replace** 91:16
**replowing** 51:20
**report** 44:15, 18 45:1, 4, 7 46:6, 8, 20 60:24 61:4, 21 66:20 85:6 89:21 92:9 121:17, 18 158:3, 15 160:2 161:2 163:13, 16, 17 228:14 229:5, 10, 11 238:22 239:15, 18 242:4, 17 245:3
**reported** 1:19, 24
**reporter** 4:16 5:5 6:11, 14 17:5, 6, 9 21:2, 8, 12 28:22 29:12, 23 53:10, 14 55:22 88:21, 25 119:2, 6 220:2, 8 270:9
**REPORTER'S** 270:5
**Reporting** 4:15, 18
**reports** 44:12, 16, 20 46:18 47:4, 8, 17, 21 48:10 247:7
**represent** 89:15 240:10 257:21 258:2 259:17 263:22 264:16
**representations** 45:16 232:22
**representative** 211:11, 15 222:14 223:4 225:11 226:14, 24, 25 227:3, 12 229:24 230:5 231:25 239:19 240:21 241:1 244:13 260:13 263:8
**representatives** 227:19, 20 238:24 239:2 240:8 241:17 242:11
**represented** 258:8 259:14
**REPRESENTING** 2:1, 8
**reputable** 264:15
**request** 213:4 241:3
**requested** 20:17 21:13 89:3, 6 118:24 270:16, 21
**requests** 213:2, 9
**required** 118:9 125:21
**requires** 8:4
**Research** 2:18 21:15 25:24 26:3, 6 33:5 34:23 41:17 77:5 116:4, 18 204:4 214:3 216:17 222:8 237:19 240:23 245:13 256:20 264:14
**researching** 77:13
**reserve** 10:22
**resigns** 203:7
**RESOURCES** 1:3 3:12, 17 4:6 23:17 47:22 54:21 66:3 71:12 73:11 79:23 80:5 82:5 86:9 92:22 97:22 101:1 103:6 104:23 111:8 112:18, 20 115:20 116:18 117:7, 21 155:16 159:14 160:10 161:6 162:12 163:3, 22 164:7, 9, 11 188:5 206:1, 17 215:12 241:9 270:3
**respect** 10:9 57:9 75:8 88:19 132:19
**responding** 6:21
**response** 86:8 186:4 195:15 199:11 200:8, 13 201:1
**Responses** 3:10 51:22 86:12, 25 134:6 137:18 195:7
**responsibilities** 10:1 11:16 14:2
**responsive** 207:11
**rest** 18:23 248:14
**restate** 107:19
**restating** 70:13
**result** 223:6, 9
**resume** 198:23 253:5
**résumé** 8:19
**retail** 74:8
**retire** 8:14 11:10 14:23 20:24 22:9 25:16 26:3 91:15 95:20, 25 104:21 106:12 112:2, 5
**retired** 8:13, 20 11:9 14:25 94:17 95:5 111:21
**retirement** 8:17, 24 9:4 11:12 15:22 24:19 63:12 67:10 94:14, 25 95:4, 6, 7 107:8, 13 111:16
**retiring** 22:12
**returned** 270:17, 19
**revenue** 18:7 26:11, 21 28:6 36:16 38:24 39:8 69:25 70:8 75:13, 15 76:4 77:7, 8, 10, 13, 15, 18 81:12 83:11, 13, 14, 23 113:6, 16 114:13 119:9, 22 120:22 121:6 190:12 216:9 230:25 232:25 233:2, 14, 19 235:10, 15 237:2
**revenues** 26:20 78:23
**review** 10:11, 17 36:23, 24 37:11, 12 58:17 78:14, 17 208:11, 22 212:12 256:3
**reviewed** 79:18 207:20 208:5 209:1 212:3, 22 258:19
**revoke** 118:7 125:19
**revoked** 222:2
**rid** 52:11
**Right** 9:24 14:8 16:7 17:3 19:14 22:20 24:16 28:1 29:4, 5, 6, 8, 16, 17 30:6, 7 33:18 34:1 35:1 36:17 38:16 40:17 43:6 44:3 47:1 48:21 52:2 54:7 55:20, 25 56:5, 6 60:24 61:7 62:23 63:21, 23 65:5 66:5, 17 69:7 73:7 75:6 79:4 80:14 81:3, 8 85:1 87:4, 8 96:25 99:9, 10 100:16 101:21 102:15 103:8, 9, 17, 18 104:4, 24 106:15 108:6, 7, 8 109:14 112:8 114:5 115:19 118:12 119:4, 16 121:12, 16 122:8 123:4, 5 124:10 128:3 132:2 133:16, 17 134:18, 19 139:19, 21, 24 144:15, 17 145:4, 6, 7 147:25 148:18 149:1 150:9 151:24 152:12, 20, 23 153:4, 9 154:17, 19, 21 156:15, 18, 19, 23 157:7 158:17, 18, 19 159:4, 9, 10, 21 160:25 162:11 165:21 167:16 168:9

169:11, 19 173:21, 23, 25 175:5, 8 177:18, 19, 20 178:3 182:23 184:25 185:5, 25 187:19 192:23, 24 194:23 195:22 197:25 200:9, 21, 23 205:23 206:2 207:5 211:22 216:22 218:7 224:16, 18 226:1, 23 227:9 228:19 231:19 236:11 238:12, 17 243:22 250:8 251:10, 25 252:4, 11, 19 253:14 254:1, 10, 17 255:2, 5, 8, 9 257:4, 12 258:15 259:1 260:23 264:23 267:4, 11
**right-hand** 59:17, 25 60:9, 22 115:7 152:1 158:3 181:20
**rights** 66:9 226:18
**risk** 113:24 114:15 119:11, 24 120:14 121:2 122:17 123:9 124:14 125:23 126:19, 23 127:1 128:6 132:8 164:10 165:19 218:3, 21 220:18 224:23 230:23 231:11
**risk-and-return** 132:17
**risky** 118:13 124:3
**rkillorin@faruqilaw.com** 2:6
**Robert** 2:1 4:22
**role** 10:8 209:19, 22 210:6, 21 211:11, 19 213:2, 14
**roles** 72:22
**rollover** 63:12
**Ron** 73:12, 17 74:23, 25 75:22
**Ronald** 72:21 216:18, 23 217:16 231:14 234:10 242:6
**rosy** 70:1, 9 75:19, 24 81:13 120:6 230:24
**rough** 214:10
**row** 83:12
**RPR** 1:24 271:11
**rule** 215:13 270:14
**Rules** 1:20 6:6 55:9, 10 200:4
**rumors** 46:10 48:3 164:20 175:17 255:19
**run** 82:2 85:4

< S >
**S&P** 171:17, 18 173:15
**Sadler** 73:10, 13, 17 74:24 75:1, 23
**safe** 172:5
**safer** 27:8
**Saigon** 12:13
**salary** 91:17
**sale** 191:13 196:20 198:1, 10
**sales** 134:12 184:3, 21 195:16 196:10, 16, 23 197:24 198:7 203:14
**San** 4:12 5:23 242:25 244:1
**savings** 194:19
**savvy** 103:18, 22, 23 104:1
**saw** 70:25 77:7 139:20 148:11 186:1 189:22 193:9 198:20 199:5 204:2, 7 205:4 206:13 207:5 225:8 264:24 265:16
**saying** 6:22 32:6, 13 38:1 45:11, 12, 20 47:12, 13, 24 66:7 71:5 74:12 102:21 110:13 132:2 157:15 169:4 176:18 200:3 205:8, 24 216:5 233:11 239:15 240:4 241:7 243:24 245:18, 19 252:6 259:7
**says** 60:23 87:24 92:9, 18 93:3 97:22 98:1 112:13, 17 117:25 118:3 122:10 140:25 145:16 146:7 155:15 158:24 159:4 162:18 185:17 201:5
**schedule** 233:13
**scheme** 167:11 176:6
**Schwab** 15:11, 17 17:12, 14 35:3 51:6
**scope** 133:4
**screen** 21:4
**seal** 269:17
**search** 43:1, 2, 3, 5, 12 45:2 71:16, 18, 21 78:24 188:6, 9, 14, 15 189:8, 14, 16 193:11 199:5, 24 203:16, 22 204:2, 9, 20, 21 205:6 206:20 207:4, 8 221:7 222:18 228:14 245:7, 8 264:25
**searched** 78:21 189:1 217:21 229:12 230:19 264:9
**searches** 189:23
**searching** 42:25
**SEC** 37:20 38:2 78:18
**second** 47:16 60:13 62:22 63:25 65:7, 20 74:13 86:20 87:18, 23 88:13 119:3 150:16 157:21 185:11
**secondly** 94:20
**seconds** 137:2
**second-to-last** 86:17 198:17
**section** 121:20 122:7, 10
**sector** 39:6
**SECURITIES** 1:3 3:15 4:6 10:23 14:14 27:8, 9, 14, 19 28:4, 9, 11 105:5 116:20 129:7, 23 130:1 132:23 134:12 181:16, 24 182:9 184:14, 17 196:10 210:19 270:3
**security** 28:12 29:3 30:3, 17 31:6 32:3, 8 53:1 55:1, 9 68:24 93:5 112:18 113:2, 12 130:6, 11, 16 132:7 147:4 150:11 183:2 215:13, 14
**SEDAR** 78:18
**see** 42:18 43:5 44:25 45:19 59:1, 18 60:8 61:1 62:6, 9, 15 86:19 87:14, 19 92:18 95:25 96:21 97:20, 22 98:2 102:10 103:11 104:6 105:15 112:8, 16 115:7 117:18 118:1, 10 121:19, 23 122:7, 9 138:2 141:4, 16, 18, 23 142:6, 20 144:23 145:8, 11 146:2, 9 148:5 151:22 152:2, 3 153:25 155:10, 15, 20 156:10 157:25 160:5 161:10, 18 162:14, 22, 25 163:9 179:23 180:8 181:22 182:10, 13 185:16, 21 196:12, 17 198:24 199:1 200:15 203:23 205:7 206:21 216:7 220:9 222:20 238:10 251:16, 20 264:11 265:5
**seeing** 161:4
**seeking** 258:2 259:12
**seeks** 257:21 258:22 261:2
**seen** 44:7 117:6 176:20
**select** 21:15 111:11
**selected** 161:22, 24
**sell** 33:18, 23 135:8 136:5 147:4 177:24 178:1, 6 184:7 190:13, 16 191:10 193:3, 17, 25 197:10, 21 198:19 199:15

201:2, 22 203:2 249:19 250:24 251:5
**seller** 135:4 164:22
**selling** 135:14, 22, 25 175:10 193:13 197:5 253:25
**sells** 248:2
**semiannually** 170:5
**semimonthly** 215:6
**seminars** 15:8, 12 17:13
**senior** 9:9 26:13 29:8, 10, 17, 20 30:4, 25 33:15 35:9, 21 45:12, 15, 24 46:2, 9 47:13 48:1, 2 69:20 72:15, 16 75:4, 7 76:11, 19 77:3, 20 81:21 84:13, 20 89:15, 25 90:6, 10, 14, 17 114:2, 16 120:3 127:4, 23 128:1 164:16, 25 166:4, 8 175:14, 18 186:13, 20 187:15 188:2, 12 189:20 190:1 191:2 192:9 196:25 199:25 200:2 201:16 202:11 204:24 211:5 212:2 215:11 233:3 235:25 237:15 239:14 240:19 250:18 266:15, 25 267:3
**sense** 6:25 7:1 16:15 43:7 96:7
**sentence** 87:24 122:9 124:10, 13, 19, 21 126:1 198:17
**separate** 259:8 260:16
**separately** 259:22
**September** 92:23 96:10 100:21 265:18 266:4
**sequence** 162:1
**series** 6:19, 20 9:10
**serve** 260:9
**Set** 3:12 55:21 56:20, 21 57:20 86:9, 13 94:18, 21 106:8, 11
**settle** 147:5
**settled** 197:24 198:8
**settlement** 146:17
**seven** 6:2 9:9 25:6
**shakes** 6:23
**share** 101:6, 14, 19 135:8, 9 149:10 177:12
**shareholder** 256:5
**shares** 22:7 24:15, 16 52:16, 20 53:17 54:12 55:3, 14, 17 56:3 63:5 68:25 69:2, 3 83:1 87:13 134:21 135:15, 16, 24 136:4, 14, 17 138:4 142:7, 18, 19 143:4 149:9, 24 177:14 186:7 190:13, 17 198:19 202:3, 6, 16 203:2
**sheet** 24:3 265:16
**shooting** 227:1
**short** 32:4, 14 164:21 184:21
**shorthand** 65:6 270:8
**show** 42:24 57:24 85:14 92:21 104:18 114:21 132:16 135:2, 5, 7 151:5, 10 158:17 204:21, 22 208:19 209:17 212:10 239:7
**showed** 115:17 116:5 216:9
**showing** 144:7 148:2 159:2 164:17 175:4 193:11 203:21
**shown** 209:15
**shows** 42:23 61:10, 15 93:19 96:19, 23 97:5, 8 98:4 144:13, 22 147:13 154:3 155:9, 16 156:6, 8 158:7, 12, 14 160:13 162:11
**shut** 132:13 190:22
**shutdown** 132:13
**shy** 92:23
**sic** 198:2 231:14 234:10, 13 242:7
**side** 133:11 135:4, 22
**sign** 116:5
**signature** 86:21 268:1 269:2 270:15, 19
**significant** 129:7, 23 149:10 171:12 178:17, 20
**significantly** 114:14 118:7 119:10, 23 121:4 125:19
**silence** 227:3, 18
**similar** 256:7
**Simple** 22:14 125:14 162:7
**simply** 200:10
**Simultaneous** 68:15
**single** 10:23 22:23 23:11 134:25 135:6, 17 136:14 141:13 142:1 167:3, 24 170:16 172:5, 12, 24 173:7, 10, 17 180:20 184:10 196:24 198:10, 12
**sir** 5:12 32:13
**sit** 236:3 266:19
**site** 71:16
**sitting** 102:9
**situation** 197:17 247:24 255:10
**situations** 30:9, 16 31:5
**six** 6:1, 2
**sixth** 71:7
**sizeable** 172:4
**skeptical** 45:9 166:2 198:22 201:16
**skins** 239:9
**slide** 97:25
**slightly** 61:17 155:2, 9
**small** 27:7 51:6, 15 52:3 139:17 149:22 167:12 172:9 173:19 176:7
**smoke** 253:9
**smoothly** 6:7
**social** 31:21, 25 32:7, 18, 20, 23 33:3, 6 44:7
**sold** 182:8 183:2 192:22 194:16 202:2 248:6, 13, 14, 18 249:5, 15, 19, 23 254:15 263:15 264:20 266:2, 4
**sole** 122:11
**somebody** 21:25 111:9 164:22 238:5 239:4 242:23
**somebody's** 240:2
**son** 13:3
**Sorry** 14:6 16:22 20:12 23:16 28:22 29:12 53:10 54:6 55:22 56:12 58:10 65:4 71:20 109:1 121:22 139:4 144:25 147:14 157:16 177:25 185:14 189:2 195:19 209:21 212:15 232:6, 7 243:4 249:1 256:15 266:23
**sort** 32:3 59:15 132:17 195:13 205:12 213:24
**sorts** 37:8
**Sotto** 58:17
**sought** 52:7 247:15 266:1
**sound** 99:8 177:17
**Sounds** 7:15 99:10 140:7
**source** 71:15 72:11, 12, 13 91:19 199:7 229:8 233:14
**sources** 26:5, 18 35:23, 24, 25 37:17 40:10 42:11 45:25 77:12, 23 255:19
**space** 243:23
**span** 200:2 209:5
**spanned** 242:20

