# EXHIBIT 3

Zachary Nye, PhD Deposition Transcript

EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

In re TAHOE RESOURCES, INC.,
SECURITIES LITIGATION
------------------------------/ Case No.
This Document Relates to: 2:17-cv-01868-RFB-NJK
All Actions
------------------------------/

VIDEOTAPED DEPOSITION OF ZACHARY NYE, PhD

Wednesday, August 4, 2021

Stenographically reported by:
LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
California CSR No. 10523
Washington CSR No. 3318
Oregon CSR No. 19-0458
Texas CSR No. 11318

Job No.: 9119

A P P E A R A N C E S

Appearing as counsel on behalf of the Plaintiff Kevin Nguyen:

FARUQI & FARUQI, LLP
BY: ROBERT W. KILLORIN, ESQ.
3975 Roswell Road, Suite A
Atlanta, GA 30342
(404) 847-0617
rkillorin@faruqilaw.com
BY: JAMES M. WILSON, JR., ESQ.
685 Third Avenue
New York, NY 10017
(212) 983-9330
jwilson@faruqilaw.com

Appearing as counsel on behalf of the Defendants:

NEAL, GERBER & EISENBERG, LLP
BY: KARL R. BARNICKOL, ESQ.
ANDREW G. MAY, ESQ.
Two North LaSalle Street, Suite 1700
Chicago, IL 60602
(773) 405-8202
kbarnickol@nge.com
amay@nge.com

Also present:

Brian Fryd, Cornerstone Research

Peter Matteson, Videographer

---oOo---

# I N D E X

## INDEX OF EXAMINATION


| EXAMINATION BY | PAGE |
|---|---|
| MR. BARNICKOL | 5 |


---oOo---

## INDEX OF EXHIBITS MARKED FOR IDENTIFICATION


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 70 | Expert Report of Zachary Nye, PhD | 4 |


---oOo---

WEDNESDAY, AUGUST 4, 2021
SAN FRANCISCO, CALIFORNIA
9:34 a.m. PDT
(Marked for identification purposes, Exhibit 70.)
THE VIDEOGRAPHER: This is the videotaped deposition of Zachary Nye, PhD, taken by the defendants, In Re Tahoe Resources, Inc., Securities Litigation, in the United States District Court, District of Nevada.
This deposition is being held at 425 Market Street, 26th Floor, San Francisco, California, on August 4th, 2021.
My name is Peter Matteson from Everest Court Reporting and I am the video specialist.
The court reporter today is Lorrie Marchant, also from Everest Court Reporting.
We are going on the record at 9:34 a.m.
Counsel will now state their appearances for the record.
MR. KILLORIN: My name is Robert Killorin from Faruqi & Faruqi for the lead plaintiff, and with me is my partner, James Wilson.
MR. BARNICKOL: Hi. My name is Karl Barnickol from the firm of Neal, Gerber &



Eisenberg, and with me is my partner, Andrew May, and our consultant, Brian Fryd, and we represent the defendants in this action.
THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.
ZACHARY NYE, PhD,
FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:
EXAMINATION BY MR. BARNICKOL
Q. Welcome, Dr. Nye. Thanks for being here, and thanks for being here in person.
I know that you have been deposed in the past; is that correct?
A. Yes.
Q. So I'll kind of try and breeze through the ground rules but just state some of them just to have the record clear.
I'm going to ask you questions today, and I need you to give a verbal response so that the court reporter can take it down.
Do you understand that?
A. I do.
Q. So that means that things like gesturing can't be recorded by the court reporter even though it would appear on the video record.
Does that make sense?



A. It does, but I want to point to you, I sometimes will nod while you're answering and asking a question, and I tend to answer verbally after that.
Q. Understood.
A. So don't worry, it's coming.
Q. Understood.
And in addition to that, we need to keep our questions and answers sequenced. So if I ask a question, I would ask you to wait until I finish before you start your answer so that we don't talk over each other.
And by the same token, I will endeavor to not talk over you when you're giving an answer so that I don't talk over you.
The same goes for your counsel. Your counsel may make an objection from time to time, and if he does, we will try not to talk over each and I think he would ask you not to talk over him when he's making his objection.
Is that fair?
A. Sounds good.
Q. And then the last thing is answers, yes/no answers need to be "yes" or "no." You can't use huh-uh or uh-huh because it doesn't transcribe



clearly. Fair?
A. Understood.
Q. Okay. So could you spell your name for the record, please.
A. Sure. Zachary, Z-A-C-H-A-R-Y, Nye, N-Y-E.
Q. Where do you work, Zachary?
A. Stanford Consulting Group.
Q. And actually, I should have asked you this at the beginning. What would you like me to call you during the deposition? Would you like me to call you "Dr. Nye" or "Zach," or what's most comfortable for you?
A. In these settings, it's usually Dr. Nye.
Q. Okay. Then I will try and do that and respect that.
What is Stanford Consulting, Dr. Nye?
A. It's a little company founded by my father and mother, I think back in 1981 or so. And, you know, he was a football player and then went on to become a finance professor at a couple of universities and began a consulting career and, you know, evaluation and expert testimony.
Over the years I grew up around it and kept going to school, got my degrees in economics and finance, and it was a natural progression for me to,

you know, carry on in that business.
Q. Are you married?
A. I am.
Q. Do you have any children?
A. I have four kids.
Q. How long have you been working for Stanford Consulting?
A. A long time if you count the high school years when I was in and out of the office, up and out. My first full year of work was 2004, after my master's degree from the London Business School. As I worked during the year, I also applied to PhD programs in finance and got into the University of California at Irvine.
So I left for four years, came back in 2009, pretty much my current role, like project management role and expert testimony evaluation. And I've been there ever since.
Q. Do you have any siblings that also work for Stanford Consulting?
A. My brother Blaine, Jr. He is in charge of our IT.
Q. Does your wife work for Stanford Consulting?
A. No.



Q. Any other family members that work for the firm?
A. No. My mom is, you know, part of the accounting, but no.
Q. How did you decide to pursue a career in economics?
A. It was an interesting subject. Growing up as a kid, my grandpa always used to say I was a little banker, which was odd to him. So I've always been interested in the science of valuation, money, and interest rates and things like that.
So, again, going to school, I kept getting more degrees, and it seemed like a natural fit for me and my family.
Q. When you were deciding to pursue a what made you choose the University of California at Irvine?
A. It was local. So I have -- a big primary concern for my family was that my oldest daughter is pretty severely disabled. And so there's not many PhD programs in financial economics kind of period. They're rare. And so I applied to a handful of them in the U.S., and the University of California at Irvine accepted me, and they had a great program.
And I was particularly excited to study



under Philippe Jorion, who is a well-respected and highly published academic.
Q. Does Dr. Jorion testify as an expert?
A. I think he has. I think he testified -- I remember seeing -- well, I think, yes.
Q. Where is Stanford Consulting?
A. Redwood City, California.
Q. And where is Redwood City relative to San Francisco?
A. It's an hour south. It took me an hour to get here today.
Q. Okay. And where is Redwood City relative to Irvine?
A. Irvine is in Orange County, so near Disneyland. So it's more like, you know, Southern California.
Q. In addition to working at Stanford Consulting, I've looked at your résumé and it reflects that you have some teaching experience.
Are you currently teaching?
A. No.
Q. When was the last time you taught?
A. In my graduate program.
Q. So what year? Can you give me --
A. 2009.



Q. And so that was at the University of California, Irvine?
A. Yes.
Q. What was the course or courses that you taught?
A. So I was a lecturer and teaching assistant for Professor Jorion and other professors, and it was probably risk management or -- I think they might call it financial engineering now.
Q. Can you give me a layman's explanation of either risk management or financial engineering, if they're different or if they're the same?
A. They're the same. They're kind of general topics. It's the -- it's probably the most quantitative side of finance. It's a lot of option pricing theory, value and risk techniques. And those are -- those are pretty much it.
Q. And no teaching since you got your PhD; correct?
A. Correct.
Q. Do you recall the first time that you submitted an expert report in a securities fraud lawsuit?
A. I mean, I recall it in principle. I don't think I remember the name of the case.

Page 12

I think my first case I got deposed in, though, was Heckmann Security Litigation.
Q. Can you spell Heckmann?
A. H-E-C-K-M-A-N-N. And it's on -- I think it's the last thing on my CV.
Q. Okay. So you were deposed in that case.
Did you also submit a written report?
A. Yes.
Q. Do you know what court that case was in?
A. Delaware federal court.
Q. And do you know approximately what year it was?
A. 2012 or '13, I think.
Q. Prior to the Heckmann case -- you graduated in 2009 with your PhD that case was I think you said 2012 or 2013.
What did you do in those intervening three years, perhaps four years?
A. I was a project manager for a couple of experts at the firm, like my father was testifying at that point. He's not anymore.
Jane Nettesheim was another expert we had at the firm, and then Tavy Ronen who's a professor at Rutgers. So I would manage their projects and help with their reports.

Page 13

Q. Can you give me a little bit more description of what the work entailed as a project manager.
What did you have to do to assist them?
A. Well, as the experts in those cases, they were in charge of overseeing the entire process, but there would be various tasks that would need to be performed, much like you see in my report here today. There's regressions and data analysis. And so you've got to go out there and get the data and review analyst reports and news articles -- a lot of work.
So a project manager is responsible for overseeing and facilitating the ultimate direction of the expert in a case.
Q. Today how many project managers or people that are fulfilling that project manager function does Stanford Consulting employ?
A. How many?
Q. Yeah.
A. Currently two.
Q. And has it been two generally over the last -- you said you started testifying in about 2012.
So in about the last nine years, has it

Page 14

usually been about two or has that number changed?
A. Yeah. It's been two.
Q. What are the qualifications of the project managers? What's the basic educational or experience requirement you have to have to be a project manager?
A. Typically our project managers have a master's degree, at least, like an MBA or a master's in operational sciences or supply chain management. Business school topic is typically what we have at least for our current project managers.
And then ultimately it's the experience of working in our industry and having an understanding of what we need to accomplish, which is pretty rare. So our employees have tended to be there for over a decade at least.
Q. I should have asked you this when we were talking about your doctorate, but what was the -- what is your doctorate in?
A. Well, it's on the diploma it's a PhD in management, but my committee was all financial economists and I did my dissertation on finance. And so everyone would consider me a PhD in financial economics.
Q. And what was your -- the subject of your

Page 15

dissertation?
A. Volatility forecasting, generally speaking, and volatility is a -- it's called the second moment of the distribution of security returns, and it's just a topic of interest for risk management, option pricing, and also, you know, the valuation of underlying securities as well.
Q. Since you wrote that first report in the Heckmann case, how many other securities cases similar to this case have you provided a written report in?
A. I don't know the exact number. On that CV of mine in this report here, I list all the times I've been deposed, and so that will correspond to at least a report in my history. But a lot of times -- not a lot of times, but occasionally I will not actually get deposed after issuing a report.
So I would say that the 50 or so times that I've been deposed is probably a lower bound of the number of reports I've issued on similar topics.
Q. Of the cases that are listed in your CV, how many of those are securities fraud cases like this versus some other kind of litigation?
A. Most of them are securities, you know, litigation similar to this, and that's because I'm a

Page 16

financial economist who has expertise in valuation of stocks and bonds. So it's like right up my alley.
Other times, though, I have other cases in which I've valued privately held securities, intellectual property, and also more like general business disputes.
Q. Give me an example of valuation -- valuation work you've done in connection with intellectual property.
A. Sure. There's a couple of cases on my CV that involve L-3 Communications, and there was disputes regarding trade secrets and intellectual property that was stolen, allegedly, from them by employees who then developed a competing business. So I was engaged to assess damages and that process sets the value of the stolen trade secrets and intellectual property.
Q. So you were serving as an expert for the plaintiff in that particular example; is that right?
A. Yes, which was L-3 Communications.
Q. If I looked at the CV and we looked at just cases where you were testifying in a securities matter similar to this one, how often have you represented the plaintiff and how often have you

Page 17

represented the defendants?
A. On my CV, it's all work in which I've been engaged by counsel for plaintiff. I've been called a few times for -- by defendants, mostly on a consulting basis, but I've not been engaged to write reports and issue opinions in connection with cases involving them. However, I'm open to it. I just don't tend to get those calls.
Q. Right now, how many other securities fraud cases like this one are you serving as an expert in?
A. Right now?
Q. Right now.
A. I don't know the exact number, but it's probably north of six or something like that.
Q. How many of those cases -- in how many of those cases were you retained by the Faruqi firm?
MR. KILLORIN: You mean the six -- just to be clear, the six that he's talking about?
MR. BARNICKOL: Yes, the six that he's currently working on.
THE WITNESS: Right now I'm working with the Faruqi and Faruqi firm on one more case, I believe.
BY MR. BARNICKOL:
Q. And can you tell me what other firms you're

Page 18

working on -- so that -- I think you said six. Is that including this Tahoe Resources case?
A. I don't know the exact number right now.
Q. Fair enough.
A. Because cases kind of come and go. And my involvement, I tend to get panicked calls in the middle of nowhere to -- because it's revived or there's a motion or something like that. So it's a little bit fuzzy on the exact number I'm involved in right now. Sorry.
The six that -- I said north of six and it would include this case as well.
Q. And what other law firms were you retained by in connection with that limited group, whether it's six or what other law firms are you working with right now?
A. Um --
Q. And to be clear, in this space, right, in securities fraud cases.
A. I think I can -- so it's always a little dicey with -- there's confidentiality agreements about who I'm working with, but I have issued reports at class certification phases. So this is all public information, I think.
Pomerantz LLP, I think is the firm, is one

Page 19

of them. Robbins Geller Rudman & Dowd. I think the Rosen Law Firm. Kessler Topaz Meltzer & Check.
And there's cocounsel on all those cases, so I don't know -- I can't remember all of them.
Q. Sure. Fair enough.
A. And I might be missing one or two.
Q. For cases where there is -- I understand the confidentiality, and I'm not going to ask you about anything where you haven't submitted a report that's been filed or given testimony that would otherwise make your involvement public knowledge.
Can you give me the names of those cases where you're currently testifying? So, again, not betraying any confidences for unsubmitted testimony or unsubmitted reports.
A. I will do my best to remember right here and right now.
I think I recently submitted a report in a case against Maxar. It might have more to it, but it's Maxar-something, Incorporated.
Allergan.
Mylan.
I did a case against Endo.
But these are current stuff; right?
Q. Yeah.

Page 20

A. So Endo I'm not -- I'm not on right now.
And there's probably more. I just can't recall right now.
Q. Have you -- broader than just the six cases or roughly six cases you're working on now, have you submitted expert opinions in any other cases in federal court in Nevada previously?
A. I don't -- I don't know right now. I may have.
Is Nevada Ninth Circuit?
Q. It's in the Ninth Circuit.
A. I've done a number of cases in the Ninth Circuit. Maybe not necessarily Nevada.
Q. A case in the Ninth Circuit might originate in a number of different states. Nevada is just one of them.
A. Right.
Q. And I suppose if I asked the same question for state court proceedings in Nevada, do you have any recollection?
A. I don't remember any state court. I'm pretty sure I don't have any state court in Nevada experience.
Q. Have you done expert opinions in class actions in state court?

Page 21

A. I think there's been cases where state law claims were made, but I think it's generally more within the federal framework. And I've definitely done some state law cases, but I'm not sure in securities litigation.
Q. So like what kind of cases would those be?
A. I did one in the Delaware Chancery Court, which I'm assuming is a state court.
Q. Yes.
A. And that was against -- it was called El Paso Pipeline Partners Derivative Litigation. And that one I had to value a privately held liquid natural gas terminal, which is surprisingly expensive. I guess they're huge, so that shouldn't be too surprising.
Q. When did you first get retained by the Faruqi firm in this case?
A. I don't recall the exact date. It's usually three to six months prior to a class cert report. So it could have been around the beginning of the year 2021.
Q. Do you have a better recollection of the month?
A. I don't.
Q. Sometime in 2021?

Page 22

A. I think so, but it might have been early or late 2020 as well.
Q. The other case that you're working on where you were retained by the Faruqi firm, are you working with the same lawyers that are representing you here or different lawyers?
A. The same.
Q. The same.
Currently you have six-ish cases like this that you're working on. Has that number been relatively constant or has it changed in the nine years since you started testifying, so 2012 to 2021?
A. Well, first it was zero, and then I got one and two and then kind of built up. Lately, though, I've had to kind of manage my time and turn down stuff and, you know, just keep it balanced. So I would say static number six-ish what I try and keep open at any point in time. Sometimes it gets bigger. Sometimes it gets smaller.
Q. So as you're describing kind of a ramp-up period, when did you get up to the current level of six?
A. Probably 2015 or '16.
Q. Does your job at Stanford Consulting

Page 23

involve anything other than serving as an expert in cases like this and other cases?
MR. KILLORIN: Objection. Asked and answered.
THE WITNESS: It does. I mean, I do a lot of expert testimony and --
BY MR. BARNICKOL:
Q. But other than expert testimony. So aside from expert testimony, do you perform any other consulting services as part of your job?
MR. KILLORIN: Same objection.
THE WITNESS: We do. So we're contacted for -- in a consultant capacity to assess, you know, damages or losses in cases that I may or may not or another expert may or may not be engaged later on. Also provide more valuation services or have historically as well.
Insurance economics is something that the firm has done a lot of in the past, not so much lately. And then -- and that's like, you know, one project we did was looking at claims and was there a deficiency with respect to making claims for deceased individuals or paying claims for deceased individuals that we weren't aware were deceased. So it was kind of a data analysis project.

Page 24

And then we do work on -- for the State of California sometimes and also I think the State of New York in the past, looking at data analysis for them.
BY MR. BARNICKOL:
Q. What I'm really trying to get at, though, is this all in the context of litigation or some kind of a dispute or are there times when you perform consulting services that are strictly related to day-to-day business?
A. The past couple of years it's been mostly related to litigation, particularly early on or, you know, there's assessing losses and I can assume that's -- I don't know what that phase -- whether it's really litigation or not, but I am always -- I look at losses and data and the impact of information on securities, things like that.
Q. Do you perform that sort of function at all for investors?
A. I wouldn't say so. I could, but I haven't done that lately.
Q. Have you done it at some point in the past?
A. There was -- yes, but once or twice.
Q. And can you give me at least a general description of what that work entailed.

Page 25

A. There's been startup -- I live in Palo Alto, Menlo Park, so there's a lot of startup companies around. And I'm an economist, a financial economist, with expertise in valuation.
So every once in a while I get asked to take a look at the prospects of, you know, a company that's in its infancy, and I usually consult with them and say it's too early to tell, you know, that type of thing.
Q. Do you recall when the last time you would have done that is?
A. Years ago. Not lately.
Q. Like before 2015?
A. Could be, yeah, probably.
Q. By the way, I'm nodding my head too. I just noticed myself doing it and I was like yeah.
A. Okay.
Q. I want to talk about your process for putting together this report. So if you were retained by the Faruqi firm at some point in the six months preceding July 1st of this year, do you recall when you first started working on this report?
A. I don't.
Q. What was your process for preparing the

Page 26

report? How did you get started?
A. Sure.
So this class certification analysis is something I've done many, many times at this point. My firm has done even more times. So there is a process to it, and we have -- we're pretty efficient at it at this point.
So it starts with an appreciation of the class period, the company at issue. And then diving into the markets, you know, where was it traded? Find the prices, volumes, looking at analyst reports. So that is probably the biggest time sink, is the gathering of the news and analyst reports and reviewing those. So it tends to start with that.
And one of my analysts, in particular, Dave Bentley, usually gets started shortly after engagement and starts gathering that news search and information search and putting it into -- you see the events at the end. So that -- that's his job, is putting that into one easy Word file.
And then I go through it and my project managers do as well, and read all the reports and edit it and make sure -- and ultimately it's my opinion and my words. So I have the final pass, and I go through and change it as necessary. And then

Page 27

that's -- so that's where you'll see a lot of the hours spent early on by Dave and maybe Faye or Beth at my firm.
And then we'll get into the data analysis which Ruth Lambert does, and she's a PhD in aerospace and fluid dynamics or something like that. Really smart woman. And she does a lot of the quantitative work putting together the volume analysis and short interest --
(Stenographer interrupted for clarification of the record.)
THE WITNESS: Bid-ask spreads. And then we put it all in the report and I -- I have the final say and supervise the whole project.
BY MR. BARNICKOL:
Q. At what point do you review the allegations that are made in the lawsuit?
A. It varies. I mean, certainly before the report is written and submitted. But it kind of really depends on my timing. So if I am very busy on something else, I might wait a month or two before I get into that.
But, I mean, early on, before I get engaged with anything, I do review the -- usually the motion to dismiss order and the theory of liability. So I

may not read the entire complaint, but I understand what the theory of liability is, to make sure it's consistent with what I've done in the past and what I understand is necessary to have a damage opinion that's consistent with that theory.
Q. When did you first review the complaint in this case?
A. I don't recall.
Q. Was it -- can you give me an estimate? Was it shortly after you were contacted by the Faruqi firm? Was it the end of June? I mean, give me a ballpark.
A. It probably was shortly after being contacted, but as we discussed, I don't recall exactly when that was.
Q. Did you review the motion -- the order on the motion to dismiss?
A. I think there's a transcript in this one; right?
Q. Yes.
A. Yeah. So I read that and saw what the judge said at that point in time.
Q. Did you review the motion to dismiss filed by the defendants?
A. I don't believe so. I'm more concerned at


this point with what the judge orders.
Q. Why?
A. Because that's going to be what's actionable going forward and, you know, my work is always contingent -- it assumes the truth of the allegations made by plaintiffs, but also as sustained by the Court.
Q. Any other pleadings in this case that you've reviewed?
A. Yesterday I think there was a motion for interlocutory appeal. I think I mispronounced that.
Q. No, you got it. You nailed it.
A. Thank you.
So I read the judge's denial of that motion yesterday.
Q. In this case, in addition to the -- the expert report which has a substantial number of exhibits attached to it, there was some additional source material that we requested from counsel that they provided.
Did you review our request for additional materials supporting this report?
A. I believe -- yes, and we produced what we thought was satisfying that request.
Q. Did you review what your counsel provided


to us or just what you -- do you know what -- only what you gave your counsel, or do you know also what your counsel gave us?
A. I only know what we gave counsel.
Q. Is there anything -- and I understand that there's an evolutionary process here for you, but for purposes of this report, is there any document or source material or any other thing that you relied on that you have not provided your counsel?
A. So what we provided to counsel was news -- news articles on the -- surrounding the event dates, analyzed under Cammer 5. Cammer 5.
Q. See, I gave her "Cammer" up front.
A. Oh, did you? Okay. Smart.
And then what else? Analyst reports, and also the underlying native exhibits and the computer code that we used to generate I think primarily the regression analysis.
But we didn't provide things that were already on the docket and also publicly available academic articles and things like that.
Q. Are there specific academic articles that you relied on for purposes of drafting this report?
A. Sure. They're cited in the report.
Q. Anything that's not cited in the report


that you would have relied on?
A. Well, in principle, a lot, just because there's so many articles out there on the issue of market efficiency that I've read and considered over the years. But the primary ones that I think are particularly compelling are cited in my report.
Q. Well, when you say "particularly compelling," I mean, I understand your answer, but I guess I need to understand, in terms of the specific analysis that you performed here, is there something that's not cited in the report that you relied on?
A. No, not really, not of any material effect at all. I answered the question, and I'm just saying there's a lot of articles that I could cite that would be supportive of the opinions I've made, but the ones I directly relied on are cited in the report.
Q. What's your hourly rate for this case?
A. 900.
Q. Is your hourly rate the same for other cases like this that you're working on right now?
A. Yes.
Q. How has your hourly rate changed over time since you first became a testifying expert?
A. It's gone up over time. I think I started

at $385 per hour back in 2009, and over the years it's gone up to -- maybe 500 to 700 and to 900, something like that.
It changes on an annual basis usually. Sometimes I'll go two years at the same rate, or have in the past few years.
Q. Do all of your clients at a particular time pay the same hourly rate or do you have variable hourly rates depending on the nature of the work?
A. By and large, it's always the same rate. I've had a few instances where the rate has -- like the State of California has contracts and so you can't update them until it's over. So they will have a lag sometimes with respect to the billing rate.
Q. In connection with just security fraud cases, though, is the rate the same for -- at any given point in time for all of your clients?
A. Yes. Right now it is.
Q. Do you ever do fixed-fee arrangements with counsel in this kind of case?
A. No. I never have. It's always, you know, based on the hours that we work on the case.
Q. Do you expect to get any compensation from this case other than the $900 hourly rate that you


previously mentioned?
A. Only -- so as an expert, I get 10 percent of my staff's underlying billings as well.
Q. I guess I don't understand the answer.
A. I'm happy to clarify.
Q. Please. Sorry.
A. So I bill a number of hours and I charge 900 for that. I get a percentage of that because, you know, it's a company. I don't get all of it.
And then my staff also bills, you know, at lower rates, but they're still billing for the time they spend assisting me in writing this report.
And then you add all that up and I'm, on a gross basis, given 10 percent of those collective underlying billings.
Q. Got it. And I'm not going to remember the names of all of the folks that you mentioned that have helped you on this, but I do remember Dave.
So, for example, Dave, what's Dave's hourly rate?
A. I think he might be now at 400.
Q. And can you give me, at least in a generalized way, information about what the other project managers, I think you called them, or research analysts charge?


A. Yeah. It's between 400 and I think now 750.
Q. And what is it that distinguishes one person from another in terms of determining what their hourly rates are? I mean, like is it experience, education, or some other thing?
A. It's correlated and determined based on their experience and their responsibility level.
Q. On the team that you have for this case, who's the seniormost person that's not you?
A. I can't remember -- I know Faye Fort worked on it. And it could also be Beth Charlesworth. And they're both vice presidents, and they help me as project managers of various projects.
Q. Has your father worked on this matter at all?
A. No. He hasn't worked on anything for a long time.
Q. He's fully retired?
A. He is our back office. So he's accounting and stuff like that.
Q. Do you have any expectation that you'll be compensated in this case based on the result?
A. Definitely not. In no way contingent. None of my work ever has been.


Q. I want to look at securities fraud cases that you've done over the last nine years and more broadly than just the six current ones.
Do you know if any of those cases involve businesses that had operations in Guatemala?
A. I don't recall any with operations in Guatemala. I did one case involving -- at least one, one in my mind, that involved a gold mine in Africa or a series of gold mines.
Q. What was that case?
A. Kinross Gold Corporation. Dr. Gompers will know that one.
Q. Do you know what year that was?
A. I don't. It might have been 2014 or '15, somewhere in there.
Q. Do you recall what the allegations in that lawsuit were?
A. I think there was misstatements and omissions alleged under Section 10(b) involving the gold mine. And I can't remember the specifics, but it implied material overvaluation of that mine in the public's eyes, such that when the alleged relevant truth was disclosed, stock price came down significantly.
Q. Were there accounting irregularities

alleged in that case?
A. I don't recall. There may have been.
Q. Were there financial statement manipulations alleged in that case?
A. I don't recall. There may have been.
Q. Do you recall if there were specific allegations of misstated revenue or earnings guidance?
A. I don't recall, but my suspicion is that, yes.
Q. Do you recall what country in Africa the mine was located in?
A. I don't.
Q. Any other cases involving mining companies?
A. I think so, a long time ago. I worked on a case with -- not as an expert, but I think it was Ashanti, I think a gold company. It could be wrong about that. That was a long time ago.
And then mining companies here and there. It's not common, but I have seen a few.
Q. Other than Guatemala, any other cases just expanding -- not mining, but cases involving defendant companies that had substantial operations in other parts of Central America?
A. Well, South America for sure. I was


helping with the Petrobras Securities Litigation.
Q. So tell me about your opinions -- I'm sorry. Strike that.
Tell me about the allegations in the Petrobras case.
A. So that one was the last case my dad did as an expert, and I think that was 2014/15, I think, maybe '16.
And it was just -- it was all over the news. It was allegations of widespread corruption basically all across Brazil, going all the way up to the president, and using that company basically as a piggy bank.
Q. Do you recall if there's allegations of financial statement fraud or accounting irregularities in that case?
A. I believe so.
Q. Have you ever had -- have you ever worked on another securities fraud case where the class period was four and a half years long, like this case?
A. Have I ever?
Q. Yeah.
A. Yeah, for sure.
Q. What case?


A. Mylan is a-year class period right now. And four and a half, five years -- five is getting out at the edge usually. I haven't seen a class period going out seven years before the Mylan case. But, anyway, yes, I've encountered class periods of that length before.
Q. Is there -- are there special things that you need to consider when you're working on a case with a longer class period like a four-and-a-half-year class period versus a -- say a six-month to a year class period? Does that change how you do your job?
A. I mean, sure. It's more -- longer time period to analyze for market efficiency, more data. Usually a lot more analyst reports. So it makes it, you know, more time-consuming for sure on the market efficiency side.
And for damages, you know, the length of the class period is part of it, but it depends on the allegations and the theory of liability. Because ultimately the point of any damage analysis is to assess those damages in a manner consistent with plaintiff's theory of liability.
So it can -- longer class periods can have more going on with respect to the allegations, but


not necessarily.
Q. So is it fair to say that the length of the class period is relevant to the work that you're doing and how you prepare a report like this?
A. It's one of those things that it depends. It's always relevant because it's a how long was the alleged fraud going on? And that can be -- certainly lengthens the class period and exposes a defendant corporation or the defendants to more damages because you've got purchases during a longer period of time. So it's relevant.
Q. When is the last time you were asked to work on a securities fraud case and you demurred, you declined?
A. When was the last time?
Q. Yeah.
A. A couple of days ago.
Q. How often has that happened in the last, let's say, year? How many cases have you turned away?
A. A lot. Maybe ten.
Q. Have any of those cases been turned away because of your assessment of what was alleged or were they turned away because you were too busy?
A. Both. So when I get involved in a case at

the class cert phase, you know, I review the plaintiff -- the complaint and the theory of liability. And then I kind of want to do a preliminary view of whether there's -- you know, how -- whether damages can be calculated in a manner consistent with that.

And so -- and then sometimes for cases I'll be asked to assess, you know, way before class cert is even going on, you know, preliminary loss causation findings, and at that time I can -- have found and recently have found cases where I didn't think that there was good evidence of loss causation and so I said I couldn't come to an opinion to that effect. And so the case went somewhere else, I suppose.

Q. Just to be clear, in terms of the timeline in this case, though, you were not called in to do a loss causation analysis prior to being retained to do this report; correct?

A. I don't recall for this specific case. I might have looked at preliminary evidence.

Q. So you think you had contact with the Faruqi firm about this case prior to January of 2021?

A. No. I don't think so.



Q. What would be things that would -- things about the allegations in a lawsuit that would cause you to decline? What is it about a lawsuit that would make it unattractive for you and make you decline the representation?

A. Well, so sometimes it's not about the lawsuit necessarily. Sometimes there's not great evidence of market efficiency. So it might be a really thinly traded security. It might be there are issues that I found in my preliminary checks of market efficiency that caused me to be hesitant or unwilling to bind to efficiency, so that would kind of -- once I conveyed that sentiment, it would be the case goes somewhere else or was dropped altogether.

As far as the theories are concerned -- well, as the motion to dismiss process, you know, shows that loss causation is weighed by the Court, and so getting a sense of how the loss causation allegations were perceived by the Court is important for me to consider as well.

Q. Do you review the allegations in the complaint, then, prior to signing an engagement agreement with counsel, or do you sign an engagement agreement first and then have a provision that



allows you to withdraw afterwards?

A. Well, there's no -- I mean, there's no provision of withdrawal afterwards. And sometimes we have an engagement agreement early, sometimes not until later, so it kind of varies.

Really, as far as withdrawal is concerned, I've never really formally withdrawn. It's just, you know, if I do my analysis, come to an opinion that's not helpful, you know, I'm not asked to submit a report.

Q. But in cases where you decline because of something, something about the case, have you reviewed the allegations before you signed an engagement letter?

A. Sometimes, for sure.

Q. Are there times when you --

A. Well, probably -- probably always because that's not -- that's all public. So it's like getting the complaint that's filed in the docket, and getting a motion to dismiss order that's filed in the docket, if it's at that phase, will be something I am considering and do consider prior to signing up for the long haul.

Q. But are there times where you have signed an engagement letter without reviewing the



allegations of the lawsuit?

A. I don't believe so.

MR. BARNICKOL: We've been going about an hour, and I saw Bob looking at his watch about a minute ago. So do you think this is a good time?

MR. KILLORIN: I do think it's a good time but, please, I look at my watch habitually. It's fine to stop, yeah.

MR. BARNICKOL: So we can go off the record.

THE VIDEOGRAPHER: We are off the record at 10:28 a.m.

(Recess taken from 10:28 to 10:43.)

THE VIDEOGRAPHER: We are back on the record at 10:43 a.m.

BY MR. BARNICKOL:

Q. Dr. Nye, I just want to kind of make sure I understand your testimony previously.

As you sit here today, have you been retained to perform a loss causation analysis in this case?

A. No.

Q. And in terms of the date that you were retained by the Faruqi firm in this case, is there a written engagement letter that you signed for this?

Page 44

A. I don't know. There might be.
Q. How would you determine -- I mean, is there somebody at Stanford Consulting who keeps the retainer letters?
A. No. We just have it in our folders and our internal network.
Q. If there was an engagement letter, would that tell us what day you were first retained?
A. Probably close.
Q. Do you ever get retained just by e-mail or would it be a formal letter?
A. Sometimes just by a call. It just varies.
Q. And we talked a little bit about cases that you've declined.
Can you give me an example of an allegation or a set of allegations or a claim that was not susceptible to a damages analysis and caused you to reject a case?
A. Sure. I think the easiest example is the complaint might allege that a loss was caused by something, and upon careful examination, there was a lot more going on that was actually the reason for the decline as opposed to the alleged loss-inducing event.
Q. So when you say "a lot more going on," what

Page 45

do you mean, a lot more going on in the press releases and SEC filings and the analyst reports, in the news reports, or a lot more going on in terms of investigation that you did into the allegations?
A. I'm just speaking casually. I just mean that there's a different reason for the price decline than what's alleged in the complaint.
Q. How would you make the determination?
A. By looking at the information conveyed on the decline date and at least preliminarily expressing -- you know, coming to a conclusion that there's more going on than or potentially a completely different reason for the decline.
Q. Is that something you can determine just by looking at the allegations in the complaint, or do you have to look at external sources to make that determination?
A. It's external sources. There's news and -- a lot like what you see in my report, looking at analyst reports and news and price changes.
Q. Do you independently assess the allegations made in the lawsuit or do you just accept what the allegations are as true?
A. So there's -- the allegations are usually what's withheld from the market; right? I don't

Page 46

have an opinion on that because I'm not privy to the underlying discovery evidence at that point or the actual internal knowledge or scienter of the defendant. I just know what's alleged by the plaintiff as being misstated or omitted.
But when you've got price declines alleged on certain specific dates, it's real easy to go look at those and preliminarily get an assessment of what was the cause for the drops -- or reasons, depending on the nature of the case.
And so at that early phase, which is not a full-blown loss causation analysis, it's not trying to disentangle anything or even assess whether that's possible; it's more just getting a sense of the news flow.
And at that point I'll convey my preliminary opinions -- not always, sometimes -- and it will usually force the client to go somewhere else because, you know, it's not helpful to them for their purposes.
But, again, I'm not concerned with that. I'm concerned with, you know, coming to an independent conclusion and opinion about what were the information that caused the prices to change either in a market efficiency sense, over a long

Page 47

period of time, or on specific dates.
Q. So this assessment that we're talking about that might cause you to reject a case relates to causation, not to the existence of a misstatement; correct?
A. I mean, I think yes, just because my understanding, not as a lawyer, is that the misstatements and omissions are fundamentally a liability issue. Was there a duty to disclose or not? And plaintiffs will allege yes, there was, and defendants will dispute it.
There's trial and a whole process for determining whether that's true or not. So I just take those allegations as sustained by the Court throughout the case as true, and they underlie my opinions on things like economic materiality, loss causation, and damages.
Market efficiency doesn't really require any assumptions at all. It's just a straightforward, you know, analysis of the factors that are indicative of efficiency over a period of time.
Q. So can you give me a high-level summary of what you have been retained to opine on in this report?

Page 48

A. In my report, Section 2 maybe, "Scope of Engagement," I've been asked to assess market efficiency during the class period and also to assess whether there exists a damages estimation methodology that can be commonly employed across the class and also in a manner consistent with plaintiff's theory of liability.
Q. Have you been retained to give an opinion on any other topics?
A. No.
Q. Do you have any opinion regarding the adequacy of any public statements made by Tahoe Resources?
MR. KILLORIN: Objection. Ambiguous.
THE WITNESS: Do I have any opinions?
BY MR. BARNICKOL:
Q. Yes.
A. I don't think so. Not -- I probably would never. I'm not a liability expert.
Q. Do you have any opinion on whether Tahoe stock was a risky investment?
MR. KILLORIN: Objection. Ambiguous.
THE WITNESS: Every stock market investment is risky. It's just a relative question.
///

Page 49

BY MR. BARNICKOL:
Q. All right. But relative to, say, the S&P 500, do you have an opinion -- are you going to give an opinion on whether Tahoe stock was riskier than, let's say, garden-variety securities risk?
MR. KILLORIN: Objection. Calls for speculation.
THE WITNESS: I'm definitely going to opine on the financial risk or valuation risk associated with Tahoe.
BY MR. BARNICKOL:
Q. No, I'm talking about financial risk.
A. Yeah. And I think, just as an economist who's discussing market efficiency and damages generally speaking, that that's something that -- of interest to me and it's important to consider in my analysis.
I don't think I'm going to have an opinion, though, nor have I been asked to date in connection with this report about whether Tahoe is riskier or not than other investments.
I think the important point here, though, is in an efficient market, all of that risk and the expectations of future cash flows, at least as perceived based on the information set available at

Page 50

that point in time, will be reflected in the market price.
Q. Does the risk associated with the stock affect whether damages can be calculated using a common method for all class members in a manner consistent with the theory of liability?
MR. KILLORIN: Are you talking about in general or in Tahoe?
MR. BARNICKOL: In general.
THE WITNESS: Can you repeat the question?
BY MR. BARNICKOL:
Q. Does the risk associated with a security affect your opinion or your analysis of whether damages can be calculated using a common method for all class members in a manner consistent with the theory of liability?
A. No, not -- again, risk is something that's important to valuation. And so it's going to play a role in the ultimate damages analysis, but it won't affect in an efficient market whether damages can be applied commonly across the class.
Q. How does risk affect the damages calculation?
A. So it's just a matter of we observe stock price declines through a study, but at a level, the

Page 51

risk of this company is going to also be important to the valuation of that stock over time. And so it could influence the amount of the price change.
And it's just a matter of like at a fundamental level, a stock price is equal to the present value of the future cash flows discounted for the time value of money and risk. And that's going to be embedded in the discount rate used to value the stock.
And so it's something that's, you know, just important to consider. I'm not saying that it's affecting the common -- or the ability to employ this event study or out-of-pocket methodology in a manner common to the class.
Q. So I just want to make sure I understand. So its risk influences that from a calculation perspective but not an analytical perspective; is that true or false?
A. I don't understand the difference in your question between calculation and analytical.
Q. Fair enough. When I'm saying "analytical," I'm talking about conceptual construction of a model; right? Conceptual construction of a damages model versus calculation being just one variable in a model.

So do you have to consider risk in order to build your model, not as a variable, but as a conceptual piece of your model, or is it just a variable that goes into the model?

MR. KILLORIN: Objection. Ambiguous.

BY MR. BARNICKOL:

Q. Do you understand the question?

A. I don't. But -- I don't understand the question.

Q. So let me ask it this way: Where in the source materials that you studied here is there information about risk that went into your determination that the damages could be calculated using a common method consistent with the liability theory?

A. There's -- I mean, there's the papers I cite regarding market efficiency. They're going to talk about the principles of valuation. There's a paper; there's a paper; there's a Brealey & Myers textbook. All of those are going to talk about valuation. And, again, that's the -- at its core going to be the present value of the expected stream of future cash flows discounted for risk, effectively.

And what I'm just trying to say is that



those principles, which hold in an efficient stock market, are going to be part of the price -- pricing mechanism; right? Those are important considerations for investors to weigh when estimating values.

And through the event study we're seeing -- and the regression associated with that event study -- we're seeing and estimating the price declines that are occurring on certain days. I analyzed a whole bunch of them in my event study.

And those are measuring reliably and scientifically the company-specific contribution or portion of those price declines net of market and industry effects, and indeed reflecting and measuring the value of the information on a given day.

When I say that risk is a component to that, I'm just being careful to acknowledge that even though we're empirically observing price changes and, you know, running them through a regression model, at a fundamental level that discount rate is part of the process, is part of that price change and that's it.

It's just one of those things that's important to price discovery in an efficient market,



but the event study objectively and reliably and scientifically measures those price changes and has been used in class action securities litigation for decades as a measure of damages and can be commonly employed across a class of investors.

Q. Does an event study measure risk?

A. For the reasons stated, yes.

Q. Are risk and volatility the same thing?

A. They're related.

Q. How are they related?

A. They're both -- volatility is really just the square root of the variance of returns over a finite period of time. It's more like an econometric exercise. Say look over a year of time and estimate what is the volatility? What is the standard deviation of these returns on a daily basis or monthly basis or whatever you want to do?

It's just a measure. It's measuring how jumpy they are, effectively, right, in lay terms. And more volatile stocks in a given sample will have greater price fluctuations around their mean relative to less volatile stocks; right?

And while that can be -- that is related to risk, but the problem is a lot of those jumps are idiosyncratic. They're company-specific. They're



not measuring the systematic risk, which is a -- something that can be eliminated by investors through the process of diversification.

And this is stuff that's taught in MBA classes, you know, really every day across the world. And through that diversification process you're going to eliminate that source of risk to your portfolio.

And if enough people do it, that type of volatility will not be reflected in the risk measure used to value a security at a given point in time.

So they're related, but they're still distinct concepts that should be appreciated.

Q. Do you intend to offer any opinion on plaintiff's stock trades in this case? And the plaintiff is Kevin Nguyen.

A. I don't intend to, and I don't think I had for years until -- and I never really -- it's become an issue in a few cases. I'm trying to think. Did I have an opinion on it? I definitely saw other experts in a rebuttal setting discuss a plaintiff's or even a defendant's transactions.

And, yeah, recently I had replied to these opinions in a report and described how, you know, insider transactions aren't necessarily indicative

Page 56

of certain motives. There can be a plethora of motives for trading securities. But here I don't expect to do that, at least right now.
Q. In connection with this motion for class certification, are you going to offer any opinion or do you intend to offer any opinion as to whether or not the lead plaintiff's trading history makes him suitable to serve as a class representative?
A. I have not been asked to do that and I don't intend to do that.
Q. Have you ever done that in another case?
A. I don't think so.
Q. So we talked a bit about the complaint. Can you give me your understanding of what the allegations are against the defendants?
A. Sure. Just at a high level?
Q. Yeah. I mean, let's break it down. That's probably too general.
What are the alleged misrepresentations in this case?
A. So it's all in the complaint, first of all. So I'm going to do probably a poor job relative to very well-worded complaint that I've read a few times.
But generally, there's allegations that

Page 57

defendants here misstated and omitted, I think, their knowledge of there being certain indigenous peoples, I think they're called the Xinca --
Q. Xinca?
A. Xinca. Excuse me. I might mispronounce a few words.
Q. And I think it's the Z-H sound, so like Xinca, Xinca.
A. Okay. The Xinca people in and around the region of the Escobal mine, and I think also maybe within the exploration license area, but I'm not sure about that second part.
And also failed to disclose that, you know, the Xinca were trying to communicate their reservations about the mine in part of a process that the complaint alleges was required for Guatemala's Ministry of Energy and Mining to consult with those Xinca people but did not based on defendants' alleged deficient census, which I understand contradicted many other censuses performed around that time that showed a much higher population of the Xinca people in the area.
And also, the defendants actively sought to thwart the Xinca from communicating with the Ministry of Energy and Mining, and even there were

Page 58

certain violent acts at protests. There's a discussion of kidnapping after a
Q. Yes.
A. Plebiscite.
And knowing all these, you know, facts, allegedly, defendants then went on to misstate their social responsibility program, effectively, I think in their SEC filings.
And ultimately, those are the misrepresentations. I'm probably missing quite a few things. It's a very long complaint.
Q. It's a very long complaint?
A. Yeah.
Q. It's a four-and-a-half-year class period.
A. Right.
Q. So is it your understanding that there were both false statements made by the defendants and omissions, statements that are misrepresentations because there was a material omission?
A. I think so.
Q. But as you sit here, can you identify any specific false statement?
MR. KILLORIN: Objection. I think it's ambiguous and misleading. The complaint --
MR. BARNICKOL: Why is it misleading to ask

Page 59

him if it's a false statement?
MR. KILLORIN: Well, you said false statement or omissions, and --
MR. BARNICKOL: No, no. I said what are the --
MR. KILLORIN: False by way of omissions. Same thing.
MR. BARNICKOL: I'm just trying to parse those two.
MR. KILLORIN: Yeah.
MR. BARNICKOL: Are there false statements that he knows about?
MR. KILLORIN: Oh, okay. You mean false without -- false but not by way of omission.
MR. BARNICKOL: I said the light was green and the light was red. False.
MR. KILLORIN: No, when you say false, you mean false but not by way of omission, but just affirmatively false in its own right.
MR. BARNICKOL: Correct.
MR. KILLORIN: Okay. That's clear enough.
THE WITNESS: I'm not a lawyer or thea trier of fact here. So --
BY MR. BARNICKOL:
Q. But you know --

Page 60

A. What I'm considering false and misleading is based on my experience in these settings -- or misstatements versus omissions is what I meant to say.

I think plaintiffs are alleging that a lot of the statements made by defendants were certainly false by omission, by failing to state or failing to disclose the Xinca population significantly in population close by and should have been consulted in connection with the mining license.

I'm trying to think of false statements that were just -- and I guess with all of -- with the omissions piece, I'm just a little confused. It seems like all of the false statements are at least false because of the omissions.

So it's really just about were there any other statements that were just actively, you know, lies.

Q. That's the question.

A. Yeah. And I just want to be careful. This is subject to the Court's weighing of the evidence, and I'm in no way opining on liability and what is true or false, but it seems to me, just as a layperson, that some of the statements about there being no significant Xinca population would -- are

Page 61

false on their face given what's alleged to have been known.

Again, I'm not a lawyer.

Q. So as you sit here, that's the example of -- that's the only example of an affirmatively false statement that you can testify to?

A. No. Another thing that comes to mind is the one I read about how the local population is grateful for the higher security forces and safety provided or something to that effect.

And it seems based on the complaint that the local population was quite upset with Tahoe and didn't like the clamp-down. So that might be false too. But, again, it's all in the complaint, and I'm not here to -- nor have I been asked to -- opine on liability or the allegations.

Q. So in some cases, you know, there's an accounting irregularity alleged and there's a claim that, you know, you said that earnings per share were a dollar and it turns out that earnings per share were not a dollar; right? So that's a false statement.

Does that sort of case require any kind of different analysis than a case like this one where the allegations primarily relate to something that

Page 62

you should have said and you allegedly didn't say?

MR. KILLORIN: Objection. Assumes -- mischaracterizes the witness's testimony. If you want to ask a hypothetical about that kind of case, that's fine, but that's not his testimony.

MR. BARNICKOL: I'm asking what the complaint says, not his testimony.

MR. KILLORIN: Well, then show him the complaint.

MR. BARNICKOL: I want to know what he remembers.

MR. KILLORIN: He just told you what he remembers.

MR. BARNICKOL: Okay.

BY MR. BARNICKOL:

Q. Do you -- take efficient market out of it. Damages analysis. Common damages method consistent with plaintiff's theory of liability.

As a general matter, does it matter to you in performing that analysis whether the allegations relate to a false statement or an omitted fact?

MR. KILLORIN: Objection. Ambiguous.

THE WITNESS: All cases are different; right? All different companies, different allegations of fraud, different time periods. Every

Page 63

damages analysis is going to be context-specific.

You've got to be -- carefully weigh all the relevant facts when coming to those types of opinions. And I've done that exercise a number of times. Even had it upheld, you know, at least past a motion to exclude.

Generally speaking, though, I don't think it makes a difference like categorically. I think it's something that may, depending on the case and what's alleged.

BY MR. BARNICKOL:

Q. Does it affect how you perform an event study?

A. So event studies are going to be also context specific. Yes, they involve a regression analysis, but ultimately we're trying to net out factors that are unrelated to the alleged disclosure of fraud or events that are materializations of the risk created by the fraud that wasn't previously appreciated.

But there could be and there sometimes are, in my experience, other nonfraud-related company-specific information that needs to be appreciated and removed from the residual or company-specific return when estimating damages.

And whether it's -- I'm sorry. All of this analysis is also going to be in the context of plaintiff's theory of liability. So if there's an allegation that the price was inflated as a result of misstatements and/or omissions over a period of time and plaintiffs allege they have evidence and can prove this, and that the losses, you know, caused later on by the disclosure of information that's directly related to or causally connected to those misstatements and omissions, then the event study can and has been found to be a scientific and reliable measure of damages associated in both kinds of cases, whether it's just misstatements or omissions or a combination of both.

Q. Does it make the process of preparing an event study more difficult when you are focusing on something that was omitted from a disclosure versus something that was fraudulently said, falsely said?

MR. KILLORIN: Objection. Ambiguous.

THE WITNESS: Not necessarily, but, again, it's just something I think you want to be careful with and get all the facts correct and considered when forming an opinion about damages. It just needs to be consistent with plaintiff's theory of liability. That's the primary focus of a damages



estimation methodology in these types of settings.

BY MR. BARNICKOL:

Q. When you're doing an event study and you're looking at the impact of a statement on the stock price, it would seem that it is easier to contrast a statement made by the company with other facts showing that that statement was false than to contrast a statement made by the company with other facts that might -- that allegedly should have been included in the statement.

Is that right or wrong?

MR. KILLORIN: Objection. Ambiguous.

THE WITNESS: It doesn't seem to me that it's harder or easier. It seems like it's something that depends on every case and every set of allegations, and -- but it seems like you might be going to an area where you're trying to draw a distinction between a corrective disclosure versus a materialization of risk, and kind of implying through your questioning that a foreseeable consequence of a materialization of a concealed risk might not be eligible or reflective of damages associated with the concealment of that risk earlier on.

And my understanding is that that's not the



case, that there's plenty of times that courts at the federal level, at least, and the circuit level have found that those types of events can be demonstrative of loss causation, again, materialization of risk events caused by the omission of risk or the level of risk, for whatever reason, and also reflective of compensable damages under Section 10(b).

BY MR. BARNICKOL:

Q. So I think -- I get you. But that's all on a much more macro level. I'm just talking about the basic exercise of preparing an event study and whether that process is more difficult in the context of assessing impact from or inflation from a false statement allegation versus an omission allegation? That's very limited.

MR. KILLORIN: Objection. Ambiguous.

THE WITNESS: Again, generally speaking, I don't think it makes it any harder, but it's more about the specifics of the case, the company you're looking at, and what is the value of the information disclosed on the alleged corrective event dates. But it's also something to consider and to carefully weigh when estimating price inflation in these contexts.



BY MR. BARNICKOL:

Q. So let's go to the corrective disclosure. On what dates do you believe there was a corrective disclosure that was materialization of a concealed risk -- a risk concealed by the defendants?

A. I don't have an opinion on what's corrective or not. I think fundamentally there's a liability argument and that's going to be determined by the Court.

Q. Fair enough.

A. The complaint, though, alleges a few drops in a, you know, note in the complaint at various points that, you know, I think in July of 2017 there was a decline of 30 percent or so, right? And also another in August.

And those correspond to what, the suspension of the license at Escobal temporarily upon the, you know, finding that they hadn't consulted or the MEM hadn't consulted with the Xinca. And then later on in August, there was another ruling on that topic.

Q. Is a significant drop in the stock price a sure sign of a corrective disclosure?

Let me strike that. Let me ask it this way.

Page 68

Is every significant stock price, a 30 percent stock price -- is every 30 percent stock price drop indicative of a corrective disclosure?
A. I'm just being careful. I have no opinion on what's corrective from a liability perspective. As an economist, however, you know, stock prices change for all sorts of reasons. 30 percent declines are very rare. And I think whether they're corrective or not is going to be the results of a trial.
Q. Are there circumstances that are just unforeseen that cause a company -- in your experience, have you ever seen a stock drop by 30 percent in a situation where it was just based on unforeseen circumstances?
A. I can't recall any right now. 30 percent is a lot. I mean, there are certain binary events that can occur.
And what comes to mind right now is let's say a development-stage biotech company; right? They've got an FDA Phase III study out there, and the FDA sends them a complete response letter and says no dice. The price will tank, you know, maybe 30, 50 percent overnight.
And there are often lawsuits in connection

Page 69

with certain events, but it doesn't necessarily mean that it was fraud. It could be just bad luck. Or just, you know, the way the cookie crumbles, as they say.
Q. You talked about -- I'm going to get this wrong, but you talked about doing your dissertation on volatility.
As part of that, did you ever have -- or in connection with that, did you have a reason to study stock price -- I think you said options, but stock price volatility and what are the causes of stock volatility?
A. Well, sure.
Q. So, like, so what? In studying -- if you were just doing options, let me know, but if you studied stock volatility, what are the factors that cause stock prices to be volatile?
A. As we talked about a little bit earlier, there's kind of a fundamental risk versus systematic risk that you can't diversify away. And so that will be part of the risk -- you know, that will influence security returns or stock returns over time.
There's also the company-specific side to it. So if the company is in very risky business or

Page 70

it has a bunch of just kind of company-specific things going on that make it jump in value or decline in value, that can also influence it, and that's called idiosyncratic risk.
Q. In arriving at the conclusion that you can have a common damages model for class members consistent with plaintiff's theory of liability, does it matter that there are multiple corrective disclosures alleged in the complaint?
A. I mean, it matters to the measure of damages, but not to whether the methodology can be applied commonly.
Q. Yeah. I was asking about the methodology.
A. It doesn't affect whether it can be commonly employed.
Q. So I want to make sure I'm clear too. You don't have an opinion as to whether any particular event alleged in the complaint was actually a corrective disclosure; right?
A. No.
Q. Do you have a specific knowledge -- or recollection is probably a better way to ask it, about what the complaint alleges the market learned first in July of 2017?
A. I'm trying to remember the specific events

Page 71

that occurred, and unfortunately, I'm getting a little fuzzy with the -- I know they involved the license and the license being suspended.
And it involved the constitutional court of Guatemala and the Supreme Court going back and fourth between July and August. But if we've got the complaint, I can just refresh my memory, if you want to do that.
Q. I think I just want to kind of understand what you recall at this point. Do you recall if there was any disclosure in July of 2017 relating to where Xinca people lived or how many Xinca people lived in any particular place?
A. All I know is what's in the complaint at this point. And I think -- my recollection is that in July there was -- you know, that the license was at least temporarily suspended because of the failure to consult the Xinca people.
I don't recall them discussing specific numbers in the complaint, you know, in that release about the population of the Xinca, but I think the point, though, is it was important enough or they were significant enough to warrant consultation on these mining licenses, at least in the Court's eyes at that point in time.

Page 72

Q. Is it your understanding from the allegations of the complaint that the mining ministry knew prior to that court decision that it had an obligation to consult the Xinca and had failed to do so?
A. My recollection is that in the complaint it's kind of like the mining ministry and defendants were both aware and kind of in tandem didn't -- went out of their way not to consult the Xinca.
Q. When you say "aware," are you saying aware of a legal obligation to have conducted consultation, or aware that there were Xinca allegedly living in some area around the mine?
A. You know, not having the complaint in front of me, my recollection is both, that -- you know, they knew there were significant populations of Xinca in the area, the affected area or the relevant area, and that there was a duty to consult with them prior to issuing the license.
Q. Is it your understanding that Tahoe Resources or the Guatemala subsidiary had an obligation to consult or just the mining ministry?
MR. KILLORIN: Objection. Asked and answered.
THE WITNESS: I think -- I think that's an

Page 73

issue that's very legally tenable that I'm not an expert on. I just read the complaint. So the complaint I think to me seems to allege that defendants and its subsidiary Minera --
BY MR. BARNICKOL:
Q. Minera San Rafael. You can go with MSR.
A. MSR. I'll probably forget that too.
You know, actively tried to thwart the efforts of the Xinca from consulting with the Mining Ministry, and also that defendants were part of that process the whole time and working in connection with the MEM, Mining Ministry, to prevent consultation, and as a result and probably to accomplish, at least it was alleged, the issuance of the mining license to Tahoe.
Q. What was the legal requirement? What was the source of the legal requirement that consultation take place?
A. I know it's alleged in the complaint. I can't recall the specific legal requirement or what statute dictated it.
Q. Was it a Guatemalan law? Was it a Canadian law?
A. I don't recall.
Q. Same kinds of questions for the second

Page 74

stock price drop at the end of the purported class period.
As you sit here, what's your understanding of the disclosures that were made on August 24th of 2017 that are alleged to have caused or contributed to the stock price drop?
A. That's the one we have the complaint open. I just want to refresh my memory about what that second event was. I know it's in connection with the license and the suspension.
My recollection is that it was sent back to the Supreme Court to consider, you know, whether the Xinca should be consulted, I think. And then I think it was determined that -- I can't recall right now.
Q. Do you know if there are any misrepresentations, false statements, or omissions, any misrepresentations alleged between those two stock price drops, so July 5th, 2017, to August 24th, 2017?
A. If there's any corrective events; is that what you're saying?
Q. No, no. Any material misrepresentation alleged to have occurred in that window of time.
A. I don't recall. I think, again, the

Page 75

complaint speaks for itself, but I think plaintiffs allege that the full effect or ramifications had not yet been felt, and that the materialization of this risk was ongoing, the way I read it, just as an economist.
Q. So we've talked a little bit about the plaintiffs' allegations, and, again, I don't want to get into the efficient market stuff at the moment.
Just talking about damages model, is there any difference in how you craft a damages model that is consistent -- that's common to the plaintiffs and consistent with the plaintiffs' theory of liability? Is there any particular way that that depends on what's been alleged in the complaint?
MR. KILLORIN: Objection. Ambiguous. Calls for speculation.
THE WITNESS: It always does. I testified earlier a few times, got to be consistent, as your question asked -- or stated with plaintiffs' theory of liability.
BY MR. BARNICKOL:
Q. How could it be inconsistent?
A. If you just looked at the -- you know, if you've got a class period where it goes from 100 to zero, you can say damages are 100, but along the way

there was a whole bunch of things unrelated to fraud that caused it to go from 100 to 90 and then only the last $10 is fraud related. That wouldn't be measuring damages in a manner consistent with plaintiffs' theory of liability.
Q. But in that scenario, is it possible to create a damages model that was consistent with a theory of liability that just -- it seems to me that the way you answered the question, you're really just looking at whether the theory of liability of 100 to zero could be calculated.
I mean, is there a way to calculate something different than that, something less than that, in the same set of facts?
MR. KILLORIN: Objection. Form.
THE WITNESS: Well, I think you might have misunderstood, or maybe I expressed myself unclearly.
BY MR. BARNICKOL:
Q. No.
A. I meant more like in that hypothetical, only $10 of the drop of the $100 drop was due to the fraud. So -- and there would be a rational or objective basis for establishing that; right?
But if I instead took the $100 complete


loss, 90 of which was due to nonfraud-related effects, then I wouldn't be measuring damages consistent with plaintiffs' theory of liability because I wouldn't be measuring the amount of the price inflation and actual loss incurred as a result of the disclosure of the relevant truth.
Q. But I guess I'm trying to understand, in that example it seems like -- that the problem isn't that it is inconsistent with the plaintiffs' theory of liability. It sounded to me like what you were talking about was something that was inconsistent with the plaintiffs' theory of damages.
Is that different? Am I making a distinction that I shouldn't be?
MR. KILLORIN: Objection to form.
THE WITNESS: I tend to think of them at least similarly, or as the same thing, you know. I would say that the theory of damages has to be reflecting -- or should be complete unison or harmony with a theory of liability.
BY MR. BARNICKOL:
Q. Can you come up with a model that is consistent with the theory of liability but arrives at a damages determination that's different than what's alleged in the complaint?


MR. KILLORIN: Objection to form.
THE WITNESS: I don't think so. I mean, well, unless there's court orders that modify the actionability of certain statements and/or omissions.
MR. BARNICKOL: Want to take a short break?
MR. KILLORIN: Sure.
THE VIDEOGRAPHER: We are off the record at 11:35 a.m.
(Recess taken from 11:35 to 12:00.)
THE VIDEOGRAPHER: We are back on the record at 11:00 o'clock p.m.
THE STENOGRAPHER: P.m.?
THE VIDEOGRAPHER: Sorry. 12:00.
BY MR. BARNICKOL:
Q. Dr. Nye, we talked earlier about your process.
Do you have a template that you use as sort of a document for creating a report like this?
A. You could call it a template if you want. It's the product of, you know, at this point over ten years of my work in matters like this and market efficiency analyses and damage analyses for cases in federal court, and it's updated every single time and parts of it are written anew every single time


to 100 percent accurately reflect the company and issues, you know, relevant to the engagement at that time.
Q. What are some of the things that you have to tailor when you are -- let's be specific in this case.
What are some of the things that you tailored in this case for this report from the template document, if I can call it that?
A. So the report itself is -- you know, has common elements and common structure to many of my prior reports, and that's because it's been well-received. My opinions have been accepted by numerous courts. It gets the job done, as they say.
But the analysis is always fresh and new; right? I'm always new volume analysis, new analysis of bid-ask spreads, new analysis of the analyst reports and a new event study. And the event study is the big, hard piece here that takes the most time. To actually read all the news and the analyst reports on a company over a four-and-a-half-year period, that takes some time; right?
So -- and interpreting and analyzing and, you know, conducting that event study. So that's always new or fresh every time.

Q. The issues of volume, bid-ask spread, and event study I believe are primarily relevant to your opinions regarding an efficient market; is that correct?
A. I think all of the analysis in my report and the exhibits are relevant to market efficiency.
Q. Fair enough. I wasn't trying to be exclusive. But in particular, what aspects of your report needed to be tailored for this case with respect to common damages model consistent with the theory of liability?
A. So that one is really just, you know, reading the allegations in the complaint and the Court's orders, or here's the transcript of the Court's hearing about the motion to dismiss, which I understand was granted almost completely -- or, no, denied almost completely. McGreggor (phonetic) I think had the claims dropped against her.
But as far as the misstatements and omissions, my recollection is that that was all upheld by the court as actionable. And then appreciating the class period and the allegations made and here it's -- I would interpret it as a price maintenance style case in that there's a failure to disclosure material information that



keeps the stock price higher than it should have been relative to, you know, the truth as alleged.
And then looking at the loss causation section, there's, you know, clear allegations of losses upon -- as we talked about the July and August, you know, 2017 events, which as alleged appear to be causally connected to the misstatements and omissions. So that's the theory of liability; right?
And I've seen and have opined on the use and implementation of the event study, also known as out-of-pocket damages estimation methodology that I've described in this report as being upheld and proper as a methodology for estimating damages in a manner common to the class.
Q. And sticking to that last point that you just made about the out-of-pocket damages theory, is this report different than any other report you've submitted in a case like this?
I mean, in other words, could I go and pull your reports from other cases and find the same sort of analysis in those reports with respect to that point?
MR. KILLORIN: Objection to form.
THE WITNESS: Oh, for sure, yeah. I have a



lot of reports that -- in which I opine using the same if not exactly the same language which, you know, is that this methodology is perfectly suitable for these types of cases and theories of liability.
BY MR. BARNICKOL:
Q. So is there anything different about this report than other reports that you've written on that specific subject?
A. Might be a little different, but it's the same opinion.
Q. Sorry. I don't want to interrupt you.
How?
A. Sometimes there's multiple statutes or sections that were estimating damages, things get a little different in those. Section 11, Section 12, Section 14. So it can get a little bit more elaborate or different, depending on the case. And there also might be different securities, different common stock than I've opined on in the past.
Q. But if I compare it with another 10(b) case, that part of the analysis is very likely to be the same; correct?
A. Yes. It is likely to be the same. And because this case, in my opinion, is just as suitable for the application of the event study



damages estimation methodology as those other prior cases.
Q. In response to some of the questions I've asked earlier, you have talked about how each case is different; every situation has to be looked at in context.
Can you identify in your report where there is sort of a discussion of those context-specific factors that need to be addressed?
A. Yeah. I mean --
Q. And, yeah, please. I'll say for the record, we've premarked Dr. Nye's report as Exhibit 70, and he has it in front of him. So ...
A. In Section 7, which starts on page 37, I discuss the methodology, not the implementation of that methodology, specifically in the context of Tahoe Resources and the plaintiffs' theory of liability as alleged and upheld by the Court.
In paragraph 69 I set forth a general economic framework for quantifying per share or per security damages on a class-wide basis, which reflect methodologies I would propose to use if asked to calculate damages in this matter.
Although damages, if any, for each individual class member may vary, the methodologies

for calculating damages described below would be commonly applicable to each class member in this matter.

And I just wanted to highlight that last sentence because, you know, damages here are going to depend on plaintiffs' trading records, when they purchased and/or sold during the class period. So that's going to be context-specific and it's going to be part of the implementation of the damages methodology down the road.

I describe in paragraph 70, you know, what is -- what are damages, at least legally, because it's a legal construct. It's not something that economists, you know, determine in principle. It's something that's part of the Court's equity remedy, I suppose I've heard said. And I describe, you know, when and why it can occur.

I described price maintenance earlier. I think the sentence in the middle about material misrepresentations and/or omissions may also prevent preexisting inflation in a stock price from dissipating, thereby causing inflation not simply by adding it to a stock, but by maintaining it. I think that is the case here as alleged.

In paragraph 71 I describe how price



inflation can be measured on a class-wide basis by analyzing the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk.

Next sentence, I describe the securities price response reflects the dissipation of price inflation --

Q. Are these all conclusions that are --

A. I'm getting to the point about the differences. So I would like to finish.

Q. Fair enough.

A. -- created by earlier misrepresentations and/or omissions. And here's where I think my answer is to your question. What are the context-specific issues that need to be considered, and I think this sentence addresses it.

"An event study can be used to isolate company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors. Other factors can include changes in market and industry conditions or the dissemination of material nonfraud-related company-specific information."

So there's where the implementation is going to be different every time. You've got to



look at what was disclosed specifically, what was fraud-related, what was not fraud-related, how did investors react, and try and estimate, you know, reliably and scientifically what is the fraud-induced portion of a price change.

So the language of this methodology is the same across these reports because it's a methodology; right? But there's specific implementation steps that are going to vary depending on the case, and there might be additional tools described in exactly this -- you know, trying to isolate the component due to nonfraud-related company-specific information.

And so it can go -- it's the regression analysis which is part of the event study, but then there's also additional analyses that can go into it to separate how much of that company-specific price change is due to fraud versus nonfraud.

Q. So how come that -- that point you just made about "other factors can include changes in market and industry conditions or the dissemination of material nonfraud-related company-specific information," I don't see anything in your report that applies that principle in this case.

How come that's not in here?



A. It's beyond the scope of my engagement. I have not been asked to estimate damages or assess loss causation or materiality -- economic materiality at this point. I may later, but I haven't yet.

Q. So can you make a determination that this methodology works without first trying to apply it?

A. Yes. It is applicable for this type of theory of liability and that's ultimately the question being asked, is under plaintiffs' theory of liability, can you estimate damages using a common methodology?

Here for these types of cases, securities class actions, involve, you know, big companies with, you know, liquid stocks. And, sure, you have to establish market efficiency first, which I think I have here, and in all my other cases I have.

And so once you've got those parameters, you're now looking at an efficient market response to information that affects all investors at a given point in time equally. And it's exactly the kind of common damages measure that can be applied in these segments and has been found many, many times to be acceptable.

Q. Is the methodology equally applicable if

Page 88

the Court later determines that some portion of the plaintiffs' theory of liability is invalid?
A. Those are all implementation steps of the methodology and, yes, the methodology can adapt to ultimate verdicts that might deviate from the allegations.
So I've been part of cases where after the, you know, verdict has been established, there's been an opportunity to go back and reassess damages based on the findings. Because, you know, at first you're assuming everything is true. That doesn't mean there's no damages just because a portion was found to be actionable and another wasn't. It means that now you need to go in and reassess what damages are at that point.
I think in the Seventh Circuit that happened in the Household, which is a famous case at least in my circles, about -- there was a whole post-verdict -- you what?
Q. I know that.
A. Oh, you do. You know, there's the shell, the post-verdict stuff that happened with reestimating damages and going up and down with the circuit and stuff like that.
Q. So the dissemination of material nonfraud-related company-specific information affects how you implement this methodology, but it doesn't affect whether you can implement this methodology; correct?
A. I don't think so. I think the plaintiffs' theory of liability, as I read it, given my experience and the fact that it's been upheld by the Court almost completely, is a price inflation -- I'm sorry, a price maintenance theory of liability that is perfectly suitable -- I think I've heard language like "fits like a glove."
The event study methodology fits securities class actions like a glove given -- and that's by courts. I'm talking about like appellate judges making that determination because of the fact we have very efficient security prices, at least in the U.S., that facilitate this methodology and make it a reliable and scientific estimate of damages that can be commonly employed.
Q. So I think I should ask you for a definition of a price maintenance case versus whatever else.
Maybe let me start with what other kinds of cases are there? There's price maintenance and what else?

Page 89

Page 90

A. Really, the other side of the coin is the affirmative misstatement in the sense that it would be a lie implying greater value than the market previously appreciated that induces an immediate price increase that was totally fraudulent, just lying about, "Hey, we won a million dollars," but you didn't really win a million dollars.
And if the value increases by a million dollars on the day you make that announcement, that's now going to be different than a price maintenance case where you just omit the truth, but when the truth comes out that you lost a million dollars, say, you have a million-dollar value decline upon that revelation.
Q. Does the methodology allow for adjustments based on this concept of material nonfraud-related company-specific information?
MR. KILLORIN: Objection to form.
THE WITNESS: The methodology does, yes.
BY MR. BARNICKOL:
Q. How?
A. It's an event study that I've conducted, gosh, maybe a times now. Countless other experts have done it for decades, and it's what event studies do, they value information and their impact on stock prices. That's all it's for.
Q. Is the concept of inflation an all-or-nothing concept? I mean, is it always -- it's completely inflated by the purported misrepresentation, or are there times when, for some other variable, some other factor, that's accounting for that?
MR. KILLORIN: Objection to form.
THE WITNESS: If you're talking about fraud-induced inflation, price inflation, I mean, that's two things. It's theoretical at first as an allegation, and then it's investigated and confirmed empirically using an event study usually, you know, by people like me.
So he's representing, if you're using an event study, you're measuring actual losses incurred by the revelation of fraud or materializations of risk that are foreseeable -- that cause foreseeable price declines as a result of fundamentally, at the root cause, being the omitted concealed information on the front end.
So that was a long answer. Short answer: Fraud-induced inflation is going to be a measure of damages.
///

Page 91

BY MR. BARNICKOL:
Q. Does fraud-induced inflation vary dependent on what -- in a price-maintenance case, does fraud-induced inflation vary depending on what kind of information is in the marketplace?
MR. BARNICKOL: Objection to form.
THE WITNESS: I don't quite understand the question. I mean, it's primarily -- and it's going to be measured on the corrective events, at least in my experience.
You could do it, I guess, different ways, but using the event study methodology, it's going to be measured on disclosure dates either of, again, corrective information or materialization of risk events.
If you're asking if it can vary over time, it depends on plaintiffs' theory of liability.
BY MR. BARNICKOL:
Q. I'm not asking about variance over time. I'm sort of asking if taking -- if I can make this work.
Taking your example from earlier of a drug that is in the development stage and the company makes public statements to the effect that we feel good about getting FDA approval, and in the context


of that situation and facts alleged that the defendants had reason to believe that it wasn't going well, I mean, is that a fair example of a price-maintenance scenario?
MR. BARNICKOL: Object to form.
THE WITNESS: Probably. It could be construed both ways, I suppose.
I think the best example of price maintenance, at least as defined, is in the quote I read from the Vivendi Second Circuit decision. That's in paragraph 70. I read it earlier. And Vivendi I think is the first case that coined that term, materialization of risk theory of liability, and it's a great example.
But not only -- fundamentally, it's about the concealment of facts and risks that aren't corrected by necessarily admissions of guilt or admissions of truth by a defendant, but by events that are foreseeable consequences of those -- of that concealed risk or concealed facts.
So they have been found, in Vivendi and other cases now, to be demonstrative of loss causation and also a measure of damages.
BY MR. BARNICKOL:
Q. What happens to the price inflation theory


if there is information in the marketplace that's contrary to what the defendants allegedly said?
MR. KILLORIN: Objection to form.
BY MR. BARNICKOL:
Q. How does non-- I don't remember what your verbiage is.
A. Nonfraud-related company-specific.
Q. How does that information, when it's in the marketplace, affect your ability to measure inflation?
A. So that nonfraud-related company-specific information is -- what I mean by that is that it's a new disclosure of unexpected information that was not previously priced in the security's price.
So it contributed to a decline or an increase, but usually a decline, on a specific corrective event date, but it's not fraud-related. So you have to make an effort to disentangle that nonfraud-related portion of the decline.
Q. So if the company says "We expect to make a dollar a share next quarter," and an analyst says "No, no, no. They're not going to make a dollar; we see it as more likely 80 cents," how does that affect the damages methodology and the determination of inflation?


Because you have conflicting pieces of information out there that are certainly affecting the market price in an efficient market; right?
A. Well, that's kind of the beauty of the efficient market, is that prices are changing over time and it looks like it's bounced around for no reason; right? It looks like a lottery -- or not a lottery, but it looks like a thing.
But it's not that the market is inefficient. It's that the evolution of time and experience and information is evolving, you know, somewhat randomly; right? So you are seeing it bounce around as people appreciate new things about a company. There are risk aversion changes, and that's what's causing these blips over time.
So these conflicting or different opinions, right, everyone has a different opinion. Me and you disagree, I'm sure, on a lot of things. But through the competitive process, through the thousands if not millions of people and institutions investing at a given point in time, all of our thoughts are competing against each other and the market is impounding all that information. And as a result, those prices that you see, even today, they're reflecting the result of that entire process and

Page 96

it's embedding all that information.
So just because an analyst thought it was 80 cents versus a dollar disclosed by the company, that skepticism is going to be reflected into the price to a certain extent. It may not at all because maybe the analyst is, you know, a dingdong, right, and nobody respects their opinion and it's not reflective of the broader consensus.
Q. So how do you --
A. But at the end of the day, that means when you see price changes, it's because of new information; it's not because of what the analyst saw yesterday or said yesterday.
It's because here there was a license revocation of a crucial mine; right? The price comes down. Because that's, you know, very negative information about, here, Tahoe Resources.
And so that's now going to measure the value of that information on that alleged corrective event or corrective event date, and provides a reliable scientific measure of the actual losses and, in turn, price inflation incurred by investors during the class.
Q. How do you disentangle the stock price drop that results from a suspension from the stock price

Page 97

drop resulted from a materialization of the risk? Are they the same?
MR. KILLORIN: Objection. Form.
THE WITNESS: Under plaintiffs' theory, yes.
BY MR. BARNICKOL:
Q. So there is no portion of the damages here that is attributable to just the suspension of the license versus the concealment of a risk that the license could be suspended?
MR. KILLORIN: Object to form. Calls for speculation.
THE WITNESS: I haven't estimated damages at all or been asked to. But I'm saying that I think, under their theory of liability, the revocation of the license is a materialization of the concealed risk that defendants' conduct thrust upon investors unknowingly during the class period.
BY MR. BARNICKOL:
Q. Would you expect the price of the stock to have dropped when the license was suspended regardless of whether or not there had been misrepresentation?
A. For sure, yes, but it depends on, you know, what caused the license to be suspended. Here

Page 98

plaintiffs are clearly alleging it was because of information concealed by the defendants.
Q. Well, now I want to unpack that for a second.
Is it your understanding that they allege that the defendants made misrepresentations in getting the license that caused -- the license was suspended because the defendants made misrepresentations in getting the license?
MR. KILLORIN: Objection. Asked and answered.
We've already gone over his understanding of the complaint, but you can keep doing it if you want.
THE WITNESS: I think so, yeah.
BY MR. BARNICKOL:
Q. Okay. So but for misrepresentations by the defendants regarding the license, your belief is that the plaintiffs' allegation is the license wouldn't have been suspended?
MR. KILLORIN: Objection to form. Misstates prior testimony.
MR. BARNICKOL: Well, I don't know whether it does or it doesn't.
///

Page 99

BY MR. BARNICKOL:
Q. I mean, does it? Is that true?
A. Can you repeat the question?
MR. BARNICKOL: Could you repeat the question.
(Record read as follows: "Okay. So but for misrepresentations by the defendants regarding the license, your belief is that the plaintiffs' allegation is the license wouldn't have been suspended?")
THE WITNESS: That's a tricky question there. Let's see.
If they didn't misrepresent -- sorry.
MR. KILLORIN: If you don't understand it, just say so.
THE WITNESS: I don't quite understand the question. There's a lot going on.
BY MR. BARNICKOL:
Q. Okay. I understood you to have testified that the defendants are alleged to have made misrepresentations in getting the license and that those misrepresentations were the cause of the suspension of the license.
MR. KILLORIN: Is that a question or a statement?

Page 100

MR. BARNICKOL: It's a question.
BY MR. BARNICKOL:
Q. Is that what you testified to?
MR. KILLORIN: Excuse me. Then I object to the form. Misstates prior testimony.
MR. BARNICKOL: I don't know whether it does or it doesn't.
BY MR. BARNICKOL:
Q. Is that what you testified to?
A. I'm not a liability expert. I'm not plaintiffs. So I think the complaint speaks for itself.
What I think I remember in the complaint, though, is that Tahoe gave a faulty census that, you know, I think was widely acknowledged as being completely -- well, I think "racist" is what was used in the complaint, and nonrepresentative of the Xinca populations at the time, and that -- and also actively worked, in conjunction with the Mining Ministry, thwarting the ability of the Xinca to raise their objections, and kind of put forth that mining license and approved it in an illegal manner, I think.
Q. So I'm just trying to puzzle through all of this and understand.

Page 101

Is it your understanding that the defendants' misrepresentations in connection with getting the license are what caused the license to be suspended?
MR. KILLORIN: Objection to form.
BY MR. BARNICKOL:
Q. I think you're saying yes, but I don't know.
A. You're asking me repeatedly to, you know, testify on -- as like a liability expert. And I'm not. But plaintiffs' complaint stands and allegations stand on their own.
What I'm -- I think I just answered the question.
So I think if they hadn't -- or what caused that mining license revocation; right? I think it's clearly stated in the complaint what the events were that lead to the revocation of the license at Escobal, and I believe there's another one -- license. And the root cause is the failure to consult with the Xinca.
And plaintiffs have -- as we've talked about a lot and I've stated, my recollection is the complaint says that they actively, in conjunction, in connection with, or in unison with the Mining

Page 102

Ministry, tried to prevent the Xinca from raising their objections and consulting on the mining license application, and that that violated, you know, many standards and laws.
Q. Is there a way to use your damages methodology to separate out any portion of the stock drop on July 5th? Just take that one as an example. Any portion that was attributable just to the suspension?
A. Why would you do that?
Q. Because in the context of -- let's say there were no misrepresentations. Let's say the lawsuit just doesn't exist; right? Would you agree with me that it's possible that this mining license would have been suspended?
MR. KILLORIN: Objection. Ambiguous. Calls for speculation.
THE WITNESS: Under plaintiffs' liability theory, I see no reason, as I sit here today, for making an effort to disentangle or remove the effect of license revocation from the measure of damages. I don't think that would be required at all.
BY MR. BARNICKOL:
Q. I got it. Okay. Could you?
A. Yes. An event study is a sophisticated

Page 103

technique. I've done a lot of things with it and disentangled a lot of different pieces of information.
There's -- so this would be something where I think academic papers that acknowledge and study the effect of certain regulatory events on stock prices might be informative.
I think option pricing theory could be helpful here because of the -- you know, it's a probability thing; right? It could be informative if you wanted to. Again, I don't think you need to or should, based on my understanding of plaintiffs' theory of liability, disentangle the license revocation from the measure of damages.
Q. Accepting that you don't think it's necessary, have you ever done that before in another case?
A. Yes.
Q. What case?
A. I've had to disentangle confounding company-specific or nonfraud-related company-specific information in the Kinross Gold case we talked about earlier.
And then also it's come up in another case recently which I can't talk about. There are two

Page 104

cases right now that I can't talk about.
Q. Two other cases?
A. Yeah. So it's at least three cases that I've had go in there and disentangle.
Q. I meant to ask this before.
Have your opinions ever been excluded in part or in whole by a court?
A. In part one time. It was a case against Ocwen Financial Corporation, and the defendants had a motion to exclude my testimony on loss causation, I believe, with respect to seven days, maybe eight, and one of those dates the Court said that, as a matter of law, loss causation couldn't be found.
Nobody has read it as an exclusion of me as an expert in any way. In fact, in that case the Court upheld me as an expert and all my other opinions. And in two other instances I've had the motions to exclude my testimony denied in their entirety.
Q. So no exclusion at all on your -- on opinions relating to efficient markets?
A. Definitely, yes.
Q. And no exclusions based on your opinions relating to the common theory of damages consistent with the theory of liability?

Page 105

A. Right. In fact, I think the Second Circuit explicitly endorsed my methodology on damages in the Barclays case. It's Wagner v Barclays, I think.
Q. Turning to the efficient market opinions, can you explain to me what an efficient market is.
A. Yeah. It's a spectrum, first of all. It's not an on-or-off thing. It's not like it's efficient or inefficient necessarily. But it's ultimately measuring, if you will, the level of information or how well a security's price is reflecting the information set available over time.
Q. And you cite in your report the Cammer factors as subjects to consider in making a determination of whether there's an efficient market; correct?
A. Yeah. That's the standard at least in federal courts for assessing market efficiency.
Q. Do securities trade in sort of a bipolar way either in an efficient market or an inefficient market, or do some securities trade in the efficient market for a period of time and then trade in an inefficient market later?
A. So I think in my spectrum discussion at the beginning, it's definitely not on or off, inefficient, efficient. It kind of ebbs and flows

Page 106

with respect to how a stock is embedding information over time.
That said, my work and analyses, as well as the work of many, many academics and hundreds, if not a thousand-plus papers on market efficiency, has found that U.S. markets, the major national market systems' stocks are highly efficient and do a very good job reflecting information on a you know, day-to-day basis.
Q. But there are circumstances where you have stocks traded on a national exchange that suddenly are not in an efficient market; correct?
A. It's an empirical issue. It's something to consider for each stock at a given point in time. That's why we do these analyses. We look at the specific relevant period, the class period, and all the news and all the statistics surrounding the stock to come to that determination.
It is possible for a certain stock to be relatively less efficient at a certain point in time relative to others.
Q. So earlier this year, there was the whole issue with GameStop and the spike in prices of GameStop. And I don't know whether you have a reason to have formed an opinion, but do you believe

Page 107

GameStop was trading in an efficient market?
A. I haven't formally analyzed GameStop. I've read the news like you have, and certainly the speculation on the part of the media is that -- at least certain media -- was that it was irrational and speculative.
And that may be the case. I haven't analyzed that security during that period of time.
Q. But, I mean, if it was viewed as an example of a stock trading in an inefficient market, it is also an example of a change in status from being in an efficient market to an inefficient market and then maybe back or not; right?
A. I think you have to be careful and look at the stock over time. Because my recollection right now is that GameStop was doing really poorly. So it might have been, you know, having trouble with, you know, illiquid trading and things like that that would perhaps be indicative of less efficiency than during a better period of time for their company's prospects. And then certainly it popped up.
And personally, my -- looking at this, the news about it, it seems like, you know, there was a lot of fear given COVID about kind of like brick-and-mortar retailers and consumer goods

distributors maybe a year ago, but as we've seen, they're all actually doing pretty well. So it's not -- I'm not even sure that it's evidence of inefficiency, what's happened to GameStop.
Q. In the context of GameStop, the trading volume was significantly higher during the period when the stock shot up and then came down than it had been in prior periods. And I know that you look at trading volume as an indicator of efficiency, but I'm trying to understand how you can reconcile -- strike that.
Is the concept of trading volume dependent on looking at an average, or is it related to trading volume period to period?
A. The Cammer court is very clear it's analyzing the relevant measure for which they give thresholds of 2 percent and 1 percent, strong and -- there's two thresholds, a strong presumption versus a something-else presumption of efficiency. It's looking at the average weekly volume during the class period as a percentage of the shares.
Q. If you're doing an average that is calculated based on a long period of time like this case, four and a half years, do you have to consider -- do you have to consider substantially



different trading volumes in different parts of the class period?
In other words is it appropriate to use a weekly average over the entire length of the class period when trading volumes change markedly?
A. Yes, always the case because that's the language provided by Cammer. And it's been upheld numerous times -- more times than anybody can count in federal court, how that Cammer Factor 1 is interpreted.
I'm just looking at my Exhibit 4, since that's where we are.
Q. I tabbed it.
A. Good.
Q. One of those. It's probably the second tab; is that right?
A. Yeah. You've got less volume for sure in the front end of the class period, and then it shoots up pretty good, it looks like, in about 2015 and carries through the end of the class period.
And, you know, I think that's consistent with the nature of the business here, was developing its mining operations from basically scratch early on through the class period. I think they went into production in 2014 and started ramping up, and then



you see much more volume in 2015.
Q. When I look at your analysis here in Exhibit 4, and this is -- at the top of this page it's marked as, I think, paragraph -- sorry, page 102 of 709. But on page 103 at the bottom, as you said a minute ago, it doesn't look to me like the trading volume -- the weekly trading volume of Tahoe got above 1 percent of the shares outstanding until March of 2015, which is approximately a little less than two years into the class period.
A. Oh, hold on one second.
Bear with me one sec.
Q. Sure.
MR. KILLORIN: Karl, which exhibit are you looking at, 4A or 4B?
MR. BARNICKOL: 4B.
MR. KILLORIN: Thanks.
THE WITNESS: I'm just trying to refresh my memory of when they were listed in Canada versus the U.S.
Okay. Sorry. Your two-sided pages, I got mixed up with where they were.
I thought this applied to Canada, that the listing was later, but it's not. They were listed in Canada first, then the New York Stock Exchange.



So I think a important point here with respect to volume is that it's dual listed. So as I've shown in the price discovery, there's price parity between Canada and the U.S. It's like when you convert to dollars, U.S. dollars, they're within a cent of each other pretty much always.
Which makes sense; right? It would be an obvious arbitrage opportunity that even I could figure out; right? And I would make a lot of money if I could buy and sell stock in Canada versus the U.S.
BY MR. BARNICKOL:
Q. Can I interrupt you for one second on that point?
A. Sure.
Q. Do you know, are there arbitrageurs out there who are doing exactly that, not necessarily in the context of Tahoe, but are there firms out there that have as a strategic goal, as a targeted goal, to trade on imbalances between currency values on TSX and NYSE stocks?
A. I know that, in principle, that's an arbitrage technique that's been employed. I couldn't name you a firm right now, but that's something that is being monitored actively by hedge

funds and other sophisticated investors over time to, exactly, take advantage of those discrepancies when they exist.
Q. But in this case you don't know if that happened with respect to Tahoe; right?
A. The prices are -- there's complete price parity. That's like strong evidence. That's definitely happening. And if it didn't happen, it's because the market was too smart to let the deviation occur.
Q. And I just want to make sure I'm right about this. Your opinion is that aggregating trading volumes between the U.S. and Canada is appropriate without reservation because of the price parity; correct?
A. Yeah. I think it's -- ultimately what matters for efficiency is does that price reflect the information set; right?
And so here, if we had in the U.S. NASDAQ trading and -- which we do, you know. There's NASDAQ and IC trading simultaneously; right? They're happening at the same time. Those prices are also identical over the course of a day.
Here it's just going over the border a little bit, to Toronto, and there's more trading



going on. That is all-influencing -- that is the market that is absorbing the information for Tahoe Resources, and that's the competitive dynamic that's leading to an efficient market.
So, yeah, I think it's important to consider the combined volume analysis in this case.
Q. And then the second one of the Cammer factors that you discuss -- actually, let me go back and just ask the closeout question on that.
So in this case, what's your opinion regarding how trading -- average weekly trading volume impacts an efficient market analysis?
MR. KILLORIN: Objection to form.
THE WITNESS: Oh, as described in my report, a liquid market where a lot of people are invested and competing, you know, based on information, to take advantage of informational changes? Yeah, I think volume is reflective of that, and numerous courts have found it to be the case as well.
BY MR. BARNICKOL:
Q. When we were talking earlier about information coming into the market, do you have a view as to what the time period -- the relevant time period was for information to be incorporated into



Tahoe's stock price?
A. Oh, like how quickly?
Q. Correct.
A. Yeah. So that's -- I think answer it in the context of the spectrum of efficiency first, and I think there's also the idea -- I mean, fact that certain information is more complex than other pieces of information. There could be a longer time frame that's required for the market to fully appreciate and fully price that information.
There's also the fact that information isn't just discrete and nothing else happens. In a given event window, you can see related disclosures or events occurring over the entire period.
So I think it's important to consider each event and then try and isolate the period of time that the events transpired and also when the price change -- the information was reflected in the price.
So it can be context-specific. For market efficiency purposes, typically it's a day. You're looking at earnings events, as I have here, in a day event window. Given that these things occur either premarket hours or after market hours, you want to look at the day period that investors are reacting



to that information. So that is a very standard choice for analyzing earnings events for market efficiency.
When looking at damages, though, for the reasons I stated before, there can be instances where you look at longer periods, like maybe two days, maybe even three days or longer, and that's also consistent with the academic literature on the subject of event studies and particularly in the context of securities litigation.
Q. Does the academic literature provide any guidance on when the time period necessary for the market to react to news gets so long as to defeat a presumption of market efficiency?
A. The big academic studies, they're called cross-sectional event studies, they're looking at say a hundred or a thousand companies and analyzing kind of the average response to a corporate event over time and in those instances by design, because you've got multiple firms that are -- and there's a cancellation of any kind of idiosyncratic problems or events that occur across the sample, that they do tend to focus on daily event windows, but also two-day event windows, and indeed determine that many, many times, hundreds of papers say that the

Page 116

response within a day or two is consistent with efficiency.

And then there's other event studies that are more long term that may go on months, and they've documented these average patterns of, say, long-term price reversals or momentum that can persist in a seemingly inefficient way over the course of many months, maybe six months or a year.

But there's also counter literature that shows that those can be the product of efficient market dynamics as well because it's reflective of certain risk characteristics that may not be perceived by the certain pricing models used in other papers.

Q. So if you can use an event study as a way to, at least in part, establish market efficiency, can you use an event study to establish market inefficiency?

MR. KILLORIN: Objection to form.

THE WITNESS: You may be able to. It's the tool, one of the primary tools, if not the primary tool, for analyzing market efficiency.

BY MR. BARNICKOL:

Q. And what would an event study have to show to demonstrate market inefficiency?

Page 117

A. I think it would have to -- it would just be dependent on what's found empirically. It's just a measure of what happened during a sample, so just analyzing it and seeing what happened during that sample. And if it's something, I guess, just weird and unexplainable, then you would say that it might be evidence in favor of inefficiency.

Q. What variables other than the time for the market to incorporate information would be relevant to that kind of a determination?

MR. KILLORIN: Objection to form.

THE WITNESS: In what way? You mean like in the regression analysis?

BY MR. BARNICKOL:

Q. Yeah.

A. Like what variables would be included in the regression?

Q. Right. I mean -- tell me if this is wrong, but I think you agree that the time for the market to incorporate information is at least one variable that's relevant to market efficiency -- not a standalone, but one variable; right?

A. It's relevant for sure. It's just that you have to be careful with the events under study. So just because you see a two-day or three-day or

Page 118

longer reaction doesn't necessarily mean it's an inefficient reaction if there's a sequence of events or a good reason, basically, for that prolonged reaction to occur.

Q. Right. So that's exactly what I'm getting at, is what are the other things? If you're looking at exactly that, what are those other things besides the time? What else are you looking at in trying to assess market efficiency based on the regression analysis?

A. Well, the event study is just a piece of evidence that's considered by economists and also by courts in assessing general market efficiency kind of period, and it's measuring the ability of securities and their markets to reflect changes in information over time.

As far as other variables in a regression analysis, I can't think of anything off the top of the head -- or my head, at least. The standard procedure is what I've done, which is to adjust for market effects and industry effects.

And you're asking specifically what would show inefficiency. I don't even know. Because if you throw in a variable that's seemingly unrelated, like, I don't know, Disneyland ticket prices changes

Page 119

or something like that, right, you might see a correlation. You might see it's significantly associated over a certain sample with a series of stock returns.

Now that is probably a spurious correlation, but it also -- not necessarily mean that the market is inefficient; it could mean that that's just a sample-specific phenomenon that you just saw by chance.

Q. But do you agree with me that there are a number of variables that go into this determination; right?

A. Of market efficiency in general or within the regression event study context?

Q. The latter.

A. There's a voluminous literature on, you know, event studies and their findings with respect to market efficiency. In a nutshell, they all come down to -- at least the short-term ones -- that stock prices on average reacts significantly and appropriately to corporate events.

Q. The next one of the Cammer factors that you looked at is securities analysts and the number of securities analysts that follow the stock, and you looked at the analysts following Tahoe Resources.

Page 120

Do you recall how many?
And I'm not trying to hide the ball from you. You can look at your report.
A. Where is the next step?
Q. I think it is the next step. I don't know that I tabbed it, though.
A. You did. Anyway, it's -- the number is -- it looks like 583 total reports where Tahoe Resources was primary ticker symbol in our search of Refinitiv Eikon, which is one data vendor that provides historical analyst reports.
But that's a subset of the reports available in realtime because a lot of companies, like Goldman Sachs is the one that comes to mind, they don't make their reports available historically to anybody. It's only to clients in realtime; right?
So we have what we have. Here I think it's strong evidence that there was a wide analyst following for Tahoe Resources.
Q. Do you know if the analysts that are listed there -- is that Exhibit what?
A. 5A.
Q. 5A. The analysts listed on Exhibit 5A, are those American firms, Canadian firms; do you know?

Page 121

A. Right now I don't -- well, People Canada is probably Canadian. A lot of them are historically American, but, you know, their financial markets are, you know, increasingly global. So I would say that a lot of these companies are following all markets.
Q. Like Canaccord is probably a Canadian analyst; right?
A. I don't know. I see them a lot too, and not just for Canadian stocks. So they might be -- they could just be U.S. based.
Q. Is there any difference for purposes of your review of Cammer Factor 2 based on whether or not an analyst is a U.S. firm or a Canadian firm?
A. No, not at all.
Q. What about a British firm?
A. Nope. Anybody who wants to critically analyze Tahoe Resources during the class period, it's an Internet-driven world, so it's really easy to convey your opinions and disseminate information to the market and your clients.
And indeed, there's investors from all over the world trading companies like Tahoe Resources on U.S. stock markets and Canadian stock markets.
Q. So we just -- you brought up an example of

Page 122

Goldman Sachs not having -- making their analyst reports publicly available.
Does the failure of an analyst to make reports publicly available affect whether that analyst's reports affect stock prices?
A. No. I mean, publicly, you know, how widely disseminated certain information is can be important or relevant to how quickly it gets reflected in the market price.
But in that instance, for companies like Goldman Sachs, they are making trades on their own behalf. They are a huge proprietary trader. So whatever they know, their thoughts are definitely getting conveyed to the market. And then they have their entire huge investment-banking clientele that they are providing these reports to and probably trading on behalf of.
Q. So do you have to do any sort of consideration of the availability of reports from any of these analysts in making a determination as to whether their presence in the marketplace affects market efficiency?
A. So, I mean, all the analyst reports we have are publicly available and were at the time. And they were all on the conference calls. They were

Page 123

quoted in news articles. I think there's strong evidence that all the information or analysis they performed was conveyed to the market and reflected in the price.
And indeed, it's -- the market is just absorbing whatever information it has. So it doesn't mean that it's perfect. It doesn't have to be like perfect, like there's no disagreement or they know everything about everything.
It's just that whatever the information set happens to be, an efficient market is one that reflects that information set, as complete or incomplete as it might be.
Q. How do you know what's -- what the bounds of the information set are?
MR. KILLORIN: Objection to form.
THE WITNESS: I think I've provided a lot of evidence about what the bounds were, and it was huge. I mean, this is a widely followed stock. We got 25 analysts, almost 600 reports, news coverage, conference calls, SEC filings, prompt-like price reactions to material information, corporate disclosures.
And I think my analysis is putting a very good bound on the information set available and how

Page 124

it was reflected in the price.
BY MR. BARNICKOL:
Q. Is there any sort of public information that you would exclude from the determination of market efficiency or market price incorporation?
A. No.
Q. What about things like social media? Do -- does Twitter, Twitter posts, at least have the potential to impact stock price?
A. They can, yeah. If it's breaking information, might come out on Twitter. I've seen that in the past.
Q. What about things like Facebook, Instagram?
A. It can. When I'm looking at these event studies, though, I'm, A, looking at it ex post; right? It's a historical effort. So if I was trading these things in realtime, I would have my social media all up in front of me.
But retroactively, you consider the information that's -- you know, analysts and news. And Bloomberg will actually publish a lot of Tweets and other social media posts that influence stock prices.
So I think it's -- between the news I've considered and the analysts' reports I've

Page 125

considered, I've more than adequately -- or adequately, I should say, considered the information set available on these days in the class period and particularly around the earnings-related events I examined in Exhibit 12, I believe.
Q. So another one of the Cammer factors -- and I'm sorry, I'm not going to remember whether it's 3 or 4. I could look it up, but another one is the -- it's the presence of sophisticated investors.
A. Sure.
Q. Right. So I understand from your report that the presence of sophisticated investors can show market efficiency because sophisticated investors have the potential to bring information into the stock price on a relatively quick basis; is that fair?
A. I don't think I said that, but --
Q. Well, give it to me in your own words.
A. Sure.
These institutional investors, they're big companies; right? They've got staff. They employ financial economists, PhDs, all sorts of MBAs, and their job is to pore over information as it's occurring.
Some desks are more, you know, long term in

Page 126

nature, so they're not so concerned with intraday shifts, but there are more and more high-frequency teams that are really, really concerned not just with algorithmic trading, but also with the specific timing of news releases. And they're just on alert, basically. And so they're -- yes, able to trade quickly on information, more so than maybe you or I who are working on unrelated things during the day.
And that's their job; right? They're getting paid to do that job. We're getting paid to do different jobs. And so it's just a lot of smart people who are trying to make money in a competitive business by interpreting information and receiving it as quickly as possible, in order to do exactly what efficient markets are kind of optimized with, is like really extreme competition. The more competitive investors are with each other to beat each other to market, the more efficient a stock price will be.
Q. And access to information is one of the key aspects of competitiveness for these institutional investors; right?
A. Yeah. I think it's very important.
Q. And in the same vein, incorporating information into trading strategy rapidly is

Page 127

important to competitiveness for institutional investors; right?
A. Yeah. They're trying to beat everyone else to the market before the price adjusts, and through that -- those buying and selling transactions, to influence the price to come to whatever fundamental value they perceive as being fair.
It doesn't mean that every institutional investor or sophisticated investor knows exactly what that fair value is, but by trading on information and critically analyzing that information, their trades and other trades achieve equilibrium prices that reflect that information set such that the price does things like react to new information but not old information, as you would expect.
Q. Institutional investors, do they rely solely on company-made public statements, press releases, and SEC filings?
A. No.
Q. Do they consider company-made statements in press releases and SEC filings in light of other available information?
A. Yeah, for sure. Everyone does.
Q. In terms of the information that's publicly

available, is there any reasonable basis -- is there any basis in the economic literature to limit what is considered, like something is just not sufficiently public to go into the variable, the calculus of price impact?

MR. KILLORIN: Object to the form.

THE WITNESS: I think it's just an issue that needs to be considered carefully. Because I've encountered in my experience cases where information is -- may have been technically available in the past, but in a really difficult or obscure -- let's put it that way -- obscure manner in which you could access it back in the past, and there's no evidence that anybody actually did access that information even though it was technically available, such that, you know, you see price declines or increases upon the revelation of information that was technically available earlier.

In that case -- in those cases, it seems to me empirically there's strong evidence that that information was not known, even though you could have potentially got it or somebody could have potentially gotten it earlier.

BY MR. BARNICKOL:

Q. Can I --



A. So I would say it's an empirical issue and it's something that needs to be examined in the context that it occurred.

Q. And when you say "in the context that it occurred," on an information-by-information basis or how?

A. Yeah. I think fundamentally, yeah. That's why I kind of painstakingly analyze each of the events that I do.

Q. Do sophisticated investors -- or I think I should use your verbiage. Do institutional investors consider information that's not solely in English, that's in other languages?

MR. KILLORIN: Objection to form.

THE WITNESS: Yeah, I think so. It depends on maybe not the language, but in certain parts of the world, it's harder to publish or disseminate information, regardless of the language; right? So I'm not sure -- I don't think the language matters. I think it's more the mechanisms by which you make that information known varies across regions.

BY MR. BARNICKOL:

Q. And I'm going to get this wrong and you can correct me, but Stanford Consulting has access to a database called, I think, Prius Eikon? Did I get



that right?

A. Refinitiv Eikon.

Q. So what's available in Refinitiv Eikon? We know analyst reports. Anything else?

A. I think they have a lot of financial data. We use it for analyst reports primarily and I think institutional holdings. But they have, you know, stock prices and volumes and shares and a lot of risk measures and short interest. I think they have pretty much everything relevant to stock valuation.

Q. Do you have access to databases that provide you -- I mean, other than just the Internet, do you have access to databases that provide you with like press release data?

A. Yeah. We use Bloomberg as well.

Q. So does Bloomberg, then, also contain, in addition to press release data, just third-party news reports regarding companies?

A. Yes.

Q. Do you ever or does your team at Stanford Consulting ever use just the garden-variety Internet Google to find information?

A. Sure. We do.

MR. BARNICKOL: I don't know how long we've been going.



MR. KILLORIN: I think more than an hour.

MR. BARNICKOL: Do you want to pause now for lunch?

MR. KILLORIN: I think Jim and I are good. It's up to you two.

MR. BARNICKOL: Let's go off the record for a minute.

THE VIDEOGRAPHER: We are off the record at 1:13 p.m.

(Recess taken from 1:13 to 2:01.)

THE VIDEOGRAPHER: We are back on the record at 2:00 o'clock p.m.

BY MR. BARNICKOL:

Q. Dr. Nye, before lunch I asked you about whether you could disentangle or disaggregate effects from a -- from suspension of the license in this case from effects caused by a realization of or revelation of the purported fraud.

And I think you said that it's not necessary here because that's not -- that process is not consistent with the plaintiffs' theory of liability; is that correct?

A. Yeah, effectively. I think all of this, you know, needs to be carefully considered for someone who's doing a damage analysis or loss

causation analysis, which I haven't done or been asked to do.

But, you know, given the theory of liability, I think at least my reading of it, is the suspension of the license and the, you know, court orders to consult with the Xinca are materializations of their allegedly concealed risk, and along with that, there's a foreseeable consequence of a price decline.

So I don't see it, as I sit here today, as a reason to disassociate the license issue from the misstatements and omissions and the damages associates with those.

Q. I think you said that you have in the past had occasion to do that, and I think you referenced the Kinross case as an example?
A. Yeah. Totally different case and context.
Q. Understood.
A. But in that case and other cases, I've had to go in and disaggregate or disentangle components or portions of the price declines on the alleged corrective event dates that were due to confounding information unrelated to the alleged misstatements and omissions.
Q. How do you do that?



A. Well, in the Kinross case, it was a gold-mining company, and they had other minerals because, you know, digging in the dirt, you might find other things than gold, but predominantly a gold-mining company, and they had a collection of assets, gold mines, but only one of those mines had had material information concealed about it.

So upon the -- one of the alleged corrective events at least, if my memory serves correct, conveyed negative news about not just one mine but other mines.

So I went in and had to estimate how much of the observed price decline was due to just the negative material information about the gold mine that had been misrepresented.
Q. How do you go about making that estimation?
A. It varies.
Q. In that case.
A. It depends, but in that case, there were analysts, many of them, that estimated the value of Kinross Gold Corporation using a net asset value approach. And so what they would do is they would value each of the mines individually, and then, you know, the sum of those values plus maybe a little bit here and there for corporate, you know,



efficiencies, dictated their analysis of Kinross's overall stock price.

But by virtue of their detailed reports, you could see how their valuations changed pre and post disclosure or event. And I use that as the basis for my disentanglement.
Q. What did you do to test -- so I assume the analysts have the valuation that they had put on that, and then is that just a starting point, or is that the only data point you need for purposes of that estimation?
A. Well, there that was, you know, direct evidence of professional investors' assessment of the diminution in value on a mine-by-mine basis. So they had already calculated how much of the overall value loss was attributable to the mine at issue.

So it was a percent of the total, so I don't know -- 25, 30 percent, and that was now the ratio I used to estimate the portion of the overall stock price decline that was due to that mine.
Q. In this case, Tahoe Resources and MSR at the beginning of the class period had a single asset, which was the Escobal mine; right?
A. They had the Escobal mine. I think they also had other various licenses and applications,



but I think it was primarily Escobal.
Q. Was there any other revenue-producing asset?
A. No, but an asset doesn't have to be revenue-producing right now to have positive value. I'm just being careful with the subject. And I think -- no, you're right, Escobal was the primary asset.
Q. And the only revenue-producing asset; right?
A. At the beginning of the class period, I don't think it was producing any revenue.
Q. Fair enough.

In 2015, I believe, the company acquired another company that had mines in Peru.

Are you aware of that?
A. Yes.
Q. And then in 2016, the company acquired another company that had some mines in Canada.

Are you aware of that?
A. Yes.
Q. How does the existence of -- the effect of those operations on the company's financial statements or its balance sheet impact your ability to calculate damages in a uniform way both pre-2015

Page 136

and then 2015 to 2016 and then 2016 to the end of the class period?
MR. KILLORIN: Objection. Form.
THE WITNESS: So the measure of price inflation is typically, using event-study methodology, the price declines upon the corrective events. In an efficient market, that will accurately and reliably and scientifically measure the value of that disclosure.
If there's no other information pertaining to those other mines disclosed on that day, then it wouldn't be affected by those other mines. So that still is going to measure the actual loss incurred as a result of the corrective event, but you've got to be careful.
And I haven't done this analysis, but I have in the past, and you've got to be careful with everything that was disclosed and see how the market reacted and, you know, what drove those declines.
Pre and post acquisition of other operating assets or even companies, I've never seen that being used as a rationale for modifying inflation, though, and damages incurred by that inflation.
BY MR. BARNICKOL:
Q. Well, then let me ask you. And maybe I'm

Page 137

just missing how this works, but an investor who bought before -- who bought in thea time when MSR only had the Escobal mine, in the context of a price maintenance type of claim, type of allegations, that investor would seem to have the inflation affected solely by Escobal because that was the only revenue-producing asset; is that fair?
A. Yeah. I think so. It's also true of people later on given my understanding of the complaint and the way -- what was disclosed on the alleged corrective event dates.
So if the only information about the, you know, Escobal mine was disclosed and it caused the price to decline, that's going to measure, in an efficient market, the value impact of those -- of that mining license revocation or suspension, you know, for Escobal.
And it's not going to measure the impact to the other mines, which are -- you know, they're standalone assets. They're sitting there producing gold or other byproduct materials.
And really, as I talk about it, in Kinross, you know, at least there's -- that's why you do an asset value approach, is these are distinct assets with their own value that you can buy and sell even

Page 138

across other mining companies.
So it only becomes an issue when you've got contemporaneous disclosures of multiple mines that you would have to disentangle the effect of the other mines.
Q. Isn't it reasonable, though, that if the license had been suspended prior to the acquisition of Rio Alto, which is the Peruvian mines, so at a time when the company only had Escobal, the stock price drop would have been, I think, necessarily greater than 30 percent; right? If the only revenue-producing asset was impaired, the stock wouldn't have dropped by just 30 percent; right?
MR. KILLORIN: Objection. Calls for speculation.
THE WITNESS: Yeah. I have not analyzed damages or implemented a methodology to date. But yeah, it is something I consider. I don't know if it would ultimately matter, but it's something you want to be careful with.
BY MR. BARNICKOL:
Q. I mean because in part, stock price is determined based on current and expected future revenues and earnings; right?
A. Yes.

Page 139

Q. And if you have an asset that's not producing any revenue or any earnings, that's a worse situation than having one of three or five or ten assets that's not producing revenue earnings; right?
A. Well, it's -- again, the value of each mine is going to be reflected in the price. So more valuable mines, the higher the overall value of the firm is going to be. But if you only have negative information disclosed about one of those mines, you're going to see the negative information about that specific mine reflected in the stock price decline the next day.
And the percentages are not how you would estimate damage. I'm sorry. I've got a tickle in my throat.
Q. Yeah.
A. Typically, in my analyses in other cases, it's the per-share dollar decline adjusted for all nonfraud-related effects is how you measure the damages. So you take that and multiply by the number of shares, that's going to, you know, give you the equity impact of those disclosures overall.
Q. So not a percentage-based analysis, just a dollar-based -- dollars per share?

Page 140

A. That's pretty much the standard, given my understanding of case law, specifically a case called -- against Dura Pharmaceuticals, I think, and it was a Supreme Court case. I don't know if I cite it in this report.
Q. I believe you did.
A. I did. Okay.
You know, that's what the Supreme Court said. You've got to -- if you buy and sell before a alleged corrective event, you know, at that instant you're selling something that's of equivalent value to the prior purchase price.
So that has been interpreted as saying that there's a constant percentage-style damage analysis, which was the norm I think 20 years ago, was no longer acceptable.
Q. On that point, is it true that a purchaser who bought after the class period began and sold before the class period ended cannot be a member of the class?
A. The way I have opined on this subject before, many times, is if there's a one-drop case, yes. If you buy in the class period and sell before the first corrective event or only corrective event, you would not be damaged by virtue of the logic in

Page 141

Dura.
Economically, I think, is another question. But legally speaking, given that damages is a legal construct, that's the way it's implemented.
Similarly, if you have multiple corrective events, so your price inflation band is changing over time, if you buy and sell between two events, corrective events, you're undamaged as well.
But it's possible to be damaged if you buy and sell in the class period, but it's at two different levels of price inflation. So beyond a corrective event.
So if you buy before the first corrective event and sell between the second and third, the price inflation is up here, but then it drops down here, you'll be damaged under -- given my understanding of how damages should be calculated under Section 10(b).
Q. For purposes of figuring out inflation, the delta between the stock's true price and the stock's market price, is the amount of inflation constant during the class period or does it vary during the class period?
MR. KILLORIN: Objection.
Are you talking about this case or in the

Page 142

abstract?
MR. BARNICKOL: In this case.
THE WITNESS: In this case, I haven't done it.
BY MR. BARNICKOL:
Q. Okay. In the abstract.
A. It depends on the plaintiffs' theory of liability. But for the reasons I just stated, the Dura court's decision strongly implies that, you know, it's at least constant; it shouldn't be on a dollar basis between corrective events.
But I've seen other cases where, you know, for whatever reason, plaintiffs' theory of liability has applied a variation in the level of price inflation over the course of the class period.
Q. What's your understanding of the allegations in this case? Do they apply that degree of variation in the amount of inflation during the class period or do they imply a constant state of inflation?
MR. KILLORIN: Objection. Form.
THE WITNESS: I haven't analyzed the issue or been asked to.
Given my understanding right now of plaintiffs' theory, I don't see a good reason to

Page 143

have it change over time. But it may. Something that I would, if asked, definitely consider.
BY MR. BARNICKOL:
Q. What are the kinds of things -- not specific to this case, going back to the general, what are the kinds of things that might support your opinion that a variable inflation model is appropriate as opposed to a constant inflation model?
A. So what comes to mind is that in certain cases I've seen, there's specific allegations of an evolution of scienter. That could suggest time-varying inflation that would grow from a small amount to a higher amount during the class period. That's a liability consideration, of course.
In that particular case, I disagreed that that should be the way it was done, just in principle. But I've seen other -- I've seen cases where that's happened.
I've also seen other cases by other experts in which they've had it evolve for all sorts of reasons, like present value of -- what was one? -- pharmaceutical drug sales. And as it evolved over time, they graduated the price-inflation band.
Q. Have you ever seen it in the context of

Page 144

differences in the alleged misrepresentations as opposed to the scienter?
A. No, never.
Q. Anything else besides scienter and what the nature of the misrepresentations is that could affect the variable versus constant inflation?
A. No. I mean, the nature of the misrepresentations doesn't matter in a price-maintenance case, at least, you know, based on my experience and understanding, if there's prior omissions. Because however you omit the information, it's still fundamentally an omission and you're preventing the market from realizing the truth.
So I don't think the type of misrepresentation or differences in it over time changes things, and I think in the Vivendi Second Circuit decision, it implicitly says it wasn't the role of the economist, who is my father, to -- you know, assess when price inflation and how much came in with various misstatements in exactly that case, which was a price-maintenance case. It's up to the jury, based on the economic evidence, to assess the causal connection between the misrepresentations and the ultimate damage incurred.

Page 145

So the way the Court described it is that the economist or expert estimated actual damages or actual price inflation that was reflective of the market's misapprehension of the true risk associated in that case, Vivendi, thereby causing the stock price decline. But then it was up to the jury to estimate, by weighing all of the evidence, what is the fraud-induced component or portion of inflation over time.
And in that case the jury did not graduate it or change it depending on the misstatements. It was, you know, based on their weighing of the evidence. But it was not -- it didn't change depending on when the misstatements occurred or what type of misstatements because it was fundamentally, I believe, a concealment of the true risk or price-maintenance case.
Q. In this case if you're asked to -- to prepare a damages calculations, are you of the view that this is a single inflation situation or a variable inflation situation?
MR. KILLORIN: Objection. Calls for speculation. Ambiguous.
THE WITNESS: I answered earlier, I haven't done that, but it's something I considered. Upon

Page 146

analyzing, you know, if asked, the evolution of price inflation, I'll consider plaintiffs' theory of liability in detail and all of the evidence available at that time, including discovery evidence.
BY MR. BARNICKOL:
Q. But so right now, no present view as to which is the damages model you would apply here?
A. No. I haven't done the analysis. It's an important subject and topic for all these types of cases, and so I like to be very careful with my analysis.
Q. You just mentioned discovery information. What sorts of discovery information would have some impact on -- I'm not just going to stick to the inflation question, but on your damages -- on your determination of how to build a damages model?
A. So I've encountered a number of cases where companies have stated or explained a price decline and bad performance and they've said it was due to things totally unrelated to internal problems.
Discovery evidence has strongly contradicted that and it's been informative of what information was perceived and indeed touted as confounding and nonfraud-related when in reality it

Page 147

appears to be quite fraud-related.
So discovery is very important for appreciating the root causes of a given price decline. Maybe not necessarily in this case, but in other cases it has been.
It also -- you know, again, my recollection in the Vivendi case is that there was all sorts of internal e-mails describing their internal appreciation of the liquidity crisis there, and my recollection is that was useful in determining the graduation in that particular case over time.
Q. Graduation of inflation?
A. Yeah.
Q. Can you explain "confounding information" in the context of your last couple of answers? I mean, what do you mean by that?
A. As we discussed earlier, primarily company-specific, nonfraud-related information disclosed contemporaneously with the fraud-related information on the corrective event dates.
Q. If there's confounding -- so if you have a single disclosure and there's confounding information included, so information on two topics, one is fraudulent, one is not. How does that impact your ability to incorporate that disclosure into an

Page 148

event study?
A. As I've described a few times today, that's why you go in and -- first you run the regression analysis, which nets out the market and industry effects and leaves you just with the estimated company-specific portion of the decline.
And in Kinross, for instance, we talked about earlier, we and went in and said, "Okay. Well, of the ten mines, only one is at issue." And lists -- there's like, you know, six, seven of them. They're buying these things on a mine-by-mine basis.
On average, they attribute 30 percent of the decline to the fraud mine, let's say. That gave me a basis for disentanglement on fraud-related information on that day, which was all the other mines that just had a poor quarter; right?
In other cases there's like an earnings disclosure, and the company, which I can't name right now, but the issue was there's a few divisions; right? There's operations in Europe. There's operations in the U.S. And within the U.S., there's two different types of products. One of those products is at issue. Well, how much of that quarter's shortfall was due to the fraud-related product?

Page 149

That's -- so I got discovery evidence, went in, and said, "Okay, I know exactly what the company is attributing to this particular product's shortfall." And that helped me disentangle the portion of the decline due to the fraud. And it's very case-specific, so it's dependent on what was announced and what discovery evidence shows usually.
Q. Is it always feasible? I mean, is there ever a situation where you're unable to disentangle confounding information from fraudulent information?
A. I'm sure it's possible. It's not possible.
Q. Is it something that you've ever run across in your experience?
A. I've come across days in my -- event dates where there's so much going on that it didn't seem possible or that so much of the decline was due to nonfraud-related reasons that it wasn't -- that I didn't feel like I could come to an opinion on loss causation on that date and in turn disentangle.
So I've encountered those scenarios.
Q. Separate from loss causation, does it -- does that also impact the inflation analysis, the ability to attribute inflation on a particular day?
MR. KILLORIN: Objection. Form.
THE WITNESS: Yeah, it's obviously harder

Page 150

on certain days. And what I said right after I said loss causation was also the ability to disentangle the portion of the decline, which I meant to be related to damages and price inflation.
MR. BARNICKOL:
Q. Okay.
A. But it's not that it's impossible. It's just a matter of certain cases are easier to demonstrate than others, I think, is the way I put it.
Q. Is it possible to have so many confounding variables affecting the inflation during the course of a class period that your equation just becomes too complicated, too unwieldy, to apply in a universal fashion?
MR. KILLORIN: Objection to form.
THE WITNESS: No, I don't think so. I think the event study is very robust to separating out competing impacts to a stock price decline or price increase. So, no, I wouldn't say that it -- and it never changes the ability of that methodology to be commonly employed. It's just a matter of whether, you know, on a given day you have a more accurate or less accurate estimate of the fraud-related component, but that still -- whatever

Page 151

your estimate is, is going to equally apply across all investors.
BY MR. BARNICKOL:
Q. Is it still possible to create a common damages model that is commonly -- that is consistent with the plaintiffs' theory of damages generally, not in this case, where there is a mismatch between what the misrepresentation is and what the corrective disclosure is?
MR. KILLORIN: Objection to form.
THE WITNESS: I know you're trying to tie in Goldman Sachs, but I don't --
BY MR. BARNICKOL:
Q. Because I used the words "information mismatch"?
A. Yes. Can you repeat the question? Because I got a little lost there in the middle of it.
MR. BARNICKOL: Yeah. I think I would rather just have -- would you mind reading the question back.
(Record read as follows: "Is it still possible to create a common damages model that is commonly -- that is consistent with the plaintiffs' theory of damages generally, not in this case, where there

Page 152

is a mismatch between what the misrepresentation is and what the corrective disclosure is?")
THE WITNESS: What do you mean by "mismatch"?
BY MR. BARNICKOL:
Q. Let me ask you this: If the alleged misrepresentation does not involve the same event, the same issue, as the corrective disclosure, is it possible to have a damages model that's still consistent with the theory of liability?
MR. KILLORIN: Objection to form.
THE WITNESS: The same event?
BY MR. BARNICKOL:
Q. Yeah.
A. What do you mean --
Q. All right. Let me use this case.
Is it possible to have a common theory, a common damages theory, that's consistent with the theory of liability if the alleged misrepresentation relates to like, say, the corporate social responsibility, compliance with corporate social responsibility initiatives, and the corrective disclosure is the license was suspended?
MR. KILLORIN: Objection. Form.

Page 153

BY MR. BARNICKOL:
Q. Those are not the same topic.
A. They are. They're relating to the same underlying root cause, same subject matters.
Q. Accept for a second that there isn't a direct relationship. Could you still create a damages model that would work?
MR. KILLORIN: Object to form.
THE WITNESS: So, I mean, that -- my understanding of loss causation is that the -- what the subject matter of the alleged misrepresentations and omissions needs to be what caused the ultimate underlying or ultimate actual losses.
Similarly, in I think the same way -- a different way of saying it is the actual losses and the cause of those actual losses are connected with the alleged misstatements and omissions.
So if you're asking -- which it sounds like you are -- that the alleged misstatements and omissions are just totally on a different subject totally and there's no possible way you could construe the two, and they don't have the same underlying phenomena or relate in any way to the corrective information disclosed later on, and I mean in any way, then, yeah, I wouldn't say there's

Page 154

loss causation. I wouldn't say there are damages. But I think it's important to be careful with that exercise and analysis of the causal connection between the two.
BY MR. BARNICKOL:
Q. If you were asked to develop a damages methodology for this case, what would it be?
MR. KILLORIN: Calls for speculation.
THE WITNESS: I don't know. I haven't been asked to do it. But I've done it in a lot of cases, and I've used the event-study methodology, and the way you value information as a financial economist in these cases involve the effect of information on security prices.
So it's been upheld in all sorts of courts and federal and state and circuit appeals level, Supreme Court even. So I would probably use the event-study methodology.
BY MR. BARNICKOL:
Q. What other --
A. As I described in my report.
Q. What other methodologies would be available options?
A. That would be the one I would try first, and that's the one I'm proposing here based on

Page 155

plaintiffs' theory of liability.
But, you know, in the abstract, there's -- fundamental evaluation can be done in a few different ways, you know. There's -- looking at discounted cash flow models might be a way to do it. You do that in other cases with intellectual property and stuff. So maybe that would. The event study is the way to go.
Q. How do you do the discounted cash flow methodology? What does that entail?
A. It's forecasting cash flows, basically profits, up to a point in time and then having a terminal value that captures forever, you know, those future cash flows in perpetuity and discounting them back to present day.
That's not how I think you should do it by default, but if there's -- you asked me if there are other ways to do it and that conceptually could capture it because that's how you value things kind of at the most basic level, theoretically.
Q. In what way does the event-study methodology take into consideration broader industry factors, broader industry changes in stock price? How does the event-study methodology incorporate that? Or does it?

Page 156

A. Oh, yeah. That's why it's so popular and it's really foundational in econometrics. It's super robust to market industry effects, market and industry effects, and really any company-specific information as well because in an efficient market, all those industry-related news and conditions that you're describing that are asked in your question are being priced in the stock. So if you have a downturn in the industry, you're going to see a stock's price go down and capture that worst industry state of affairs.

And then on the date of issue, the event that you're studying, you're going to be honed in on it, maybe the day or two days, you know, but it's still a pretty tight window around the event.

And so you're going to see a price decline, but we've got the regression analysis which has been used by academics for decades as a reliable scientific method for controlling for the market and industry dynamics that are unfolding during the event window.

So the event study is very good at controlling for the industry effects, as you asked.

Q. What about in the context of Tahoe Resources where the product is a commodity --

Page 157

commodities that have a very specific value at any given time? Does the event-study methodology control for changes in the price of the commodities coming out of the mine?

MR. KILLORIN: Objection to form.

THE WITNESS: Yes.

BY MR. BARNICKOL:

Q. How?

A. The industry index is other mining companies. Indeed, in this case it's the peer set that Tahoe Resources selected.

And so mining companies, they really are strongly driven by the underlying metals that they're producing.

Q. So is it fair, then, to say that you control for changes in the commodity value by virtue of the -- just by virtue of the price movements of the peer group firms?

MR. KILLORIN: Objection to form.

THE WITNESS: Yes.

BY MR. BARNICKOL:

Q. How does that account for fundamental differences in like, for example, cost of production? So you could have multiple peer group firms that all have variable costs of production and

Page 158

so the -- I don't know whether there's a fair correlation between the commodity value and the stock price of peer group firms. Is there?

A. Is there a fair correlation?

Q. Yeah.

A. For sure. They're very tightly correlated with the underlying metals, and in those effects you're talking about, like true industry effects on the cost of production that are affecting everybody in the industry, that's reflected in the industry index.

Q. How big of an industry index do you have to have to have a fair sample size? Is there any literature on what you need in order to have a fair sample size?

A. No. It's really more an empirical issue. And here I've got 16 companies named by Tahoe Resources as being their peer groups. And the R-squared or adjusted R-squared measures in my regression are all very strong.

So it fits Tahoe Resources' daily returns very well, as I would expect, given my experience valuing -- or economically analyzing mining firms like Tahoe Resources.

Q. So in this case, if you were to develop a

Page 159

damages model, you would use that list of the Tahoe-identified peer group firms?

MR. KILLORIN: Objection. Calls for speculation. I'm not sure it fairly characterizes prior testimony.

THE WITNESS: I probably would consider this index strongly or quite a bit.

BY MR. BARNICKOL:

Q. Any other index or any other group of companies that you would consider?

A. I considered, as I state in my Appendix A, companies in the -- let me find out the exact spot.

I considered companies identified as industry competitors and analyst reports published during the class period, also companies identified by the Bloomberg Industry Classification System as operating primarily in the precious metal mining industry, and also companies identified as peers in Tahoe's SEC filings issued during the class period. And that's ultimately what I went with.

Q. Mechanically, using the methodology we've been discussing, how do you -- on a very micro level, how do you calculate the daily inflation on any particular day in the class period?

MR. KILLORIN: Karl, you mean in the

Page 160

event-study methodology?
MR. BARNICKOL: Yes.
THE WITNESS: So back to damages?
BY MR. BARNICKOL:
Q. Yeah. Back to damages.
A. So the event study -- I'm sorry, the regression is a starting point. It's a natural starting point. It gives you an estimate of the company-specific returns or price changes on the --
(Stenographer interrupted for clarification of the record.)
THE WITNESS: Company-specific returns or price changes on the alleged corrective events or event dates. And that's thea starting point.
And depending on plaintiffs' theory of liability and what they intend to prove, it could easily be the measure of inflation throughout the entire class period, which I have opined on a number of times.
BY MR. BARNICKOL:
Q. And how do you then apply that to a class member to determine what the individual class member's damages are?
A. Oh, as described in my report, it's through their trading records and, you know, when did they

Page 161

buy and when did they sell?
So if they bought at a point where price inflation was $10 and held all the way through until price inflation was zero, they'd get $10 per share in inflation or in damages per share.
Q. Does it matter what happens to the stock price after the corrective disclosure and before they sell a stock?
A. So there's the 90-day look back constraints that I describe in my report, which are, I think, required under the Private Securities Litigation Reform Act of 1995, if I remember correctly. And that limits damages effectively to the purchase price less the average price during the 90-day period subsequent to the class period, and there's a few more wrinkles to it. That's effectively what it does.
Q. And I just want to make sure that I'm clear on this. Sitting here today, you don't have an opinion one way or another as to the way that you would measure damages with respect to this class period; right?
A. I haven't implemented the event-study methodology that I've described here at all, but I think that it's perfectly suitable to estimate

Page 162

damages under plaintiffs' theory of liability as I understand it here today.
MR. BARNICKOL: I want to take a quick break.
MR. KILLORIN: Okay. That's good.
THE VIDEOGRAPHER: We are off the record at 2:44 p.m.
(Recess taken from 2:44 to 3:04.)
THE VIDEOGRAPHER: We are back on the record at 3:04 p.m.
BY MR. BARNICKOL:
Q. Having read the allegations that the plaintiffs have made in their complaint, what else would you need to know to determine whether their theory of liability involves a constant or a variable rate of inflation?
MR. KILLORIN: Objection to form.
THE WITNESS: What else would I need?
BY MR. BARNICKOL:
Q. Yeah.
A. Outside of the complaint?
Q. Yeah.
A. Nothing really. I mean, the complaint is as it stands, and the Court has, you know, sustained most of those allegations through the motion to

Page 163

dismiss order -- or hearing.
But, you know, there's a discovery process that will -- might change -- you know, these types of cases, discovery can cause the allegations to evolve or change slightly. So that's just something that I keep in mind as the case progresses and will ultimately inform the measure of damages.
Q. But sitting here today, you don't have an opinion as to whether the plaintiffs' theory of liability is consistent with a constant rate of inflation during the class period or a variable rate of inflation during the class period?
A. I haven't -- I haven't done the analysis. I focused on -- as far as damages are concerned, whether the event-study methodology that I've employed numerous times, and other experts have, is amenable to estimating damages under this type of theory.
Here I believe it's a price-maintenance theory, as we've discussed. Materialization of the risk, issues, and theories. Yeah. I mean, that study method, which can result, as implemented, in a constant band of inflation or a variable rate of inflation, is suitable to estimate damages in a method common to the class.

Page 164

Q. Based on your understanding of the allegations in the complaint, is the plaintiffs' theory of liability that it was a certainty that the Escobal license was going to be suspended during the class period?
MR. KILLORIN: Objection to form.
THE WITNESS: It's a matter -- I think those are allegations. I think that could be implied from the allegations.
BY MR. BARNICKOL:
Q. But is that what --
A. I think that's ultimately something that the plaintiffs are trying to prove through evidence, and ultimately will be weighed by the Court and trier of fact, I guess. So --
Q. Is that what they're alleging?
A. They're alleging, as the complaint states, misstatements and omissions that concealed the true risk of the suspension of the license.
Given what's alleged, it seems like it would almost imply that the license would be suspended given the actions alleged in the complaint. But that's not something I've focused on now. I'm giving you my description of the complaint and, ultimately, it might change depending on what's

Page 165

discovered through that process, the discovery process, that is.
Q. Right. I understand that. But in terms of their theory right now, is the theory that it was certain that the license was going to get suspended or is the theory that it was possible that the license would get suspended and then, in fact, it did?
MR. KILLORIN: Objection to form.
THE WITNESS: I can't speak for plaintiffs. The way I read the complaint is that it's virtually certain to get suspended by virtue of the actions alleged.
BY MR. BARNICKOL:
Q. If their theory was that it wasn't certain, if their theory was that there was a risk that the license would get suspended but it wasn't a certainty, how would you deal with the materialization of the risk in calculating damages?
MR. KILLORIN: Objection. Calls for speculation.
MR. BARNICKOL: It only calls for speculation if he has to speculate to create a damages model.
THE WITNESS: Was that a shot at me? I

Page 166

think it was.
MR. BARNICKOL: No.
MR. KILLORIN: You mean the damage model you're speculating he might create someday?
MR. BARNICKOL: That's fair.
THE WITNESS: Okay. I haven't performed the analysis to date, so I proposed a general framework which has been perfectly acceptable in these types of settings before and in federal courts.
That's really my only opinion, is that their theory of liability I think can -- is amenable to the estimation of damages using the event-study methodology, which is commonly applied or employed across the class.
BY MR. BARNICKOL:
Q. Have you ever had occasion to deal with materialization of something that was an uncertain risk during the class period?
A. It was certain. Certainly a risk in all the cases I've done. You know, there was distinct -- or at least as alleged --
Q. Right. As alleged.
A. -- concealment of material risks, not maybe risks, but definite risks.

Page 167

Q. As you sit here today, do you have a methodology that you could use that would address damages in the context where you had materialization of something that wasn't a certainty -- a materialization of a risk that wasn't alleged to have been a certainty?
MR. KILLORIN: I'm sorry. Could you say the last words?
MR. BARNICKOL: That wasn't alleged to have been a certainty.
THE WITNESS: My understanding is that there's no requirement that the materialization of a risk that has actually occurred in real life needs to have been foreseeable with 100 percent probability.
So it's my understanding, and my opinions I think are consistent with the notion that materializations of risk and the foreseeable consequences of those events as far as the price declines, attendant price declines are concerned, are demonstrative of loss causation and reflect the actual losses and the actual inflation created by the misrepresentations and omissions that allegedly prevented investors from appreciating the risks that caused those later losses.

BY MR. BARNICKOL:
Q. Does it change how you do the damages model, though?
MR. KILLORIN: Objection to form.
THE WITNESS: You just want to be careful. Everything is context-specific. So I want to -- I have theories and complaints and everything needs to be carefully considered -- and discovery evidence later on.
So it's not something that there's a general rule, but as far as the foreseeability being perfect or certain, I don't -- it's not my understanding that that's a requirement in order for price declines to be -- price declines that are caused by the same subject matter as the alleged misstatements of omissions to be reflective of damages.
BY MR. BARNICKOL:
Q. Right. I got all that. I'm just saying, does it require you to adjust the model?
A. Not necessarily. Nothing comes to mind, but I just want to make sure that everyone understands that this is something that needs to be carefully considered on a case-by-case basis, and that's why we do it on a case-by-case basis.



There's no hard rule here. It's a matter of appreciating all that's alleged, all that can be proven, and what the facts are in the market as these events are unfolding.
Q. If you have a situation where you concluded that a variable inflation model was appropriate, how do you calculate the inflation on a particular day in the class period?
I think I understand how you would calculate it for a constant rate of inflation. How do you calculate a variable inflation on a particular day in a class period?
MR. KILLORIN: Object to form.
THE WITNESS: We talked about this earlier. First of all, that class certification I think it's well-determined that estimates of price inflation are not required nor is an analysis of time --
(Stenographer interrupted for clarification of the record.)
THE WITNESS: An analysis of time-varying inflation required. I mean, my understanding is that's pretty well settled.
The implementation of the time-varying inflation band, as I've discussed earlier, can be appropriate, depending on the theory of liability.



And I talked about the scienter arguments earlier, and in that case, there were a number of measures for the graduation that were assessed to be correlated with the increase in knowledge and awareness of the fraud by defendants.
Ultimately what was chosen as the most conservative measure was, I think, the cumulative amount of purchase-accounting adjustments that needed to be required over the class period, up until the point at which the CEO and CFO got together and sent e-mails to each other that said, basically, "We know exactly what's going on. It's a disaster, and it's only a matter of time before we get" -- you know, "the wheels fall off the bus."
And at that point inflation was determined to be 100 percent and then was constant and then came out with the alleged corrective events. That was a result of the way the plaintiffs had pled the case, is my understanding.
BY MR. BARNICKOL:
Q. Right. No. I got it. I'm trying to figure out quantifying it. How do you calculate, how do you quantify it? I think I heard you say it's just an estimate that you have to build off of a number of different factors.



But I'm not trying to put words in your mouth. How do you quantify it?
A. Well, I just gave you an example of a case in which it was done depending on, A, the theory of liability, the level of scienter depending on discovery evidence, and then under the assumption that the accounting fraud grew over time and as it got worse, they became more aware of the ramifications and the liability.
So in that case it was dependent on those factors.
Q. But I guess I'm trying to understand, like, how do you put numbers on that?
A. I get the purchase accounting. So it's a percentage -- it cumulates over time. So it grows.
Say you do $100 of fraudulent accounting in the first month, then it grows to 200, then to 300, to 400, and so it grows until it gets to $1,000. So it's growing by 10 percent, as an example, based on the level of accounting fraud in that case.
But, realizing 100 percent inflation, which would reflect the complete price decline on the corrective event dates at the point where discovery evidence strongly implied complete liability, a complete understanding of the problem.

And it's going to be -- and that's not always required. I don't think I've ever opined on a time-varying inflation band because, in my opinion, the plaintiffs' theories of liability have not required it.
I mean, it changes depending on how many corrective events are there, but not this graduation technique that I'm describing now. That, I think, is a relatively rare occurrence. And it's the product of how the case evolves over time.
Q. Okay. Are you aware that there is a class-action lawsuit against Tahoe pending in Canada?
A. I heard that.
Q. Do you know anything about the allegations in that case?
A. Not -- I mean, I think it's similar events, but that's about it.
Q. Do you know what the alleged class period is in that case?
A. I think a shorter class period.
Q. Like?
A. I don't really know. I haven't read the complaint.
Q. Do you know -- do you know if the plaintiff



in that case has submitted an expert report similar to yours from an economist opining on the suitability of class treatment in Canada?
A. I don't know that, but it wouldn't surprise me.
Q. Would it be relevant to your own report to read the report of a similarly situated expert in the Canadian case?
A. No. I don't normally look at the opinions of other experts at this phase at all.
Q. Have you dealt with other cases where there were parallel cross-border cases, parallel cross-border claims, against the same defendant?
A. Yes.
Q. Can you give me an example? Again, where you have a report on file and it's public.
A. Yeah. I think it's public. A case against Maxar we talked about earlier, I think. That's one of the cases that also had a dual listing in Canada. And I was informed at my last deposition, about a month ago, that there was this Canadian lawsuit.
Q. Did you review the plaintiff expert -- the Canadian plaintiffs' expert report in Maxar?
A. No.
Q. Can you foresee any reason why your



opinions would change in this case based on what another expert said about these allegations in Canada?
MR. KILLORIN: Objection. Calls for speculation. Irrelevant.
THE WITNESS: No. Definitely not.
BY MR. BARNICKOL:
Q. If a plaintiff -- sorry.
If a class -- the Canadian case, if it was certified, would involve both U.S. and Canadian investors.
MR. KILLORIN: Objection to counsel testifying.
MR. BARNICKOL: Okay. I'm still in the middle of asking my question.
MR. KILLORIN: Okay. All right. Good save.
BY MR. BARNICKOL:
Q. The Canadian case involves both Canadian -- prospectively trying to get certification of a class of both Canadian and U.S. purchasers.
Does it affect your ability to come up with a common damages model that's consistent with the plaintiffs' theory of liability in this case that certain class members in this case, if it were



certified, would also be class members in the Canadian case?
MR. KILLORIN: Objection. Calls for speculation. Assumes facts not in evidence. And calls for a legal opinion.
THE WITNESS: I don't think the other case affects my opinion -- my opinions at all.
BY MR. BARNICKOL:
Q. Does it affect your ability to craft the methodology that works?
A. No.
MR. KILLORIN: Same objection.
THE WITNESS: No, it doesn't. So the methodology would estimate per-share damages based on price changes in U.S. markets.
And then through the claims process, for whatever investors have eligible, valid claims, I'm assuming there would be no -- there would be a control by the Court -- but maybe not, I don't know -- for, you know, double-dipping effectively in the two class actions.
But that's not for me. I have no opinion on those issues. All I would be supplying is the damages estimation methodology on a per-share basis and whatever exclusions to a control for a Canadian

Page 176

action would need to be determined by the Court.
MR. BARNICKOL: Okay. Dr. Nye, that's all I've got for you right now. I'll see what your counsel wants to do.
MR. KILLORIN: I want to adjourn.
MR. BARNICKOL: All right. Go off the record.
THE VIDEOGRAPHER: This is the end of this video deposition of Zachary Nye, PhD, on August 4th, 2021.
We are off the record at 3:23 p.m.
(Discussion off the record.)
THE STENOGRAPHER: Mr. Killorin, do you need an e-mailed rough?
MR. KILLORIN: Rough.
THE STENOGRAPHER: And how about delivery of the final?
MR. KILLORIN: Regular delivery, I believe. And we will read and sign.
(The deposition concluded at 3:25 p.m.)
---oOo---

STENOGRAPHER'S CERTIFICATE

I, LORRIE L. MARCHANT, Certified Shorthand Reporter, Certificate No. 10523, for the State of California, hereby certify that ZACHARY NYE, PhD, was by me duly sworn/affirmed to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported to the best of my ability by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed under my direction into typewriting by computer; that request [ X ] was [ ] was not made to read and correct said deposition.

I further certify that I am not interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of August, 2021.

LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
Stenographic Certified Shorthand Reporter #10523

- - -

ERRATA SHEET

- - -

PAGE LINE CHANGE

ACKNOWLEDGMENT OF DEPONENT

I, ____________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

__________ ____________________________
Date Signature

Subscribed and sworn to before me this ____ day of

____________________, 20__.

My commission expires:______________________

________________________________
Notary Public

**WORD INDEX**


**< $ >**
**$1,000** 171:18
**$10** 76:3, 22 161:3, 4
**$100** 76:22, 25 171:16
**$385** 32:1
**$900** 32:25

**< 1 >**
**1** 108:17 109:9 110:8
**1:13** 131:9, 10
**10** 33:2, 14 171:19
**10(b** 35:19 66:8 82:20 141:18
**10:28** 43:12, 13
**10:43** 43:13, 15
**100** 75:24, 25 76:2, 11 79:1 167:14 170:16 171:21
**10017** 2:8
**102** 110:5
**103** 110:5
**10523** 1:21 177:3, 25
**11** 82:15
**11:00** 78:12
**11:35** 78:9, 10
**11318** 1:22
**12** 82:15 125:5
**12:00** 78:10, 14
**13** 12:13
**14** 82:16
**15** 35:14
**16** 22:24 37:8 158:17
**1700** 2:13
**19-0458** 1:22
**1981** 7:18
**1995** 161:12
**1st** 25:21

**< 2 >**
**2** 48:1 108:17 121:13
**2:00** 131:12
**2:01** 131:10
**2:17-cv-01868-RFB-NJK** 1:5
**2:44** 162:7, 8
**20** 140:15 179:19
**200** 171:17
**2004** 8:10
**2009** 8:16 10:25 12:15 32:1
**2012** 12:13, 16 13:24 22:12
**2013** 12:16
**2014** 35:14 109:25
**2014/15** 37:7
**2015** 22:24 25:13 109:19 110:1, 9 135:14 136:1
**2016** 135:18 136:1
**2017** 67:13 70:24 71:11 74:5, 19, 20 81:6
**2020** 22:2
**2021** 1:12 4:1, 13 21:21, 25 22:13 40:24 176:10 177:21
**212** 2:9
**24th** 74:4, 20
**25** 123:20 134:18
**26th** 4:12

**< 3 >**
**3** 125:7
**3:04** 162:8, 10
**3:23** 176:11
**3:25** 176:20
**30** 67:14 68:2, 7, 14, 16, 24 134:18 138:11, 13 148:12
**300** 171:17
**30342** 2:6
**3318** 1:21
**37** 83:14
**3975** 2:5

**< 4 >**
**4** 1:12 3:8 4:1 109:11 110:3 125:8
**400** 33:21 34:1 171:18
**404** 2:6
**405-8202** 2:14
**425** 4:12
**4A** 110:15
**4B** 110:15, 16
**4th** 4:13 176:9

**< 5 >**
**5** 3:4 30:12
**50** 15:18 68:24
**500** 32:2 49:3
**583** 120:8
**5A** 120:23, 24
**5th** 74:19 102:7

**< 6 >**
**600** 123:20
**60602** 2:14
**685** 2:8
**69** 83:19
**6th** 177:21

**< 7 >**
**7** 83:14
**70** 3:8 4:5 83:13 84:11 93:11
**700** 32:2
**709** 110:5
**71** 84:25
**750** 34:2
**773** 2:14

**< 8 >**
**80** 94:23 96:3
**847-0617** 2:6

**< 9 >**
**9:34** 4:3, 18
**90** 76:2 77:1
**900** 31:19 32:2 33:8
**90-day** 161:9, 14
**9119** 1:24
**983-9330** 2:9

**< A >**
**a.m** 4:3, 18 43:12, 15 78:9
**ability** 51:12 94:9 100:20 118:14 135:24 147:25 149:23 150:2, 21 174:22 175:9 177:10
**able** 116:20 126:6
**absorbing** 113:2 123:6
**abstract** 142:1, 6 155:2
**academic** 10:2 30:21, 22 103:5 115:8, 11, 15
**academics** 106:4 156:18
**accept** 45:22 153:5
**acceptable** 87:24 140:16 166:8
**accepted** 9:24 79:13
**Accepting** 103:15
**access** 126:20 128:13, 14 129:24 130:11, 13
**accomplish** 14:14 73:14
**account** 157:22
**accounting** 9:4 34:20 35:25 37:15 61:18 91:6 171:7, 14, 16, 20
**accurate** 150:24
**accurately** 79:1 136:8
**achieve** 127:12
**acknowledge** 53:18 103:5
**acknowledged** 100:15
**ACKNOWLEDGMENT** 179:1
**acquired** 135:14, 18
**acquisition** 136:20 138:7
**Act** 161:12
**action** 5:3 54:3 176:1 177:17, 18
**actionability** 78:4
**actionable** 29:4 80:21 88:13
**Actions** 1:6 20:25 87:14 89:13 164:22 165:12 175:21
**actively** 57:23 60:17 73:8 100:19 101:24 111:25
**acts** 58:1

**actual** 46:3 77:5 91:16 96:21 136:13 145:2, 3 153:13, 15, 16 167:22
**adapt** 88:4
**add** 33:13
**adding** 84:23
**addition** 6:8 10:17 29:16 130:17
**additional** 29:18, 21 86:10, 16
**address** 167:2
**addressed** 83:9
**addresses** 85:16
**adequacy** 48:12
**adequately** 125:1, 2
**adjourn** 176:5
**adjust** 118:20 168:20
**adjusted** 139:19 158:19
**adjustments** 90:15 170:8
**adjusts** 127:4
**admissions** 93:17, 18
**advantage** 112:2 113:17
**aerospace** 27:6
**affairs** 156:11
**affect** 50:4, 13, 20, 22 63:12 70:14 89:3 94:9, 24 122:4, 5 144:6 174:22 175:9
**affirmative** 90:2
**affirmatively** 59:19 61:5
**Africa** 35:9 36:11
**aggregating** 112:12
**ago** 25:12 36:15, 18 39:17 43:5 108:1 110:6 140:15 173:21
**agree** 102:13 117:19 119:10
**agreement** 41:24, 25 42:4
**agreements** 18:21
**alert** 126:5
**algorithmic** 126:4
**allegation** 44:15 64:4 66:15, 16 91:12 98:19 99:9
**allegations** 27:16 29:6 35:16 36:7 37:4, 10, 14 38:20, 25 41:2, 20, 22 42:13 43:1 44:16 45:4, 15, 21, 23, 24 47:14 56:15, 25 61:16, 25 62:20, 25 65:16 72:2 75:7 80:13, 22 81:4 88:6 101:12 137:4 142:17 143:11 162:12, 25 163:4 164:2, 8, 9 172:15 174:2
**allege** 44:20 47:10 64:6 73:3 75:2 98:5
**alleged** 35:19, 22 36:1, 4 39:7, 23 44:23 45:7 46:4, 6 56:19 57:19 61:1, 18 63:10, 17 66:22 70:9, 18 73:14, 19 74:5, 18, 24 75:14 77:25 81:2, 6 83:18 84:24 85:19 93:1 96:19 99:20 132:21, 23 133:8 137:11 140:10 144:1 152:7, 20 153:11, 17, 19 160:13 164:20, 22 165:13 166:22, 23 167:5, 9 168:15 169:2 170:17 172:19
**allegedly** 16:14 58:6 62:1 65:9 72:13 94:2 132:7 167:23
**alleges** 57:16 67:11 70:23
**alleging** 60:5 98:1 164:16, 17
**Allergan** 19:21
**alley** 16:3
**all-influencing** 113:1
**all-or-nothing** 91:3
**allow** 90:15
**allows** 42:1
**Alto** 25:2 138:8
**altogether** 41:15
**amay@nge.com** 2:15
**Ambiguous** 48:14, 22 52:5 58:24 62:22 64:19 65:12 66:17 75:15 102:16 145:23
**amenable** 163:17 166:12
**America** 36:24, 25
**American** 120:25 121:3
**amount** 51:3 77:4 141:21 142:18 143:14 170:8
**analyses** 78:23 86:16 106:3, 15 139:18
**analysis** 13:9 23:25 24:3 26:3 27:4, 9 30:18 31:10 38:21 40:18 42:8 43:20 44:17 46:12 47:20 49:17 50:13, 19 61:24 62:17, 20 63:1, 16 64:2 79:15, 16, 17 80:5 81:22 82:21 86:15 110:2 113:6, 12 117:13 118:10, 18 123:2, 24 131:25 132:1 134:1 136:16 139:24 140:14 146:9, 12 148:4 149:22 154:3 156:17 163:13 166:7 169:17, 20
**analyst** 13:11 26:11, 13 30:15 38:15 45:2, 20 79:17, 20 94:21 96:2, 6, 12 120:11, 19 121:8, 14 122:1, 3, 23 130:4, 6 159:14
**analysts** 26:15 33:25 119:23, 24, 25 120:21, 24 122:20 123:20 124:20, 25 133:20 134:8
**analyst's** 122:5
**analytical** 51:17, 20, 21
**analyze** 38:14 121:18 129:8
**analyzed** 30:12 53:10 107:2, 8 138:16 142:22
**analyzing** 79:23 85:2 108:16 115:2, 17 116:22 117:4 127:11 146:1 158:23
**and/or** 64:5 78:4 84:7, 20 85:3, 13
**ANDREW** 2:13 5:1
**anew** 78:25
**announced** 149:7
**announcement** 90:9
**annual** 32:4
**answer** 6:3, 11, 14 31:8 33:4 85:14 91:22 114:4
**answered** 23:4 31:13 72:24 76:9 98:11 101:13 145:24
**answering** 6:2
**answers** 6:9, 23, 24 147:15 179:5
**anybody** 109:8 120:16 121:17 128:14
**anymore** 12:21
**anyway** 38:5 120:7
**appeal** 29:11
**appeals** 154:16
**appear** 5:24 81:7
**appearances** 4:19
**Appearing** 2:3, 11
**appears** 147:1
**appellate** 89:14
**Appendix** 159:11
**applicable** 84:2 87:8, 25
**application** 82:25 102:3
**applications** 134:25
**applied** 8:12 9:22 50:21 70:12 87:22 110:23 142:14 166:14
**applies** 86:24
**apply** 87:7 142:17 146:8 150:14 151:1 160:21
**appreciate** 95:13 114:10
**appreciated** 55:13 63:20, 24 90:4
**appreciating** 80:22 147:3 167:24 169:2

**appreciation** 26:8 147:9
**approach** 133:22 137:24
**appropriate** 109:3 112:14 143:8 169:6, 25
**appropriately** 119:21
**approval** 92:25
**approved** 100:22
**approximately** 12:11 110:9
**arbitrage** 111:8, 23
**arbitrageurs** 111:16
**area** 57:11, 22 65:17 72:13, 17, 18
**argument** 67:8
**arguments** 170:1
**arrangements** 32:20
**arrives** 77:23
**arriving** 70:5
**articles** 13:11 30:11, 21, 22 31:3, 14 123:1
**Ashanti** 36:17
**aside** 23:8
**asked** 7:8 14:17 20:18 23:3 25:5 39:12 40:8 42:9 48:2 49:19 56:9 61:15 72:23 75:19 83:4, 23 87:2, 10 97:14 98:10 131:14 132:2 142:23 143:2 145:18 146:1 154:6, 10 155:17 156:7, 23
**asking** 6:2 62:6 70:13 92:16, 19, 20 101:9 118:22 153:18 174:15
**aspects** 80:8 126:21
**assess** 16:16 23:13 38:22 40:8 45:21 46:13 48:2, 4 87:2 118:9 144:20, 23
**assessed** 170:3
**assessing** 24:13 66:14 105:17 118:13
**assessment** 39:23 46:8 47:2 134:13
**asset** 133:21 134:23 135:3, 4, 8, 9 137:7, 24 138:12 139:1
**assets** 133:6 136:21 137:20, 24 139:4
**assist** 13:4
**assistant** 11:6
**assisting** 33:12
**associated** 49:9 50:3, 12 53:7 64:12 65:23 119:3 145:4
**associates** 132:13
**assume** 24:13 134:7
**assumes** 29:5 62:2 175:4
**assuming** 21:8 88:11 175:18
**assumption** 171:6
**assumptions** 47:19
**Atlanta** 2:6
**attached** 29:18 179:8
**attendant** 167:20
**attributable** 97:8 102:8 134:16
**attribute** 148:12 149:23
**attributing** 149:3
**August** 1:12 4:1, 13 67:15, 20 71:6 74:4, 20 81:6 176:9 177:21
**availability** 122:19
**available** 30:20 49:25 105:11 120:13, 15 122:2, 4, 24 123:25 125:3 127:23 128:1, 10, 15, 18 130:3 146:4 154:22
**Avenue** 2:8
**average** 108:13, 20, 22 109:4 113:11 115:18 116:5 119:20 148:12 161:14
**aversion** 95:14
**aware** 23:24 72:8, 10, 12 135:16, 20 171:8 172:11
**awareness** 170:5
**a-year** 38:1

**< B >**
**back** 7:18 8:15 32:1 34:20 43:14 71:5 74:11 78:11 88:9 107:13 113:8 128:13 131:11 143:5 151:20 155:15 160:3, 5 161:9 162:9
**bad** 69:2 146:20
**balance** 135:24
**balanced** 22:17
**ball** 120:2
**ballpark** 28:12
**band** 141:6 143:24 163:23 169:24 172:3
**bank** 37:13
**banker** 9:9
**Barclays** 105:3
**BARNICKOL** 2:12 3:4 4:24, 25 5:8 17:19, 24 23:7 24:5 27:15 43:3, 9, 16 48:16 49:1, 11 50:9, 11 52:6 58:25 59:4, 8, 11, 15, 20, 24 62:6, 10, 14, 15 63:11 65:2 66:9 67:1 73:5 75:21 76:19 77:21 78:6, 15 82:5 90:20 92:1, 6, 18 93:5, 24 94:4 97:6, 19 98:16, 23 99:1, 4, 18 100:1, 2, 6, 8 101:6 102:23 110:16 111:12 113:21 116:23 117:14 124:2 128:24 129:22 130:24 131:2, 6, 13 136:24 138:21 142:2, 5 143:3 146:6 150:5 151:3, 13, 18 152:6, 14 153:1 154:5, 19 157:7, 21 159:8 160:2, 4, 20 162:3, 11, 19 164:10 165:14, 22 166:2, 5, 16 167:9 168:1, 18 170:20 174:7, 14, 18 175:8 176:2, 6
**based** 32:23 34:7, 23 49:25 57:18 60:2 61:11 68:14 88:9 90:16 103:12 104:23 108:23 113:16 118:9 121:11, 13 138:23 144:9, 23 145:12 154:25 164:1 171:19 174:1 175:14
**basic** 14:4 66:12 155:20
**basically** 37:11, 12 109:23 118:3 126:6 155:11 170:12
**basis** 17:5 32:4 33:14 54:16, 17 76:24 83:21 85:1 106:9 125:15 128:1, 2 129:5 134:6, 14 142:11 148:11, 14 168:24, 25 175:24
**Bear** 110:12
**beat** 126:17 127:3
**beauty** 95:4
**began** 7:21 140:18
**beginning** 7:9 21:20 105:24 134:22 135:11
**behalf** 2:3, 11 122:12, 17
**belief** 98:18 99:8
**believe** 17:23 28:25 29:23 37:17 43:2 67:3 80:2 93:2 101:19 104:11 106:25 125:5 135:14 140:6 145:16 163:19 176:18
**Bentley** 26:16
**best** 19:16 93:8 177:10
**Beth** 27:2 34:12
**betraying** 19:14
**better** 21:22 70:22 107:20
**beyond** 87:1 141:11
**Bid-ask** 27:12 79:17 80:1

**big** 9:*18* 79:*19* 87:*14* 115:*15* 125:*20* 158:*12*
**bigger** 22:*20*
**biggest** 26:*12*
**bill** 33:*7*
**billing** 32:*14* 33:*11*
**billings** 33:*3*, *15*
**bills** 33:*10*
**binary** 68:*17*
**bind** 41:*12*
**biotech** 68:*20*
**bipolar** 105:*18*
**bit** 13:*1* 18:*9* 44:*13* 56:*13* 69:*18* 75:*6* 82:*16* 112:*25* 133:*25* 159:*7*
**Blaine** 8:*21*
**blips** 95:*15*
**Bloomberg** 124:*21* 130:*15*, *16* 159:*16*
**Bob** 43:*4*
**bonds** 16:*2*
**border** 112:*24*
**bottom** 110:*5*
**bought** 137:*2* 140:*18* 161:*2*
**bounce** 95:*13*
**bounced** 95:*6*
**bound** 15:*19* 123:*25*
**bounds** 123:*14*, *18*
**Brazil** 37:*11*
**break** 56:*17* 78:*6* 162:*4*
**breaking** 124:*10*
**Brealey** 52:*19*
**breeze** 5:*14*
**Brian** 2:*18* 5:*2*
**brick-and-mortar** 107:*25*
**bring** 125:*14*
**British** 121:*16*
**broader** 20:*4* 96:*8* 155:*22*, *23*
**broadly** 35:*3*
**brother** 8:*21*
**brought** 121:*25*
**build** 52:*2* 146:*17* 170:*24*
**built** 22:*15*
**bunch** 53:*10* 70:*1* 76:*1*
**bus** 170:*14*
**business** 8:*1*, *11* 14:*10* 16:*7*, *15* 24:*10* 69:*25* 109:*22* 126:*13*
**businesses** 35:*5*
**busy** 27:*20* 39:*24*
**buy** 111:*10* 137:*25* 140:*9*, *23* 141:*7*, *9*, *13* 161:*1*
**buying** 127:*5* 148:*11*
**byproduct** 137:*21*

< C >
**calculate** 76:*12* 83:*23* 135:*25* 159:*23* 169:*7*, *10*, *11* 170:*22*
**calculated** 40:*5* 50:*4*, *14* 52:*13* 76:*11* 108:*23* 134:*15* 141:*17*
**calculating** 84:*1* 165:*19*
**calculation** 50:*23* 51:*16*, *20*, *24*
**calculations** 145:*19*
**calculus** 128:*5*
**California** 1:*21* 4:*2*, *13* 8:*14* 9:*16*, *23* 10:*7*, *16* 11:*2* 24:*2* 32:*12* 177:*4*
**call** 7:*9*, *11* 11:*9* 44:*12* 78:*20* 79:*9*
**called** 15:*3* 17:*3* 21:*10* 33:*24* 40:*17* 57:*3* 70:*4* 115:*15* 129:*25* 140:*3*
**calls** 17:*8* 18:*6* 49:*6* 75:*16* 97:*11* 102:*17* 122:*25* 123:*21* 138:*14* 145:*22* 154:*8* 159:*3* 165:*20*, *22* 174:*4* 175:*3*, *5*
**Cammer** 30:*12*, *13* 105:*12* 108:*15* 109:*7*, *9* 113:*7* 119:*22* 121:*13* 125:*6*
**Canaccord** 121:*7*
**Canada** 110:*19*, *23*, *25* 111:*4*, *10* 112:*13* 121:*1* 135:*19* 172:*13* 173:*3*, *19* 174:*3*
**Canadian** 73:*22* 120:*25* 121:*2*, *7*, *10*, *14*, *24* 173:*8*, *21*, *23* 174:*9*, *10*, *19*, *21* 175:*2*, *25*
**cancellation** 115:*21*
**capacity** 23:*13*
**capture** 155:*19* 156:*10*
**captures** 155:*13*
**career** 7:*21* 9:*5*
**careful** 44:*21* 53:*18* 60:*20* 64:*21* 68:*4* 107:*14* 117:*24* 135:*6* 136:*15*, *17* 138:*20* 146:*11* 154:*2* 168:*5*
**carefully** 63:*2* 66:*23* 128:*8* 131:*24* 168:*8*, *24*
**carries** 109:*20*
**carry** 8:*1*
**Case** 1:*5* 11:*25* 12:*1*, *6*, *9*, *14*, *15* 13:*15* 15:*9*, *10* 17:*22* 18:*2*, *12* 19:*19*, *23* 20:*14* 21:*17* 22:*3* 28:*7* 29:*8*, *16* 31:*18* 32:*21*, *23*, *25* 34:*9*, *23* 35:*7*, *10* 36:*1*, *4*, *16* 37:*5*, *6*, *16*, *19*, *21*, *25* 38:*4*, *9* 39:*13*, *25* 40:*14*, *17*, *20*, *23* 41:*14* 42:*12* 43:*21*, *24* 44:*18* 46:*10* 47:*3*, *15* 55:*15* 56:*11*, *20* 61:*23*, *24* 62:*4* 63:*9* 65:*15* 66:*1*, *20* 79:*6*, *8* 80:*9*, *24* 81:*19* 82:*17*, *21*, *24* 83:*4* 84:*24* 86:*10*, *24* 88:*17* 89:*21* 90:*11* 92:*3* 93:*12* 103:*17*, *19*, *23*, *24* 104:*8*, *15* 105:*3* 107:*7* 108:*24* 109:*6* 112:*4* 113:*6*, *10*, *20* 128:*19* 131:*17* 132:*16*, *17*, *19* 133:*1*, *18*, *19* 134:*21* 140:*2*, *4*, *22* 141:*25* 142:*2*, *3*, *17* 143:*5*, *16* 144:*9*, *21*, *22* 145:*5*, *10*, *17*, *18* 147:*4*, *7*, *11* 151:*7*, *25* 152:*17* 154:*7* 157:*10* 158:*25* 163:*6* 170:*2*, *19* 171:*3*, *10*, *20* 172:*10*, *16*, *20* 173:*1*, *8*, *17* 174:*1*, *9*, *19*, *24*, *25* 175:*2*, *6*
**case-by-case** 168:*24*, *25*
**cases** 13:*5* 15:*9*, *21*, *22* 16:*4*, *11*, *23* 17:*6*, *10*, *15*, *16* 18:*5*, *19* 19:*3*, *7*, *12* 20:*4*, *5*, *6*, *12* 21:*1*, *4*, *6* 22:*9* 23:*2*, *14* 31:*21* 32:*17* 35:*1*, *4* 36:*14*, *21*, *22* 39:*19*, *22* 40:*7*, *11* 42:*11* 44:*13* 55:*19* 61:*17* 62:*23* 64:*13* 78:*23* 81:*21* 82:*4* 83:*2* 87:*13*, *17* 88:*7* 89:*24* 93:*22* 104:*1*, *2*, *3* 128:*9*, *19* 132:*19* 139:*18* 142:*12* 143:*11*, *18*, *20* 146:*11*, *18* 147:*5* 148:*17* 150:*8* 154:*10*, *13* 155:*6* 163:*4* 166:*21* 173:*11*, *12*, *19*
**case-specific** 149:*6*
**cash** 49:*24* 51:*6* 52:*23* 155:*5*, *9*, *11*, *14*
**casually** 45:*5*
**categorically** 63:*8*
**causal** 144:*24* 154:*3*
**causally** 64:*9* 81:*7*
**causation** 40:*10*, *12*, *18* 41:*18*, *19* 43:*20* 46:*12* 47:*4*, *17* 66:*4* 81:*3* 87:*3* 93:*23* 104:*10*, *13* 132:*1* 149:*19*, *21* 150:*2* 153:*10* 154:*1* 167:*21*
**cause** 41:*2* 46:*9* 47:*3* 68:*12* 69:*17*

91:*18, 20* 99:*22* 101:*20* 153:*4, 16* 163:*4* 177:*7*
**caused** 41:*11* 44:*17, 20* 46:*24* 64:*8* 66:*5* 74:*5* 76:*2* 85:*2, 18, 20* 97:*25* 98:*7* 101:*3, 15* 131:*17* 137:*13* 153:*12* 167:*25* 168:*15*
**causes** 69:*11* 147:*3*
**causing** 84:*22* 95:*15* 145:*5*
**CCRR** 1:*20* 177:*24*
**census** 57:*19* 100:*14*
**censuses** 57:*20*
**cent** 111:*6*
**Central** 36:*24*
**cents** 94:*23* 96:*3*
**CEO** 170:*10*
**cert** 21:*19* 40:*1, 8*
**certain** 46:*7* 53:*9* 56:*1* 57:*2* 58:*1* 68:*17* 69:*1* 78:*4* 96:*5* 103:*6* 106:*19, 20* 107:*5* 114:*7* 116:*12, 13* 119:*3* 122:*7* 129:*16* 143:*10* 150:*1, 8* 165:*5, 12, 15* 166:*20* 168:*12* 174:*25*
**certainly** 27:*18* 39:*8* 60:*6* 95:*2* 107:*3, 21* 166:*20*
**certainty** 164:*3* 165:*18* 167:*4, 6, 10*
**CERTIFICATE** 177:*1, 3*
**certification** 18:*23* 26:*3* 56:*5* 169:*15* 174:*20*
**certified** 174:*10* 175:*1* 177:*2, 11, 25*
**certify** 177:*4, 16* 179:*3*
**CFO** 170:*10*
**chain** 14:*9*
**chance** 119:*9*
**Chancery** 21:*7*
**change** 26:*25* 38:*11* 46:*24* 51:*3* 53:*23* 68:*7* 85:*2* 86:*5, 18* 107:*11* 109:*5* 114:*18* 143:*1* 145:*11, 13* 163:*3, 5* 164:*25* 168:*2* 174:*1* 178:*5*
**changed** 14:*1* 22:*11* 31:*23* 134:*4*
**changes** 32:*4* 45:*20* 53:*20* 54:*2* 85:*21* 86:*20* 95:*14* 96:*11* 113:*18* 118:*15, 25* 144:*17* 150:*21* 155:*23* 157:*3, 16* 160:*9, 13* 172:*6* 175:*15* 179:*7*
**changing** 95:*5* 141:*6*
**characteristics** 116:*12*
**characterizes** 159:*4*
**charge** 8:*21* 13:*6* 33:*7, 25*
**Charlesworth** 34:*12*
**Check** 19:*2*
**checks** 41:*10*
**Chicago** 2:*14*
**children** 8:*4*
**choice** 115:*2*
**choose** 9:*16*
**chosen** 170:*6*
**circles** 88:*18*
**Circuit** 20:*10, 11, 13, 14* 66:*2* 88:*16, 24* 93:*10* 105:*1* 144:*18* 154:*16*
**circumstances** 68:*11, 15* 106:*10*
**cite** 31:*14* 52:*17* 105:*12* 140:*4*
**cited** 30:*24, 25* 31:*6, 11, 16*
**City** 10:*7, 8, 12*
**claim** 44:*16* 61:*18* 137:*4*
**claims** 21:*2* 23:*21, 22, 23* 80:*18* 173:*13* 175:*16, 17*
**clamp-down** 61:*13*
**clarification** 27:*10*
160:*10* 169:*18*
**clarify** 33:*5*
**class** 18:*23* 20:*24* 21:*19* 26:*3, 9* 37:*19* 38:*1, 3, 5, 9, 10, 11, 19, 24* 39:*3, 8* 40:*1, 8* 48:*3, 6* 50:*5, 15, 21* 51:*14* 54:*3, 5* 56:*4, 8* 58:*14* 70:*6* 74:*1* 75:*24* 80:*22* 81:*15* 83:*25* 84:*2, 7* 87:*14* 89:*13* 96:*23* 97:*18* 106:*16* 108:*21* 109:*2, 4, 18, 20, 24* 110:*10* 121:*18* 125:*3* 134:*22* 135:*11* 136:*2* 140:*18, 19, 20, 23* 141:*10, 22, 23* 142:*15, 19* 143:*14* 150:*13* 159:*15, 19, 24* 160:*18, 21, 22* 161:*15, 21* 163:*11, 12, 25* 164:*5* 166:*15, 19* 169:*8, 12, 15* 170:*9* 172:*19, 21* 173:*3* 174:*9, 20, 25* 175:*1, 21*
**class-action** 172:*12*
**classes** 55:*5*
**Classification** 159:*16*
**class-wide** 83:*21* 85:*1*
**clear** 5:*16* 17:*18* 18:*18* 40:*16* 59:*21* 70:*16* 81:*4* 108:*15* 161:*18*
**clearly** 7:*1* 98:*1* 101:*17*
**client** 46:*18*
**clientele** 122:*15*
**clients** 32:*7, 18* 120:*16* 121:*21*
**close** 44:*9* 60:*9*
**closeout** 113:*9*
**cocounsel** 19:*3*
**code** 30:*17*
**coin** 90:*1*
**coined** 93:*12*
**collection** 133:*5*
**collective** 33:*14*
**combination** 64:*14*
**combined** 113:*6*
**come** 18:*5* 40:*13* 42:*8* 77:*22* 86:*19, 25* 103:*24* 106:*18* 119:*18* 124:*11* 127:*6* 149:*14, 18* 174:*22*
**comes** 61:*7* 68:*19* 90:*12* 96:*16* 120:*14* 143:*10* 168:*21*
**comfortable** 7:*12*
**coming** 6:*6* 45:*11* 46:*22* 63:*3* 113:*23* 157:*4*
**commission** 179:*21*
**committee** 14:*21*
**commodities** 157:*1, 3*
**commodity** 156:*25* 157:*16* 158:*2*
**common** 36:*20* 50:*5, 14* 51:*12, 14* 52:*14* 62:*17* 70:*6* 75:*11* 79:*11* 80:*10* 81:*15* 82:*19* 87:*11, 22* 104:*24* 151:*4, 22* 152:*18, 19* 163:*25* 174:*23*
**commonly** 48:*5* 50:*21* 54:*4* 70:*12, 15* 84:*2* 89:*19* 150:*22* 151:*5, 23* 166:*14*
**communicate** 57:*14*
**communicating** 57:*24*
**Communications** 16:*12, 21*
**companies** 25:*3* 36:*14, 19, 23* 62:*24* 87:*14* 115:*17* 120:*13* 121:*5, 23* 122:*10* 125:*21* 130:*18* 136:*21* 138:*1* 146:*19* 157:*10, 12* 158:*17* 159:*10, 12, 13, 15, 18*
**company** 7:*17* 25:*6* 26:*9* 33:*9* 36:*17* 37:*12* 51:*1* 65:*6, 8* 66:*20* 68:*12, 20* 69:*25* 79:*1, 21* 92:*23* 94:*20* 95:*14* 96:*3* 133:*2, 5* 135:*14, 15, 18, 19* 138:*9* 148:*18* 149:*2*

**company-made** 127:18, 21
**company's** 107:20 135:23
**company-specific** 53:12 54:25 63:23, 25 69:24 70:1 85:18, 23 86:13, 17, 22 89:1 90:17 94:7, 11 103:21, 22 147:18 148:6 156:4 160:9, 12
**compare** 82:20
**compelling** 31:6, 8
**compensable** 66:7
**compensated** 34:23
**compensation** 32:24
**competing** 16:15 95:22 113:16 150:19
**competition** 126:16
**competitive** 95:19 113:3 126:12, 17
**competitiveness** 126:21 127:1
**competitors** 159:14
**complaint** 28:1, 6 40:2 41:23 42:19 44:20 45:7, 15 56:13, 21, 23 57:16 58:11, 12, 24 61:11, 14 62:7, 9 67:11, 12 70:9, 18, 23 71:7, 14, 20 72:2, 6, 14 73:2, 3, 19 74:7 75:1, 14 77:25 80:13 98:13 100:11, 13, 17 101:11, 17, 24 137:10 162:13, 21, 23 164:2, 17, 23, 24 165:11 172:24
**complaints** 168:7
**complete** 68:22 76:25 77:19 112:6 123:12 171:22, 24, 25
**completely** 45:13 80:16, 17 89:8 91:4 100:16
**complex** 114:7
**compliance** 152:22
**complicated** 150:14
**component** 53:17 86:12 145:8 150:25
**components** 132:20
**computer** 30:16 177:13
**concealed** 65:21 67:4, 5 85:4 91:20 93:20 97:17 98:2 132:7 133:7 164:18
**concealment** 65:23 93:16 97:9 145:16 166:24
**concept** 90:16 91:2, 3 108:12
**concepts** 55:13
**conceptual** 51:22, 23 52:3
**conceptually** 155:18
**concern** 9:19
**concerned** 28:25 41:16 42:6 46:21, 22 126:1, 3 163:14 167:20
**concluded** 169:5 176:20
**conclusion** 45:11 46:23 70:5
**conclusions** 85:8
**conditions** 85:22 86:21 156:6
**conduct** 97:17
**conducted** 72:11 90:22
**conducting** 79:24
**conference** 122:25 123:21
**confidences** 19:14
**confidentiality** 18:21 19:8
**confirmed** 91:12
**conflicting** 95:1, 16
**confounding** 103:20 132:22 146:25 147:14, 21, 22 149:10 150:11
**confused** 60:13
**conjunction** 100:19 101:24
**connected** 64:9 81:7 153:16 177:17
**connection** 16:9 17:6 18:14 32:16 49:19 56:4 60:10 68:25 69:9 73:11 74:9 101:2, 25 144:24 154:3
**consensus** 96:8
**consequence** 65:21 132:9
**consequences** 93:19 167:19
**conservative** 170:7
**consider** 14:23 38:8 41:21 42:22 49:16 51:11 52:1 66:23 74:12 105:13 106:14 108:25 113:6 114:15 124:19 127:21 129:12 138:18 143:2 146:2 159:6, 10
**consideration** 122:19 143:15 155:22
**considerations** 53:4
**considered** 31:4 64:22 85:15 118:12 124:25 125:1, 2 128:3, 8 131:24 145:25 159:11, 13 168:8, 24
**considering** 42:22 60:1
**consistent** 28:3, 5 38:22 40:6 48:6 50:6, 15 52:14 62:17 64:24 70:7 75:11, 12, 18 76:4, 7 77:3, 23 80:10 104:24 109:21 115:8 116:1 131:21 151:5, 23 152:11, 19 163:10 167:17 174:23
**constant** 22:11 140:14 141:21 142:10, 19 143:8 144:6 162:15 163:10, 23 169:10 170:16
**constitutional** 71:4
**constraints** 161:9
**construct** 84:13 141:4
**construction** 51:22, 23
**construe** 153:22
**construed** 93:7
**consult** 25:7 57:17 71:18 72:4, 9, 18, 22 101:21 132:6
**consultant** 5:2 23:13
**consultation** 71:23 72:12 73:13, 18
**consulted** 60:9 67:19 74:13
**Consulting** 7:7, 16, 21 8:7, 20, 24 10:6, 18 13:18 17:5 22:25 23:10 24:9 44:3 73:9 102:2 129:24 130:21
**consumer** 107:25
**contact** 40:22
**contacted** 23:12 28:10, 14
**contain** 130:16
**contemporaneous** 138:3
**contemporaneously** 147:19
**context** 24:7 63:15 64:2 66:14 83:6, 16 92:25 102:11 108:5 111:18 114:5 115:10 119:14 129:3, 4 132:17 137:3 143:25 147:15 156:24 167:3
**contexts** 66:25
**context-specific** 63:1 83:8 84:8 85:15 114:20 168:6
**contingent** 29:5 34:24
**contracts** 32:12
**contradicted** 57:20 146:23
**contrary** 94:2
**contrast** 65:5, 8
**contributed** 74:5 94:15
**contribution** 53:12
**control** 157:3, 16

175:19, 25
**controlling** 156:19, 23
**convert** 111:5
**convey** 46:16 121:20
**conveyed** 41:13 45:9 122:14 123:3 133:10
**cookie** 69:3
**core** 52:21
**Cornerstone** 2:18
**corporate** 115:18 119:21 123:22 133:25 152:21, 22
**Corporation** 35:11 39:9 104:9 133:21
**correct** 5:12 11:19, 20 40:19 47:5 59:20 64:22 80:4 82:22 89:4 105:15 106:12 112:15 114:3 129:24 131:22 133:10 177:15 179:5
**corrected** 93:17
**corrections** 179:7
**corrective** 65:18 66:22 67:2, 3, 7, 23 68:3, 5, 9 70:8, 19 74:21 85:3 92:9, 14 94:17 96:19, 20 132:22 133:9 136:6, 14 137:11 140:10, 24 141:5, 8, 12, 13 142:11 147:20 151:9 152:3, 9, 23 153:24 160:13 161:7 170:17 171:23 172:7
**correctly** 161:12
**correlated** 34:7 158:6 170:4
**correlation** 119:2, 6 158:2, 4
**correspond** 15:14 67:16
**corruption** 37:10
**cost** 157:23 158:9
**costs** 157:25
**counsel** 2:3, 11 4:19 6:16, 17 17:3 29:19, 25 30:2, 3, 4, 9, 10 32:21 41:24 174:12 176:4 177:19
**count** 8:8 109:8
**counter** 116:9
**Countless** 90:23
**country** 36:11
**County** 10:14
**couple** 7:20 12:19 16:11 24:11 39:17 147:15
**course** 11:4 112:23 116:8 142:15 143:15 150:12
**courses** 11:4
**COURT** 1:1 4:9, 15, 16, 17 5:5, 18, 23 12:9, 10 20:7, 19, 21, 22, 25 21:7, 8 29:7 41:18, 20 47:14 67:9 71:4, 5 72:3 74:12 78:3, 24 80:21 83:18 88:1 89:8 104:7, 12, 16 108:15 109:9 132:5 140:4, 8 145:1 154:17 162:24 164:14 175:19 176:1
**courts** 66:1 79:14 89:14 105:17 113:19 118:13 154:15 166:10
**Court's** 60:21 71:24 80:14, 15 84:15 142:9
**coverage** 123:20
**COVID** 107:24
**craft** 75:10 175:9
**CRC** 1:20 177:24
**create** 76:7 151:4, 22 153:6 165:23 166:4
**created** 63:19 85:12 167:22
**creating** 78:19
**crisis** 147:9
**critically** 121:17 127:11
**cross-border** 173:12, 13
**cross-sectional** 115:16
**CRR** 1:20 177:24
**crucial** 96:15
**crumbles** 69:3
**CSR** 1:21, 22
**cumulates** 171:15
**cumulative** 170:7
**currency** 111:20
**current** 8:16 14:11 19:24 22:22 35:3 138:23
**currently** 10:20 13:21 17:20 19:13 22:9
**CV** 12:5 15:12, 21 16:11, 22 17:2

**< D >**
**dad** 37:6
**daily** 54:16 115:23 158:21 159:23
**damage** 28:4 38:21 78:23 131:25 139:15 140:14 144:25 166:3
**damaged** 140:25 141:9, 16
**damages** 16:16 23:14 38:18, 22 39:10 40:5 44:17 47:17 48:4 49:14 50:4, 14, 19, 20, 22 51:23 52:13 54:4 62:17 63:1, 25 64:12, 23, 25 65:22 66:7 70:6, 11 75:9, 10, 25 76:4, 7 77:2, 12, 18, 24 80:10 81:12, 14, 17 82:14 83:1, 21, 23, 24 84:1, 5, 9, 12 87:2, 11, 22 88:9, 12, 14, 23 89:18 91:24 93:23 94:24 97:7, 13 102:5, 21 103:14 104:24 105:2 115:4 132:12 135:25 136:23 138:17 139:21 141:3, 17 145:2, 19 146:8, 16, 17 150:4 151:5, 6, 22, 24 152:10, 19 153:7 154:1, 6 159:1 160:3, 5, 23 161:5, 13, 21 162:1 163:7, 14, 17, 24 165:19, 24 166:13 167:3 168:2, 17 174:23 175:14, 24
**data** 13:9, 10 23:25 24:3, 16 27:4 38:14 120:10 130:5, 14, 17 134:10
**database** 129:25
**databases** 130:11, 13
**date** 21:18 43:23 45:10 49:19 94:17 96:20 138:17 149:19 156:12 166:7 179:14
**dates** 30:11 46:7 47:1 66:22 67:3 92:13 104:12 132:22 137:11 147:20 149:14 160:14 171:23
**daughter** 9:19
**Dave** 26:16 27:2 33:18, 19
**Dave's** 33:19
**day** 44:8 53:16 55:5 90:9 96:10 112:23 114:21, 22, 25 116:1 126:8 136:11 139:13 148:15 149:23 150:23 155:15 156:14 159:24 169:7, 12 177:21 179:17
**days** 39:17 53:9 104:11 115:7 125:3 149:14 150:1 156:14
**day-to-day** 24:10 106:9
**deal** 165:18 166:17
**dealt** 173:11
**decade** 14:16
**decades** 54:4 90:24 156:18
**deceased** 23:23, 24
**decide** 9:5
**deciding** 9:15
**decision** 72:3 93:10 142:9 144:18
**decline** 41:3, 5 42:11 44:23 45:7, 10, 13 67:14 70:3 90:14 94:15, 16, 19 132:9 133:13 134:20

137:14 139:13, 19 145:6 146:19 147:4 148:6, 13 149:5, 16 150:3, 19 156:16 171:22
**declined** 39:14 44:14
**declines** 46:6 50:25 53:9, 13 68:8 91:19 128:16 132:21 136:6, 19 167:20 168:14
**default** 155:17
**defeat** 115:13
**defendant** 36:23 39:9 46:4 93:18 173:13
**Defendants** 2:11 4:8 5:3 17:1, 4 28:24 39:9 47:11 56:15 57:1, 19, 23 58:6, 17 60:6 67:5 72:7 73:4, 10 93:2 94:2 97:17 98:2, 6, 8, 18 99:7, 20 101:2 104:9 170:5
**defendant's** 55:22
**deficiency** 23:22
**deficient** 57:19
**defined** 93:9
**definite** 166:25
**definitely** 21:3 34:24 49:8 55:20 104:22 105:24 112:8 122:13 143:2 174:6
**definition** 89:21
**degree** 8:11 14:8 142:17
**degrees** 7:24 9:13
**Delaware** 12:10 21:7
**delivery** 176:16, 18
**delta** 141:20
**demonstrate** 116:25 150:9
**demonstrative** 66:4 93:22 167:21
**demurred** 39:13
**denial** 29:14
**denied** 80:17 104:18
**depend** 84:6
**dependent** 92:2 108:12 117:2 149:6 171:10
**depending** 32:9 46:9 63:9 82:17 86:10 92:4 145:11, 14 160:15 164:25 169:25 171:4, 5 172:6
**depends** 27:20 38:19 39:5 65:15 75:13 92:17 97:24 129:15 133:19 142:7
**DEPONENT** 179:1
**deposed** 5:11 12:1, 6 15:14, 17, 19
**DEPOSITION** 1:11 4:7, 11 7:10 173:20 176:9, 20 177:7, 9, 15
**Derivative** 21:11
**describe** 84:11, 16, 25 85:5 161:10
**described** 55:24 81:13 84:1, 18 86:11 113:14 145:1 148:2 154:21 160:24 161:24
**describing** 22:21 147:8 156:7 172:8
**DESCRIPTION** 3:7 13:2 24:25 164:24
**design** 115:19
**desks** 125:25
**detail** 146:3
**detailed** 134:3
**determination** 45:8, 17 52:13 77:24 87:6 89:15 94:24 105:14 106:18 117:10 119:11 122:20 124:4 146:17
**determine** 44:2 45:14 84:14 115:24 160:22 162:14
**determined** 34:7 67:8 74:14 138:23 170:15 176:1
**determines** 88:1
**determining** 34:4 47:13 147:10
**develop** 154:6 158:25
**developed** 16:15
**developing** 109:22
**development** 92:23
**development-stage** 68:20
**deviate** 88:5
**deviation** 54:16 112:10
**dice** 68:23
**dicey** 18:21
**dictated** 73:21 134:1
**difference** 51:19 63:8 75:10 121:12
**differences** 85:10 144:1, 16 157:23
**different** 11:12 20:15 22:6 45:6, 13 61:24 62:23, 24, 25 76:13 77:13, 24 81:18 82:6, 9, 15, 17, 18 83:5 85:25 90:10 92:11 95:16, 17 103:2 109:1 126:11 132:17 141:11 148:22 153:15, 20 155:4 170:25
**difficult** 64:16 66:13 128:11
**digging** 133:3
**diminution** 134:14
**dingdong** 96:6
**diploma** 14:20
**direct** 134:12 153:6
**direction** 13:14 177:13
**directly** 31:16 64:9
**dirt** 133:3
**disabled** 9:20
**disaggregate** 131:15 132:20
**disagree** 95:18
**disagreed** 143:16
**disagreement** 123:8
**disassociate** 132:11
**disaster** 170:13
**disclose** 47:9 57:13 60:8
**disclosed** 35:23 66:22 86:1 96:3 136:11, 18 137:10, 13
139:10 147:19 153:24
**disclosure** 63:17 64:8, 17 65:18 67:2, 4, 23 68:3 70:19 71:11 77:6 80:25 85:3 92:13 94:13 134:5 136:9 147:22, 25 148:18 151:9 152:3, 9, 24 161:7
**disclosures** 70:9 74:4 114:13 123:23 138:3 139:23
**discount** 51:8 53:22
**discounted** 51:6 52:23 155:5, 9
**discounting** 155:15
**discovered** 165:1
**discovery** 46:2 53:25 111:3 146:4, 13, 14, 22 147:2 149:1, 7 163:2, 4 165:1 168:8 171:6, 23
**discrepancies** 112:2
**discrete** 114:12
**discuss** 55:21 83:15 113:8
**discussed** 28:14 147:17 163:20 169:24
**discussing** 49:14 71:19 159:22
**discussion** 58:2 83:8 105:23 176:12
**disentangle** 46:13 94:18 96:24 102:20 103:13, 20 104:4 131:15 132:20 138:4 149:4, 9, 19 150:2
**disentangled** 103:2
**disentanglement** 134:6 148:14
**disinterested** 177:12
**dismiss** 27:25 28:17, 23 41:17 42:20 80:15 163:1
**Disneyland** 10:15 118:25
**dispute** 24:8 47:11
**disputes** 16:7, 13

**disseminate** 121:20 129:17
**disseminated** 122:7
**dissemination** 85:22 86:21 88:25
**dissertation** 14:22 15:1 69:6
**dissipating** 84:22
**dissipation** 85:6
**distinct** 55:13 137:24 166:22
**distinction** 65:18 77:14
**distinguishes** 34:3
**distribution** 15:4
**distributors** 108:1
**DISTRICT** 1:1, 2 4:9, 10
**diversification** 55:3, 6
**diversify** 69:20
**diving** 26:9
**divisions** 148:20
**docket** 30:20 42:19, 21
**doctorate** 14:18, 19
**Document** 1:5 30:7 78:19 79:9
**documented** 116:5
**doing** 25:16 39:4 65:3 69:6, 15 98:13 107:16 108:2, 22 111:17 131:25
**dollar** 61:20, 21 94:21, 22 96:3 139:19 142:11
**dollar-based** 139:25
**dollars** 90:6, 7, 9, 13 111:5 139:25
**double-dipping** 175:20
**Dowd** 19:1
**downturn** 156:9
**Dr** 5:9 7:11, 13, 16 10:3 35:11 43:17 78:16 83:12 131:14 176:2
**drafting** 30:23
**draw** 65:17
**driven** 157:13
**drop** 67:22 68:3, 13 74:1, 6 76:22 96:24 97:1 102:7 138:10
**dropped** 41:14 80:18 97:21 138:13
**drops** 46:9 67:11 74:19 141:15
**drove** 136:19
**drug** 92:22 143:23
**dual** 111:2 173:19
**due** 76:22 77:1 86:12, 18 132:22 133:13 134:20 146:20 148:24 149:5, 16
**DULY** 5:7 177:5, 11
**Dura** 140:3 141:1 142:9
**duty** 47:9 72:18
**dynamic** 113:3
**dynamics** 27:6 116:11 156:20

**< E >**
**earlier** 65:23 69:18 75:18 78:16 83:4 84:18 85:12 92:22 93:11 103:23 106:22 113:22 128:18, 23 145:24 147:17 148:8 169:14, 24 170:2 173:18
**early** 22:1 24:12 25:8 27:2, 23 42:4 46:11 109:23
**earnings** 36:7 61:19, 20 114:22 115:2 138:24 139:2, 4 148:17
**earnings-related** 125:4
**easier** 65:5, 14 150:8
**easiest** 44:19
**easily** 160:17
**easy** 26:20 46:7 121:19
**ebbs** 105:25
**econometric** 54:14
**econometrics** 156:2
**economic** 47:16 83:20 87:3 128:2 144:23
**Economically** 141:2 158:23
**economics** 7:24 9:6, 21 14:24 23:18
**economist** 16:1 25:3, 4 49:13 68:6 75:5 144:19 145:2 154:12 173:2
**economists** 14:22 84:14 118:12 125:22
**edge** 38:3
**edit** 26:23
**education** 34:6
**educational** 14:4
**effect** 31:12 40:14 61:10 75:2 92:24 102:20 103:6 135:22 138:4 154:13
**effectively** 52:24 54:19 58:7 131:23 161:13, 16 175:20
**effects** 53:14 77:2 118:21 131:16, 17 139:20 148:5 156:3, 4, 23 158:7, 8
**efficiencies** 134:1
**efficiency** 31:4 38:14, 17 41:8, 11, 12 46:25 47:18, 21 48:3 49:14 52:17 78:23 80:6 87:16 105:17 106:5 107:19 108:9, 19 112:17 114:5, 21 115:3, 14 116:2, 16, 22 117:21 118:9, 13 119:13, 18 122:22 124:5 125:13
**efficient** 26:6 49:23 50:20 53:1, 25 62:16 75:8 80:3 87:19 89:16 95:3, 5 104:21 105:4, 5, 8, 14, 19, 20, 25 106:7, 12, 20 107:1, 12 113:4, 12 116:10 123:11 126:15, 18 136:7 137:15 156:5
**effort** 94:18 102:20 124:16
**efforts** 73:9
**eight** 104:11
**Eikon** 120:10 129:25 130:2, 3
**EISENBERG** 2:12 5:1
**either** 11:11 46:25 92:13 105:19 114:23
**El** 21:11
**elaborate** 82:17
**elements** 79:11
**eligible** 65:22 175:17
**eliminate** 55:7
**eliminated** 55:2
**e-mail** 44:10
**e-mailed** 176:14
**e-mails** 147:8 170:11
**embedded** 51:8
**embedding** 96:1 106:1
**empirical** 106:13 129:1 158:16
**empirically** 53:19 91:13 117:2 128:20
**employ** 13:18 51:13 125:21
**employed** 48:5 54:5 70:15 89:19 111:23 150:22 163:16 166:14
**employees** 14:15 16:15
**encountered** 38:5 128:9 146:18 149:20
**endeavor** 6:13
**ended** 140:19
**Endo** 19:23 20:1
**endorsed** 105:2
**Energy** 57:17, 25
**engaged** 16:16 17:3, 5 23:15 27:23
**engagement** 26:17 41:23, 24 42:4, 14, 25 43:25 44:7 48:2 79:2 87:1
**engineering** 11:9, 11
**English** 129:13

**entail** 155:10
**entailed** 13:2 24:25
**entire** 13:6 28:1 95:25 109:4 114:14 122:15 160:18
**entirety** 104:19
**equal** 51:5
**equally** 87:21, 25 151:1
**equation** 150:13
**equilibrium** 127:13
**equity** 84:15 139:23
**equivalent** 140:11
**Errata** 179:8
**Escobal** 57:10 67:17 101:19 134:23, 24 135:1, 7 137:3, 6, 13, 17 138:9 164:4
**ESQ** 2:5, 7, 12, 13
**establish** 87:16 116:16, 17
**established** 88:8
**establishing** 76:24
**estimate** 28:9 54:15 86:3 87:2, 11 89:18 133:12 134:19 139:15 145:7 150:24 151:1 160:8 161:25 163:24 170:24 175:14
**estimated** 97:13 133:20 145:2 148:5
**estimates** 169:16
**estimating** 53:5, 8 63:25 66:24 81:14 82:14 163:17
**estimation** 48:4 65:1 81:12 83:1 133:16 134:11 166:13 175:24
**Europe** 148:20
**evaluation** 7:22 8:17 155:3
**event** 30:11 44:24 51:13 53:6, 7, 10 54:1, 6 63:12, 14 64:10, 16 65:3 66:12, 22 70:18 74:9 79:18, 24 80:2 81:11 82:25 85:17 86:15 89:12 90:22, 24 91:13, 16 92:12 94:17 96:20 102:25 114:13, 16, 23 115:9, 16, 18, 23, 24 116:3, 15, 17, 24 118:11 119:14, 17 124:14 132:22 134:5 136:14 137:11 140:10, 24 141:12, 14 147:20 148:1 149:14 150:18 152:8, 13 155:7 156:12, 15, 21, 22 160:6, 14 171:23
**events** 26:19 63:18 66:3, 5 68:17 69:1 70:25 74:21 81:6 92:9, 15 93:18 101:17 103:6 114:14, 17, 22 115:2, 22 117:24 118:2 119:21 125:4 129:9 133:9 136:7 141:6, 7, 8 142:11 160:13 167:19 169:4 170:17 172:7, 17
**event-study** 136:5 154:11, 18 155:21, 24 157:2 160:1 161:23 163:15 166:13
**Everest** 4:14, 17
**everybody** 158:9
**evidence** 40:12, 21 41:8 46:2 60:21 64:6 108:3 112:7 117:7 118:12 120:19 123:2, 18 128:13, 20 134:13 144:23 145:7, 13 146:3, 5, 22 149:1, 7 164:13 168:8 171:6, 24 175:4
**evolution** 95:10 143:12 146:1
**evolutionary** 30:6
**evolve** 143:21 163:5
**evolved** 143:23
**evolves** 172:10
**evolving** 95:11
**ex** 124:15
**exact** 15:12 17:13 18:3, 9 21:18 159:12
**exactly** 28:15 82:2 86:11 87:21 111:17 112:2 118:5, 7 126:14 127:9 144:21 149:2 170:12
**EXAMINATION** 3:2, 3 5:8 44:21
**examined** 125:5 129:2
**example** 16:8, 20 33:19 44:15, 19 61:4, 5 77:8 92:22 93:3, 8, 14 102:7 107:9, 11 121:25 132:16 157:23 171:3, 19 173:15
**exchange** 106:11 110:25
**excited** 9:25
**exclude** 63:6 104:10, 18 124:4
**excluded** 104:6
**exclusion** 104:14, 20
**exclusions** 104:23 175:25
**exclusive** 80:8
**Excuse** 57:5 100:4
**exercise** 54:14 63:4 66:12 154:3
**EXHIBIT** 3:7, 8 4:5 83:13 109:11 110:3, 14 120:22, 24 125:5
**EXHIBITS** 3:6 29:18 30:16 80:6
**exist** 102:13 112:3
**existence** 47:4 135:22
**exists** 48:4
**expanding** 36:22
**expect** 32:24 56:3 94:20 97:20 127:16 158:22
**expectation** 34:22
**expectations** 49:24
**expected** 52:22 138:23
**expensive** 21:14
**experience** 10:19 14:5, 12 20:23 34:6, 8 60:2 63:22 68:13 89:7 92:10 95:11 128:9 144:10 149:13 158:22
**Expert** 3:8 7:22 8:17 10:3 11:22 12:22 13:15 16:19 17:10 20:6, 24 23:1, 6, 8, 9, 15 29:17 31:24 33:2 36:16 37:7 48:19 73:2 100:10 101:10 104:15, 16 145:2 173:1, 7, 22, 23 174:2
**expertise** 16:1 25:4
**experts** 12:20 13:5 55:21 90:23 143:20 163:16 173:10
**expires** 179:21
**explain** 105:5 147:14
**explained** 146:19
**explanation** 11:10
**explicitly** 105:2
**exploration** 57:11
**exposes** 39:8
**expressed** 76:17
**expressing** 45:11
**extent** 96:5
**external** 45:16, 18
**extreme** 126:16
**eyes** 35:22 71:24

**< F >**
**face** 61:1
**Facebook** 124:13
**facilitate** 89:17
**facilitating** 13:14
**fact** 59:23 62:21 89:7, 15 104:15 105:1 114:6, 11 164:15 165:7
**factor** 91:6 109:9 121:13
**factors** 47:20 63:17 69:16 83:9 85:20, 21 86:20 105:13 113:8 119:22 125:6 155:23 170:25 171:11
**facts** 58:5 63:3 64:22 65:6, 9 76:14 85:19 93:1, 16, 20

169:3 175:4
**failed** 57:13 72:5
**failing** 60:7
**failure** 71:18 80:25 101:20 122:3
**fair** 6:21 7:1 18:4 19:5 39:2 51:21 67:10 80:7 85:11 93:3 125:16 127:7, 10 135:13 137:7 157:15 158:1, 4, 13, 14 166:5
**fairly** 159:4
**fall** 170:14
**false** 51:18 58:17, 22 59:1, 2, 6, 11, 13, 14, 16, 17, 18, 19 60:1, 7, 11, 14, 15, 23 61:1, 6, 13, 21 62:21 65:7 66:15 74:17
**falsely** 64:18
**family** 9:1, 14, 19
**famous** 88:17
**far** 41:16 42:6 80:19 118:17 163:14 167:19 168:11
**FARUQI** 2:3 4:22 17:16, 22 21:17 22:4 25:20 28:10 40:23 43:24
**fashion** 150:15
**father** 7:17 12:20 34:15 144:19
**faulty** 100:14
**favor** 117:7
**Faye** 27:2 34:11
**FDA** 68:21, 22 92:25
**fear** 107:24
**feasible** 149:8
**federal** 12:10 20:7 21:3 66:2 78:24 105:17 109:9 154:16 166:9
**feel** 92:24 149:18
**felt** 75:3
**figure** 111:9 170:22
**figuring** 141:19
**file** 26:20 173:16
**filed** 19:10 28:23 42:19, 20
**filings** 45:2 58:8 123:21 127:19, 22 159:19
**final** 26:24 27:13 176:17
**finance** 7:20, 25 8:13 11:15 14:22
**financial** 9:21 11:9, 11 14:21, 23 16:1 25:3 36:3 37:15 49:9, 12 104:9 121:3 125:22 130:5 135:23 154:12
**Find** 26:11 81:21 130:22 133:4 159:12
**finding** 67:18
**findings** 40:10 88:10 119:17
**fine** 43:8 62:5
**finish** 6:10 85:10
**finite** 54:13
**firm** 4:25 9:2 12:20, 23 17:16, 22 18:25 19:2 21:17 22:4 23:19 25:20 26:5 27:3 28:11 40:23 43:24 111:24 121:14, 16 139:9
**firms** 17:25 18:13, 15 111:18 115:20 120:25 157:18, 25 158:3, 23 159:2
**FIRST** 5:7 8:10 11:21 12:1 15:8 21:16 22:14 25:22 28:6 31:24 41:25 44:8 56:21 70:24 87:7, 16 88:10 91:11 93:12 105:6 110:25 114:5 140:24 141:13 148:3 154:24 169:15 171:17
**fit** 9:13
**fits** 89:11, 12 158:21
**five** 38:2 139:3
**fixed-fee** 32:20
**Floor** 4:12
**flow** 46:15 155:5, 9
**flows** 49:24 51:6 52:23 105:25 155:11, 14
**fluctuations** 54:21
**fluid** 27:6
**focus** 64:25 115:23
**focused** 163:14 164:23
**focusing** 64:16
**folders** 44:5
**folks** 33:17
**follow** 119:24
**followed** 123:19
**following** 119:25 120:20 121:5
**FOLLOWS** 5:7 99:6 151:21
**football** 7:19
**force** 46:18
**forces** 61:9
**forecasting** 15:2 155:11
**foregoing** 179:4
**foresee** 173:25
**foreseeability** 168:11
**foreseeable** 65:20 91:18 93:19 132:8 167:14, 18
**forever** 155:13
**forget** 73:7
**Form** 76:15 77:15 78:1 81:24 90:18 91:8 92:6 93:5 94:3 97:3, 11 98:21 100:5 101:5 113:13 116:19 117:11 123:16 128:6 129:14 136:3 142:21 149:24 150:16 151:10 152:12, 25 153:8 157:5, 19 162:17 164:6 165:9 168:4 169:13 179:7
**formal** 44:11
**formally** 42:7 107:2
**formed** 106:25
**forming** 64:23
**Fort** 34:11
**forth** 83:19 100:21
**forward** 29:4
**found** 40:11 41:10 64:11 66:3 87:23 88:12 93:21 104:13 106:6 113:19 117:2
**foundational** 156:2
**founded** 7:17
**four** 8:5, 15 12:18 37:20 38:2 108:24
**four-and-a-half-year** 38:10 58:14 79:21
**fourth** 71:6
**frame** 114:9
**framework** 21:3 83:20 166:8
**FRANCISCO** 4:2, 12 10:9
**fraud** 11:22 15:22 17:9 18:19 32:16 35:1 37:15, 19 39:7, 13 62:25 63:18, 19 69:2 76:1, 3, 23 85:20 86:18 91:17 131:18 148:13 149:5 170:5 171:7, 20
**fraud-induced** 86:5 91:10, 23 92:2, 4 145:8
**fraud-related** 86:2 94:17 147:1, 19 148:14, 24 150:25
**fraudulent** 90:5 147:24 149:10 171:16
**fraudulently** 64:18
**fresh** 79:15, 25
**front** 30:13 72:14 83:13 91:21 109:18 124:18
**Fryd** 2:18 5:2
**fulfilling** 13:17
**full** 8:10 75:2
**full-blown** 46:12
**fully** 34:19 114:9, 10
**function** 13:17 24:18
**fundamental** 51:5 53:21 69:19 127:6 155:3 157:22
**fundamentally** 47:8 67:7 91:19 93:15

129:7 144:12 145:15
**funds** 112:1
**further** 177:16
**future** 49:24 51:6 52:23 138:23 155:14
**fuzzy** 18:9 71:2

< G >
**GA** 2:6
**GameStop** 106:23, 24 107:1, 2, 16 108:4, 5
**garden-variety** 49:5 130:21
**gas** 21:13
**gathering** 26:13, 17
**Geller** 19:1
**general** 11:13 16:6 24:24 50:8, 9 56:18 62:19 83:19 118:13 119:13 143:5 166:7 168:11
**generalized** 33:23
**generally** 13:22 15:2 21:2 49:15 56:25 63:7 66:18 151:6, 25
**generate** 30:17
**GERBER** 2:12 4:25
**gesturing** 5:22
**getting** 9:12 38:2 41:19 42:19, 20 46:14 71:1 85:9 92:25 98:7, 9 99:21 101:3 118:5 122:14 126:10
**give** 5:18 10:24 11:10 13:1 16:8 19:12 24:24 28:9, 11 33:22 44:15 47:23 48:8 49:4 56:14 108:16 125:18 139:22 173:15
**given** 19:10 32:18 33:14 53:15 54:20 55:11 61:1 87:20 89:6, 13 95:21 106:14 107:24 114:13, 23 132:3 137:9 140:1 141:3, 16 142:24 147:3
150:23 157:2 158:22 164:20, 22 179:5
**gives** 160:8
**giving** 6:14 164:24
**global** 121:4
**glove** 89:11, 13
**go** 13:10 18:5 26:21, 25 32:5 43:9 46:7, 18 67:2 73:6 76:2 81:20 86:14, 16 88:9, 14 104:4 113:8 116:4 119:11 128:4 131:6 132:20 133:16 148:3 155:8 156:10 176:6
**goal** 111:19
**goes** 6:16 41:14 52:4 75:24
**going** 4:18 5:17 7:24 9:12 19:8 29:3, 4 33:16 37:11 38:4, 25 39:7 40:9 43:3 44:22, 25 45:1, 3, 12 49:3, 8, 18 50:18 51:1, 8 52:17, 20, 22 53:2 55:7 56:5, 22 63:1, 14 64:2 65:17 67:8 68:9 69:5 70:2 71:5 84:5, 8 85:25 86:9 88:23 90:10 91:23 92:8, 12 93:3 94:22 96:4, 18 99:17 112:24 113:1 125:7 129:23 130:25 136:13 137:14, 18 139:7, 9, 11, 22 143:5 146:15 149:15 151:1 156:9, 13, 16 164:4 165:5 170:12 172:1
**gold** 35:8, 9, 11, 20 36:17 103:22 133:4, 6, 14, 21 137:21
**Goldman** 120:14 122:1, 11 151:12
**gold-mining** 133:2, 5
**Gompers** 35:11
**good** 6:22 40:12 43:5, 6 92:25 106:8 109:14, 19 118:3
123:25 131:4 142:25 156:22 162:5 174:16
**goods** 107:25
**Google** 130:22
**gosh** 90:23
**gotten** 128:23
**graduate** 10:23 145:10
**graduated** 12:14 143:24
**graduation** 147:11, 12 170:3 172:7
**grandpa** 9:8
**granted** 80:16
**grateful** 61:9
**great** 9:24 41:7 93:14
**greater** 54:21 90:3 138:11
**green** 59:15
**grew** 7:23 171:7
**gross** 33:14
**ground** 5:15
**Group** 7:7 18:14 157:18, 24 158:3 159:2, 9
**groups** 158:18
**grow** 143:13
**Growing** 9:7 171:19
**grows** 171:15, 17, 18
**Guatemala** 35:5, 7 36:21 71:5 72:21
**Guatemalan** 73:22
**Guatemala's** 57:17
**guess** 21:14 31:9 33:4 60:12 77:7 92:11 117:5 164:15 171:12
**guidance** 36:8 115:12
**guilt** 93:17

< H >
**habitually** 43:7
**half** 37:20 38:2 108:24
**hand** 177:21
**handful** 9:22
**happen** 112:8
**happened** 39:18 88:17, 22 108:4
112:5 117:3, 4 143:19
**happening** 112:8, 22
**happens** 93:25 114:12 123:11 161:6
**happy** 33:5
**hard** 79:19 169:1
**harder** 65:14 66:19 129:17 149:25
**harmony** 77:20
**haul** 42:23
**head** 25:15 118:19
**heard** 84:16 89:10 170:23 172:14
**hearing** 80:15 163:1
**Heckmann** 12:2, 3, 14 15:9
**H-E-C-K-M-A-N-N** 12:4
**hedge** 111:25
**held** 4:11 16:5 21:12 161:3
**help** 12:25 34:13
**helped** 33:18 149:4
**helpful** 42:9 46:19 103:9
**helping** 37:1
**hereunto** 177:20
**hesitant** 41:11
**Hey** 90:6
**Hi** 4:24
**hide** 120:2
**high** 8:8 56:16
**higher** 57:21 61:9 81:1 108:6 139:8 143:14
**high-frequency** 126:2
**high-level** 47:23
**highlight** 84:4
**highly** 10:2 106:7
**historical** 120:11 124:16
**historically** 23:17 120:15 121:2
**history** 15:15 56:7
**hold** 53:1 110:11
**holdings** 130:7
**honed** 156:13
**hour** 10:10 32:1 43:4 131:1

**hourly** 31:18, 20, 23 32:8, 9, 25 33:19 34:5
**hours** 27:2 32:23 33:7 114:24
**Household** 88:17
**huge** 21:14 122:12, 15 123:19
**huh-uh** 6:25
**hundred** 115:17
**hundreds** 106:4 115:25
**hypothetical** 62:4 76:21

< I >
**IC** 112:21
**idea** 114:6
**identical** 112:23
**IDENTIFICATION** 3:6 4:4
**identified** 159:13, 15, 18
**identify** 58:21 83:7
**idiosyncratic** 54:25 70:4 115:21
**III** 68:21
**IL** 2:14
**illegal** 100:22
**illiquid** 107:18
**imbalances** 111:20
**immediate** 90:4
**impact** 24:16 65:4 66:14 90:25 124:9 128:5 135:24 137:15, 18 139:23 146:15 147:24 149:22
**impacts** 113:12 150:19
**impaired** 138:12
**implement** 89:2, 3
**implementation** 81:11 83:15 84:9 85:24 86:9 88:3 169:23
**implemented** 138:17 141:4 161:23 163:22
**implicitly** 144:18
**implied** 35:21 164:9 171:24
**implies** 142:9
**imply** 142:19 164:21
**implying** 65:19 90:3
**important** 41:20 49:16, 22 50:18 51:1, 11 53:3, 25 71:22 111:1 113:5 114:15 122:7 126:23 127:1 146:10 147:2 154:2
**impossible** 150:7
**impounding** 95:23
**include** 18:12 85:21 86:20
**included** 65:10 117:16 147:23
**including** 18:2 146:4
**incomplete** 123:13
**inconsistent** 75:22 77:9, 11
**incorporate** 117:9, 20 147:25 155:24
**Incorporated** 19:20 113:25
**incorporating** 126:24
**incorporation** 124:5
**increase** 90:5 94:16 150:20 170:4
**increases** 90:8 128:16
**increasingly** 121:4
**incurred** 77:5 91:16 96:22 136:13, 23 144:25
**independent** 46:23
**independently** 45:21
**INDEX** 3:2, 6 157:9 158:11, 12 159:7, 9
**indicative** 47:21 55:25 68:3 107:19
**indicator** 108:9
**indigenous** 57:2
**individual** 83:25 160:22
**individually** 133:23
**individuals** 23:23, 24
**induces** 90:4
**industry** 14:13 53:14 85:22 86:21 118:21 148:4 155:22, 23 156:3, 4, 9, 11, 20, 23 157:9 158:8, 10, 12 159:14, 16, 18
**industry-related** 156:6
**inefficiency** 108:4 116:18, 25 117:7 118:23
**inefficient** 95:10 105:8, 19, 22, 25 107:10, 12 116:7 118:2 119:7
**infancy** 25:7
**inflated** 64:4 91:4
**inflation** 66:14, 24 77:5 84:21, 22 85:1, 7 89:8 91:2, 10, 23 92:2, 4 93:25 94:10, 25 96:22 136:5, 22, 23 137:5 141:6, 11, 15, 19, 21 142:15, 18, 20 143:7, 8, 13 144:6, 20 145:3, 8, 20, 21 146:2, 16 147:12 149:22, 23 150:4, 12 159:23 160:17 161:3, 4, 5 162:16 163:11, 12, 23, 24 167:22 169:6, 7, 10, 11, 16, 21, 24 170:15 171:21 172:3
**influence** 51:3 69:22 70:3 124:22 127:6
**influences** 51:16
**inform** 163:7
**information** 18:24 24:17 26:18 33:23 45:9 46:24 49:25 52:12 53:15 63:23 64:8 66:21 80:25 85:23 86:13, 23 87:20 89:1 90:17, 25 91:20 92:5, 14 94:1, 8, 12, 13 95:2, 11, 23 96:1, 12, 17, 19 98:2 103:3, 22 105:10, 11 106:1, 8 112:18 113:2, 17, 23, 25 114:7, 8, 10, 11, 18 115:1 117:9, 20 118:16 121:20 122:7 123:2, 6, 10, 12, 15, 22, 25 124:3, 11, 20 125:2, 14, 23 126:7, 13, 20, 25 127:11, 12, 13, 15, 23, 25 128:9, 14, 17, 21 129:12, 18, 21 130:22 132:23 133:7, 14 136:10 137:12 139:10, 11 144:12 146:13, 14, 24 147:14, 18, 20, 23 148:15 149:10 151:14 153:24 154:12, 13 156:5
**informational** 113:17
**information-by-information** 129:5
**informative** 103:7, 10 146:23
**informed** 173:20
**initiatives** 152:23
**insider** 55:25
**Instagram** 124:13
**instance** 122:10 148:7
**instances** 32:11 104:17 115:5, 19
**instant** 140:10
**institutional** 125:20 126:21 127:1, 8, 17 129:11 130:7
**institutions** 95:20
**Insurance** 23:18
**intellectual** 16:6, 10, 13, 18 155:6
**intend** 55:14, 17 56:6, 10 160:16
**interest** 9:11 15:5 27:9 49:16 130:9
**interested** 9:10 177:16
**interesting** 9:7
**interlocutory** 29:11
**internal** 44:6 46:3 146:21 147:8
**Internet** 130:12, 22
**Internet-driven** 121:19
**interpret** 80:23

**interpreted** 109:10 140:13
**interpreting** 79:23 126:13
**interrupt** 82:11 111:13
**interrupted** 27:10 160:10 169:18
**intervening** 12:17
**intraday** 126:1
**invalid** 88:2
**invested** 113:16
**investigated** 91:12
**investigation** 45:4
**investing** 95:20
**investment** 48:21, 23
**investment-banking** 122:15
**investments** 49:21
**investor** 127:9 137:1, 5
**investors** 24:19 53:4 54:5 55:2 86:3 87:20 96:22 97:18 112:1 114:25 121:22 125:9, 12, 14, 20 126:17, 22 127:2, 17 129:10, 12 134:13 151:2 167:24 174:11 175:17
**involve** 16:12 23:1 35:4 63:15 87:14 152:8 154:13 174:10
**involved** 18:9 35:8 39:25 71:2, 4
**involvement** 18:6 19:11
**involves** 162:15 174:19
**involving** 17:7 35:7, 19 36:14, 22
**irrational** 107:5
**irregularities** 35:25 37:16
**irregularity** 61:18
**Irrelevant** 174:5
**Irvine** 8:14 9:17, 24 10:13, 14 11:2
**isolate** 85:17 86:12 114:16
**issuance** 73:14
**issue** 17:6 26:9 31:3 47:9 55:19 73:1 106:13, 23 128:7 129:1 132:11 134:16 138:2 142:22 148:9, 19, 23 152:9 156:12 158:16
**issued** 15:20 18:22 159:19
**issues** 41:10 79:2 80:1 85:15 163:21 175:23
**issuing** 15:17 72:19
**its** 25:7 51:16 52:21 59:19 73:4 109:23 135:24

**< J >**
**JAMES** 2:7 4:23
**Jane** 12:22
**January** 40:23
**Jim** 131:4
**Job** 1:24 22:25 23:10 26:19 38:12 56:22 79:14 106:8 125:23 126:9, 10
**jobs** 126:11
**Jorion** 10:1, 3 11:7
**JR** 2:7 8:21
**judge** 28:22 29:1
**judges** 89:14
**judge's** 29:14
**July** 25:21 67:13 70:24 71:6, 11, 16 74:19 81:5 102:7
**jump** 70:2
**jumps** 54:24
**jumpy** 54:19
**June** 28:11
**jury** 144:23 145:6, 10
**jwilson@faruqilaw.com** 2:9

**< K >**
**KARL** 2:12 4:25 110:14 159:25
**kbarnickol@nge.com** 2:15
**keep** 6:8 22:17, 18 98:13 163:6
**keeps** 44:3 81:1
**kept** 7:23 9:12
**Kessler** 19:2
**Kevin** 2:3 55:16
**key** 126:20
**kid** 9:8
**kidnapping** 58:2
**kids** 8:5
**KILLORIN** 2:5 4:21 17:17 23:3, 11 43:6 48:14, 22 49:6 50:7 52:5 58:23 59:2, 6, 10, 13, 17, 21 62:2, 8, 12, 22 64:19 65:12 66:17 72:23 75:15 76:15 77:15 78:1, 7 81:24 90:18 91:8 94:3 97:3, 11 98:10, 21 99:14, 24 100:4 101:5 102:16 110:14, 17 113:13 116:19 117:11 123:16 128:6 129:14 131:1, 4 136:3 138:14 141:24 142:21 145:22 149:24 150:16 151:10 152:12, 25 153:8 154:8 157:5, 19 159:3, 25 162:5, 17 164:6 165:9, 20 166:3 167:7 168:4 169:13 174:4, 12, 16 175:3, 12 176:5, 13, 15, 18
**kind** 5:14 9:21 11:13 15:23 18:5 21:6 22:15, 16, 21 23:25 24:8 27:19 32:21 40:3 41:12 42:5 43:17 61:23 62:4 65:19 69:19 70:1 71:9 72:7, 8 87:21 92:4 95:4 100:21 105:25 107:24 115:18, 21 117:10 118:13 126:15 129:8 155:19
**kinds** 64:12 73:25 89:23 143:4, 6
**Kinross** 35:11 103:22 132:16 133:1, 21 137:22 148:7
**Kinross's** 134:1
**knew** 72:3, 16
**know** 5:11 7:19, 22 8:1 9:3 10:15 12:9, 11 15:6, 12, 24 17:13 18:3 19:4 20:8 22:17 23:13, 20 24:13, 14 25:6, 8 26:10 29:4 30:1, 2, 4 32:22 33:9, 10 34:11 35:4, 12, 13 38:16, 18 40:1, 4, 8, 9 41:17 42:8, 9 44:1 45:11 46:4, 19, 22 47:20 51:10 53:20 55:5, 24 57:13 58:5 59:25 60:17 61:17, 19 62:10 63:5 64:7 67:12, 13, 18 68:6, 23 69:3, 15, 21 71:2, 14, 16, 20 72:14, 15 73:8, 19 74:9, 12, 16 75:23 77:17 78:21 79:2, 10, 24 80:12 81:2, 4, 6 82:3 84:5, 11, 14, 17 86:3, 11 87:14, 15 88:8, 10, 20, 21 91:13 95:11 96:6, 16 97:24 98:23 100:6, 15 101:8, 9 102:4 103:9 106:8, 24 107:17, 18, 23 108:8 109:21 111:16, 22 112:4, 20 113:16 118:23, 25 119:17 120:5, 21, 25 121:3, 4, 9 122:6, 13 123:9, 14 124:20 125:25 128:16 130:4, 7, 24 131:24 132:3, 5 133:3, 24, 25 134:12, 18 136:19 137:13, 17, 19, 23 138:18 139:22 140:4, 8, 10 142:10, 12 144:9, 20 145:12 146:1 147:6 148:10

149:2 150:23 151:11 154:9 155:2, 4, 13 156:14 158:1 160:25 162:14, 24 163:2, 3 166:21 170:12, 14 172:15, 19, 23, 25 173:4 175:20
**knowing** 58:5
**knowledge** 19:11 46:3 57:2 70:21 170:4
**known** 61:2 81:11 128:21 129:21
**knows** 59:12 127:9

< L >
**L-3** 16:12, 21
**lag** 32:14
**Lambert** 27:5
**language** 82:2 86:6 89:10 109:7 129:16, 18, 19
**languages** 129:13
**large** 32:10
**LaSalle** 2:13
**late** 22:2
**Lately** 22:15 23:20 24:21 25:12
**law** 18:13, 15 19:2 21:1, 4 73:22, 23 104:13 140:2
**laws** 102:4
**lawsuit** 11:23 27:17 35:17 41:2, 3, 7 43:1 45:22 102:13 172:12 173:21
**lawsuits** 68:25
**lawyer** 47:7 59:22 61:3
**lawyers** 22:5, 6
**lay** 54:19
**layman's** 11:10
**layperson** 60:24
**lead** 4:22 56:7 101:18
**leading** 113:4
**learned** 70:23
**leaves** 148:5
**lecturer** 11:6
**left** 8:15
**legal** 72:11 73:16, 17, 20 84:13 141:3 175:5
**legally** 73:1 84:12 141:3
**length** 38:6, 18 39:2 109:4
**lengthens** 39:8
**letter** 42:14, 25 43:25 44:7, 11 68:22
**letters** 44:4
**level** 22:22 34:8 50:25 51:5 53:21 56:16 66:2, 6, 11 105:9 142:14 154:16 155:20 159:23 171:5, 20
**levels** 141:11
**liability** 27:25 28:2 38:20, 23 40:3 47:9 48:7, 19 50:6, 16 52:14 60:22 61:16 62:18 64:3, 25 67:8 68:5 70:7 75:12, 20 76:5, 8, 10 77:3, 10, 20, 23 80:11 81:8 82:4 83:18 87:9, 11 88:2 89:6, 9 92:17 93:13 97:15 100:10 101:10 102:18 103:13 104:25 131:22 132:4 142:8, 13 143:15 146:3 152:11, 20 155:1 160:16 162:1, 15 163:10 164:3 166:12 169:25 171:5, 9, 24 172:4 174:24
**license** 57:11 60:10 67:17 71:3, 16 72:19 73:15 74:10 96:14 97:9, 10, 16, 21, 25 98:7, 9, 18, 19 99:8, 9, 21, 23 100:22 101:3, 16, 18, 20 102:3, 14, 21 103:13 131:16 132:5, 11 137:16 138:7 152:24 164:4, 19, 21 165:5, 7, 17
**licenses** 71:24 134:25
**lie** 90:3
**lies** 60:18
**life** 167:13
**light** 59:15, 16 127:22
**limit** 128:2
**limited** 18:14 66:16
**limits** 161:13
**LINE** 178:5
**liquid** 21:12 87:15 113:15
**liquidity** 147:9
**list** 15:13 159:1
**listed** 15:21 110:19, 24 111:2 120:21, 24
**listing** 110:24 173:19
**lists** 148:10
**literature** 115:8, 11 116:9 119:16 128:2 158:14
**LITIGATION** 1:4 4:9 12:2 15:23, 25 21:5, 11 24:7, 12, 15 37:1 54:3 115:10 161:11
**little** 7:17 9:9 13:1 18:9, 20 44:13 60:13 69:18 71:2 75:6 82:9, 15, 16 110:9 112:25 133:24 151:17
**live** 25:1
**lived** 71:12, 13
**living** 72:13
**LLP** 2:3, 12 18:25
**local** 9:18 61:8, 12
**located** 36:12
**logic** 140:25
**London** 8:11
**long** 8:6, 8 34:18 36:15, 18 37:20 39:6 42:23 46:25 58:11, 12 91:22 108:23 115:13 116:4 125:25 130:24
**longer** 38:9, 13, 24 39:10 114:8 115:6, 7 118:1 140:16
**long-term** 116:6
**look** 24:16 25:6 35:1 43:7 45:16 46:7 54:14 86:1 106:15 107:14 108:8 110:2, 6 114:25 115:6 120:3 125:8 161:9 173:9
**looked** 10:18 16:22 40:21 75:23 83:5 119:23, 25
**looking** 23:21 24:3 26:11 43:4 45:9, 15, 19 65:4 66:21 76:10 81:3 87:19 107:22 108:13, 20 109:11 110:15 114:22 115:4, 16 118:6, 8 124:14, 15 155:4
**looks** 95:6, 7, 8 109:19 120:8
**LORRIE** 1:20 4:16 177:2, 24
**loss** 40:9, 12, 18 41:18, 19 43:20 44:20 46:12 47:16 66:4 77:1, 5 81:3 87:3 93:22 104:10, 13 131:25 134:16 136:13 149:18, 21 150:2 153:10 154:1 167:21
**losses** 23:14 24:13, 16 64:7 81:5 91:16 96:21 153:13, 15, 16 167:22, 25
**loss-inducing** 44:23
**lost** 90:12 151:17
**lot** 11:15 13:11 15:15, 16 23:5, 19 25:2 27:1, 7 31:2, 14 38:15 39:21 44:22, 25 45:1, 3, 19 54:24 60:5 68:17 82:1 95:18 99:17 101:23 103:1, 2 107:24 111:9 113:15 120:13 121:2, 5, 9 123:17 124:21 126:11 130:5, 8 154:10

**lottery** 95:7, 8
**lower** 15:19 33:11
**luck** 69:2
**lunch** 131:3, 14
**lying** 90:6

< M >
**macro** 66:11
**maintaining** 84:23
**maintenance** 80:24 84:18 89:9, 21, 24 90:11 93:9 137:4
**major** 106:6
**making** 6:20 23:22 77:13 89:15 102:20 105:13 122:1, 11, 20 133:16
**manage** 12:24 22:16
**management** 8:17 11:8, 11 14:9, 21 15:5
**manager** 12:19 13:3, 13, 17 14:6
**managers** 13:16 14:4, 7, 11 26:22 33:24 34:14
**manipulations** 36:4
**manner** 38:22 40:5 48:6 50:5, 15 51:14 76:4 81:15 100:22 128:12
**March** 110:9
**MARCHANT** 1:20 4:17 177:2, 24
**MARKED** 3:6 4:4 110:4
**markedly** 109:5
**Market** 4:12 31:4 38:14, 16 41:8, 11 45:25 46:25 47:18 48:2, 23 49:14, 23 50:1, 20 52:17 53:2, 13, 25 62:16 70:23 75:8 78:22 80:3, 6 85:21 86:21 87:16, 19 90:3 95:3, 5, 9, 22 105:4, 5, 15, 17, 19, 20, 21, 22 106:5, 6, 12 107:1, 10, 12 112:9 113:2, 4, 12, 15, 23 114:9, 20, 24 115:2, 13, 14 116:11, 16, 17, 22, 25 117:9, 19, 21 118:9, 13, 21 119:7, 13, 18 121:21 122:9, 14, 22 123:3, 5, 11 124:5 125:13 126:18 127:4 136:7, 18 137:15 141:21 144:13 148:4 156:3, 5, 19 169:3
**marketplace** 92:5 94:1, 9 122:21
**markets** 26:10 104:21 106:6 118:15 121:3, 6, 24 126:15 175:15
**market's** 145:4
**married** 8:2
**master's** 8:11 14:8
**material** 29:19 30:8 31:12 35:21 58:19 74:23 80:25 84:19 85:22 86:22 88:25 90:16 123:22 133:7, 14 166:24
**materiality** 47:16 87:3, 4
**materialization** 65:19, 21 66:5 67:4 75:3 85:3 92:14 93:13 97:1, 16 163:20 165:19 166:18 167:3, 5, 12
**materializations** 63:18 91:17 132:7 167:18
**materials** 29:22 52:11 137:21
**matter** 16:24 34:15 50:24 51:4 62:19 70:8 83:23 84:3 104:13 138:19 144:8 150:8, 22 153:11 161:6 164:7 168:15 169:1 170:13
**matters** 70:10 78:22 112:17 129:19 153:4
**Matteson** 2:19 4:14
**Maxar** 19:19 173:18, 23
**Maxar-something** 19:20
**MBA** 14:8 55:4
**MBAs** 125:22
**McGreggor** 80:17
**mean** 11:24 17:17 23:5 27:18, 23 28:11 31:8 34:5 38:13 42:2 44:2 45:1, 5 47:6 52:16 54:21 56:17 59:13, 18 68:17 69:1 70:10 76:12 78:2 81:20 83:10 88:11 91:3, 10 92:8 93:3 94:12 99:2 107:9 114:6 117:12, 18 118:1 119:6, 7 122:6, 23 123:7, 19 127:8 130:12 138:22 144:7 147:16 149:8 152:4, 16 153:9, 25 159:25 162:23 163:21 166:3 169:21 172:6, 17
**means** 5:22 88:13 96:10
**meant** 60:3 76:21 104:5 150:3
**measure** 54:4, 6, 18 55:10 64:12 70:10 87:22 91:23 93:23 94:9 96:18, 21 102:21 103:14 108:16 117:3 136:4, 8, 13 137:14, 18 139:20 160:17 161:21 163:7 170:7
**measured** 85:1 92:9, 13
**measures** 54:2 130:9 158:19 170:3
**measuring** 53:11, 15 54:18 55:1 76:4 77:2, 4 91:16 105:9 118:14
**Mechanically** 159:21
**mechanism** 53:3
**mechanisms** 129:20
**media** 107:4, 5 124:7, 18, 22
**Meltzer** 19:2
**MEM** 67:19 73:12
**member** 83:25 84:2 140:19 160:22
**members** 9:1 50:5, 15 70:6 174:25 175:1
**member's** 160:23
**memory** 71:7 74:8 110:19 133:9
**Menlo** 25:2
**mentioned** 33:1, 17 146:13
**metal** 159:17
**metals** 157:13 158:7
**method** 50:5, 14 52:14 62:17 156:19 163:22, 25
**methodologies** 83:22, 25 154:22
**methodology** 48:5 51:13 65:1 70:11, 13 81:12, 14 82:3 83:1, 15, 16 84:10 86:6, 8 87:7, 12, 25 88:4 89:2, 4, 12, 17 90:15, 19 92:12 94:24 102:6 105:2 136:6 138:17 150:21 154:7, 11, 18 155:10, 22, 24 157:2 159:21 160:1 161:24 163:15 166:14 167:2 175:10, 14, 24
**micro** 159:22
**middle** 18:7 84:19 151:17 174:15
**million** 90:6, 7, 8, 12
**million-dollar** 90:13
**millions** 95:20
**mind** 35:8 61:7 68:19 120:14 143:10 151:19 163:6 168:21
**mine** 15:13 35:8, 20, 21 36:12 57:10, 15 72:13 96:15 133:11, 14 134:16, 20, 23, 24

137:3, 13 139:6, 12 148:13 157:4
**mine-by-mine** 134:14 148:11
**Minera** 73:4, 6
**minerals** 133:2
**mines** 35:9 133:6, 11, 23 135:15, 19 136:11, 12 137:19 138:3, 5, 8 139:8, 10 148:9, 16
**mining** 36:14, 19, 22 57:17, 25 60:10 71:24 72:2, 7, 22 73:9, 12, 15 100:19, 22 101:16, 25 102:2, 14 109:23 137:16 138:1 157:9, 12 158:23 159:17
**Ministry** 57:17, 25 72:3, 7, 22 73:10, 12 100:20 102:1
**minute** 43:5 110:6 131:7
**misapprehension** 145:4
**mischaracterizes** 62:3
**misleading** 58:24, 25 60:1
**mismatch** 151:7, 15 152:1, 5
**mispronounce** 57:5
**mispronounced** 29:11
**misrepresent** 99:13
**misrepresentation** 74:23 91:5 97:23 144:16 151:8 152:2, 8, 20
**misrepresentations** 56:19 58:10, 18 74:17, 18 84:20 85:12 98:6, 9, 17 99:7, 21, 22 101:2 102:12 144:1, 5, 8, 24 153:11 167:23
**misrepresented** 133:15
**missing** 19:6 58:10 137:1
**misstate** 58:6
**misstated** 36:7 46:5 57:1
**misstatement** 47:4 90:2
**misstatements** 35:18 47:8 60:3 64:5, 10, 13 80:19 81:7 132:12, 23 144:21 145:11, 14, 15 153:17, 19 164:18 168:16
**Misstates** 98:22 100:5
**misunderstood** 76:17
**mixed** 110:22
**model** 51:23, 24, 25 52:2, 3, 4 53:21 70:6 75:9, 10 76:7 77:22 80:10 143:7, 9 146:8, 17 151:5, 22 152:10 153:7 159:1 165:24 166:3 168:3, 20 169:6 174:23
**models** 116:13 155:5
**modify** 78:3
**modifying** 136:22
**mom** 9:3
**moment** 15:3 75:8
**momentum** 116:6
**money** 9:10 51:7 111:9 126:12
**monitored** 111:25
**month** 21:23 27:21 171:17 173:21
**monthly** 54:17
**months** 21:19 25:21 116:4, 8
**mother** 7:18
**motion** 18:8 27:24 28:16, 17, 23 29:10, 14 41:17 42:20 56:4 63:6 80:15 104:10 162:25
**motions** 104:18
**motives** 56:1, 2
**mouth** 171:2
**movement** 85:18, 20
**movements** 157:17
**MSR** 73:6, 7 134:21 137:2
**multiple** 70:8 82:13 115:20 138:3 141:5 157:24
**multiply** 139:21
**Myers** 52:19
**Mylan** 19:22 38:1, 4

< N >
**nailed** 29:12
**name** 4:14, 21, 24 7:3 11:25 111:24 148:18
**named** 158:17 177:8
**names** 19:12 33:17
**NASDAQ** 112:19, 21
**national** 106:6, 11
**native** 30:16
**natural** 7:25 9:13 21:13 160:7
**nature** 32:9 46:10 109:22 126:1 144:5, 7
**NEAL** 2:12 4:25
**near** 10:14
**necessarily** 20:13 39:1 41:7 55:25 64:20 69:1 93:17 105:8 111:17 118:1 119:6 138:10 147:4 168:21
**necessary** 26:25 28:4 103:16 115:12 131:20
**need** 5:18 6:8, 24 13:7 14:14 31:9 38:8 83:9 85:15 88:14 103:11 134:10 158:14 162:14, 18 176:1, 14
**needed** 80:9 170:9
**needs** 63:23 64:24 128:8 129:2 131:24 153:12 167:13 168:7, 23
**negative** 96:16 133:10, 14 139:9, 11
**net** 53:13 63:16 133:21
**nets** 148:4
**Nettesheim** 12:22
**network** 44:6
**NEVADA** 1:2 4:10 20:7, 10, 13, 15, 19, 22
**never** 32:22 42:7 48:19 55:18 136:21 144:3 150:21
**New** 2:8 24:3 79:15, 16, 17, 18, 25 94:13 95:13 96:11 110:25 127:14
**news** 13:11 26:13, 17 30:10, 11 37:10 45:3, 18, 20 46:15 79:20 106:17 107:3, 23 115:13 123:1, 20 124:20, 24 126:5 130:18 133:10 156:6
**Nguyen** 2:3 55:16
**nine** 13:25 22:12 35:2
**Ninth** 20:10, 11, 12, 14
**nod** 6:2
**nodding** 25:15
**non** 94:5
**nonfraud** 86:18
**nonfraud-related** 63:22 77:1 85:23 86:12, 22 89:1 90:16 94:7, 11, 19 103:21 139:20 146:25 147:18 149:17
**nonrepresentative** 100:17
**Nope** 121:17
**norm** 140:15
**normally** 173:9
**North** 2:13 17:14 18:11
**Notary** 179:23
**note** 67:12
**noted** 179:8
**noticed** 25:16
**notion** 167:17
**number** 14:1 15:12, 20 17:13 18:3, 9 20:12, 15 22:10, 18 29:17 33:7 63:4 119:11, 23 120:7

139:22 146:18 160:18 170:2, 25
**numbers** 71:20 171:13
**numerous** 79:14 109:8 113:19 163:16
**nutshell** 119:18
**NY** 2:8
**NYE** 1:11 3:8 4:7 5:6, 9 7:5, 11, 13, 16 43:17 78:16 131:14 176:2, 9 177:4
**N-Y-E** 7:5
**Nye's** 83:12
**NYSE** 111:21

**< O >**
**Object** 93:5 97:11 100:4 128:6 153:8 169:13
**objection** 6:17, 20 23:3, 11 48:14, 22 49:6 52:5 58:23 62:2, 22 64:19 65:12 66:17 72:23 75:15 76:15 77:15 78:1 81:24 90:18 91:8 92:6 94:3 97:3 98:10, 21 101:5 102:16 113:13 116:19 117:11 123:16 129:14 136:3 138:14 141:24 142:21 145:22 149:24 150:16 151:10 152:12, 25 157:5, 19 159:3 162:17 164:6 165:9, 20 168:4 174:4, 12 175:3, 12
**objections** 100:21 102:2
**objective** 76:24
**objectively** 54:1
**obligation** 72:4, 11, 22
**obscure** 128:11, 12
**observe** 50:24
**observed** 133:13
**observing** 53:19
**obvious** 111:8
**obviously** 149:25
**occasion** 132:15 166:17
**occasionally** 15:16
**occur** 68:18 84:17 112:10 114:23 115:22 118:4
**occurred** 71:1 74:24 129:3, 5 145:14 167:13
**occurrence** 172:9
**occurring** 53:9 114:14 125:24
**o'clock** 78:12 131:12
**Ocwen** 104:9
**odd** 9:9
**offer** 55:14 56:5, 6
**office** 8:9 34:20
**Oh** 30:14 59:13 81:25 88:21 110:11 113:14 114:2 156:1 160:24
**Okay** 7:3, 14 10:12 12:6 25:17 30:14 57:9 59:13, 21 62:14 98:17 99:6, 19 102:24 110:21 140:7 142:6 148:8 149:2 150:6 162:5 166:6 172:11 174:14, 16 176:2
**old** 127:15
**oldest** 9:19
**omission** 58:19 59:14, 18 60:7 66:6, 15 144:12
**omissions** 35:19 47:8 58:18 59:3, 6 60:3, 13, 15 64:5, 10, 14 74:17 78:5 80:20 81:8 84:20 85:13 132:12, 24 144:11 153:12, 17, 20 164:18 167:23 168:16
**omit** 90:11 144:11
**omitted** 46:5 57:1 62:21 64:17 91:20
**once** 24:23 25:5
41:13 87:18
**one-drop** 140:22
**ones** 31:5, 16 35:3 119:19
**ongoing** 75:4
**on-or-off** 105:7
**oOo** 2:20 3:5, 10 176:21
**open** 17:7 22:19 74:7
**operating** 136:20 159:17
**operational** 14:9
**operations** 35:5, 6 36:23 109:23 135:23 148:20, 21
**opine** 47:24 49:8 61:15 82:1
**opined** 81:10 82:19 140:21 160:18 172:2
**opining** 60:22 173:2
**opinion** 26:24 28:4 40:13 42:8 46:1, 23 48:8, 11, 20 49:3, 4, 18 50:13 55:14, 20 56:5, 6 64:23 67:6 68:4 70:17 82:10, 24 95:17 96:7 106:25 112:12 113:10 143:7 149:18 161:20 163:9 166:11 172:4 175:5, 7, 22
**opinions** 17:6 20:6, 24 31:15 37:2 46:17 47:16 48:15 55:24 63:4 79:13 80:3 95:16 104:6, 17, 21, 23 105:4 121:20 167:16 173:9 174:1 175:7
**opportunity** 88:9 111:8
**opposed** 44:23 143:8 144:2
**optimized** 126:15
**option** 11:15 15:5 103:8
**options** 69:10, 15 154:23
**Orange** 10:14
**order** 27:25 28:16 42:20 52:1 126:14 158:14 163:1 168:13
**orders** 29:1 78:3 80:14 132:6
**Oregon** 1:22
**originate** 20:14
**outcome** 177:17
**out-of-pocket** 51:13 81:12, 17
**Outside** 162:21
**outstanding** 110:8
**overall** 134:2, 15, 19 139:8, 23
**overnight** 68:24
**overseeing** 13:6, 14
**overvaluation** 35:21

**< P >**
**p.m** 78:12, 13 131:9, 12 162:7, 10 176:11, 20
**PAGE** 3:3, 7 83:14 110:3, 5 178:5
**pages** 110:21 179:4
**paid** 126:10
**painstakingly** 129:8
**Palo** 25:2
**panicked** 18:6
**paper** 52:19
**papers** 52:16 103:5 106:5 115:25 116:14
**paragraph** 83:19 84:11, 25 93:11 110:4
**parallel** 173:12
**parameters** 87:18
**parity** 111:4 112:7, 15
**Park** 25:2
**parse** 59:8
**part** 9:3 23:10 38:19 53:2, 22 57:12, 15 69:8, 21 73:10 82:21 84:9, 15 86:15 88:7 104:7, 8 107:4 116:16 138:22
**particular** 16:20 26:15 32:7 70:17 71:13 75:13 80:8

143:16 147:11 149:3, 23 159:24 169:7, 12
**particularly** 9:25 24:12 31:6, 7 115:9 125:4
**parties** 177:18
**partner** 4:23 5:1
**Partners** 21:11
**parts** 36:24 78:25 109:1 129:16
**Paso** 21:11
**pass** 26:24
**patterns** 116:5
**pause** 131:2
**pay** 32:8
**paying** 23:23
**PDT** 4:3
**peer** 157:10, 18, 24 158:3, 18 159:2
**peers** 159:18
**pending** 172:12
**people** 13:16 55:9 57:9, 18, 22 71:12, 18 91:14 95:13, 20 113:15 121:1 126:12 137:9
**peoples** 57:3
**perceive** 127:7
**perceived** 41:20 49:25 116:13 146:24
**percent** 33:2, 14 67:14 68:2, 7, 14, 16, 24 79:1 108:17 110:8 134:17, 18 138:11, 13 148:12 167:14 170:16 171:19, 21
**percentage** 33:8 108:21 171:15
**percentage-based** 139:24
**percentages** 139:14
**percentage-style** 140:14
**perfect** 123:7, 8 168:12
**perfectly** 82:3 89:10 161:25 166:8
**perform** 23:9 24:9, 18 43:20 63:12
**performance** 146:20
**performed** 13:8 31:10 57:21 123:3 166:6
**performing** 62:20
**period** 9:21 22:22 26:9 37:20 38:1, 4, 9, 10, 11, 14, 19 39:3, 8, 11 47:1, 21 48:3 54:13 58:14 64:5 74:2 75:24 79:22 80:22 84:7 97:18 105:21 106:16 107:8, 20 108:6, 14, 21, 23 109:2, 5, 18, 20, 24 110:10 113:24, 25 114:14, 16, 25 115:12 118:14 121:18 125:3 134:22 135:11 136:2 140:18, 19, 23 141:10, 22, 23 142:15, 19 143:14 150:13 159:15, 19, 24 160:18 161:15, 22 163:11, 12 164:5 166:19 169:8, 12 170:9 172:19, 21
**periods** 38:5, 24 62:25 108:8 115:6
**perpetuity** 155:14
**per-share** 139:19 175:14, 24
**persist** 116:7
**person** 5:10 34:4, 10 177:12
**personally** 107:22
**perspective** 51:17 68:5
**pertaining** 136:10
**Peru** 135:15
**Peruvian** 138:8
**Peter** 2:19 4:14
**Petrobras** 37:1, 5
**pharmaceutical** 143:23
**Pharmaceuticals** 140:3
**phase** 24:14 40:1 42:21 46:11 68:21 173:10
**phases** 18:23
**PhD** 1:11 3:8 4:7 5:6 8:12 9:21 11:18 12:15 14:20, 23 27:5 176:9 177:4
**PhDs** 125:22
**phenomena** 153:23
**phenomenon** 119:8
**Philippe** 10:1
**phonetic** 80:17
**piece** 52:3 60:13 79:19 118:11
**pieces** 95:1 103:2 114:8
**piggy** 37:13
**Pipeline** 21:11
**place** 71:13 73:18 177:8
**Plaintiff** 2:3 4:22 16:20, 25 17:3 40:2 46:5 55:16 172:25 173:22 174:8
**plaintiffs** 29:6 47:10 60:5 64:6 75:1, 7, 11, 12, 19 76:5 77:3, 9, 12 83:17 84:6 87:10 88:2 89:5 92:17 97:4 98:1, 19 99:9 100:11 101:11, 22 102:18 103:12 131:21 142:7, 13, 25 146:2 151:6, 24 155:1 160:15 162:1, 13 163:9 164:2, 13 165:10 170:18 172:4 173:23 174:24
**plaintiff's** 38:23 48:7 55:15, 21 56:7 62:18 64:3, 24 70:7
**play** 50:18
**player** 7:19
**pleadings** 29:8
**please** 5:5 7:4 33:6 43:7 83:11
**Plebiscite** 58:4
**pled** 170:18
**plenty** 66:1
**plethora** 56:1
**plus** 133:24
**point** 6:1 12:21 22:19 24:22 25:20 26:4, 7 27:16 28:22 29:1 32:18 38:21 46:2, 16 49:22 50:1 55:11 71:10, 15, 22, 25 78:21 81:16, 23 85:9 86:19 87:4, 21 88:15 95:21 106:14, 20 111:1, 14 134:9, 10 140:17 155:12 160:7, 8, 14 161:2 170:10, 15 171:23
**points** 67:13
**Pomerantz** 18:25
**poor** 56:22 148:16
**poorly** 107:16
**popped** 107:21
**popular** 156:1
**population** 57:22 60:8, 9, 25 61:8, 12 71:21
**populations** 72:16 100:18
**pore** 125:23
**portfolio** 55:8
**portion** 53:13 86:5 88:1, 12 94:19 97:7 102:6, 8 134:19 145:8 148:6 149:5 150:3
**portions** 132:21
**positive** 135:5
**possible** 46:14 76:6 102:14 106:19 126:14 141:9 149:11, 16 150:11 151:4, 22 152:10, 18 153:21 165:6
**post** 124:15 134:5 136:20
**posts** 124:8, 22
**post-verdict** 88:19, 22
**potential** 124:9 125:14
**potentially** 45:12 128:22, 23
**pre** 134:4 136:20
**pre-2015** 135:25

**preceding** 25:*21*
**precious** 159:*17*
**predominantly** 133:*4*
**preexisting** 84:*21*
**preliminarily** 45:*10* 46:*8*
**preliminary** 40:*4*, *9*, *21* 41:*10* 46:*17*
**premarked** 83:*12*
**premarket** 114:*24*
**prepare** 39:*4* 145:*19*
**preparing** 25:*25* 64:*15* 66:*12*
**presence** 122:*21* 125:*9*, *12*
**present** 2:*17* 51:*6* 52:*22* 143:*22* 146:*7* 155:*15*
**president** 37:*12*
**presidents** 34:*13*
**press** 45:*1* 127:*18*, *22* 130:*14*, *17*
**presumption** 108:*18*, *19* 115:*14*
**pretty** 8:*16* 9:*20* 11:*17* 14:*14* 20:*22* 26:*6* 108:*2* 109:*19* 111:*6* 130:*10* 140:*1* 156:*15* 169:*22*
**prevent** 73:*12* 84:*20* 102:*1*
**prevented** 167:*24*
**preventing** 144:*13*
**previously** 20:*7* 33:*1* 43:*18* 63:*19* 90:*4* 94:*14*
**price** 35:*23* 45:*6*, *20* 46:*6* 50:*2*, *25* 51:*3*, *5* 53:*2*, *8*, *13*, *19*, *23*, *25* 54:*2*, *21* 64:*4* 65:*5* 66:*24* 67:*22* 68:*1*, *2*, *3*, *23* 69:*10*, *11* 74:*1*, *6*, *19* 77:*5* 80:*24* 81:*1* 84:*18*, *21*, *25* 85:*2*, *6*, *18*, *20* 86:*5*, *17* 89:*8*, *9*, *21*, *24* 90:*5*, *10* 91:*10*, *19* 93:*8*, *25* 94:*14* 95:*3* 96:*5*, *11*, *15*, *22*, *24*, *25* 97:*20* 105:*10* 111:*3* 112:*6*, *14*, *17* 114:*1*, *10*, *17*, *19* 116:*6* 122:*9* 123:*4*, *21* 124:*1*, *5*, *9* 125:*15* 126:*19* 127:*4*, *6*, *14* 128:*5*, *16* 132:*9*, *21* 133:*13* 134:*2*, *20* 136:*4*, *6* 137:*3*, *14* 138:*10*, *22* 139:*7*, *12* 140:*12* 141:*6*, *11*, *15*, *20*, *21* 142:*14* 144:*20* 145:*3*, *6* 146:*2*, *19* 147:*3* 150:*4*, *19*, *20* 155:*23* 156:*10*, *16* 157:*3*, *17* 158:*3* 160:*9*, *13* 161:*2*, *4*, *7*, *14* 167:*19*, *20* 168:*14* 169:*16* 171:*22* 175:*15*
**priced** 94:*14* 156:*8*
**price-inflation** 143:*24*
**price-maintenance** 92:*3* 93:*4* 144:*9*, *22* 145:*17* 163:*19*
**prices** 26:*11* 46:*24* 68:*6* 69:*17* 89:*16* 91:*1* 95:*5*, *24* 103:*7* 106:*23* 112:*6*, *22* 118:*25* 119:*20* 122:*5* 124:*23* 127:*13* 130:*8* 154:*14*
**pricing** 11:*16* 15:*6* 53:*2* 103:*8* 116:*13*
**primarily** 30:*17* 61:*25* 80:*2* 92:*8* 130:*6* 135:*1* 147:*17* 159:*17*
**primary** 9:*18* 31:*5* 64:*25* 116:*21* 120:*9* 135:*7*
**principle** 11:*24* 31:*2* 84:*14* 86:*24* 111:*22* 143:*18*
**principles** 52:*18* 53:*1*
**Prior** 12:*14* 21:*19* 40:*18*, *23* 41:*23* 42:*22* 72:*3*, *19* 79:*12* 83:*1* 98:*22* 100:*5* 108:*8* 138:*7* 140:*12* 144:*10* 159:*5*
**Prius** 129:*25*
**Private** 161:*11*
**privately** 16:*5* 21:*12*
**privy** 46:*1*
**probability** 103:*10* 167:*15*
**probably** 11:*8*, *14* 15:*19* 17:*14* 20:*2* 22:*24* 25:*14* 26:*12* 28:*13* 42:*17* 44:*9* 48:*18* 56:*18*, *22* 58:*10* 70:*22* 73:*7*, *13* 93:*6* 109:*15* 119:*5* 121:*2*, *7* 122:*16* 154:*17* 159:*6*
**problem** 54:*24* 77:*8* 171:*25*
**problems** 115:*21* 146:*21*
**procedure** 118:*20*
**proceedings** 20:*19*
**process** 13:*6* 16:*16* 25:*18*, *25* 26:*6* 30:*6* 41:*17* 47:*12* 53:*22* 55:*3*, *6* 57:*15* 64:*15* 66:*13* 73:*11* 78:*17* 95:*19*, *25* 131:*20* 163:*2* 165:*1*, *2* 175:*16*
**produced** 29:*23*
**producing** 135:*12* 137:*20* 139:*2*, *4* 157:*14*
**product** 78:*21* 116:*10* 148:*25* 156:*25* 172:*10*
**production** 109:*25* 157:*24*, *25* 158:*9*
**products** 148:*22*, *23*
**product's** 149:*3*
**professional** 134:*13*
**professor** 7:*20* 11:*7* 12:*23*
**professors** 11:*7*
**profits** 155:*12*
**program** 9:*24* 10:*23* 58:*7*
**programs** 8:*13* 9:*21*
**progresses** 163:*6*
**progression** 7:*25*
**project** 8:*16* 12:*19* 13:*2*, *13*, *16*, *17* 14:*3*, *6*, *7*, *11* 23:*21*, *25* 26:*21* 27:*14* 33:*24* 34:*14*
**projects** 12:*24* 34:*14*
**prolonged** 118:*3*
**prompt-like** 123:*21*
**proper** 81:*14*
**property** 16:*6*, *10*, *14*, *18* 155:*7*
**propose** 83:*22*
**proposed** 166:*7*
**proposing** 154:*25*
**propounded** 179:*6*
**proprietary** 122:*12*
**prospectively** 174:*20*
**prospects** 25:*6* 107:*21*
**protests** 58:*1*
**prove** 64:*7* 160:*16* 164:*13*
**proven** 169:*3*
**provide** 23:*16* 30:*19* 115:*11* 130:*12*, *13*
**provided** 15:*10* 29:*20*, *25* 30:*9*, *10* 61:*10* 109:*7* 123:*17*
**provides** 96:*20* 120:*11*
**providing** 122:*16*
**provision** 41:*25* 42:*3*
**public** 18:*24* 19:*11* 42:*18* 48:*12* 92:*24* 124:*3* 127:*18* 128:*4* 173:*16*, *17* 179:*23*
**publicly** 30:*20* 122:*2*, *4*, *6*, *24* 127:*25*
**public's** 35:*22*
**publish** 124:*21* 129:*17*
**published** 10:*2* 159:*14*
**pull** 81:*20*
**purchase** 140:*12* 161:*13* 171:*14*
**purchase-accounting**

170:8
**purchased** 84:7
**purchaser** 140:17
**purchasers** 174:21
**purchases** 39:10
**purported** 74:1 91:4 131:18
**purposes** 4:4 30:7, 23 46:20 114:21 121:12 134:10 141:19
**pursue** 9:5, 15
**put** 27:13 100:21 128:12 134:8 150:9 171:1, 13
**putting** 25:19 26:18, 20 27:8 123:24
**puzzle** 100:24

**< Q >**
**qualifications** 14:3
**quantify** 170:23 171:2
**quantifying** 83:20 170:22
**quantitative** 11:15 27:8
**quarter** 94:21 148:16
**quarter's** 148:24
**question** 6:3, 10 20:18 31:13 48:24 50:10 51:20 52:7, 9 60:19 75:19 76:9 85:14 87:10 92:8 99:3, 5, 11, 17, 24 100:1 101:14 113:9 141:2 146:16 151:16, 20 156:7 174:15
**questioning** 65:20
**questions** 5:17 6:9 73:25 83:3 179:6
**quick** 125:15 162:3
**quickly** 114:2 122:8 126:7, 14
**quite** 58:10 61:12 92:7 99:16 147:1 159:7
**quote** 93:9
**quoted** 123:1

**< R >**
**racist** 100:16
**Rafael** 73:6
**raise** 100:21
**raising** 102:1
**ramifications** 75:2 171:9
**ramping** 109:25
**ramp-up** 22:21
**randomly** 95:12
**rapidly** 126:25
**rare** 9:22 14:14 68:8 172:9
**rate** 31:18, 20, 23 32:5, 8, 10, 11, 15, 17, 25 33:20 51:8 53:22 162:16 163:10, 11, 23 169:10
**rates** 9:11 32:9 33:11 34:5
**ratio** 134:19
**rational** 76:23
**rationale** 136:22
**react** 86:3 115:13 127:14
**reacted** 136:19
**reacting** 114:25
**reaction** 118:1, 2, 4
**reactions** 123:22
**reacts** 119:20
**read** 26:22 28:1, 21 29:14 31:4 56:23 61:8 73:2 75:4 79:20 89:6 93:10, 11 99:6 104:14 107:3 151:21 162:12 165:11 172:23 173:7 176:19 177:14 179:4
**reading** 80:13 132:4 151:19
**real** 46:7 167:13
**reality** 146:25
**realization** 131:17
**realizing** 144:13 171:21
**really** 24:6, 15 27:7, 20 31:12 41:9 42:6, 7 47:18 54:11 55:5, 18 60:16 76:9 80:12 90:1, 7 107:16 121:19 126:3, 16 128:11 137:22 156:2, 4 157:12 158:16 162:23 166:11 172:23
**realtime** 120:13, 16 124:17
**reason** 44:22 45:6, 13 66:7 69:9 93:2 95:7 102:19 106:25 118:3 132:11 142:13, 25 173:25
**reasonable** 128:1 138:6
**reasons** 46:9 54:7 68:7 115:5 142:8 143:22 149:17
**reassess** 88:9, 14
**rebuttal** 55:21
**recall** 11:21, 24 20:3 21:18 25:10, 22 28:8, 14 35:6, 16 36:2, 5, 6, 9, 11 37:14 40:20 68:16 71:10, 19 73:20, 24 74:14, 25 120:1
**receiving** 126:13
**Recess** 43:13 78:10 131:10 162:8
**recollection** 20:20 21:22 70:22 71:15 72:6, 15 74:11 80:20 101:23 107:15 147:6, 10
**reconcile** 108:10
**record** 4:18, 20 5:16, 24 7:4 27:11 43:10, 11, 15 78:8, 12 83:12 99:6 131:6, 8, 12 151:21 160:11 162:6, 10 169:19 176:7, 11, 12 177:9
**recorded** 5:23
**records** 84:6 160:25
**red** 59:16
**Redwood** 10:7, 8, 12
**reestimating** 88:23
**referenced** 132:15
**Refinitiv** 120:10 130:2, 3
**reflect** 79:1 83:22 112:17 118:15 127:13 167:21 171:22
**reflected** 50:1 55:10 96:4 114:18 122:8 123:3 124:1 139:7, 12 158:10
**reflecting** 53:14 77:19 95:25 105:11 106:8
**reflective** 65:22 66:7 96:8 113:18 116:11 145:3 168:16
**reflects** 10:19 85:6 123:12
**Reform** 161:12
**refresh** 71:7 74:8 110:18
**regarding** 16:13 48:11 52:17 80:3 98:18 99:8 113:11 130:18
**regardless** 97:22 129:18
**region** 57:10
**regions** 129:21
**regression** 30:18 53:7, 21 63:15 86:14 117:13, 17 118:9, 17 119:14 148:3 156:17 158:20 160:7
**regressions** 13:9
**Regular** 176:18
**regulatory** 103:6
**reject** 44:18 47:3
**relate** 61:25 62:21 153:23
**related** 24:10, 12 54:9, 10, 23 55:12 64:9 76:3 85:19 108:13 114:13 150:4 177:18
**Relates** 1:5 47:3 152:21
**relating** 71:11 104:21, 24 153:3
**relationship** 153:6

**relative** 10:8, 12 48:24 49:2 54:22 56:22 81:2 106:21
**relatively** 22:11 106:20 125:15 172:9
**release** 71:20 130:14, 17
**releases** 45:2 126:5 127:19, 22
**relevant** 35:23 39:3, 6, 11 63:3 72:17 77:6 79:2 80:2, 6 106:16 108:16 113:24 117:9, 21, 23 122:8 130:10 173:6
**reliable** 64:12 89:18 96:21 156:18
**reliably** 53:11 54:1 86:4 136:8
**relied** 30:9, 23 31:1, 11, 16
**rely** 127:17
**remedy** 84:15
**remember** 10:5 11:25 19:4, 16 20:21 33:16, 18 34:11 35:20 70:25 94:5 100:13 125:7 161:12
**remembers** 62:11, 13
**remove** 102:20
**removed** 63:24
**repeat** 50:10 99:3, 4 151:16
**repeatedly** 101:9
**replied** 55:23
**Report** 3:8 11:22 12:7 13:8 15:8, 11, 13, 15, 17 19:9, 18 21:20 25:19, 23 26:1 27:13, 19 29:17, 22 30:7, 23, 24, 25 31:6, 11, 17 33:12 39:4 40:19 42:10 45:19 47:25 48:1 49:20 55:24 78:19 79:8, 10 80:5, 9 81:13, 18 82:7 83:7, 12 86:23 105:12 113:15 120:3 125:11 140:5 154:21 160:24 161:10 173:1, 6, 7, 16, 23
**reported** 1:20 177:10
**reporter** 4:16 5:5, 19, 23 177:3, 11, 25
**Reporting** 4:15, 17
**reports** 12:25 13:11 15:20 17:6 18:23 19:15 26:12, 13, 22 30:15 38:15 45:2, 3, 20 79:12, 18, 21 81:21, 22 82:1, 7 86:7 120:8, 11, 12, 15 122:2, 4, 5, 16, 19, 23 123:20 124:25 130:4, 6, 18 134:3 159:14
**represent** 5:2
**representation** 41:5
**representative** 56:8
**represented** 16:25 17:1
**representing** 22:5 91:15
**request** 29:21, 24 177:14
**requested** 29:19
**require** 47:18 61:23 168:20
**required** 57:16 102:22 114:9 161:11 169:17, 21 170:9 172:2, 5
**requirement** 14:5 73:16, 17, 20 167:12 168:13
**Research** 2:18 33:25
**reservation** 112:14
**reservations** 57:15
**residual** 63:24
**RESOURCES** 1:4 4:8 18:2 48:13 72:21 83:17 96:17 113:3 119:25 120:9, 20 121:18, 23 134:21 156:25 157:11 158:18, 21, 24
**respect** 7:15 23:22 32:14 38:25 80:10 81:22 104:11 106:1 111:2 112:5 119:17 161:21
**respective** 177:19
**respects** 96:7
**response** 5:18 68:22 83:3 85:6 87:19 115:18 116:1
**responsibility** 34:8 58:7 152:22, 23
**responsible** 13:13
**result** 34:23 64:4 73:13 77:5 91:19 95:23, 25 136:14 163:22 170:18
**resulted** 97:1
**results** 68:9 96:25
**résumé** 10:18
**retailers** 107:25
**retained** 17:16 18:13 21:16 22:4 25:20 40:18 43:20, 24 44:8, 10 47:24 48:8
**retainer** 44:4
**retired** 34:19
**retroactively** 124:19
**return** 63:25
**returns** 15:4 54:12, 16 69:22 119:4 158:21 160:9, 12
**revelation** 85:19 90:14 91:17 128:17 131:18
**revenue** 36:7 135:12 139:2, 4
**revenue-producing** 135:2, 5, 9 137:7 138:12
**revenues** 138:24
**reversals** 116:6
**review** 13:11 27:16, 24 28:6, 16, 23 29:21, 25 40:1 41:22 121:13 173:22
**reviewed** 29:9 42:13
**reviewing** 26:14 42:25
**revived** 18:7
**revocation** 96:15 97:16 101:16, 18 102:21 103:14 137:16
**right** 16:2, 20 17:9, 11, 12, 21 18:3, 10, 16, 18 19:16, 17, 24 20:1, 3, 8, 17 28:19 31:21 32:19 38:1 45:25 49:2 51:23 53:3 54:19, 22 56:3 58:15 59:19 61:21 62:24 65:11 67:14 68:16, 19, 20 70:19 74:14 76:24 79:16, 22 81:9 86:8 95:3, 7, 12, 17 96:7, 15 101:16 102:13 103:10 104:1 105:1 107:13, 15 109:16 111:7, 9, 24 112:5, 11, 18, 21 117:18, 22 118:5 119:1, 12 120:17 121:1, 8 124:16 125:11, 21 126:9, 22 127:2 129:18 130:1 134:23 135:5, 7, 10 138:11, 13, 24 139:5 142:24 146:7 148:16, 19, 20 150:1 152:17 161:22 165:3, 4 166:23 168:19 170:21 174:16 176:3, 6
**Rio** 138:8
**risk** 11:8, 11, 16 15:5 49:5, 9, 12, 23 50:3, 12, 17, 22 51:1, 7, 16 52:1, 12, 23 53:17 54:6, 8, 24 55:1, 7, 10 63:19 65:19, 21, 23 66:5, 6 67:5 69:19, 20, 21 70:4 75:4 85:4 91:18 92:14 93:13, 20 95:14 97:1, 9, 17 116:12 130:9 132:7 145:4, 16 163:21 164:19 165:16, 19 166:19, 20 167:5, 13, 18
**riskier** 49:4, 20

**risks** 93:16 166:24, 25 167:24
**risky** 48:21, 24 69:25
**rkillorin@faruqilaw.com** 2:7
**RMR** 1:20 177:24
**Road** 2:5 84:10
**Robbins** 19:1
**ROBERT** 2:5 4:21
**robust** 150:18 156:3
**role** 8:16, 17 50:19 144:19
**Ronen** 12:23
**root** 54:12 91:20 101:20 147:3 153:4
**Rosen** 19:2
**Roswell** 2:5
**rough** 176:14, 15
**roughly** 20:5
**R-squared** 158:19
**Rudman** 19:1
**rule** 168:11 169:1
**rules** 5:15
**ruling** 67:21
**run** 148:3 149:12
**running** 53:20
**Rutgers** 12:24
**Ruth** 27:5

< S >
**S&P** 49:3
**Sachs** 120:14 122:1, 11 151:12
**safety** 61:9
**sales** 143:23
**sample** 54:20 115:22 117:3, 5 119:3 158:13, 15
**sample-specific** 119:8
**SAN** 4:2, 12 10:9 73:6
**satisfying** 29:24
**save** 174:17
**saw** 28:21 43:4 55:20 96:13 119:9
**saying** 31:14 51:11, 21 72:10 74:22 97:14 101:7 140:13 153:15 168:19
**says** 62:7 68:23 94:20, 21 101:24 144:18
**scenario** 76:6 93:4
**scenarios** 149:20
**school** 7:24 8:8, 11 9:12 14:10
**science** 9:10
**sciences** 14:9
**scienter** 46:3 143:12 144:2, 4 170:1 171:5
**scientific** 64:11 89:18 96:21 156:19
**scientifically** 53:12 54:2 86:4 136:8
**Scope** 48:1 87:1
**scratch** 109:23
**search** 26:17, 18 120:10
**SEC** 45:2 58:8 110:12 123:21 127:19, 22 159:19
**second** 15:3 57:12 73:25 74:9 93:10 98:4 105:1 109:15 110:11 111:13 113:7 141:14 144:17 153:5
**secrets** 16:13, 17
**Section** 35:19 48:1 66:8 81:4 82:15, 16 83:14 141:18
**sections** 82:14
**SECURITIES** 1:4 4:8 11:22 15:7, 9, 22, 24 16:5, 23 17:9 18:19 21:5 24:17 35:1 37:1, 19 39:13 49:5 54:3 56:2 82:18 85:5 87:13 89:12 105:18, 20 115:10 118:15 119:23, 24 161:11
**Security** 12:2 15:4 32:16 41:9 50:12 55:11 61:9 69:22 83:21 89:16 107:8 154:14
**security's** 85:2 94:14 105:10
**see** 13:8 26:18 27:1 30:13 45:19 86:23 94:23 95:24 96:11 99:12 102:19 110:1 114:13 117:25 119:1, 2 121:9 128:16 132:10 134:4 136:18 139:11 142:25 156:9, 16 176:3
**seeing** 10:5 53:6, 8 95:12 117:4
**seemingly** 116:7 118:24
**seen** 36:20 38:3 68:13 81:10 108:1 124:11 136:21 142:12 143:11, 18, 20, 25
**segments** 87:23
**selected** 157:11
**sell** 111:10 137:25 140:9, 23 141:7, 10, 14 161:1, 8
**selling** 127:5 140:11
**sends** 68:22
**seniormost** 34:10
**sense** 5:25 41:19 46:14, 25 90:2 111:7
**sent** 74:11 170:11
**sentence** 84:5, 19 85:5, 16
**sentiment** 41:13
**separate** 86:17 102:6 149:21
**separating** 150:18
**sequence** 118:2
**sequenced** 6:9
**series** 35:9 119:3
**serve** 56:8
**serves** 133:9
**services** 23:10, 16 24:9
**serving** 16:19 17:10 23:1
**set** 44:16 49:25 65:15 76:14 83:19 105:11 112:18 123:10, 12, 15, 25 125:3 127:13 157:10 177:20
**sets** 16:17
**setting** 55:21
**settings** 7:13 60:2 65:1 166:9
**settled** 169:22
**seven** 38:4 104:11 148:10
**Seventh** 88:16
**severely** 9:20
**share** 61:19, 21 83:20 94:21 139:25 161:4, 5
**shares** 108:21 110:8 130:8 139:22
**sheet** 135:24 179:8
**shell** 88:21
**shifts** 126:2
**shoots** 109:19
**short** 27:9 78:6 91:22 130:9
**shorter** 172:21
**shortfall** 148:24 149:4
**Shorthand** 177:2, 11, 25
**shortly** 26:16 28:10, 13
**short-term** 119:19
**shot** 108:7 165:25
**show** 62:8 116:24 118:23 125:13
**showed** 57:21
**showing** 65:7
**shown** 111:3
**shows** 41:18 116:10 149:7
**siblings** 8:19
**side** 11:15 38:17 69:24 90:1
**sign** 41:24 67:23 176:19
**Signature** 179:14
**signed** 42:13, 24 43:25
**significant** 60:25 67:22 68:1 71:23 72:16
**significantly** 35:24

60:8 108:6 119:2, 20
**signing** 41:23 42:23
**similar** 15:10, 20, 25 16:24 172:17 173:1
**similarly** 77:17 141:5 153:14 173:7
**simply** 84:22
**simultaneously** 112:21
**single** 78:24, 25 134:22 145:20 147:22
**sink** 26:12
**sit** 43:19 58:21 61:4 74:3 102:19 132:10 167:1
**sitting** 137:20 161:19 163:8
**situated** 173:7
**situation** 68:14 83:5 93:1 139:3 145:20, 21 149:9 169:5
**six** 17:14, 17, 18, 19 18:1, 11, 15 20:4, 5 21:19 22:23 25:21 35:3 116:8 148:10
**six-ish** 22:9, 18
**six-month** 38:11
**size** 158:13, 15
**skepticism** 96:4
**slightly** 163:5
**small** 143:13
**smaller** 22:20
**smart** 27:7 30:14 112:9 126:11
**social** 58:7 124:7, 18, 22 152:21, 22
**sold** 84:7 140:18
**solely** 127:18 129:12 137:6
**somebody** 44:3 128:22
**someday** 166:4
**something-else** 108:19
**somewhat** 95:12
**sophisticated** 102:25 112:1 125:9, 12, 13 127:9 129:10
**Sorry** 18:10 33:6 37:3 64:1 78:14
82:11 89:9 99:13 110:4, 21 125:7 139:15 160:6 167:7 174:8
**sort** 24:18 61:23 78:18 81:21 83:8 92:20 105:18 122:18 124:3
**sorts** 68:7 125:22 143:21 146:14 147:7 154:15
**sought** 57:23
**sound** 57:7
**sounded** 77:10
**Sounds** 6:22 153:18
**source** 29:19 30:8 52:11 55:7 73:17
**sources** 45:16, 18
**south** 10:10 36:25
**Southern** 10:16
**space** 18:18
**speak** 165:10
**speaking** 15:2 45:5 49:15 63:7 66:18 141:3
**speaks** 75:1 100:11
**special** 38:7
**specialist** 4:15
**specific** 30:22 31:9 36:6 40:20 46:7 47:1 58:22 63:15 70:21, 25 71:19 73:20 79:5 82:8 86:8 94:16 106:16 126:4 139:12 143:5, 11 157:1
**specifically** 83:16 86:1 118:22 140:2
**specifics** 35:20 66:20
**spectrum** 105:6, 23 114:5
**speculate** 165:23
**speculating** 166:4
**speculation** 49:7 75:16 97:12 102:17 107:4 138:15 145:23 154:8 159:4 165:21, 23 174:5 175:4
**speculative** 107:6
**spell** 7:3 12:3
**spend** 33:12
**spent** 27:2
**spike** 106:23
**spot** 159:12
**spread** 80:1
**spreads** 27:12 79:17
**spurious** 119:5
**square** 54:12
**staff** 33:10 125:21
**staff's** 33:3
**stage** 92:23
**stand** 101:12
**standalone** 117:22 137:20
**standard** 54:16 105:16 115:1 118:19 140:1
**standards** 102:4
**stands** 101:11 162:24
**Stanford** 7:7, 16 8:6, 20, 23 10:6, 17 13:18 22:25 44:3 129:24 130:21
**start** 6:11 26:14 89:23
**started** 13:23 22:12 25:22 26:1, 16 31:25 109:25
**starting** 134:9 160:7, 8, 14
**starts** 26:8, 17 83:14
**startup** 25:1, 2
**state** 4:19 5:15 20:19, 21, 22, 25 21:1, 4, 8 24:1, 2 32:12 60:7 142:19 154:16 156:11 159:11 177:3
**stated** 54:7 75:19 101:17, 23 115:5 142:8 146:19
**statement** 36:3 37:15 58:22 59:1, 3 61:6, 22 62:21 65:4, 6, 7, 8, 10 66:15 99:25
**statements** 48:12 58:17, 18 59:11 60:6, 11, 14, 17, 24 74:17
78:4 92:24 127:18, 21 135:24
**STATES** 1:1 4:9 20:15 164:17
**static** 22:18
**statistics** 106:17
**status** 107:11
**statute** 73:21
**statutes** 82:13
**Stenographer** 27:10 78:13 160:10 169:18 176:13, 16
**STENOGRAPHER'S** 177:1
**Stenographic** 177:25
**Stenographically** 1:20
**step** 120:4, 5
**steps** 86:9 88:3
**stick** 146:15
**sticking** 81:16
**stock** 35:23 48:21, 23 49:4 50:3, 24 51:2, 5, 9 53:1 55:15 65:4 67:22 68:1, 2, 6, 13 69:10, 11, 16, 17, 22 74:1, 6, 19 81:1 82:19 84:21, 23 91:1 96:24, 25 97:20 102:6 103:6 106:1, 14, 18, 19 107:10, 15 108:7 110:25 111:10 114:1 119:4, 20, 24 121:24 122:5 123:19 124:9, 22 125:15 126:18 130:8, 10 134:2, 20 138:9, 12, 22 139:12 145:5 150:19 155:23 156:8 158:3 161:6, 8
**stocks** 16:2 54:20, 22 87:15 106:7, 11 111:21 121:10
**stock's** 141:20 156:10
**stolen** 16:14, 17
**stop** 43:8
**straightforward** 47:20
**strategic** 111:19
**strategy** 126:25

**stream** 52:22
**Street** 2:13 4:12
**strictly** 24:9
**Strike** 37:3 67:24 108:11
**strong** 108:17, 18 112:7 120:19 123:1 128:20 158:20
**strongly** 142:9 146:22 157:13 159:7 171:24
**structure** 79:11
**studied** 52:11 69:16
**studies** 63:14 90:25 115:9, 15, 16 116:3 119:17 124:15
**study** 9:25 50:25 51:13 53:6, 8, 10 54:1, 6 63:13 64:11, 16 65:3 66:12 68:21 69:9 79:18, 24 80:2 81:11 82:25 85:17 86:15 89:12 90:22 91:13, 16 92:12 102:25 103:5 116:15, 17, 24 117:24 118:11 119:14 148:1 150:18 155:8 156:22 160:6 163:22
**studying** 69:14 156:13
**stuff** 19:24 22:17 34:21 55:4 75:8 88:22, 24 155:7
**style** 80:24
**subject** 9:7 14:25 60:21 82:8 115:9 135:6 140:21 146:10 153:4, 11, 20 168:15
**subjects** 105:13
**submit** 12:7 42:10
**submitted** 11:22 19:9, 18 20:6 27:19 81:19 173:1
**Subscribed** 179:17
**subsequent** 161:15
**subset** 120:12
**subsidiary** 72:21 73:4
**substance** 179:7
**substantial** 29:17 36:23
**substantially** 108:25
**suddenly** 106:11
**sufficiently** 128:4
**suggest** 143:12
**suitability** 173:3
**suitable** 56:8 82:3, 25 89:10 161:25 163:24
**Suite** 2:5, 13
**sum** 133:24
**summary** 47:23
**super** 156:3
**supervise** 27:14
**supply** 14:9
**supplying** 175:23
**support** 143:6
**supporting** 29:22
**supportive** 31:15
**suppose** 20:18 40:15 84:16 93:7
**Supreme** 71:5 74:12 140:4, 8 154:17
**Sure** 7:5 16:11 19:5 20:22 21:4 26:2, 23 28:2 30:24 36:25 37:24 38:13, 16 42:15 43:17 44:19 51:15 56:16 57:12 67:23 69:13 70:16 78:7 81:25 87:15 95:18 97:24 108:3 109:17 110:13 111:15 112:11 117:23 125:10, 19 127:24 129:19 130:23 149:11 158:6 159:4 161:18 168:22
**surprise** 173:4
**surprising** 21:15
**surprisingly** 21:13
**surrounding** 30:11 106:17
**susceptible** 44:17
**suspended** 71:3, 17 97:10, 21, 25 98:8, 20 99:10 101:4 102:15 138:7 152:24 164:4, 22 165:5, 7, 12, 17
**suspension** 67:17 74:10 96:25 97:8 99:23 102:9 131:16 132:5 137:16 164:19
**suspicion** 36:9
**sustained** 29:7 47:14 162:24
**swear** 5:5
**sworn** 179:17
**SWORN/AFFIRMED** 5:7 177:5
**symbol** 120:9
**System** 159:16
**systematic** 55:1 69:19
**systems** 106:7

**< T >**
**tab** 109:16
**tabbed** 109:13 120:6
**TAHOE** 1:4 4:8 18:2 48:13, 20 49:4, 10, 20 50:8 61:12 72:21 73:15 83:17 96:17 100:14 110:8 111:18 112:5 113:3 119:25 120:9, 20 121:18, 23 134:21 156:25 157:11 158:18, 21, 24 172:12
**Tahoe-identified** 159:2
**Tahoe's** 114:1 159:19
**tailor** 79:5
**tailored** 79:8 80:9
**take** 5:19 25:6 47:14 62:16 73:18 78:6 102:7 112:2 113:17 139:21 155:22 162:3
**taken** 4:7 43:13 78:10 131:10 162:8 177:8
**takes** 79:19, 22
**talk** 6:11, 14, 15, 18, 19 25:18 52:18, 20 103:25 104:1 137:22
**talked** 44:13 56:13 69:5, 6, 18 75:6 78:16 81:5 83:4 101:22 103:23 148:7 169:14 170:1 173:18
**talking** 14:18 17:18 47:2 49:12 50:7 51:22 66:11 75:9 77:11 89:14 91:9 113:22 141:25 158:8
**tandem** 72:8
**tank** 68:23
**targeted** 111:19
**tasks** 13:7
**taught** 10:22 11:5 55:4
**Tavy** 12:23
**teaching** 10:19, 20 11:6, 18
**team** 34:9 130:20
**teams** 126:3
**technically** 128:10, 15, 17
**technique** 103:1 111:23 172:8
**techniques** 11:16
**tell** 17:25 25:8 37:2, 4 44:8 117:18
**template** 78:18, 20 79:9
**temporarily** 67:17 71:17
**ten** 39:21 78:22 139:4 148:9
**tenable** 73:1
**tend** 6:3 17:8 18:6 77:16 115:23
**tended** 14:15
**tends** 26:14
**term** 93:13 116:4 125:25
**terminal** 21:13 155:13
**terms** 31:9 34:4 40:16 43:23 45:3 54:19 127:25 165:3
**test** 134:7
**TESTIFIED** 5:7 10:4 75:17 99:19 100:3, 9
**testify** 10:3 61:6 101:10 177:5

**testifying** 12:20 13:23 16:23 19:13 22:12 31:24 174:13
**testimony** 7:22 8:17 19:10, 14 23:6, 8, 9 43:18 62:3, 5, 7 98:22 100:5 104:10, 18 159:5 177:10
**Texas** 1:22
**textbook** 52:20
**Thank** 5:4 29:13
**Thanks** 5:9, 10 110:17
**thea** 59:22 137:2 160:14
**theoretical** 91:11
**theoretically** 155:20
**theories** 41:16 82:4 163:21 168:7 172:4
**theory** 11:16 27:25 28:2, 5 38:20, 23 40:2 48:7 50:6, 16 52:15 62:18 64:3, 24 70:7 75:12, 19 76:5, 8, 10 77:3, 9, 12, 18, 20, 23 80:11 81:8, 17 83:17 87:9, 10 88:2 89:6, 9 92:17 93:13, 25 97:4, 15 102:19 103:8, 13 104:24, 25 131:21 132:3 142:7, 13, 25 146:2 151:6, 24 152:11, 18, 19, 20 155:1 160:15 162:1, 15 163:9, 18, 20 164:3 165:4, 6, 15, 16 166:12 169:25 171:4 174:24
**thing** 6:23 12:5 25:9 30:8 34:6 54:8 59:7 61:7 77:17 95:8 103:10 105:7
**things** 5:22 9:11 24:17 30:19, 21 38:7 39:5 41:1 47:16 53:24 58:11 70:2 76:1 79:4, 7 82:14 91:11 95:13, 18 103:1 107:18 114:23 118:6, 7 124:7, 13, 17 126:8 127:14 133:4 143:4, 6 144:17 146:21 148:11 155:19
**think** 6:19 7:18 10:4, 5 11:8, 25 12:1, 4, 13, 15 18:1, 20, 24, 25 19:1, 18 21:1, 2 22:1 24:2 28:18 29:10, 11 30:17 31:5, 25 33:21, 24 34:1 35:18 36:15, 16, 17 37:7 40:12, 22, 25 43:5, 6 44:19 47:6 48:18 49:13, 18, 22 55:17, 19 56:12 57:1, 3, 7, 10 58:7, 20, 23 60:5, 11 63:7, 8 64:21 66:10, 19 67:7, 13 68:8 69:10 71:9, 15, 21 72:25 73:3 74:13, 14, 25 75:1 76:16 77:16 78:2 80:5, 18 84:19, 24 85:13, 16 87:16 88:16 89:5, 10, 20 93:8, 12 97:15 98:15 100:11, 13, 15, 16, 23 101:7, 13, 15, 16 102:22 103:5, 8, 11, 15 105:1, 3, 23 107:14 109:21, 24 110:4 111:1 112:16 113:5, 18 114:4, 6, 15 117:1, 19 118:18 120:5, 18 123:1, 17, 24 124:24 125:17 126:23 128:7 129:7, 10, 15, 19, 20, 25 130:5, 6, 9 131:1, 4, 19, 23 132:4, 14, 15 134:24 135:1, 7, 12 137:8 138:10 140:3, 15 141:2 144:15, 17 150:9, 17, 18 151:18 153:14 154:2 155:16 161:10, 25 164:7, 8, 12 166:1, 12 167:17 169:9, 15 170:7, 23 172:2, 8, 17, 21 173:17, 18 175:6
**thinly** 41:9
**Third** 2:8 141:14
**third-party** 130:17
**thought** 29:24 96:2 110:23
**thoughts** 95:21 122:13
**thousand** 115:17
**thousand-plus** 106:5
**thousands** 95:19
**three** 12:17 21:19 104:3 115:7 139:3
**three-day** 117:25
**thresholds** 108:17, 18
**throat** 139:16
**throw** 118:24
**thrust** 97:17
**thwart** 57:24 73:8
**thwarting** 100:20
**ticker** 120:9
**ticket** 118:25
**tickle** 139:15
**tie** 151:11
**tight** 156:15
**tightly** 158:6
**time** 6:17 8:8 10:22 11:21 22:16, 19 25:10 26:12 28:22 31:23, 25 32:7, 18 33:11 34:18 36:15, 18 38:13 39:11, 12, 15 40:10 43:5, 6 47:1, 22 50:1 51:2, 7 54:13, 14 55:11 57:21 62:25 64:6 69:23 71:25 73:11 74:24 78:24, 25 79:3, 20, 22, 25 85:25 87:21 92:16, 19 95:6, 10, 15, 21 100:18 104:8 105:11, 21 106:2, 14, 20 107:8, 15, 20 108:23 112:1, 22 113:24 114:8, 16 115:12, 19 117:8, 19 118:8, 16 122:24 137:2 138:9 141:7 143:1, 24 144:16 145:9 146:4 147:11 155:12 157:2 169:17 170:13 171:7, 15 172:10 177:8
**time-consuming** 38:16
**timeline** 40:16
**times** 15:13, 15, 16, 18 16:4 17:4 24:8 26:4, 5 42:16, 24 56:24 63:5 66:1 75:18 87:23 90:23 91:5 109:8 115:25 140:22 148:2 160:19 163:16
**time-varying** 143:13 169:20, 23 172:3
**timing** 27:20 126:5
**today** 4:16 5:17 10:11 13:9, 16 43:19 95:24 102:19 132:10 148:2 161:19 162:2 163:8 167:1
**token** 6:13
**told** 62:12
**tool** 116:21, 22
**tools** 86:11 116:21
**top** 110:3 118:18
**Topaz** 19:2
**topic** 14:10 15:5 67:21 146:10 153:2
**topics** 11:14 15:20 48:9 147:23
**Toronto** 112:25
**total** 120:8 134:17
**totally** 90:5 132:17 146:21 153:20, 21
**touted** 146:24
**trade** 16:13, 17 105:18, 20, 21 111:20 126:6
**traded** 26:10 41:9 106:11
**trader** 122:12
**trades** 55:15 122:11 127:12
**trading** 56:2, 7 84:6 107:1, 10, 18 108:5, 9, 12, 14 109:1, 5 110:7 112:13, 20, 21, 25 113:11 121:23

122:17 124:17 126:4, 25 127:10 160:25
**transactions** 55:22, 25 127:5
**transcribe** 6:25
**transcribed** 177:12
**transcript** 28:18 80:14
**transcription** 179:5
**transpired** 114:17
**treatment** 173:3
**trial** 47:12 68:10
**tricky** 99:11
**tried** 73:8 102:1
**trier** 59:23 164:15
**trouble** 107:17
**true** 45:23 47:13, 15 51:18 60:23 85:19 88:11 99:2 137:8 140:17 141:20 145:4, 16 158:8 164:18 177:9
**truth** 29:5 35:23 77:6 81:2 90:11, 12 93:18 144:14 177:6
**try** 5:14 6:18 7:14 22:18 86:3 114:16 154:24
**trying** 24:6 46:12 52:25 55:19 57:14 59:8 60:11 63:16 65:17 70:25 77:7 80:7 86:11 87:7 100:24 108:10 110:18 118:8 120:2 126:12 127:3 151:11 164:13 170:21 171:1, 12 174:20
**TSX** 111:21
**turn** 22:16 96:22 149:19
**turned** 39:19, 22, 24
**Turning** 105:4
**turns** 61:20
**Tweets** 124:21
**twice** 24:23
**Twitter** 124:8, 11
**Two** 2:13 13:21, 22 14:1, 2 19:6 22:15 27:21 32:5 59:9 74:18 91:11 103:25 104:2, 17 108:18 110:10 115:7 116:1 131:5 141:7, 10 147:23 148:22 153:22 154:4 156:14 175:21
**two-day** 115:24 117:25
**two-sided** 110:21
**type** 25:9 55:9 87:8 137:4 144:15 145:15 163:17
**types** 63:3 65:1 66:3 82:4 87:13 146:10 148:22 163:3 166:9
**typewriting** 177:13
**Typically** 14:7, 10 114:21 136:5 139:18

< U >
**U.S** 9:23 89:17 106:6 110:20 111:4, 5, 11 112:13, 19 121:11, 14, 24 148:21 174:10, 21 175:15
**uh-huh** 6:25
**ultimate** 13:14 50:19 88:5 144:25 153:12, 13
**ultimately** 14:12 26:23 38:21 58:9 63:16 87:9 105:9 112:16 138:19 159:20 163:7 164:12, 14, 25 170:6
**Um** 18:17
**unable** 149:9
**unattractive** 41:4
**uncertain** 166:18
**unclearly** 76:18
**undamaged** 141:8
**underlie** 47:15
**underlying** 15:7 30:16 33:3, 15 46:2 153:4, 13, 23 157:13 158:7
**understand** 5:20 19:7 28:1, 4 30:5 31:8, 9 33:4 43:18 51:15, 19 52:7, 8 57:20 71:9 77:7 80:16 92:7 99:14, 16 100:25 108:10 125:11 162:2 165:3 169:9 171:12
**understanding** 14:13 47:7 56:14 58:16 65:25 72:1, 20 74:3 98:5, 12 101:1 103:12 137:9 140:2 141:17 142:16, 24 144:10 153:10 164:1 167:11, 16 168:13 169:21 170:19 171:25
**understands** 168:23
**Understood** 6:5, 7 7:2 99:19 132:18
**unexpected** 94:13
**unexplainable** 117:6
**unfolding** 156:20 169:4
**unforeseen** 68:12, 15
**unfortunately** 71:1
**uniform** 135:25
**unison** 77:19 101:25
**UNITED** 1:1 4:9
**universal** 150:15
**universities** 7:21
**University** 8:13 9:16, 23 11:1
**unknowingly** 97:18
**unpack** 98:3
**unrelated** 63:17 76:1 118:24 126:8 132:23 146:21
**unsubmitted** 19:14, 15
**unwieldy** 150:14
**unwilling** 41:12
**update** 32:13
**updated** 78:24
**upheld** 63:5 80:21 81:13 83:18 89:7 104:16 109:7 154:15
**upset** 61:12
**use** 6:24 78:18 81:10 83:22 102:5 109:3 116:15, 17 129:11 130:6, 15, 21 134:5 152:17 154:17 159:1 167:2
**useful** 147:10
**usually** 7:13 14:1 21:19 25:7 26:16 27:24 32:4 38:3, 15 45:24 46:18 91:13 94:16 149:7

< V >
**valid** 175:17
**valuable** 139:8
**valuation** 9:10 15:6 16:1, 8, 9 23:16 25:4 49:9 50:18 51:2 52:18, 21 130:10 134:8
**valuations** 134:4
**value** 11:16 16:17 21:12 51:6, 7, 9 52:22 53:15 55:11 66:21 70:2, 3 90:3, 8, 13, 25 96:19 127:7, 10 133:20, 21, 23 134:14, 16 135:5 136:9 137:15, 24, 25 139:6, 8 140:11 143:22 154:12 155:13, 19 157:1, 16 158:2
**valued** 16:5
**values** 53:5 111:20 133:24
**valuing** 158:23
**variable** 32:8 51:24 52:2, 4 91:6 117:20, 22 118:24 128:4 143:7 144:6 145:21 157:25 162:16 163:11, 23 169:6, 11
**variables** 117:8, 16 118:17 119:11 150:12
**variance** 54:12 92:19
**variation** 142:14, 18
**varies** 27:18 42:5 44:12 129:21 133:17

**various** 13:7 34:14 67:12 134:25 144:21
**vary** 83:25 86:9 92:2, 4, 16 141:22
**vein** 126:24
**vendor** 120:10
**verbal** 5:18
**verbally** 6:3
**verbiage** 94:6 129:11
**verdict** 88:8
**verdicts** 88:5
**versus** 15:23 38:10 51:24 60:3 64:17 65:18 66:15 69:19 86:18 89:21 96:3 97:9 108:18 110:19 111:10 144:6
**vice** 34:13
**video** 4:15 5:24 176:9
**Videographer** 2:19 4:6 5:4 43:11, 14 78:8, 11, 14 131:8, 11 162:6, 9 176:8
**VIDEOTAPED** 1:11 4:6
**view** 40:4 113:24 145:19 146:7
**viewed** 107:9
**violated** 102:3
**violent** 58:1
**virtually** 165:11
**virtue** 134:3 140:25 157:16, 17 165:12
**Vivendi** 93:10, 12, 21 144:17 145:5 147:7
**volatile** 54:20, 22 69:17
**Volatility** 15:2, 3 54:8, 11, 15 55:10 69:7, 11, 12, 16
**volume** 27:8 79:16 80:1 108:6, 9, 12, 14, 20 109:17 110:1, 7 111:2 113:6, 12, 18
**volumes** 26:11 109:1, 5 112:13 130:8
**voluminous** 119:16

**< W >**
**Wagner** 105:3
**wait** 6:10 27:21
**want** 6:1 25:18 35:1 40:3 43:17 51:15 54:17 60:20 62:4, 10 64:21 70:16 71:8, 9 74:8 75:7 78:6, 20 82:11 98:3, 14 112:11 114:24 131:2 138:20 161:18 162:3 168:5, 6, 22 176:5
**wanted** 84:4 103:11
**wants** 121:17 176:4
**warrant** 71:23
**Washington** 1:21
**watch** 43:4, 7
**way** 25:15 33:23 34:24 37:11 40:8 52:10 59:6, 14, 18 60:22 67:25 69:3 70:22 72:9 75:4, 13, 25 76:9, 12 102:5 104:15 105:19 116:7, 15 117:12 128:12 135:25 137:10 140:21 141:4 143:17 145:1 150:9 153:14, 15, 21, 23, 25 154:12 155:5, 8, 21 161:3, 20 165:11 170:18
**ways** 92:11 93:7 155:4, 18
**Wednesday** 1:12 4:1
**weekly** 108:20 109:4 110:7 113:11
**weigh** 53:4 63:2 66:24
**weighed** 41:18 164:14
**weighing** 60:21 145:7, 12
**weird** 117:5
**Welcome** 5:9
**well** 10:5 13:5 14:20 15:7 18:12 22:2, 14 23:17 26:22 31:2, 7 33:3 36:25 41:6, 17, 21 42:2, 17 59:2 62:8 69:13 76:16 78:3 93:3 95:4 98:3, 23 100:16 105:10 106:3 108:2 113:20 116:11 118:11 121:1 125:18 130:15 133:1 134:12 136:25 139:6 141:8 148:9, 23 156:5 158:22 169:22 171:3
**well-determined** 169:16
**well-received** 79:13
**well-respected** 10:1
**well-worded** 56:23
**went** 7:19 40:14 52:12 58:6 72:8 109:24 133:12 148:8 149:1 159:20
**we're** 23:12 26:6 47:2 53:6, 8, 19 63:16 126:10
**We've** 43:3 71:6 75:6 83:12 98:12 101:22 108:1 130:24 156:17 159:21 163:20
**wheels** 170:14
**WHEREOF** 177:20
**wide** 120:19
**widely** 100:15 122:6 123:19
**widespread** 37:10
**wife** 8:23
**WILSON** 2:7 4:23
**win** 90:7
**window** 74:24 114:13, 23 156:15, 21
**windows** 115:23, 24
**withdraw** 42:1
**withdrawal** 42:3, 6
**withdrawn** 42:7
**withheld** 45:25
**within-entitled** 177:7
**witness** 5:5 17:21 23:5, 12 27:12 48:15, 23 49:8 50:10 59:22 62:23 64:20 65:13 66:18 72:25 75:17 76:16 77:16 78:2 81:25 90:19 91:9 92:7 93:6 97:4, 13 98:15 99:11, 16 102:18 110:18 113:14 116:20 117:12 123:17 128:7 129:15 136:4 138:16 142:3, 22 145:24 149:25 150:17 151:11 152:4, 13 153:9 154:9 157:6, 20 159:6 160:3, 12 162:18 164:7 165:10, 25 166:6 167:11 168:5 169:14, 20 174:6 175:6, 13 177:20
**witness's** 62:3 177:9
**woman** 27:7
**won** 90:6
**Word** 26:20
**words** 26:24 57:6 81:20 109:3 125:18 151:14 167:8 171:1
**work** 7:6 8:10, 19, 23 9:1 13:2, 12 16:9 17:2 24:1, 25 27:8 29:4 32:9, 23 34:25 39:3, 13 78:22 92:21 106:3, 4 153:7
**worked** 8:12 34:11, 15, 17 36:15 37:18 100:19
**working** 8:6 10:17 14:13 17:20, 21 18:1, 15, 22 20:5 22:3, 5, 10 25:22 31:21 38:8 73:11 126:8
**works** 87:7 137:1 175:10
**world** 55:6 121:19, 23 129:17
**worry** 6:6
**worse** 139:3 171:8
**worst** 156:10
**wrinkles** 161:16
**write** 17:5
**writing** 33:12

**written** 12:*7* 15:*10* 27:*19* 43:*25* 78:*25* 82:*7*
**wrong** 36:*17* 65:*11* 69:*6* 117:*18* 129:*23*
**wrote** 15:*8*

< X >
**Xinca** 57:*3*, *4*, *5*, *8*, *9*, *14*, *18*, *22*, *24* 60:*8*, *25* 67:*20* 71:*12*, *18*, *21* 72:*4*, *9*, *12*, *17* 73:*9* 74:*13* 100:*18*, *20* 101:*21* 102:*1* 132:*6*

< Y >
**Yeah** 13:*20* 14:*2* 19:*25* 25:*14*, *16* 28:*21* 34:*1* 37:*23*, *24* 39:*16* 43:*8* 49:*13* 55:*23* 56:*17* 58:*13* 59:*10* 60:*20* 70:*13* 81:*25* 83:*10*, *11* 98:*15* 104:*3* 105:*6*, *16* 109:*17* 112:*16* 113:*5*, *18* 114:*4* 117:*15* 124:*10* 126:*23* 127:*3*, *24* 129:*7*, *15* 130:*15* 131:*23* 132:*17* 137:*8* 138:*16*, *18* 139:*17* 147:*13* 149:*25* 151:*18* 152:*15* 153:*25* 156:*1* 158:*5* 160:*5* 162:*20*, *22* 163:*21* 173:*17*
**year** 8:*10*, *12* 10:*24* 12:*11* 21:*21* 25:*21* 35:*13* 38:*11* 39:*19* 54:*14* 106:*22* 108:*1* 116:*8*
**years** 7:*23* 8:*9*, *15* 12:*18* 13:*25* 22:*12* 24:*11* 25:*12* 31:*5* 32:*1*, *5*, *6* 35:*2* 37:*20* 38:*2*, *4* 55:*18* 78:*22* 108:*24* 110:*10* 140:*15*
**yes/no** 6:*23*
**Yesterday** 29:*10*, *15* 96:*13*
**York** 2:*8* 24:*3* 110:*25*

< Z >
**Zach** 7:*11*
**ZACHARY** 1:*11* 3:*8* 4:*7* 5:*6* 7:*5*, *6* 176:*9* 177:*4*
**Z-A-C-H-A-R-Y** 7:*5*
**zero** 22:*14* 75:*25* 76:*11* 161:*4*
**Z-H** 57:*7*

**WORD LIST**

< $ >
**$1,000** *(1)*
**$10** *(4)*
**$100** *(3)*
**$385** *(1)*
**$900** *(1)*

< 1 >
**1** *(3)*
**1:13** *(2)*
**10** *(3)*
**10(b** *(4)*
**10:28** *(2)*
**10:43** *(2)*
**100** *(8)*
**10017** *(1)*
**102** *(1)*
**103** *(1)*
**10523** *(3)*
**11** *(1)*
**11:00** *(1)*
**11:35** *(2)*
**11318** *(1)*
**12** *(2)*
**12:00** *(2)*
**13** *(1)*
**14** *(1)*
**15** *(1)*
**16** *(3)*
**1700** *(1)*
**19-0458** *(1)*
**1981** *(1)*
**1995** *(1)*
**1st** *(1)*

< 2 >
**2** *(3)*
**2:00** *(1)*
**2:01** *(1)*
**2:17-cv-01868-RFB-NJK** *(1)*
**2:44** *(2)*
**20** *(2)*
**200** *(1)*
**2004** *(1)*
**2009** *(4)*
**2012** *(4)*
**2013** *(1)*
**2014** *(2)*
**2014/15** *(1)*
**2015** *(7)*
**2016** *(3)*
**2017** *(7)*
**2020** *(1)*
**2021** *(9)*
**212** *(1)*
**24th** *(2)*
**25** *(2)*
**26th** *(1)*

< 3 >
**3** *(1)*
**3:04** *(2)*
**3:23** *(1)*
**3:25** *(1)*
**30** *(11)*
**300** *(1)*
**30342** *(1)*
**3318** *(1)*
**37** *(1)*
**3975** *(1)*

< 4 >
**4** *(6)*
**400** *(3)*
**404** *(1)*
**405-8202** *(1)*
**425** *(1)*
**4A** *(1)*
**4B** *(2)*
**4th** *(2)*

< 5 >
**5** *(3)*
**50** *(2)*
**500** *(2)*
**583** *(1)*
**5A** *(3)*
**5th** *(2)*

< 6 >
**600** *(1)*
**60602** *(1)*
**685** *(1)*
**69** *(1)*
**6th** *(1)*

< 7 >
**7** *(1)*
**70** *(5)*
**700** *(1)*
**709** *(1)*
**71** *(1)*
**750** *(1)*
**773** *(1)*

< 8 >
**80** *(2)*
**847-0617** *(1)*

< 9 >
**9:34** *(2)*
**90** *(2)*
**900** *(3)*
**90-day** *(2)*
**9119** *(1)*
**983-9330** *(1)*

< A >
**a.m** *(5)*
**ability** *(12)*
**able** *(2)*
**absorbing** *(2)*
**abstract** *(3)*
**academic** *(7)*
**academics** *(2)*
**accept** *(2)*
**acceptable** *(3)*
**accepted** *(2)*
**Accepting** *(1)*
**access** *(6)*
**accomplish** *(2)*
**account** *(1)*
**accounting** *(10)*
**accurate** *(2)*
**accurately** *(2)*
**achieve** *(1)*
**acknowledge** *(2)*
**acknowledged** *(1)*
**ACKNOWLEDGMENT** *(1)*
**acquired** *(2)*
**acquisition** *(2)*
**Act** *(1)*
**action** *(5)*
**actionability** *(1)*
**actionable** *(3)*
**Actions** *(7)*
**actively** *(6)*
**acts** *(1)*
**actual** *(12)*
**adapt** *(1)*
**add** *(1)*
**adding** *(1)*
**addition** *(4)*
**additional** *(4)*
**address** *(1)*
**addressed** *(1)*
**addresses** *(1)*
**adequacy** *(1)*
**adequately** *(2)*
**adjourn** *(1)*
**adjust** *(2)*
**adjusted** *(2)*
**adjustments** *(2)*
**adjusts** *(1)*
**admissions** *(2)*
**advantage** *(2)*
**aerospace** *(1)*
**affairs** *(1)*
**affect** *(14)*
**affirmative** *(1)*
**affirmatively** *(2)*
**Africa** *(2)*
**aggregating** *(1)*
**ago** *(9)*
**agree** *(3)*
**agreement** *(3)*
**agreements** *(1)*
**alert** *(1)*
**algorithmic** *(1)*
**allegation** *(7)*
**allegations** *(46)*
**allege** *(6)*
**alleged** *(57)*
**allegedly** *(8)*
**alleges** *(3)*
**alleging** *(4)*
**Allergan** *(1)*
**alley** *(1)*
**all-influencing** *(1)*
**all-or-nothing** *(1)*
**allow** *(1)*
**allows** *(1)*

**Alto** *(2)*
**altogether** *(1)*
**amay@nge.com** *(1)*
**Ambiguous** *(11)*
**amenable** *(2)*
**America** *(2)*
**American** *(2)*
**amount** *(7)*
**analyses** *(6)*
**analysis** *(56)*
**analyst** *(23)*
**analysts** *(13)*
**analyst's** *(1)*
**analytical** *(3)*
**analyze** *(3)*
**analyzed** *(6)*
**analyzing** *(10)*
**and/or** *(6)*
**ANDREW** *(2)*
**anew** *(1)*
**announced** *(1)*
**announcement** *(1)*
**annual** *(1)*
**answer** *(9)*
**answered** *(7)*
**answering** *(1)*
**answers** *(5)*
**anybody** *(4)*
**anymore** *(1)*
**anyway** *(2)*
**appeal** *(1)*
**appeals** *(1)*
**appear** *(2)*
**appearances** *(1)*
**Appearing** *(2)*
**appears** *(1)*
**appellate** *(1)*
**Appendix** *(1)*
**applicable** *(3)*
**application** *(2)*
**applications** *(1)*
**applied** *(8)*
**applies** *(1)*
**apply** *(6)*
**appreciate** *(2)*
**appreciated** *(4)*
**appreciating** *(4)*
**appreciation** *(2)*
**approach** *(2)*
**appropriate** *(5)*
**appropriately** *(1)*
**approval** *(1)*
**approved** *(1)*
**approximately** *(2)*
**arbitrage** *(2)*
**arbitrageurs** *(1)*
**area** *(7)*
**argument** *(1)*
**arguments** *(1)*
**arrangements** *(1)*
**arrives** *(1)*
**arriving** *(1)*
**articles** *(7)*
**Ashanti** *(1)*
**aside** *(1)*
**asked** *(31)*
**asking** *(10)*
**aspects** *(2)*
**assess** *(12)*
**assessed** *(1)*
**assessing** *(4)*
**assessment** *(4)*
**asset** *(10)*
**assets** *(5)*
**assist** *(1)*
**assistant** *(1)*
**assisting** *(1)*
**associated** *(8)*
**associates** *(1)*
**assume** *(2)*
**assumes** *(3)*
**assuming** *(3)*
**assumption** *(1)*
**assumptions** *(1)*
**Atlanta** *(1)*
**attached** *(2)*
**attendant** *(1)*
**attributable** *(3)*
**attribute** *(2)*
**attributing** *(1)*
**August** *(11)*
**availability** *(1)*
**available** *(18)*
**Avenue** *(1)*
**average** *(10)*
**aversion** *(1)*
**aware** *(9)*
**awareness** *(1)*
**a-year** *(1)*

**< B >**
**back** *(20)*
**bad** *(2)*
**balance** *(1)*
**balanced** *(1)*
**ball** *(1)*
**ballpark** *(1)*
**band** *(5)*
**bank** *(1)*
**banker** *(1)*
**Barclays** *(2)*
**BARNICKOL** *(113)*
**based** *(26)*
**basic** *(3)*
**basically** *(7)*
**basis** *(21)*
**Bear** *(1)*
**beat** *(2)*
**beauty** *(1)*
**began** *(2)*
**beginning** *(5)*
**behalf** *(4)*
**belief** *(2)*
**believe** *(17)*
**Bentley** *(1)*
**best** *(3)*
**Beth** *(2)*
**betraying** *(1)*
**better** *(3)*
**beyond** *(2)*
**Bid-ask** *(3)*
**big** *(6)*
**bigger** *(1)*
**biggest** *(1)*
**bill** *(1)*
**billing** *(2)*
**billings** *(2)*
**bills** *(1)*
**binary** *(1)*
**bind** *(1)*
**biotech** *(1)*
**bipolar** *(1)*
**bit** *(10)*
**Blaine** *(1)*
**blips** *(1)*
**Bloomberg** *(4)*
**Bob** *(1)*
**bonds** *(1)*
**border** *(1)*
**bottom** *(1)*
**bought** *(4)*
**bounce** *(1)*
**bounced** *(1)*
**bound** *(2)*
**bounds** *(2)*
**Brazil** *(1)*
**break** *(3)*
**breaking** *(1)*
**Brealey** *(1)*
**breeze** *(1)*
**Brian** *(2)*
**brick-and-mortar** *(1)*
**bring** *(1)*
**British** *(1)*
**broader** *(4)*
**broadly** *(1)*
**brother** *(1)*
**brought** *(1)*
**build** *(3)*
**built** *(1)*
**bunch** *(3)*
**bus** *(1)*
**business** *(9)*
**businesses** *(1)*
**busy** *(2)*
**buy** *(8)*
**buying** *(2)*
**byproduct** *(1)*

**< C >**
**calculate** *(8)*
**calculated** *(8)*
**calculating** *(2)*
**calculation** *(4)*
**calculations** *(1)*
**calculus** *(1)*
**California** *(12)*
**call** *(6)*
**called** *(10)*
**calls** *(17)*
**Cammer** *(11)*
**Canaccord** *(1)*
**Canada** *(12)*
**Canadian** *(17)*
**cancellation** *(1)*
**capacity** *(1)*

**capture** *(2)*
**captures** *(1)*
**career** *(2)*
**careful** *(14)*
**carefully** *(6)*
**carries** *(1)*
**carry** *(1)*
**Case** *(149)*
**case-by-case** *(2)*
**cases** *(77)*
**case-specific** *(1)*
**cash** *(7)*
**casually** *(1)*
**categorically** *(1)*
**causal** *(2)*
**causally** *(2)*
**causation** *(22)*
**cause** *(13)*
**caused** *(20)*
**causes** *(2)*
**causing** *(3)*
**CCRR** *(2)*
**census** *(2)*
**censuses** *(1)*
**cent** *(1)*
**Central** *(1)*
**cents** *(2)*
**CEO** *(1)*
**cert** *(3)*
**certain** *(28)*
**certainly** *(7)*
**certainty** *(5)*
**CERTIFICATE** *(2)*
**certification** *(5)*
**certified** *(5)*
**certify** *(3)*
**CFO** *(1)*
**chain** *(1)*
**chance** *(1)*
**Chancery** *(1)*
**change** *(21)*
**changed** *(4)*
**changes** *(21)*
**changing** *(2)*
**characteristics** *(1)*
**characterizes** *(1)*
**charge** *(4)*
**Charlesworth** *(1)*
**Check** *(1)*
**checks** *(1)*
**Chicago** *(1)*
**children** *(1)*
**choice** *(1)*
**choose** *(1)*
**chosen** *(1)*
**circles** *(1)*
**Circuit** *(11)*
**circumstances** *(3)*
**cite** *(4)*
**cited** *(5)*
**City** *(3)*
**claim** *(3)*
**claims** *(8)*
**clamp-down** *(1)*
**clarification** *(3)*
**clarify** *(1)*
**class** *(91)*
**class-action** *(1)*
**classes** *(1)*
**Classification** *(1)*
**class-wide** *(2)*
**clear** *(9)*
**clearly** *(3)*
**client** *(1)*
**clientele** *(1)*
**clients** *(4)*
**close** *(2)*
**closeout** *(1)*
**cocounsel** *(1)*
**code** *(1)*
**coin** *(1)*
**coined** *(1)*
**collection** *(1)*
**collective** *(1)*
**combination** *(1)*
**combined** *(1)*
**come** *(14)*
**comes** *(7)*
**comfortable** *(1)*
**coming** *(6)*
**commission** *(1)*
**committee** *(1)*
**commodities** *(2)*
**commodity** *(3)*
**common** *(23)*
**commonly** *(11)*
**communicate** *(1)*
**communicating** *(1)*
**Communications** *(2)*
**companies** *(24)*
**company** *(28)*
**company-made** *(2)*
**company's** *(2)*
**company-specific** *(22)*
**compare** *(1)*
**compelling** *(2)*
**compensable** *(1)*
**compensated** *(1)*
**compensation** *(1)*
**competing** *(4)*
**competition** *(1)*
**competitive** *(4)*
**competitiveness** *(2)*
**competitors** *(1)*
**complaint** *(55)*
**complaints** *(1)*
**complete** *(8)*
**completely** *(6)*
**complex** *(1)*
**compliance** *(1)*
**complicated** *(1)*
**component** *(4)*
**components** *(1)*
**computer** *(2)*
**concealed** *(12)*
**concealment** *(5)*
**concept** *(4)*
**concepts** *(1)*
**conceptual** *(3)*
**conceptually** *(1)*
**concern** *(1)*
**concerned** *(9)*
**concluded** *(2)*
**conclusion** *(3)*
**conclusions** *(1)*
**conditions** *(3)*
**conduct** *(1)*
**conducted** *(2)*
**conducting** *(1)*
**conference** *(2)*
**confidences** *(1)*
**confidentiality** *(2)*
**confirmed** *(1)*
**conflicting** *(2)*
**confounding** *(8)*
**confused** *(1)*
**conjunction** *(2)*
**connected** *(4)*
**connection** *(15)*
**consensus** *(1)*
**consequence** *(2)*
**consequences** *(2)*
**conservative** *(1)*
**consider** *(23)*
**consideration** *(3)*
**considerations** *(1)*
**considered** *(15)*
**considering** *(2)*
**consistent** *(31)*
**constant** *(12)*
**constitutional** *(1)*
**constraints** *(1)*
**construct** *(2)*
**construction** *(2)*
**construe** *(1)*
**construed** *(1)*
**consult** *(9)*
**consultant** *(2)*
**consultation** *(4)*
**consulted** *(4)*
**Consulting** *(18)*
**consumer** *(1)*
**contact** *(1)*
**contacted** *(3)*
**contain** *(1)*
**contemporaneous** *(1)*
**contemporaneously** *(1)*
**context** *(21)*
**contexts** *(1)*
**context-specific** *(6)*
**contingent** *(2)*
**contracts** *(1)*
**contradicted** *(2)*
**contrary** *(1)*
**contrast** *(2)*
**contributed** *(2)*
**contribution** *(1)*
**control** *(4)*
**controlling** *(2)*
**convert** *(1)*
**convey** *(2)*
**conveyed** *(5)*
**cookie** *(1)*
**core** *(1)*
**Cornerstone** *(1)*

**corporate** *(6)*
**Corporation** *(4)*
**correct** *(19)*
**corrected** *(1)*
**corrections** *(1)*
**corrective** *(42)*
**correctly** *(1)*
**correlated** *(3)*
**correlation** *(4)*
**correspond** *(2)*
**corruption** *(1)*
**cost** *(2)*
**costs** *(1)*
**counsel** *(18)*
**count** *(2)*
**counter** *(1)*
**Countless** *(1)*
**country** *(1)*
**County** *(1)*
**couple** *(6)*
**course** *(6)*
**courses** *(1)*
**COURT** *(46)*
**courts** *(8)*
**Court's** *(6)*
**coverage** *(1)*
**COVID** *(1)*
**craft** *(2)*
**CRC** *(2)*
**create** *(6)*
**created** *(3)*
**creating** *(1)*
**crisis** *(1)*
**critically** *(2)*
**cross-border** *(2)*
**cross-sectional** *(1)*
**CRR** *(2)*
**crucial** *(1)*
**crumbles** *(1)*
**CSR** *(4)*
**cumulates** *(1)*
**cumulative** *(1)*
**currency** *(1)*
**current** *(6)*
**currently** *(5)*
**CV** *(6)*

**< D >**
**dad** *(1)*
**daily** *(4)*
**damage** *(8)*
**damaged** *(3)*
**damages** *(113)*
**data** *(12)*
**database** *(1)*
**databases** *(2)*
**date** *(11)*
**dates** *(13)*
**daughter** *(1)*
**Dave** *(4)*
**Dave's** *(1)*
**day** *(23)*
**days** *(9)*
**day-to-day** *(2)*
**deal** *(2)*
**dealt** *(1)*
**decade** *(1)*
**decades** *(3)*
**deceased** *(3)*
**decide** *(1)*
**deciding** *(1)*
**decision** *(4)*
**decline** *(30)*
**declined** *(2)*
**declines** *(14)*
**default** *(1)*
**defeat** *(1)*
**defendant** *(5)*
**Defendants** *(31)*
**defendant's** *(1)*
**deficiency** *(1)*
**deficient** *(1)*
**defined** *(1)*
**definite** *(1)*
**definitely** *(10)*
**definition** *(1)*
**degree** *(3)*
**degrees** *(2)*
**Delaware** *(2)*
**delivery** *(2)*
**delta** *(1)*
**demonstrate** *(2)*
**demonstrative** *(3)*
**demurred** *(1)*
**denial** *(1)*
**denied** *(2)*
**depend** *(1)*
**dependent** *(5)*
**depending** *(14)*
**depends** *(10)*
**DEPONENT** *(1)*
**deposed** *(6)*
**DEPOSITION** *(10)*
**Derivative** *(1)*
**describe** *(5)*
**described** *(11)*
**describing** *(4)*
**DESCRIPTION** *(4)*
**design** *(1)*
**desks** *(1)*
**detail** *(1)*
**detailed** *(1)*
**determination** *(14)*
**determine** *(6)*
**determined** *(6)*
**determines** *(1)*
**determining** *(3)*
**develop** *(2)*
**developed** *(1)*
**developing** *(1)*
**development** *(1)*
**development-stage** *(1)*
**deviate** *(1)*
**deviation** *(2)*
**dice** *(1)*
**dicey** *(1)*
**dictated** *(2)*
**difference** *(4)*
**differences** *(4)*
**different** *(37)*
**difficult** *(3)*
**digging** *(1)*
**diminution** *(1)*
**dingdong** *(1)*
**diploma** *(1)*
**direct** *(2)*
**direction** *(2)*
**directly** *(2)*
**dirt** *(1)*
**disabled** *(1)*
**disaggregate** *(2)*
**disagree** *(1)*
**disagreed** *(1)*
**disagreement** *(1)*
**disassociate** *(1)*
**disaster** *(1)*
**disclose** *(3)*
**disclosed** *(11)*
**disclosure** *(25)*
**disclosures** *(6)*
**discount** *(2)*
**discounted** *(4)*
**discounting** *(1)*
**discovered** *(1)*
**discovery** *(16)*
**discrepancies** *(1)*
**discrete** *(1)*
**discuss** *(3)*
**discussed** *(4)*
**discussing** *(3)*
**discussion** *(4)*
**disentangle** *(14)*
**disentangled** *(1)*
**disentanglement** *(2)*
**disinterested** *(1)*
**dismiss** *(7)*
**Disneyland** *(2)*
**dispute** *(2)*
**disputes** *(2)*
**disseminate** *(2)*
**disseminated** *(1)*
**dissemination** *(3)*
**dissertation** *(3)*
**dissipating** *(1)*
**dissipation** *(1)*
**distinct** *(3)*
**distinction** *(2)*
**distinguishes** *(1)*
**distribution** *(1)*
**distributors** *(1)*
**DISTRICT** *(4)*
**diversification** *(2)*
**diversify** *(1)*
**diving** *(1)*
**divisions** *(1)*
**docket** *(3)*
**doctorate** *(2)*
**Document** *(4)*
**documented** *(1)*
**doing** *(11)*
**dollar** *(7)*
**dollar-based** *(1)*
**dollars** *(7)*
**double-dipping** *(1)*
**Dowd** *(1)*
**downturn** *(1)*

**Dr** (*11*)
**drafting** (*1*)
**draw** (*1*)
**driven** (*1*)
**drop** (*11*)
**dropped** (*4*)
**drops** (*4*)
**drove** (*1*)
**drug** (*2*)
**dual** (*2*)
**due** (*11*)
**DULY** (*3*)
**Dura** (*3*)
**duty** (*2*)
**dynamic** (*1*)
**dynamics** (*3*)

< E >
**earlier** (*21*)
**early** (*8*)
**earnings** (*9*)
**earnings-related** (*1*)
**easier** (*3*)
**easiest** (*1*)
**easily** (*1*)
**easy** (*3*)
**ebbs** (*1*)
**econometric** (*1*)
**econometrics** (*1*)
**economic** (*5*)
**Economically** (*2*)
**economics** (*5*)
**economist** (*10*)
**economists** (*4*)
**edge** (*1*)
**edit** (*1*)
**education** (*1*)
**educational** (*1*)
**effect** (*10*)
**effectively** (*7*)
**effects** (*13*)
**efficiencies** (*1*)
**efficiency** (*36*)
**efficient** (*34*)
**effort** (*3*)
**efforts** (*1*)
**eight** (*1*)
**Eikon** (*4*)
**EISENBERG** (*2*)
**either** (*5*)
**El** (*1*)
**elaborate** (*1*)
**elements** (*1*)
**eligible** (*2*)
**eliminate** (*1*)
**eliminated** (*1*)
**e-mail** (*1*)
**e-mailed** (*1*)
**e-mails** (*2*)
**embedded** (*1*)
**embedding** (*2*)
**empirical** (*3*)
**empirically** (*4*)
**employ** (*3*)
**employed** (*8*)
**employees** (*2*)
**encountered** (*4*)
**endeavor** (*1*)
**ended** (*1*)
**Endo** (*2*)
**endorsed** (*1*)
**Energy** (*2*)
**engaged** (*5*)
**engagement** (*11*)
**engineering** (*2*)
**English** (*1*)
**entail** (*1*)
**entailed** (*2*)
**entire** (*7*)
**entirety** (*1*)
**equal** (*1*)
**equally** (*3*)
**equation** (*1*)
**equilibrium** (*1*)
**equity** (*2*)
**equivalent** (*1*)
**Errata** (*1*)
**Escobal** (*13*)
**ESQ** (*4*)
**establish** (*3*)
**established** (*1*)
**establishing** (*1*)
**estimate** (*17*)
**estimated** (*4*)
**estimates** (*1*)
**estimating** (*7*)
**estimation** (*8*)
**Europe** (*1*)
**evaluation** (*3*)
**event** (*74*)
**events** (*36*)
**event-study** (*10*)
**Everest** (*2*)
**everybody** (*1*)
**evidence** (*29*)
**evolution** (*3*)
**evolutionary** (*1*)
**evolve** (*2*)
**evolved** (*1*)
**evolves** (*1*)
**evolving** (*1*)
**ex** (*1*)
**exact** (*6*)
**exactly** (*13*)
**EXAMINATION** (*4*)
**examined** (*2*)
**example** (*21*)
**exchange** (*2*)
**excited** (*1*)
**exclude** (*4*)
**excluded** (*1*)
**exclusion** (*2*)
**exclusions** (*2*)
**exclusive** (*1*)
**Excuse** (*2*)
**exercise** (*4*)
**EXHIBIT** (*10*)
**EXHIBITS** (*4*)
**exist** (*2*)
**existence** (*2*)
**exists** (*1*)
**expanding** (*1*)
**expect** (*6*)
**expectation** (*1*)
**expectations** (*1*)
**expected** (*2*)
**expensive** (*1*)
**experience** (*16*)
**Expert** (*33*)
**expertise** (*2*)
**experts** (*7*)
**expires** (*1*)
**explain** (*2*)
**explained** (*1*)
**explanation** (*1*)
**explicitly** (*1*)
**exploration** (*1*)
**exposes** (*1*)
**expressed** (*1*)
**expressing** (*1*)
**extent** (*1*)
**external** (*2*)
**extreme** (*1*)
**eyes** (*2*)

< F >
**face** (*1*)
**Facebook** (*1*)
**facilitate** (*1*)
**facilitating** (*1*)
**fact** (*10*)
**factor** (*3*)
**factors** (*14*)
**facts** (*12*)
**failed** (*2*)
**failing** (*2*)
**failure** (*4*)
**fair** (*21*)
**fairly** (*1*)
**fall** (*1*)
**false** (*27*)
**falsely** (*1*)
**family** (*3*)
**famous** (*1*)
**far** (*7*)
**FARUQI** (*13*)
**fashion** (*1*)
**father** (*4*)
**faulty** (*1*)
**favor** (*1*)
**Faye** (*2*)
**FDA** (*3*)
**fear** (*1*)
**feasible** (*1*)
**federal** (*9*)
**feel** (*2*)
**felt** (*1*)
**figure** (*2*)
**figuring** (*1*)
**file** (*2*)
**filed** (*4*)
**filings** (*6*)
**final** (*3*)
**finance** (*5*)
**financial** (*17*)
**Find** (*5*)

**finding** *(1)*
**findings** *(3)*
**fine** *(2)*
**finish** *(2)*
**finite** *(1)*
**firm** *(22)*
**firms** *(12)*
**FIRST** *(28)*
**fit** *(1)*
**fits** *(3)*
**five** *(3)*
**fixed-fee** *(1)*
**Floor** *(1)*
**flow** *(3)*
**flows** *(6)*
**fluctuations** *(1)*
**fluid** *(1)*
**focus** *(2)*
**focused** *(2)*
**focusing** *(1)*
**folders** *(1)*
**folks** *(1)*
**follow** *(1)*
**followed** *(1)*
**following** *(3)*
**FOLLOWS** *(3)*
**football** *(1)*
**force** *(1)*
**forces** *(1)*
**forecasting** *(2)*
**foregoing** *(1)*
**foresee** *(1)*
**foreseeability** *(1)*
**foreseeable** *(7)*
**forever** *(1)*
**forget** *(1)*
**Form** *(36)*
**formal** *(1)*
**formally** *(2)*
**formed** *(1)*
**forming** *(1)*
**Fort** *(1)*
**forth** *(2)*
**forward** *(1)*
**found** *(12)*
**foundational** *(1)*
**founded** *(1)*
**four** *(6)*
**four-and-a-half-year** *(3)*
**fourth** *(1)*
**frame** *(1)*
**framework** *(3)*
**FRANCISCO** *(3)*
**fraud** *(26)*
**fraud-induced** *(6)*
**fraud-related** *(8)*
**fraudulent** *(4)*
**fraudulently** *(1)*
**fresh** *(2)*
**front** *(6)*
**Fryd** *(2)*
**fulfilling** *(1)*
**full** *(2)*
**full-blown** *(1)*
**fully** *(3)*
**function** *(2)*
**fundamental** *(6)*
**fundamentally** *(7)*
**funds** *(1)*
**further** *(1)*
**future** *(5)*
**fuzzy** *(2)*

**< G >**
**GA** *(1)*
**GameStop** *(7)*
**garden-variety** *(2)*
**gas** *(1)*
**gathering** *(2)*
**Geller** *(1)*
**general** *(13)*
**generalized** *(1)*
**generally** *(9)*
**generate** *(1)*
**GERBER** *(2)*
**gesturing** *(1)*
**getting** *(17)*
**give** *(19)*
**given** *(28)*
**gives** *(1)*
**giving** *(2)*
**global** *(1)*
**glove** *(2)*
**go** *(28)*
**goal** *(2)*
**goes** *(4)*
**going** *(79)*
**gold** *(11)*
**Goldman** *(4)*
**gold-mining** *(2)*
**Gompers** *(1)*
**good** *(15)*
**goods** *(1)*
**Google** *(1)*
**gosh** *(1)*
**gotten** *(1)*
**graduate** *(2)*
**graduated** *(2)*
**graduation** *(4)*
**grandpa** *(1)*
**granted** *(1)*
**grateful** *(1)*
**great** *(3)*
**greater** *(3)*
**green** *(1)*
**grew** *(2)*
**gross** *(1)*
**ground** *(1)*
**Group** *(7)*
**groups** *(1)*
**grow** *(1)*
**Growing** *(2)*
**grows** *(3)*
**Guatemala** *(5)*
**Guatemalan** *(1)*
**Guatemala's** *(1)*
**guess** *(9)*
**guidance** *(2)*
**guilt** *(1)*

**< H >**
**habitually** *(1)*
**half** *(3)*
**hand** *(1)*
**handful** *(1)*
**happen** *(1)*
**happened** *(8)*
**happening** *(2)*
**happens** *(4)*
**happy** *(1)*
**hard** *(2)*
**harder** *(4)*
**harmony** *(1)*
**haul** *(1)*
**head** *(3)*
**heard** *(4)*
**hearing** *(2)*
**Heckmann** *(4)*
**H-E-C-K-M-A-N-N** *(1)*
**hedge** *(1)*
**held** *(4)*
**help** *(2)*
**helped** *(2)*
**helpful** *(3)*
**helping** *(1)*
**hereunto** *(1)*
**hesitant** *(1)*
**Hey** *(1)*
**Hi** *(1)*
**hide** *(1)*
**high** *(2)*
**higher** *(6)*
**high-frequency** *(1)*
**high-level** *(1)*
**highlight** *(1)*
**highly** *(2)*
**historical** *(2)*
**historically** *(3)*
**history** *(2)*
**hold** *(2)*
**holdings** *(1)*
**honed** *(1)*
**hour** *(5)*
**hourly** *(8)*
**hours** *(5)*
**Household** *(1)*
**huge** *(4)*
**huh-uh** *(1)*
**hundred** *(1)*
**hundreds** *(2)*
**hypothetical** *(2)*

**< I >**
**IC** *(1)*
**idea** *(1)*
**identical** *(1)*
**IDENTIFICATION** *(2)*
**identified** *(3)*
**identify** *(2)*
**idiosyncratic** *(3)*
**III** *(1)*
**IL** *(1)*
**illegal** *(1)*

**illiquid** *(1)*
**imbalances** *(1)*
**immediate** *(1)*
**impact** *(13)*
**impacts** *(2)*
**impaired** *(1)*
**implement** *(2)*
**implementation** *(7)*
**implemented** *(4)*
**implicitly** *(1)*
**implied** *(3)*
**implies** *(1)*
**imply** *(2)*
**implying** *(2)*
**important** *(18)*
**impossible** *(1)*
**impounding** *(1)*
**include** *(3)*
**included** *(3)*
**including** *(2)*
**incomplete** *(1)*
**inconsistent** *(3)*
**incorporate** *(4)*
**Incorporated** *(2)*
**incorporating** *(1)*
**incorporation** *(1)*
**increase** *(4)*
**increases** *(2)*
**increasingly** *(1)*
**incurred** *(6)*
**independent** *(1)*
**independently** *(1)*
**INDEX** *(7)*
**indicative** *(4)*
**indicator** *(1)*
**indigenous** *(1)*
**individual** *(2)*
**individually** *(1)*
**individuals** *(2)*
**induces** *(1)*
**industry** *(22)*
**industry-related** *(1)*
**inefficiency** *(5)*
**inefficient** *(10)*
**infancy** *(1)*
**inflated** *(2)*
**inflation** *(67)*
**influence** *(5)*
**influences** *(1)*
**inform** *(1)*
**information** *(113)*
**informational** *(1)*
**information-by-information** *(1)*
**informative** *(3)*
**informed** *(1)*
**initiatives** *(1)*
**insider** *(1)*
**Instagram** *(1)*
**instance** *(2)*
**instances** *(4)*
**instant** *(1)*
**institutional** *(7)*
**institutions** *(1)*
**Insurance** *(1)*
**intellectual** *(5)*
**intend** *(5)*
**interest** *(5)*
**interested** *(2)*
**interesting** *(1)*
**interlocutory** *(1)*
**internal** *(5)*
**Internet** *(2)*
**Internet-driven** *(1)*
**interpret** *(1)*
**interpreted** *(2)*
**interpreting** *(2)*
**interrupt** *(2)*
**interrupted** *(3)*
**intervening** *(1)*
**intraday** *(1)*
**invalid** *(1)*
**invested** *(1)*
**investigated** *(1)*
**investigation** *(1)*
**investing** *(1)*
**investment** *(2)*
**investment-banking** *(1)*
**investments** *(1)*
**investor** *(4)*
**investors** *(26)*
**involve** *(8)*
**involved** *(5)*
**involvement** *(2)*
**involves** *(2)*
**involving** *(5)*
**irrational** *(1)*
**irregularities** *(2)*
**irregularity** *(1)*
**Irrelevant** *(1)*
**Irvine** *(6)*
**isolate** *(3)*
**issuance** *(1)*
**issue** *(20)*
**issued** *(3)*
**issues** *(6)*
**issuing** *(2)*
**its** *(7)*

**< J >**
**JAMES** *(2)*
**Jane** *(1)*
**January** *(1)*
**Jim** *(1)*
**Job** *(11)*
**jobs** *(1)*
**Jorion** *(3)*
**JR** *(2)*
**judge** *(2)*
**judges** *(1)*
**judge's** *(1)*
**July** *(9)*
**jump** *(1)*
**jumps** *(1)*
**jumpy** *(1)*
**June** *(1)*
**jury** *(3)*
**jwilson@faruqilaw.com** *(1)*

**< K >**
**KARL** *(4)*
**kbarnickol@nge.com** *(1)*
**keep** *(5)*
**keeps** *(2)*
**kept** *(2)*
**Kessler** *(1)*
**Kevin** *(2)*
**key** *(1)*
**kid** *(1)*
**kidnapping** *(1)*
**kids** *(1)*
**KILLORIN** *(89)*
**kind** *(38)*
**kinds** *(5)*
**Kinross** *(7)*
**Kinross's** *(1)*
**knew** *(2)*
**know** *(198)*
**knowing** *(1)*
**knowledge** *(5)*
**known** *(4)*
**knows** *(2)*

**< L >**
**L-3** *(2)*
**lag** *(1)*
**Lambert** *(1)*
**language** *(7)*
**languages** *(1)*
**large** *(1)*
**LaSalle** *(1)*
**late** *(1)*
**Lately** *(4)*
**law** *(9)*
**laws** *(1)*
**lawsuit** *(11)*
**lawsuits** *(1)*
**lawyer** *(3)*
**lawyers** *(2)*
**lay** *(1)*
**layman's** *(1)*
**layperson** *(1)*
**lead** *(3)*
**leading** *(1)*
**learned** *(1)*
**leaves** *(1)*
**lecturer** *(1)*
**left** *(1)*
**legal** *(7)*
**legally** *(3)*
**length** *(4)*
**lengthens** *(1)*
**letter** *(6)*
**letters** *(1)*
**level** *(17)*
**levels** *(1)*
**liability** *(66)*
**license** *(46)*
**licenses** *(2)*
**lie** *(1)*
**lies** *(1)*
**life** *(1)*
**light** *(3)*

**limit** *(1)*
**limited** *(2)*
**limits** *(1)*
**LINE** *(1)*
**liquid** *(3)*
**liquidity** *(1)*
**list** *(2)*
**listed** *(6)*
**listing** *(2)*
**lists** *(1)*
**literature** *(6)*
**LITIGATION** *(14)*
**little** *(17)*
**live** *(1)*
**lived** *(2)*
**living** *(1)*
**LLP** *(3)*
**local** *(3)*
**located** *(1)*
**logic** *(1)*
**London** *(1)*
**long** *(17)*
**longer** *(9)*
**long-term** *(1)*
**look** *(19)*
**looked** *(8)*
**looking** *(25)*
**looks** *(5)*
**LORRIE** *(4)*
**loss** *(26)*
**losses** *(12)*
**loss-inducing** *(1)*
**lost** *(2)*
**lot** *(40)*
**lottery** *(2)*
**lower** *(2)*
**luck** *(1)*
**lunch** *(2)*
**lying** *(1)*

**< M >**
**macro** *(1)*
**maintaining** *(1)*
**maintenance** *(8)*
**major** *(1)*
**making** *(10)*
**manage** *(2)*
**management** *(6)*
**manager** *(5)*
**managers** *(7)*
**manipulations** *(1)*
**manner** *(10)*
**March** *(1)*
**MARCHANT** *(4)*
**MARKED** *(3)*
**markedly** *(1)*
**Market** *(99)*
**marketplace** *(4)*
**markets** *(10)*
**market's** *(1)*
**married** *(1)*
**master's** *(3)*
**material** *(16)*
**materiality** *(3)*
**materialization** *(16)*
**materializations** *(4)*
**materials** *(3)*
**matter** *(20)*
**matters** *(5)*
**Matteson** *(2)*
**Maxar** *(3)*
**Maxar-something** *(1)*
**MBA** *(2)*
**MBAs** *(1)*
**McGreggor** *(1)*
**mean** *(62)*
**means** *(3)*
**meant** *(4)*
**measure** *(26)*
**measured** *(3)*
**measures** *(4)*
**measuring** *(10)*
**Mechanically** *(1)*
**mechanism** *(1)*
**mechanisms** *(1)*
**media** *(5)*
**Meltzer** *(1)*
**MEM** *(2)*
**member** *(4)*
**members** *(6)*
**member's** *(1)*
**memory** *(4)*
**Menlo** *(1)*
**mentioned** *(3)*
**metal** *(1)*
**metals** *(2)*
**method** *(7)*
**methodologies** *(3)*
**methodology** *(48)*
**micro** *(1)*
**middle** *(4)*
**million** *(4)*
**million-dollar** *(1)*
**millions** *(1)*
**mind** *(8)*
**mine** *(21)*
**mine-by-mine** *(2)*
**Minera** *(2)*
**minerals** *(1)*
**mines** *(17)*
**mining** *(26)*
**Ministry** *(9)*
**minute** *(3)*
**misapprehension** *(1)*
**mischaracterizes** *(1)*
**misleading** *(3)*
**mismatch** *(4)*
**mispronounce** *(1)*
**mispronounced** *(1)*
**misrepresent** *(1)*
**misrepresentation** *(8)*
**misrepresentations** *(21)*
**misrepresented** *(1)*
**missing** *(3)*
**misstate** *(1)*
**misstated** *(3)*
**misstatement** *(2)*
**misstatements** *(18)*
**Misstates** *(2)*
**misunderstood** *(1)*
**mixed** *(1)*
**model** *(28)*
**models** *(2)*
**modify** *(1)*
**modifying** *(1)*
**mom** *(1)*
**moment** *(2)*
**momentum** *(1)*
**money** *(4)*
**monitored** *(1)*
**month** *(4)*
**monthly** *(1)*
**months** *(5)*
**mother** *(1)*
**motion** *(14)*
**motions** *(1)*
**motives** *(2)*
**mouth** *(1)*
**movement** *(2)*
**movements** *(1)*
**MSR** *(4)*
**multiple** *(6)*
**multiply** *(1)*
**Myers** *(1)*
**Mylan** *(3)*

**< N >**
**nailed** *(1)*
**name** *(7)*
**named** *(2)*
**names** *(2)*
**NASDAQ** *(2)*
**national** *(2)*
**native** *(1)*
**natural** *(4)*
**nature** *(6)*
**NEAL** *(2)*
**near** *(1)*
**necessarily** *(14)*
**necessary** *(5)*
**need** *(17)*
**needed** *(2)*
**needs** *(9)*
**negative** *(5)*
**net** *(3)*
**nets** *(1)*
**Nettesheim** *(1)*
**network** *(1)*
**NEVADA** *(8)*
**never** *(7)*
**New** *(13)*
**news** *(23)*
**Nguyen** *(2)*
**nine** *(3)*
**Ninth** *(4)*
**nod** *(1)*
**nodding** *(1)*
**non** *(1)*
**nonfraud** *(1)*
**nonfraud-related** *(15)*
**nonrepresentative** *(1)*
**Nope** *(1)*
**norm** *(1)*
**normally** *(1)*
**North** *(3)*

**Notary** *(1)*
**note** *(1)*
**noted** *(1)*
**noticed** *(1)*
**notion** *(1)*
**number** *(21)*
**numbers** *(2)*
**numerous** *(4)*
**nutshell** *(1)*
**NY** *(1)*
**NYE** *(15)*
**N-Y-E** *(1)*
**Nye's** *(1)*
**NYSE** *(1)*

< O >
**Object** *(6)*
**objection** *(56)*
**objections** *(2)*
**objective** *(1)*
**objectively** *(1)*
**obligation** *(3)*
**obscure** *(2)*
**observe** *(1)*
**observed** *(1)*
**observing** *(1)*
**obvious** *(1)*
**obviously** *(1)*
**occasion** *(2)*
**occasionally** *(1)*
**occur** *(6)*
**occurred** *(6)*
**occurrence** *(1)*
**occurring** *(3)*
**o'clock** *(2)*
**Ocwen** *(1)*
**odd** *(1)*
**offer** *(3)*
**office** *(2)*
**Oh** *(9)*
**Okay** *(26)*
**old** *(1)*
**oldest** *(1)*
**omission** *(7)*
**omissions** *(26)*
**omit** *(2)*
**omitted** *(5)*
**once** *(4)*
**one-drop** *(1)*
**ones** *(4)*
**ongoing** *(1)*
**on-or-off** *(1)*
**oOo** *(4)*
**open** *(3)*
**operating** *(2)*
**operational** *(1)*
**operations** *(7)*
**opine** *(4)*
**opined** *(5)*
**opining** *(2)*
**opinion** *(37)*
**opinions** *(23)*
**opportunity** *(2)*
**opposed** *(3)*
**optimized** *(1)*
**option** *(3)*
**options** *(3)*
**Orange** *(1)*
**order** *(8)*
**orders** *(4)*
**Oregon** *(1)*
**originate** *(1)*
**outcome** *(1)*
**out-of-pocket** *(3)*
**Outside** *(1)*
**outstanding** *(1)*
**overall** *(5)*
**overnight** *(1)*
**overseeing** *(2)*
**overvaluation** *(1)*

< P >
**p.m** *(8)*
**PAGE** *(7)*
**pages** *(2)*
**paid** *(2)*
**painstakingly** *(1)*
**Palo** *(1)*
**panicked** *(1)*
**paper** *(2)*
**papers** *(5)*
**paragraph** *(5)*
**parallel** *(2)*
**parameters** *(1)*
**parity** *(3)*
**Park** *(1)*
**parse** *(1)*
**part** *(21)*
**particular** *(14)*
**particularly** *(6)*
**parties** *(1)*
**partner** *(2)*
**Partners** *(1)*
**parts** *(4)*
**Paso** *(1)*
**pass** *(1)*
**patterns** *(1)*
**pause** *(1)*
**pay** *(1)*
**paying** *(1)*
**PDT** *(1)*
**peer** *(6)*
**peers** *(1)*
**pending** *(1)*
**people** *(15)*
**peoples** *(1)*
**perceive** *(1)*
**perceived** *(4)*
**percent** *(22)*
**percentage** *(3)*
**percentage-based** *(1)*
**percentages** *(1)*
**percentage-style** *(1)*
**perfect** *(3)*
**perfectly** *(4)*
**perform** *(5)*
**performance** *(1)*
**performed** *(5)*
**performing** *(1)*
**period** *(80)*
**periods** *(5)*
**perpetuity** *(1)*
**per-share** *(3)*
**persist** *(1)*
**person** *(4)*
**personally** *(1)*
**perspective** *(3)*
**pertaining** *(1)*
**Peru** *(1)*
**Peruvian** *(1)*
**Peter** *(2)*
**Petrobras** *(2)*
**pharmaceutical** *(1)*
**Pharmaceuticals** *(1)*
**phase** *(6)*
**phases** *(1)*
**PhD** *(13)*
**PhDs** *(1)*
**phenomena** *(1)*
**phenomenon** *(1)*
**Philippe** *(1)*
**phonetic** *(1)*
**piece** *(4)*
**pieces** *(3)*
**piggy** *(1)*
**Pipeline** *(1)*
**place** *(3)*
**Plaintiff** *(11)*
**plaintiffs** *(47)*
**plaintiff's** *(9)*
**play** *(1)*
**player** *(1)*
**pleadings** *(1)*
**please** *(5)*
**Plebiscite** *(1)*
**pled** *(1)*
**plenty** *(1)*
**plethora** *(1)*
**plus** *(1)*
**point** *(45)*
**points** *(1)*
**Pomerantz** *(1)*
**poor** *(2)*
**poorly** *(1)*
**popped** *(1)*
**popular** *(1)*
**population** *(7)*
**populations** *(2)*
**pore** *(1)*
**portfolio** *(1)*
**portion** *(13)*
**portions** *(1)*
**positive** *(1)*
**possible** *(16)*
**post** *(3)*
**posts** *(2)*
**post-verdict** *(2)*
**potential** *(2)*
**potentially** *(3)*
**pre** *(2)*
**pre-2015** *(1)*
**preceding** *(1)*
**precious** *(1)*
**predominantly** *(1)*
**preexisting** *(1)*
**preliminarily** *(2)*

**preliminary** *(5)*
**premarked** *(1)*
**premarket** *(1)*
**prepare** *(2)*
**preparing** *(3)*
**presence** *(3)*
**present** *(6)*
**president** *(1)*
**presidents** *(1)*
**press** *(5)*
**presumption** *(3)*
**pretty** *(13)*
**prevent** *(3)*
**prevented** *(1)*
**preventing** *(1)*
**previously** *(6)*
**price** *(134)*
**priced** *(2)*
**price-inflation** *(1)*
**price-maintenance** *(6)*
**prices** *(19)*
**pricing** *(5)*
**primarily** *(8)*
**primary** *(7)*
**principle** *(6)*
**principles** *(2)*
**Prior** *(17)*
**Prius** *(1)*
**Private** *(1)*
**privately** *(2)*
**privy** *(1)*
**probability** *(2)*
**probably** *(27)*
**problem** *(3)*
**problems** *(2)*
**procedure** *(1)*
**proceedings** *(1)*
**process** *(23)*
**produced** *(1)*
**producing** *(5)*
**product** *(5)*
**production** *(4)*
**products** *(2)*
**product's** *(1)*
**professional** *(1)*
**professor** *(3)*
**professors** *(1)*
**profits** *(1)*
**program** *(3)*
**programs** *(2)*
**progresses** *(1)*
**progression** *(1)*
**project** *(16)*
**projects** *(2)*
**prolonged** *(1)*
**prompt-like** *(1)*
**proper** *(1)*
**property** *(5)*
**propose** *(1)*
**proposed** *(1)*
**proposing** *(1)*
**propounded** *(1)*
**proprietary** *(1)*
**prospectively** *(1)*
**prospects** *(2)*
**protests** *(1)*
**prove** *(3)*
**proven** *(1)*
**provide** *(5)*
**provided** *(8)*
**provides** *(2)*
**providing** *(1)*
**provision** *(2)*
**public** *(11)*
**publicly** *(6)*
**public's** *(1)*
**publish** *(2)*
**published** *(2)*
**pull** *(1)*
**purchase** *(3)*
**purchase-accounting** *(1)*
**purchased** *(1)*
**purchaser** *(1)*
**purchasers** *(1)*
**purchases** *(1)*
**purported** *(3)*
**purposes** *(8)*
**pursue** *(2)*
**put** *(7)*
**putting** *(5)*
**puzzle** *(1)*

**< Q >**
**qualifications** *(1)*
**quantify** *(2)*
**quantifying** *(2)*
**quantitative** *(2)*
**quarter** *(2)*
**quarter's** *(1)*
**question** *(29)*
**questioning** *(1)*
**questions** *(5)*
**quick** *(2)*
**quickly** *(4)*
**quite** *(6)*
**quote** *(1)*
**quoted** *(1)*

**< R >**
**racist** *(1)*
**Rafael** *(1)*
**raise** *(1)*
**raising** *(1)*
**ramifications** *(2)*
**ramping** *(1)*
**ramp-up** *(1)*
**randomly** *(1)*
**rapidly** *(1)*
**rare** *(4)*
**rate** *(18)*
**rates** *(4)*
**ratio** *(1)*
**rational** *(1)*
**rationale** *(1)*
**react** *(3)*
**reacted** *(1)*
**reacting** *(1)*
**reaction** *(3)*
**reactions** *(1)*
**reacts** *(1)*
**read** *(24)*
**reading** *(3)*
**real** *(2)*
**reality** *(1)*
**realization** *(1)*
**realizing** *(2)*
**really** *(31)*
**realtime** *(3)*
**reason** *(14)*
**reasonable** *(2)*
**reasons** *(7)*
**reassess** *(2)*
**rebuttal** *(1)*
**recall** *(26)*
**receiving** *(1)*
**Recess** *(4)*
**recollection** *(12)*
**reconcile** *(1)*
**record** *(25)*
**recorded** *(1)*
**records** *(2)*
**red** *(1)*
**Redwood** *(3)*
**reestimating** *(1)*
**referenced** *(1)*
**Refinitiv** *(3)*
**reflect** *(7)*
**reflected** *(10)*
**reflecting** *(5)*
**reflective** *(7)*
**reflects** *(3)*
**Reform** *(1)*
**refresh** *(3)*
**regarding** *(8)*
**regardless** *(2)*
**region** *(1)*
**regions** *(1)*
**regression** *(14)*
**regressions** *(1)*
**Regular** *(1)*
**regulatory** *(1)*
**reject** *(2)*
**relate** *(3)*
**related** *(13)*
**Relates** *(3)*
**relating** *(4)*
**relationship** *(1)*
**relative** *(8)*
**relatively** *(4)*
**release** *(3)*
**releases** *(4)*
**relevant** *(19)*
**reliable** *(4)*
**reliably** *(4)*
**relied** *(5)*
**rely** *(1)*
**remedy** *(1)*
**remember** *(14)*
**remembers** *(2)*
**remove** *(1)*
**removed** *(1)*
**repeat** *(4)*
**repeatedly** *(1)*
**replied** *(1)*
**Report** *(60)*

**reported** *(2)*
**reporter** *(7)*
**Reporting** *(2)*
**reports** *(39)*
**represent** *(1)*
**representation** *(1)*
**representative** *(1)*
**represented** *(2)*
**representing** *(2)*
**request** *(3)*
**requested** *(1)*
**require** *(3)*
**required** *(9)*
**requirement** *(6)*
**Research** *(2)*
**reservation** *(1)*
**reservations** *(1)*
**residual** *(1)*
**RESOURCES** *(19)*
**respect** *(12)*
**respective** *(1)*
**respects** *(1)*
**response** *(7)*
**responsibility** *(4)*
**responsible** *(1)*
**result** *(10)*
**resulted** *(1)*
**results** *(2)*
**résumé** *(1)*
**retailers** *(1)*
**retained** *(12)*
**retainer** *(1)*
**retired** *(1)*
**retroactively** *(1)*
**return** *(1)*
**returns** *(9)*
**revelation** *(5)*
**revenue** *(4)*
**revenue-producing** *(5)*
**revenues** *(1)*
**reversals** *(1)*
**review** *(12)*
**reviewed** *(2)*
**reviewing** *(2)*
**revived** *(1)*
**revocation** *(7)*
**right** *(105)*
**Rio** *(1)*
**risk** *(63)*
**riskier** *(2)*
**risks** *(5)*
**risky** *(3)*
**rkillorin@faruqilaw.com** *(1)*
**RMR** *(2)*
**Road** *(2)*
**Robbins** *(1)*
**ROBERT** *(2)*
**robust** *(2)*
**role** *(4)*
**Ronen** *(1)*
**root** *(5)*
**Rosen** *(1)*
**Roswell** *(1)*
**rough** *(2)*
**roughly** *(1)*
**R-squared** *(2)*
**Rudman** *(1)*
**rule** *(2)*
**rules** *(1)*
**ruling** *(1)*
**run** *(2)*
**running** *(1)*
**Rutgers** *(1)*
**Ruth** *(1)*

**< S >**
**S&P** *(1)*
**Sachs** *(4)*
**safety** *(1)*
**sales** *(1)*
**sample** *(7)*
**sample-specific** *(1)*
**SAN** *(4)*
**satisfying** *(1)*
**save** *(1)*
**saw** *(5)*
**saying** *(10)*
**says** *(6)*
**scenario** *(2)*
**scenarios** *(1)*
**school** *(5)*
**science** *(1)*
**sciences** *(1)*
**scienter** *(6)*
**scientific** *(4)*
**scientifically** *(4)*
**Scope** *(2)*
**scratch** *(1)*
**search** *(3)*
**SEC** *(7)*
**second** *(14)*
**secrets** *(2)*
**Section** *(9)*
**sections** *(1)*
**SECURITIES** *(31)*
**Security** *(12)*
**security's** *(3)*
**see** *(26)*
**seeing** *(5)*
**seemingly** *(2)*
**seen** *(13)*
**segments** *(1)*
**selected** *(1)*
**sell** *(9)*
**selling** *(2)*
**sends** *(1)*
**seniormost** *(1)*
**sense** *(6)*
**sent** *(2)*
**sentence** *(4)*
**sentiment** *(1)*
**separate** *(3)*
**separating** *(1)*
**sequence** *(1)*
**sequenced** *(1)*
**series** *(2)*
**serve** *(1)*
**serves** *(1)*
**services** *(3)*
**serving** *(3)*
**set** *(15)*
**sets** *(1)*
**setting** *(1)*
**settings** *(4)*
**settled** *(1)*
**seven** *(3)*
**Seventh** *(1)*
**severely** *(1)*
**share** *(7)*
**shares** *(4)*
**sheet** *(2)*
**shell** *(1)*
**shifts** *(1)*
**shoots** *(1)*
**short** *(4)*
**shorter** *(1)*
**shortfall** *(2)*
**Shorthand** *(3)*
**shortly** *(3)*
**short-term** *(1)*
**shot** *(2)*
**show** *(4)*
**showed** *(1)*
**showing** *(1)*
**shown** *(1)*
**shows** *(3)*
**siblings** *(1)*
**side** *(4)*
**sign** *(3)*
**Signature** *(1)*
**signed** *(3)*
**significant** *(5)*
**significantly** *(5)*
**signing** *(2)*
**similar** *(6)*
**similarly** *(4)*
**simply** *(1)*
**simultaneously** *(1)*
**single** *(5)*
**sink** *(1)*
**sit** *(7)*
**sitting** *(3)*
**situated** *(1)*
**situation** *(8)*
**six** *(16)*
**six-ish** *(2)*
**six-month** *(1)*
**size** *(2)*
**skepticism** *(1)*
**slightly** *(1)*
**small** *(1)*
**smaller** *(1)*
**smart** *(4)*
**social** *(6)*
**sold** *(2)*
**solely** *(3)*
**somebody** *(2)*
**someday** *(1)*
**something-else** *(1)*
**somewhat** *(1)*
**sophisticated** *(7)*
**Sorry** *(15)*
**sort** *(9)*
**sorts** *(6)*

sought (1)
sound (1)
sounded (1)
Sounds (2)
source (5)
sources (2)
south (2)
Southern (1)
space (1)
speak (1)
speaking (6)
speaks (2)
special (1)
specialist (1)
specific (22)
specifically (4)
specifics (2)
spectrum (3)
speculate (1)
speculating (1)
speculation (13)
speculative (1)
spell (2)
spend (1)
spent (1)
spike (1)
spot (1)
spread (1)
spreads (2)
spurious (1)
square (1)
staff (2)
staff's (1)
stage (1)
stand (1)
standalone (2)
standard (5)
standards (1)
stands (2)
Stanford (12)
start (3)
started (7)
starting (4)
starts (3)
startup (2)
state (18)
stated (7)
statement (15)
statements (15)
STATES (4)
static (1)
statistics (1)
status (1)
statute (1)
statutes (1)
Stenographer (6)
STENOGRAPHER'S (1)
Stenographic (1)
Stenographically (1)
step (2)
steps (2)
stick (1)
sticking (1)
stock (73)
stocks (8)
stock's (3)
stolen (2)
stop (1)
straightforward (1)
strategic (1)
strategy (1)
stream (1)
Street (2)
strictly (1)
Strike (3)
strong (7)
strongly (5)
structure (1)
studied (2)
studies (8)
study (42)
studying (2)
stuff (8)
style (1)
subject (12)
subjects (1)
submit (2)
submitted (7)
Subscribed (1)
subsequent (1)
subset (1)
subsidiary (2)
substance (1)
substantial (2)
substantially (1)
suddenly (1)
sufficiently (1)
suggest (1)
suitability (1)
suitable (6)
Suite (2)
sum (1)
summary (1)
super (1)
supervise (1)
supply (1)
supplying (1)
support (1)
supporting (1)
supportive (1)
suppose (4)
Supreme (5)
Sure (43)
surprise (1)
surprising (1)
surprisingly (1)
surrounding (2)
susceptible (1)
suspended (18)
suspension (10)
suspicion (1)
sustained (3)
swear (1)
sworn (1)
SWORN/AFFIRMED (2)
symbol (1)
System (1)
systematic (2)
systems (1)

< T >
tab (1)
tabbed (2)
TAHOE (31)
Tahoe-identified (1)
Tahoe's (2)
tailor (1)
tailored (2)
take (12)
taken (6)
takes (2)
talk (11)
talked (15)
talking (14)
tandem (1)
tank (1)
targeted (1)
tasks (1)
taught (3)
Tavy (1)
teaching (4)
team (2)
teams (1)
technically (3)
technique (3)
techniques (1)
tell (6)
template (3)
temporarily (2)
ten (4)
tenable (1)
tend (5)
tended (1)
tends (1)
term (3)
terminal (2)
terms (8)
test (1)
TESTIFIED (6)
testify (4)
testifying (7)
testimony (17)
Texas (1)
textbook (1)
Thank (2)
Thanks (3)
thea (3)
theoretical (1)
theoretically (1)
theories (5)
theory (74)
thing (12)
things (37)
think (190)
thinly (1)
Third (2)
third-party (1)
thought (3)
thoughts (2)
thousand (1)
thousand-plus (1)
thousands (1)
three (5)
three-day (1)

**thresholds** *(2)*
**throat** *(1)*
**throw** *(1)*
**thrust** *(1)*
**thwart** *(2)*
**thwarting** *(1)*
**ticker** *(1)*
**ticket** *(1)*
**tickle** *(1)*
**tie** *(1)*
**tight** *(1)*
**tightly** *(1)*
**time** *(95)*
**time-consuming** *(1)*
**timeline** *(1)*
**times** *(25)*
**time-varying** *(4)*
**timing** *(2)*
**today** *(14)*
**token** *(1)*
**told** *(1)*
**tool** *(2)*
**tools** *(2)*
**top** *(2)*
**Topaz** *(1)*
**topic** *(5)*
**topics** *(4)*
**Toronto** *(1)*
**total** *(2)*
**totally** *(5)*
**touted** *(1)*
**trade** *(7)*
**traded** *(3)*
**trader** *(1)*
**trades** *(4)*
**trading** *(27)*
**transactions** *(3)*
**transcribe** *(1)*
**transcribed** *(1)*
**transcript** *(2)*
**transcription** *(1)*
**transpired** *(1)*
**treatment** *(1)*
**trial** *(2)*
**tricky** *(1)*
**tried** *(2)*
**trier** *(2)*
**trouble** *(1)*
**true** *(16)*
**truth** *(11)*
**try** *(7)*
**trying** *(27)*
**TSX** *(1)*
**turn** *(3)*
**turned** *(3)*
**Turning** *(1)*
**turns** *(1)*
**Tweets** *(1)*
**twice** *(1)*
**Twitter** *(3)*
**Two** *(28)*
**two-day** *(2)*
**two-sided** *(1)*
**type** *(8)*
**types** *(9)*
**typewriting** *(1)*
**Typically** *(5)*

< U >
**U.S** *(17)*
**uh-huh** *(1)*
**ultimate** *(6)*
**ultimately** *(15)*
**Um** *(1)*
**unable** *(1)*
**unattractive** *(1)*
**uncertain** *(1)*
**unclearly** *(1)*
**undamaged** *(1)*
**underlie** *(1)*
**underlying** *(10)*
**understand** *(27)*
**understanding** *(26)*
**understands** *(1)*
**Understood** *(5)*
**unexpected** *(1)*
**unexplainable** *(1)*
**unfolding** *(2)*
**unforeseen** *(2)*
**unfortunately** *(1)*
**uniform** *(1)*
**unison** *(2)*
**UNITED** *(2)*
**universal** *(1)*
**universities** *(1)*
**University** *(4)*
**unknowingly** *(1)*
**unpack** *(1)*
**unrelated** *(6)*
**unsubmitted** *(2)*
**unwieldy** *(1)*
**unwilling** *(1)*
**update** *(1)*
**updated** *(1)*
**upheld** *(8)*
**upset** *(1)*
**use** *(17)*
**useful** *(1)*
**usually** *(14)*

< V >
**valid** *(1)*
**valuable** *(1)*
**valuation** *(14)*
**valuations** *(1)*
**value** *(39)*
**valued** *(1)*
**values** *(3)*
**valuing** *(1)*
**variable** *(18)*
**variables** *(5)*
**variance** *(2)*
**variation** *(2)*
**varies** *(5)*
**various** *(5)*
**vary** *(6)*
**vein** *(1)*
**vendor** *(1)*
**verbal** *(1)*
**verbally** *(1)*
**verbiage** *(2)*
**verdict** *(1)*
**verdicts** *(1)*
**versus** *(16)*
**vice** *(1)*
**video** *(3)*
**Videographer** *(13)*
**VIDEOTAPED** *(2)*
**view** *(4)*
**viewed** *(1)*
**violated** *(1)*
**violent** *(1)*
**virtually** *(1)*
**virtue** *(5)*
**Vivendi** *(6)*
**volatile** *(3)*
**Volatility** *(10)*
**volume** *(16)*
**volumes** *(5)*
**voluminous** *(1)*

< W >
**Wagner** *(1)*
**wait** *(2)*
**want** *(31)*
**wanted** *(2)*
**wants** *(2)*
**warrant** *(1)*
**Washington** *(1)*
**watch** *(2)*
**way** *(47)*
**ways** *(4)*
**Wednesday** *(2)*
**weekly** *(4)*
**weigh** *(3)*
**weighed** *(2)*
**weighing** *(3)*
**weird** *(1)*
**Welcome** *(1)*
**well** *(48)*
**well-determined** *(1)*
**well-received** *(1)*
**well-respected** *(1)*
**well-worded** *(1)*
**went** *(10)*
**we're** *(8)*
**We've** *(11)*
**wheels** *(1)*
**WHEREOF** *(1)*
**wide** *(1)*
**widely** *(3)*
**widespread** *(1)*
**wife** *(1)*
**WILSON** *(2)*
**win** *(1)*
**window** *(5)*
**windows** *(2)*
**withdraw** *(1)*
**withdrawal** *(2)*
**withdrawn** *(1)*
**withheld** *(1)*
**within-entitled** *(1)*
**witness** *(67)*
**witness's** *(2)*
**woman** *(1)*
**won** *(1)*

**Word** *(1)*
**words** *(8)*
**work** *(23)*
**worked** *(7)*
**working** *(17)*
**works** *(3)*
**world** *(4)*
**worry** *(1)*
**worse** *(2)*
**worst** *(1)*
**wrinkles** *(1)*
**write** *(1)*
**writing** *(1)*
**written** *(6)*
**wrong** *(5)*
**wrote** *(1)*

**< X >**
**Xinca** *(28)*

**< Y >**
**Yeah** *(57)*
**year** *(13)*
**years** *(22)*
**yes/no** *(1)*
**Yesterday** *(4)*
**York** *(3)*

**< Z >**
**Zach** *(1)*
**ZACHARY** *(8)*
**Z-A-C-H-A-R-Y** *(1)*
**zero** *(4)*
**Z-H** *(1)*