# EXHIBIT 4

Report of Dr. Nye in Allergan Litigation

EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Allergan PLC Securities Litigation | Case No. 18-cv-12089-CM |

EXPERT REPORT OF ZACHARY NYE, PH.D.

January 31, 2020

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 3 of 241

**Table of Contents**


I. Background and Qualifications .......... 1

II. Scope of Engagement .......... 1

III. Bases for Opinions .......... 2

IV. Summary of Opinions .......... 3

V. Overview of Allergan's Business Operations .......... 3

VI. The Markets for Allergan Common Stock and Preferred Stock Were Efficient Throughout the Class Period .......... 7

- A. *Cammer* Factor 1: Weekly Trading Volume .......... 13
- B. *Cammer* Factor 2: Number of Securities Analysts .......... 15
- C. *Cammer* Factor 3: Number of Market Makers and the Potential for Arbitrage .......... 17
- D. *Cammer* Factor 4: Eligibility to File SEC Form S-3 .......... 24
- E. *Cammer* Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship Between Unexpected Corporate Events or Financial Releases and the Price Reaction of Allergan Stock .......... 26
- F. Additional Factor 1: Market Capitalization .......... 30
- G. Additional Factor 2: Bid/Ask Spread .......... 31
- H. Additional Factor 3: Public Float .......... 32
- I. Comparison of the Markets for Allergan Common Stock and Preferred Stock .......... 32

VII. Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Plaintiff's Theory of Liability .......... 34

VIII. Conclusion .......... 38

Appendix A: Description of Regression Analyses .......... 39

## I. Background and Qualifications

1. I am a financial economist and Vice President at Stanford Consulting Group, Inc. ("SCG"). Since 1981, SCG has provided economic research and expert testimony for business litigation, and regulatory and legislative proceedings. All SCG professionals hold masters or doctoral degrees in business, economics, finance or operations research, and certain senior consultants have testified as experts in these fields. I have an A.B. in Economics from Princeton University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine. I have co-authored academic research published in peer-reviewed conference proceedings, as well as working papers with finance faculty at various universities. My research areas include the market efficiency of financial and derivative securities, volatility forecasting, risk management, financial econometrics, valuation and corporate finance. I have previously served as an expert witness in matters involving securities litigation, as well as business and intellectual property valuation. My curriculum vitae, which includes my academic research, publications in the past ten years, and prior expert testimony in the past four years, is attached hereto as Exhibit 1.

2. My current hourly rate is $800. I have received assistance from individuals at SCG, who worked under my direction; their fees charged for this project are their standard hourly rates. Neither my compensation nor that of any individual at SCG is contingent on the outcome of this litigation.

## II. Scope of Engagement

3. I have been retained by Counsel for Plaintiff in this matter to opine as to whether certain securities of Allergan plc ("Allergan" or the "Company") traded in an efficient market during the period January 30, 2017 through December 19, 2018, inclusive (the "Class Period"). I have been asked to include the following securities in my analysis: (i) Allergan ordinary shares (Allergan

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 5 of 241

"common stock" or "common shares"); and (ii) Allergan 5.500% mandatory convertible preferred shares, Series A (Allergan "preferred stock" or "preferred shares").[1]

4. I also have been asked by Counsel to opine on whether damages under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC, can be calculated using a method that is common to each Class member and in a manner consistent with Plaintiff's theory of liability,[2] for investors who purchased or otherwise acquired Allergan securities during the Class Period. However, I have not been asked at this time to calculate or opine on the amount of such damages.

## III. Bases for Opinions

5. My opinions are based upon my professional knowledge and experience, my review of documents and information relevant to this matter (*see* Exhibit 2), and the analyses described in this Report and its Exhibits. Documents, data, and other information that I have relied upon as bases for my opinions are cited in this Report and its Exhibits. Such documents and information are typically relied upon by financial experts in securities class actions and by financial economists in their research.

6. Counsel for Plaintiff has informed me that the record in this matter continues to be developed and that fact discovery is ongoing. To the extent they are relevant, I would expect to review additional information that may become available through discovery as well as the reports and depositions of other expert witnesses. The opinions offered in this Report are subject to refinement or revision based on continuing analysis of the documents and information listed

---

[1] Herein, Allergan common stock and Allergan preferred stock are collectively referred to as "Allergan stock" or "Allergan securities."

[2] The claims in this action are set forth in the Consolidated Amended Class Action Complaint, filed April 19, 2019 (the "Complaint").

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 5 of 241

above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

## IV. Summary of Opinions

7. As discussed below in §VI, based on my review of the available evidence in this matter, and careful analysis of data specific to Allergan relating to the efficiency factors detailed throughout this Report, I conclude that the markets for Allergan common stock and preferred stock were efficient during the Class Period.

8. As discussed in §VII, it is my opinion that damages under §10(b) of the Exchange Act, for investors who purchased or otherwise acquired Allergan securities during the Class Period, can be calculated using a methodology that is common to the Class and in a manner that is consistent with Plaintiff's theory of liability.

## V. Overview of Allergan's Business Operations

9. During the Class Period, Allergan described itself as "a global specialty pharmaceutical company engaged in the development, manufacturing, marketing, and distribution of brand name pharmaceutical products …, medical aesthetics, biosimilar and OTC pharmaceutical products," with operations in over 100 countries.[3] The Company's "principal executive offices" are located in Ireland and its "administrative headquarters" are located in New Jersey.[4] The Company "acquired Allergan, Inc. ('Legacy Allergan') for approximately $77.0 billion" prior to the Class

---

[3] Allergan, SEC Form 10-K for year-end 2016, filed February 24, 2017, p. 4. *See also,* Allergan, SEC Form 10-K for year-end 2017, filed February 16, 2018, p. 4; Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, p. 4.

[4] Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, p. 4. *See also*, Allergan, SEC Form 10-K for year-end 2016, filed February 24, 2017, p. 4.

Period in March 2015.[5] As a result of the acquisition, "the Company expanded its franchises to include ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery, which complemented the Company's central nervous system, gastroenterology, women's health and urology franchises."[6] According to Allergan, it "benefits significantly from [its] global brand equity and consumer awareness of key products, including Botox ® and Restasis ®."[7] During the Class Period, the Company made several acquisitions, the largest of which were: LifeCell Corporation, a regenerative medicine company, for $2.8 billion in February 2017; and Zeltiq Aesthetics, Inc., a body contouring company and developer of Coolsculpting, for $2.4 billion in April 2017.[8]

10. Throughout the Class Period, the Company, "operate[d] and manage[d] [its] business in three distinct operating segments" as follows:

i. US Specialized Therapeutics, which "includes sales and expenses relating to branded products within the U.S., including Medical Aesthetics, Medical Dermatology through September 20, 2018, Eye Care and Neuroscience and Urology therapeutic products";

ii. US General Medicine, which "includes sales and expenses relating to branded products within the U.S. that do not fall into the US Specialized Therapeutics business units, including Central Nervous System, Gastrointestinal, Women's Health, Anti-Infectives and Diversified Brands"; and

---

[5] Allergan, SEC Form 10-K for year-end 2016, filed February 24, 2017, p. 3.

[6] *Ibid*. In connection with the Allergan acquisition, in 2015 the Company changed its name from Actavis to Allergan plc. (*Ibid*.) Warner Chilcott Limited is an indirect wholly owned subsidiary of Allergan "and has the same principal business activities" as the Company. (*Id*., p. 4.) In June 2015, the ticker symbols for Allergan common stock and preferred stock changed from "ACT" to "AGN," and from "ACT-PA" to "AGN-PA," respectively. (Source: Bloomberg.)

[7] Allergan, SEC Form 10-K for year-end 2016, filed February 24, 2017, p. 4.

[8] Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, pp. 4, 5.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 8 of 241

iii. International, which "includes sales and expenses relating to products sold outside the U.S."[9]

For the year ended December 31, 2017, US Specialized Therapeutics, US General Medicine, and International accounted for 42.7%, 36.4%, and 20.8% of the Company's $15.941 billion net revenue, respectively. For the year ended December 31, 2018, US Specialized Therapeutics, US General Medicine, and International accounted for 43.8%, 33.7%, and 22.2% of the Company's $15.787 billion net revenue, respectively.[10] During the Class Period, the Company applied "three key strategies to achieve growth" in each of its segments, including: "(i) internal development of differentiated and high-demand products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement [its] current business."[11] At year-ends 2017 and 2018, the Company had approximately 17,800 and 16,900 employees, respectively.[12]

11. Allergan had two classes of publicly traded equity securities during the Class Period—its common stock and its preferred stock, both of which were listed and traded on the New York Stock Exchange ("NYSE").[13] Allergan preferred stock was issued in February 2015. A total of

[9] Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, p. 9. *See also,* Allergan, SEC Form 10-K for year-end 2016, filed February 24, 2017, pp. 9, 10; Allergan, SEC Form 10-K for year-end 2017, filed February 16, 2018, p. 10.

