# EXHIBIT 5

Report of Dr. Nye in Akorn Litigation

EXHIBIT 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: AKORN, INC. SECURITIES LITIGATION | Case No. 15 C 01944<br>**Honorable Gary Feinerman** |

EXPERT REPORT OF ZACHARY NYE, PH.D.

May 5, 2017

## Table of Contents

I. Background and Qualifications....1

II. Scope of Engagement....1

III. Bases for Opinions....2

IV. Summary of Opinions....2

V. Overview of Akorn's Business Operations....3

VI. The Market for Akorn Common Stock Was Efficient Throughout the Class Period....4
- A. Cammer Factor 1: Weekly Trading Volume....10
- B. Cammer Factor 2: Number of Securities Analysts....12
- C. Cammer Factor 3: Number of Market Makers and the Potential for Arbitrage....14
- D. Cammer Factor 4: Eligibility to File SEC Form S-3....19
- E. Cammer Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship Between Unexpected Corporate Events or Financial Releases and the Price Reaction of Akorn Common Stock....21
- F. Additional Factor 1: Market Capitalization....24
- G. Additional Factor 2: Public Float....25
- H. Additional Factor 3: Autocorrelation....25

VII. Damages for Purchasers of Akorn Common Stock During the Class Period Can Be Calculated on a Class-Wide Basis....26

VIII. Conclusion....29

Appendix A: Description of Regression Analysis....30

## I. Background and Qualifications

1. I am a financial economist and Vice President at Stanford Consulting Group, Inc. ("SCG"). Since 1981, SCG has provided economic research and expert testimony for business litigation, and regulatory and legislative proceedings. All SCG professionals hold masters or doctoral degrees in business, economics, finance or operations research, and certain senior consultants have testified as experts in these fields. I have an A.B. in Economics from Princeton University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine. I have co-authored academic research published in peer-reviewed conference proceedings, as well as working papers with finance faculty at various universities. My research areas include the market efficiency of underlying and derivative securities, volatility forecasting, risk management, financial econometrics, valuation and corporate finance. I have previously served as an expert witness in matters involving securities litigation, as well as business and intellectual property valuation. My curriculum vitae, which includes my academic research, publications in the past ten years, and prior expert testimony in the past four years, is attached hereto as Exhibit 1.

2. My current hourly rate is $600. I have received assistance from individuals at SCG, who worked under my direction; their fees charged for this project are their standard hourly rates. Neither my compensation nor that of any individual at SCG is contingent on the outcome of this litigation.

## II. Scope of Engagement

3. I have been retained by Counsel for Plaintiffs in this matter to opine as to whether the common stock of Akorn, Inc. ("Akorn," or the "Company") traded in an efficient market throughout the period between May 6, 2014 and April 24, 2015, inclusive, (the "Class Period").

I also have been asked by Counsel to opine on whether damages for investors who purchased Akorn common stock during the Class Period can be calculated using a method that is common to the Class.[1]

## III. Bases for Opinions

4. My opinions are based upon my professional knowledge and experience, my review of documents and information relevant to this matter (*see* Exhibit 2), and the analyses described in this report and its exhibits. Documents, data, and other information that I have relied upon as bases for my opinions are cited in this report and its exhibits. Such documents and information are typically relied upon by financial experts in securities class actions and by financial economists in their research.

5. Counsel for Plaintiffs have informed me that the record in this matter continues to be developed. I expect to review additional facts that may become available through discovery as well as the reports and depositions of other expert witnesses. The opinions offered in this report are subject to refinement or revision based on continuing analysis of the documents and information listed above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

## IV. Summary of Opinions

6. As discussed in §VI, based on my review of the available evidence in this matter and careful analysis of data specific to Akorn relating to the efficiency factors detailed throughout this report, I conclude that the market for Akorn common stock was efficient throughout the Class Period.

[1] The claims in this action are set forth in the Consolidated Amended Class Action Complaint, dated July 5, 2016 (the "Complaint").

7. As discussed in §VII, it is my opinion that damages for investors who purchased Akorn common stock during the Class Period can be calculated using a method that is common to the Class.

## V. Overview of Akorn's Business Operations

8. Shortly before the start of the Class Period, Akorn's SEC Form 10-K stated that the Company:

> manufactures and markets a full line of diagnostic and therapeutic ophthalmic pharmaceuticals as well as niche hospital drugs and injectable pharmaceuticals. In addition, through our subsidiary Advanced Vision Research, Inc. ("AVR"), we manufacture and market a line of over-the-counter ("OTC") ophthalmic products for the treatment of dry eye under the TheraTears® brand name, as well as a portfolio of private label OTC ophthalmic products. The Company is a manufacturer and/or marketer of diagnostic and therapeutic pharmaceutical products in various specialty areas, including ophthalmology, antidotes, anti-infectives, vaccines, and controlled substances for pain management and anesthesia, among others. Our customers include physicians, optometrists, hospitals, wholesalers, group purchasing organizations, retail pharmacy chains and other pharmaceutical companies. Akorn, Inc. is a Louisiana corporation founded in 1971 in Abita Springs, Louisiana. In 1997, we relocated our corporate headquarters to the Chicago, Illinois area and currently maintain our corporate offices in Lake Forest, Illinois. We operate pharmaceutical manufacturing facilities in Decatur, Illinois and Somerset, New Jersey, and in Paonta Sahib, Himachal Pradesh, India. We also operate a Research and Development ("R&D") center in Vernon Hills, Illinois and a distribution warehouse in Gurnee, Illinois.[2]

9. Prior to the Class Period, Akorn reported its financial results for three operating segments: "ophthalmic; hospital drugs and injectables; and contract services."[3] During the Class Period, the Company completed multiple "strategic acquisitions of companies and businesses,"[4] including the acquisition of VPI Holdings Corp., Inc., the parent company of VersaPharm Inc.,

---

[2] Akorn SEC Form 10-K for year-end December 31, 2013, filed March 14, 2014, p. 4.