**speak** 6:20 17:7 29:14 48:20 49:6 78:5, 8 191:12 214:22
**speaking** 46:25
**speaks** 6:18 70:12
**specialist** 4:16
**specific** 35:6 57:6, 8 70:23 71:1 189:14 207:24
**specifically** 37:9 50:9, 11 72:17 73:16 75:8, 10, 15, 22 79:13 83:10 128:20 207:3 230:16 232:21 237:7
**specifics** 69:6
**speculate** 126:4 175:16 217:12 218:5 261:22
**speculation** 122:19 126:1, 11 128:9 176:15 246:4 250:2 260:4 261:19 262:16
**spell** 5:14 11:4
**spend** 214:19 239:14
**spent** 9:14 214:5, 11 238:14
**spoke** 49:25
**spread** 85:8 242:19
**stable** 127:9, 15, 18
**start** 8:21 9:3 24:9 43:18, 19 140:17 193:12 224:13 225:7 231:15 233:25 252:14 253:24
**started** 9:16 14:20, 21, 24 226:21 246:20
**startup** 9:7
**state** 4:20 5:14 74:2 98:11 108:21 186:14 269:7, 22 270:9
**stated** 1:20 87:1 114:2 236:18
**statement** 18:5 26:12 29:21 30:5 35:9, 21 36:9, 13 38:13, 22 39:8 42:18 46:9 48:1 58:24 61:23 69:21 71:4, 9 72:8, 15 80:22, 23 81:21 84:13, 20, 21 89:16 90:7 102:19 114:20 119:18 120:3, 5, 9, 10 122:20 127:4, 24 175:7 187:15 188:2, 7, 11 190:1 207:17 228:12 231:4, 6 235:1 236:11, 13 249:7 250:8 254:7
**Statements** 3:8 26:15 27:21 33:15 36:6, 23 37:10, 11, 15, 16, 22, 25 38:5, 18 39:2, 10, 17 42:4, 5 47:10 58:21 59:5 70:6, 23, 24 71:1, 13, 16 72:2 73:1, 6, 12, 16 74:23 75:13, 15 76:10, 18 77:19 79:18, 21, 23 80:3, 5, 8, 11 81:10, 15, 25 82:3, 5 89:25 90:10 123:3, 7 124:6 128:2 187:19, 24 204:24 215:23, 25 235:6, 13, 16 236:6, 9 250:17 254:3 263:24
**STATES** 1:1 3:15 4:7 12:7, 8, 11 13:5 270:1
**stay** 187:23 188:4
**staying** 61:14
**steady** 113:16
**stenographically** 1:19
**step** 224:5
**stick** 157:15
**sticks** 151:16
**sticky** 140:4 147:21 151:4 153:25 157:18
**stimulus** 40:16, 19, 24
**stipulate** 170:18, 24
**stock** 19:4 20:10, 13, 14, 23 22:3 24:10, 13 30:6 33:11 41:5, 7 46:21 48:12 52:10, 13, 21 53:5, 17 54:2, 13 55:4, 15, 18 57:2, 16, 18 61:8 64:20 69:9, 14, 18 74:3 78:2 79:12 81:1 84:4, 16 85:5 87:13, 25 90:4 91:23 93:10, 12 94:15 96:23 97:5, 8 105:14 107:10, 23 109:16 112:21 134:21 136:21 137:19 138:4, 7, 11, 16, 23 139:8, 15, 22 141:7, 11, 13 142:7, 18 144:8 145:6, 9, 10 147:1 149:8, 13 152:5 153:7 154:13 155:10 156:4 158:8, 13 159:13, 14, 18, 23 160:8 161:5 162:11, 19 163:1, 7, 8, 12 164:2, 22 165:7, 15, 24, 25 167:24 168:11, 15 169:4, 14, 25 170:16, 21 171:8, 11, 21 172:5, 12, 25 173:8, 17 174:10 175:5, 23 178:1 179:5, 20 180:16 181:9 184:10 185:19 189:24 191:10 192:22 193:3 195:18 196:17 197:10, 11, 12, 22 198:20 199:15 202:17, 19, 20, 25 203:15, 23 231:1 248:5, 18 249:13, 15, 23 251:10, 16, 20, 21 252:9, 13, 15 254:11, 15, 16 255:6 257:22 260:8 263:1, 15, 16 264:23 266:2, 14
**stocks** 23:17, 23, 24 34:4 50:13 51:10, 14, 18 54:18, 20 57:10, 15 69:8 79:10, 14 85:5 94:4, 5 97:14 105:3, 5, 6 106:1 107:3 133:14 146:18 147:13 148:2, 20 149:15 154:4, 9, 23 156:3, 7, 8, 21 157:4, 5, 9 158:14, 23, 24, 25 159:3, 4, 8, 9, 18, 22 160:8, 15, 21, 22 167:5 170:15, 22 171:16 172:2 173:11 178:14 183:11 193:13 256:18 257:10 263:1 266:18
**stock's** 248:23
**stop** 138:25 165:24
**stopped** 130:5 132:10 165:23
**story** 203:5
**straight** 103:4
**strategic** 136:20
**strategies** 17:22 18:12 28:18 65:18, 19 185:18
**strategy** 17:23 22:22 23:10 25:9, 14 168:3 172:6, 12 173:8 184:16, 18, 25 190:4, 7
**Street** 2:10 4:11
**strike** 16:5 56:12 57:6 74:24 79:11, 20 119:4 136:12 138:5 153:22 157:16 163:25 164:7 165:4 194:20 220:14 255:23
**structure** 66:20
**stuff** 72:7 238:15
**Subject** 87:20
**submit** 260:17 261:13 262:14
**submitted** 13:3
**submitting** 262:4
**subscribed** 269:14 271:5
**subsequent** 203:14
**substantially** 77:11
**subtract** 156:13
**subtractions** 61:15, 17
**successfully** 197:4
**sue** 213:15
**sued** 226:6, 7
**suggest** 142:7
**Suite** 2:10
**summarize** 70:21 76:8
**summary** 104:17
**support** 227:7

**supposed** 222:*13* 237:*22*
**Supreme** 190:*19* 191:*4*, *6* 192:*7* 194:*2*, *3* 197:*2* 199:*22* 200:*6* 201:*18*, *19* 202:*12* 203:*11* 224:*5* 231:*21* 253:*2*
**sure** 6:*6*, *16* 10:*12*, *20*, *22* 13:*15* 14:*22* 17:*7* 19:*11* 21:*12* 23:*8* 26:*14* 30:*22* 37:*21* 41:*14* 49:*10* 57:*12*, *22* 67:*1* 70:*3* 71:*19* 82:*9* 93:*7* 109:*12* 132:*4* 137:*3* 140:*25* 145:*21* 148:*10*, *16* 149:*7* 150:*1*, *17*, *25* 154:*16* 159:*19* 160:*11* 171:*6* 173:*2*, *6* 192:*3*, *14* 203:*10* 207:*25* 208:*3* 209:*25* 210:*2*, *5* 211:*7* 225:*20* 238:*24* 250:*14* 251:*15* 252:*1* 253:*17* 255:*21* 258:*10* 259:*21* 260:*10*, *11* 263:*20*
**surely** 169:*17*, *21*
**surface** 244:*7*
**surrounding** 87:*12* 186:*6*
**survivorship** 55:*21* 56:*1*, *5* 62:*24* 66:*10*
**suspend** 137:*1* 190:*20* 192:*7* 224:*4*
**suspended** 165:*2* 166:*10* 191:*4*, *6* 192:*17* 193:*2* 194:*2*, *13* 199:*23* 200:*1* 201:*14* 217:*8* 218:*3*, *4*, *20*, *22* 220:*17*, *19* 221:*1*, *5*, *17* 223:*6* 225:*4* 227:*8* 233:*5* 234:*2*, *5* 236:*15* 250:*12* 251:*4* 252:*18* 253:*13* 255:*1*, *4*
**suspension** 165:*16* 192:*1*, *5* 193:*16*, *21* 199:*11* 200:*16*, *22* 201:*1* 223:*24* 224:*9*
**swaps** 184:*20*
**swear** 5:*6*
**switched** 125:*4*
**switching** 72:*22*
**sworn** 1:*16* 5:*7*, *9* 270:*11* 271:*5*
**symbol** 26:*8* 35:*19* 37:*4* 42:*18* 43:*11*, *23* 203:*23* 205:*15*, *25* 206:*20* 264:*10*
**system** 46:*3* 102:*14* 103:*3* 104:*13* 111:*12* 112:*24* 135:*10* 136:*1*, *9*