[10] Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, p. 10.

[11] Allergan, SEC Form 10-K for year-end 2016, filed February 24, 2017, p. 10; Allergan, SEC Form 10-K for year-end 2017, filed February 16, 2018, p. 11. The Company listed an additional fourth "key strategy" in its Form 10-K for the period ending December 31, 2018, "investing behind key marketed brands." (Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, p. 9.)

[12] Allergan, SEC Form 10-K for year-end 2017, filed February 16, 2018, p. 22; Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, p. 21.

[13] Source: Bloomberg.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 9 of 241

5,060,000 preferred shares were issued at a price of $1,000 per share.[14] Dividends on the preferred stock were 5.5% of the liquidation preference of $1,000 per share per year, and were to be paid "in cash or, subject to certain limitations, in [Allergan] ordinary shares or by delivery of any combination of cash and [Allergan] ordinary shares, as determined by [the Company] in [its] sole discretion" on March 1, June 1, September 1, and December 1 of each year.[15] On March 1, 2018, unless previously converted, each preferred share would automatically convert into between 2.8345 and 3.4722 ordinary shares, "depending on the applicable market value of [Allergan's] ordinary shares, and subject to certain anti-dilution adjustments."[16, 17] Holders of the Allergan preferred shares had no voting rights.[18] "[W]ith respect to dividend rights and distribution rights upon [Allergan's] liquidation, winding-up or dissolution," the preferred shares ranked senior to the Company's ordinary shares and junior to its existing and future

[14] Allergan, SEC Form 424B2, dated February 26, 2015, p. S-13.

[15] *Id.*, pp. S-13, S-14.

[16] *Id.*, p. S-15.

[17] At any time prior to March 1, 2018,

> other than during a fundamental change conversion period as defined, holders of the Mandatory Convertible Preferred Shares may elect to convert each Mandatory Convertible Preferred Share into [the Company's] ordinary shares at the minimum conversion rate of 2.8345 ordinary shares per Mandatory Convertible Preferred Share, subject to antidilution adjustments. In addition, holders may elect to convert any Mandatory Convertible Preferred Shares during a specified period beginning on the fundamental change effective date, in which case such Mandatory Convertible Preferred Shares will be converted into [the Company's] ordinary shares at the fundamental change conversion rate and converting holders will also be entitled to receive a fundamental change dividend make-whole amount and accumulated dividend amount. (Allergan, SEC Form 10K for year-end 2017, filed February 16, 2018, pp. F-75, F-76.)

[18] Allergan, SEC Form 424B2, dated February 26, 2015, p. S-18.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 10 of 241

indebtedness.[19] In 2017, 2016 and 2015, Allergan paid $278.4 million, $278.4 million and $208.1 million of dividends on the preferred shares, respectively.[20] On March 1, 2018, "[e]ach preferred share automatically converted to approximately 3.53 ordinary shares … for a total of 17,876,930 ordinary shares."[21]

## VI. The Markets for Allergan Common Stock and Preferred Stock Were Efficient Throughout the Class Period

12. In this case, Plaintiff has asserted the "fraud on the market" presumption of reliance. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic, Inc. v. Levinson*:

> In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[22]

13. Since *Basic*, academic economists have debated various forms of the efficient capital market hypothesis ("ECMH").[23] In 2014, the Supreme Court clarified that *Basic* did not

---

[19] *Id.*, p. S-19.

[20] Allergan, SEC Form 10-K for year-end 2017, filed February 16, 2018, p. F-76.

[21] Allergan, SEC Form 10-K for year-end 2018, filed February 15, 2019, p. F-67.

[22] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241–242 (1988).

[23] Generally speaking, academic economists consider there to be three forms of market efficiency: "weak" form, "semi-strong" form, and "strong" form market efficiency. (*See* Elton, E., M. Gruber, S. Brown and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis*, 6th ed., John Wiley and Sons, Inc., 2007, p. 400.) In "fraud on the market" litigation, several courts reference the semi-strong form of efficiency, which implies that market prices incorporate all publicly available information. In academic finance literature, this is referred to as "informational efficiency." This hypothesis has been empirically validated in numerous studies. (*See, e.g.*, Fama, Eugene F., 1970 "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, Issue 2, pp. 383–417.) The ECMH also has stood up against its critics; while anomalies have occurred in financial markets, they appear to be random

"endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.'"[24] To the contrary, the "fraud on the market" theory is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[25] Under this theory, investors' reliance on any public material misrepresentations and/or omissions may be presumed for purposes of a Rule 10b-5 action since the effects of those misrepresentations and/or omissions will already be impounded in the market price.[26]

14. While the Supreme Court in *Halliburton II* stated that a market need only be "generally efficient" to invoke the "fraud on the market" presumption, it did not adopt any particular test of general market efficiency.[27] Accordingly, I consider in this Report direct and indirect tests of efficiency that courts have commonly used in securities litigation for over 30 years. A direct empirical test of market efficiency is to examine price responsiveness to the release of new and material information about the company in question. If the security price responds quickly, the response supports a conclusion that the market for the security is efficient. As an indirect test of efficiency, one can examine whether market conditions promote efficiency.

---

and do not allow for trading strategies that would create abnormal profits. (*See, e.g.*, Fama, Eugene F., 1998, "Market Efficiency, Long-term Returns, and Behavioral Finance," *Journal of Financial Economics*, Vol. 49, pp. 283–306; Malkiel, Burton G., 2003, "The Efficient Market Hypothesis and Its Critics," *Journal of Economic Perspectives*, Vol. 17, pp. 59–82.)

[24] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014) ("*Halliburton II*"), quoting *Basic*, 485 U.S. at 248, n. 28.

[25] *Id.*, quoting *Basic*, 485 U.S. at 246, n. 24.

[26] *Basic*, 485 U.S. at 241–242, 244, quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir. 1986). *See also*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011).

[27] *Halliburton II*, 134 S. Ct. at 2404.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 12 of 241

15. Consistent with *Basic* and *Halliburton II*, the oft-cited *Cammer v. Bloom* decision considered "efficient markets" to be "markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price."[28] The court in *Cammer* identified five non-exhaustive factors that may be considered in determining whether the market for a security is efficient and, therefore, whether security prices respond quickly to new relevant information.[29] These factors include indirect indicators of market efficiency as well as a direct empirical test. I understand that courts throughout the country assessing the applicability of the "fraud on the market" doctrine, including courts in the Second Circuit, have widely adopted these five factors in evaluating market efficiency.[30] In concluding that the markets for Allergan common and preferred stock were efficient during the Class Period, I considered each of the following five *Cammer* factors as applied to the stocks:

a. whether the security trades at a large weekly volume;

b. whether analysts follow and report on the security;

c. whether the security has market makers and whether there is a potential for arbitrage activity;

---

[28] *Cammer v. Bloom*, 711 F. Supp. 1264, 1273 n.11 (D.N.J. 1989).

[29] "The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.' Indeed, not even the *Cammer* court considered the fifth factor necessary, stating only that 'it *would be helpful* to a plaintiff seeking to allege an efficient market . . . .'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015). "Different contexts require courts to place greater importance on some factors than on others. No other court has adopted a per se rule that any one factor is dispositive. At the same time, courts have found market efficiency in the absence of an event study or where the event study was not definitive." *Id.,* 310 F.R.D. at 84.

[30] *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005); *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 214-217 (E.D. Pa. 2008), *aff'd* 659 F.2d 623 (3d Cir. 2011); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39 (S.D.N.Y. 2019) ("courts routinely consider the following non-exhaustive list of factors, commonly referred to as the *Cammer* factors"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 98 (2d Cir. 2017) (noting that the *Cammer* factors are tools for analyzing market efficiency).