[3] *Ibid.*

[4] Akorn SEC Form 10-K for year-end December 31, 2014, filed March 17, 2015, pp. 5–8.

which was completed on August 12, 2014,[5] and the acquisition of Hi-Tech Pharmacal Co., Inc., "a specialty pharmaceutical company which develops, manufactures and markets generic and branded prescription and OTC products," which was completed on April 17, 2014.[6] Following these acquisitions, Akorn described itself as:

> a specialty pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals as well as animal and over-the-counter ("OTC") consumer health products. We specialize in difficult-to-manufacture sterile and non-sterile dosage forms including: ophthalmics, injectables, oral liquids, otics, topicals, inhalants, and nasal sprays.[7]

10. Following these acquisitions, the Company consisted of two operating segments: 1) the Prescription Pharmaceuticals Segment, "which represented approximately 91.5% of the Company's net sales" in 2014, selling "branded and generic prescription pharmaceuticals"; and 2) the Consumer Health Segment, which "represented approximately 8.5% of the Company's net sales" in 2014, selling "branded and private label consumer and animal health products."[8]

11. After the Class Period, in April 2017, the Company announced that it would be acquired by Fresenius Kabi for approximately $4.3 billion, or $34.00 a share, plus the assumption of approximately $450 million of debt. The acquisition is expected to close by early 2018.[9]

## VI. The Market for Akorn Common Stock Was Efficient Throughout the Class Period

12. In this case, Plaintiffs have asserted the "fraud-on-the-market" theory of reliance for certain of their claims. The "fraud-on-the-market" theory was first addressed by the U.S. Supreme Court in *Basic, Inc. v. Levinson*:

---

[5] *Id.*, pp. 5, 6.

[6] *Id.*, p. 6.

[7] *Id.*, p. 4

[8] *Ibid*.

[9] Company Press Release, "Fresenius Kabi to Acquire Akorn," April 24, 2017.

> In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[10]

13. Since *Basic*, academic economists have debated various forms of the efficient capital market hypothesis ("ECMH").[11] In 2014, the Supreme Court clarified that *Basic* did not "endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.'"[12] To the contrary, the "fraud-on-the-market" theory is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[13] Under this theory, investors' reliance on any public material misrepresentations and/or omissions may be

---

[10] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241–242 (1988).

[11] Generally speaking, academic economists consider there to be three forms of market efficiency: "weak" form; "semi-strong" form; and "strong" form market efficiency. *See* Elton, E., M. Gruber, S. Brown and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis*, Sixth Edition, John Wiley and Sons, Inc., 2007, p. 400. In fraud-on-the-market litigation, several courts reference the semi-strong form of efficiency, which implies that market prices incorporate all publicly available information. In academic finance literature, this is referred to as "informational efficiency." This hypothesis has been empirically validated in numerous studies. *See, e.g.,* Fama, Eugene F., 1970 "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, Issue 2, pp. 383–417. The ECMH also has stood up against its critics; while anomalies have occurred in financial markets, they appear to be random and do not allow for trading strategies that would create abnormal profits. *See, e.g.*, Fama, Eugene F., 1998, "Market Efficiency, Long-term Returns, and Behavioral Finance," *Journal of Financial Economics,* Vol. 49, pp. 283–306; and Malkiel, Burton G., 2003, "The Efficient Market Hypothesis and Its Critics," *Journal of Economic Perspectives,* Vol. 17, pp. 59–82.

[12] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014) ("*Halliburton II*"), quoting *Basic.*

[13] *Id.,* quoting *Basic.*

presumed for purposes of a Rule 10b-5 action since the effects of those misrepresentations and/or omissions will already be impounded in the market price.[14]

14. While the Supreme Court in *Halliburton II* stated that a market need only be "generally efficient" to invoke the "fraud-on-the-market" presumption, it did not adopt any particular test of general market efficiency.[15] Accordingly, I consider in this report direct and indirect tests of efficiency that have been commonly used in securities litigation. A direct empirical test of market efficiency is to examine price responsiveness to the release of new and material information about the company in question. If the security price responds quickly, the response supports a conclusion that the market for the security is efficient. As an indirect test of efficiency, one can examine whether market conditions promote efficiency.

15. Consistent with *Basic* and *Halliburton II*, the oft-cited decision in *Cammer v. Bloom* considered "efficient markets" to be "markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price."[16] *Cammer* identified five non-exhaustive factors that may be considered in determining whether the market for a security is efficient and, therefore, whether security prices respond quickly to new relevant information.[17] These factors include both a direct empirical test, as well as indirect indicators, of

---

[14] *Basic*, 485 U.S. at 241–242, 244, quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir. 1986); *see also*, *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804 (2011).

[15] *Halliburton II*, 134 S. Ct. at 2404.

[16] *Cammer v. Bloom*, 711 F. Supp. 1264, 1273 n.11 (D.N.J. 1989).

[17] "The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.' Indeed, not even the *Cammer* court considered the fifth factor necessary, stating only that 'it *would be helpful* to a plaintiff seeking to allege an efficient market . . . .'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015). "Different contexts require courts to place greater importance on some factors than on others. No other court has adopted a per se rule that any one factor is dispositive. At the same

market efficiency. These five factors have been widely adopted by courts throughout the country, as well as by courts within the Seventh Circuit, in evaluating market efficiency in "fraud-on-the-market" cases.[18] In forming my opinion, I have considered each of the five *Cammer* Factors as applied to Akorn common stock:[19]

*A.* whether the security trades at a large weekly volume;

*B.* whether analysts follow and report on the security;

*C.* whether the security has market makers and whether there is a potential for arbitrage activity;

*D.* whether the company is eligible to file SEC Form S-3; and

*E.* whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and a response in the security's price.

16. In addition to these five *Cammer* Factors, I have considered three additional factors that have also been considered by courts in evaluating market efficiency.[20] These additional factors are:

*F.* the company's market capitalization;

---

time, courts have found market efficiency in the absence of an event study or where the event study was not definitive." *Id., 310 F.R.D.* at 84.

[18] *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005); *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 214-217 (E.D. Pa. 2008), *aff'd* 639 F.3d 623 (3d Cir. 2011) (finding market efficiency by considering whether DVI's securities (1) were traded on a public exchange; (2) had large trading volumes; (3) were followed by market analysts; (4) had several market makers; (5) could be and were registered on SEC Form S-3; and (6) responded quickly to the release of company-specific information, as well as by considering (7) the market capitalization of the issuer; (8) the size of the public float for the security; (9) the ability to short sell the security; and (10) the level of autocorrelation). *See also, In re Groupon Inc. Sec. Litig.*, Case No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, *12, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015).

[19] *Cammer*, 711 F. Supp. at 1285–1287.

[20] *DVI, Inc.*, 249 F.R.D. at 214–217; *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

*G.* the security's public float; and

*H.* the degree of autocorrelation present in the security's returns.

17. An analysis of these factors for Akorn common stock supports a conclusion that the market for the Company's stock was informationally efficient throughout the Class Period.