**< T >**
**TAHOE** 1:*3* 3:*11*, *17* 4:*5* 20:*9*, *13*, *14* 23:*15*, *17* 26:*4* 33:*19*, *25* 46:*15*, *17*, *23* 47:*14*, *15*, *22* 52:*18*, *20* 53:*1* 54:*1*, *12*, *21*, *22* 55:*1*, *4*, *14*, *18* 56:*3* 57:*2* 61:*8* 63:*5* 64:*20* 66:*2* 69:*14*, *18* 71:*4*, *12* 72:*7*, *15* 73:*3*, *11* 76:*11*, *20* 77:*6*, *15*, *19*, *24* 78:*2*, *20*, *24* 79:*3*, *6*, *23* 80:*5* 81:*1*, *6* 82:*4* 83:*1*, *5*, *10* 84:*4*, *16* 85:*12* 86:*9* 87:*13*, *25* 90:*4* 91:*10*, *22* 92:*22* 93:*25* 94:*2* 96:*24* 97:*6*, *17*, *22* 100:*25* 102:*2*, *6* 103:*6* 104:*23* 105:*14*, *17* 107:*6* 108:*11* 109:*5*, *17* 111:*8* 112:*18*, *20*, *21* 113:*1* 114:*15* 117:*7*, *21* 118:*13* 119:*12*, *25* 120:*15* 122:*17* 124:*3*, *15* 125:*24* 126:*20* 130:*6*, *10*, *15* 132:*6*, *19* 133:*22* 134:*12*, *21* 137:*18* 138:*4*, *7*, *11*, *16*, *18*, *23* 139:*8*, *22* 141:*7*, *11*, *13* 142:*7*, *17* 144:*8*, *14* 145:*16* 147:*1* 152:*5* 153:*7* 154:*13* 155:*10*, *15* 156:*4* 157:*7* 158:*8* 159:*2*, *14* 160:*9* 161:*6* 162:*12* 163:*2*, *7*, *12*, *22* 164:*1*, *7*, *9*, *11* 165:*4*, *6*, *14*, *18*, *23* 167:*8* 168:*10*, *17* 169:*13*, *24* 174:*19* 175:*2*, *10* 176:*9*, *23* 178:*18* 181:*9*, *15*, *25* 183:*16* 184:*17*, *20* 185:*1*, *19* 186:*22*, *25* 187:*21*, *23* 188:*5*, *12*, *13* 189:*11*, *20*, *21* 190:*3*, *13* 191:*12*, *15*, *18* 193:*13* 194:*16* 195:*18* 196:*10*, *17*, *20* 198:*20* 199:*1* 201:*7*, *23* 202:*7*, *17*, *21*, *24* 203:*3*, *14* 204:*8* 205:*25* 206:*17* 211:*6* 212:*2*, *24*, *25* 213:*3* 215:*12* 216:*23* 217:*7*, *18* 221:*23* 222:*1*, *11*, *19* 224:*7*, *12*, *20* 225:*12* 226:*6* 227:*22*, *25* 228:*6*, *15*, *21* 230:*2* 233:*4* 234:*13*, *14* 237:*13*, *18* 239:*12*, *21* 240:*19* 241:*9*, *15*, *16*, *20* 245:*12*, *19* 246:*14* 247:*4* 248:*1* 249:*8*, *11* 251:*14* 256:*6*, *18* 257:*10*, *22* 258:*3*, *23* 261:*3* 264:*10*, *13*, *21* 266:*2*, *14*, *16*, *25* 270:*3*
**Tahoe's** 78:*14*, *17* 114:*4*, *13* 119:*22* 121:*11*
**take** 7:*23* 28:*15* 35:*16* 38:*25* 49:*8* 58:*6* 90:*24* 115:*6* 156:*11*, *13* 194:*16*, *21* 208:*17* 232:*9* 265:*4*
**taken** 4:*5* 126:*1* 271:*1*
**takes** 146:*18* 147:*5*
**talk** 7:*3* 8:*18* 32:*20* 33:*25* 38:*22* 50:*20* 52:*18* 90:*15* 153:*4* 167:*11* 183:*4*, *7* 206:*23* 208:*14* 214:*15*
**talked** 27:*6* 34:*22* 42:*4* 76:*22* 138:*12* 141:*10* 170:*10* 187:*19* 209:*3*
**talking** 9:*3* 13:*20* 25:*7* 27:*16* 37:*6* 46:*10* 48:*4*, *12* 50:*15* 64:*19* 67:*14* 80:*13* 124:*20* 138:*2* 142:*24* 145:*20*, *22* 149:*3* 150:*3* 152:*8*, *13*, *24* 154:*14* 155:*13* 156:*5* 157:*4* 159:*20* 168:*19* 214:*8* 232:*22* 240:*1* 243:*12*, *14* 244:*6*, *23* 246:*20*
**tap** 96:*2*
**tax** 24:*15* 177:*13* 194:*19*
**taxes** 69:*1*
**teenagers** 13:*25*
**Tell** 15:*12* 29:*8*, *18* 111:*12* 124:*12* 157:*9* 166:*5* 211:*1*, *10*, *18* 217:*5*, *6* 218:*16* 220:*1* 228:*19* 238:*4*, *5*, *11*, *12*, *16*, *19*, *20* 239:*3* 256:*23*, *25*
**telling** 47:*7* 65:*17* 90:*18* 105:*13* 131:*23* 135:*18* 177:*1* 197:*9*
**ten** 71:*8*
**term** 16:*3*, *17* 25:*21* 150:*6* 152:*21*
**terminology** 64:*22* 65:*7*
**terms** 10:*14*, *21* 17:*25* 18:*4* 26:*1*, *20* 27:*2* 32:*23* 36:*8*, *9* 37:*1* 39:*8* 44:*23* 49:*4* 53:*5*, *13* 79:*14* 81:*5* 82:*4* 89:*23*

127:18 143:23 159:12 166:25 168:5 173:14 208:15 237:23 242:13 243:22 263:20
**test** 173:10
**testified** 5:9
**testify** 8:5
**testifying** 139:1
**testimony** 8:10 23:3, 5 30:13 32:11 41:12 47:6 54:17 88:11 95:10 99:17 103:20 105:19 107:15 108:1, 13 109:24 118:17, 18 123:14, 20 130:8, 24 131:24 138:21 139:10 165:9 166:19 168:13 172:14, 16 174:13 176:1 199:18 204:11 223:19 248:10 252:17, 21 253:16 260:25 270:13, 25
**Texas** 1:24 270:9 271:12
**Thank** 5:18 17:9 29:24 53:14 82:23 111:25 137:24 180:8
**Thanks** 5:21
**therefor** 270:20
**thing** 32:3 45:24 72:10 76:1 90:21 149:25 170:2, 8 177:23 201:15 205:12 209:9 216:17 227:9 245:19
**things** 6:10 10:24 15:22 18:8, 22 32:1, 18 34:13 37:8, 18 38:16, 21, 24 40:11, 24 42:2, 3, 8 46:11, 12 49:1, 24 63:20 76:23 88:3 94:16, 24 102:25 103:1, 13, 15 104:9, 15 106:2 120:21 136:1 140:6 159:8 164:18 166:5 167:2, 11 173:13 187:17 188:8 189:17 190:18 193:9 203:5 205:16 209:13 222:6, 7 224:13 225:7 226:21 236:16, 21 237:19 239:24 243:16, 19 246:9 251:1 252:1, 2, 25 253:8 261:4 267:2
**think** 7:4 19:1 28:14, 19 29:4 30:9, 10 31:20, 21, 23, 24 32:15, 17, 19 33:16, 20 39:7 40:20 42:15 46:1, 20 47:8, 19 50:4, 22 53:2, 4 57:19 59:4 61:24 63:13 66:22 67:7, 11, 18 69:15 70:14 72:20 73:5 74:2, 12 75:18 77:14 78:21, 24 79:4, 7 82:1, 19 84:18 93:4, 11, 12 94:3, 16, 17, 20 97:13 98:25 99:7, 17 100:5, 13 102:17 104:10, 21 105:8 106:8 107:22 111:10, 13 112:25 113:7 116:6 120:24 123:8 127:3, 22 128:19, 24 129:25 130:19 132:3, 12, 16 133:3, 12 135:1, 9, 12, 19, 20, 25 136:9 138:6 141:11 142:4 145:22 147:16 150:5 153:12 155:3 159:7 160:11 161:7, 20 163:14 164:14, 18 165:3, 5, 13, 22 166:6, 9 168:14 169:8 171:12 172:11 177:23 178:15, 16, 22, 23 179:15 180:5, 6, 23 182:4 188:1 190:19, 21 192:6, 8, 13 193:4, 5, 8, 19 194:7 197:23, 25 198:4 199:4 200:1, 3, 17 201:11, 20 202:22 203:4, 9, 20 204:4, 22 209:3 212:7 214:7, 16 215:4 216:13, 14 217:2, 9, 12, 18, 24 218:1, 6, 8, 12, 13, 14 219:11 220:13, 24 221:6, 7, 19 222:15 224:7 225:3, 15, 21, 25 226:3, 5 227:4, 18 228:9 229:2, 3, 22 230:10, 18 231:3, 21, 23 233:3, 7 234:19 235:5 237:9, 15 239:6, 8 240:8, 17, 23 242:5, 12, 16, 18, 20 245:2, 17 247:9 249:18 251:7, 9 253:3 259:16, 22 261:20 262:19 263:2, 7 264:5, 13, 22
**thinking** 32:24 36:1 82:13 89:14, 24 90:16 122:21 194:3 200:18 258:16 262:23
**thinks** 113:6
**Third** 2:5 18:20 19:20 63:1, 11 71:6
**thought** 13:17, 18 16:24 20:12 53:18, 22 54:15 80:15 81:9, 24 90:13 102:12, 15 200:19 201:21 220:14, 16
**thousand** 105:25 106:1 135:9 172:1 211:25 221:12, 13 222:12 228:10, 16, 17 237:12 239:16 245:4, 5 247:19
**thousands** 172:2 209:8 227:13
**three** 8:15 14:25 15:2 17:2, 24 25:20 41:2 49:25 50:15 62:8 63:4 66:12 67:2, 5, 7, 16 77:9 83:11 146:18 147:5 174:24 181:8 187:4 197:25 198:3 229:3 242:20
**ticker** 26:8 35:19 37:4 42:17 43:1, 11, 23 203:22 205:15, 25 206:19 264:10
**tie** 28:25
**Tiffany** 11:3, 8 66:9
**time** 6:18 9:17 25:7 29:13 32:4, 14, 15 33:20, 23 36:3, 17 57:2 59:6 66:4 67:9, 19 69:2, 11 71:5 72:23 82:18 83:1 85:19 91:23 97:9 98:11 100:5 105:1 107:4 111:7 114:3, 7, 10 129:1 130:5, 12, 14 132:7, 9 149:9 161:5 166:12 168:25 180:13 181:17 182:9 184:4 186:25 187:6, 22 188:22 190:17 191:13 192:20 193:1, 15 196:11 197:18 200:2 206:10, 12, 17 208:13, 25 209:5 212:18 214:5, 7, 11, 15, 19 224:1, 12 226:20 229:13, 18 230:7 239:14 248:2, 5, 6 251:14 253:24 256:17 257:10 266:13, 14, 20 267:3
**times** 34:11, 18, 20 51:21 62:13 91:8 104:4, 5 105:9 187:5
**timing** 224:3 241:11, 12, 13 265:2, 22
**Title** 117:25 122:3
**TOD** 66:10
**today** 4:16 5:3 6:13 7:11 8:2, 8, 10 222:3 224:10 226:20 236:3 242:5 252:2, 9 266:19 267:1
**told** 34:24 49:24 50:4 75:3 79:2, 21 80:3 81:4, 9 88:8 102:5 105:8 106:17 110:9 118:12 121:10 123:2, 6 124:2

125:15, 22 128:3 141:11 142:9 165:3, 5, 13 166:4 168:23 177:11 236:23 237:6 239:20 251:9, 11 253:20 258:18 259:9 260:22
**ton** 15:15
**top** 73:20 97:12 151:23 152:1 158:2, 3, 18 185:15, 23 198:17 207:5 264:14
**total** 67:10 99:19 104:16 105:23 136:17 147:13 148:2 149:15 154:23 156:7, 15 157:5 159:4 162:12, 18 163:1, 6, 7 172:8 181:16, 24
**totaling** 182:9
**totally** 168:12
**touch** 167:14
**track** 72:23 213:24
**trade** 14:14 23:14, 18 34:7, 10, 11, 18 42:20 105:3, 4 135:1 184:9 190:5
**traded** 105:4, 9 156:23
**trades** 105:1 133:13, 22 183:11
**trading** 14:17 15:4 30:19 31:9 172:12 173:8 182:16 184:1 190:4, 7
**trail** 41:10
**train** 201:21
**training** 15:3
**trains** 200:19
**transaction** 116:21 141:17, 22 142:1, 6 146:19, 21 181:25 183:15
**transactions** 136:22 195:22
**transcript** 270:12, 18
**transitioned** 9:17
**translated** 246:8
**transmission** 21:1
**traveled** 191:23
**treasury** 9:6, 9, 12, 17
**treasury-related** 9:14, 20
**tricky** 82:13, 21
**tried** 28:12, 15, 25 69:11 164:21, 22
**trouble** 216:4, 12
**true** 29:11 32:5 42:8, 9 87:1 105:2 174:15 176:13 177:22 199:25 202:15 222:17 228:16 230:21 235:2, 7 236:13 237:21 249:3 269:2 270:13
**truly** 29:9, 19
**trust** 45:15 46:2, 3 48:2 55:19, 21 56:9, 19 57:4 69:4 103:2 114:19 175:17 213:18 214:1 235:25 250:18
**trusted** 102:14 123:6
**trustee** 56:25
**trustees** 56:24
**truthfully** 8:5
**try** 45:21 125:7 140:1 150:22 162:7 201:17, 18 211:23 227:3 261:21, 23 262:18
**trying** 30:11, 12 31:11, 15 34:16 37:21, 24 38:6 41:9, 23 42:2 47:2 53:8 57:13 63:15, 20 68:14 69:5 75:7 76:9 82:15 109:20 111:15 116:22, 24 117:4 122:15 131:10 140:10 143:15, 16 160:23 165:10 169:8 173:21, 24 176:17, 21 180:1 188:23 189:10 192:25 204:12 205:22 218:7, 18 224:15, 19 234:25 248:22 254:1, 8 260:6
**turn** 13:19 92:2 106:13 121:15, 16 134:3 136:24 137:14, 17 139:25 144:2 146:6 153:23 157:13, 17 181:2 185:5, 10, 12 195:6, 8 196:7, 14 198:14
**turnaround** 197:17
**turned** 231:23
**turning** 33:17 122:13 140:17 181:13
**TV** 42:23, 24 70:25
**twist** 204:15
**Two** 2:10 7:2 29:16 64:1 65:24 67:10, 21 72:24 136:21 144:2 161:25 162:1 170:8 207:7 217:20 222:16 228:12 229:3 237:22 242:20
**two-days** 142:12
**types** 65:24
**typical** 24:6 172:12 173:8 184:9 215:24 263:23
**typically** 33:10 34:4 105:9
**typing** 6:13