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 13 of 241

d. whether the company is eligible to file SEC Form S-3; and

e. whether empirical facts show a cause-and-effect relationship between the release of new, material information about the company in question and a response in the security's price.[31]

16. In addition to these five *Cammer* Factors, I have considered three other factors that have also been considered by courts in evaluating market efficiency.[32] These additional factors are:

f. the company's market capitalization;

g. the bid/ask spread for stock sales; and

h. the security's public float.

17. As demonstrated below in §VI.A–§VI.H, an analysis of these factors supports my conclusion that the markets for Allergan common and preferred stock were informationally efficient during the Class Period.

18. Though not necessarily conclusive of market efficiency, it is worth noting that throughout the Class Period, Allergan common stock and preferred stock were both listed and traded on the NYSE under the symbols "AGN" and "AGN-PA," respectively.[33] The NYSE is a leading global cash equity exchange, listing common stocks, preferred stocks, and warrants, as well as structured products, such as capital securities and mandatory convertible securities.[34] The NYSE was the listing market for 2,301 and 2,285 public companies in January 2017 and December 2018, respectively.[35] The total market capitalization of all companies listed on the NYSE as of

---

[31] *Cammer*, 711 F. Supp. at 1285–1287.

[32] *Unger*, 401 F.3d 316 at 323, HN10; *Bell*, 422 F.3d 307 at 313, n10; *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[33] Source: Bloomberg

[34] Intercontinental Exchange, Inc., Form 10-K for 2017, filed February 7, 2018, p. 8.

[35] World Federation of Exchanges, Equity Market Highlights for January 2017 and December 2018 (available at https://statistics.world-exchanges.org/PredefinedReport).

Case 1:18-cv-12089-CM-GWG Document 94-1 Filed 01/31/20 Page 14 of 241

January 2017 was $25.6 trillion,[36] and the median and mean market capitalization of companies listed on the NYSE was $2.2 billion and $11.3 billion, respectively.[37] The NYSE is a "national securities exchange" registered with the SEC under §6 of the Securities Exchange Act of 1934,[38] and "the [NYSE's] current form of listing agreement generally seeks to achieve the following objectives":[39]

- Ensure timely disclosure of information that may affect security values or influence investment decisions, and in which shareholders, the public and the Exchange have a warrantable interest.
- Ensure frequent, regular and timely publication of financial reports prepared in accordance with generally accepted accounting principles.
- Provide the Exchange with timely information to enable it to efficiently perform its function of maintaining an orderly market for the company's securities, to enable it to maintain necessary records and to allow it the opportunity to make comment as to certain matters before they become established facts.
- Preclude certain business practices not generally considered sound.[40]

19. A security's listing on a national securities exchange such as the NYSE means that financial information about that company is readily available to investors, at a minimum, through the company's SEC filings, and that investors have access to trading prices and volumes throughout the trading day.[41] Rules of the U.S. National Market System ("NMS") also require

---

[36] https://www.nyse.com/market-cap.

[37] Source: Bloomberg (includes companies whose primary listing of common stock is on the NYSE, excluding companies with no data available).

[38] http://www.sec.gov/divisions/marketreg/mrexchanges.shtml.

[39] http://wallstreet.cch.com/LCM/Sections/. (Select: Section 2 - Disclosure and Reporting Material Information > 201.00 Introduction.)

[40] *Ibid.*

[41] According to the Consolidated Tape Association's website (https://www.ctaplan.com/index):

Case 1:18-cv-12089-CM-GWG Document 94-1 Filed 01/31/20 Page 15 of 241

that investor orders in NYSE-listed securities be filled at the best price that can be executed immediately, even if that price is available in a different market.[42] Because listing on a national securities exchange brings together many thousands (or millions) of investors, trading prices reflect a consensus opinion as to a security's value.

20. The market for securities trading on the NYSE is widely recognized as efficient. At least one authority has commented that:

> at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[43]

Similarly, the court in *Cammer* stated:

> some may concur with [Defendant's] suggestion … that companies listed on national stock exchanges or companies entitled to issue new securities using SEC Form S-3 would almost by definition involve stocks trading in an "open and developed" market.[44]

---

> The Consolidated Tape Association (CTA) oversees the dissemination of real-time trade and quote information in New York Stock Exchange LLC (Network A) and Bats, NYSE Arca, NYSE American and other regional exchange (Network B) listed securities. Since the late 1970s, all SEC-registered exchanges and market centers that trade Network A or Network B securities send their trades and quotes to a central consolidator where the Consolidated Tape System (CTS) and Consolidated Quote System (CQS) data streams are produced and distributed worldwide.
>
> The current Participants include the Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc., Investors Exchange LLC, Long-Term Stock Exchange, Inc., Nasdaq BX, Inc., Nasdaq ISE, LLC, Nasdaq PHLX LLC, Nasdaq Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc., (collectively, the "Participants").

[42] Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, McGraw-Hill/Irwin, 7th ed., 2008, Ch. 3, pp. 73, 74.

[43] Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, Section 8.6 (Aug. 1988) (quoted in *Cammer,* 711 F. Supp at 1292).

[44] *Cammer*, 711 F. Supp. at 1276–77.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 16 of 241

21. The fact that Allergan common stock and preferred stock were both listed and traded on a major exchange supports my conclusion that the markets for the stocks were efficient during the Class Period. Furthermore, my analyses of the efficiency factors set forth below confirm the attributes of market efficiency that Allergan's listing on the NYSE strongly implies.

### A. *Cammer* Factor 1: Weekly Trading Volume

22. A market for a security is liquid if investors can trade a large number of securities on demand. Liquidity allows investors to buy and sell securities quickly when their assessments about the value of a company have changed, facilitating the prompt price reaction to new, material information that is characteristic of an efficient market. The large weekly trading volume of Allergan stock during the Class Period indicates the presence of a liquid market.

23. According to the *Cammer* decision:

> … [T]he existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market … because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.[45]

24. Under *Cammer*, "turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[46] During the Class Period, the total number of Allergan common shares issued and outstanding ranged from approximately 327.6

[45] *Cammer*, 711 F. Supp. at 1286.

[46] *Cammer*, 711 F. Supp. at 1293, quoting *Bromberg*.

million to 345.7 million shares.[47] The average weekly reported trading volume for the common stock, excluding weeks not entirely contained within the Class Period, was as follows:[48]

| Allergan Common Stock | |
|---|---|
| Average Weekly Trading Volume in Dollars | $2,497,302,399 |
| Average Weekly Trading Volume in Shares | 12,971,700 |
| Average Weekly Share Trading Volume as a % of Shares Outstanding | 3.9% |

Thus, the average weekly reported trading volume for Allergan common stock during the Class Period exceeds the 2% "strong presumption" of market efficiency set out by *Cammer*.

25. With respect to the preferred stock, during the Class Period through March 1, 2018 (*i.e.*, the automatic conversion date), the total number of Allergan preferred shares issued and outstanding was 5.06 million shares.[49] The average weekly reported trading volume for the preferred stock during this period was as follows:[50]

| Allergan Preferred Stock | |
|---|---|
| Average Weekly Trading Volume in Dollars | $141,697,145 |
| Average Weekly Trading Volume in Shares | 195,836 |
| Average Weekly Share Trading Volume as a % of Shares Outstanding | 3.9% |

Thus, the average weekly reported trading volume for Allergan preferred stock during the Class Period exceeds the 2% "strong presumption" of market efficiency set out by *Cammer*.

---

[47] Bloomberg.

[48] *See* Exhibit 4A for a summary of weekly trading volume and shares outstanding for the common stock.

[49] Bloomberg.

[50] *See* Exhibit 4B for a summary of weekly trading volume and shares outstanding for the preferred stock.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 18 of 241

26. The high trading volume observed during the Class Period demonstrates an actively traded market for Allergan common and preferred stock, showing significant investor interest in the Company and implying a likelihood that many investors executed trades on the basis of newly available or disseminated corporate information. These circumstances support my conclusion that Allergan common and preferred stock traded in an efficient market during the Class Period.

### B. *Cammer* Factor 2: Number of Securities Analysts

27. In demonstrating market efficiency, the *Cammer* decision states:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor's] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors. [] In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [auditor's] reports, as interpreted by the securities analysts.[51]

28. Securities analysts research and report to investors on the financial condition and prospects of a covered company. Analysts are conduits to the market for information collected from on-site visits, conference calls accompanying key company announcements, and other contacts with senior management. Analysts can channel new information to the market rapidly through their published reports, online reporting services, and alerts given to clients and other employees of the same investment firm. Analysts thus facilitate the dissemination of new information to investors and any corresponding price reaction in a company's securities.