18. Throughout the Class Period, Akorn common stock was listed and traded on the Nasdaq Global Select Market, which is the highest tier of the broader Nasdaq Stock Market ("NASDAQ"), under the symbol "AKRX."[21] The NASDAQ is an electronic stock market that displays the bid and ask quotes of market makers through a worldwide network of thousands of computer terminals. NASDAQ investors have access to real-time pricing and continuous trading. In addition, companies that are listed on the NASDAQ must meet certain financial, trading, and corporate governance criteria. The NASDAQ was the listing market for 2,874 and 3,010 public companies in May 2014 and April 2015, respectively.[22] The Nasdaq Global Select Market has the most stringent initial financial and liquidity listing requirements of the NASDAQ's three-market tier designations:

> The Nasdaq Stock Market has three distinctive tiers: The Nasdaq Global Select Market®, The Nasdaq Global Market® and The Nasdaq Capital Market®. Applicants must satisfy certain financial, liquidity and corporate governance requirements to be approved for listing on any of these market tiers. … [T]he initial financial and liquidity requirements for the Nasdaq Global Select Market are more stringent than those for the Nasdaq Global Market and likewise, the initial listing requirements for the Nasdaq Global Market are more stringent than those for the Nasdaq Capital Market. Corporate governance requirements are the same across all Nasdaq market tiers.[23]

---

[21] Akorn SEC Form 10-K for year-end December 31, 2015, filed May 10, 2016, p. 36.

[22] NASDAQ Trader, http://www.nasdaqtrader.com/Trader.aspx?id=MonthlyMarketSummary.

[23] http://business.nasdaq.com/Docs//Nasdaq%20Initial%20Listing%20Guide_tcm5044-13919.pdf.

19. A security's listing on a national securities exchange means that financial information about that company is readily available to investors, at a minimum, through the company's SEC filings, and that investors have access to trading prices and volumes throughout the trading day.[24] Rules of the U.S. National Market System ("NMS") also require that investor orders in NASDAQ-listed securities be filled at the best price that can be executed immediately, even if that price is available in a different market.[25] Because listing on a national securities exchange brings together many thousands (or millions) of investors, trading prices reflect a consensus opinion as to a security's value.

20. At least one authority has commented that:

> [A]t a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[26]

In the *Cammer* decision, the court stated:

> [S]ome may concur with [Defendant's] suggestion…that companies listed on national stock exchanges or companies entitled to issue new securities using SEC Form S-3 would almost by definition involve stock trading in an "open and developed" market. . . .[27]

---

[24] The Consolidated Tape Association (CTA) oversees the dissemination of real-time trade and quote information in New York Stock Exchange LLC (Network A) and BATS, NYSE Arca, NYSE MKT and other regional exchange (Network B) listed securities. Since the late 1970s, all SEC-registered exchanges and market centers that trade Network A or Network B securities send their trades and quotes to a central consolidator where the Consolidated Tape System (CTS) and Consolidated Quote System (CQS) data streams are produced and distributed worldwide. (Source: https://www.ctaplan.com/index.)

[25] Bodie, Zvi, Alex Kane and Alan J. Marcus, *Investments*, McGraw-Hill/Irwin, 2008, 7th Ed., Ch. 3, pp. 73, 74.

[26] Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, Section 8.6 (Aug. 1988) (quoted in *Cammer*, 711 F. Supp. at 1292).

[27] *Cammer*, 711 F. Supp. at 1276–1277.

21. The market for securities trading on the NASDAQ exchange is widely recognized as efficient.[28] The fact that Akorn common stock was listed and traded on a major exchange during the Class Period supports a conclusion that the market for the stock was efficient during that period.

### A. *Cammer* Factor 1: Weekly Trading Volume

22. A market for a security is liquid if investors can trade a large number of shares on demand. Liquidity allows investors to buy and sell shares quickly when their assessments about the value of a company have changed, facilitating the prompt price reaction to material new information that is characteristic of an efficient market. The large weekly trading volume of Akorn common stock during the Class Period indicates the presence of a liquid market.

23. According to the *Cammer* decision:

> [T]he existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market … because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.[29]

24. Under *Cammer*, "turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[30] During the Class Period, the number of Akorn shares issued and outstanding ranged from approximately 103.9 million to 113.9 million shares. The average weekly reported trading volume for the shares, excluding weeks not entirely contained within the Class Period, was as follows: [31]

---

[28] *Supra*, notes 26, 27.

[29] *Cammer*, 711 F. Supp. at 1286.

[30] *Cammer*, 711 F. Supp. at 1293, quoting *Bromberg*.

[31] *See* Exhibit 4 for a summary of weekly trading volume and shares outstanding.

| Akorn Common Stock | |
|---|---|
| Average Weekly Trading Volume in Dollars | $294,172,807 |
| Average Weekly Trading Volume in Shares | 7,203,270 |
| Average Weekly Share Trading Volume as a % of Shares Outstanding | 6.7% |

Thus, the average weekly reported trading volume for Akorn common stock is over three times the 2% "strong presumption" of market efficiency set out by *Cammer*.

25. I also have examined the annualized turnover ratio for Akorn common stock.[32] Based on 113.9 million shares outstanding at the end of the Class Period, the total trading volume during the Class Period implies the following annualized turnover ratio:[33]

| Akorn Common Stock | |
|---|---|
| Total Shares Traded in Class Period | 364,104,465 |
| Annualized Share Turnover | 330.7% |

26. By comparison, the average annualized turnover ratio for all stocks listed on the New York Stock Exchange ("NYSE") in 2014 and 2015 was: 57% and 65%, respectively.[34, 35] Thus, the annualized turnover ratio for Akorn common stock was more than five times greater than the average for all stocks listed on the NYSE during the Class Period.

---

[32] Annualized turnover ratio is trading volume divided by the number of shares outstanding divided by the time period in years.

[33] *See* Exhibit 4.

[34] NYSE Factbook Online, http://www.nyxdata.com/nysedata/default.aspx?tabid=115; choose "Market Activity" then "NYSE Group Turnover."

[35] To my knowledge, unlike the NYSE, NASDAQ does not publish comparable share turnover data. However, given that "[a]t minimum, there should be a presumption—probably conditional for class determination—that certain markets [including the NYSE] are developed and efficient for virtually all the securities traded there," I have compared Akorn common stock to NYSE-listed securities. (Bromberg & Lowenfels, 4 Securities Fraud and commodities Fraud, Section 8.6 (Aug. 1988), quoted in *Cammer,* 711 F. Supp at 1292.)

27. The high trading volume and high annualized turnover ratio observed during the Class Period support a conclusion that Akorn common stock traded in an efficient market during that time.