**< U >**
**uh-huh** 6:23 42:1 47:5 49:23 51:12 52:9, 22 54:14 58:14 60:2 62:14 63:18 67:22 71:25 75:21 81:3 87:10 92:5, 20, 24 94:6 96:22 98:18 103:5 115:10 118:2, 11 121:25 124:11 137:20 141:19 145:7, 12, 17 146:3 148:15 151:2 154:24 155:21 156:24 158:4 160:4 162:15, 23 166:14 170:13 174:4 175:9 181:14, 21 185:13 197:13 198:16, 25 223:8 236:5 249:14 252:8 253:22 259:10
**ultimately** 223:6
**uncertain** 118:5 120:13 125:17
**uncheck** 111:18 112:2
**unclear** 41:12
**understand** 7:12, 14 8:1 12:4, 6 30:13 31:11, 15 36:12 37:22, 25 38:7, 9 39:15 41:23 42:2 43:8 47:2, 6, 23 53:8, 24 54:3 55:23 57:13 63:20 64:22 68:11, 16 70:13 71:19 75:6, 8 80:19 82:22 84:9, 23 85:2, 5 88:4 89:17, 21 90:20 93:7 98:14, 19 99:21 103:25 108:7 109:13, 21 110:2, 13 111:4 112:19, 24 115:15 116:22, 25 117:4, 20, 22 120:18 122:15 125:10 131:6 143:16 147:6 156:17 159:10 165:10 173:24 176:8, 17, 21, 22 188:24 189:3, 10 192:25 198:5 200:23 204:13 205:22 210:14, 19 215:9 216:16 217:22 218:7, 19 220:5 221:21 223:11 224:19 229:13, 18 231:11 233:1 234:23, 25 236:2 244:4 248:22 249:21 254:1, 5 258:10, 13 259:4 261:22 262:2, 9, 19, 20 263:20 267:6
**understanding** 51:4 55:7 68:1 74:18 95:2 98:7 99:13 148:17 149:14 156:2 160:12 167:21 196:19 198:10

211:10, 18 260:6 265:25
**understood** 90:1 100:11, 16 113:19 121:11 252:16
**undervalued** 28:8, 10, 13
**unfair** 169:8
**unfold** 222:7 224:14 226:9, 21 252:15
**unfolded** 203:5
**unfolds** 251:2
**UNITED** 1:1 3:15 4:7 12:7, 8, 11 13:5 270:1
**unpack** 224:15
**unstable** 128:4
**untrue** 236:18
**unusual** 85:4
**update** 208:15 215:8
**updated** 214:24
**upper** 81:11
**upset** 234:20
**use** 7:18 13:9 15:10 18:16 21:22 23:19 43:10, 11, 23 59:23 91:19 94:13 95:4, 19 96:5 111:16 146:22 150:6, 22 152:21 185:1 227:18
**usually** 33:3, 12 35:16 73:4, 5 113:15 147:5 170:5 182:18 188:1

< V >
**vague** 53:24 119:18 143:7 177:4 210:9 243:8 244:5, 20 254:22 262:15
**valid** 28:18
**validity** 118:3 120:11 125:15
**valuable** 185:20 186:10, 12, 18
**value** 24:12 29:3 30:3, 7, 17, 20 31:6, 10 32:7 61:11 97:9, 21 98:2, 4, 9, 20 99:1 100:6 104:7 154:8 155:17 156:8, 15 162:13, 21 163:7 164:14 165:25 167:1 175:2 178:8, 10 248:19
**values** 32:5 97:19 100:7
**variety** 170:14
**various** 136:22
**vary** 34:5
**verbally** 6:21
**verification** 86:18, 24
**versus** 45:7 46:10 127:2 238:19
**vested** 24:7, 8, 11, 13, 23 25:6
**video** 4:15 6:12, 14 17:16
**VIDEOCONFERENCE** 2:17
**VIDEOGRAPHER** 2:12 4:3 49:14, 17 60:14, 17 91:2, 5 137:5, 8 194:25 195:3 232:11, 15 265:9, 12 267:13
**videos** 17:17
**VIDEOTAPED** 1:8 4:4 270:5
**Vietnam** 12:13, 15, 23 238:10
**Vietnamese** 11:24 12:2 13:9, 13 48:20, 24, 25 49:3, 7
**view** 165:7 218:21 221:3 238:2
**village** 238:11, 13
**violate** 55:9
**violated** 226:18, 23
**violence** 193:9 227:1, 17 231:23
**voce** 58:17
**voice** 221:9
**volume** 143:5, 11 182:16 184:1
**volumes** 85:8
**voluminous** 58:24

< W >
**wait** 21:7 62:18 85:20 164:24 166:7 175:12, 13 180:7
**waiting** 197:14
**walked** 209:10
**want** 7:3 8:18 22:11, 13, 16, 18 26:14 38:9 41:10 49:8, 21 51:20 57:22 58:25 59:1, 5 60:20 62:17 65:6 70:3 80:18, 19 83:2 87:4 92:14 93:7 95:24, 25 107:19, 20 109:12 115:21 118:17 130:20 137:13 146:16 148:16 149:6 150:9 167:15 170:18 172:25 175:19 182:21 211:7 217:11 218:5 221:9 222:4 231:1 235:19, 20 250:3, 14 251:14 252:1, 3 258:9, 13 261:21, 23 263:19
**wanted** 14:21, 22 16:16, 19, 25 20:23 22:8 26:2 91:15, 16 102:2 103:7 149:13 153:12 168:17 171:13, 14 173:10 175:13 232:18 240:4 255:20
**War** 12:23
**water** 7:18 243:19
**way** 12:14 16:8 28:13 50:4 55:6 66:18 82:18 85:19 135:9 143:13, 14 146:13 160:17 191:16 216:15 217:3, 12, 20, 24, 25 221:20 226:14 234:9 238:23
**webinar** 17:15
**website** 15:10 26:7 35:18 37:3 38:2 71:24 72:1 205:13
**websites** 15:12 42:15, 16
**weekly** 215:6
**welcome** 63:8
**well** 6:15 8:21 17:13 18:7 26:13, 23 31:2 34:13, 14 35:5 37:16 40:8, 23 41:23 43:18, 21 45:13 46:4 52:5 53:3 59:20 61:21, 23 66:15 68:10 69:22 71:11 73:21, 22, 25 74:10 76:3, 13 79:8, 11 85:2 95:14, 17 97:13 100:7 104:3 105:7 107:10, 22 114:17 117:14, 20 119:17 133:15 143:12, 17 146:11 148:24 149:9, 17 150:12 153:3 158:14, 23 159:9, 18, 23 160:16 161:17 162:6 165:3 166:17 167:2, 14 168:7, 14, 23 171:11 174:20, 23 176:13, 17 178:15 180:3 182:20 183:1, 14 189:2 194:9 204:14 212:16 213:24 217:18 218:10 219:17, 25 228:9 233:22, 24 235:9, 14 236:7 239:17 240:9 241:19 251:22 258:18 260:21
**well-aware** 217:4
**well-crafted** 169:10
**went** 24:11 138:6 143:22 166:12 216:22 265:15
**we're** 7:16 27:18 46:22 50:15, 19 57:25 85:14 96:20 112:8 114:21 134:17 147:12, 16 150:19 153:4, 18 179:3 235:14 244:6
**We've** 58:24 64:24 67:3 69:15 149:2 150:25 152:8, 9, 13,

14 168:14 178:23 202:4
**wife** 11:2 55:25 56:5 57:2, 9, 14, 16, 23 62:23 66:25 78:8, 10 153:5
**wife's** 56:14
**willing** 136:5
**wipe** 22:19
**witness** 1:15 5:6, 7 16:11, 13 17:8 19:3, 7, 16 20:18 21:14 28:24 29:15 38:12 40:7, 14 44:1, 3 48:16 50:24 52:2 53:12, 15 55:24 63:9 69:16 74:21 76:16, 25 77:2 80:8, 13, 17 81:19 82:9 83:19 84:10 94:8 95:11, 13 98:23, 25 101:9, 12 103:22 105:20, 22 107:16 108:2, 6, 14, 17, 19, 23 109:1, 9 111:22 112:1 120:20 122:23 123:15, 18 124:25 125:2, 5, 8, 12 128:10 129:11, 14, 19 131:13 133:20 139:11, 14 145:24 148:11 153:19 158:20 162:3 169:6 171:24 173:3 177:2, 6 178:10 179:10 180:11, 23 183:5, 20 186:1 187:3, 7 188:17, 25 189:5 195:23 196:1, 4 200:12 210:25 215:19 218:12 220:22, 24 232:6 242:1 243:4, 7, 10, 12 245:2 246:5, 19, 22 250:3 253:18 255:14, 17 257:1, 4, 8 259:4 260:5 261:24 262:17, 22 267:10 270:11, 13
**woman** 20:2
**word** 38:9 189:17, 21 210:5
**words** 22:21 23:9 30:11, 12 34:17 75:20 76:9 91:18 112:20 113:19 131:13 136:3 186:19 204:15 242:22
**work** 9:11 10:3 11:8 12:22 18:15 19:19, 24 20:4, 20 21:16, 20 211:23
**worked** 12:24 136:10 191:18 209:11, 13
**working** 9:8 10:8 11:13
**works** 135:10 146:13 191:20
**worldwide** 258:4 259:13 261:3
**worth** 184:3, 10
**wrong** 22:19 29:5, 7, 9, 17, 19 185:14 200:4

< X >
**Xinca** 221:8, 13 222:12, 14, 22, 24 223:4 225:10, 11 226:13, 24, 25 227:2, 11, 12, 14, 20, 22 228:2, 4, 6, 10, 20 229:6, 15, 20, 24 230:4, 8, 20 231:17, 24 233:6 234:20 237:11, 16 238:1, 6, 21, 23 239:1, 2, 4, 8, 16, 19, 22 240:4, 6, 8, 10, 12, 15, 21 241:1, 9, 16, 17, 21 242:11 243:17 244:13, 18 245:14, 21 246:1, 13 247:3

< Y >
**Yahoo** 35:17 42:10 72:12
**Yeah** 5:16, 20 7:1 10:24 13:16 16:14, 17 17:14, 24 18:3, 10 20:11 23:13 24:25 26:19 30:19 31:8, 23 32:5, 9, 14, 19, 22 33:7 34:15, 20, 21 35:4 37:24 38:12 40:24, 25 46:13, 24 48:22 50:24 52:1, 2, 19 53:15 54:23 56:21, 23 58:16 59:3, 9, 13 60:10 62:1, 2, 7 64:9, 11, 17 67:19, 25 68:3, 8, 18, 19, 23 69:16 70:4 71:18 72:6 76:7 77:1, 7 82:2, 24 86:20 87:8, 21 88:9 89:9 90:23 92:15 93:16 95:12 96:12 98:3, 24 99:12 100:15, 18 101:4, 9 102:23 104:25 105:4, 6, 7, 11, 12, 21, 22 106:8 107:1 108:16, 18, 25 112:16 116:6 117:19, 23 120:9 122:4, 8 125:6 127:5 131:8 135:13 136:7, 9, 25 137:3 138:3, 20 139:12 140:11, 14, 15 141:5 142:15 143:2, 3 145:24 147:23 148:1, 11, 12 149:23 150:2, 7, 14, 17, 24 151:8, 10, 25 152:25 153:6, 13 154:2 156:11 157:8, 12, 24 158:1 159:2, 11 160:1, 4 161:3, 7, 15, 20, 23 162:9 163:5, 14 164:5 166:14 167:5, 10 169:6, 20 170:13 174:17 176:7 177:3, 6 179:11, 15, 16 180:9, 12, 24 181:12, 23 182:4, 7 183:20 184:11, 13 185:9, 13 187:6 188:1, 25 189:9 192:6, 10 194:4, 7, 15 195:23 196:22 198:6, 13 199:13 202:23 203:16 205:21 206:18 207:19, 22 208:7, 20, 24 209:7 210:4, 5 211:8 212:5, 20 213:6, 13 214:3, 4 215:8, 19, 24 216:10 217:9 219:19 221:20 224:2, 10, 14 226:5 229:12 230:10 231:13 232:9 234:23 236:10 238:7 241:13 242:3, 16 243:20 244:10, 23 245:1 246:10, 19 247:10, 14 249:9, 22 251:5, 7 253:24 255:15, 17 257:1, 25 258:17 262:7, 11 264:17 265:21, 24 266:3 267:10
**year** 34:13 100:13 158:8 159:13 183:1, 21 184:13 245:6 250:25
**year-end** 38:18 158:2 160:2 161:1 182:21, 23 249:7
**year-ends** 182:19
**years** 6:1, 2 8:15 9:9, 23 11:7 14:19 15:1, 2 17:14 24:7, 9, 10, 25 25:6 34:6 77:9 83:12 122:21 126:3 136:19 144:1 161:8 167:15 180:12 183:23 209:5 212:11 214:17 222:8 225:6 248:14
**yellow** 140:4 147:21 151:4, 16 153:25 157:15, 18
**York** 2:5
**you-all** 147:15
**yup** 198:25

< Z >
**Zoom** 21:1

**WORD LIST**


< $ >
**$0.02** *(3)*
**$0.73** *(1)*
**$1.8** *(9)*
**$11** *(1)*
**$11.4** *(1)*
**$12,000** *(2)*
**$140,000** *(1)*
**$2,418,635.73** *(2)*
**$2,880,713.50** *(1)*
**$2,880,717.50** *(1)*
**$2.4** *(2)*
**$2.6** *(5)*
**$2.8** *(4)*
**$2.88** *(3)*
**$2.9** *(5)*
**$24.8** *(2)*
**$25** *(4)*
**$28** *(1)*
**$38** *(6)*
**$4,000** *(4)*
**$4.95** *(1)*
**$7,428,179.13** *(1)*