29. During the Class Period, several well-known investment firms followed and published research reports on Allergan that are publicly available from Thomson Reuters Eikon and/or Thomson Reuters Knowledge, including, but not limited to: B.Riley FBR, Inc.; Bank of America

---

[51] *Cammer*, 711 F. Supp. at 1286.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 19 of 241

Merrill Lynch; Barclays; Bryan Garnier; Cantor Fitzgerald; Citi; Coleman Research; Cowen and Company; Credit Suisse; Deutsche Bank; EVERCORE ISI; Gabelli & Company; Gordon Haskett; Guggenheim Securities LLC; JPMorgan; Keefe, Bruyette & Woods Europe; LifeSci Capital; Mizuho Securities USA; Morgan Stanley; Morningstar, Inc.; Piper Jaffray; RBC Capital Markets; Stifel Nicolaus and Company, Inc.; SunTrust Robinson Humphrey Capital Markets; Susquehanna Financial Group LLLP; SVB Leerink; UBS Equities; Wells Fargo Securities, LLC; and William Blair & Company.[52] Over 1,200 analyst reports pertaining to the Company were issued during the Class Period.[53] According to Bloomberg, the following investment firms also followed and issued reports on the Company during the Class Period: Bernstein; DZ Bank AG; Edward Jones; Goldman Sachs; ISS-EVA; Raymond James; and Shore Capital Stockbrokers.[54]

30. Investors also received information and analyses about Allergan during the Class Period via media coverage, investor conferences, trade magazines, Company presentations and SEC filings. Specifically, articles concerning Allergan appeared in major domestic and international news media including: *ACCESSWIRE*; *Benzinga.com*; *Bloomberg*; *Boston Business Journal Online*; *Business Wire*; *Canada NewsWire*; *Contify Life Science News*; *CQ FD Disclosure (U.S.)*; *Daily Mail*; *Dow Jones Newswires*; *Drug Industry Daily*; *Drug Store News*; *ENP Newswire*; *FDA Week*; *FDAnews Drug Daily Bulletin*; *FinancialWire (U.S.)*; *GlobalData*; *GlobeNewswire*

---

[52] *See* Exhibit 5. Exhibit 5B lists research reports on Allergan available from Thomson Reuters Eikon and Thomson Reuters Knowledge. These reports are only a subset of all reports pertaining to Allergan published during the Class Period. Other databases, including restricted databases, may carry research reports pertaining to Allergan that are not included in Exhibit 5B. Furthermore, it is my understanding that certain analyst firms do not make all their reports available through historical and/or public databases.

[53] *Ibid*.

[54] *See* Exhibit 5C, which lists analysts' price targets and rating actions on selected event dates during the Class Period as reported by Bloomberg.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 20 of 241

*(U.S.)*; *Il Sole*; *Investment Weekly News*; *Investor's Business Daily (U.S.)*; *Journal of Engineering*; *M2 Presswire*; *MarketLine*; *MarketWatch*; *New York Law Journal*; *New York Post*; *News Bites*; *NewsRx Medical Newsletters*; *PharmaBiz*; *PR Newswire*; *Reuters*; *RTT News (U.S.)*; *Seeking Alpha*; *SeeNews Pharmaceuticals*; *SNL Financial*; *Sudan Tribune*; *Tehran Times (Iran)*; *The Associated Press*; *The Boston Globe*; *The Canadian Press*; *The New York Times*; and *The Times (U.K.)*.[55]

31. In addition, Allergan's filings with the SEC were publicly available online during the Class Period at no cost.[56] Allergan's SEC filings during the Class Period included its consolidated quarterly and year-end financial statements, Company press releases, and Company statements.[57] Allergan's financial statements, press releases and SEC filings are also made available on the Company's website.[58]

32. The coverage of Allergan by securities analysts and the amount of public reporting on Allergan during the Class Period indicate that Company-specific news was widely disseminated to investors, thereby facilitating the incorporation of such information into the market prices of Allergan common and preferred stock. Accordingly, this factor supports my conclusion that the stocks traded in an efficient market during the Class Period.

### C. *Cammer* Factor 3: Number of Market Makers and the Potential for Arbitrage

33. The third *Cammer* factor concerns the existence of market makers and arbitrageurs who can react quickly to news and facilitate trading. As discussed below, the fact that trading in Allergan stock was facilitated by numerous market makers, including a designated market maker

---

[55] Source: Dow Jones' Factiva (www.factiva.com); Bloomberg; internet search.

[56] The SEC's EDGAR website is located at http://www.sec.gov/edgar.shtml.

[57] Exhibit 6 includes a list of Allergan's filings with the SEC during the Class Period.

[58] *See* https://www.allergan.com/investors.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 21 of 241

on the NYSE, and the fact that investors could have exploited arbitrage opportunities during the Class Period, support a finding of market efficiency.

Market Makers

34. The NYSE, where Allergan common stock and preferred stock were listed during the Class Period, uses a single designated market-maker ("DMM"), formerly known as a specialist, to maintain a competitive and efficient market for the securities assigned to that firm. DMMs are independent companies in corporate or partnership structures that have obligations to "quote at the NBBO [National Best Bid and Offer] a specified percentage of the time, and facilitate price discovery throughout the day as well as at the open, close and in periods of significant imbalances and high volatility."[59, 60] DMMs "manage a physical auction to combine with an automated auction that includes algorithmic quotes from other DMMs and market participants."[61] DMMs are also "required to meet stringent NYSE depth and continuity standards."[62] DMMs thus enable investors to trade promptly upon the arrival of new relevant information, allowing new information to be rapidly reflected in security prices.

35. As is the case with all NYSE-listed equities, Allergan stock also traded on other national securities markets as well as Alternative Trading Systems ("ATS") in the U.S. during the Class Period, including the NASDAQ. NASDAQ market participants are made up of "market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's

---

[59] "NBBO" is the national best bid and offer prices for a security available in all exchanges and quoted by market makers at any given time.

[60] https://www.nyse.com/market-model.

[61] https://www.nyse.com/markets/nyse/membership.

[62] *Ibid.*

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 22 of 241

trading services."[63] NASDAQ defines a market maker as a "NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."[64] Market makers help to ensure a liquid market for a particular stock; a market in which willing buyers can readily find willing sellers, and vice versa. They are obligated to "engage in a course of dealings for its own account to assist in the maintenance, insofar as reasonably practicable, of fair and orderly markets."[65] Market makers in a particular stock stand ready to provide stock price quotations and facilitate trading by purchasing that stock from and selling to investors. They also buy and sell securities and may increase or reduce their inventory when pricing discrepancies exist. Market makers display both buy and sell quotes in all securities in which they choose to make a market and are subject to disciplinary action if they fail to honor their quoted prices.[66] Accordingly, market efficiency can be facilitated by market maker involvement.

36. I obtained NASDAQ market maker activity in Allergan common stock from Bloomberg.[67] During the Class Period, there were 150 active market makers that traded Allergan common stock (data reported monthly from January 2017 to December 2018, inclusive). In addition, many of the market makers that facilitated trading in Allergan common stock handled a

[63] https://www.nasdaqtrader.com/Trader.aspx?id=MarketMakerProcess.

[64] *Ibid.*

[65] Nasdaq Rule 4600, Requirements for Nasdaq Market Makers and Other Nasdaq Market Center Participants (available at https://listingcenter.nasdaq.com/assets/rulebook/nasdaq/rules/Equity_Rules_Legacy.pdf).

[66] *Ibid.*

[67] According to Bloomberg, historical NASDAQ market maker data are not available for Allergan preferred stock.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 23 of 241

sizeable volume of shares.[68] The substantial number of market makers for Allergan common stock supports my conclusion that the market for the stock was efficient during the Class Period.

Arbitrage Activity

37. Related to *Cammer* Factor 3 is the existence of arbitrageurs, sophisticated investors who can act rapidly to take advantage of security pricing discrepancies. Arbitrageurs ensure that market prices reflect public information—the fundamental hallmark of market efficiency.[69] As I demonstrate below, the level of short interest, the degree of institutional ownership and the tightness of bid/ask spreads suggest that arbitrage activity for Allergan stock was prevalent during the Class Period.