### B. *Cammer* Factor 2: Number of Securities Analysts

28. In demonstrating market efficiency, the *Cammer* decision states:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor's] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[] In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [auditor's] reports, as interpreted by the securities analysts.[36]

29. Securities analysts research and report to investors on the financial condition and prospects of a covered company. Analysts are conduits to the market for information collected from management through on-site visits, conference calls accompanying key company announcements, and other contacts with senior management. Analysts can channel new information to the market rapidly through their published reports, online reporting services, and alerts given to clients and other employees of the same investment firm. Analysts thus facilitate the dissemination of new information to investors and any corresponding share price reaction.

30. During the Class Period, several well-known investment firms followed and published research reports on Akorn, including, but not limited to: Avondale Partners; Craig Hallum; CRT Capital; Deutsche Bank Equity Research; Gabelli & Company; Guggenheim Securities; Jefferies; J.P. Morgan; Leerink Partners; Morningstar; Piper Jaffray; RBC Capital Markets; SterneAgee CRT; and William Blair & Company.[37] Over 150 analyst reports pertaining to

---

[36] *Cammer*, 711 F. Supp. at 1286.

[37] *See* Exhibit 5A.

Akorn were issued during the Class Period.[38] In addition, BOE Securities, EVA Dimensions, Goldman Sachs, Needham & Co., and Wallachbeth Capital also followed and issued reports on Akorn during the Class Period.[39] Also, Bank of America Merrill Lynch participated in Akorn's conference calls following its earnings releases.[40]

31. Financial information pertinent to Akorn was further disseminated to investors via media coverage, investor conferences, trade magazines, Company presentations and SEC filings during the Class Period. Specifically, articles concerning Akorn appeared in major U.S. and international news media, including: *Benzinga.com*; *BioSpace*; *Bloomberg*; *Business Wire*; *CQ FD Disclosure*; *Dow Jones Institutional News*; *FARS News Agency*; *GlobalData Company Profiles*; *GlobeNewswire*; *Herald & Review*; *India Pharma News*; *Investor's Business Daily*; *M&A Navigator*; *MarketResearch.com*; *News Bites - People in Business*; *Pharma Business Week*; *PR Newswire (U.S.)*; *Reuters News*; *RTT News*; *Seeking Alpha*; *Theflyonthewall.com*; *The Motley Fool*; *US Fed News*; and *US Food and Drug Administration News*.[41]

32. In addition, Akorn's filings with the SEC were publicly available online during the Class Period at no cost.[42] Akorn's SEC filings during the Class Period included its consolidated

[38] Exhibit 5B lists research reports on Akorn available from Thomson Reuters Eikon. These reports are only a subset of all reports pertaining to Akorn published during the Class Period. Certain restricted databases may carry research reports pertaining to Akorn that are not included in Exhibit 5B. Furthermore, it is my understanding that certain analyst firms do not make all their reports available through historical and/or public databases.

[39] Source: Bloomberg. *See* Exhibit 5C, which lists analysts' price targets and rating actions on selected event dates during the Class Period as reported by Bloomberg.

[40] *See Thomson Reuters Street Events* conference call transcripts for Akorn during the Class Period.

[41] Sources: Dow Jones' Factiva; Bloomberg; Internet search.

[42] The SEC's EDGAR website is located at http://www.sec.gov/edgar.shtml.

quarterly and year-end financial statements and Company press releases.[43] Akorn's financial statements, press releases and SEC filings are also made available on the Company's website.[44]

33. The coverage of Akorn by securities analysts and the amount of reporting on Akorn during the Class Period indicate that Company-specific news was widely disseminated to investors, thereby facilitating the incorporation of such information into the market price of Akorn common stock. Accordingly, this factor supports a conclusion that Akorn common stock traded in an efficient market throughout the Class Period.

### C. *Cammer* Factor 3: Number of Market Makers and the Potential for Arbitrage

34. *Cammer* Factor 3 concerns the existence of market makers and arbitrageurs who can react quickly to news and facilitate trading. As discussed below, the high number of market makers, the lack of short-selling constraints and the fact that arbitrage opportunities could have been exploited during the Class Period is evidence in support of market efficiency.

Market Makers

35. Market makers enable investors to trade promptly upon the arrival of new relevant information, thereby facilitating the incorporation of new information into securities prices. Akorn common stock was listed and traded on the NASDAQ. NASDAQ market participants are made up of market makers, order entry firms, and alternative trading systems that include electronic communication networks and unlisted trading privileges exchanges. NASDAQ allows all participants equal access to the market and to market information through a simultaneous broadcast of quotes over computer terminals to over 1.3 million users in 83 countries. Market makers are independent dealers competing for investor orders by displaying buy and sell interest

[43] Exhibit 6 includes a list of Akorn's filings with the SEC during the Class Period.

[44] *See* http://investors.akorn.com/phoenix.zhtml?c=78132&p=irol-irhome.

in NASDAQ-listed securities. Market makers help to ensure a liquid market for a particular stock; a market in which willing buyers can readily find willing sellers, and vice versa. Market makers in a particular stock stand ready to provide stock price quotations and facilitate trading by purchasing that stock from and selling to investors. They also buy and sell shares and may increase or reduce their inventory when pricing discrepancies exist. Market makers display both buy and sell quotes in all securities in which they choose to make a market and are subject to disciplinary action if they fail to honor their quoted prices.[45] Market efficiency can be facilitated by market maker involvement.

36. NASDAQ market maker activity in Akorn common stock was obtained from Bloomberg. During the Class Period, the number of active market makers trading Akorn common stock (data reported monthly from May 2014 to April 2015) was 136. In addition, many of the market makers that facilitated trading in Akorn common stock handled a sizeable volume of shares.[46] The substantial number of market makers for Akorn common stock supports a conclusion that the market for Akorn common stock was efficient during the Class Period.

<u>Arbitrage Activity</u>

37. *Cammer* Factor 3 also relates to the existence of arbitrageurs. Arbitrageurs are generally understood to be sophisticated investors who can act rapidly to take advantage of pricing discrepancies and thus ensure that market prices reflect public information—the hallmark of market efficiency.[47] The level of short interest, the high degree of institutional ownership and

---

[45] "About NASDAQ," http://www.nasdaq.com/about/about.pdf, pp. 44–46.

[46] *See* Exhibit 7 for the share volume by market maker for Akorn common stock.

[47] Arbitrage has been defined as:

> … the process of earning riskless profits by taking advantage of differential pricing for the same physical asset or security. As a widely applied investment

the tightness of bid/ask spreads for Akorn common stock suggest that arbitrage activity for the Company's stock was prevalent during the Class Period.

38. One way in which arbitrageurs can exploit mispricing in the market is by engaging in short-sale transactions. A short sale is a transaction in which an investor sells a stock that he or she does not own and then purchases that stock back in the future. If the price declines between the time a security is sold short and the time it is purchased, the short seller realizes a gain. Thus, short selling is an advantageous strategy if an arbitrageur expects a security's price to decline in the future.[48] Furthermore, short sales allow arbitrageurs that currently do not own a security to convey their negative opinions to the market, thereby helping the market to achieve a consensus as to that security's fair value given all publicly available information.