< 0 >
**00001067** *(1)*
**00001110** *(1)*
**00001233** *(1)*
**00022097** *(1)*
**00022098** *(1)*
**07/31/22** *(1)*
**09/30/21** *(1)*

< 1 >
**1** *(9)*
**1,200** *(1)*
**1.8** *(1)*
**1:02** *(1)*
**1:03** *(1)*
**1:39** *(1)*
**1:45** *(1)*
**1:56** *(1)*
**10** *(5)*
**10,000** *(3)*
**10:27** *(1)*
**10:49** *(1)*
**100** *(7)*
**10017** *(1)*
**107-17** *(1)*
**11** *(4)*
**11:02** *(1)*
**11:03** *(1)*
**11:37** *(2)*
**11:39** *(1)*
**11:55** *(1)*
**114** *(4)*
**12** *(4)*
**12:27** *(1)*
**12:48** *(1)*
**12:50** *(1)*
**13** *(5)*
**13:30:21** *(1)*
**14:22:06** *(1)*
**140,000** *(1)*
**14407** *(2)*
**147,000** *(1)*
**15** *(1)*
**16** *(5)*
**16-month** *(1)*
**16th** *(1)*
**17** *(7)*
**1700** *(1)*
**1745** *(1)*
**18** *(6)*
**19** *(2)*
**1986** *(2)*
**1994** *(1)*

< 2 >
**2** *(14)*
**2,500** *(5)*
**2.4** *(1)*
**2.6** *(2)*
**2.9** *(2)*
**2:17-cv-01868-RFB-NJK** *(3)*
**2:48** *(1)*
**2:49** *(1)*
**20** *(11)*
**200** *(1)*
**200,000** *(14)*
**2000** *(7)*
**2007** *(2)*
**2008/2007** *(1)*
**2008/2009** *(1)*
**2009/2008** *(1)*
**2009/2010** *(1)*
**2010** *(6)*
**2011** *(3)*
**2013** *(3)*
**2014** *(1)*
**2016** *(70)*
**2017** *(32)*
**2017/2018** *(1)*
**2018** *(11)*
**2019** *(5)*
**2021** *(7)*
**212** *(1)*
**22** *(1)*
**22,000** *(3)*
**22098** *(1)*
**22114** *(4)*
**22123** *(1)*
**22130** *(1)*
**22133** *(2)*
**22144** *(1)*
**22190** *(2)*
**22191** *(1)*
**22192** *(1)*
**222** *(1)*
**22246** *(3)*
**22261** *(1)*
**22280** *(1)*
**2278** *(1)*
**2279** *(1)*
**23** *(7)*
**24** *(3)*
**25** *(2)*
**25th** *(1)*
**266** *(1)*
**269-8047** *(1)*
**26th** *(3)*
**28** *(6)*
**280** *(2)*
**28th** *(2)*
**291** *(1)*
**29th** *(1)*
**2nd** *(2)*

< 3 >
**3** *(6)*
**3:05** *(1)*
**3:46** *(1)*
**3:48** *(1)*
**3:58** *(1)*
**30** *(4)*
**30(f)(1** *(1)*
**300,000** *(6)*
**31** *(8)*
**312** *(1)*
**31st** *(1)*
**32** *(2)*
**34** *(6)*
**36** *(1)*
**37** *(3)*
**3rd** *(2)*

< 4 >
**4:00** *(1)*
**4:05** *(1)*
**4:41** *(1)*
**4:49** *(1)*
**4:51** *(1)*
**4:53** *(1)*
**40** *(2)*
**401(k** *(2)*
**40-F** *(1)*
**425** *(1)*
**45** *(8)*

< 5 >
**5** *(25)*
**5.3** *(2)*
**5:05** *(1)*
**5:48** *(1)*
**50** *(8)*
**50,000** *(2)*
**500** *(3)*
**500,000** *(4)*
**51** *(1)*
**547** *(15)*
**58** *(1)*

< 6 >
**6** *(1)*
**6:05** *(1)*
**6:41** *(1)*
**6:51** *(1)*
**6:53** *(2)*
**60602** *(1)*
**67** *(13)*
**68** *(9)*
**685** *(1)*
**69** *(3)*

< 7 >
**7** *(1)*
**70** *(1)*
**79-2** *(1)*

< 8 >
**8** *(4)*
**82** *(1)*
**85** *(1)*

< 9 >
**9:37** *(1)*
**9306** *(2)*
**94122** *(1)*
**983-9330** *(1)*

< A >
**a.m** *(8)*
**ability** *(1)*
**able** *(15)*
**above-styled** *(1)*
**Absolutely** *(3)*
**abstract** *(1)*
**accepted** *(1)*
**account** *(132)*
**account/savings** *(1)*
**accountant** *(1)*
**accounting** *(2)*
**accounts** *(31)*
**accuracy** *(1)*
**accurate** *(1)*
**achieving** *(1)*
**acknowledged** *(1)*
**acquire** *(1)*
**acquired** *(5)*
**act** *(1)*
**action** *(22)*
**activities** *(1)*
**add** *(1)*
**addition** *(1)*
**additional** *(3)*
**additions** *(2)*
**address** *(1)*
**advance** *(1)*
**advantage** *(1)*
**advertise** *(1)*
**advertisements** *(2)*
**advice** *(2)*
**adviser** *(8)*
**advisers** *(1)*
**affect** *(3)*
**affirmatively** *(1)*
**affix** *(1)*
**afterward** *(1)*
**age** *(1)*
**aggressive** *(3)*
**ago** *(13)*
**agree** *(5)*
**agreed** *(1)*
**ahead** *(6)*
**air** *(1)*
**align** *(3)*
**aligned** *(1)*
**allegations** *(1)*
**alleged** *(1)*
**alleging** *(2)*
**allocating** *(1)*
**allocation** *(5)*
**allocations** *(1)*
**alter** *(2)*
**amay@nge.com** *(1)*
**ambiguous** *(17)*
**amended** *(2)*
**America** *(2)*
**American** *(3)*
**amount** *(9)*
**amounts** *(1)*
**analogy** *(1)*
**analysis** *(1)*
**analyst** *(22)*
**analysts** *(1)*
**analyze** *(1)*
**analyzing** *(1)*
**and/or** *(1)*
**Andrew** *(7)*
**Andrew's** *(1)*
**Angeles** *(4)*
**announce** *(2)*
**announcement** *(4)*
**answer** *(97)*
**answered** *(14)*
**answering** *(3)*
**answers** *(7)*
**Anybody** *(2)*
**anyway** *(2)*
**apologize** *(2)*
**appeal** *(10)*
**appealed** *(1)*
**appearance** *(4)*
**appearances** *(1)*
**appeared** *(1)*
**appearing** *(1)*
**appears** *(2)*
**applicable** *(4)*
**apply** *(1)*
**applying** *(1)*
**appointed** *(1)*
**appreciate** *(1)*
**appreciation** *(2)*
**approximate** *(1)*
**approximately** *(10)*
**approximation** *(1)*
**April** *(1)*
**Area** *(33)*
**article** *(4)*
**articles** *(1)*
**artificially** *(2)*
**aside** *(2)*
**asked** *(26)*
**asking** *(33)*
**aspects** *(1)*
**assert** *(7)*
**asserted** *(2)*
**assessment** *(11)*
**asset** *(6)*
**assets** *(9)*
**assist** *(1)*
**assume** *(1)*
**assumes** *(4)*
**assurance** *(2)*
**asylum** *(1)*
**attached** *(1)*
**attend** *(2)*
**attention** *(10)*
**attesting** *(1)*
**attorney** *(2)*
**attractive** *(1)*
**attributable** *(4)*
**attribute** *(3)*
**audibly** *(2)*
**Audio** *(1)*
**August** *(44)*
**automatic** *(2)*
**automatically** *(3)*
**available** *(3)*
**Avenue** *(2)*
**average** *(3)*
**aware** *(15)*

< B >
**back** *(62)*
**backwards** *(1)*
**bad** *(5)*
**balance** *(4)*
**Ballpark** *(3)*
**Bank** *(2)*
**banker** *(1)*
**bankers** *(2)*
**Barnickol** *(2)*
**barrier** *(3)*
**base** *(1)*
**based** *(35)*
**basic** *(1)*
**basically** *(21)*
**basing** *(2)*
**basis** *(7)*
**basket** *(9)*
**Bates** *(6)*
**Bates-label** *(1)*
**Bates-labeled** *(4)*
**bathroom** *(1)*
**Bay** *(1)*
**Becky** *(2)*
**began** *(1)*
**beginning** *(9)*
**begins** *(6)*
**behalf** *(2)*
**belabor** *(1)*
**believe** *(33)*
**believed** *(7)*
**believing** *(1)*
**beneficiary** *(1)*
**best** *(4)*
**beyond** *(1)*
**bid** *(1)*
**big** *(10)*
**bigger** *(1)*
**billion** *(1)*
**bit** *(9)*
**black** *(1)*
**blacked** *(1)*
**blanked** *(1)*
**Bloomberg** *(1)*
**blow** *(1)*
**Bob** *(13)*

**Bob's** *(1)*
**bodies** *(2)*
**bolts** *(1)*
**bond** *(2)*
**bonds** *(3)*
**borrowed** *(1)*
**bottom** *(20)*
**bought** *(12)*
**box** *(5)*
**break** *(12)*
**breakdown** *(1)*
**Breckinridge** *(16)*
**Brian** *(2)*
**broader** *(4)*
**brokerage** *(6)*
**Brothers** *(1)*
**bucket** *(5)*
**buckets** *(12)*
**budget** *(1)*
**budgeting** *(1)*
**bunch** *(5)*
**business** *(39)*
**businesses** *(1)*
**busy** *(1)*
**buy** *(9)*
**buyer** *(1)*
**buys** *(1)*

**< C >**
**CALAS** *(3)*
**C-A-L-A-S** *(1)*
**calculate** *(2)*
**calculated** *(2)*
**calculation** *(4)*
**calculator** *(1)*
**calculus** *(2)*
**California** *(4)*
**call** *(16)*
**called** *(3)*
**calls** *(13)*
**camps** *(1)*
**Canada** *(19)*
**Canadian** *(7)*
**cap** *(5)*
**capital** *(3)*
**card** *(1)*
**care** *(3)*
**career** *(1)*
**CASE** *(53)*
**cases** *(1)*
**cash** *(37)*
**catch** *(1)*
**cause** *(2)*
**caused** *(2)*
**caution** *(1)*
**census** *(3)*
**center** *(4)*
**CEO** *(14)*
**certain** *(6)*
**certainly** *(1)*
**certainty** *(5)*
**certification** *(3)*
**certified** *(4)*
**certify** *(6)*
**CFO** *(4)*
**challenging** *(5)*
**chance** *(1)*
**change** *(9)*
**changed** *(2)*
**changes** *(5)*
**characterize** *(4)*
**charged** *(1)*
**cheap** *(1)*
**check** *(5)*
**checked** *(5)*
**checking** *(1)*
**checking/saving** *(1)*
**checks** *(1)*
**Chicago** *(1)*
**children** *(2)*
**Chinese** *(1)*
**choose** *(14)*
**choosing** *(7)*
**chose** *(5)*
**Christian** *(1)*
**chronology** *(1)*
**circumstance** *(1)*
**circumstances** *(8)*
**citizen** *(3)*
**City** *(1)*
**Civil** *(1)*
**claim** *(10)*
**claimed** *(1)*
**claims** *(11)*
**clarification** *(8)*
**clarifications** *(1)*
**clarify** *(11)*
**clarity** *(2)*
**class** *(35)*
**classify** *(1)*
**Clayton** *(12)*
**clean** *(6)*
**cleanup** *(1)*
**clear** *(29)*
**clearly** *(2)*
**click** *(1)*
**clients** *(2)*
**close** *(1)*
**closed** *(1)*
**closely** *(3)*
**CNBC** *(5)*
**colleagues** *(1)*
**column** *(3)*
**combination** *(2)*
**combine** *(2)*
**combined** *(1)*
**come** *(6)*
**coming** *(5)*
**comments** *(1)*
**commercial** *(1)*
**Commission** *(3)*
**commodities** *(1)*
**common** *(32)*
**communications** *(2)*
**Communist** *(1)*
**community** *(1)*
**companies** *(33)*
**company** *(167)*
**company's** *(24)*
**compare** *(1)*
**compared** *(4)*
**compel** *(1)*
**complaint** *(4)*
**complementary** *(1)*
**complete** *(3)*
**completely** *(7)*
**completion** *(2)*
**comply** *(2)*
**comprise** *(1)*
**comprised** *(5)*
**comprising** *(1)*
**concept** *(1)*
**concern** *(2)*
**concerned** *(2)*
**concerning** *(1)*
**conclude** *(2)*
**concluded** *(1)*
**conditions** *(2)*
**conducting** *(1)*
**confer** *(1)*
**confidence** *(1)*
**confident** *(1)*
**confidential** *(1)*
**confirmation** *(1)*
**confirmed** *(9)*
**confuse** *(1)*
**confused** *(4)*
**confusion** *(1)*
**conglomerate** *(1)*
**Congress** *(11)*
**connected** *(1)*
**connection** *(2)*
**conservative** *(4)*
**consider** *(33)*
**consideration** *(1)*
**considered** *(13)*
**considering** *(3)*
**considers** *(1)*
**consistently** *(1)*
**consists** *(1)*
**consolidated** *(1)*
**constructive** *(1)*
**consult** *(19)*
**consulted** *(22)*
**Consulting** *(1)*
**contact** *(5)*
**contacted** *(1)*
**contains** *(1)*
**contend** *(1)*
**contention** *(1)*
**contested** *(3)*
**context** *(4)*
**continue** *(15)*
**continued** *(14)*
**continues** *(2)*
**continuing** *(2)*
**contrary** *(1)*
**contribution** *(1)*
**contributions** *(1)*
**conversation** *(1)*
**conversations** *(1)*
**conveyed** *(1)*
**copy** *(11)*
**corner** *(10)*
**Cornerstone** *(2)*
**corporation** *(1)*