38. One way in which arbitrageurs can exploit mispricing in the market is by engaging in short-sale transactions. A short sale is a transaction in which an investor sells a stock that he or she does not own and then purchases that stock back in the future. If the price declines between the time a security is sold short and the time it is purchased, the short seller realizes a gain. Thus, short selling is an advantageous strategy if an arbitrageur expects a security's price to

[68] *See* Exhibit 7 for the share volume by market maker for Allergan common stock.

[69] Arbitrage has been defined as:

> … the process of earning riskless profits by taking advantage of differential pricing for the same physical asset or security. As a widely applied investment tactic, arbitrage typically entails the sale of a security at a relatively high price and the simultaneous purchase of the same security (or its functional equivalent) at a relatively low price.
>
> Arbitrage activity is a critical element of modern, efficient security markets. Because arbitrage profits are by definition riskless, all investors have an incentive to take advantage of them whenever they are discovered. Granted, some investors have greater resources and inclination to engage in arbitrage than others. However, it takes relatively few of these active investors to exploit arbitrage situations and, by their buying and selling actions, eliminate these profit opportunities. (Sharpe, William F., *et al.*, *Investments,* Prentice Hall, 6th ed., 1999, p. 284.)

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 24 of 241

decline in the future.[70] Furthermore, short sales allow arbitrageurs that currently do not own a security to convey their opinions to the market, thereby helping the market to achieve a consensus as to that security's fair value given all publicly available information.

39. Arbitrageurs were not constrained in their ability to short shares of Allergan stock. During the Class Period, the average short interest as a percentage of float for the total U.S. market was 3.89%.[71] Similarly, economist Gene D'Avolio found that short interest was, on average, 2.30% of shares outstanding for companies listed in the U.S. during the period April 2000 to September 2001.[72] D'Avolio also estimated that as much as one-quarter of the U.S. market capitalization was available as loan supply for short-selling and that only 7% of that capacity was utilized, thereby indicating that "[t]he aggregate market is easy to borrow."[73] In comparison, the average short interest for Allergan common stock during the Class Period was 2.04% of its shares outstanding as well as its public float.[74, 75, 76]

---

[70] Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, Pearson Education, Inc., 1st ed., 2007, Ch. 11, p. 339.

[71] Source: Bloomberg. (*See* Exhibit 8A.)

[72] D'Avolio, Gene, 2002, "The market for borrowing stock," *Journal of Financial Economics*, Vol. 66, pp. 271–306.

[73] *Id.*, p. 273.

[74] *See* Exhibit 8B for a summary of short interest for Allergan common stock during the Class Period. Public float is equal to shares outstanding less insider holdings. A comparison of short interest to public float is relevant as public float represents the shares available to lend for short sales.

[75] According to Bloomberg, historical short interest data are not available for Allergan preferred stock.

[76] FINRA (the Financial Industry Regulatory Authority) was created in July 2007 from the consolidation of the NASD and various regulatory functions of the NYSE. It is a non-governmental organization that regulates member brokerage firms and exchange markets, and is overseen by the SEC, the ultimate regulator of the U.S. securities industry, including FINRA. (*See* https://www.finra.org/media-center/news-releases/2007/nasd-and-nyse-member-regulation-combine-form-financial-industry.) Every firm and broker that sells securities to the public in the

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 25 of 241

40. Institutional ownership is another indicator of arbitrage activity in so far as institutional investors, such as pension funds, mutual funds and investment banks, are generally considered to be sophisticated investors that have ready access to minute-to-minute financial news and to online bulletins from analysts. Relative to most individual investors, institutional investors have significantly greater resources with which to analyze financial information pertinent to the securities in which they invest. Institutional ownership implies that investment professionals actively review company-specific financial information and, in turn, make buy/sell recommendations to their firm and/or client investors. In this way, investors bid up or down the market price of a security to reflect all publicly available information, as interpreted by institutional investors. Moreover, because short sellers often borrow shares from institutions, a high degree of institutional ownership relative to the level of short interest indicates a lack of short-sale constraints, thereby facilitating market efficiency by enabling arbitrageurs to engage in short selling.[77]

---

United States must be licensed and registered by FINRA. (*See* https://www.finra.org/registration-exams-ce/broker-dealers/become-new-finra-registered-broker-dealer-firm.) Pursuant to FINRA Rule 4560:

> member firms are required to report total short positions in all customer and proprietary firm accounts in all equity securities to FINRA on a bi-monthly basis. These filings are made online using the Short Interest reporting system accessible via Firm Gateway at firms.finra.org … Member firms that have short positions in OTC equity securities and in securities listed on a national securities exchange, such as NASDAQ, NYSE, NYSE American, NYSE Arca, Cboe BZX, and IEX, must file a Short Position Report with FINRA via the Web-based system. (*See* https://www.finra.org/filing-reporting/short-interest/regulation-filing-applications-instructions.)

[77] Asquith, Paul, Parag A. Pathak and Jay R. Ritter, 2005, "Short interest, institutional ownership and stock returns," *Journal of Financial Economics*, Vol. 78, pp. 243–76. Asquith, *et al*., find that "[i]n a typical year, there are 5,500 domestic operating companies trading on the NYSE, Amex, and the Nasdaq National Market System. For these stocks, … institutional ownership is

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 26 of 241

41. According to data provided by Thomson Reuters Eikon, during the Class Period, institutions held over 84% of the public float of Allergan common stock and over 1,500 institutional investors held Allergan common stock.[78] Additionally, institutional holdings of Allergan common stock were, on average, more than 43 times the level of short interest during the Class Period, indicating that short selling was not constrained.[79]

42. With respect to Allergan preferred stock, during the Class Period through December 31, 2017 (the last quarter-end prior to the automatic conversion date), institutions held over 76% of the public float and over 140 institutional investors held Allergan preferred stock.[80]

43. Another indicator of the potential for arbitrage activity to correct market inefficiencies (*i.e.*, arbitrage opportunities) is the size of bid/ask spreads.[81] Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily. As shown in the following table, during the Class Period, the average and median

---

greater than short sales for 95% of stocks, suggesting that short-sale constraints are not common." (*Id.*, p. 245.)

[78] Institutions which file Form 13F with the SEC report shares held as of the end of each calendar quarter. *See* Exhibit 9A for a summary of institutional holdings for Allergan common stock during the Class Period.

[79] The average number of common shares held by institutions for the quarters ended during the Class Period was approximately 294.5 million, and the average short interest during the Class Period was approximately 6.8 million.

[80] *See* Exhibit 9B for a summary of institutional holdings for Allergan preferred stock during the Class Period. (Source: Bloomberg.) According to Bloomberg, historical short interest data are not available for Allergan preferred stock.

[81] *Unger*, 401 F.3d 316 at 323, *Krogman*, 202 F.R.D. at 478.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 27 of 241

bid/ask spreads on Allergan common and preferred stock during the Class Period were comparable to those of randomly sampled stocks listed on the NYSE.[82]

| | Allergan Common Stock | | Allergan Preferred Stock | | NYSE Sample[83] | |
|---|---|---|---|---|---|---|
| | Spread ($) | Spread (%) | Spread ($) | Spread (%) | Spread ($) | Spread (%) |
| Average: | $0.03 | 0.01% | $1.42 | 0.19% | $0.02 | 0.08% |
| Median: | $0.02 | 0.01% | $1.19 | 0.16% | $0.02 | 0.07% |

44. The fact that the bid/ask spreads on Allergan common and preferred stock were comparable to those of other stocks listed on the NYSE supports my conclusion that Allergan stock traded in an efficient market during the Class Period.

### D. *Cammer* Factor 4: Eligibility to File SEC Form S-3

45. The *Cammer* court discussed the relationship between S-3 eligibility and efficiency, noting that "[t]he issue is not whether [the company] recently completed a public offering, but whether, if it did, it would enjoy the benefit of making abbreviated prospectus disclosure because the SEC viewed it to be in an efficient market where documents 'on file' could be deemed to be known by the investment community."[84]

46. Form S-3 is a simplified registration form that may be used by U.S. companies that meet the following requirements:

i. it has been subject to the Securities Exchange Act of 1934 reporting requirements for more than one year;

---

[82] The bid/ask spread analysis reported in Exhibits 10A and 10B compares the bid/ask spreads of Allergan common and preferred stock, respectively, on each day during the Class Period to those of 100 randomly selected NYSE-listed stocks.

[83] During the Class Period through the March 1, 2018 automatic conversion date for the preferred stock, the average and median spread of the random sample of stocks listed on the NYSE were: $0.03 (0.09%), and $0.02 (0.08%), respectively. (*See* Exhibit 10B.)