39. Arbitrageurs were not constrained in their ability to short shares of Akorn common stock. During the Class Period, the average short interest for Akorn common stock was 9.81% of its

---

> tactic, arbitrage typically entails the sale of a security at a relatively high price and the simultaneous purchase of the same security (or its functional equivalent) at a relatively low price.
>
> Arbitrage activity is a critical element of modern, efficient security markets. Because arbitrage profits are by definition riskless, all investors have an incentive to take advantage of them whenever they are discovered. Granted, some investors have greater resources and inclination to engage in arbitrage than others. However, it takes relatively few of these active investors to exploit arbitrage situations and, by their buying and selling actions, eliminate these profit opportunities. Sharpe, William F., et al., *Investments,* Prentice Hall, 1999, 6th Ed., p. 284.

[48] Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, Pearson Education, Inc., 2007, 1st Ed., Ch. 11, p. 339.

shares outstanding, and 14.20% of its public float.[49, 50] In comparison, NYSE-listed stocks had an average short interest equal to 3.25% of total shares outstanding during the Class Period.[51, 52] Furthermore, economist Gene D'Avolio has summarized the market for short-selling in the United States by examining data from April 2000 to September 2001.[53] D'Avolio estimates that in the second quarter of 2001, as much as one-quarter of the U.S. market capitalization was available as loan supply for short-selling and that 7% of that capacity was utilized. D'Avolio also finds that short interest was, on average, 2.3% of shares outstanding. That the short interest for Akorn common stock exceeded the average of NYSE-listed stocks during the Class Period, as well as the findings of the D'Avolio study, supports my conclusion that the market for the Company's stock was efficient.

---

[49] FINRA (the Financial Industry Regulatory Authority) was created in July 2007 from the consolidation of the NASD and various regulatory functions of the NYSE. It is a non-governmental organization that regulates member brokerage firms and exchange markets, and is overseen by the SEC, the ultimate regulator of the U.S. securities industry, including FINRA.

Pursuant to FINRA Rule 4560, FINRA member firms are required to report total short positions in all customer and proprietary firm accounts in all NASDAQ, NYSE, NYSE MKT, NYSE Arca, BATS, and OTC equity securities to FINRA on a semi-monthly basis. Short position filings are made online via the Regulation Filing Applications (RFA) system at https://regfiling.finra.org. Short position reports filed by member firms include the relevant exchange/market code, issue symbol, security name, and number of common shares, preferred shares, warrants, units or ADRs short for the current reporting period as of the designated settlement date. *See* http://www.finra.org/industry/short-interest/regulation-filing-applications-instructions.

[50] *See* Exhibit 8B. Public float is equal to shares outstanding less insider holdings. A comparison of short interest to public float is relevant as public float represents the shares available to lend for short sales.

[51] *See* Exhibit 8A.

[52] To my knowledge, unlike the NYSE, NASDAQ does not publish comparable market-wide short interest data, thus I have compared Akorn common stock to NYSE-listed securities. *Supra*, note 35.

[53] D'Avolio, Gene, 2002, "The market for borrowing stock," *Journal of Financial Economics*, Vol. 66, pp. 271–306.

40. Institutional ownership is another indicator of arbitrage activity. Institutional investors, such as pension funds, mutual funds and investment banks, are generally considered to be sophisticated investors that have ready access to minute-to-minute financial news and to online bulletins from analysts. Relative to most individual investors, institutions have significantly greater resources with which to analyze financial information pertinent to the securities in which they invest. Institutional ownership implies that company-specific financial information is actively reviewed by investment professionals, who in turn make buy/sell recommendations to their firm and/or client investors. In this way, the market price of a security is bid up or down to reflect all publicly available information, as interpreted by institutional investors. Moreover, because shares held by institutions are often available to borrow by short sellers, a high degree of institutional ownership relative to the level of short interest indicates a lack of short-sale constraints, thereby facilitating market efficiency by permitting short sales by arbitrageurs.[54]

41. According to data provided by Alacra On Demand, institutions held the majority of Akorn common stock during the Class Period, and over 278 institutional investors held Akorn common stock at the end of each quarter during the Class Period.[55] Additionally, institutional holdings were on average over 8 times the short interest in Akorn common stock, indicating that short selling was not constrained during the Class Period.[56]

---

[54] Asquith, Paul, Parag A. Pathak and Jay R. Ritter, 2005, "Short interest, institutional ownership and stock returns," *Journal of Financial Economics*, Vol. 78, pp. 243–76.

[55] Institutions which file Form 13F with the SEC report shares held as of the end of each calendar quarter. *See* Exhibit 9 for a summary of institutional holdings for Akorn common stock during the Class Period.

[56] The average number of shares held by institutions during the Class Period was approximately 86.3 million shares; the average short interest was approximately 10.5 million shares.

42. Another indicator of the potential for arbitrage activity to correct market inefficiencies (*i.e.*, arbitrage opportunities) is the size of bid/ask spreads. Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily. As shown in the following table, the average and median bid/ask spreads on Akorn common stock during the Class Period were comparable to those of a random sample of stocks listed on the NASDAQ Global Select Market.[57]

| | Akorn Common Stock | | NASDAQ Sample | |
|---|---|---|---|---|
| | Spread ($) | Spread (%) | Spread ($) | Spread (%) |
| Average: | $0.01 | 0.04% | $0.06 | 0.26% |
| Median: | $0.01 | 0.03% | $0.05 | 0.21% |

43. The fact that the bid/ask spreads on Akorn common stock were lower than the sample of stocks listed on the NASDAQ Global Select Market supports a conclusion that the market for Akorn common stock was efficient during the Class Period.

### D. *Cammer* Factor 4: Eligibility to File SEC Form S-3

44. The *Cammer* court discussed the relationship between S-3 eligibility and efficiency, noting that "[t]he issue is not whether [the company] recently completed a public offering, but whether, if it did, it would enjoy the benefit of making abbreviated prospectus disclosure because the SEC viewed it to be in an efficient market where documents 'on file' could be deemed to be known by the investment community."[58]

45. Form S-3 is a simplified registration form that may be used by a U.S. company that meets the following requirements:

---

[57] The bid/ask spread analysis reported in Exhibit 10 compares the bid/ask spreads of Akorn common stock on each day during the Class Period to those of 100 randomly selected stocks listed on the NASDAQ Global Select Market.