**correct** *(154)*
**corrective** *(2)*
**correctly** *(17)*
**cost** *(3)*
**Costs** *(3)*
**Counsel** *(12)*
**count** *(2)*
**countries** *(3)*
**country** *(6)*
**country-specific** *(1)*
**COUNTY** *(1)*
**couple** *(27)*
**coupons** *(1)*
**course** *(10)*
**COURT** *(34)*
**cover** *(1)*
**covering** *(1)*
**covers** *(1)*
**COVID-19** *(1)*
**creates** *(1)*
**crosstalk** *(1)*
**CRR** *(2)*
**CSR** *(6)*
**CST** *(12)*
**current** *(1)*
**currently** *(2)*
**cut** *(3)*

**< D >**
**daily** *(1)*
**damages** *(2)*
**dark** *(2)*
**data** *(2)*
**date** *(6)*
**day** *(12)*
**days** *(10)*
**December** *(17)*
**decide** *(5)*
**decided** *(6)*
**deciding** *(6)*
**decision** *(34)*
**decisions** *(4)*
**decline** *(3)*
**default** *(1)*
**Defendant** *(6)*
**defendants** *(3)*
**defined** *(1)*
**definitely** *(1)*
**definition** *(1)*
**demands** *(3)*
**department** *(1)*
**Dependence** *(2)*
**depends** *(11)*
**deponent** *(3)*
**deposed** *(2)*
**DEPOSITION** *(26)*
**depositions** *(1)*
**derived** *(4)*
**describe** *(2)*
**described** *(1)*
**describes** *(1)*
**describing** *(2)*
**DESCRIPTION** *(5)*
**detail** *(8)*
**details** *(3)*
**determine** *(2)*
**determined** *(2)*
**determining** *(3)*
**difference** *(4)*
**different** *(26)*
**differently** *(1)*
**difficulties** *(1)*
**digging** *(1)*
**direct** *(4)*
**directing** *(2)*
**directly** *(3)*
**director** *(1)*
**disagree** *(1)*
**disclaimer** *(2)*
**disclose** *(1)*
**disclosed** *(2)*
**disclosure** *(4)*
**discount** *(1)*
**discouraged** *(1)*
**discovery** *(5)*
**discrepancy** *(1)*
**discuss** *(1)*
**Discussion** *(2)*
**distance** *(1)*
**distort** *(1)*
**distracted** *(1)*
**DISTRICT** *(6)*
**diversification** *(5)*
**diversified** *(3)*
**diversify** *(11)*
**diversifying** *(2)*
**diversity** *(1)*
**divide** *(4)*
**dividend** *(54)*
**dividends** *(91)*
**docket** *(1)*
**document** *(31)*
**documents** *(14)*
**doing** *(33)*
**doings** *(1)*
**dollars** *(12)*
**double** *(2)*
**double-check** *(1)*
**doubt** *(7)*
**Dow** *(1)*
**Dr** *(1)*
**draft** *(4)*
**drawing** *(1)*
**drink** *(2)*
**driver** *(1)*
**drop** *(2)*
**dropped** *(5)*
**Duc** *(1)*
**due** *(2)*
**duly** *(4)*

**< E >**
**earlier** *(15)*
**early** *(7)*
**earning** *(5)*
**earnings** *(4)*
**easier** *(1)*
**efficiency** *(2)*
**efficient** *(7)*
**effort** *(1)*
**eggs** *(3)*
**eight** *(6)*
**EISENBERG** *(1)*
**either** *(3)*
**eleventh** *(1)*
**employ** *(2)*
**employed** *(6)*
**employee** *(7)*
**employees** *(7)*
**encompassed** *(1)*
**encompasses** *(1)*
**ended** *(1)*
**ends** *(6)*
**engaged** *(1)*
**engaging** *(1)*
**engine** *(3)*
**English** *(2)*
**Enron** *(1)*
**entertainment** *(1)*
**entire** *(7)*
**entirety** *(1)*
**entitled** *(2)*
**entity** *(4)*
**environment** *(1)*
**environments** *(1)*
**equivalent** *(9)*
**equivalents** *(4)*
**escape** *(2)*
**Escobal** *(44)*
**essentially** *(1)*
**established** *(1)*
**estimate** *(1)*
**ETF** *(18)*
**ETFs** *(2)*
**event** *(1)*
**events** *(3)*
**eventually** *(5)*
**Everest** *(2)*
**everybody** *(1)*
**everyone's** *(1)*
**everything's** *(2)*
**evidence** *(4)*
**exactly** *(42)*
**EXAMINATION** *(4)*
**example** *(6)*
**examples** *(1)*
**excellent** *(1)*
**exception** *(1)*
**excerpted** *(1)*
**Exchange** *(3)*
**exclusively** *(2)*
**Excuse** *(6)*
**executed** *(1)*
**executives** *(1)*
**Exhibit** *(21)*
**EXHIBITS** *(1)*
**exist** *(1)*
**existed** *(2)*
**expect** *(4)*
**expected** *(1)*
**expedite** *(1)*
**expense** *(3)*
**expenses** *(2)*
**experience** *(2)*
**expert** *(2)*
**Expiration** *(2)*

**EXPIRES** *(1)*
**explain** *(3)*
**explaining** *(1)*
**expressed** *(1)*
**extent** *(1)*
**extra** *(1)*

< F >
**face** *(1)*
**Facebook** *(36)*
**Facebook's** *(2)*
**faced** *(1)*
**fact** *(19)*
**factor** *(2)*
**factored** *(1)*
**factors** *(1)*
**facts** *(9)*
**factual** *(1)*
**failed** *(1)*
**fair** *(17)*
**fairly** *(6)*
**fall** *(2)*
**fallen** *(5)*
**false** *(28)*
**familiar** *(8)*
**family** *(3)*
**far** *(7)*
**FARUQI** *(16)*
**Faruqi's** *(1)*
**faster** *(1)*
**father** *(1)*
**Federal** *(1)*
**fee** *(1)*
**feel** *(7)*
**fell** *(2)*
**felt** *(1)*
**Fidelity** *(46)*
**Fidelity's** *(1)*
**fiduciary** *(1)*
**field** *(1)*
**fifth** *(1)*
**fight** *(1)*
**figure** *(5)*
**figuring** *(1)*
**file** *(10)*
**filed** *(18)*
**files** *(3)*
**filing** *(4)*
**filings** *(7)*
**final** *(3)*
**finally** *(2)*
**Finance** *(6)*
**financial** *(17)*
**financially** *(1)*
**find** *(1)*
**fine** *(16)*
**finish** *(10)*
**finished** *(2)*
**Finwest** *(1)*
**finwest.com** *(1)*
**firm** *(28)*
**firms** *(5)*
**First** *(39)*
**fishing** *(1)*
**five** *(10)*
**five-years** *(1)*
**fixed** *(1)*
**flip** *(9)*
**Floor** *(2)*
**flows** *(1)*
**fluctuate** *(1)*
**focus** *(4)*
**focused** *(3)*
**follow** *(10)*
**following** *(5)*
**follows** *(1)*
**foregoing** *(2)*
**foreseeable** *(5)*
**forgot** *(1)*
**Form** *(27)*
**formal** *(1)*
**forth** *(3)*
**forward** *(6)*
**found** *(5)*
**foundation** *(7)*
**founded** *(1)*
**four** *(5)*
**fourth** *(1)*
**fraction** *(1)*
**Francisco** *(4)*
**fraud** *(1)*
**FRCP** *(1)*
**free** *(1)*
**frequently** *(6)*
**friends** *(3)*
**front** *(2)*
**froze** *(1)*
**Fryd** *(2)*
**fulfill** *(1)*
**full** *(1)*
**fully** *(3)*
**function** *(1)*
**functions** *(4)*
**fundamental** *(1)*
**funds** *(26)*
**funny** *(1)*
**further** *(4)*
**future** *(18)*
**futures** *(3)*

< G >
**gain** *(1)*
**gains** *(1)*
**gap** *(1)*
**gathered** *(2)*
**general** *(7)*
**generally** *(3)*
**generate** *(4)*
**generated** *(2)*
**generating** *(1)*
**GERBER** *(1)*
**give** *(13)*
**given** *(5)*
**giving** *(4)*
**go** *(43)*
**goal** *(3)*
**goals** *(4)*
**goes** *(4)*
**going** *(133)*
**Goldcorp** *(7)*
**Good** *(35)*
**good-faith** *(1)*
**Google** *(52)*
**Googled** *(12)*
**Googling** *(2)*
**gosh** *(1)*
**gotten** *(1)*
**government** *(3)*
**governmental** *(2)*
**grand** *(2)*
**granted** *(1)*
**Graziano** *(4)*
**Great** *(9)*
**greater** *(1)*
**ground** *(1)*
**grounds** *(1)*
**group** *(1)*
**grow** *(6)*
**growing** *(3)*
**grown** *(2)*
**growth** *(89)*
**Guatemala** *(31)*
**Guatemalan** *(1)*
**guess** *(8)*
**guidance** *(2)*
**guide** *(2)*
**guy** *(4)*
**guys** *(3)*

< H >
**Hai** *(4)*
**H-a-i** *(1)*
**half** *(1)*
**hand** *(2)*
**handed** *(1)*
**handing** *(1)*
**handle** *(1)*
**handled** *(1)*
**happen** *(3)*
**happened** *(11)*
**happening** *(1)*
**happy** *(2)*
**hard** *(1)*
**harm** *(2)*
**head** *(1)*
**heading** *(2)*
**heads-up** *(1)*
**health** *(7)*
**healthy** *(3)*
**hear** *(12)*
**heard** *(5)*
**hearing** *(1)*
**hedge** *(3)*
**hedging** *(4)*
**held** *(7)*
**help** *(4)*
**helpful** *(2)*
**helping** *(1)*
**Hey** *(4)*
**hi** *(1)*
**high** *(11)*
**higher** *(2)*
**hire** *(2)*
**hired** *(1)*
**historical** *(1)*
**histories** *(2)*

**history** *(1)*
**hit** *(1)*
**Hmm** *(1)*
**Hold** *(16)*
**holding** *(5)*
**holdings** *(27)*
**holds** *(7)*
**hood** *(1)*
**hope** *(7)*
**hoped** *(1)*
**hopefully** *(1)*
**hospital** *(1)*
**host** *(1)*
**hour** *(2)*
**hours** *(2)*
**huh-uh** *(2)*
**human** *(2)*
**hundred** *(2)*
**hundreds** *(1)*
**Huynh** *(7)*
**H-u-y-n-h** *(1)*

**< I >**
**idea** *(3)*
**identifies** *(2)*
**identify** *(2)*
**identifying** *(1)*
**identity** *(1)*
**ignore** *(2)*
**ignored** *(3)*
**Illinois** *(1)*
**imagine** *(1)*
**immediately** *(2)*
**impact** *(6)*
**impacted** *(3)*
**imperfections** *(1)*
**importance** *(1)*
**important** *(4)*
**impossible** *(1)*
**impression** *(1)*
**improper** *(5)*
**include** *(1)*
**included** *(4)*
**includes** *(1)*
**including** *(7)*
**income** *(11)*
**incomes** *(1)*
**incoming** *(2)*
**increase** *(4)*
**increased** *(3)*
**increasing** *(3)*
**independently** *(1)*
**INDEX** *(3)*
**indicating** *(1)*
**indicative** *(1)*
**indigenous** *(4)*
**individual** *(3)*
**individually** *(3)*
**individuals** *(3)*
**indulge** *(1)*
**industry** *(8)*
**inefficient** *(1)*
**inflate** *(1)*
**inflated** *(7)*
**inflates** *(1)*
**influenced** *(5)*
**inform** *(1)*
**information** *(17)*
**informations** *(1)*
**informed** *(3)*
**informing** *(2)*
**infrastructure** *(2)*
**initial** *(3)*
**inquiry** *(2)*
**inside** *(1)*
**insist** *(1)*
**Instagram** *(1)*
**instance** *(1)*
**instances** *(5)*
**instruct** *(7)*
**instructing** *(3)*
**instructions** *(1)*
**instrument** *(1)*
**integrity** *(19)*
**intend** *(1)*
**intended** *(5)*
**intention** *(1)*
**interaction** *(1)*
**interest** *(6)*
**interests** *(2)*
**interference** *(1)*
**internet** *(9)*
**interrogations** *(1)*
**Interrogatories** *(4)*
**interrogatory** *(19)*
**interrupting** *(1)*
**interruption** *(2)*
**invest** *(30)*
**invested** *(15)*
**investing** *(14)*
**investment** *(73)*
**investments** *(28)*
**investor** *(31)*
**investors** *(17)*
**invests** *(1)*
**involve** *(4)*
**involved** *(5)*
**IPO** *(1)*
**IRA** *(5)*
**IRAs** *(1)*
**irrelevant** *(9)*
**issue** *(12)*
**issued** *(9)*
**issues** *(1)*
**its** *(14)*
**Iyaz's** *(1)*