[84] *Cammer*, 711 F. Supp. at 1284.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 28 of 241

ii. it has filed all required documents in a timely manner during the prior twelve months;

iii. it has not, since the last audited statements, failed to pay required dividends or sinking fund installments on preferred stock, or defaulted on debts or material leases; and

iv. it meets certain minimum stock requirements.[85, 86]

Companies eligible for filing Form S-3 are permitted to incorporate prior filings by reference into current filings, and need not repeat such information since it is already widely publicly available.

47. It is the SEC's view that these Form S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—have already disseminated information to the marketplace, and, therefore, that the market operates efficiently for them.[87] Certain courts have also stated that the ability to file Form S-3 is an indicator of market efficiency:

> Corporations permitted to use the S-3 form are thus presumed to be actively traded and widely followed. *See Harman*, 122 F.R.D. at 525. Therefore, a company's ability to file an S-3 Registration Statement points to market efficiency.[88]

[85] http://www.sec.gov/about/forms/forms-3.pdf.

[86] Prior to January 28, 2008, the SEC required a minimum of $75 million in stock be held by non-affiliates. Effective January 28, 2008, a company with a non-affiliate public float of less than $75 million is permitted to file Form S-3 with certain restrictions. (*See* Securities and Exchange Commission, 17 CFR Parts 230 and 239 [Release No. 33-8878; File No. S7-10-07], RIN 3235-AJ89, Revisions to the Eligibility Requirements for Primary, Securities Offerings on Forms S-3 and F-3.)

[87] SEC Securities Act Release No. 6331 (August 18, 1981), pp. 5, 6.

[88] *Krogman*, 202 F.R.D. at 476.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 29 of 241

48. Allergan filed a Form S-3 both prior to and during the Class Period.[89] That Allergan was eligible to file Form S-3 throughout the Class Period supports my conclusion that the markets for its common and preferred stock were efficient during that time.

**E. *Cammer* Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship Between Unexpected Corporate Events or Financial Releases and the Price Reaction of Allergan Stock**

49. *Cammer* Factor 5 relates to how a security's price reacts to new, material information. The *Cammer* court stated that:

> … one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between the company disclosures and resulting movements in stock price.[90]

50. A direct test of market efficiency is to conduct what is known as an "event study" to examine whether security prices respond to new, material information released to the market. Expert economists commonly use an event study in securities litigation to correlate the disclosure of new, material information to security price response. Event studies comprise numerous steps, including: (i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v)

[89] Allergan filed automatic shelf registration statements on Form S-3ASR on February 19, 2015 and February 16, 2018. Source: Edgar Pro (pro.edgar-online.com).

[90] *Cammer*, 711 F. Supp. at 1291.

interpretation of empirical results.[91] Academic research acknowledges that some variation in approaches to event studies is permitted.[92]

51. I performed a standard event study for Allergan common and preferred stock to determine whether new, material corporate events or financial releases promptly caused measurable stock price reactions after accounting for contemporaneous market and industry effects. As set forth in Exhibit 12, my event study demonstrates a cause-and-effect relationship between new, material, Company-specific disclosures and resulting movements in the prices of Allergan common and preferred stock during the Class Period. The regression analyses used in the event study, from which I have estimated Allergan's Company-specific returns (*i.e.*, returns net of market and industry effects), are described in Appendix A and Exhibit 11.[93]

---

[91] As described by Mitchell and Netter (1994):

> The execution of an event study is quite simple. It involves the identification of an event that causes investors to change their expectations about the value of a firm. The investigator compares a stock price movement contemporaneous with the event to the expected stock price movement if the event had not taken place. There are three basic steps in conducting an event study: (i) define the event window; (ii) calculate abnormal stock price performance around the event; and (iii) test for statistical significance of the abnormal stock price performance.

*See* Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 557, 558.

[92] However, "[w]hile there is no unique structure, the analysis can be viewed as having seven steps." Those steps are event definition, selection criteria, normal and abnormal returns, estimation procedure, testing procedure, empirical results, and interpretation and conclusion. *See* Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, pp. 150–152.

[93] My estimated regression equations for the common and preferred stock appear in Exhibits 11A and 11C, respectively. Exhibits 11B and 11D show Allergan's expected and residual returns estimated from the regression models on each day of the Class Period for the common and preferred stock, respectively.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 31 of 241

52. To determine which events to include in my analysis, I relied on my knowledge of a large body of event-study literature that has evaluated what types of information affect stock prices.[94] Specifically, I examined dates on which Allergan released quarterly or year-end financial results and/or guidance. Such earnings-related announcements are an objective set of events to examine, which has been shown in the academic finance literature to impact stock prices.[95] Exhibit 12 describes each of my selected event dates in detail and discusses how the observed Company-specific price reaction in Allergan stock is consistent with that expected in an efficient market.[96]

53. Out of the nine dates I examined, four (*i.e.*, 44.44%) are associated with statistically significant Company-specific returns at or above the 95% confidence level (two statistically significant positive returns and two statistically significant negative returns).[97] At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time. Thus, one should expect a random sample of nine days to contain 0.45 days with returns that are statistically significant at the 95% confidence level. Given that my sample contains more than

---

[94] *See*, *e.g.*, Fama, Eugene F., 1991, "Efficient Capital Markets: II," *The Journal of Finance*, Vol. 46, No. 5, pp. 1575–1617.

[95] *See*, *e.g.*, Ball, R., and P. Brown, 1968, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, pp. 159–78.

[96] For each event date, Exhibit 12 contains the associated price movements of Allergan common and preferred stock, both observed and net of market and industry effects, as well as indicators of statistical significance at the 90% and 95% confidence level.

[97] The statistically significant positive impact dates are: November 1, 2017 (third-quarter 2017 financial results); and January 9, 2018 (preliminary full-year 2018 guidance). The statistically significant negative impact dates are: April 30, 2018 (first-quarter 2018 financial results); and October 30, 2018 (third-quarter 2018 financial results). In addition, February 8, 2017 (year-end 2016 financial results) is associated with positive Company-specific returns for the common stock and preferred stock that are statistically significant at the 94.3% and 91.7% confidence levels, respectively.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 32 of 241

eight times as many statistically significant dates as should be expected from a randomly selected nine-day sample (at or above the 95% confidence level), my analysis confirms that Allergan's stock price typically reacted more strongly on event dates than on non-event dates.[98]

54. Furthermore, although directionality may not be required to show general market efficiency for purposes of a securities class action,[99] my review of the news and analysts' reports demonstrates that the direction of the Company-specific returns observed on each event date were consistent with that expected in an efficient market, thereby providing additional evidence of efficiency. Specifically, the event dates on which predominantly *positive* Company-specific news reached the market are associated with statistically significant *positive* returns. The event dates on which predominantly *negative* Company-specific news reached the market are associated with statistically significant *negative* returns. On the event dates associated with statistically insignificant Company-specific returns,[100] the Company's financial results were

---

[98] Additionally, for the common stock, the estimated probability of observing a statistically significant Company-specific return (at the 95% confidence level) is 44.4% on event dates (*i.e.*, four out of nine event dates), but only 7.3% on non-event dates during the Class Period (*i.e.*, 34 out of 468 non-event dates). Statistical tests of the difference between these two estimated probabilities strongly reject the null hypothesis that event dates and non-event dates are equally likely to be associated with statistically significant Company-specific returns. Indeed, both the "two-sample z-test" and "Fisher's exact test," which are commonly used to conduct hypothesis tests for differences between proportions observed in categorical data, reject the null hypothesis (p-value < 0.01) in favor of the alternative that there exists a higher probability of observing statistically significant Company-specific returns on event dates. (*See, e.g.*, Agresti, Alan, *An Introduction to Categorical Data Analysis*, John Wiley & Sons, Inc., 2nd ed., 2007, Ch. 2 Contingency Tables, pp. 21–64.)

[99] *See, e.g., In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017) (stating that district court finding that directionality was not required was "within the range of permissible decisions"); *Wilson v. LSB Indus.*, 2018 U.S. Dist. LEXIS 138832, at *40 (S.D.N.Y. Aug. 13, 2018) (lack of directionality analysis did not impair usefulness of market efficiency report).