[58] *Cammer*, 711 F. Supp. at 1284.

a. it has been subject to the Securities Exchange Act of 1934 reporting requirements for more than one year;

b. it has filed all required documents in a timely manner during the prior twelve months;

c. it has not, since the last audited statements, failed to pay required dividends or sinking fund installments on preferred stock, or defaulted on debts or material leases; and

d. it meets certain minimum stock requirements.[59, 60]

Companies eligible for filing on Form S-3 are permitted to incorporate prior filings by reference into current filings, and need not repeat such information since it is already widely available to the public.

46. It is the SEC's view that these S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—have already disseminated information to the marketplace, and, therefore, that the market operates efficiently for them.[61] Courts have also stated that the ability to file Form S-3 is an indicator of market efficiency:

> Corporations permitted to use the S-3 form are thus presumed to be actively traded and widely followed. *See Harman*, 122 F.R.D. at 525. Therefore, a company's ability to file an S-3 Registration Statement points to market efficiency.[62]

---

[59] http://www.sec.gov/about/forms/forms-3.pdf.

[60] Prior to January 28, 2008, the SEC required a minimum of $75 million in stock be held by non-affiliates. Effective January 28, 2008, a company with a non-affiliate public float of less than $75 million is permitted to file Form S-3 with certain restrictions. *See* Securities and Exchange Commission, 17 CFR Parts 230 and 239 [Release No. 33-8878; File No. S7-10-07], RIN 3235-AJ89, Revisions to the Eligibility Requirements for Primary, Securities Offerings on Forms S-3 and F-3.

[61] SEC Securities Act Release No. 6331 (August 18, 1981), pp. 5, 6.

[62] *Krogman,* 202 F.R.D. at 476.

47. Akorn filed multiple Form S-3s prior to the Class Period, indicating it was eligible to file Form S-3 during the Class Period.[63] That Akorn was eligible to file Form S-3 throughout the Class Period supports a conclusion that the market for its stock was efficient.

### E. *Cammer* Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship Between Unexpected Corporate Events or Financial Releases and the Price Reaction of Akorn Common Stock

48. *Cammer* Factor 5 relates to how a security reacts to new information. The *Cammer* court stated that:

> … one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between the company disclosures and resulting movements in stock price.[64]

49. A direct test of market efficiency is to conduct what is known as an "event study" to examine whether security prices respond to new material information released to the market. Expert economists commonly use event studies in securities litigation to correlate the disclosure of new material information to security price response. Event studies comprise numerous steps, including: (i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v) interpretation of empirical

---

[63] Akorn filed a Form S-3 or Form S-3/A on August 23, 2005; April 14, 2006; November 14, 2006; December 5, 2007; June 19, 2009; October 1, 2009; and October 14, 2009. Source: Edgar Pro (pro.edgar-online/com).

[64] *Cammer*, 711 F. Supp. at 1291.

results.[65] Academic research acknowledges that some variation in approaches to event studies is permitted.[66]

50. I performed a standard event study for Akorn common stock to determine whether corporate financial releases promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects. As set forth in Exhibit 11, my event study clearly demonstrates a cause-and-effect relationship between Company disclosures and resulting movements in Akorn's stock price during the Class Period. The regression analyses used in the event study are described in Appendix A and Exhibit 12.

51. To determine which events to include in my analysis, I relied on my knowledge of event study literature that has evaluated what types of information affect stock prices. Specifically, I examined dates on which Akorn disclosed information related to its quarterly or year-end financial results. Such earnings announcements are an easily identified and objective set of events to examine, which has been shown in the academic finance literature to impact stock

---

[65] As described by Mitchell and Netter:

> The execution of an event study is quite simple. It involves the identification of an event that causes investors to change their expectations about the value of a firm. The investigator compares a stock price movement contemporaneous with the event to the expected stock price movement if the event had not taken place. There are three basic steps in conducting an event study: (i) define the event window; (ii) calculate abnormal stock price performance around the event; and (iii) test for statistical significance of the abnormal stock price performance.

*See* Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 557, 558.

[66] However, "[w]hile there is no unique structure, the analysis can be viewed as having seven steps." Those steps are event definition, selection criteria, normal and abnormal returns, estimation procedure, testing procedure, empirical results, and interpretation and conclusion. *See* Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, pp. 150–152.

prices.[67] Exhibit 11 describes each of my selected event dates in detail and discusses how the observed price reactions in Akorn common stock are consistent with those expected in an efficient stock market.[68]

52. Out of the seven dates I examined, five (or 71%) are associated with a statistically significant Company-specific return at or above the 95% confidence level (two statistically significant positive returns,[69] and three statistically significant negative returns[70]). Given that my sample contains over 14 times as many statistically significant dates as should be expected from a randomly selected seven-day sample during the Class Period (at or above the 95% confidence level), it is clear that Akorn's stock price typically reacted more strongly on the event dates than on non-event dates during the Class Period.[71] Furthermore, my review of the news and analyst reports demonstrates that each event date on which material new *positive* Company-specific news reached the market is associated with a statistically significant *positive* return, and that each event date on which material new *negative* Company-specific news reached the market is associated with a statistically significant *negative* return. For the event dates that are associated with a statistically insignificant Company-specific return,[72] the Company's financial results were generally in line with market expectations and/or the information released was neutral or mixed,

---

[67] *See*, *e.g.*, Ball, R., and P. Brown, 1968, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, pp. 159–78.

[68] For each event date, Exhibit 11 contains the associated stock price movements, both observed and net of market and industry effects, and well as an indicator of statistical significance at the 95% confidence level.

[69] February 26, 2015 and March 18, 2015.

[70] November 6, 2014; March 3, 2015; and April 27, 2015.

[71] At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time. Thus, one should expect a random sample of 7 days to contain 0.35 days that are statistically significant.

[72] May 6, 2014 and August 5, 2014.

such that the insignificant stock price reactions are consistent with those expected in an efficient market. Thus, my event study finds that a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting stock price movements.

53. Based on the event study performed, I find that Akorn's stock price reflected the information disclosed to the market, and promptly responded to material, unexpected news. The event study supports a conclusion that the market for Akorn common stock was efficient throughout the Class Period.