**< J >**
**January** *(3)*
**job** *(1)*
**joined** *(1)*
**joint** *(9)*
**jointly** *(2)*
**July** *(5)*
**jump** *(1)*

**< K >**
**Karl** *(2)*
**Katerra** *(1)*
**Katherine** *(2)*
**Kathy** *(1)*
**kbarnickol@nge.com** *(1)*
**keep** *(26)*
**kept** *(2)*
**KEVIN** *(42)*
**K-e-v-i-n** *(1)*
**kidnap** *(3)*
**kidnapped** *(1)*
**kill** *(2)*
**Killorin** *(264)*
**kilometers** *(4)*
**Kimball** *(3)*
**kind** *(12)*
**knew** *(63)*
**know** *(521)*
**known** *(3)*
**knows** *(1)*
**Korea** *(1)*

**< L >**
**label** *(1)*
**labeled** *(1)*
**Lack** *(3)*
**laid** *(3)*
**language** *(5)*
**languages** *(1)*
**large** *(2)*
**LaSalle** *(1)*
**late** *(3)*
**latitude** *(1)*
**law** *(25)*
**laws** *(1)*
**lawsuit** *(25)*
**lawsuits** *(3)*
**lawyer** *(3)*
**lawyers** *(15)*
**lay** *(1)*
**laying** *(3)*
**lead** *(14)*
**leading** *(1)*
**leads** *(1)*
**leaf** *(2)*
**learn** *(9)*
**learned** *(9)*
**learning** *(4)*
**leave** *(5)*
**led** *(3)*
**left** *(3)*
**left-hand** *(2)*
**legal** *(3)*
**legend** *(2)*
**Lehman** *(1)*
**Lenahan** *(2)*
**level** *(7)*
**license** *(73)*
**Licenses** *(7)*
**license's** *(2)*
**licensings** *(1)*
**light** *(2)*
**Line** *(10)*
**linear** *(1)*
**lines** *(1)*
**list** *(9)*
**listed** *(21)*
**listen** *(1)*

**listened** *(1)*
**lists** *(5)*
**LITIGATION** *(10)*
**litigations** *(3)*
**little** *(13)*
**live** *(5)*
**lived** *(6)*
**living** *(13)*
**LLP** *(2)*
**local** *(8)*
**located** *(2)*
**location** *(2)*
**lockdown** *(1)*
**long** *(19)*
**look** *(128)*
**looked** *(23)*
**looking** *(39)*
**looks** *(7)*
**Los** *(4)*
**lose** *(1)*
**losing** *(3)*
**loss** *(7)*
**losses** *(5)*
**lost** *(9)*
**lot** *(18)*
**lots** *(1)*
**loudly** *(1)*
**low** *(4)*
**low-risk** *(15)*

**< M >**
**Madam** *(2)*
**main** *(4)*
**maintain** *(3)*
**maintained** *(1)*
**majority** *(2)*
**making** *(20)*
**man** *(2)*
**manage** *(5)*
**managed** *(5)*
**management** *(80)*
**manager** *(2)*
**managers** *(2)*
**manages** *(1)*
**manner** *(1)*
**margin** *(7)*
**mark** *(7)*
**marked** *(17)*
**Market** *(43)*
**markets** *(2)*
**marking** *(2)*
**married** *(3)*
**math** *(2)*
**matter** *(1)*
**Matteson** *(2)*
**M-a-y** *(1)*
**McArthur** *(10)*
**McCarthy** *(4)*
**mean** *(72)*
**means** *(11)*
**meant** *(5)*
**media** *(13)*
**medication** *(1)*
**meet** *(4)*
**meeting** *(5)*
**mega** *(1)*
**members** *(3)*
**mention** *(4)*
**mentioned** *(25)*
**met** *(1)*
**methodology** *(2)*
**microphone** *(1)*
**mid** *(1)*
**middle** *(6)*
**military** *(1)*
**million** *(51)*
**million-dollar** *(1)*
**mind** *(15)*
**mine** *(51)*
**mines** *(2)*
**mine's** *(2)*
**mining** *(34)*
**minings** *(6)*
**minister** *(5)*
**ministers** *(3)*
**ministries** *(1)*
**ministry** *(10)*
**minute** *(8)*
**minutes** *(3)*
**mis** *(1)*
**miscellaneous** *(1)*
**mischaracterization** *(1)*
**mischaracterizes** *(5)*
**miscommunication** *(1)*
**misleading** *(8)*
**misleads** *(1)*
**misled** *(13)*
**misrepresent** *(1)*
**misrepresentation** *(1)*
**misrepresentations** *(6)*
**missed** *(1)*
**missing** *(5)*
**misstate** *(1)*
**misstated** *(1)*
**misstatement** *(2)*
**misstatements** *(11)*
**misstates** *(27)*
**misstating** *(2)*
**mistake** *(1)*
**misunderstanding** *(1)*
**misunderstood** *(3)*
**mix** *(2)*
**money** *(24)*
**moneys** *(1)*
**monitor** *(5)*
**monitoring** *(1)*
**month** *(19)*
**monthly** *(48)*
**months** *(10)*
**morning** *(3)*
**motion** *(4)*
**mouth** *(4)*
**move** *(2)*
**multiple** *(6)*
**municipal** *(7)*
**musics** *(1)*
**mutual** *(19)*

**< N >**
**name** *(30)*
**names** *(2)*
**natural** *(1)*
**naturalized** *(1)*
**NEAL** *(1)*
**near** *(2)*
**necessarily** *(2)*
**necessary** *(1)*
**need** *(30)*
**needed** *(4)*
**needs** *(1)*
**negative** *(2)*
**negatives** *(1)*
**neither** *(1)*
**nervous** *(1)*
**net** *(4)*
**NEVADA** *(3)*
**never** *(14)*
**New** *(4)*
**news** *(32)*
**newspaper** *(1)*
**NGUYEN** *(35)*
**N-g-u-y-e-n** *(1)*
**NGUYEN_00001067** *(1)*
**NGUYEN_22097** *(1)*
**NGUYEN_22114** *(2)*
**NGUYEN_22133** *(1)*
**NGUYEN_22191** *(1)*
**NGUYEN_22246** *(1)*
**nine** *(1)*
**nods** *(1)*
**normal** *(1)*
**North** *(2)*
**NOTARY** *(1)*
**note** *(1)*
**noted** *(1)*
**notes** *(2)*
**nothing's** *(1)*
**notice** *(2)*
**noticed** *(2)*
**not-Xinca** *(1)*
**Number** *(50)*
**numbered** *(1)*
**numbers** *(1)*
**number's** *(1)*
**nurse** *(1)*
**nuts** *(1)*

**< O >**
**oath** *(3)*
**obfuscating** *(1)*
**Object** *(10)*
**objecting** *(2)*
**Objection** *(124)*
**Objections** *(6)*
**objective** *(1)*
**obligated** *(1)*
**obligation** *(1)*
**Obvious** *(1)*
**obviously** *(5)*
**Occasionally** *(2)*
**October** *(4)*
**offer** *(2)*

**offerings** *(1)*
**office** *(1)*
**off-limits** *(1)*
**offset** *(1)*
**Oh** *(52)*
**okay** *(401)*
**old** *(1)*
**old-fashioned** *(1)*
**once** *(3)*
**ones** *(8)*
**one-third** *(1)*
**online** *(6)*
**open** *(2)*
**opened** *(4)*
**operate** *(5)*
**operating** *(2)*
**operation** *(5)*
**operations** *(5)*
**opinion** *(3)*
**opposed** *(2)*
**opposition** *(1)*
**option** *(1)*
**options** *(13)*
**oral** *(1)*
**order** *(21)*
**ordered** *(1)*
**orders** *(3)*
**ordinary** *(1)*
**orient** *(4)*
**orienting** *(2)*
**original** *(3)*
**Originally** *(1)*
**originated** *(1)*
**outcome** *(1)*
**outlook** *(3)*
**outperform** *(1)*
**outset** *(2)*
**outside** *(2)*
**overall** *(3)*
**overthrown** *(1)*
**owned** *(28)*
**ownership** *(6)*
**owning** *(2)*
**owns** *(1)*

**< P >**
**p.m** *(27)*
**package** *(4)*
**PAGE** *(106)*
**PAGE/LINE** *(1)*
**pages** *(20)*
**paid** *(16)*
**paint** *(1)*
**painted** *(1)*
**Pan** *(3)*
**paperwork** *(1)*
**paragraph** *(3)*
**paraphrasing** *(1)*
**parse** *(1)*
**part** *(21)*
**participate** *(2)*
**particular** *(7)*
**particularly** *(1)*
**parties** *(1)*
**partner** *(2)*
**parts** *(1)*
**party** *(5)*
**path** *(1)*
**pay** *(50)*
**paying** *(15)*
**payment** *(2)*
**pays** *(2)*
**pending** *(1)*
**pendings** *(1)*
**people** *(79)*
**percent** *(42)*
**percentage** *(8)*
**perception** *(1)*
**perfectly** *(3)*
**perform** *(2)*
**performance** *(3)*
**performing** *(2)*
**period** *(38)*
**periods** *(1)*
**person** *(8)*
**personally** *(1)*
**pertain** *(1)*
**pertained** *(1)*
**Peter** *(2)*
**petition** *(1)*
**phone** *(1)*
**physical** *(1)*
**pick** *(8)*
**picked** *(2)*
**picks** *(1)*
**picture** *(11)*
**pictures** *(3)*
**place** *(6)*
**PLAINTIFF** *(19)*
**Plaintiff's** *(1)*
**planned** *(1)*
**platform** *(1)*
**play** *(2)*
**please** *(15)*
**plural** *(1)*
**point** *(66)*
**pointed** *(1)*
**policy** *(2)*
**pollute** *(1)*
**polluted** *(1)*
**pollutes** *(1)*
**pop** *(5)*
**popped** *(5)*
**population** *(1)*
**portfolio** *(39)*
**portion** *(1)*
**portions** *(1)*
**position** *(8)*
**positions** *(5)*
**possible** *(4)*
**Possibly** *(1)*
**posted** *(1)*
**postings** *(1)*
**precede** *(1)*
**predicate** *(1)*
**predict** *(5)*
**PRESENT** *(1)*
**press** *(5)*
**presume** *(1)*
**pretty** *(2)*
**prevent** *(3)*
**prevented** *(2)*
**previous** *(1)*
**previously** *(1)*
**price** *(9)*
**prices** *(3)*
**primary** *(2)*
**principal** *(3)*
**principle** *(1)*
**prior** *(40)*
**private** *(1)*
**privileged** *(1)*
**Probably** *(46)*
**problem** *(2)*
**problems** *(1)*
**Procedure** *(1)*
**procedures** *(2)*
**proceed** *(1)*
**proceeding** *(1)*
**PROCEEDINGS** *(1)*
**process** *(4)*
**produce** *(4)*
**produced** *(13)*
**production** *(2)*
**products** *(1)*
**professional** *(4)*
**professionally** *(1)*
**program** *(1)*
**progress** *(3)*
**project** *(4)*
**projecting** *(1)*
**projection** *(3)*
**projections** *(1)*
**projects** *(1)*
**prompted** *(2)*
**pronounce** *(1)*
**proportion** *(1)*
**prospect** *(14)*
**prospective** *(4)*
**prospects** *(8)*
**protest** *(3)*
**protestor** *(2)*
**protests** *(5)*
**proved** *(1)*
**provide** *(2)*
**provided** *(2)*
**providing** *(1)*
**provinces** *(2)*
**provisions** *(1)*
**proximity** *(1)*
**prudent** *(2)*
**public** *(31)*
**publications** *(1)*
**published** *(2)*
**publishes** *(1)*
**pull** *(1)*
**purchase** *(27)*
**purchased** *(35)*
**purchases** *(13)*
**purchasing** *(2)*
**purposes** *(1)*
**pursuant** *(2)*
**put** *(28)*
**putting** *(4)*

**< Q >**

**qualified** *(1)*
**quantities** *(2)*
**quantity** *(2)*
**quarterly** *(2)*
**question** *(83)*
**questioning** *(2)*
**questions** *(17)*
**quickly** *(2)*
**quite** *(1)*