[100] The statistically insignificant impact dates are: May 9, 2017; August 3, 2017; February 6, 2018; and July 26, 2018.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 33 of 241

generally in line with expectations, and/or conveyed a mix of offsetting positive and negative information, such that the insignificant price reactions are consistent with those expected in an efficient market. Thus, my event study finds that a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting price movements in Allergan common and preferred stock.[101]

55. Based on the event study performed, I find that Allergan's common and preferred stock prices reflected the information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information, thereby supporting my conclusion that the market for each stock was efficient throughout the Class Period.

### F. Additional Factor 1: Market Capitalization

56. Courts have found that a large market capitalization (*i.e.*, the total value of a company's equity) is an indicator of market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[102] I have discussed above the fact that Allergan stock exhibited a high degree of institutional ownership and the Company was widely followed by analysts. This is consistent with Allergan's sizeable market capitalization.

---

[101] As shown in Exhibit 12, the results of my event study for Allergan preferred stock are qualitatively and quantitatively similar to those for the common stock, with each exhibiting Company-specific returns of the same direction and relative magnitude on event dates that occurred prior to the automatic conversion of the preferred stock into common stock on March 1, 2018. (*See, e.g.*, Allergan, SEC Form 424B2, dated February 26, 2015, p. S-15.) These results are consistent with market efficiency, given that the market value of the preferred stock was inextricably tethered to the market value of the common stock prior to the conversion date. Indeed, as described in §VI.I below, the common and preferred stocks exhibited a contemporaneous daily return correlation of 98.7% during the Class Period.

[102] *Krogman*, 202 F.R.D. at 478.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 34 of 241

During the Class Period, the Company's market capitalization ranged between $46.06 billion (in December 2018) and $86.03 billion (in July 2017).[103]

57. By comparison, the median market capitalization of the 1,356 companies listed on the NYSE was $2.61 billion at the end of the Class Period, while the median market capitalization of the 2,435 companies listed on the NASDAQ was approximately $317.19 million at the end of the Class Period. As of December 19, 2018 (*i.e.*, the end of the Class Period), Allergan's market capitalization was greater than 94.3% and 98.4% of NYSE-listed and NASDAQ-listed stocks, respectively. Accordingly, Allergan's high market capitalization during the Class Period weighs in favor of a finding of market efficiency.

### G. Additional Factor 2: Bid/Ask Spread

58. The *Krogman* court describes bid-ask spreads as "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares," finding that "a large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[104] As discussed above, the average and median bid/ask spreads on Allergan common and preferred stock during the Class Period were comparable to those of randomly sampled stocks listed on the NYSE.[105] The fact that Allergan's bid/ask spreads were comparable to those of other stocks listed on the NYSE supports my conclusion that Allergan common and preferred stock traded in an efficient market during the Class Period.

---

[103] *See* Exhibit 13.

[104] *Krogman*, 202 F.R.D. at 478. *See also*, *Unger*, 401 F.3d 316 at 323.

[105] *Supra* ¶43.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 35 of 241

### H. Additional Factor 3: Public Float

59. Courts have held that a large public float percentage (*i.e.*, the percentage of a security outstanding held by the public rather than insiders) may be an indicator of market efficiency.[106] During the Class Period, on average, there were approximately 336.4 million common shares outstanding, while insiders held approximately 434,068 of these shares. Accordingly, the public float of Allergan common stock was, on average, 99.9% of shares outstanding during the Class Period. On a dollar basis, the public float of the common stock ranged between $49.93 billion (December 14, 2018) and $84.64 billion (July 31, 2017).[107] For Allergan preferred stock, during the Class Period through March 1, 2018, there were 5.06 million shares outstanding. According to data provided by Thomson Reuters Eikon, no insiders held Allergan preferred stock. Accordingly, the public float of Allergan preferred stock was 100% of shares outstanding. On a dollar basis, the public float of the preferred stock ranged between $2.75 billion (February 28, 2018) and $4.52 billion (July 31, 2017).[108] The fact that the majority of Allergan common and preferred stock was held by the public as opposed to Company insiders throughout the Class Period supports a conclusion that the stocks traded in an efficient market during that time.

### I. Comparison of the Markets for Allergan Common Stock and Preferred Stock

60. As shown in Figure 1 below, the daily market values of Allergan common stock and preferred stock were highly correlated during the Class Period. Given that each of these securities represented a claim on the firm's overall equity value (*i.e.*, the value of Allergan's

---

[106] *Unger*, 401 F.3d at 323; *Bell*, 422 F.3d at 313 n.10; *Krogman*, 202 F.R.D. at 478; *O'Neil*, 165 F.R.D. at 503.

[107] *See* Exhibit 14A, which provides the public float for Allergan common stock at each mid-month and end-of-month during the Class Period.

[108] *See* Exhibit 14B, which provides the public float for Allergan preferred stock at each mid-month and end-of-month during the Class Period through March 1, 2018.

**Figure 1**

**Price Comparison between Allergan Common and Preferred Stock**




Source: Bloomberg.

assets less debt repayment), the fact that they traded in lock-step during the Class Period is entirely consistent with market efficiency. Moreover, the market value of Allergan preferred stock was inextricably tethered to the market value of the Company's common stock during the Class Period. Indeed, the preferred stock was scheduled to automatically convert into the Company's common (*i.e.*, ordinary) stock on March 1, 2018, and investors could convert their shares prior to this date subject to certain terms and conditions.[109] Thus, to the extent that both

[109] Allergan, SEC Form 10K for year-end 2017, filed February 16, 2018, pp. F-75, F-76.

Case 1:18-cv-12089-CM-GWG Document 94-1 Filed 01/31/20 Page 37 of 241

markets were informationally efficient, the contemporaneous correlation observed between the market prices of the two securities is entirely expected.

61. The high degree of relative informational efficiency exhibited by Allergan common and preferred stock is further demonstrated by: (i) a contemporaneous daily return correlation of 98.7% between the two securities; and (ii) the absence of cross autocorrelation between the two securities (*i.e.*, daily price changes of the preferred stock could not have been predicted using lagged daily price changes of the common stock, and vice versa).[110] As "correlation is a barometer of the degree to which the returns [of securities] share common risk and tend to move together," as well as the fact that "[t]he closer the correlation is to [100%], the more the returns tend to move together as a result of common risk,"[111] the high correlation observed between Allergan common and preferred stock supports my conclusion that they each traded in an informationally efficient market during the Class Period.

62. In sum, my analyses of the *Cammer* factors and additional factors set forth above, strongly demonstrate that the markets for Allergan common and preferred stock were informationally efficient during the Class Period.

## VII. Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Plaintiff's Theory of Liability

63. I have not, as of yet, been asked to provide an opinion on loss causation or to calculate Class-wide damages in this matter. I have been asked, however, to opine on whether damages can be calculated on a Class-wide basis under §10(b) of the Exchange Act for all purchases of Allergan securities during the Class Period in a manner consistent with Plaintiff's theory of

---

[110] *See* Exhibit 15.

[111] Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, Pearson Education, Inc., 2007, 1st ed., Ch. 11, pp. 328, 329.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 38 of 241

liability. In what follows, I set forth the general economic framework for quantifying per-security damages on a Class-wide basis, which reflect methodologies I would propose to use if asked to calculate damages in this matter. Although damages, if any, for each individual Class member may vary, the methodologies for calculating damages described below would be commonly applicable to each Class member in this matter.

64. An investor incurs damages when a security is acquired at a price that is inflated as a result of false or misleading statements or omissions, provided that a later corrective disclosure and/or the materialization of a concealed risk causes the price of that security to decline.[112] Price inflation in a security can be created by material misrepresentations and/or omissions on or before the date of purchase, which remain uncorrected in whole or in part at the time of purchase. Damages may be mitigated if the security is sold before the price inflation is fully dissipated, given that the investor receives the benefit of any inflation remaining at the date of sale.[113]

65. Price inflation may be measured on a Class-wide basis by analyzing the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk.[114] The decline in a security's price in response to such events reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions. An event study can be used to isolate Company-specific price movement caused by the revelation of true facts related to

---

[112] *See, e.g.*, Gold, Kevin L., Eric Korman and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," *Litigation Services Handbook, The Role of the Financial Expert*, 6th ed., Ed. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017, Ch. 27, pp. 12–17.