### F. Additional Factor 1: Market Capitalization

54. Courts have found that a large market capitalization (*i.e.*, the total value of a company's equity) may be an indicator of market efficiency because investors have a greater incentive to purchase the stock of more highly capitalized corporations.[73] I have discussed above the fact that Akorn common stock exhibited substantial institutional ownership and was widely followed by analysts. This is consistent with Akorn's relatively high market capitalization. The market capitalization of Akorn common stock ranged from a high of $6.37 billion in April 2015 to a low of $2.39 billion in May 2014.[74]

55. By comparison, the median market capitalization of the roughly 2,300 companies listed on the NASDAQ ranged from $299.7 million at the start of the Class Period to $334.5 million at the end of the Class Period. As of year-end 2014, Akorn's equity market capitalization was greater than 89.8% of NASDAQ-listed stocks. According to the *DVI* court, a finding of "high

---

[73] *DVI, Inc.*, 249 F.R.D. at 212, *quoting Krogman*, 202 F.R.D. at 478.

[74] *See* Exhibit 13.

market capitalization as compared to the broader survey of publicly traded companies weighs in favor of a finding of market efficiency."[75]

**G. Additional Factor 2: Public Float**

56. Courts have held that a large public float percentage (*i.e.*, the percentage of shares outstanding held by the public rather than insiders) may be an indicator of market efficiency.[76] During the Class Period, there were between 103.9 million and 113.9 million Akorn shares outstanding, and insiders held between 31.6 million and 34.5 million of these shares. Accordingly, the public float of Akorn common stock ranged from 67.9% to 69.7% of total shares outstanding during the Class Period.[77]

57. The fact that that majority of the shares were held by the public as opposed to Company insiders throughout the Class Period supports a conclusion that Akorn common stock traded in an efficient market during that time.

**H. Additional Factor 3: Autocorrelation**

58. "A security exhibits autocorrelation if the change in price of the security on a given day provides an indication of what the change in price for the security will be on the following day."[78] Courts have found that a lack of autocorrelation in security returns may be an indicator of market efficiency since "if new information about a company is incorporated slowly into the price of a security, then the security will exhibit autocorrelation, suggesting an inefficient

---

[75] *DVI, Inc.*, 249 F.R.D. at 212.

[76] *Unger*, 401 F.3d at 323; *Bell*, 422 F.3d at 313 n.10; *Krogman*, 202 F.R.D. at 478; *O'Neil v. Appel*, 165 F.R.D. 479, 503 (W.D. Mich. 1996).

[77] *See* Exhibit 14.

[78] *DVI, Inc.*, 249 F.R.D. at 213; *see also In re PolyMedica Corp. Sec. Litig.,* 453 F. Supp. 2d 260, 276-277 (D. Mass. 2006).

market."[79] The first-order autocorrelation coefficient for Akorn common stock returns, which measures the correlation between a given trading day's (day *t*'s) return and the return from the previous trading day (day *t*-1), was a statistically insignificant -0.01 during the Class Period.[80] Thus, Akorn common stock did not exhibit autocorrelation during the Class Period, suggesting it traded in an efficient market during that time.

## VII. Damages for Purchasers of Akorn Common Stock During the Class Period Can Be Calculated on a Class-Wide Basis

59. I have not, as of yet, been asked to provide an opinion on loss causation or to calculate Class-wide damages in this matter. I have been asked, however, to opine on whether damages for investors who purchased Akorn common stock during the Class Period can be calculated on a Class-wide basis. Although damages, if any, for each individual Class member may vary, the method of calculating damages is common to the Class. In what follows, I set forth the general economic framework for quantifying per-share damages on a Class-wide basis.

60. An investor incurs damages when a security is acquired at a price that is inflated as a result of false or misleading statements or omissions, provided that a later corrective disclosure and/or materialization of concealed risk causes the price of that security to decline. Price inflation in a security can be created by material misrepresentations and/or omissions on or before the date of purchase, which remain uncorrected in whole or in part at the time of purchase. Damages may be mitigated if the security is sold before the price inflation is fully dissipated, given that the investor receives the benefit of any inflation remaining at the date of sale.

---

[79] *DVI, Inc.*, 249 F.R.D. at 213.

[80] *See* Exhibit 15.

61. Price inflation may be measured on a Class-wide basis by analyzing the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk. The decline in a security's price in response to such events reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions. An event study can be used to isolate Company-specific price movement caused by the revelation of the alleged fraud from price movement caused by other factors. Other factors can include changes in market and industry conditions or the dissemination of material non-fraud-related, Company-specific information. After isolating the price impact of the alleged misstatements and omissions, one can estimate the price inflation due to the alleged fraud for each day during the Class Period, and on a Class-wide basis for each member of the Class.[81, 82]

---

[81] "Price impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud." *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013), *vacated and remanded on other grounds*, *Halliburton II*, 134 S. Ct. 2398 (U.S. 2014).

[82] *In re Pfizer, Inc. Sec. Litig.*, Case No. 14-2853-cv (2d Cir. Apr. 12, 2016), pp. 16, 17 (internal citations omitted):

> Performing an event study can thus help an expert to determine at least two things. First, assuming that the defendant company fraudulently concealed information, the event study shows how much money the fraud caused shareholders to lose. Identifying residual returns on days when allegedly concealed information reached the market indicates that the supposedly withheld information caused the company's stock price to change. If the release of allegedly withheld information causes a stock price decrease, shareholders who purchased the defendant company's stock after the alleged fraud but before the revelation may have paid a higher price than they would have but for the defendant's fraudulent conduct — known as an "artificial[ly] inflat[ed]" price.
>
> Second, the event study helps the expert "calculat[e] what the price of [the defendant company's] security would have been had the alleged wrongful conduct not occurred," by estimating the amount of artificial inflation in the company's stock price over time. Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information

62. Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis. For each Class member, damages incurred on a security acquired during the Class Period and retained through the end of the Class Period are equal to the amount of inflation at purchase. For a security acquired during the Class Period and sold later in the Class Period, damages are the price inflation at purchase minus the price inflation at sale. Given my understanding of the Supreme Court's ruling in *Dura*,[83] a security purchased during the Class Period and sold before the first corrective disclosure and/or materialization of a concealed risk is ineligible for damages. Similarly, a security that is both purchased and sold between two sequential disclosures of corrective information is ineligible for damages.

63. Finally, per-share damages should also incorporate the so-called "90-day lookback" provision of the Private Securities Litigation Reform Act of 1995, which also can be applied on a Class-wide basis. This provision applies such that losses on securities purchased during the Class Period and held as of the close of the 90-day period subsequent to the Class Period (the "90-Day Lookback Period") cannot exceed the difference between the purchase price paid for the security and the average price of the security during the 90-Day Lookback Period. Losses on securities purchased during the Class Period and sold during the 90-Day Lookback Period cannot

---

inflated the defendant company's stock. As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections. Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.

[83] *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*").

exceed the difference between the purchase price paid for the security and the rolling average price of the security during the portion of the 90-Day Lookback Period elapsed as of the date of sale. Damages incurred by purchasers of Akorn common stock during the Class Period can be calculated on a Class-wide basis in this manner.