**< R >**
**radio** *(2)*
**raised** *(2)*
**range** *(3)*
**rank** *(2)*
**reach** *(1)*
**reached** *(2)*
**react** *(1)*
**read** *(40)*
**reading** *(5)*
**reads** *(1)*
**ready** *(1)*
**realize** *(2)*
**realized** *(1)*
**really** *(17)*
**reason** *(16)*
**reasons** *(2)*
**rebalance** *(4)*
**rebalanced** *(2)*
**Rebecca** *(4)*
**recall** *(13)*
**receipt** *(1)*
**receive** *(7)*
**received** *(8)*
**receiving** *(6)*
**Recess** *(8)*
**recognize** *(3)*
**recollection** *(3)*
**recommendations** *(1)*
**record** *(45)*
**recording** *(1)*
**records** *(2)*
**recoup** *(3)*
**recovery** *(1)*
**redacted** *(8)*
**refer** *(6)*
**referred** *(2)*
**referring** *(7)*
**refers** *(1)*
**reflect** *(4)*
**reflected** *(4)*
**reflecting** *(1)*
**reflects** *(8)*
**refresh** *(3)*
**refugee** *(4)*
**regard** *(1)*
**regarding** *(1)*
**regime** *(1)*
**region** *(2)*
**regular** *(1)*
**regularly** *(2)*
**regulatory** *(2)*
**reinvest** *(13)*
**reinvested** *(14)*
**reinvesting** *(2)*
**reinvestment** *(11)*
**reinvestments** *(1)*
**reject** *(1)*
**relate** *(1)*
**related** *(12)*
**relating** *(3)*
**relative** *(2)*
**release** *(3)*
**released** *(2)*
**releases** *(2)*
**relevant** *(6)*
**relied** *(17)*
**rely** *(2)*
**relying** *(1)*
**remained** *(4)*
**remaining** *(2)*
**remember** *(91)*
**remind** *(3)*
**REMOTE** *(2)*
**renew** *(2)*
**reopen** *(1)*
**reopening** *(2)*
**repeat** *(20)*
**repeating** *(1)*
**rephrase** *(3)*
**rephrasing** *(1)*
**replace** *(1)*
**replowing** *(1)*
**report** *(34)*
**reported** *(2)*
**reporter** *(23)*
**REPORTER'S** *(1)*
**Reporting** *(2)*
**reports** *(10)*
**represent** *(7)*
**representations** *(2)*
**representative** *(19)*
**representatives** *(7)*
**represented** *(2)*
**REPRESENTING** *(2)*
**reputable** *(1)*
**request** *(3)*
**requested** *(7)*
**requests** *(2)*
**required** *(2)*
**requires** *(1)*
**Research** *(20)*
**researching** *(1)*
**reserve** *(1)*
**resigns** *(2)*
**RESOURCES** *(42)*
**respect** *(5)*
**responding** *(1)*
**response** *(7)*
**Responses** *(7)*
**responsibilities** *(3)*
**responsive** *(1)*
**rest** *(2)*
**restate** *(1)*
**restating** *(1)*
**result** *(2)*
**resume** *(2)*
**résumé** *(1)*
**retail** *(1)*
**retire** *(14)*
**retired** *(7)*
**retirement** *(16)*
**retiring** *(1)*
**returned** *(2)*
**revenue** *(41)*
**revenues** *(2)*
**review** *(13)*
**reviewed** *(7)*
**revoke** *(2)*
**revoked** *(1)*
**rid** *(1)*
**Right** *(195)*
**right-hand** *(8)*
**rights** *(2)*
**risk** *(23)*
**risk-and-return** *(1)*
**risky** *(2)*
**rkillorin@faruqilaw.com** *(1)*
**Robert** *(2)*
**role** *(9)*
**roles** *(1)*
**rollover** *(1)*
**Ron** *(5)*
**Ronald** *(7)*
**rosy** *(7)*
**rough** *(1)*
**row** *(1)*
**RPR** *(2)*
**rule** *(2)*
**Rules** *(5)*
**rumors** *(5)*
**run** *(2)*

**< S >**
**S&P** *(3)*
**Sadler** *(6)*
**safe** *(1)*
**safer** *(1)*
**Saigon** *(1)*
**salary** *(1)*
**sale** *(4)*
**sales** *(10)*
**San** *(4)*
**savings** *(1)*
**savvy** *(4)*
**saw** *(17)*
**saying** *(32)*
**says** *(22)*
**schedule** *(1)*
**scheme** *(2)*
**Schwab** *(6)*
**scope** *(1)*
**screen** *(1)*
**seal** *(1)*
**search** *(37)*
**searched** *(6)*
**searches** *(1)*
**searching** *(1)*
**SEC** *(3)*
**second** *(15)*
**secondly** *(1)*
**seconds** *(1)*
**second-to-last** *(2)*
**section** *(3)*
**sector** *(1)*

**SECURITIES** *(27)*
**security** *(24)*
**SEDAR** *(1)*
**see** *(86)*
**seeing** *(1)*
**seeking** *(2)*
**seeks** *(3)*
**seen** *(3)*
**select** *(2)*
**selected** *(2)*
**sell** *(26)*
**seller** *(2)*
**selling** *(7)*
**sells** *(1)*
**semiannually** *(1)*
**semimonthly** *(1)*
**seminars** *(3)*
**senior** *(77)*
**sense** *(5)*
**sentence** *(8)*
**separate** *(2)*
**separately** *(1)*
**September** *(5)*
**sequence** *(1)*
**series** *(3)*
**serve** *(1)*
**Set** *(11)*
**settle** *(1)*
**settled** *(2)*
**settlement** *(1)*
**seven** *(3)*
**shakes** *(1)*
**share** *(7)*
**shareholder** *(1)*
**shares** *(41)*
**sheet** *(2)*
**shooting** *(1)*
**short** *(4)*
**shorthand** *(2)*
**show** *(19)*
**showed** *(3)*
**showing** *(7)*
**shown** *(1)*
**shows** *(23)*
**shut** *(2)*
**shutdown** *(1)*
**shy** *(1)*
**sic** *(5)*
**side** *(3)*
**sign** *(1)*
**signature** *(5)*
**significant** *(6)*
**significantly** *(6)*
**silence** *(2)*
**similar** *(1)*
**Simple** *(3)*
**simply** *(1)*
**Simultaneous** *(1)*
**single** *(23)*
**sir** *(2)*
**sit** *(2)*
**site** *(1)*
**sitting** *(1)*
**situation** *(3)*
**situations** *(3)*
**six** *(2)*
**sixth** *(1)*
**sizeable** *(1)*
**skeptical** *(4)*
**skins** *(1)*
**slide** *(1)*
**slightly** *(3)*
**small** *(10)*
**smoke** *(1)*
**smoothly** *(1)*
**social** *(9)*
**sold** *(18)*
**sole** *(1)*
**somebody** *(6)*
**somebody's** *(1)*
**son** *(1)*
**Sorry** *(32)*
**sort** *(6)*
**sorts** *(1)*
**Sotto** *(1)*
**sought** *(3)*
**sound** *(2)*
**Sounds** *(3)*
**source** *(9)*
**sources** *(12)*
**space** *(1)*
**span** *(2)*
**spanned** *(1)*
**speak** *(9)*
**speaking** *(1)*
**speaks** *(2)*
**specialist** *(1)*
**specific** *(7)*
**specifically** *(16)*
**specifics** *(1)*
**speculate** *(5)*
**speculation** *(10)*
**spell** *(2)*
**spend** *(2)*
**spent** *(4)*
**spoke** *(1)*
**spread** *(2)*
**stable** *(3)*
**start** *(13)*
**started** *(6)*
**startup** *(1)*
**state** *(9)*
**stated** *(4)*
**statement** *(56)*
**Statements** *(70)*
**STATES** *(8)*
**stay** *(2)*
**staying** *(1)*
**steady** *(2)*
**stenographically** *(1)*
**step** *(1)*
**stick** *(1)*
**sticks** *(1)*
**sticky** *(5)*
**stimulus** *(3)*
**stipulate** *(2)*
**stock** *(172)*
**stocks** *(68)*
**stock's** *(1)*
**stop** *(2)*
**stopped** *(3)*
**story** *(1)*
**straight** *(1)*
**strategic** *(1)*
**strategies** *(6)*
**strategy** *(14)*
**Street** *(2)*
**strike** *(17)*
**structure** *(1)*
**stuff** *(2)*
**Subject** *(1)*
**submit** *(3)*
**submitted** *(1)*
**submitting** *(1)*
**subscribed** *(2)*
**subsequent** *(1)*
**substantially** *(1)*
**subtract** *(1)*
**subtractions** *(2)*
**successfully** *(1)*
**sue** *(1)*
**sued** *(2)*
**suggest** *(1)*
**Suite** *(1)*
**summarize** *(2)*
**summary** *(1)*
**support** *(1)*
**supposed** *(2)*
**Supreme** *(16)*
**sure** *(61)*
**surely** *(2)*
**surface** *(1)*
**surrounding** *(2)*
**survivorship** *(5)*
**suspend** *(4)*
**suspended** *(34)*
**suspension** *(11)*
**swaps** *(1)*
**swear** *(1)*
**switched** *(1)*
**switching** *(1)*
**sworn** *(5)*
**symbol** *(12)*
**system** *(9)*

**< T >**
**TAHOE** *(273)*
**Tahoe's** *(6)*
**take** *(15)*
**taken** *(3)*
**takes** *(2)*
**talk** *(15)*
**talked** *(9)*
**talking** *(36)*
**tap** *(1)*
**tax** *(4)*
**taxes** *(1)*
**teenagers** *(1)*
**Tell** *(26)*
**telling** *(8)*
**ten** *(1)*
**term** *(5)*
**terminology** *(2)*
**terms** *(31)*
**test** *(1)*
**testified** *(1)*

**testify** *(1)*
**testifying** *(1)*
**testimony** *(43)*
**Texas** *(3)*
**Thank** *(8)*
**Thanks** *(1)*
**therefor** *(1)*
**thing** *(15)*
**things** *(72)*
**think** *(233)*
**thinking** *(11)*
**thinks** *(1)*
**Third** *(6)*
**thought** *(18)*
**thousand** *(18)*
**thousands** *(4)*
**three** *(28)*
**ticker** *(13)*
**tie** *(1)*
**Tiffany** *(3)*
**time** *(89)*
**times** *(11)*
**timing** *(6)*
**Title** *(2)*
**TOD** *(1)*
**today** *(16)*
**told** *(39)*
**ton** *(1)*
**top** *(12)*
**total** *(21)*
**totaling** *(1)*
**totally** *(1)*
**touch** *(1)*
**track** *(2)*
**trade** *(13)*
**traded** *(3)*
**trades** *(4)*
**trading** *(10)*
**trail** *(1)*
**train** *(1)*
**training** *(1)*
**trains** *(1)*
**transaction** *(9)*
**transactions** *(2)*
**transcript** *(2)*
**transitioned** *(1)*
**translated** *(1)*
**transmission** *(1)*
**traveled** *(1)*
**treasury** *(4)*
**treasury-related** *(2)*
**tricky** *(2)*
**tried** *(6)*
**trouble** *(2)*
**true** *(21)*
**truly** *(2)*
**trust** *(17)*
**trusted** *(2)*
**trustee** *(1)*
**trustees** *(1)*
**truthfully** *(1)*
**try** *(12)*
**trying** *(53)*
**turn** *(24)*
**turnaround** *(1)*
**turned** *(1)*
**turning** *(4)*
**TV** *(3)*
**twist** *(1)*
**Two** *(20)*
**two-days** *(1)*
**types** *(1)*
**typical** *(6)*
**typically** *(3)*
**typing** *(1)*

< U >
**uh-huh** *(60)*
**ultimately** *(1)*
**uncertain** *(3)*
**uncheck** *(2)*
**unclear** *(1)*
**understand** *(117)*
**understanding** *(18)*
**understood** *(6)*
**undervalued** *(3)*
**unfair** *(1)*
**unfold** *(5)*
**unfolded** *(1)*
**unfolds** *(1)*
**UNITED** *(8)*
**unpack** *(1)*
**unstable** *(1)*
**untrue** *(1)*
**unusual** *(1)*
**update** *(2)*
**updated** *(1)*
**upper** *(1)*
**upset** *(1)*
**use** *(23)*
**usually** *(10)*

< V >
**vague** *(10)*
**valid** *(1)*
**validity** *(3)*
**valuable** *(4)*
**value** *(34)*
**values** *(3)*
**variety** *(1)*
**various** *(1)*
**vary** *(1)*
**verbally** *(1)*
**verification** *(2)*
**versus** *(4)*
**vested** *(6)*
**video** *(4)*
**VIDEOCONFERENCE** *(1)*
**VIDEOGRAPHER** *(17)*
**videos** *(1)*
**VIDEOTAPED** *(3)*
**Vietnam** *(5)*
**Vietnamese** *(9)*
**view** *(4)*
**village** *(3)*
**violate** *(1)*
**violated** *(2)*
**violence** *(4)*
**voce** *(1)*
**voice** *(1)*
**volume** *(4)*
**volumes** *(1)*
**voluminous** *(1)*

< W >
**wait** *(8)*
**waiting** *(1)*
**walked** *(1)*
**want** *(63)*
**wanted** *(23)*
**War** *(1)*
**water** *(2)*
**way** *(27)*
**webinar** *(1)*
**website** *(8)*
**websites** *(3)*
**weekly** *(1)*
**welcome** *(1)*
**well** *(103)*
**well-aware** *(1)*
**well-crafted** *(1)*
**went** *(6)*
**we're** *(19)*
**We've** *(13)*
**wife** *(13)*
**wife's** *(1)*
**willing** *(1)*
**wipe** *(1)*
**witness** *(131)*
**woman** *(1)*
**word** *(4)*
**words** *(15)*
**work** *(12)*
**worked** *(5)*
**working** *(3)*
**works** *(3)*
**worldwide** *(3)*
**worth** *(2)*
**wrong** *(8)*

< X >
**Xinca** *(74)*

< Y >
**Yahoo** *(3)*
**Yeah** *(293)*
**year** *(9)*
**year-end** *(7)*
**year-ends** *(1)*
**years** *(33)*
**yellow** *(7)*
**York** *(2)*
**you-all** *(1)*
**yup** *(1)*

< Z >
**Zoom** *(1)*