[113] This general economic framework for calculating recoverable damages for a class of shareholders is often referred to as the "out-of-pocket measure of damages." (*Ibid.*)

[114] *Ibid.*

the alleged fraud from price movement caused by other factors. Other factors can include changes in market and industry conditions or the dissemination of material, non-fraud-related, Company-specific information. This event study analysis applies to all Class members, regardless of the extent to which the price movement is due to corrective disclosures and/or the materialization of a concealed risk. After isolating the price impact of the alleged misstatements and omissions, one can estimate the price inflation due to the alleged fraud for each day during the Class Period, and on a Class-wide basis for each member of the Class.[115, 116]

---

[115] "Price impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud." *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013), *vacated and remanded on other grounds*, *Halliburton II*, 134 S. Ct. 2398 (U.S. 2014).

[116] *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal citations omitted, emphasis in original):

> Performing an event study can thus help an expert to determine at least two things. First, assuming that the defendant company fraudulently concealed information, the event study shows how much money the fraud caused shareholders to lose. Identifying residual returns on days when allegedly concealed information reached the market indicates that the supposedly withheld information caused the company's stock price to change. If the release of allegedly withheld information causes a stock price decrease, shareholders who purchased the defendant company's stock after the alleged fraud but before the revelation may have paid a higher price than they would have but for the defendant's fraudulent conduct — known as an "artificial[ly] inflat[ed]" price.
>
> Second, the event study helps the expert "calculat[e] what the price of [the defendant company's] security would have been had the alleged wrongful conduct not occurred," by estimating the amount of artificial inflation in the company's stock price over time. Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock. As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections. Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 40 of 241

66. Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis. For each Class member, damages incurred on a security acquired during the Class Period and retained through the end of the Class Period are equal to the amount of inflation at purchase. For a security acquired during the Class Period and sold later in the Class Period, damages are the price inflation at purchase minus the price inflation at sale. Given my understanding of the Supreme Court's ruling in *Dura*,[117] a security purchased during the Class Period and sold before the first corrective disclosure and/or the materialization of a concealed risk is ineligible for damages. Similarly, a security that is both purchased and sold between two consecutive disclosures of corrective information is ineligible for damages.

67. Finally, per-security damages should also incorporate the so-called "90-day lookback" provision of the Private Securities Litigation Reform Act of 1995,[118] which also can be applied on a Class-wide basis. This provision applies such that losses on securities purchased during the Class Period and held as of the close of the 90-day period subsequent to the Class Period (the "90-Day Lookback Period") cannot exceed the difference between the purchase price paid for the security and the average price of the security during the 90-Day Lookback Period. Losses on securities purchased during the Class Period and sold during the 90-Day Lookback Period cannot exceed the difference between the purchase price paid for the security and the rolling average price of the security during the portion of the 90-Day Lookback Period elapsed as of the date of

purchased their shares, which is equivalent to estimating the difference between what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.

[117] *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*").

[118] 15 U.S.C. § 78u–4(e).

sale. Section 10(b) damages incurred by purchasers of Allergan securities during the Class Period can be calculated on a Class-wide basis in this manner.

## VIII. Conclusion

68. In summary, the markets for Allergan common stock and preferred stock were efficient throughout the Class Period. In addition, damages can be calculated for investors who purchased or otherwise acquired Allergan securities during the Class Period using a method that is common to the Class and in a manner consistent with Plaintiff's theory of liability.

69. My work in this matter is ongoing. My opinions in this Report are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, receipt of additional documents and data, and based on further analysis of the data and materials described herein. I understand that discovery is ongoing. Should additional relevant information be provided to me, my opinions may be supplemented at a later date.

Executed on January 31, 2020, at Redwood City, California.

Zachary Nye, Ph.D.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 42 of 241

**Appendix A: Description of Regression Analyses**

70. For the purpose of examining market efficiency, I have conducted an event study for Allergan common and preferred stock to determine whether new, material, Company-specific information promptly caused measurable stock price reactions after accounting for contemporaneous market and industry effects. In an effort to isolate Company-specific effects that influenced Allergan's stock price during the Class Period, I performed regression analyses to measure the relationship between Allergan stock returns and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) changes in industry-wide factors that would be expected to impact stocks in the "Specialty Pharma" industry. By measuring how Allergan stock returns move in relation to an overall market index and an industry index, I can also measure how it responds to Company-specific news.

71. For each event date prior to and including the alleged corrective event (*i.e.*, December 19, 2018[119]), the "Control Period" used to estimate the regression equation is the calendar year immediately preceding the impact date (*i.e.*, the first trading day on which the information

[119] Complaint, ¶¶164–167.

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 43 of 241

disclosed could have impacted the market price).[120, 121] To be consistent with the academic literature, each of my Control Periods excludes the events under study.[122, 123]

72. The market index used is the S&P 500, which "includes 500 leading companies and captures approximately 80% coverage of available market capitalization."[124] This broad-based market index is commonly used by economists as a representation of the overall market, which is theoretically required by the Capital Asset Pricing Model ("CAPM"), for which famed financial economist, William Sharpe, won a Nobel Prize.[125]

---

[120] Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 545–90 at p. 568:

> The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study.

[121] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15:

> Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.

[122] *See* Exhibit 12 for a list of all the events under study.

[123] *See, e.g.*, MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15; and Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, p. 152.

[124] http://www.spindices.com/indices/equity/sp-500.

[125] The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 1990, Press Release, http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/1990/press.html:

> An important result is that the expected return on an asset is determined by the beta coefficient on the asset, which also measures the covariance between the return on the asset and the return on the market portfolio. … The CAPM is considered the backbone of modern price theory for financial markets. It is also

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 44 of 241

73. In addition to market-wide factors, my regression analyses also measure the relationship between Allergan stock returns and changes in industry-wide factors that would be expected to impact all stocks in Allergan's particular industry. In constructing the industry index, I considered: (i) companies identified as industry competitors in analyst reports published during the Class Period; (ii) companies identified by the Bloomberg Industry Classification System (BICS) as operating in the "Specialty Pharma" industry; and (iii) companies identified as peers in Allergan's SEC filings issued during the Class Period. The industry index used in this analysis is the Dow Jones US Pharmaceuticals Index,[126] to which Allergan compared its stock price performance in its SEC filings during the Class Period.[127]

74. My estimated regression equations appear in Exhibits 11A and 11C, for Allergan common and preferred stock, respectively. As indicated by the *t*-statistics corresponding to each index, Allergan stock returns exhibited a statistically significant association with both market index returns and residual industry index returns during the Class Period.[128] Exhibits 11B and 11D show Allergan's expected (*i.e.*, "predicted") and residual (*i.e.*, "Company-specific") returns estimated from the regression models on each day of the Class Period, for the common and preferred stock, respectively. Expected returns are those changes in stock prices due to market

---

> widely used in empirical analysis, so that the abundance of financial statistical data can be utilized systematically and efficiently. … Along with Markowitz' portfolio model, the CAPM has also become the framework in textbooks on financial economics throughout the world.

[126] Bloomberg ticker symbol "DJUSPRT Index."

[127] *See, e.g.*, Allergan, SEC Form 10-K, filed February 16, 2018, p. 48.

[128] Residual industry index returns are the portions of daily returns on the industry index which are not explained by market effects, as determined from a regression of industry index returns on market index returns during the Control Period. The use of residual industry index returns rather than raw returns eliminates any statistical problems due to multicollinearity. (*See* Greene, William H., *Econometric Analysis*, Prentice Hall, 2012, 7th ed., Ch. 4, p. 89.)

Case 1:18-cv-12089-CM-GWG Document 54-1 Filed 01/31/20 Page 45 of 241

and industry factors that change the values of all stocks in an economy (market effects) or in a particular industry (industry effects). Allergan's residual returns are a measure of the change in the stock price due to Company-specific events and are calculated as the difference between Allergan's actual return and its expected return.[129]

[129] Exhibits 11B and 11D also provide the confidence level for each day of the Class Period for the common and preferred stock, respectively, which measures the statistical significance of Allergan's residual returns. The confidence level associated with a given Company-specific return is measured as one minus the "*p*-value" of that return, where the *p*-value represents the conditional probability of observing a Company-specific return. Thus, consistent with the standard frequently employed by social scientists, statistical significance in context of securities litigation merely indicates that a given company-specific return is a relatively rare occurrence. (*See* Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," in Federal Judicial Center, *Reference Manual on Scientific Evidence*, National Academies Press, 2011, 3rd ed., pp. 250–252: "Statistical significance is determined by comparing a *p* [*i.e.*, the probability of getting data as extreme as, or more extreme than, the actual data—given that the null hypothesis is true] to a preset value, called the significance level." Thus, statistical significance "is merely a label for a certain kind of *p*-value.")