## VIII. Conclusion

64. In summary, the market for Akorn common stock was efficient throughout the Class Period and damages for investors who purchased Akorn common stock during the Class Period can be calculated using a method that is common to the Class.

65. My work in this matter is ongoing. My opinions in this report are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, and receipt of additional documents and data, and based on further analysis of the data and materials described herein. I understand that discovery is ongoing. Should additional relevant information be provided to me, my opinions may be supplemented at a later date.

Executed on May 5, 2017, at Redwood City, California.

Zachary Nye, Ph.D.

**Appendix A: Description of Regression Analysis**

66. For the purposes of examining market efficiency, I have conducted an event study to determine whether new, material, Company-specific information promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects. In an effort to isolate Company-specific effects that influenced Akorn's stock price during the Class Period, I performed a regression analysis to measure the relationship between Akorn common stock returns and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) changes in industry-wide factors that would be expected to impact stocks in the "Specialty Pharma" and "Generic Pharma" industries. By measuring how Akorn common stock returns move in relation to an overall market index and an industry index, I can also measure how it responds to Company-specific news.

67. For each event prior to the first alleged corrective disclosure on March 2, 2015, the "Control Period" used to estimate the regression equation is the calendar year immediately preceding the impact date (*i.e.*, the first trading day on which the information disclosed could have impacted the market price).[84, 85] To be consistent with the academic literature, each of my

---

[84] Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 545–90 at p. 568:

> The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study.

[85] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15:

> Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is

Control Periods exclude the events under study.[86, 87] Further, in order to prevent the disclosure of the alleged fraud from contaminating my normal return measure, and in turn my estimate of abnormal return volatility, the Control Period used for each event subsequent to the first alleged corrective disclosure is the calendar year immediately preceding March 2, 2015.[88, 89]

68. The market index used is the S&P 500, which "includes 500 leading companies and captures approximately 80% coverage of available market capitalization."[90] This broad-based market index is commonly used by economists as a representation of the overall market, which is

---

> not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.

[86] *See* Exhibit 11 for a list of all the events under study.

[87] *See, e.g.,* MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15; and Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, p. 152.

[88] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15:

> Appraisal of the event's impact requires a measure of the abnormal return. The abnormal return is the actual ex post return of the security over the event window minus the normal return of the firm over the event window. The normal return is defined as the expected return without conditioning on the event taking place.

[89] Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, p. 158:

> It is typical for the estimation window and the event window not to overlap. This design provides estimators for the parameters of the normal return model which are not influenced by the event-related returns. Including the event window in the estimation of the normal model parameters could lead to the event returns having a large influence on the normal return measure. In this situation both the normal returns and the abnormal returns would reflect the impact of the event. This would be problematic since the methodology is built around the assumption that the event impact is captured by the abnormal returns.

[90] http://www.spindices.com/indices/equity/sp-500.

theoretically required by the Capital Asset Pricing Model ("CAPM"), for which famed financial economist, William Sharpe, won a Nobel Prize.[91]

69. In addition to market-wide factors, my regression analysis also measures the relationship between Akorn common stock returns and changes in industry-wide factors that would be expected to impact all stocks in Akorn's particular industry. In constructing the industry index, I considered: (i) companies identified as industry competitors in analyst reports published during the Class Period; (ii) companies identified by the Bloomberg Industry Classification System (BICS) as operating in the "Specialty Pharma" and "Generic Pharma" industries; and (iii) companies identified as peers in Akorn's SEC filings issued during the Class Period. In this analysis, the industry index is comprised of the constituent stocks of the NASDAQ Health Care Index, to which Akorn compared its stock price performance in its SEC filings during the Class Period.[92] To be included in the industry index, the company's stock must have pricing

---

[91] The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 1990, Press Release, http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/1990/press.html:

> An important result is that the expected return on an asset is determined by the beta coefficient on the asset, which also measures the covariance between the return on the asset and the return on the market portfolio. …The CAPM is considered the backbone of modern price theory for financial markets. It is also widely used in empirical analysis, so that the abundance of financial statistical data can be utilized systematically and efficiently. …Along with Markowitz' portfolio model, the CAPM has also become the framework in textbooks on financial economics throughout the world.

[92] Akorn SEC Form 10-K for year-end December 31, 2014, filed March 17, 2015, p. 28.

information available during the Class Period and must have been traded on a U.S. exchange.[93, 94]

70. My estimated regression equations for the stock are provided in Exhibit 12B. As indicated by the *t*-statistics corresponding to each index, Akorn common stock returns exhibited a statistically significant association with both market index returns and residual industry index returns during each Control Period.[95] Exhibit 12A shows Akorn's expected and residual returns estimated from the regression model on each day of the Class Period. Expected returns are those changes in stock prices due to market and industry factors that change the values of all stocks in an economy (market effects) or in a particular industry (industry effects). Akorn's residual returns are a measure of the change in the stock price due to Company-specific events and are calculated as the difference between Akorn's actual return and its expected return.[96]

---

[93] Given time differences between closing prices observed on stock exchanges in different countries, which can bias regression results due to the so called "nonsynchronous trading effect," stocks traded on foreign exchanges have been excluded from my regression analysis. Nonsynchronous trading effects "can create a false impression of predictability in price changes and returns even if true price changes or returns are statistically independent." (*See* Campbell, John Y., Andrew W. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, p. 84)

[94] The industry index is comprised of the stocks listed in Exhibit 12C.

[95] Residual industry index returns are the portions of daily returns on the industry index which are not explained by market effects, as determined from a regression of industry index returns on market index returns during the Control Period. The use of residual industry index returns rather than raw returns eliminates any statistical problems due to multicollinearity. (*See* Greene, William H., *Econometric Analysis*, Prentice Hall, 2012, 7th Ed., Ch. 4, p. 89.)

[96] Exhibit 12A also provides the confidence level for each day of the Class Period, which measures the statistical significance of Akorn's residual returns. The confidence level associated with a given Company-specific return is measured as one minus the "p-value" of that return, where the p-value represents the conditional probability of observing a Company-specific return. Thus, consistent with the standard frequently employed by social scientists, statistical significance in context of securities litigation merely indicates that a given company-specific return is a relatively rare occurrence. (*See* Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," in Federal Judicial Center, *Reference Manual on Scientific Evidence*,

National Academies Press, 2011, 3rd Ed., pp. 250–252: "Statistical significance is determined by comparing a *p* [*i.e.*, the probability of getting data as extreme as, or more extreme than, the actual data—given that the null hypothesis is true] to a preset value, called the significance level." Thus, statistical significance "is merely a label for a certain kind of *p*-value.")